# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## MEMPHIS DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION<br><br>This Document Relates to:<br>IN RE REGIONS MORGAN KEEGAN OPEN-END MUTUAL FUND LITIGATION<br>No. 2:07-cv-02784-SHM-dkv | MDL Docket No. 2009<br><br>Judge Samuel H. Mays, Jr.<br><br>Magistrate Judge Diane K. Vescovo<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 6

I.  JURISDICTION AND VENUE .......................................................... 9

II.  PARTIES ............................................................................................ 9

III.  CLASS ACTION ALLEGATIONS ................................................. 39

IV.  STATEMENT OF FACTS: ALL DEFENDANTS ........................... 45

    A.  THE FUNDS AND THEIR LOSSES ..................................... 45

    B.  THE FUNDS' PERFORMANCES COMPARED WITH THEIR RESPECTIVE PEERS 54

    C.  DEFENDANTS' UNDISCLOSED AND MISREPRESENTED RISKS AND VIOLATIONS OF THE FUNDS' INVESTMENT OBJECTIVES, POLICIES AND RESTRICTIONS ..................................................... 64

        1.  The RMK Defendants Did Not Limit the Funds' Investments in Illiquid Securities, as They and the Funds Represented They Would.. 64

        2.  The Funds' Uncertain Net Asset Value ............................... 95

        3.  The Funds' Extraordinary Credit Risk ............................. 125

        4.  The RMK Defendants Did Not Maintain the Funds' NAV Stability, as They and the Funds Represented They Would. ............................ 167

        5.  The RMK Defendants Did Not Limit the Funds' Investments in a Single Industry, as They and the Funds Represented that They Would. .................................................................. 169

        6.  The RMK Defendants Caused the High Income and Intermediate Funds to Misrepresent the Percentage of Asset-Backed Securities Held by Them ................................................................... 173

        7.  The RMK Defendants Did Not Limit the Funds' Use of Leverage, as They and the Funds Represented They Would .................................. 176

    D.  THE MATERIALIZATION OF THE FUNDS' UNDISCLOSED EXTRAORDINARY CREDIT, CONCENTRATION, LIQUIDITY, VALUATION AND LEVERAGE RISKS CAUSED THE FUNDS' LOSSES ..................................................... 181

    E.  REGIONS FORESAW THE SUBPRIME DEBACLE IN 2006, AND THE RMK DEFENDANTS KNEW OF THE RISKS OF THE ILLIQUID SUBPRIME SECURITIES PURCHASED BY THE FUNDS ..................................................... 193

        1.  Regions' Subprime Prescience ......................................... 193

2. RMK Defendants' Knowledge of the Extraordinary Risks of the Subprime Securities Purchased by the Funds.....................................196

3. Kelsoe and Devaney/UCM: the RMK Defendants Knew the Funds Were Purchasing Illiquid Highly Risky Securities.............................197

F. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ............................201

1. High Income Fund.............................................................................201

2. Intermediate Bond Fund....................................................................208

3. Short Term Fund ...............................................................................219

4. The Funds' Prospectuses Omitted Additional Material Facts............227

5. The Funds' Misleading Statements of Additional Information .........228

6. The Funds' Misleading Safety/Volatility Disclosures .......................235

G. IDENTICAL DISCLOSURES BUT DISPARATE PERFORMANCES; DISPARATE DISCLOSURES BUT IDENTICAL PERFORMANCES: A COMPARISON OF THE PROSPECTUSES FOR THE RMK FIXED INCOME OPEN- AND CLOSED-END FUNDS ..................................................................................................245

V. STATEMENT OF FACTS: PwC ......................................................................250

A. PwC'S REQUIRED KNOWLEDGE, RESPONSIBILITIES AND DUTIES .............250

1. Generally ..........................................................................................250

2. Pricing and Valuation of the Funds' Thinly Traded Structured Financial Instruments .......................................................................254

3. The Use of and Need for Good Faith Fair Value Procedures; Valuation Uncertainty .......................................................................264

4. The Funds' Noncompliance with Their Investment Restrictions.......272

5. Concentration of Credit Risk ............................................................275

6. The Risks of Material Misstatements Due to Fraud...........................276

B. PwC'S DISCLOSURE AND REPORTING OBLIGATIONS..................................281

C. PwC'S FALSE DIRECT REPRESENTATIONS .................................................284

D. THE FUNDS' 2004, 2005 AND 2006 FINANCIAL STATEMENTS WERE NOT PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND DID NOT INCLUDE ALL REQUIRED FINANCIAL STATEMENT DISCLOSURES..................................................................................................294

E.   PwC's Audits of the Funds' 2004, 2005 and 2006 Financial Statements Were Not Conducted in Accordance with Generally Accepted Auditing Standards ............................................................299

VI.   DIRECTORS' DUTIES; RMK ORGANIZATION, RELATIONSHIPS AND Conflicts; STATUTORY POLICY, SAFE HARBOR........................... 319

A.   Duties of the Defendant Directors ......................................319

B.   The Intertwined Organizational and Contractual relationship between Morgan Keegan, Morgan Management, Regions Bank and Regions Financial' ........................................................321

1.   The Investment Advisory Agreement ...............................321

2.   The Underwriting Agreement ...........................................322

3.   The Fund Accounting Service and Administration Agreements .......323

4.   The Investment Advisory Service Agreements.................329

5.   Regions Morgan Keegan Held Itself Out as a Single Unified Enterprise ...................................................................331

C.   The RMK Defendants' Duty to the Fiduciary Accounts and Conflicting Interests...........................................................338

D.   The Federal Statutory Policy Relating to Registered Investment Companies...........................................................341

E.   No Statutory Safe Harbor ...............................................342

VII.   CLAIMS ...............................................................................343

COUNT I. Violation of The Securities Act of 1933 § 11: All Defendants except Defendant Directors and Officers, Regions and MK Holding...........................................................................346

COUNT II. Violation of the Securities Act of 1933 § 12(a)(2): All Defendants except Regions , PwC and MK Holding.......................352

COUNT III. Liability Under the Securities Act §15: All Defendants except Company/Funds and PwC .......................................354

COUNT IV. Violation of Investment Company Act §§ 13, 22, 30, 34(b), 47(b): All Defendants ...........................................................356

COUNT V. Violation of Securities Exchange Act of 1934 § 10(b) and Rule 10b-5:FUNDS, Morgan Management, Morgan Keegan and Regions360

4

COUNT VI. VIOLATION OF SECURITIES EXCHANGE ACT OF 1934 §§ 10(b) AND
    RULE 10b-5: REGIONS BANK, MORGAN KEEGAN, AND MORGAN
    MANAGEMENT – FIDUCIARY SUBCLASS ......................................................362

COUNT VII . LIABILITY UNDER THE SECURITIES EXCHANGE ACT §20:
    DEFENDANT OFFICERS AND DIRECTORS, REGIONS, HOLDING....................363

PRAYER FOR RELIEF .................................................................................................366

DEMAND FOR JURY TRIAL .....................................................................................366

APPENDIX A...............................................................................................................368

APPENDIX B ...............................................................................................................369

APPENDIX C................................................................................................................378

APPENDIX D................................................................................................................380

APPENDIX E ...............................................................................................................381

APPENDIX F ...............................................................................................................383

## INTRODUCTION

Plaintiffs, individually and on behalf of all other persons similarly situated for their Consolidated Amended Class Action Complaint against defendants allege as follows:

1.      This action was initiated on December 6, 2007. Plaintiffs filed their First Amended Complaint on February 4, 2008 (Dkt. # 53). This Complaint is filed following the Court's orders dated September 23, 2008 (Dkt. # 154) and September 30, 2009 (Dkt. # 211), consolidating the actions herein and appointing lead plaintiff and approving lead plaintiffs' selection of lead and liaison counsel. The actions consolidated herein include *Atkinson v. Morgan Asset Management, Inc.*, No. 07-2784; *Willis v. Morgan Keegan & Company, Inc*., No. 07-2830; *Hartman v. Morgan Keegan & Company, Inc*., (except with respect to Regions Morgan Keegan Multi-Sector High Income Fund, Inc.), No. 08-2071; *Daniels, Trustee ad Litem v. Morgan Asset Management, Inc.*, No. 08-2454 and "all other substantively related actions arising out of or related to the same facts as alleged, or involving claims similar to those alleged, in the [foregoing] actions, which have been filed, may be filed, or are transferred to this Court."

2.      This is an action:

(a)      By plaintiffs, on behalf of themselves and all other persons similarly situated,

(1)      Who purchased one or more classes of shares of Regions Morgan Keegan Select Short Term Bond Fund ("Short Term Fund"), Regions Morgan Keegan Select Intermediate Bond Fund ("Intermediate Fund") and/or Regions Morgan Keegan Select High Income Fund ("High Income Fund") (together, "the Funds"), during the period December 6, 2004 through December 6, 2007, or

(2)      Who refrained from redeeming the Funds' shares during the period from March 1, 2007 through April 30, 2008,

(b)      Against the Funds and their investment adviser, officers and directors, distribu-

tor of the Funds' shares, the Funds' accounting administrator, an affiliated trust company that advised investors to purchase, or purchased on behalf of its trust accounts, or provided information to the Funds' shareholders to enable them to decide whether to redeem or otherwise participated in the distribution of the Funds' shares, or had a duty to cause their trust accounts to redeem, the Funds' shares, the controlling persons of such entities, and the Funds' auditor,

(c)    For violations of the disclosure, reporting and other requirements of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

3.    The Funds and the defendants misrepresented or failed to disclose material facts relating to (i) the nature of the risks being assumed by an investment in the Funds, (ii) the illiquidity of certain securities in which the Funds invested, (iii) the extent to which the Funds' portfolios contained securities that were illiquid or exhibited the characteristics of illiquid securities so that they were highly vulnerable to suddenly becoming unsalable at the estimated values at which they were being carried on the Funds' records, (iv) the extent to which the Funds' portfolios were subject to fair value procedures, (v) the extent to which the values of such securities, and, consequently, the net asset values ("NAVs") of the Funds, were based on estimates of value and the uncertainty inherent in such estimated values, (vi) the extraordinary credit risk embedded in the Funds, (vii) the leverage risk carried by the Funds, (viii) the concentration of investments in a single industry and (ix) the attendant violations by the Funds of their respective investment objectives, policies and restrictions.

4.    Defendants did not disclose the concentration, credit, liquidity and valuation risks and uncertainties being taken by the Funds and investors therein as a result of the Funds investing an extraordinarily large (as compared with their respective peer funds) portion of their respective portfolios in complex, thinly traded, market-untested securities of uncertain valuation that had a history of suddenly becoming unsalable at their estimated values

7

upon shifting market sentiments, which risks materialized in 2007 and 2008 to cause the Funds' shareholders' catastrophic losses.

5.     The risks taken on by the Funds materialized in 2007 and 2008 and caused the Funds' shareholders' losses: the total net assets of the three Funds dropped from $2.2 billion at December 31, 2006, to $372.5 million at December 31, 2007, attributable approximately equally to the loss in the values of the Funds' investments and net redemptions caused by the Funds' plummeting net asset values. The net asset value per share of the Short Term, Intermediate and High Income Funds dropped 23%, 70% and 72% respectively during 2007 and early 2008.

6.     The direct cause of these investment losses was the improper and unauthorized composition of these Funds' portfolios that exposed the Funds to much higher concentration, credit, liquidity and valuation risks than (i) allowed by their respective investment objectives, policies and restrictions, (ii) advertised and disclosed, and (iii) their respective peers.

7.     Morgan Keegan officials, speaking on "background," have said that it isn't logical for investors to receive the above-market returns they once enjoyed without above-market risks. *The Commercial Appeal*, July 22, 2009, p. C2. These officials thus admit knowing that the Company/Funds were taking on above-market risks, but these risks were neither undisclosed nor allowed by the Funds' stated respective investment objectives, policies and restrictions.

8.     Plaintiffs, by their undersigned attorneys, bring this action upon personal knowledge as to themselves and their own acts, upon the investigation conducted by Plaintiffs' counsel as to all other matters, including analysis of publicly available news articles and reports, public filings with the Securities and Exchange Commission ("SEC"), review of various web sites and Internet information sources (including the Morgan Keegan Funds and Regions Financial websites), news reports, press releases and other matters of public record, prospectuses, statements of additional information ("SAIs"), annual, semi-annual, and quar-

8

terly reports issued by and on behalf of the Funds, proxy statements, sales materials, and upon information and belief.

## I.     JURISDICTION AND VENUE

9.     This action arises under:

(a)     The Securities Act of 1933, as amended, 15 U.S.C. §§ 77a *et seq.* (the "Securities Act" or "'33 Act"), and, in particular, §§ 11, 12(a)(2) and 15, 15 U.S.C. §§ 77k, 77*l* and 77o, and Rule 156, 17 C.F.R. § 230.156;

(b)     The Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a *et seq.* (the "Securities Exchange Act" or "'34 Act"), and, in particular, §§ 10(b) and 20, 15 U.S.C. §§ 78j and 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and

(c)     The Investment Company Act of 1940, as amended, 15 U.S.C. §§ 80a *et seq.* ("ICA" or "1940 Act"), and, in particular, §§ 13, 30, 34(b) and 47(b), 15 U.S.C. §§ 80a-13, 80a-30, 80a-34(b) and 80a-46(b).

10.     Venue is proper in this District, pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, Section 44 of the 1940 Act, and 28 U.S.C. § 1391(b), because most of the Defendants have principal places of business or reside in this District and many of the acts complained of occurred in this District.

11.     In connection with the conduct alleged herein, the Defendants used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone facilities.

## II.     PARTIES

12.     Plaintiffs Richard A. Atkinson, M.D., and Patricia B. Atkinson, residents of Tennessee, invested approximately $152,000 in the Intermediate Fund during the Class Period (as defined below), as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the Intermediate

Fund during the Class Period costing approximately $1,196,000.

13.　　Plaintiffs Charles M. Crump and Diana W. Crump, residents of Tennessee, each or both invested approximately $100,000 in the Short Term Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the Short Term Fund ($100,000) and Intermediate Fund ($167,682) during the Class Period costing approximately $267,682.

14.　　Plaintiffs H. Austin Landers and Jeanette H. Landers, residents of Alabama, invested approximately $515,000 in the High Income Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the High Income Fund during the Class Period costing approximately $1,167,000.

15.　　Plaintiff Alabama Elks Trust, Inc., whose principal office is in the State of Alabama, invested approximately $200,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of its investment in the Intermediate Fund during the Class Period  costing approximately $200,000.

16.　　Plaintiff Fred Krimm, a resident of California, invested approximately $100,000 in the High Income Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the High Income Fund during the Class Period costing approximately $239,000.

17.　　Plaintiff Jonathan M. Bloom, a resident of Florida, invested approximately $175,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the Intermediate Fund during the Class Period costing approximately $175,000.

18.　　Plaintiff Todd R. Leren, a resident of Wisconsin, invested approximately

10

$243,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the Intermediate Fund during the Class Period costing approximately $243,000

19.    Plaintiff Brenda Blatt, a resident of the Province of Quebec, Canada, invested approximately $75,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of her investment in the Intermediate Fund during the Class Period costing approximately $75,000.

20.    Plaintiff Dajalis Ltd., a Quebec corporation with its principal office in the Province of Quebec, Canada, invested approximately $414,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of its investment in the Intermediate Fund during the Class Period costing approximately $414,000.

21.    Plaintiff Larry D. Shaw, a resident of Tennessee, invested approximately $571,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the Intermediate Fund during the Class Period costing approximately $571,000.

22.    Plaintiff Noah B. Kimball, M.D., a resident of Tennessee, invested approximately $150,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the Intermediate Fund during the Class Period costing approximately $150,000.

23.    Plaintiffs Frank D. Tutor and Gwendolyn T. Tutor, residents of Tennessee, invested approximately $332,000 in the Intermediate Fund during the Class Period, as set forth

in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the Intermediate Fund during the Class Period costing approximately $332,000.

24.     Plaintiff Robert L. Summit, Jr., M.D., a resident of Tennessee, invested approximately $151,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint and refrained from redeeming some or all of his investment in the Intermediate Fund during the Class Period costing approximately $151,000.

25.     Plaintiffs Charles B. Anderson, M.D., and Andrea L. Anderson, residents of Tennessee, invested approximately $329,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the Intermediate Fund during the Class Period costing approximately $329,000.

26.     Plaintiffs Elroy N. Schuler and Lisbeth R. Schuler, residents of Tennessee, invested approximately $120,000 in the Intermediate Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of their investment in the Intermediate Fund during the Class Period costing approximately $120,000.

27.     Plaintiff James H. Frazier, a resident of Tennessee, invested approximately $106,800 in the High Income Fund during the Class Period plus substantial pre-Class Period investments in the Intermediate Fund, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the High Income Fund during the Class Period costing approximately $317,564.

28.     Plaintiffs Albert R. Colombo and Patricia A. Colombo, residents of Tennessee, invested approximately $128,000 in the High Income Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained

from redeeming some or all of their investment in the High Income Fund during the Class Period costing approximately $128,000.

29.     Plaintiff Lloyd R. Thomas, M.D., a resident of Tennessee, invested approximately $215,000 in the High Income Fund during the Class Period, as set forth in the certification accompanying the initial or First Amended Complaint, and refrained from redeeming some or all of his investment in the High Income Fund during the Class Period costing approximately $338,033.

30.     Plaintiff Kathryn S. Cashdollar Estate is the estate of Kathryn S. Cashdollar, a resident of Tennessee, who, until her death, had invested approximately $204,000 in the Intermediate Fund and approximately $268,000 in the High Income Fund during the Class Period, as set forth in the certification accompanying the RMK Open-End Funds Group's motion to be appointed lead plaintiff herein, and refrained from redeeming some or all of her investment in said Funds during the Class Period costing approximately $472,000

31.     Plaintiffs James P. Whitaker and Peggy C. Whitaker, residents of Tennessee, refrained from redeeming some or all of their investment in the Intermediate Fund during the Class Period costing $230,306 and refrained from redeeming some or all of their investment in the High Income Fund during the Class Period costing $204,700.

32.     Plaintiffs Phoebe Heckle and her two children, Ferd Heckle and Maryan Mercer, residents of Tennessee, are beneficiaries or successor beneficiaries of a testamentary trust of which Regions Bank is the trustee, which trust held and did not redeem shares during the Class Period costing $144,000 and seek to represent a Fiduciary Subclass .

33.     Plaintiff John R. S. Robilio, a resident of Tennessee, is the beneficiary of a trust of which Regions Bank is the trustee, which trust held and did not redeem shares during the Class Period costing approximately $9600 and seek to represent a Fiduciary Subclass .

34.     In summary:

(a)     During the Class Period, the individual Plaintiffs named herein invested ap-

13

proximately $4,500,000 in the Funds, including $100,000 in the Short Term Fund, $3,116,000 in the Intermediate Fund, and $1,333,000 in the High Income Fund.

(b)     During the  Class Period, the individual Plaintiffs named herein refrained from redeeming investments in the three Funds costing more than $7,000,000, including $100,000 in the Short Term Fund, $4,558,000 in the Intermediate Fund, and $2,663,000 in the High Income Fund.

35.     Plaintiffs Kathryn S. Cashdollar Estate, Dajalis Ltd., Jeanette H. Landers, H. Austin Landers, and Frank D. Tutor compose the "RMK Open-End Funds Group," and they have been appointed by the Court to be lead plaintiff herein.

36.     Defendant Morgan Keegan Select Fund, Inc. (now called "Helios Select Fund, Inc.") (the "Company") was organized as a Maryland corporation on October 27, 1998. The Company was an open-end, management investment company registered under the ICA. The Company consisted of three portfolios or "series" of the Company's shares of common stock, each with its own investment objective: Regions Morgan Keegan Select Short Term Bond Fund (now called "Helios Short Term Fund"), Regions Morgan Keegan Select Intermediate Bond Fund (now called "Helios Intermediate Fund"), and Regions Morgan Keegan Select High Income Fund (now called "Helios High Income Fund"), each of which funds had three classes of shares (A, C and I). Each of the three Funds ("series") issued redeemable common stock pursuant to the Company's Articles of Incorporation and the ICA § 5(a)(1), 15 U.S.C. § 80a-5(a)(1).

37.     The Intermediate and High Income Funds began operation on March 22, 1999; the Short Term Fund began operations as a Morgan Keegan Select fund on November 4, 2005. This action relates to all three Funds. The High Income Fund was closed to new investors in December 2002, except that any shareholder who owned this fund in an existing account could continue to purchase additional shares.

14

38.     Pursuant to obligations imposed by statute and contract (the Company/Funds Articles of Incorporation) and as a result of issuing a redeemable security (or "put"), each of the High Income Fund, Intermediate Fund and Short Term Fund redeemed (i.e., purchased), and offered to redeem (i.e., offered to purchase), from its respective shareholders their shares in each of said Funds, and was obliged to purchase upon demand by said Fund's shareholders, which was the only means by which the Funds' shareholders could sell their shares, as the Funds' shares did not trade on an exchange or in the over-the-counter market. The prices at which the shares were purchased or redeemed or at which the Funds offered to purchase or redeem were set by Defendants Morgan Keegan and Morgan Management and the Funds' officers and portfolio managers in accordance with procedures adopted and approved by the Company/Funds' directors.

39.     The catastrophic decline in the Funds' assets during 2007 and 2008, and the consequent losses incurred by the Funds' shareholders, caused the Funds to terminate their business and liquidate their assets, because, as a result of their diminished assets under management, the Company/Funds were no longer viable. The Company and its Funds were liquidated on June 15, 2009, pursuant to shareholder approval of a plan of liquidation on May 29, 2009. The Company/Funds filed their application with the SEC to be deregistered as investment companies on July 28, 2009.

40.     Defendant Morgan Asset Management, Inc. ("Morgan Management"), was, during the period relevant, a registered investment adviser, headquartered in Birmingham, Alabama, with a principal office in Memphis, Tennessee. Morgan Management, a wholly owned subsidiary of MK Holding, Inc., served as the Funds' investment adviser and manager under an Advisory Agreement ("Advisory Agreement"), dated June 25, 2001, and September 1, 2006, which was subject to annual approval by the Funds' shareholders. The Advisory Agreement provided that, subject to overall supervision by the Board of Directors, Morgan Management was to manage the investments and other affairs of the Funds. Morgan

Management was responsible for managing the Funds' portfolio securities and for making purchases and sales of portfolio securities consistent with the Funds' respective investment objectives, policies and limitations described in the Prospectus and SAI. Although Morgan Management was obligated to furnish the Funds with office space and with executive and other personnel necessary for the operation of the Funds, this was done by Morgan Keegan. Morgan Management was obligated to supply the Board of Directors and officers of the Funds with certain statistical information and reports, and to oversee the maintenance of various books and records.

41.     Morgan Management, Morgan Keegan and/or its affiliates also were responsible for the compensation of directors and officers of each Fund who were employees of Morgan Management, Morgan Keegan and/or its affiliates. Under the terms of the Advisory Agreement, the Short Term Fund, Intermediate Fund and High Income Fund were charged annual management fees of 0.35% (0.25% after waiver), 0.4% and 0.75% based on average daily net assets, respectively, which were calculated daily and paid monthly based on the average daily net assets of the Funds.

42.     In 2001, Morgan Management succeeded to Capital Management Group ("CMG"), a registered investment adviser under the Investment Advisers Act of 1940, a separately identifiable department within Regions Bank, when Regions Bank divested CMG from its assets, and CMG was then reorganized into Morgan Management. On July 1,2002, Regions Bank and RMK Trust (then known as Morgan Keegan Trust Company FSB) entered into a Trust Servicing Agreement that, among other things, (i) acknowledged that Regions Bank and RMK Trust provided similar trust, fiduciary and related services, and (ii) established a joint marketing arrangement for trust and fiduciary services under the trade name "Regions Morgan Keegan Trust."

43.     Defendant Morgan Management described itself in press releases as "the investment advisory arm of Regions Financial Corporation." Morgan Management was, during

16

the relevant period , the investment advisor to Regions Morgan Keegan Trust and to 15 to 20 other mutual funds, including Regions Morgan Keegan Select Funds, Morgan Keegan Select Fund, Inc., RMK Advantage Income Fund, Inc., RMK High Income Fund, Inc., RMK Multi-Sector High Income Fund, Inc., and RMK Strategic Income Fund, Inc., and, additionally, to separately managed individual accounts. "With locations throughout the South, Morgan Asset Management, an affiliate of Morgan Keegan & Co. Inc., manages more than $33 billion for institutions and high net worth individuals. . . ."

44.     Defendant MK Holding, Inc. ("Holding"), is a wholly owned subsidiary of Regions Financial Corporation ("Regions") and the wholly owning parent of Morgan Management.

45.     Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan"), a wholly owned subsidiary of Regions, is a full service broker/dealer and is headquartered in Memphis, Tennessee. It performed administration services for the Funds and distributed the Funds' shares at all relevant times ; Morgan Keegan also received commissions on sales of the Funds' shares. Morgan Keegan provided an employee to serve as the Funds' and Morgan Management's Chief Compliance Officer during most of the Class Period and, pursuant to a Fund Accounting Service Agreement with the Company, provided portfolio accounting and asset valuation services to the Funds for an annual fee of 0.03% based on the average daily net assets of the Funds.

46.     According to the Company/Funds' Statement of Additional Information ("SAI") dated November 1, 2006, Morgan Management was to provide administrative services to the Company/Funds pursuant to the Advisory Agreements between the Company/Funds and Morgan Management, but Morgan Keegan actually provided the administrative services to the Funds. Morgan Keegan also served as the Transfer and Dividend Disbursing Agent for the Funds. Pursuant to the Transfer Agency and Service Agreement, each Fund paid Morgan Keegan an annual base fee per share class plus a variable fee based on the number of share-

holder accounts.

47.     The Company had adopted two Distribution Plans pursuant to Rule 12b-1 under the 1940 Act ("12b-1 Plans"), one with respect to Class A Shares and the other with respect to Class C Shares of the Funds. The 12b-1 Plans compensated Morgan Keegan, the Funds' primary Distributor, and other dealers and investment representatives for services and expenses relating to the sale and distribution of the Funds' shares. Under the Class A Shares' 12b-1 Plan, the Funds paid a fee at an annual rate of up to 0.25% of the average daily net assets with respect to Class A Shares of the Funds. Under the Class C Shares' 12b-1 Plan, the Short Term Bond, Intermediate Bond and High Income Funds paid a fee at an annual rate of 0.45%, 0.60% and 0.75%, respectively, of the average daily net assets with respect to Class C Shares of each Fund.

48.     Defendant Regions Financial Corporation ("Regions"), a Delaware corporation, is a regional financial holding company (NYSE: RF) and the wholly owning parent corporation of Regions Bank, Holding (which owned Morgan Management) and Morgan Keegan. As the corporate parent, Regions controlled a tight cluster of overlapping and interwoven enterprises that operated as a single, unified concern and included the foregoing identified subsidiaries.

49.     The Funds' shares were marketed, offered and sold by and through and the trust department of Regions Bank and/or by other subsidiaries owned or controlled by Regions (including a trust affiliate of Morgan Keegan). Regions disclosed in its Form 10-Q dated November 9, 2007: "In addition to providing traditional commercial and retail banking services, Regions provides additional financial services including securities brokerage, asset management, financial planning, mutual funds, investment banking, insurance, mortgage origination and servicing, equipment financing and other specialty financing. Regions provides brokerage services and investment banking from approximately 430 offices of Morgan Keegan & Company, Inc. ("Morgan Keegan"), one of the largest investment firms based in

18

the South."

50.     In the Funds' annual and semi-annual reports to shareholders during the Class Period, Regions described the "Regions family of companies [to] include [sic] Regions Bank, Regions Mortgage, EquiFirst Corp., Morgan Keegan & Company, Inc., Morgan Asset Management, Inc., Regions Morgan Keegan Select Funds, Morgan Keegan Select Fund, Inc., RMK High Income Fund, Inc., RMK Strategic Income Fund, Inc., Regions Morgan Keegan Trust, FSB, Rebsamen Insurance, and other Regions affiliates." Regions aggressively used its name to brand as a Regions product and service the mutual fund investment opportunities offered by the Funds, Morgan Keegan and Morgan Management.

51.     Regions says it "strives to conduct business according to the highest moral standards, as evidenced by our Code of Ethics. Our associates and Directors take this Code of Ethics seriously and are mindful of 'Doing What Is Right.'" Regions takes "every opportunity to protect [its] culture by aggressively promoting Regions' core values to associates," which it does "because it is the right thing to do, and [Regions] customers, shareholders, communities and associates expect it if they are to continue to give [Regions] their trust and confidence." Regions believes that its financial results are important and also that "how [Regions] achieve[s] those results is equally important."

52.     As disclosed by Regions in its Form 10-K annual report for its fiscal year ended December 31, 2007, Morgan Keegan managed the Funds, as Morgan Keegan further admitted in a communication dated April 16, 2009, to the Funds' shareholders in connection with the Funds' liquidating distribution, and provided Regions Bank's trust services

53.     Defendant Regions Bank, a wholly (directly or indirectly) owned subsidiary of Regions, is an Alabama state-chartered commercial bank that is a member of the Federal Reserve System with branch offices throughout the South and Midwest. Regions Bank's treasury division includes Regions' bond portfolio, indirect mortgage lending division and other wholesale activities. Regions Bank offered trust services through its trust department

Regions Bank advised or recommended to persons seeking to invest in Regions Bank certificates of deposit that they instead invest in the Funds.

54. Defendant Regions Morgan Keegan Trust FSB, a federally chartered savings bank and formerly known as Morgan Keegan Trust Company, through its Trust Department, performed fiduciary functions and managed certain assets in various fiduciary capacities for and on behalf of its customers and required certain investment advisory services in the performance of its duties and responsibilities in such capacities. Pursuant to an Investment Advisory Service Agreement dated April 1, 2003, Morgan Management undertook to provide certain investment advisory and other related services to Regions Bank and Regions Morgan Keegan Trust FSB, both of which are referred to hereinafter as "RMK Trust."

55. During the period December 6, 2004 through June 30, 2008, Regions Bank, RMK Trust, Morgan Management, and Morgan Keegan directed or caused the Regions Bank fiduciary accounts to invest almost $378 million in the Funds, as shown in the next paragraph. The following table shows the percentages of the Funds held by RMK Trust during both Class Periods herein:

| Fund | Class A | Class C | Class I |
|---|---|---|---|
| **Short Term Fund** | MSTBX | RSTCX | MSBIX |
| 11/1/04 | | | |
| 11/1/05 | 13.93%* | | |
| 11/1/06 | 20.10% | | 90.60% |
| 11/1/07 | 76.80% | 17.10% | 96.20% |
| | | | |
| **Intermediate Fund** | MKIBX | RIBCX | RIBIX |
| 11/1/04 | 17.18% | | 42.80% |
| 11/1/05 | 20.15% | | 29.91% |
| 11/1/06 | 22.60% | | 27.15% |
| 11/1/07 | 21.80% | | 28.40% |
| | | | |
| **High Income Fund** | MKHIX | RHICX | RHIIX |
| 11/1/04 | | | |
| 11/1/05 | 14.03% | | 20.50% |
| 11/1/06 | | | 45.70% |
| 11/1/07 | | | 39.10% |

\* Sterling Trust Company as agent, Union Planters Bank as Trustee FBO Union Planters Corporation; Union Planters Bank was acquired by Regions.

56.    The following table shows the sales by all Funds of shares by class and the sales to the Regions Bank fiduciary accounts:

| Fund | Class A | Class C | Class I | Total |
|---|---|---|---|---|
| **Short Term Fund** | MSTBX | RSTCX | MSBIX | |
| Year-ended 6/30/05 | $   3,694,924 | | $  18,856,841 | |
| Year-ended 6/30/06 | $   1,887,992 | $   1,999,514 | $  20,071,133 | |
| Year-ended 6/30/07 | $  33,067,097 | $      799,281 | $  15,420,102 | |
| Total | $  38,650,013 | $   2,798,795 | $  54,348,076 | $   95,796,884 |
| RB Accounts | $  36,399,529 | $   1,240,988 | $  35,473,226 | $   73,113,743 |
| RB Accounts as % | 94% | 44% | 65% | 76% |
| | | | | |
| **Intermediate Fund** | MKIBX | RIBCX | RIBIX | |
| Year-ended 6/30/05 | $146,818,232 | $  92,830,934 | $  97,061,628 | |
| Year-ended 6/30/06 | $103,174,503 | $  99,992,714 | $114,920,717 | |
| Year-ended 6/30/07 | $217,397,756 | $177,236,902 | $169,499,613 | |
| Total | $467,390,491 | $370,060,550 | $381,481,958 | $1,218,932,999 |
| RB Accounts | $109,118,378 | $   3,868,256 | $  91,695,419 | $   204,682,053 |
| RB Accounts as % | 23% | 1% | 24% | 17% |
| | | | | |
| **High Income Fund** | MKHIX | RHICX | RHIIX | |
| Year-ended 6/30/05 | $225,435,800 | $  84,619,684 | $170,326,128 | |
| Year-ended 6/30/06 | $120,785,415 | $  62,990,158 | $110,764,508 | |
| Year-ended 6/30/07 | $124,384,135 | $  51,646,228 | $  87,213,228 | |
| Total | $470,605,350 | $199,256,070 | $368,303,864 | $1,038,165,284 |
| RB Accounts | $   3,691,157 | $      892,775 | $  95,526,906 | $   100,110,838 |
| RB Accounts as % | 1% | 0% | 26% | 10% |

| | |
|---|---|
| **Funds' Total Sales** | **$2,352,895,167** |
| **RB Accounts' Total Purchases** | **$   377,906,634** |
| **RB Accounts' Total Purchases as % of Funds' Total Sales** | **16%** |

57.    Morgan Keegan held itself out as offering "wealth management" services through its Wealth Management Group. This it did on a discretionary basis.

58.    The following chart portrays the Regions Morgan Keegan organization:



59.     Defendant Allen B. Morgan, Jr., was, during the Class Period until December 31, 2007, a Director and Chairman of the Company/Funds and is a resident of Tennessee. He also served as a Director and Vice-Chairman of Regions, a Director of Morgan Asset Management, Inc., and Chairman and Executive Managing Director and Chief Executive Officer of Morgan Keegan. He signed the Company/Funds Form N-1A registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements and which incorporated by reference the Company/Funds' annual report to shareholders, which included the Company/Funds' financial statements, in the SAI portion of the registration statement, As to each

of these filings with the SEC he was identified as the principal contact person at the Company/Funds. He was also identified as the principal contact person at the Company/Funds on the Company/Funds' Forms N-CSR annual, N- CSRS semi-annual, and N-Q quarterly reports for March 31, 2005, June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, June 30, 2006, September 30, 2006, December 31, 2006, March 31, 2007, June 30, 2007, and September 30, 2007. As a director of the Company/Funds, Defendant Morgan reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

60.    Defendant J. Kenneth Alderman was during the Class Period a Director of the Company/Funds and is a resident of Alabama. He also has been President of Regions Morgan Keegan Trust and Vice-Chairman and Chief Executive Officer of Morgan Management. He has been Executive Vice President of Regions. He is a Certified Public Accountant and he holds the Chartered Financial Analyst designation. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director of the Company/Funds, Defendant Alderman reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

61.    Defendant Jack R. Blair was, from 2005 until December 31, 2007, a Director of the Company/Funds and is a resident of Tennessee. He signed the Company/Funds registration statement, or amendments thereto, dated August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director of the Company/Funds, Defendant Blair reviewed or was responsible for reviewing the Company/Funds' registration statement and all amend-

ments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

62.    Defendant Albert C. Johnson was from 2005 during the rest of the Class Period a Director of the Company/Funds and is a resident of Alabama. He has been an independent financial consultant and has served as a director or chief financial officer of other companies. He also was with Arthur Andersen LLP. He signed the Company/Funds registration statement, or amendments thereto, dated August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements. As a director of the Company/Funds, Defendant Johnson reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

63.    Defendant William Jefferies Mann was a Director of the Company/Funds from 1999 until at least August 2005 and is a resident of Alabama. He has been Chairman and President of Mann Investments, Inc., a real estate and private investing business. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004 and September 1, 2005, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director of the Company/Funds, Defendant Mann reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

64.    Defendant James Stillman R. McFadden was during the Class Period a Director of the Company/Funds and is a resident of Tennessee. McFadden Communications, LLC ("McFadden Communications"), a company of which McFadden is a majority owner, commenced a commercial banking relationship with Union Planters Bank in August 2003, which continued with Regions Bank subsequent to the June 30, 2004 merger of Union Planters

Corporation and Regions. From January 1, 2005 through June 30, 2007, the largest aggregate amount of debt outstanding on the line of credit and loan was approximately $2.3 million. As of June 30, 2007, the approximate aggregate amount of debt outstanding was $2.0 million. McFadden Communications has a ten-year lease with Regions Bank for certain equipment at a cost of approximately $272,000 annually. Since before the June 30, 2004 merger, McFadden Communications has performed printing services for Union Planters Corporation and/or subsidiaries and for Regions and/or subsidiaries; for the period January 1, 2005 through June 30, 2007, total revenues from services provided to Regions was approximately $2.5 million representing approximately 5.0% of McFadden Communications' revenue over that same period. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements. As a director of the Company/Funds, Defendant McFadden reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

65.    Defendant W. Randall Pittman was during the Class Period a Director of the Company/Funds and is a resident of Alabama. He also has been chief financial officer of several companies and, from 1983 to 1995, he held various positions with AmSouth Bancorporation (a bank holding company since acquired by Regions), including Executive Vice President and Controller. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director of the Company/Funds, Defendant Pittman reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' an-

nual, semi-annual and quarterly reports to shareholders.

66.     Defendant Mary S. Stone was during the Class Period a Director of the Company/Funds and is a resident of Alabama. She has been a professor at the University of Alabama Culverhouse School of Accountancy and has held the Hugh Culverhouse Endowed Chair of Accountancy since 2002. She has served as Director of the Culverhouse School of Accountancy since 2004. Three of Stone's fellow members of the faculty of the University of Alabama Culverhouse School of Accountancy hold endowed chairs or fellowships contributed by the former "big five" accounting firms, including one contributed by Defendant PwC. She is also a former member of Financial Accounting Standards Advisory Council, AICPA, Accounting Standards Executive Committee and AACSB International Accounting Accreditation Committee. She is a Certified Public Accountant. She signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director of the Company/Funds, Defendant Stone reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

67.     Defendant Archie W. Willis, III, was during the Class Period a Director of the Company/Funds and is a resident of Tennessee. He also has been President of Community Capital (financial advisory and real estate development) since 1999 and Vice President of Community Realty Company (real estate brokerage) and was a First Vice President of Morgan Keegan from 1991 to 1999. He also has served as a director of a telecommunications company and a member of a bank advisory board. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, October 29, 2007, which included financial highlights taken from the Company/Funds' audited annual financial statements, As a director

of the Company/Funds, Defendant Willis reviewed or was responsible for reviewing the Company/Funds' registration statement and all amendments thereto and the Company/Funds' annual, semi-annual and quarterly reports to shareholders.

68.     The Company/Funds Board had a standing Audit Committee consisted of all the Directors of the funds who purportedly were not interested persons of the Company, as that term is defined in the 1940 Act ("Independent Directors"). The Audit Committee's function was to recommend to the Board the appointment of the independent accountants to conduct the annual audit of the Company's financial statements; review with the independent accountants the outline, scope and results of this annual audit and review the performance and fees charged by the independent accountants. The Audit Committee met with the independent accountants and representatives of management to review accounting activities and areas of financial reporting and control. During the three fiscal years ended June 30, 2007, the Board's Audit Committee held ten meetings. The Audit Committee met four times during the period July 1, 2006 through June 30, 2007, and six times during the period July 1, 2007 through April 30, 2008; subsequent to the Funds' fiscal year ended June 30, 2007, the Audit Committee met on October 3, 2007, to review the Funds' 2007 audited financial statements.

69.     In its annual reports to shareholders during all relevant times herein, the Company held out Defendants Johnson, McFadden, Pittman and Stone as members of the Company's Audit Committee and as "financial experts." The Company stated in its 2004 and 2005 annual reports to the Funds' shareholders: "The Fund's Board of Directors (the "Board") has determined that James Stillman R. McFadden, W. Randall Pittman and Mary S. Stone are audit committee financial experts, as defined in Item 3 of Form N-CSR, serving on its Audit Committee. Messrs. McFadden and Pittman and Ms. Stone are independent for purposes of Item 3 of Form N-CSR." In the 2006 annual report to the Funds' shareholders, the Company added Albert C. Johnson to the others as "financial experts."

70.    The Board had an Independent Directors Committee consisting of all of the purportedly "Independent Directors." This Committee had to determine at least annually whether the funds' advisory, underwriting, Rule 12b-1 and other arrangements should be approved for continuance for the following year. This Committee was also responsible for evaluating and recommending the selection and nomination of candidates for Independent Director and recommending to the Board policies concerning Independent Director compensation, investment in the funds and resources.

71.    The Company had a Qualified Legal Compliance Committee ("QLCC") that consisted of all of the Independent Directors. The QLCC was supposed to receive, review and take appropriate action with respect to any report made or referred to the QLCC by an attorney of evidence of a material violation of applicable federal or state securities law, material breach of fiduciary duty under. federal or state law or a similar material violation by the funds or by an officer, director, employee or agent of the funds. During the three fiscal years ended June 30, 2007, and the fiscal year ended April 30, 2008, the Board's QLCC held no meetings, even though the first of the federal securities class actions was begun on December 6, 2007, and a shareholders derivative action on behalf of the Company/Funds was filed on March 28, 2008, against most of the Defendants herein. Based on the Funds' disclosures in filings with the SEC after April 30, 2008, the QLCC never met to consider any of the complaints in this or the related class and derivative action and the allegations and claims therein.

72.    If Defendant directors did not know of the wrongful conduct alleged herein, they should have known (for purposes of their liability under the '33 Act and 1940 Act), or were recklessly ignorant (for purposes of their liability under the '34 Act), of such matters.

73.    If Defendant directors did know of the wrongful conduct alleged herein, including the omission of material facts, but did not take steps to correct these conditions or to ensure their disclosure, they negligently or knowingly breached their fiduciary duty or oth-

28

erwise negligently or knowingly engaged in wrongful conduct, including violations of the '33 Act, the '34 Act and the 1940 Act, as alleged herein.

74. If Defendant directors did not know of the wrongful conduct alleged herein but were not recklessly ignorant of such matters, this information was wrongfully withheld from them by Morgan Management, the Funds' officers, Morgan Keegan, Regions, and PwC.

75. Defendant Carter E. Anthony was President of the Funds from 2003 until at least August 2006 and is a resident of Alabama. From 2002 to 2006, he was President and Chief Investment Officer of Morgan Management. From 2000 to 2002, he served as Executive Vice President and Director of Capital Management Group, Regions Financial Corporation. From 1989 to 2000, he was Vice President-Trust Investments, National Bank of Commerce. He signed the Company/Funds registration statement, or amendments thereto, dated October 28, 2004, September 1, 2005, October 31, 2005, August 31, 2006 and October 30, 2006, He signed the letter to the Company/Funds' shareholders included in the Company/Funds' annual and semi-annual reports for June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, and June 30, 2006. He signed the Company/Funds' Forms N-CSR annual, N- CSRS semi-annual, and N-Q quarterly reports for June 30, 2004, September 30, 2004, December 31, 2004, March 31, 2005, May 31, 2005,  June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

76. Defendant Brian B. Sullivan was since August 2006 President of the Funds and President and Chief Investment Officer of Morgan Management and is a resident of Alabama. He also served as President of AmSouth Asset Management, Inc., which merged into Morgan Management. From 1996 to 1999 and from 2002 to 2005, he served as Vice President of AmSouth Asset Management, Inc. Since joining AmSouth Bank in 1982, until 1996, Mr. Sullivan served in various capacities, including Equity Research Analyst and Chief Fixed Income Officer and was responsible for Employee Benefits Portfolio Management and Regional Trust Investments. He holds the Chartered Financial Analyst designation. He

29

signed the Company/Funds registration statement, or amendments thereto, dated October 29, 2007, He signed the letter to the Company/Funds' shareholders included in the Company/Funds' annual and semi-annual reports for December 31, 2006, June 30, 2007, December 31, 2007. He signed the Company/Funds' Forms N-CSR annual, N- CSRS semi-annual, and N-Q quarterly reports for September 30, 2006, December 31, 2006, March 31, 2007, June 30, 2007, September 30, 2007, and December 31, 2007.

77.    Defendant Joseph C. Weller was from 1999 to at least October 2006 Vice President, Treasurer and Chief Financial Officer of the Funds and is a resident of Tennessee. He has been Executive Vice President and Chief Financial Officer, Treasurer and Secretary, and Executive Managing Director of Morgan Keegan since 1969. He also served as a Director of Morgan Management since 1993. He signed the Company/Funds' Form N-1A registration statement, or amendments thereto, dated September 1, 2005, October 28, 2004, October 31, 2005, August 31, 2006, and October 30, 2006, He signed the Company/Funds' Forms N-CSR annual, N-CSRS semi-annual, and N-Q quarterly reports for June 30, 2004, September 30, 2004, December 31, 2004, March 31, 2005, May 31, 2005, June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

78.    Defendant J. Thompson Weller, the son of Defendant Joseph C. Weller, was since 2006 Treasurer, Assistant Secretary, and Chief Financial Officer of the Funds and is a resident of Tennessee. He has been or was a Managing Director, Senior Vice President and Controller of Morgan Keegan and held other financial offices of Morgan Keegan. He was with Arthur Andersen & Co. and Andersen Consulting before joining Morgan Keegan. He signed the Company/Funds registration statement, or amendments thereto, dated October 29, 2007. He signed the Company/Funds' Forms N-CSR annual, N- CSRS semi-annual, and N-Q quarterly reports for September 30, 2006, December 31, 2006, March 31, 2007, June 30, 2007, September 30, 2007, and December 31, 2007.

79.    Defendant G. Douglas Edwards was the Chief Executive Officer and President

of Morgan Keegan. Edwards, who had been with Morgan Keegan for over 25 years before Morgan Keegan announced Edwards's resignation effective April 2008, was President of Morgan Keegan from 2001 until 2003, when he also became its CEO. Edwards was President of Morgan Keegan's Fixed Income Capital Markets Group from 1996 until 2003 where he directed Morgan Keegan's institutional sales, trading, research and investment banking business. From 1995 until his April 2008 departure, he was Vice Chairman of Morgan Keegan and a Director of Morgan Keegan from 1999 to April 2008.

80.     Defendant Charles D. Maxwell was during all relevant times herein Secretary and Assistant Treasurer of the Funds and is a resident of Tennessee. He also had been Executive Managing Director, Chief Financial Officer, Treasurer and Secretary of Morgan Keegan since 2006 and previously served as Managing Director of Morgan Keegan from 1998 to 2006 and held other executive positions with Morgan Keegan before that. He has been Secretary and Treasurer of Morgan Management. He was with the accounting firm of Ernst & Young LLP before joining Morgan Keegan. Maxwell had principal or primary responsibility for supervising the preparation of the Company/Funds' registration statement and amendments thereto and all other filings with the SEC.

81.     Defendant David M. George was until 2006 the Chief Compliance Officer of the Funds and is a resident of Tennessee. He was also a Senior Vice President of Morgan Keegan. He has over twenty years of industry experience in broker/dealer regulation but none in registered investment company regulation. George is a member of the NASD District 5 Focus Group and Securities Industry Association's Compliance and Legal Division.

82.     Defendant Michele F. Wood was, since 2006, the Chief Compliance Officer of the Funds and is a resident of Tennessee. She has been the Chief Compliance Officer of Morgan Management and a Senior Vice President of Morgan Keegan since 2006. She was compensated solely by Morgan Keegan. She was a Senior Attorney and First Vice President of Morgan Keegan from 2002 to 2006. Before that she was a staff attorney with FedEx Cor-

31

poration from 2001 to 2002 specializing in employment litigation and an associate with Ford & Harrison LLP from 1997 to 2001.

83.     Defendant James C. Kelsoe, Jr., CFA, a resident of Tennessee, was during the Class Period the Senior Portfolio Manager of the Funds and of Morgan Management, was also employed by Defendant Morgan Keegan, and was registered with the Financial Industry Regulatory Authority ("FINRA"),  as a representative of Defendant Morgan Keegan. He signed the letters to shareholders in the Company/Funds' annual and semi-annual reports to shareholders, including the "management discussion of fund performance" or "management discussion and analysis" for each Fund, for June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, June 30, 2007, and December 31, 2007.

84.     Defendant David H. Tannehill, CFA, was during the Class Period the Portfolio Manager of the Funds and of Morgan Management and is a resident of Tennessee. He signed the "management's discussion of fund performance" or "management discussion and analysis" for the Short Term Fund for June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, June 30, 2007, and December 31, 2007.

85.     Defendant Thomas R. Gamble was a Vice President of the Company/Funds since 2003 and also was an executive of Regions Financial Corporation since 1981. He is a resident of Alabama.

86.     Each portfolio manager was eligible to receive an annual cash bonus that may be equal to as much as 50% of his annual base salary, a portion of which was determined by the portfolio manager's investment management results compared to each fund's benchmark index. Portfolio managers could also be awarded options to purchase common shares and/or granted restricted shares of Regions Financial Corporation's stock from pools determined from time to time by the Remuneration Committee of the Regions' Board of Directors.

87.     Defendants John Doe One through Twenty at all relevant times herein

supervised, or were otherwise employed by Morgan Keegan and Morgan Management in connection with, the services rendered by Morgan Management and Morgan Keegan to the Funds pursuant to the Fund Accounting Service Agreement or the Advisory Agreement, respectively, the due diligence performed by Morgan Keegan in connection with its distribution and redemption of the Funds' shares, and the performance of services in connection with the delegation to Morgan Keegan and Morgan Management by RMK Trust of the its trust functions and responsibilities. Said Defendants shall be identified by an amended complaint as soon as their identities are revealed by the RMK Defendants or otherwise.

88.     The above identified Defendant officers and directors of the Funds, Morgan Management, Morgan Keegan, Holding, Regions Bank, Regions, and John Doe One through Twenty are sometimes hereinafter referred to as "RMK Defendants." With respect to the use of such term in allegations ascribing liability to, or responsibility for, certain specified actions, knowledge, or conduct , such term is to be understood to mean direct liability on the part of the Funds' officers and directors and Morgan Management and Morgan Keegan and secondary liability on the part of Holding and Regions, unless otherwise alleged. The term "Defendants" includes the Company/Funds, the RMK Defendants, and PwC. "Morgan Management" and "Morgan Keegan" shall each be deemed to include, as relevant, their respective officers and employees named as Defendants, including John Doe One through Twenty.

89.     The following table sets forth the dollar range of equity securities beneficially owned by each Director in the Funds and in all registered investment companies overseen by the Director as of December 31, 2004 (An asterisk (*) indicates officers and/or Directors who are "interested persons" of the Company as defined by the 1940 Act by virtue of their positions with Morgan Keegan and Morgan Management):

| Name of Director | Dollar Range of Equity Securities in the Funds | Aggregate Dollar Range of Equity Securities in All Registered Investment Companies Overseen by Director in Fund Complex | Portfolios in Fund Complex Overseen by Director |
|---|---|---|---|
| Allen B. Morgan, Jr. * | Over $100,000 | Over $100,000 | 23 |
| J. Kenneth Alderman * | $50,001-100,000 | Over $100,000 | 23 |
| William Jeffries Mann | None | $10,001-$50,000 | 23 |
| James Stillman R. McFadden | $1-$10,000 | $10,001-$50,000 | 23 |
| Mary S. Stone | None | $10,001-$50,000 | 23 |
| W. Randall Pittman | None | $10,001-$50,000 | 23 |
| Archie W. Willis III | None | $10,001-$50,000 | 23 |

90. The following table sets forth the dollar range of equity securities beneficially owned by each Director in the Funds and in all registered investment companies overseen by the Director as of December 31, 2005.

| Name of Director | Dollar Range of Equity Securities in the Funds | Aggregate Dollar Range of Equity Securities in All Registered Investment Companies Overseen by Director in Fund Complex | Portfolios in Fund Complex Overseen by Director |
|---|---|---|---|
| Allen B. Morgan, Jr. * | Over $100,000 | Over $100,000 | 18 |
| J. Kenneth Alderman * | $50,001-100,000 | Over $100,000 | 18 |
| Jack R. Blair | None | $10,001-$50,000 | 18 |
| Albert C. Johnson | None | None | 18 |
| James Stillman R. McFadden | $1-$10,000 | $10,001-$50,000 | 18 |
| Mary S. Stone | None | $10,001-$50,000 | 18 |
| W. Randall Pittman | None | $10,001-$50,000 | 18 |
| Archie W. Willis III | $10,001-$50,000 | $10,001-$50,000 | 18 |

91. The following table sets forth the dollar range of equity securities beneficially owned by each Director in the Funds and in all registered investment companies overseen by the Director as of September 30, 2007.

34

| Name of Director | Dollar Range of Equity Securities in the Funds | Aggregate Dollar Range of Equity Securities in All Registered Investment Companies Overseen by Director in Fund Complex | Portfolios in Fund Complex Overseen by Director |
|---|---|---|---|
| Allen B. Morgan, Jr. * | Over $100,000 | Over $100,000 | 18 |
| J. Kenneth Alderman * | Over $100,000 | Over $100,000 | 18 |
| Jack R. Blair | None | $10,001-$50,000 | 18 |
| Albert C. Johnson | None | None | 18 |
| James Stillman R. McFadden | $1-$10,000 | $10,001-$50,000 | 18 |
| Mary S. Stone | None | $10,001-$50,000 | 18 |
| W. Randall Pittman | None | $50,001-$100,000 | 18 |
| Archie W. Willis III | $10,001-$50,000 | $10,001-$50,000 | 18 |

92.    Based on the preceding three paragraphs, all but one of the Funds' five or six independent directors during the Class Period owned none to insignificant dollar amounts of the Funds' shares and were also directors of 15 or 20 other mutual funds in the Regions Morgan Keegan fund family. Thus, a minimal to non-existent portion of these purportedly independent directors' personal assets was at risk in the Funds, and they were necessarily preoccupied with the other 15 or 20 Regions Morgan Keegan funds of which they were directors during the Class Period, failing to devote the necessary and appropriate attention to the concentration, credit, liquidity and valuation risks and uncertainties unique (as compared with the other Regions Morgan Keegan funds) to the Funds.

93.    Morgan Asset Management, Morgan Keegan and the Funds' officers so mismanaged the Funds, and the Funds' Directors were so lax and careless in carrying out their responsibilities as directors, that the contractual rights to manage the Funds became worthless. In 2008, the Funds' Directors acquiesced in the proposal of Morgan Asset Management and Morgan Keegan to transfer the investment advisory and administration contracts between the Funds/Company relating to the Funds and Morgan Asset Management and Morgan Keegan to Hyperion Brookfield Asset Management for zero consideration. Thereafter, the Company/Funds were liquidated.

35

94.      Defendant PricewaterhouseCoopers ("PwC"), a limited liability partnership, is a national public accounting and auditing firm that, during the Class Period, had one of its principal places of business in Tennessee.  During said Class Period, PwC audited the Funds' annual financial statements, reviewed the Fund's semi-annual financial statements, issued reports on the Funds' internal controls, and read the Funds' prospectuses and statements of additional information and each amendment thereto and affirmed the financial information therein to the extent that such information was derived from the Funds' audited financial statements.  PwC held itself out as possessing special expertise in the auditing of financial statements of, and the management of, registered investment companies. Each of the Company/Funds' registration statements, and amendments thereto and including the prospectus, which included "financial highlights" audited by PwC, dated November 1, 2004, October 31, 2005, November 1, 2006, and October 29, 2007, identified PwC as the auditor of the Company/Funds' annual financial statements and referenced PwC's audit report thereon,

95.      Because of the RMK Defendants' positions with the Funds, they had access to the adverse undisclosed information about the Funds' and their investments, performance, business, operations, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition via access to internal Funds' and Funds management's documents (including but not limited to Morgan Management's and Morgan Keegan's internal management books and records pertaining to their management of the Funds), conversations with and relationships between other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

96.      All of the officers of the Company/Funds were employed and paid by Morgan Keegan or Morgan Management. The Funds' officers were either contemporaneously or successively also executives of either or both of Morgan Keegan and Morgan Management

and sometimes Regions: Anthony was an officer of the Company, MAM, and Regions; Sullivan was an officer of the Company and also Morgan Management and a bank acquired by Regions; J.C. Weller was a Company/Funds officer and also an executive of Morgan Keegan and Morgan Management; J. T. Weller, Maxwell, George, and Wood were officers of the Company/Funds officer and also executives of Morgan Keegan;  Kelsoe was an executive of the Funds and also of Morgan Management and Morgan Keegan; Tannehill was an officer of the Funds and also of Morgan Management.

97.     The Company/Funds had no employees or officers; all of its management was provided by either Morgan Management or Morgan Keegan, or both. Without discovery, it is not possible to be more specific than the allegations herein as to which aspects of the wrongful conduct alleged herein is attributable to which of the RMK Defendants. It is appropriate to treat the RMK Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Funds' public filings, sales materials, press releases and other publications are the collective actions of the narrowly defined group of defendants identified above.

98.     Each of the above RMK Defendants, by virtue of his, her or its high-level positions with the Funds and their management of or other relationship with the Funds, directly participated in the management of the Funds, was directly involved in the day-to-day operations of the Funds at the highest levels and was privy to confidential proprietary information concerning the Funds' and their investments, performance, business, operations, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition.

99.     The RMK Defendants participated in the drafting, preparation, and/or approval of the public and shareholder and investor reports, sales materials and other communications complained of herein and knew of, or should have known of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and knew of, or should have

known of, or recklessly disregarded, their materially false and misleading nature. Because of the individual Defendants' Board memberships and/or overlapping executive and managerial positions with, between and among the Company/Funds, Morgan Management, Morgan Keegan, Holding, Regions Bank, and/or Regions, each of the RMK Defendants had access to the adverse undisclosed information about the Funds' and their investments, performance, business, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition and knew, or should have known, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about the Funds and their investments, performance, business, operational trends, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition, as issued or adopted by the Funds and their management (including Morgan Management and Morgan Keegan), materially false and misleading.

100.    Each of the RMK Defendants had a duty to disseminate periodically accurate and truthful information with respect to the Funds and their investments, performance, business, operational trends, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that investments in the Funds would be based upon information that was current, truthful and accurate when made and during the period held and not redeemed. The RMK Defendants' misrepresentations and omissions violated these requirements and obligations.

101.    The corporate RMK Defendants, because of their employees' interlocking positions of control and authority as officers and/or directors of the Company, the Funds, Morgan Management, Morgan Keegan, Holding, Regions Bank, and/or Regions, controledl the management of the Company/Funds and the content of the various SEC filings, press releases, sales materials, and other public statements pertaining to the Funds.

102.    Each RMK Defendant was provided, or should have been provided, with cop-

ies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be corrected. Each of the RMK Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

103.    Each of the RMK Defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Funds shares by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Funds and their investments, performance, business, compliance with their respective investment objectives and policies and restrictions, financial statements and financial condition and the value of the Funds' shares; (ii) enabled the RMK Defendants to reap millions of dollars in advisory, management and administrative fees while in possession of material adverse non-public information about the Funds and their assets; and (iii) caused Plaintiffs and other members of the Class and Subclass herein to invest in the Funds shares on the basis of false and misleading information that concealed the highly speculative risks inherent in the Funds.

104.    All Defendants either:

(a)    participated, directly or indirectly, in the wrongful conduct alleged herein;

(b)    combined to engage in the wrongful transactions and dealings alleged herein;

(c)    knew, or in the exercise of reasonable care, should have known, of the misrepresentations and omissions of material facts, or recklessly caused such misrepresentations or omissions of material facts to be made; or

(d)    benefited from the wrongful conduct alleged.

### III.    CLASS ACTION ALLEGATIONS

105.    Each of the Funds had three classes of common stock whose ticker symbols are as follows:

39

| Fund | Class A | Class C | Class I |
|---|---|---|---|
| Short Term Fund | MSTBX | RSTCX | MSBIX |
| Intermediate Fund | MKIBX | RIBCX | RIBIX |
| High Income Fund | MKHIX | RHICX | RHIIX |

106.     The class that Plaintiffs seek to represent includes all persons and entities that (i) purchased any of classes A, C or I of shares of the Short Term, Intermediate, and High Income Funds' redeemable common stock from the Funds, and distributed through Morgan Keegan, Regions Bank and its trust department, or otherwise, at any time during the period from December 6, 2004 through December 6, 2008, inclusive ("Class Period") or (ii) held on July 1, 2007 any of classes A, C or I shares of the Short Term, Intermediate, and High Income Funds' redeemable common stock that were issued by the Funds and distributed through Morgan Keegan, Regions Bank and its trust department, or otherwise and redeemed such shares after said date for an amount less than the NAV on July 1, 2007 or less than the cost thereof upon purchase, regardless of when such shares were purchased (the "Class"). The Class includes all Trusts and Custodial Accounts (and their respective trustees, representatives, and fiduciaries): (a) for which Regions Bank is a trustee or a directed trustee, custodian, or agent; (b) that purchased, otherwise acquired, or held, one or more classes of shares of the Short Term Fund, the Intermediate Fund and/or the High Income Fund, during the Class Period. The Class excludes Defendants, any affiliates and subsidiaries of the corporate defendants, the officers and directors of the corporate defendants and members of their families, any entity in which any excluded party has a controlling interest, or any legal representatives, heirs, successors and assigns of any of the foregoing persons; this exclusion does not include accounts or trusts over which any Defendant's, or Defendant's affiliate's, control or legal ownership is derived from a fiduciary appointment as trustee, custodian or otherwise or the beneficiaries of any ERISA retirement or other compensation plans holding shares of the Funds' common stock of which any Defendant is a sponsor or to which any Defendant owes any fiduciary duty.

107.     **Fiduciary Subclass**. Plaintiffs Phoebe Heckle, Ferd Heckle, Maryan Mercer,

and John R. S. Robilio, beneficiaries of trusts of which Regions Bank d/b/a Regions Morgan Keegan Trust ("RMK Trust") was trustee and the investment responsibilities for which were delegated by Defendant Regions Bank to Defendants Morgan Management and/or Morgan Keegan pursuant to certain Investment Advisory Service Agreements, seek to represent a sub-class, designated  the "Fiduciary Subclass" or "Subclass," which includes persons who are members of the Class and (i) who are beneficiaries of trusts, directed trust accounts, custodial accounts and agency accounts (including principals as well) (collectively, "Fiduciary Accounts"), (ii) for whose benefit as beneficiaries of said Fiduciary Accounts, and for which Fiduciary Accounts, investments were  made in the Funds by Defendants RMK Trust, Morgan Keegan or Morgan Management on a discretionary basis pursuant to certain Investment Advisory Service Agreements or otherwise, or (iii) who acquired a beneficial ownership interest in the Funds' shares through accounts managed or advised by RMK Trust, or its delegees, or over which RMK Trust, or its delegees had legal ownership and control derived from a fiduciary appointment as trustee, custodian or otherwise exercised discretionary authority, which accounts purchased the Funds' shares at RMK Trust's, Morgan Keegan's or Morgan Management's direction or upon their advice during the Class Period and held such shares on July 1, 2007. The Fiduciary subclass excludes persons excluded from the Class.

108.    During the period December 6, 2004 through June 30, 2008, RMK Trust along with Morgan Management directed or caused the Fiduciary Subclass to invest almost $378 million in the Funds. *See* paragraphs 55-56 above.

109.    Sales to Regions Bank accounts constituted 76% of sales by the Short Term Fund, 17% of sales by the Intermediate Fund, 10% of sales by the High Income Fund, and 16% of sales by all three Funds. *Id.*

110.    Morgan Keegan held itself out as offering "wealth management" services through its Wealth Management Group. Morgan Keegan represented on its website, "After the investment plan has been designed and implemented, we remain your long-term partner by

providing ongoing monitoring of your investment portfolio and periodic assessments of the plan to assure that it continues to be appropriate."

111.   There are questions of law and fact common to plaintiffs and the other members of the Class and Subclass that predominate over any questions solely affecting individual members of the Class and Subclass. These questions of law and fact include the following:

(a)   Whether Defendants violated, or are otherwise to be held liable under, §§ 11, 12(a)(2), and 15 of the Securities Act, §§ 10(b) and 20 of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, and §§ 13, 34(b) and 47 of the ICA as alleged herein;

(b)   Whether defendants participated in and pursued the common course of conduct complained of;

(c)   Whether, in omitting to state and/or misrepresenting material facts, Defendants acted in such a manner as to be liable to the Funds' shareholders pursuant to the statutory claims asserted herein;

(d)   Whether registration statements issued and amended by the Funds during the Class Period were false and misleading as alleged herein;

(e)   Whether sales materials and annual and semi-annual reports issued by the Funds during the  Class Period were false and misleading as alleged herein;

(f)   Whether Defendants are responsible for the omissions of material facts in connection with the Funds' sales of their shares during the Class Period regarding the Funds' noncompliance with their respective investment objectives, policies and restrictions, the uncertain value of the Funds' assets, the Funds' pricing, the Funds' valuation practices, the illiquidity of the Funds' assets, and the risks involved in owning the Funds' shares, including concentration, credit, and illiquidity risks and valuation uncertainty, as alleged herein;

(g)   Whether Defendants are responsible for the omissions of material facts in con-

nection with the Funds' continuing offers to redeem their shares during the Class Period regarding the matters identified in the preceding subparagraph;

(h)   Whether the Funds were managed in a manner inconsistent with their respective objectives, policies, and investment restrictions and RMK Defendants' representations about how the Funds would be managed;

(i)   Whether the RMK Defendants engaged in, or failed to identify, portfolio transactions that were inconsistent with the Funds' investment objectives, policies and restrictions and that violated the 1940 Act as alleged herein;

(j)   Whether the Funds, Morgan Keegan, and Morgan Management affirmatively determined the liquidity of each security, of lack thereof, purchased by the Funds at the time of purchase;

(k)   Whether PwC failed to identify portfolio transactions that were inconsistent with, or in violation of, the Funds' investment restrictions and that violated the 1940 Act, failed to advise the Funds' board of directors of such matters, and failed to disclose such matters to the Funds' shareholders and prospective shareholders;

(l)   Whether PwC undertook to inform the Funds' officers and directors of facts, circumstances or practices that violated the Funds' investment objectives, policies and restrictions or that otherwise posed significant risks to the Funds and their shareholders;

(m)   Whether PwC conducted its audits of the Funds' financial statements during the Class Period in accordance with generally accepted auditing standards;

(n)   Whether the Funds' annual and semiannual financial statements during the Class Period were presented in accordance with generally accepted accounting principles or whether those financial statements omit required financial statements and financial statement disclosures;

43

(o)    Whether the values of certain of the Funds' assets and, accordingly, the Funds' net asset values, were uncertain;

(p)    Whether the Defendants failed to adhere to required and disclosed valuation procedures;

(q)    Whether Morgan Management and/or Morgan Keegan priced all of the assets of the Funds on a daily basis and whether they violated the 1940 Act by issuing and redeeming shares in the Funds on any days when they did not price all of the Funds' assets;

(r)    Whether Plaintiffs and the other members of the Class and Subclass are entitled to rescind their purchases of the Funds' shares during the Class Period;

(s)    Whether Plaintiffs and the other members of the Class and Subclass are entitled to recover losses that they incurred in connection with the Funds' shares held by them during the  Class Period as a result of Defendants' failure to disclose material facts in connection with the Funds' continuing offers to redeem their shares during the  Class Period;

(t)    Whether plaintiffs and the other members of the Class and Subclass have sustained damages as a result of the undisclosed unlawful conduct alleged herein; and

(u)    If plaintiffs and the other members of the Class and Subclass have been so damaged, what the proper measure of damages is.

112.    This action is properly maintained as a class action for the following reasons:

(a)    The members of the Class and Subclass are so numerous that joinder of all such class members is impracticable;

(b)    There are questions of law or fact common to the Class and Subclass;

(c)    The claims of the named plaintiffs are typical of the claims of the Class and Subclass;

44

(d)    The named plaintiffs will fairly and adequately protect the interests of the Class and Subclass;

(e)    The named plaintiffs and the Class and Subclass are represented by counsel experienced in class action and securities litigation;

(f)    The questions of law or fact common to the Class and Subclass predominate over any questions affecting only individual class members;

(g)    A class action is superior to other available methods for the fair and efficient adjudication of the controversy; and

(h)    Plaintiffs know of no difficulty that should be encountered in the management of this litigation that would preclude its maintenance as a class action.

## IV.    STATEMENT OF FACTS: ALL DEFENDANTS

### A.    THE FUNDS AND THEIR LOSSES

113.    The Intermediate and High Income Funds were opened in 1999; the Short Term Fund began operations as a series of the Company in 2005 following the merger of the Short Term Fund with a fund whose management rights were acquired by Morgan Management.  The Funds' shares were offered for sale and issued and were subject to offers to redeem and redeemed pursuant to prospectuses included as part of a SEC Form N-1A registration statement filed with the SEC.

114.    The first registration statement relating to the Funds became effective on May 22, 1999 and was amended thereafter.

115.    In addition to the Company/Funds' registration statement, the Funds' shares were sold and redeemed, and offered for sale and subject to offers to redeem, in connection with or pursuant to other information provided by the Funds to their shareholders during the Class Period, including but not limited to the Funds' June 30, 2004, 2005, and 2006 annual and December 31, 2004, 2005, and 2006 semi-annual, reports.

116.    The High Income Fund's NAV per share, from December 31, 2006 until De-

cember 31, 2007, declined from $10.14 to $3.44 for a loss of $6.70 per share, or 66.0%.

117.    The Intermediate Fund's NAV per share, from December 31, 2006 until December 31, 2007, declined from $9.93 to $4.50 for a loss of $5.43 per share or 54.7%.

118.    The Short Term Fund's NAV per share, from December 31, 2006 until December 31, 2007, declined from $10.09 to $8.44 for a loss of $1.65 per share or 16.4%.

119.    Of 426 other short-term bond funds, 439 other intermediate-term bond funds, and 253 other high-yield bond funds, none suffered losses remotely of this magnitude during the same period.

120.    These extraordinary losses in share value were caused (1) by the Funds' extraordinarily large (as compared with the Funds' respective peer funds) investments in relatively new types of thinly traded (i.e., illiquid), exotic, complex structured fixed income securities, whose uncertain valuations had to be estimated, that had not been tested through market cycles and/or had a history, or strongly resembled securities that had a history, of suddenly becoming unsalable at their estimated values and (2) by the failure of the Funds to have complied with required and disclosed procedures relating to the manner in which the Funds' assets were invested, the maintenance of the liquidity of their assets, the lack of liquidity in the Funds' portfolios, the pricing of their assets, the valuation procedures used to price their assets, the uncertainty inherent in the estimated value of their assets, and/or the failure to disclose such breaches and failures and conditions in the Funds' portfolios, all of which rendered them extraordinarily vulnerable to changes in market conditions. They were far more vulnerable than other short-term, intermediate-term and high-yield bond funds affected by the same events and conditions in the subprime and other fixed income markets in 2007.

121.    As the subprime events unfolded in the fixed income markets in the summer of 2007, buyers of, including purported market makers for, these financial instruments disproportionately (compared with their respective peer funds) purchased by the Funds disappeared, as

46

such securities became suspect even when the underlying collateral continued to pay principal and interest. This resulted in a far greater supply of such securities than a demand for such securities that in turn caused the values of all similar types of such securities to drop dramatically. This was an entirely foreseeable event for securities that traded in thin markets or for which market quotations were not readily available, as was the case with a significant portion of the Funds' portfolio securities. In an open-end fund, such as the Funds, such drops in aggregate asset values are immediately translated into losses in the Funds' net asset value per share because the per share price at which open-end funds buy and sell their shares is the value of the net assets of the fund—i.e., the value of assets minus liabilities—divided by the number of outstanding shares.

122.    The Funds' extraordinary losses were not caused by economic or market forces or by forces that could not have been largely or completely ameliorated or avoided if the Funds' had been managed in accordance with their disclosed investment objective, policies and restrictions and applicable regulatory limitations regarding restricted (i.e., illiquid) securities. The Funds' extraordinary losses were caused by the actual or predictable illiquidity of the market for those of the Funds' securities whose values could only be estimated in the absence of readily available market quotations and were thus vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments affecting such securities, resulting in precipitous price reductions for such securities.

123.    The events experienced by the fixed income securities markets in 2007 affected all fixed income mutual funds but had a far greater adverse effect on the Funds than on their respective short- and intermediate-term and high income peers because the Funds' portfolios were significantly different than their respective peer funds. The Funds contained disproportionately large positions in new, untested, illiquid structured financial instruments and other such securities—i.e., securities for which market quotations were not readily available and that, therefore, could be valued only by the use of fair value pricing procedures

47

based on estimates of value that are inherently uncertain. The Funds' securities included, or were very similar to, those that, historically, because of their existing and/or potential illiquidity, periodically have been subject to severe market dislocations, resulting in such securities suddenly becoming unsalable at or near their estimated values.

124.    The disproportionate adverse effect of these events on the Funds could not reasonably have been foreseen or anticipated by persons investing in the Funds, in light of the Funds' disclosures and their failure to disclose the extent to which their portfolios held securities uniquely vulnerable to these kinds of market events and the risks inherent in holding such large amounts of such securities, as alleged herein.

125.    The disproportionate adverse effect of these events on the Funds, as describd above, could and should have been foreseen by Defendants – and in fact was foreseen by Defendants – in view of the magnitude of illiquid securities in the Funds' portfolios and the recent history of similar events affecting niches of the fixed income securities markets and the SEC, industry and accounting guidance regarding the need for open-end funds to ensure they maintain liquid portfolios and the valuation difficulty/uncertainty attendant to thinly traded and illiquid securities.

126.    During all times relevant herein, the Funds heavily invested in collateralized bond obligations ("CBOs"), collateralized loan obligations ("CLOs"), and collateralized mortgage obligations ("CMOs"), collectively sometimes referred to as "collateralized debt obligations" ("CDOs") and more generically as "structured financial instruments," "asset-backed securities," or "mortgage-backed securities." These securities are usually only thinly traded—i.e., multiple market quotations for these securities are not regularly readily available—and, based on their characteristics, are illiquid. As a consequence, the values of these securities can only be estimated, which estimated valuations are inherently uncertain.

127.    No other short-term, intermediate-term or high-yield bond fund had invested as heavily in these structured financial instruments as did the three Regions Morgan Keegan

Funds. According to *The Birmingham News*, June 7, 2009, on July 19, 2007, Bloomberg News quoted Jim Kelsoe, the senior portfolio manager of the Funds, as having an "intoxication" with such securities. Bloomberg further reported that an analyst at Morningstar, Inc., the mutual fund research firm, noted that "[a] lot of mutual funds didn't own much of this stuff" and that the High Income Fund was "the one real big exception."

128.    The extraordinary decline (as compared with other funds of their respective types) in the Funds' respective net asset values in 2007 was caused by the illiquidity of the market for those of the Funds' securities whose values could only be estimated in the absence of readily available market quotations and were thus vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments affecting such securities, resulting in precipitous price reductions for such securities.

129.    In sales materials during the Class Period, an example of which is dated June 30, 2007, the High Income Fund represented to existing and prospective shareholders that the Fund provides the "[p]otential for lower NAV volatility than typical high-yield funds."

130.    In its sales materials during the Class Period, an example of which is dated June 30, 2007 and September 30, 2007, the High Income Fund represented to existing and prospective shareholders the following (emphasis supplied):

- "**Opportunity for High Current Income** . . . The *relatively conservative credit posture* of the Fund reflects our goal of higher yields *without excessive credit risk*."

- "**Broad Diversification**  A unique advantage of the Select High Income Fund is its diversification across a wide variety of high-income debt and equity-linked securities. Not limited to high-yield corporate bonds, we invest in many types of mortgage-backed and asset-backed securities, as well as various types of convertible securities and income-producing stocks."

The September 30, 2007 sales materials omitted the representation described in paragraph 129 above.

131.    In its sales materials during the Class Period, an example of which is dated December 31, 2005, the Intermediate Fund represented to existing and prospective shareholders the following (emphasis supplied):

> "If your objective is: *Capital Preservation* and Income, This Fund Provides:
>
> - A higher level of current income *than typical money market investments*
> - A *greater stability in principal* value than that of long-term bonds
> - A *diversified* portfolio of *investment-grade* debt instruments."

132.    In these same materials, investors were told that the Intermediate Fund "seeks to MINIMIZE RISK" and that the Fund "does *not invest in speculative derivatives*" (italics supplied; capitalized in original).

133.    In its sales/redemption materials during the Class Period, an example of which is dated December 31, 2004, the Intermediate Fund touted a benefit of investing in mutual funds to be "greater liquidity" that "means investors can *redeem any portion of their shares* or invest any additional amount *at any time*" (emphasis supplied).

134.    In its sales materials during the Class Period, an example of which is dated September 30, 2007, the Intermediate Fund represented to existing and prospective shareholders the following (emphasis supplied):

> (a)    "The Fund provides:
>
> - "A higher level of current income *than typical money market investments*
> - "A *diversified* portfolio of *mostly investment-grade* debt instruments, with some exposure to below-investment-grade assets."
>
> (b)    "**Concentrate on Value** *Credit fundamentals* and relative value drive the investment decisions. The Fund's focus is on 'undervalued' and 'out-of-favor' sectors and securities, which still have *solid credit fundamentals*. In addition to purchasing investment-grade securities to fulfill its investment objectives, the Fund may invest up to 35% of its assets in below-investment-grade debt securities. The portfolio seeks to maintain a balanced exposure across the investment-grade spec-

trum."

(c)     "**Broad Diversification** The *single best way to reduce the risk* of any portfolio is through *adequate diversification*. The *Intermediate portfolio is diversified* not only with regard to issuer, but also *industry*, *security type* and maturity. Furthermore, the Select Intermediate Bond Fund *does not invest in speculative derivatives*."

135.    The investment objective of the Intermediate Fund, which could not be changed without shareholder approval, was to "seek[] a high level of income by investing in intermediate maturity, investment grade bonds [and] seek[] capital growth as a secondary objective when consistent with the fund's primary objective." Prospectuses dated November 1, 2004, 2005, and 2006; annual and semi-annual reports dated June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007.

136.    The investment objective of the Short Term Fund, which could not be changed without shareholder approval, was "a high level of current income consistent with preservation of capital." Prospectuses dated November 1, 2005 and 2006; annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007.

137.    The Short Term Fund further represented in its prospectuses that it would "normally maintain a dollar-weighted average portfolio maturity of three years or less, but may purchase individual securities with longer maturities" in order "to moderate principal fluctuations." Prospectuses dated November 1, 2005 and 2006.

138.    In its sales materials during the Class Period, an example of which is dated September 30, 2007, the Short Term Fund represented to shareholders whose investment objective was seeking competitive income with preservation of capital the following (emphasis supplied):

(a)     The Short Term Fund provided

- "A higher level of current income *than typical CDs, savings accounts, or money market instruments*"

51

- • "A *greater stability in principal value* than that of longer term bonds or bond funds"

- • "A *diversified* portfolio of short-term investment-grade debt securities"

(b)  "**Concentrate on Value** The Fund seeks to provide current income and *capital preservation* by maintaining a portfolio of *investment-grade* debt securities. The Fund will attempt to utilize a wide variety of assets, all with *solid credit fundamentals*, to maximize short-term income. The portfolio invests primarily in issues rated in one of the *four highest credit rating categories* by a nationally recognized statistical rating organization; however, the Fund may invest up to 10% in below-investment-grade securities"

(c)  "**Minimize Risk** Historically, as interest rates move up and down, bonds with longer maturities experience greater price fluctuations than bonds with shorter maturities. Generally, longer-term bonds offer higher yields, but the trade-off is a higher degree of price volatility. By limiting the maturity of its portfolio securities, the Fund seeks to moderate principal fluctuations and, thus, provide a *more stable net asset value*."

(d)  "Short-term bonds offer *less volatility* than long-term investments and potentially greater income and total return than *money market and other conservative investments*."

139.   During the Class Periods, the RMK Defendants, on a website that prominently displayed the Funds' affiliation with Regions, under the heading "THE RELIABILITY OF INVESTING WISELY," represented as follows (emphasis supplied):

"When you invest in RMK Select Funds, *you know exactly where you're going and exactly what you own*. Each Fund has a *well defined*, '*no-surprises*' style of structured, *disciplined decision making*; each portfolio manager is *required* to select only the most promising investments *consistent with that style*."

140.   The Funds were not perceived to expose investors therein to the risk of catastrophic losses.  Morningstar, Inc., which rates the performance of mutual funds on a risk-adjusted basis, awarded the Intermediate and High Income Funds five stars, its highest possible rating, a fact that Morgan Management and those Funds highlighted in those Funds'

semi-annual report to shareholders for the six months ended December 31, 2004, which re-port was distributed to the Funds' shareholders and prospective shareholders during at least the succeeding six months.

141.    The Morningstar five-star rating of High Income Fund was likewise highlighted on the Morgan Keegan website in 2005: "The RMK Select Mid Cap Growth Fund and the RMK Select High Income Fund have earned Morningstar's highest five-star rating."

142.    In an article entitled "A Bond Fund That's Redefining Pain" on the Seeking Alpha website on October 13, 2007, the author noted that the Intermediate Fund was sup-posed to be safe: ". . . consider the case of the Regions Morgan Keegan Select Intermediate Bond Fund. Ostensibly this is intended to be a "normal" investment-grade bond fund. And yet it somehow **lost over 21% so far in 2007**. And you thought the Global Alpha fund was having a bad year! At least investing in a hedge fund you knew you were taking risk. *This was supposed to be an investment grade bond fund.* You know, where you don't take a lot of risk? You know, the safe part of your portfolio?" http://seekingalpha.com/article/49762-a-bond-fund-that-s-redefining-pain (emphasis in origi-nal).

143.    These Fund representations, which focused on the Funds' relative principal sta-bility as compared with their peers, would and did lead reasonable investors to conclude the Funds were relatively safe and concealed the concentration, credit, liquidity and valuation risks being taken by the Funds and investors therein.

144.    Notwithstanding the Funds' representations regarding relative principal stability, the Funds' management failed to implement the necessary risk management procedures to avoid the catastrophic losses incurred by the Funds. In an article in the Memphis *Commercial Appeal*, dated April 23, 2008, Lawrence Jones, a Morningstar Analyst, was quoted as saying: "RMK ultimately showed it didn't have the risk controls needed to protect investments [sic] from securities that could hurt them."

**B.**    **THE FUNDS' PERFORMANCES COMPARED WITH THEIR RESPECTIVE PEERS**

145.    According to their sales/redemption materials dated December 31, 2007, the Funds' total return performances for the indicated periods through December 31, 2007 were as follows:

(a)    Short Term Fund:

| Class of Shares | A | | C | | I | Average |
|---|---|---|---|---|---|---|
| Max Load/No Load | No | Max | No | Max | No | |
| **Period ending** | | | | | | |
| Quarter | -7.57% | -8.96% | -7.64% | -8.57% | | -8.19% |
| Six Months | -13.03% | -14.34% | -13.16% | -14.03% | -12.82% | -13.48% |
| One Year | -11.57% | -12.90% | -11.87% | -12.75% | -11.25% | -12.07% |
| **Average Annualized Total Returns** | | | | | | |
| Three Years | -1.32% | -1.81% | N/A | N/A | | -1.57% |
| Five Years | 0.42% | 0.12% | N/A | N/A | 0.72% | 0.42% |

(b)    Intermediate Fund:

| Class of Shares | A | | C | | I | Average |
|---|---|---|---|---|---|---|
| Max Load/No Load | No | Max | No | Max | No | |
| **Period ending** | | | | | | |
| Quarter | -37.01% | -38.27% | -37.12% | -37.75% | | -37.54% |
| Six Months | -49.58% | -50.59% | -49.73% | -50.23% | -49.40% | -49.91% |
| One Year | -50.33% | -51.32% | -50.56% | -51.06% | -50.09% | -50.67% |
| **Average Annualized Total Returns** | | | | | | |
| Three Years | -17.57% | -18.12% | -17.89% | -17.89% | | -17.87% |
| Five Years | -8.62% | -8.98% | -8.95% | -8.95% | -8.35% | -8.77% |

(c)    High Income Fund:

| Class of Shares | A | | C | | I | Average |
|---|---|---|---|---|---|---|
| Max Load/No Load | No | Max | No | Max | No | |
| **Period ending** | | | | | | |
| Quarter | -38.24% | -39.78% | -38.43% | -39.04% | | -38.88% |
| Six Months | -59.48% | -58.44% | -58.97% | -58.56% | -58.39% | -58.77% |
| One Year | -59.70% | -60.71% | -59.91% | -60.31% | -59.60% | -60.05% |
| **Average Annualized Total Returns** | | | | | | |
| Three Years | -21.59% | -22.25% | -22.01% | -22.01% | | -21.97% |
| Five Years | -8.46% | -8.92% | -8.92% | -8.92% | -8.23% | -8.69% |

146.    The Funds' respective performances, as compared with the performances of their peers for the twelve months ended December 31, 2007, were magnitudes worse than all other comparable funds:

| Period ending 12/31/07 | Intermediate Fund * | All Intermediate Bond Funds ** | High Income Fund * | All High Income Funds ** | Short Term Fund * | All Short Term Funds ** |
|---|---|---|---|---|---|---|
| Six months | -49.91% | 5.73% | -58.77% | 0.53% | -13.48% | 4.57% |
| One Year | -50.67% | 7.02% | -60.05% | 1.75% | -12.07% | 6.83% |
| Five Years | -8.77% | 4.22% | -8.69% | 8.66% | 0.42% | 3.38% |

* Average of load and no load classes A, C and I from tables in the preceding paragraph, Funds' semi-annual report dated December 31, 2007.
** Funds' semi-annual report dated December 31, 2007, and relevant Lehman Brothers Indices cited therein.

147.   As of March 14, 2008, the High Income Fund's one year performance was more than three times worse than the next worst performing high-income fund, over 11 times worse than the median peer fund, and three times worse than the 22 percentage point range of all of the other 249 high income funds. For five years, the High Income Fund's performance was also vastly worse than its peers:

| 249 High Income Funds | One Year | Five Years |
|---|---|---|
| RMK High Income Fund | -67.35% | -12.25% |
| All Other High Income Funds | | |
| Second Lowest | -20.61% | 3.78% |
| Median | -5.87% | 7.46% |
| Highest | 1.61% | 11.82% |

Source: http://personal.fidelity.com/research/funds/?bar=s (March 14, 2008).

148.   The following table demonstrates that the High Income Fund's performance was far worse than its high income fund category for the indicated periods, as of February 29, 2008:

| Year | HIF Total Return % | +/- Category |
|---|---|---|
| One Year-to-Date 2/29/08 | -15.16% | -11.88% |
| 2007 | -59.70% | -61.17% |
| 2006 | 11.10% | 0.96% |

Source: http://quicktake.morningstar.com/fundnet/MorningstarAnalysis.aspx?Country=USA&Symbol=MKHIX (data through February 29, 2008).

149.    As of March 14, 2008, the Intermediate Fund's one year performance was al-most eight times worse than the next worst performing intermediate-term bond fund and 24 times worse than the median peer fund. For five years, the Intermediate Fund's performance was also vastly worse than its peers:

| 461 Intermediate Bond Funds | One Year | Five Years |
|---|---|---|
| RMK Intermediate Fund * | -69.49% | -17.20% |
| All Other Intermediate-Term Funds | | |
| Second Lowest | -8.79% | 0.95% |
| Median | 2.83% | 3.34% |
| Highest | 11.40% | 9.21% |

Source: http://personal.fidelity.com/research/funds/?bar=s (March 14, 2008), except regarding Intermediate Fund.

* The Morgan Keegan Intermediate Fund is not included in the Fidelity intermediate bond fund screen; the data for Intermediate Fund isfrom Morningstar.com: http://quicktake.morningstar.com/FundNet/Snapshot.aspxhttp://quicktake.morningstar.com/FundNet/Snapshot.aspx?Country=U.S.&pgid=hetopquote&Symbol=MKIBX (data through March 14, 2008).

150.    The following table demonstrates that the Intermediate Fund's performance was far worse than its intermediate-term bond fund category for the indicated periods, as of February 29, 2008:

| Year | IBF Total Re-turn % | +/- Cate-gory |
|---|---|---|
| Year-to-Date 2/29/08 | -33.30% | -34.39% |
| 2007 | -50.32% | -55.02% |
| 2006 | 7.16% | 3.01% |

Source: http://quicktake.morningstar.com/fundnet/MorningstarAnalysis.aspx?Country=USA&Symbol=MKIBX (data through February 29, 2008)

151.    As of March 14, 2008, the Short Term Fund's performance for one year was 50% worse than the second next worst performing short-term fund and over 15 percentage points worse than the median short-term income fund:

| 169 Short-Term Bond Funds | One Year | Five Years |
|---|---|---|
| RMK Short Term Fund* | -23.09% | -2.03% |
| All Other Short-Term Funds: | | |
| Second Lowest | -8.03% | 1.15% |
| Median | 3.61% | 3.26% |
| Highest | 9.93% | 5.53% |

Source: http://personal.fidelity.com/research/funds/?bar=s (March 14, 2008), except regarding Short Term Fund.

* The Morgan Keegan Short Term Fund is not included in the Fidelity short-term bond fund screen; the data for Short Term Fund isfrom Morningstar.com: http://quicktake.morningstar.com/FundNet/TotalReturns.aspx?Country=USA&Symbol=MSTBX (data through March 14, 2008).

    152.    The following table demonstrates that the Short Term Fund's performance was far worse than its short-term income fund category for the indicated periods, as of March 14, 2008:

| Year | STF Total Return % | +/- Cate-gory |
|---|---|---|
| One Year-to-Date 3/14/08 | -12.19% | -12.57% |
| 2007 | -11.30% | -15.50% |
| 2006 | 6.10% | 2.10% |

Source: http://quicktake.morningstar.com/fundnet/MorningstarAnalysis.aspx?Country=USA&Symbol=MKHIX (data through March 14, 2008).

    153.    The following chart shows the Intermediate Fund's NAV during the years 2004 through March 14, 2008:



Source: http://finance.yahoo.com/q/bc?s=RIBCX&t=5y  3/14/08

154.    The following chart demonstrates the Intermediate Fund's performance in terms of the performance of a $10,000 investment, as compared with a bond index and with all intermediate bond funds through March 14, 2008:



Orange (bottom) line: Lehman Brothers Aggregate Bond Total Return Index

Green (middle) line: Intermediate-Term Bond fund category.

Source:
http://quicktake.morningstar.com/fundnet/TotalReturns.aspx?Country=USA&Symbol=RIBCX
3/15/08

155.    The following chart shows the High Income Fund's NAV during the years 2004 through March 14, 2008:



Source: http://finance.yahoo.com/q/bc?s=MKHIX&t=5y 3/14/08

156.   The following chart demonstrates the High Income Fund's performance in terms of the performance of a $10,000 investment, as compared with a bond index and with all high-yield bond funds through March 14, 2008:



"http://im.morningstar.com/Graph/FOGrowth10YearPNG/USA_MKHIX.png"

Orange (bottom) line: Lehman Brothers Aggregate Bond Total Return Index

Green (middle) line: High-Yield Bond fund category.

Source:
http://quicktake.morningstar.com/FundNet/TotalReturns.aspx?Country=USA&http://quicktake
.morningstar.com/FundNet/TotalReturns.aspx?Country=USA&Symbol=MKHX 3/15/08

157.   The following chart shows the Short Term Fund's NAV during the years 2004 through March 14, 2008:

59



Source: http://finance.yahoo.com/q/bc?s=MSTBX&t=5y 3/14/08

158.    The following chart demonstrates the Short Term Fund's performance in terms of the performance of a $10,000 investment, as compared with a bond index and with all short-term bond funds through March 14, 2008:



Orange (bottom) line: Lehman Brothers Aggregate Bond Total Return Index

Green (top) line: Short-Term fund category.

Source: http://quicktake.morningstar.com/fundnet/Snapshot.aspx?Country=USA&http://quicktake.morningstar.com/fundnet/Snapshot.aspx?Country=USA&Symbol=MSTBX 3/15/08

159.    The following charts from the Funds' April 30, 2008 annual report demonstrate the Funds' respective performances in terms of the performance of a $10,000 investment, as compared with their respective peer bond indices through April 30, 2008:

## SHORT TERM FUND

### GROWTH OF A $10,000 INVESTMENT
CLASS I SHARES

The graph below illustrates a hypothetical investment of $10,000 in Regions Morgan Keegan Select Short Term Bond Fund—Class I Shares from the commencement of investment operations on January 5, 2001 to April 30, 2008[1] compared to the Lehman Brothers 1-3 Year U.S. Government/Credit Index.[2]



## INTERMEDIATE FUND

### GROWTH OF A $10,000 INVESTMENT
CLASS I SHARES

The graph below illustrates a hypothetical investment of $10,000 in Regions Morgan Keegan Select Intermediate Bond Fund—Class I Shares from the commencement of investment operations on March 22, 1999 to April 30, 2008 compared to the Lehman Brothers Intermediate U. S. Aggregate Index[1].



## HIGH INCOME FUND

61

## GROWTH OF A $10,000 INVESTMENT_____
### CLASS I SHARES

The graph below illustrates a hypothetical investment of $10,000 in Regions Morgan Keegan Select High Income Fund—Class I Shares from the commencement of investment operations on March 22, 1999 to April 30, 2008 compared to the Lehman Brothers Ba U.S. High Yield Index[1].



160.   The following charts from the Funds' October 31, 2008 semi-annual report demonstrate the Funds' respective performances in terms of the performance of $10,000 investment, as compared with their peer bond indices through October 31, 2008:

### SHORT TERM FUND

**SHORT TERM BOND FUND**
**Growth of a $10,000 Investment (Unaudited)**

**Class A Shares**

The graph below illustrates a hypothetical investment of $10,000 in Short Term Bond Fund—Class A Shares from the commencement of investment operations on March 8, 2001 to October 31, 2008 compared to the Barclays Capital 1-3 Year U.S. Government/Credit Index[1].



## INTERMEDIATE FUND

INTERMEDIATE BOND FUND
Growth of a $10,000 Investment (Unaudited)

Class A Shares

The graph below illustrates a hypothetical investment of $10,000 in Intermediate Bond Fund—Class A Shares from the commencement of investment operations on March 22, 1999 to October 31, 2008 compared to the Barclays Capital Intermediate U.S. Aggregate Index[1].



## HIGH INCOME FUND

HIGH INCOME FUND
Growth of a $10,000 Investment (Unaudited)

Class A Shares

The graph below illustrates a hypothetical investment of $10,000 in High Income Fund—Class A Shares from the commencement of investment operations on March 22, 1999 to October 31, 2008 compared to the Barclays Capital Ba U.S. High Yield Index[1].



Source: Morgan Keegan Select Fund, Inc. Semi-Annual Report, October 31, 2008, pp. 7, 19, 35

C.    **DEFENDANTS' UNDISCLOSED AND MISREPRESENTED RISKS AND VIOLATIONS OF THE FUNDS' INVESTMENT OBJECTIVES, POLICIES AND RESTRICTIONS**

1.    **The RMK Defendants Did Not Limit the Funds' Investments in Illiquid Securities, as They and the Funds Represented They Would.**

161.    SEC guidelines provide that open-end registered investment companies are not to invest more than 15% of their portfolios in illiquid securities, guidance that the investment company industry interprets as an SEC requirement: "SEC policies *require*, however, that no more than 15% of a mutual fund's net assets be illiquid (10% for money markets)." Investment Company Institute: Valuation and Liquidity Issues for Mutual Funds, February 1997 p. 41 (emphasis supplied).

162.    As disclosed in their SAI, during the Class Periods, the Intermediate and High Income Funds were subject to a non-fundamental investment restriction prohibiting the Funds from purchasing "any security if, as a result, more than 15% of its net assets would be invested in securities that are illiquid because they are subject to legal or contractual restrictions on resale or because they cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued."

163.    The Short Term Fund represented, in its November 1, 2005 SAI, that, as a non-fundamental investment limitation, the Fund:

(a)    would not "[p]urchase any illiquid security if, as a result, more than 15% of the fund's net assets (based on current value) would then be invested in such securities; provided, however, that no more than 10% of the fund's total assets may be invested in the aggregate in (a) restricted securities, (b) securities of companies that (with predecessor companies) have a record of less than three years of continuous operations and (c) securities that are not readily marketable";

(b)    but that, "as a matter of non-fundamental operating policy, currently does not intend to invest in [restricted] securities in the coming year."

164.    Contrary to the representation in the preceding paragraph, just two months

later, on December 31, 2005, the Short Term Fund's portfolio included 21 securities worth $15.4 million in restricted securities, or 21% of its total investments. On June 30, 2006, without in the meantime disclosing to its existing shareholders that the Fund had reversed its policy prohibiting all investments in restricted securities, the Short Term Fund's portfolio included $20.8 million in restricted securities, or 31.5% of its total investments.

165.    In its November 1, 2006 SAI, the Short Term Fund represented that it "will not purchase securities for which there is no readily available market . . . . if immediately after and as a result, the value of such securities would exceed, in the aggregate, 15% of the fund's net assets" but did not disclose to its existing shareholders that it had reversed its policy prohibiting all investments in restricted securities.

166.    A "non-fundamental" investment restriction is one that can be changed without shareholder approval but cannot be implemented without disclosing the change. The Short Term Fund's non-fundamental restriction on illiquid and restricted securities and securities that are not readily marketable was not changed and was in effect at all relevant times.

167.    A violation of a "fundamental" investment restriction is a violation of section 13 of the ICA. The Funds' adviser and directors, without any shareholder input, can choose whether an investment restriction is "fundamental" or "non-fundamental."

168.    With respect to the 15% limitation, in their SAIs during all relevant times, the Funds represented that "if through a change in values, net assets, or other circumstances, a fund were in a position where more than 15% of its net assets was invested in illiquid securities, it would consider appropriate steps to protect liquidity."

169.    This practice violated SEC guidance with respect to illiquid securities.

170.    During the Class Period, the Funds invested more than 15% of their respective portfolios in illiquid securities in contravention of the SEC's guidance and notwithstanding being prohibited from doing so by the "non-fundamental" investment restriction imposed on

the Funds by the Funds' directors in compliance with what the investment company industry interprets as an SEC requirement.

171.    The Funds did not disclose in their prospectus that they would invest more than 15% of their respective portfolios in illiquid securities; nor did they disclose that they did, or would, do so in contravention of the SEC's guidance or that they were prohibited from doing so by the "non-fundamental" investment restriction imposed on the Funds by the Funds' directors in compliance with what the investment company industry interprets as an SEC requirement and that the Funds regularly violated that restriction.

172.    The November 1, 2006 SAI disclosed that illiquid securities are those that "cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued."

173.    In the November 1, 2006 SAI, Defendants acknowledged that factors to be taken into account in determining liquidity include:

(a)    Frequency of trades or quotes,

(b)    Number of dealers willing to purchase or sell the instrument and the number of other potential purchases,

(c)    Whether those dealers have undertaken to make a market in the instrument, and

(d)    Nature of the security (e.g., uniqueness) and the nature of the marketplace in which the instrument trades, including the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer.

174.    In the same SAI, Defendants further acknowledged that securities for which market quotations are not readily available are illiquid securities, as are securities subject to legal or contractual restrictions on resale.

175.    Fair-valued securities are:

(a)     Securities for which market quotations are not readily available whose values must be estimated in good faith in accordance with procedures adopted by a mutual fund's board of directors;

(b)     Securities that have not traded in significant volume for a substantial period;

(c)     Securities for which there is no readily available market;

(d)     Illiquid securities; and/or

(e)     Thinly traded.

176.     Illiquid securities are:

(a)     Securities for which market quotations are not readily available;

(b)     Securities that have not traded in significant volume for a substantial period;

(c)     Securities for which there is no readily available market; or

(d)     Thinly traded; and

(e)     Must be fair valued.

177.     Restricted securities are illiquid securities.

178.     The fair value of a portfolio security is the price which a mutual fund may reasonably expect to receive upon its current sale. Fair value cannot be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by the portfolio manager. Funds also may not fair value price portfolio securities at prices that are not achievable on a current basis on the belief that the fund would not currently need to sell those securities. Thus, bond funds generally may not fair value price portfolio securities at par based on the expectation that the funds will hold those securities until maturity, if the funds could not receive par value upon the current sale of those securities.

179.     The SEC requires that open-end investment companies state the percentage of

illiquid investments that they hold.

180.    During the Class Periods, many, if not most or all, of the structured financial instruments in which the Funds invested did not regularly trade or were thinly traded. Such securities were, at the time they were purchased by the Funds and during the time they were held by the Funds, illiquid. Accordingly, the investments by the Funds in illiquid securities substantially exceeded 15% of their respective net assets, as a result of purchases by the Funds in violation of the Funds' own investment restriction and SEC guidance.

181.    During the Class Periods, the Funds were managed so that the Funds were exposed to substantial liquidity risk: the risk that the Funds' exotic, new structured securities traded in a thin market and were, based on the history of such securities, at risk of suddenly becoming unsalable at the estimated values at which they were being carried on the Funds' books and records because the small number, if any, of dealers purporting to make a market in any one of these securities today might, upon a shift in market sentiment, disappear tomorrow, leaving the Funds with no one to buy their securities when they wanted to sell them. Any such dealers had no obligation to continue making a market in such securities and could withdraw from such activity at any time without notice.

182.    Many, if not most, of the securities in which the Funds invested were residential mortgage-backed securities and collateralized debt obligations backed by such securities. In an SEC administrative proceeding, the SEC determined that there was no market price readily available for such securities. The Defendants did not disclose that the Funds were exposed to liquidity risk: the risk that the Funds' complex, exotic asset- and mortgage-backed and other structured securities traded in a thin market and historically were subject to severe market dislocations and suddenly becoming unsalable at the estimated values at which they were being carried on the Funds' books and records because the small number of dealers purporting to make a market in any one of these securities today might, upon a shift in market sentiment, disappear tomorrow, leaving the Funds with no one to buy their securities when

they wanted to sell them.

183.    The following table shows that, during the Class Period, the Funds held sub-

stantial amounts of securities that were:

(a)    Fair valued (except for the Short Term Fund's June 30, 2005 annual report, designated for the first time in the Funds' respective lists of portfolio invest-ments in the June 30, 2007 annual report with an "(e)", designated in the Funds' Form N-Q report for September 30, 2007 with a "(d)", and designated in the Funds' semi-annual report for December 31, 2007 with a "#") and/or

(b)    "Restricted" (securities subject to legal or contractual restrictions on resale and designated in the Funds' respective lists of portfolio investments in the Funds' annual and semi-annual reports during all times relevant herein with an "(a)" [with a "†" in the Funds' December 31, 2007 semi-annual report]) or

(c)    Were not denoted fair-valued or restricted and were not registered with the SEC under the '33 Act or subject to '34 Act reporting (shown on the lines la-beled "No (a), R/S, 10-K/Q") and

(d)    Were, therefore, illiquid securities (denominator for "% based on $ amount" is the Fund's total investments in securities as reported in its annual, semi-annual, or quarterly reports):

| | Period Ending: | Intermediate Fund (000,000s) | | | High Income Fund (000,000s) | | | Short Term Fund (000,000s) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | # Secur-ities | Dis-closed Value | % Based on $ amount | # Secur-ities | Dis-closed Value | % Based on $ amount | # Secur-ities | Dis-closed Value | % Based on $ amount |
| 1 | December 31, 2007 | | | | | | | | | |
| 2 | Total Investments | 87 | $167.2 | 100.0% | 141 | $146.7 | 100.0% | 58 | $48.3 | 100.0% |
| 3 | Fair valued | 62 | $97.5 | 58.3% | 103 | $98.4 | 67.1% | 16 | $ 8.9 | 18.4% |
| 4 | Restricted | 60 | $127.2 | 76.1% | 77 | $93.0 | 63.4% | 18 | $12.8 | 26.5% |
| 5 | Both (a) and (e) | 50 | $87.7 | 52.4% | 73 | $81.2 | 55.4% | 13 | $ 8.3 | 17.2% |
| 6 | Fair valued, or restricted, or both [lines 3 + 4 – 5] | 72 | $137.0 | 82.0% | 107 | $110.2 | 75.1% | 21 | $13.4 | 27.7% |
| 7 | No (a), R/S, 10-K/Q | 17 | $ 16.5 | 9.9% | 27 | $ 13.8 | 9.4% | 13 | $ 7.1 | 14.7% |
| 8 | Total lines 6 + 7 | 89 | $153.5 | 91.9% | 134 | $124.0 | 84.5% | 34 | $20.5 | 42.4% |

| | Period Ending: | Intermediate Fund (000,000s) | | | High Income Fund (000,000s) | | | Short Term Fund (000,000s) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | # Securities | Disclosed Value | % Based on $ amount | # Securities | Disclosed Value | % Based on $ amount | # Securities | Disclosed Value | % Based on $ amount |
| 9 | **September 30, 2007** | | | | | | | | | |
| 10 | Total Investments | 117 | $467.1 | 100.0% | 186 | $402.8 | 100.0% | 70 | $75.7 | 100.0% |
| 11 | Fair valued | 77 | $274.0 | 58.7% | 129 | $255.5 | 63.4% | 21 | $20.0 | 26.4% |
| 12 | Restricted | 75 | $328.6 | 70.4% | 112 | $251.4 | 62.4% | 24 | $23.3 | 30.8% |
| 13 | Both (a) and (e) | 60 | $236.4 | 50.6% | 95 | $203.2 | 50.4% | 19 | $18.5 | 24.4% |
| 14 | Fair valued, or restricted, or both [lines 11 + 12 − 13] | 92 | $366.2 | 78.5% | 146 | $303.7 | 75.0% | 26 | $24.8 | 32.8% |
| 15 | No (a), R/S, 10-K/Q | 23 | $ 55.3 | 11.8% | 31 | $ 46.6 | 11.6% | 13 | $ 9.8 | 13.0% |
| 16 | Total lines 14 + 15 | 115 | $421.5 | 90.3% | 177 | $350.3 | 86.6% | 39 | $34.6 | 45.8% |
| 17 | **June 30, 2007** | | | | | | | | | |
| 18 | Total Investments | 193 | $1,021.0 | 100.0% | 330 | $1,045.7 | 100.0% | 76 | $86.4 | 100.0% |
| 19 | Fair valued | 93 | $ 514.9 | 50.4% | 168 | $ 624.9 | 59.7% | 21 | $26.1 | 30.2% |
| 20 | Restricted | 100 | $ 609.9 | 59.7% | 152 | $ 614.7 | 58.8% | 26 | $30.5 | 35.3% |
| 21 | Both (a) and (e) | 68 | $ 405.1 | 39.7% | 120 | $ 464.7 | 44.4% | 17 | $21.5 | 24.9% |
| 22 | Fair valued, or restricted, or both [lines 19 + 20 − 21] | 125 | $ 719,7 | 70.4% | 200 | $ 774.9 | 74.1% | 30 | $35.1 | 40.6% |
| 23 | No (a), R/S, 10-K/Q | 32 | $ 116.2 | 11.4% | 45 | $ 124.2 | 11.9% | 16 | $13.2 | 15.3% |
| 24 | Total lines 22 + 23 | 157 | $ 835.9 | 81.8% | 245 | $ 899.1 | 86.0% | 46 | $48.3 | 55.9% |
| 25 | **March 31, 2007** | | | | | | | | | |
| 26 | Total Investments | 174 | $1,013.5 | 100.0% | 338 | $1,200.3 | 100.0% | 74 | $81.4 | 100.0% |
| 27 | Fair valued | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 28 | Restricted | 83 | $ 541.3 | 53.4% | 139 | $ 613.3 | 51.1% | 24 | $27.4 | 33.6% |
| 29 | Both (a) and (e) | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 30 | No (a), R/S, 10-K/Q | 30 | $ 124.6 | 12.3% | 42 | $ 144.3 | 12.0% | 15 | 11.4 | 14.1% |
| 31 | Total lines 28 + 30 | 113 | $ 665.9 | 65.7% | 181 | $ 757.6 | 63.1% | 39 | $38.8 | 47.7% |
| 32 | **December 31, 2006** | | | | | | | | | |
| 33 | Total Investments | 164 | $936.1 | 100.0% | 316 | $1,243.0 | 100.0% | 69 | $79.1 | 100.0% |
| 34 | Fair valued | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 35 | Restricted | 81 | $512.0 | 54.7% | 130 | $ 634.3 | 51.0% | 21 | $20.3 | 25.7% |
| 36 | Both (a) and (e) | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 37 | No (a), R/S, 10-K/Q | 28 | $125.6 | 13.4% | 37 | $ 122.1 | 9.8% | 12 | 7.3 | 9.2% |
| 38 | Total lines 35 + 37 | 109 | $637.6 | 68.1% | 167 | $ 756.4 | 60.9% | 33 | $27.6 | 34.9% |
| 39 | **June 30, 2006** | | | | | | | | | |
| 40 | Total Investments | 159 | $673.7 | 100.0% | 316 | $1,192.8 | 100.0% | 73 | $66.0 | 100.0% |
| 41 | Fair valued | NA | $376.1 | 55.8% | NA | $ 590.0 | 49.5% | NA | $12.0 | 18.2% |
| 42 | Restricted | 79 | $382.3 | 56.7% | 127 | $ 590.1 | 49.5% | 22 | $21.5 | 32.6% |
| 43 | Both (a) and (e) | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 44 | No (a), R/S, 10-K/Q | 28 | $112.4 | 16.7% | 32 | $ 92.8 | 7.8% | 13 | $ 8.7 | 13.2% |
| 45 | Total lines 42 + 44 | 107 | $494.7 | 73.4% | 159 | $ 682.9 | 57.2% | 35 | $30.3 | 45.9% |
| 46 | **December 31, 2005** | | | | | | | | | |

70

| | Period Ending: | Intermediate Fund (000,000s) | | | High Income Fund (000,000s) | | | Short Term Fund (000,000s) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | # Securities | Disclosed Value | % Based on $ amount | # Securities | Disclosed Value | % Based on $ amount | # Securities | Disclosed Value | % Based on $ amount |
| 47 | Total Investments | 159 | $560.3 | 100.0% | 218 | $1,146.0 | 100.0% | 76 | $73.7 | 100.0% |
| 48 | Fair valued | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 49 | Restricted | 75 | $284.5 | 50.8% | 120 | $ 584.8 | 51.0% | 21 | $15.4 | 21.0% |
| 50 | Both | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 51 | No (a), R/S, 10-K/Q | 22 | $ 72.5 | 12.9% | 26 | $ 89.9 | 7.8% | 11 | $ 9.7 | 13.2% |
| 52 | Total lines 49 + 51 | 97 | $356.9 | 63.7% | 146 | $ 674.7 | 58.9% | 32 | $25.2 | 34.1% |
| 53 | **June 30, 2005** | | | | | | | | | |
| 54 | Total Investments | 159 | $482.0 | 100.0% | 209 | $1,113.6 | 100.0% | 70 | $70.5 | 100.0% |
| 55 | Fair valued | NA | NA | NA | NA | NA | NA | 6 | $ 4.4 | 6.3% |
| 56 | Restricted | 75 | $234.5 | 48.6% | 97 | $ 489.0 | 43.9% | 18 | $15.2 | 21.5% |
| 57 | Both | NA | NA | NA | NA | NA | NA | 5 | $ 3.5 | 4.9% |
| 58 | Fair valued, or restricted, or both [lines 55 + 56 − 57] | NA | NA | NA | NA | NA | NA | 19 | $16.1 | 22.9% |
| 59 | No (a), R/S, 10-K/Q | 21 | $ 63.9 | 13.3% | 26 | $ 94.5 | 8.5% | 11 | $ 9.8 | 14.0% |
| 60 | Total lines 58 + 59 | NA | NA | NA | NA | NA | NA | 30 | $25.9 | 36.9% |
| 61 | Total lines 56 + 60 | 96 | $298.4 | 61.9% | 123 | $ 583.5 | 52.4% | 29 | $25.0 | 35.5% |
| 62 | **December 31, 2004** | | | | | | | | | |
| 63 | Total Investments | 154 | $367.2 | 100.0% | 214 | $1,059.4 | 100.0% | NA | NA | NA |
| 64 | Fair valued | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 65 | Restricted | 79 | $204.8 | 55.8% | 110 | $ 543.4 | 51.3% | NA | NA | NA |
| 66 | Both | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 67 | No (a), R/S, 10-K/Q | 19 | $ 43.4 | 11.8% | 30 | $ 99.2 | 9.4% | NA | NA | NA |
| 68 | Total lines 65 + 67 | 98 | $248.1 | 67.6% | 140 | $ 642.6 | 60.7% | NA | NA | NA |
| 69 | **June 30, 2004** | | | | | | | | | |
| 70 | Total Investments | 129 | $248.2 | 100.0% | 184 | $797.9 | 100.0% | NA | NA | NA |
| 71 | Fair valued | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 72 | Restricted | 68 | $148.6 | 59.9% | 91 | $430.2 | 53.9% | NA | NA | NA |
| 73 | Both | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| 74 | No (a), R/S, 10-K/Q | 16 | $ 24.5 | 9.9% | 29 | $ 86.4 | 10.8% | NA | NA | NA |
| 75 | Total lines 72 + 74 | 84 | $173.0 | 69.7% | 120 | $516.6 | 64.7% | NA | NA | NA |

Sources of data in above table: Company/Funds' annual, semi-annual and quarterly reports for June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, March 31, 2007, June 30, 2007, September 30, 2007, December 31, 2007; prospectuses, Form 10-K reports, and Form 15-15D or 15-12B reports by issuers of securities classified as non-restricted held by the Funds during the period June 2004 through December

2007 to the extent that such reports were found on EDGAR.

184.   From the table in the preceding paragraph, with respect to those years for which fair valued securities were disclosed or are now known, most of the fair-valued securities were also restricted and most of the restricted securities were also fair-valued. During the Class Period, an extraordinarily high 52% to 90% of the Intermediate and High Income Funds' portfolios consisted of fair valued and/or restricted securities or securities that are otherwise illiquid or had the characteristics and history of securities that can suddenly become unsalable at their estimated values, even though these Funds were barred from investing more than 15% of their net assets in illiquid securities.

185.   During the Class Period, 34% to 56% of the Short Term Fund's portfolio consisted of fair valued and/or restricted securities or securities for which there was no readily available market, or were otherwise illiquid, or had the characteristics and history of securities that can suddenly become unsalable at their estimated values, even though during all relevant times , aside from the representation regarding its "current intent" not to invest in restricted securities in 2006, the Short Term Fund could not invest more than 10% of its net assets in restricted securities and "securities that are not readily marketable" or not more than 15% of net assets in securities "for which there is no readily available market."

186.   As of March 31, 2007, and June 30, 2007, securities comprising over half (54.5% and 52.6% respectively) of the investments held by the Short Term Fund were the same as securities held by the Intermediate Fund, so that the Short Term Fund in significant part took on the risk profile of the Intermediate Fund. The extent to which the Short Term Fund resembled the Intermediate Fund in terms of holding identical securities steadily increased after Morgan Management acquired the investment advisory contract for the Short Term Fund:

- June 30, 2005: 32.2%

- December 31, 2005: 33.5%

- June 30, 2006: 40.0%
- December 31, 2006: 41.5%
- March 31, 2007: 54.5%
- June 30, 2007: 52.6%

187.   On October 3, 2007, the Funds finally disclosed that, as of June 30, 2006, and June 30, 2007, the Funds held securities that were fair valued, which were illiquid or had the characteristics and history of securities that can suddenly become unsalable at their estimated values, as follows:

(a)   Intermediate Fund: 55.8% of its investment securities were fair valued at June 30, 2006, and 50.4% at June 30, 2007.

(b)   High Income Fund: 49.5% of its investment securities were fair valued at June 30, 2006, and 59.7% at June 30, 2007.

(c)   Short Term Fund: 18.2% of its investment securities were fair valued at June 30, 2006, and 28.5% at June 30, 2007

188.   Based on the October 3, 2007 disclosures, as of June 30, 2007, the Funds held securities that were *either* restricted or fair valued *or both* or, if not restricted, for which no prospectus or Form 10-K report could be found, and were, therefore, illiquid securities, as follows:

(a)   Intermediate Fund: 81.8%;

(b)   High Income Fund: 86.0%;

(c)   Short Term Fund: 55.9%.

189.   The data in the preceding paragraph, from which the Funds' investments in both restricted and fair valued securities can be calculated, was not disclosed for any period prior to June 30, 2007 (except as to the Short Term Fund on June 30, 2005).

190.   The Funds' concentration in investment securities that were *either* restricted *or* fair valued *or both*, and non-restricted securities for which no prospectuses or Form 10-K re-

73

ports could be found, from June 30, 2007 to September 30, 2007 and December 31, 2007, was as follows:

(a)     Intermediate Fund: 90.3% at September 30, 2007, and 91.9% at December 31, 2007.

(b)     High Income Fund: 86.6% at September 30, 2007, and 84.5% at December 31, 2007.

(c)     Short Term Fund: 45.8% at September 30, 2007, and 42.4% at December 31, 2007.

191.    During the Class Period, a material percentage of each Fund's portfolio was invested in securities "subject to legal or contractual restrictions on resale."

192.    During its fiscal year 2006, the Intermediate Fund had net purchases of fair valued securities of $184 million.

193.    During its fiscal year 2006, the High Income Fund had net purchases of fair valued securities of $107 million.

194.    During its fiscal year 2006, the Short Term Fund had net purchases of fair valued securities of $14.5 million.

195.    Based on filings with the SEC by issuers of securities purchased by the Funds, many of the securities not designated as "restricted securities," as indicated in paragraph 183 above, were held by only a very few investors and were subject to liquidity risk or otherwise exhibited the characteristics of an illiquid security.

196.    From June 30, 2004 through December 31, 2007, the Funds' portfolios consisted of restricted securities and of securities that were not denoted as "restricted" but for which there were no registration statements or Form 10-K or Form 10-Q reports under the Securities Exchange Act of 1934 as follows:

(a)     Intermediate Fund: 62% - 82%;

(b)     High Income Fund: 52% - 74%;

74

(c)    Short Term Fund: 34% - 51%.

197.    The SEC filings (prospectuses, Form 10-K reports, and Form 15-15D or 15-12B reports) by issuers of securities classified as non-restricted held by the Funds during the period June 2004 through December 2007, to the extent that such reports were found on EDGAR, reveal the following:

(a)    Where prospectuses were available for securities classified as "non-restricted," those prospectuses for all or almost all of said securities disclosed one or more of the following illiquidity risks, of which the following disclosures are typical:

(1)    The underwriters have no obligation to make a secondary market in the classes of Offered Certificates. There is therefore no assurance that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

(2)    Each rating agency rating the Class A and Mezzanine Certificates may change or withdraw its initial ratings at any time in the future if, in its sole judgment, circumstances warrant a change. A reduction in the claims paying ability of Radian would likely result in a reduction in the ratings of the Class A and Mezzanine Certificates. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the Class A or Mezzanine Certificates, the liquidity and market value of the affected certificates is likely to be reduced.

(3)    The offered certificates are not suitable investments for all investors. In particular, you should not purchase any class of offered certificates

unless you understand the prepayment, credit, liquidity and market risks associated with that class . . .

(4)    Lack of liquidity could result in a precipitous drop in the market value of the Offered Certificates.

(5)    The Class A and the Mezzanine Certificates (other than the Class M-8, Class M-9, Class M-10, Class M-11 and Class M-12 Certificates) will constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA") for so long as they are rated not lower than the second highest rating category by the Rating Agencies, and as such, will be legal investments for certain entities to the extent provided in SMMEA. SMMEA, however, provides for state limitation on the authority of such entities to invest in "mortgage related securities" provided that such restrictive legislation was enacted prior to October 3, 1991. Certain states have enacted legislation which overrides the preemption provisions of SMMEA. The Class M-8, Class M-9, Class M-10, Class M-11 and Class M-12 Certificates will not constitute "mortgage related securities" for purposes of SMMEA.

The Depositor makes no representations as to the proper characterization of any class of Class A and Mezzanine Certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of Class A and Mezzanine Certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of Class A and Mezzanine Certificates. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advi-

sors in determining whether and to what extent any class of Class A and Mezzanine Certificates constitutes a legal investment or is subject to investment, capital or other restrictions.

(b)     In addition to the disclosures recited in the preceding subparagraph, prospectuses for many of the securities classified as "non-restricted" (i.e., securities *for which a registration statement was filed and a prospectus was available*) disclosed the following:

(1)     The depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of the information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

(2)     The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future.  Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

(c)     The securities referenced in the preceding subparagraph (b) were a significant portion of the Funds' portfolios on and after December 31, 2006. For each Fund for each period, the following table shows the disclosed value of those securities whose prospectuses contained the above disclosures as a percentage of the disclosed value of *all non-restricted securities* (those for which a registration statement was filed and government and agency securities – i.e., liquid securities):

77

| December 31, 2006 | | | March 31, 2007 | | | June 30, 2007 | | | September 30, 2007 | | | December 31, 2007 | | | April 30, 2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF |
| 34.7% | 46.5% | 38.5% | 38.5% | 43.8% | 34.2% | 46.3% | 36.3% | 28.6% | 53.3% | 83.1% | 31.8% | 16.2% | 96.3% | 42.8% | 16.6% | 100.0% | 42.6% |

(d)     The preceding two subparagraphs (b) and (c) establish that investors (e.g., the RMK Defendants) in said securities were explicitly warned in the prospectuses for such securities of the liquidity risk that was subsequently realized; these warnings were not disclosed in the Funds' prospectuses.

(e)     Filings by 51 issuers of securities classified as "non-restricted" (30% to 96% of all such "*non-restricted" securities* held from December 2004 through December 2007 by the three Funds *for which a registration statement was filed*) disclosed the class of asset-backed security held by the Funds was held by less than ten record holders.

(f)     The securities referenced in the preceding subparagraph (e) were a substantial portion of the Funds' portfolios from June 30, 2006 through December 31, 2007. For each Fund for each period, the following table shows the disclosed value of those securities whose filings with the SEC (i.e., *non-restricted securities*) disclosed the class of asset-backed security held by the Funds was held by less than ten record holders:

| June 30, 2006 | | | December 31, 2006 | | | March 31, 2007 | | | June 30, 2007 | | | September 30, 2007 | | | December 31, 2007 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF | HIF | IBF | STF |
| 59.7% | 55.5% | 32.2% | 44.8% | 52.5% | 34.7% | 54.8% | 50.2% | 41.3% | 62.5% | 43.1% | 37.2% | 29.5% | 83.1% | 28.7% | 31.9% | 96.3% | 38.7% |

(g)     The illiquidity characteristics of a substantial portion of the Funds' *non-restricted securities* (securities for which a registration statement was filed, a prospectus was available, and reports filed with the SEC) together with the Funds' holdings of *restricted securities* establishes the illiquidity, and the enormous liquidity risk, of the Funds' portfolios.

78

198.    The Intermediate and High Income Funds' heavy concentrations in asset- and mortgage-backed securities, and the Short Term Fund's extraordinary (for short-term bond funds) investment in such securities, greatly exacerbated the Funds' liquidity risk because these securities were prominent among the Funds' illiquid securities or securities with illiquidity characteristics. In the following tables, for each Fund:

(a)    Row A shows the *non-restricted* (registered with the SEC under the '33 Act) asset- and mortgage-backed securities ("ABS/MBS") as a percentage of all of the Fund's securities based on principal and disclosed value for the indicated period;

(b)    Row B shows *restricted* ABS/MBS as a percentage of all of the Fund's securities based on principal and disclosed value for the indicated period;

(c)    Row C shows *non-restricted* ABS/MBS that have no registration statement as a percentage of all of the Fund's securities for the indicated period based on principal and disclosed value;

(d)    Row D shows ABS/MBS total *restricted* and *non-restricted* securities that have no registration statement as a percentage of all of the Fund's securities for the indicated period based on principal and disclosed value;

(e)    Row E shows total ABS/MBS *restricted* and *non-restricted* securities with no registration statement as a percentage of all of the Fund's *restricted* and *non-restricted* securities with no registration statement for this period based on principal and disclosed value:

### HIGH INCOME FUND

|   | 12/31/04 | | 6/30/05 | | 12/31/05 | | 6/30/06 | | 12/31/06 | | 3/31/07 | | 6/30/07 | | 9/30/07 | | 12/31/07 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | Principal | Value | Principal | Value | Principal | Value | Principal | Value | Principal | Value | Principal | Value | Principal | Value | Principal | Value | Principal | Value |
| **A** | 17.8% | 14.5% | 23.6% | 18.3% | 18.2% | 14.5% | 15.5% | 12.4% | 6.2% | 6.4% | 6.0% | 5.8% | 5.9% | 3.5% | 7.1% | 4.2% | 7.5% | 2.0% |
| **B** | 48.2% | 45.6% | 43.1% | 36.7% | 51.0% | 43.2% | 46.8% | 41.1% | 53.9% | 41.4% | 51.6% | 39.4% | 53.9% | 44.2% | 63.8% | 46.5% | 63.9% | 43.5% |

| | 12/31/04 | | 6/30/05 | | 12/31/05 | | 6/30/06 | | 12/31/06 | | 3/31/07 | | 6/30/07 | | 9/30/07 | | 12/31/07 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Prin-cipal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value |
| C | 10.2% | 9.4% | 7.7% | 7.7% | 6.8% | 6.9% | 7.3% | 6.3% | 8.9% | 10.1% | 10.9% | 11.7% | 9.9% | 11.2% | 9.6% | 10.4% | 15.2% | 8.3% |
| D | 58.4% | 55.0% | 50.8% | 44.4% | 57.8% | 50.1% | 54.1% | 47.4% | 62.9% | 51.6% | 62.5% | 51.0% | 63.8% | 55.4% | 73.4% | 56.9% | 79.1% | 51.8% |
| E | 91.9% | 90.7% | 86.9% | 84.8% | 87.7% | 85.0% | 84.8% | 82.7% | 88.1% | 84.8% | 84.5% | 80.8% | 82.5% | 78.5% | 86.7% | 76.9% | 89.5% | 71.1% |

## INTERMEDIATE FUND

| | 12/31/04 | | 6/30/05 | | 12/31/05 | | 6/30/06 | | 12/31/06 | | 3/31/07 | | 6/30/07 | | 9/30/07 | | 12/31/07 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Prin-cipal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value |
| A | 18.9% | 20.0% | 25.2% | 20.7% | 21.9% | 18.8% | 12.4% | 11.6% | 14.1% | 13.7% | 37.9% | 14.5% | 12.6% | 12.0% | 9.1% | 6.1% | 8.1% | 9.9% |
| B | 68.6% | 55.8% | 45.2% | 47.6% | 47.7% | 45.0% | 51.2% | 49.2% | 41.6% | 39.1% | 34.8% | 32.8% | 33.5% | 33.7% | 48.7% | 36.9% | 59.8% | 33.1% |
| C | 9.2% | 11.7% | 13.9% | 12.2% | 11.4% | 10.8% | 13.5% | 13.0% | 11.1% | 10.1% | 10.2% | 9.2% | 9.0% | 8.6% | 30.0% | 9.6% | 13.4% | 9.9% |
| D | 77.7% | 67.4% | 59.0% | 59.8% | 59.2% | 55.8% | 64.8% | 62.2% | 52.7% | 49.2% | 45.0% | 42.0% | 42.6% | 42.2% | 78.7% | 46.5% | 73.2% | 42.9% |
| E | 100% | 99.8% | 96.3% | 96.5% | 87.7% | 87.6% | 84.9% | 84.7% | 74.0% | 72.2% | 66.8% | 64.0% | 60.0% | 59.4% | 72.9% | 56.6% | 75.5% | 49.9% |

## SHORT TERM FUND

| | 6/30/05 | | 12/31/05 | | 6/30/06 | | 12/31/06 | | 3/31/07 | | 6/30/07 | | 9/30/07 | | 12/31/07 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Princi-pal | Value | Prin-cipal | Value |
| A | 20.6% | 19.8% | 17.6% | 15.8% | 11.2% | 11.2% | 11.5% | 11.5% | 12.0% | 13.3% | 10.1% | 11.2% | 10.0% | 9.4% | 12.3% | 12.9% |
| B | 15.3% | 14.7% | 17.9% | 15.8% | 28.4% | 28.4% | 20.7% | 21.3% | 22.0% | 21.9% | 27.1% | 25.5% | 25.3% | 19.5% | 21.2% | 10.4% |
| C | 17.0% | 16.2% | 16.6% | 15.0% | 14.8% | 14.7% | 10.1% | 10.1% | 15.1% | 14.7% | 13.3% | 12.4% | 10.2% | 9.5% | 12.4% | 10.9% |
| D | 32.4% | 30.9% | 34.5% | 30.8% | 43.2% | 43.2% | 30.8% | 31.4% | 37.1% | 36.7% | 40.4% | 37.9% | 35.5% | 29.0% | 33.6% | 21.3% |
| E | 87.4% | 87.0% | 90.6% | 90.3% | 94.3% | 94.2% | 89.9% | 90.1% | 76.9% | 76.9% | 75.4% | 74.8% | 71.3% | 66.2% | 66.1% | 51.6% |

199.    Collateralized debt obligations ("CDOs") were likewise illiquid or posed substantial liquidity risk. Additionally, there was a lack of information about these CDOs, which

also adversely affects their liquidity. The sales and resales of CDOs' securities are restricted because a CDO is an investment company and, in the absence of such restrictions, would be required to register under the ICA, subjecting CDO issuers to the same regulation and limitations as are mutual funds like the Funds. The prospectus for a CDO held by the Funds, Kodiak CDO 2006-1A, Class G,  due 2037, from at least December 31, 2006 through April 30, 2008, and which lost 99.75% of its value over that period, disclosed the following:

> Although any of the Placement Agents may from time to time make a market in any of the Offered Securities, neither of the Placement Agents is under any obligation to do so. In the event that any of the Placement Agents elects to commence any such market-making, it may discontinue such market-making at any time. There can be no assurance that a secondary market for any of the Offered Securities will develop, or if a secondary market does develop, that it will provide the holders of the Offered Securities with liquidity of investment or that it will continue for the life of such Class of Offered Securities.

> Limited Liquidity. There is currently no market for the Offered Securities. Although any Placement Agent may from time to time make a market in any Class of Rated Notes, the Combination Notes or the Income Notes, no Placement Agent is under any obligation to do so. In the event that a Placement Agent commences any market-making, such Placement Agent may discontinue such market-making at any time. There can be no assurance that a secondary market for any of the Offered Securities will develop, or if a secondary market does develop, that it will provide the holders of such Offered Securities with liquidity, or that it will continue for the life of the Offered Securities. In addition, the Offered Securities are subject to certain transfer restrictions and can only be transferred to certain transferees as described under "Transfer Restrictions." Consequently, an investor in the Offered Securities must be prepared to hold its Offered Securities for an indefinite period of time or until the Stated Maturity of the Notes. The Offered Securities will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no intention, and are under no obligation, to register the Offered Securities under the Securities Act or any state securities laws.

> Trust Preferred Securities—Credit Risk and General Liquidity Considerations. Trust Preferred Securities are subject to credit, interest rate and liquidity risk. The Trust Preferred Securities may only be sold to, or purchased by, investors that are Qualified Institutional Buyers thus limiting the number of investors that may purchase such securities. Adverse changes in the financial

condition or results of operations of a Real Estate Entity or in general economic conditions or both may impair its ability to make payments of principal of and interest on Corresponding Debentures. Debt obligations are also subject to liquidity risk and the risk of market price fluctuations. Adverse changes in the financial condition, results of operations or prospects of a Real Estate Entity may affect the liquidity of the market for its securities and may reduce the market price of such securities. In addition, changes in general economic conditions may affect the liquidity of the market for Trust Preferred Securities in general and may reduce the market prices of some or all of such securities.

Little or no publicly available information may be available with respect to privately placed Trust Preferred Securities, which Trust Preferred Securities are likely to comprise a substantial portion or most of the aggregate amount of Collateral Debt Securities.

If at any time the Trustee, in accordance with the terms of the Indenture, is instructed to sell or otherwise dispose of any Collateral Debt Securities, it may be difficult or impossible to sell or dispose of such securities in a timely manner, and it is unlikely that the proceeds will be equal to the unpaid principal thereof and interest thereon.

Additional Liquidity Considerations—Certain Adverse Consequences to Holders Upon Deferral of Interest on Trust Preferred Securities. If a Real Estate Entity exercises the right to defer interest payments, the market price of the Trust Preferred Securities may not fully reflect the value of accrued but unpaid interest on the Corresponding Debentures. Therefore, if the Issuer sells a Trust Preferred Security during an interest deferral period, the Issuer may receive a lower return on its investment than someone who continued to hold such Trust Preferred Security.

Additional Liquidity Considerations—Distribution of Corresponding Debentures. A Trust Preferred Securities Issuer may be terminated at any time before its expiration date at the option of the Real Estate Entity which, in some cases, requires that such termination does not result in a taxable event to holders of the related Trust Preferred Securities. As a result, and subject to the terms of the relevant declaration of trust or trust agreement, the Trust Preferred Securities Issuer may distribute the Corresponding Debentures to the holders of the Trust Preferred Securities and the common equity holders of the Trust Preferred Securities Issuer. In such a case, the Issuer would hold the Corresponding Debentures so distributed. However, there can be no assurance that a liquid trading market will develop in the Corresponding Debentures. The market prices for the Corresponding Debentures that may be dis-

tributed cannot be predicted with certainty. Accordingly, the Corresponding Debentures that are received upon a distribution thereof (or the Trust Preferred Securities held pending such a distribution) may trade at a discount to the price paid to purchase such Trust Preferred Securities.

Subordinated Notes—Credit Risk and General Liquidity Considerations. Subordinated Notes are subject to credit, interest rate and liquidity risk. Adverse changes in the financial condition or results of operations of a Subordinated Note Issuer or in general economic conditions or both may impair its ability to make payments of principal of and interest on its Subordinated Notes. Debt obligations are also subject to liquidity risk and the risk of market price fluctuations. Adverse changes in the financial condition, results of operations or prospects of a Subordinated Note Issuer may affect the liquidity of the market for an issuer's securities and may reduce the market price of such securities. In addition, changes in general economic conditions may affect the liquidity of the market for Subordinated Notes in general and may reduce the market prices of some or all of such securities.

In addition to the above, Subordinated Notes acquired by the Issuer most likely will not be rated and, if any of such Subordinated Notes are rated, they may be rated below investment grade and will accordingly be subject to more risk than investment grade obligations. Such risks may include (among others): (i) limited liquidity and secondary market support, (ii) substantial market price volatility resulting from changes in prevailing interest rates, (iii) subordination to the prior claims of banks and other seniorlenders, (iv) the operation of mandatory sinking fund or call/redemption provisions during periods of declining interest rates, (v) the possibility that earnings of the issuer thereof may be insufficient to meet its debt service . . .

As a result of the limited liquidity of securities similar to Subordinated Notes that are not rated or that are rated below investment grade, their prices at times have experienced significant and rapid decline when a substantial number of holders decided to sell. In addition, the Issuer may have difficulty disposing of such Subordinated Notes because there may be a thin trading market for such securities. To the extent that a secondary trading market for such Subordinated Notes does exist, it is generally not as liquid as the secondary market for highly rated securities. Reduced secondary market liquidity may have an adverse impact on market price and the Issuer's ability to dispose of particular issues when required under the terms of the Indenture. If at any time the Trustee, in accordance with the terms of the Indenture, is instructed to sell or otherwise dispose of any Subordinated Notes, it may be difficult or impossible to sell or dispose of such securities in a timely manner, and it is

unlikely that the proceeds will be equal to the unpaid principal thereof and interest thereon.

Certain Restrictions on Sale and Acquisition of Collateral Debt Securities. The Issuer is relying on Rule 3a-7 of the 1940 Act for an exemption from the 1940 Act. This exemption restricts the Issuer from disposing of any Defaulted Security, Equity Security or Credit Impaired Security or acquiring any Collateral Debt Security for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. These trading restrictions mean that the Issuer may be required to hold a Defaulted Security, Equity Security or Credit Impaired Security when it should otherwise have been sold to minimize losses or prohibited from acquiring Collateral Debt Securities after the Closing Date and prior to the Ramp-Up Completion Date or after the Ramp-Up Completion Date. As a result, greater losses on the portfolio of Collateral Debt Securities may be sustained and there may be insufficient proceeds on any Distribution Date to pay in full any expenses of the Issuer or any amounts payable to the Trustee, the Collateral Administrator or the Hedge Counterparty (all of which amounts are payable prior to payments in respect of the Offered Securities) and the principal of and interest on the Rated Notes.

Confidentiality; Limitations on Available Information. In connection with the purchase of certain Collateral Debt Securities, the Issuer may be required to enter into one or more confidentiality agreements regarding certain information received with respect to the Trust Preferred Securities Issuers, the Note Issuers and/or certain other parties relating to such Collateral Debt Securities. As a result thereof, the ability of the Co-Issuers, or the Collateral Manager on behalf of the Co-Issuers, to provide certain information to holders regarding the Collateral Debt Securities may be restricted or limited. The Co-Issuers or the Collateral Manager on behalf of the Co-Issuers will be obligated to provide certain non-confidential information regarding the Collateral Debt Securities and the issuers thereof to holders upon their request therefor.

Each purchaser of a beneficial interest in a Restricted Global Rated Note or a Restricted Combination Note will be deemed to represent at the time of purchase that: (a) the purchaser is both a Qualified Purchaser and a Qualified Institutional Buyer; . . . (d) the transferee and each account for which it is purchasing, will hold and transfer at least the minimum denominations of the Offered Securities specified in the Indenture; and (d) the purchaser will provide written notice of the foregoing, and of any applicable restrictions on transfer, to any transferee.

The Indenture provides that if, notwithstanding the restrictions on transfer

contained therein, either of the Co-Issuers determines that any beneficial owner of a Class A Note, Class B Note, Class C Note, Class D Note, Class E Note, Class F Note or Class G Note (or any other interest therein) (A) is a U.S. Person and (B) was not both a Qualified Purchaser and a Qualified Institutional Buyer at the time of its acquisition thereof, then either of the Co-Issuers may require, by notice to such holder, that such holder sell all of its right, title and interest in such Note (or interest therein) to a Person that is both a Qualified Purchaser and a Qualified Institutional Buyer with such sale to be effected within 30 days after notice of such sale requirement is given. . .

Certain Legal Investment Considerations. . . . . The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Offered Securities) may affect the liquidity of the Offered Securities.

200.    Based on the foregoing, the Funds purchased illiquid securities when more than 15% of the Funds' respective portfolios were illiquid, thus violating the Funds' own investment restriction that prohibited the Funds from purchasing "any [illiquid] security" when the Funds' already held illiquid securities whose value exceeded 15% of the Funds' respective net assets at the time of such purchases.

201.    In each of the Funds' reports referenced in paragraph 183 denoting the Funds' restricted securities, Defendants represented that, notwithstanding the designation of a security as "restricted," the security was deemed to be liquid. This statement was false and/or misleading because:

(a)     As set forth above, these securities were in fact illiquid, and/or

(b)     Notwithstanding any such current liquidity, these securities exhibited the characteristics of illiquid securities or securities that had a history of suddenly becoming unsalable at their estimated values upon shifting market sentiments, resulting in precipitous price reductions of such securities and catastrophic losses by the Funds, which risk was not disclosed to the Funds' investors with respect to these securities.

(c)     Moreover, a substantial portion of the securities not classified as "restricted"

85

were in fact illiquid or exhibited the characteristics of illiquid securities.

202.    Defendants inconsistently designated securities as "restricted." Of the securities held by the Funds during the period June 30, 2004 through December 31, 2007, 67 were sometimes designated as "restricted" and sometimes not so designated. Of these 67 securities, 46 were classified as "restricted" *after* having been or simultaneous with not being shown as restricted.

203.    The Funds' management knew, or should have known, of the illiquid nature of the structured financial instruments that overwhelmingly dominated the Funds' portfolios. Besides the portfolio prospectus disclosures identified above, the American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 93-1, which provides guidance to accountants and auditors on financial accounting and reporting by registered investment companies and which, although focused on high-yield securities, "is also applicable to other debt securities held as investments by investment companies," such as the complex, thinly traded structured financial instruments in which the Funds invested, says the following about the liquidity of such securities, which is as applicable to the Funds' structured financial instruments as it is to the high-yield securities held by the Funds:

(a)    The market for such securities "may not always be liquid."

(b)    "The market risk is often heightened by the absence of centralized high-yield bond exchanges and relatively thin trading markets, which make it more difficult to liquidate holdings quickly and increases the volatility of the market price."

(c)    "Market-value risk for holders of high-yield debt securities is compounded by the relatively thin trading market in such securities, which increases price volatility and makes it difficult to liquidate holdings efficiently at any specific time. Determination of market prices is difficult given the illiquid or sometimes nonexistent trading market."

86

204.    Recognizing the need to maintain "liquidity and flexibility" generally, and as a "defensive tactic" in "unusual market conditions," the Intermediate Fund in its 2004, 2005 and 2006 prospectuses, and the High Income Fund in its 2004 and 2005 prospectuses, disclosed that they would invest in investment-grade short-term securities. Company/Funds' prospectuses dated November 1, 2004, 2005, and 2006. Defendants did not disclose in the High Income Fund's 2006 prospectus the reason for the apparent change in this significant investment policy. *See* High Income Fund's prospectus dated November 1, 2006.  Contrary to these representations, the Intermediate and High Income Funds failed to invest in sufficient amounts of liquid investment-grade short-term securities to maintain the Funds' requisite liquidity but instead excessively invested in illiquid securities.

205.    Defendants Regions, Morgan Keegan and PwC had actual knowledge of the liquidity disclosures with respect to the asset- and mortgage-backed securities purchased by the Funds since Morgan Keegan was an underwriter of some of such securities (including at least two of such securities purchased by the Funds), PwC was the auditor for many such securities (including at least 20 of such securities purchased by the Funds), and a Regions Financial subsidiary was an issuer of such securities.

206.    The High Income Fund's liquidity risk was exacerbated because the Fund was closed to new investors, thus depriving the Fund of an important source of liquidity for open-end funds to meet redemptions.

207.    Numerous securities that Morgan Management caused one of the Funds to purchase were also purchased by the other Funds and by the closed-end funds managed by Morgan Management, so that the mutual funds managed by Morgan Management were among the few or exclusive holders of such securities. This fact exacerbated the liquidity risk of the Funds. This fact was not disclosed.

208.    In order for a security to be listed in the Bloomberg quotation system, Bloomberg relies on the lead manager or the issuer for information. Thus, the issuer deter-

mines whether a security is listed on Bloomberg.  Bloomberg has no particular criteria for including securities in its service.

209.    The following tables demonstrate the Funds' illiquidity based on (A) those of the Funds' securities that were and were not on Bloomberg and (B) the percentage of the Funds' portfolios invested in securities in which the Funds and all of the RMK closed-end funds hold 20-plus percent or 50-plus percent of all of the outstanding securities of the particular issuer (000s omitted for dollar denominated values):

| | | December 31, 2004 | | June 30, 2005 | | |
| | | High Income Fund | Intermediate Fund | High Income Fund | Intermediate Fund | Short Term Fund |
|---|---|---|---|---|---|---|
| **A.** | Reported value of Fund's portfolio securities NOT on Bloomberg | $380,973 | $89,474 | $374,951 | $125,611 | $35,075 |
| | **Value of such securities as % of Fund's total investments** | **36%** | **24%** | **34%** | **26%** | **50%** |
| **B.** | Reported value of Fund's portfolio securities ON Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 20% or more of the total amount of the issue. | $448,530 | $102,432 | $418,149 | $175,419 | $5,329 |
| | **Value of such securities as % of Fund's total investments** | **42%** | **28%** | **38%** | **36%** | **8%** |
| | **Total of securities not on Bloomberg + 20%+ holdings** | **78%** | **52%** | **71%** | **62%** | **57%** |
| **C.** | Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 20%: | | | | | |
| | a.  Reported value of investments that are restricted securities | $83,931 | $60,209 | $45,892 | $55,938 | $4,554 |
| | **b.  Investments that are restricted securities as % of total investments** | **8%** | **16%** | **4%** | **12%** | **6%** |
| | **Total of Items A - C:** | **86%** | **69%** | **75%** | **74%** | **64%** |
| **D.** | Reported value of Fund's portfolio securities on Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 50% or more of the total amount of the issue. | $297,241 | $63,217 | $268,875 | $90,885 | $4,389 |
| | **Value of such securities as % of Fund's total investments** | **28%** | **17%** | **24%** | **19%** | **6%** |
| | **Total of securities not on Bloomberg + 50%+ holdings** | **64%** | **42%** | **58%** | **45%** | **56%** |
| **E.** | Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 50%: | | | | | |
| | a.  Reported value of investments that are restricted securities | $212,582 | $100,802 | $185,922 | $136,484 | $6,417 |
| | **b.  Investments that are restricted securities as % of total investments** | **20%** | **27%** | **17%** | **28%** | **9%** |
| | **Total of Items D, E:** | **84%** | **69%** | **75%** | **73%** | **65%** |

| | | December 31, 2005 | | | June 30, 2006 | | |
| | | High Income Fund | Intermediate Fund | Short Term Fund | High Income Fund | Intermediate Fund | Short Term Fund |
|---|---|---|---|---|---|---|---|
| **A.** | Reported value of Fund's portfolio securities NOT on Bloomberg | $419,571 | $157,251 | $33,459 | $442,490 | $209,375 | $32,854 |
| | **Value of such securities as % of Fund's total investments** | **37%** | **28%** | **45%** | **37%** | **31%** | **50%** |
| **B.** | Reported value of Fund's portfolio securities ON Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 20% or more of the total amount of the issue. | $395,040 | $217,313 | $5,078 | $476,444 | $343,649 | $8,569 |

|  | December 31, 2005 | | | June 30, 2006 | | |
|---|---|---|---|---|---|---|
|  | High Income Fund | Intermediate Fund | Short Term Fund | High Income Fund | Intermediate Fund | Short Term Fund |
| Value of such securities as % of Fund's total investments | 34% | 39% | 7% | 40% | 51% | 13% |
| Total of securities not on Bloomberg + 20%+ holdings | 71% | 67% | 52% | 77% | 82% | 63% |
| **C.** Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 20%: | | | | | | |
| a. Reported value of investments that are restricted securities | $ 61,447 | $ 65,880 | $ 6,524 | $ 17,746 | $ 54,162 | $ 9,644 |
| **b.  Investments that are restricted securities as % of total investments** | 5% | 12% | 9% | 1% | 8% | 15% |
| **Total of Items A - C:** | **76%** | **79%** | **61%** | **79%** | **90%** | **77%** |
| **D.** Reported value of Fund's portfolio securities on Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 50% or more of the total amount of the issue. | $ 217,680 | $ 101,427 | $ 3,664 | $ 326,033 | $187,502 | $ 2,248 |
| Value of such securities as % of Fund's total investments | 19% | 18% | 5% | 27% | 28% | 3% |
| Total of securities not on Bloomberg + 50%+ holdings | 56% | 46% | 50% | 64% | 59% | 53% |
| **E.** Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 50%: | | | | | | |
| a. Reported value of investments that are restricted securities | $ 186,648 | $ 148,679 | $ 9,026 | $ 98,422 | $159,120 | $ 13,128 |
| **b. Investments that are restricted securities as % of total investments** | 16% | 27% | 12% | 8% | 24% | 20% |
| **Total of Items D, E:** | **72%** | **73%** | **63%** | **73%** | **83%** | **73%** |

|  | December 31, 2006 | | | March 31, 2007 | | |
|---|---|---|---|---|---|---|
|  | High Income Fund | Intermediate Fund | Short Term Fund | High Income Fund | Intermediate Fund | Short Term Fund |
| **A.** Reported value of Fund's portfolio securities NOT on Bloomberg | $536,840 | $340,365 | $44,871 | $530,958 | $433,021 | $39,161 |
| Value of such securities as % of Fund's total investments | 43% | 36% | 57% | 44% | 43% | 48% |
| **B.** Reported value of Fund's portfolio securities ON Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 20% or more of the total amount of the issue. | $447,822 | $422,373 | $ 14,316 | $413,108 | $416,734 | $17,580 |
| Value of such securities as % of Fund's total investments | 36% | 45% | 18% | 34% | 41% | 22% |
| Total of securities not on Bloomberg + 20%+ holdings | 79% | 81% | 75% | 79% | 84% | 70% |
| **C.** Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 20%: | | | | | | |
| a. Reported value of investments that are restricted securities | $ 3,810 | $ 53,138 | $ 4,397 | $ 43,911 | $54,167 | $ 6,880 |
| **b. Investments that are restricted securities as % of total investments** | 0% | 6% | 6% | 4% | 5% | 8% |
| **Total of Items A - C:** | **80%** | **87%** | **80%** | **82%** | **89%** | **78%** |
| **D.** Reported value of Fund's portfolio securities on Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 50% or more of the total amount of the issue. | $ 365,381 | $195,493 | $ 5,752 | $335,785 | $219,208 | $ 9,665 |
| Value of such securities as % of Fund's total investments | 29% | 21% | 7% | 28% | 22% | 12% |

89

| | December 31, 2006 | | | March 31, 2007 | | |
|---|---|---|---|---|---|---|
| | High Income Fund | Intermediate Fund | Short Term Fund | High Income Fund | Intermediate Fund | Short Term Fund |
| **Total of securities not on Bloomberg + 50%+ holdings** | **73%** | **57%** | **64%** | **72%** | **64%** | **60%** |
| E. Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 50%: | | | | | | |
| a. Reported value of investments that are restricted securities | $88,266 | $223,378 | $11,867 | $91,210 | $176,678 | $14,213 |
| **b. Investments that are restricted securities as % of total investments** | **7%** | **24%** | **15%** | **8%** | **17%** | **17%** |
| **Total of Items D, E:** | **80%** | **81%** | **79%** | **80%** | **82%** | **77%** |

| | June 30, 2007 | | | September 30, 2007 | | |
|---|---|---|---|---|---|---|
| | High Income Fund | Intermediate Fund | Short Term Fund | High Income Fund | Intermediate Fund | Short Term Fund |
| A. Reported value of Fund's portfolio securities NOT on Bloomberg | $446,461 | $503,112 | $44,685 | $160,412 | $201,388 | $43,393 |
| **Value of such securities as % of Fund's total investments** | **43%** | **49%** | **52%** | **40%** | **43%** | **57%** |
| B. Reported value of Fund's portfolio securities ON Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 20% or more of the total amount of the issue. | $326,764 | $385,307 | $15,874 | $136,692 | $175,588 | $9,666 |
| **Value of such securities as % of Fund's total investments** | **31%** | **38%** | **18%** | **34%** | **38%** | **13%** |
| **Total of securities not on Bloomberg + 20%+ holdings** | **74%** | **87%** | **70%** | **74%** | **81%** | **70%** |
| C. Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 20%: | | | | | | |
| a. Reported value of investments that are restricted securities | $42,518 | 0 | $10,330 | $6,278 | $24,616 | $5,331 |
| **b. Investments that are restricted securities as % of total investments** | **4%** | **0%** | **12%** | **2%** | **5%** | **7%** |
| **Total of Items A - C:** | **78%** | **87%** | **82%** | **75%** | **86%** | **77%** |
| D. Reported value of Fund's portfolio securities on Bloomberg that are also held by other of the RMK open- or closed-end funds whose aggregate holdings are 50% or more of the total amount of the issue. | $267,183 | $205,526 | $7,545 | $111,147 | $95,936 | $5,492 |
| **Value of such securities as % of Fund's total investments** | **26%** | **20%** | **9%** | **28%** | **21%** | **7%** |
| **Total of securities not on Bloomberg + 50%+ holdings** | **68%** | **69%** | **60%** | **67%** | **64%** | **65%** |
| E. Regarding balance of Fund's portfolio securities -- i.e., those that are on Bloomberg but aggregate RMK fund holdings < 50%: | | | | | | |
| a. Reported value of investments that are restricted securities | $91,359 | $163,052 | $16,018 | $26,085 | $86,888 | $11,804 |
| **b. Investments that are restricted securities as % of total investments** | **9%** | **16%** | **19%** | **6%** | **19%** | **16%** |
| **Total of Items D, E:** | **77%** | **85%** | **79%** | **74%** | **82%** | **80%** |

210.    For the period December 31, 2004 through September 30, 2007, the following is a summary by Fund of the data in the tables in the preceding paragraph:

(a)     **Short Term Fund**:

   (1)   The reported value of the Short Term Fund's portfolio securities that were NOT on Bloomberg was 45%-57% of the Fund's total investments.

   (2)   The reported value of the Short Term Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or High Income Funds and/or the RMK closed-end funds whose aggregate holdings were *20% or more* of the total amount of the issue was 7%-22% of the Fund's total investments.

   (3)   The reported value of the Short Term Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or High Income Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 20%* of the total amount of the issue *and* were *restricted* was 6%-15% of the Fund's total investments.

   **(4)   The total of the preceding three categories is 61%-82% of the Fund's total investments.**

   (5)   The reported value of the Short Term Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or High Income Funds and/or the RMK closed-end funds whose aggregate holdings were *50% or more* of the total amount of the issue was 3%-12% of the Fund's total investments.

   (6)   The reported value of the Short Term Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or High Income Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 50%* of the total amount of the issue *and* were *restricted* was 9%-20% of the Fund's total investments.

   **(7)   The total of the preceding two categories and the category (a)(1) above**

**is 63%-80% of the Fund's total investments.**

(b)    **Intermediate Fund**:

(1)    The reported value of the Intermediate Fund's portfolio securities that were NOT on Bloomberg was 24%-49% of the Fund's total investments.

(2)    The reported value of the Intermediate Fund's portfolio securities that were ON Bloomberg that were also held by the Short Term and/or High Income Funds and/or the RMK closed-end funds whose aggregate holdings were *20% or more* of the total amount of the issue was 28%-51% of the Fund's total investments.

(3)    The reported value of the Intermediate Fund's portfolio securities that were ON Bloomberg that were also held by the Short Term and/or High Income Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 20%* of the total amount of the issue *and* were *restricted* was 0%-16% of the Fund's total investments.

**(4)    The total of the preceding three categories is 64%-90% of the Fund's total investments.**

(5)    The reported value of the Intermediate Fund's portfolio securities that were ON Bloomberg that were also held by the Short Term and/or High Income Funds and/or the RMK closed-end funds whose aggregate holdings were *50% or more* of the total amount of the issue was 17%-28% of the Fund's total investments.

(6)    The reported value of the Intermediate Fund's portfolio securities that were ON Bloomberg that were also held by the Short Term and/or High Income Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 50%* of the total amount of the issue *and* were *restricted* was 16%-28% of the Fund's total investments.

92

**(7)   The total of the preceding two categories and the category (b)(1) above is 69%-85% of the Fund's total investments.**

(c)   **High Income Fund**:

(1)   The reported value of the High Income Fund's portfolio securities that were NOT on Bloomberg was 34%-44% of the Fund's total investments.

(2)   The reported value of the High Income Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or Short Term Funds and/or the RMK closed-end funds whose aggregate holdings were *20% or more* of the total amount of the issue was 31%-42% of the Fund's total investments.

(3)   The reported value of the High Income Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or Short Term Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 20%* of the total amount of the issue *and* were *restricted* was 0%-8% of the Fund's total investments.

**(4)   The total of the preceding three categories is 75%-86% of the Fund's total investments.**

(5)   The reported value of the High Income Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or Short Term Funds and/or the RMK closed-end funds whose aggregate holdings were *50% or more* of the total amount of the issue was 19%-29% of the Fund's total investments.

(6)   The reported value of the High Income Fund's portfolio securities that were ON Bloomberg that were also held by the Intermediate and/or Short Term Funds and/or the RMK closed-end funds but whose aggregate holdings were *less than 50%* of the total amount of the issue *and* were *re-*

*stricted* was 6%-20% of the Fund's total investments.

> **(7)    The total of the preceding two categories and the category (c)(1) above is 72%-84% of the Fund's total investments.**

211.    The dominance of the already illiquid market for these securities by the Funds and the closed-end funds managed by Morgan Management and Morgan Keegan meant that it was not in the interests of Morgan Management and Morgan Keegan to encourage or recommend to shareholders of the Funds to redeem their shares. Redemptions forced Morgan Management to cause the Funds to sell these illiquid securities at prices far lower than their estimated values, which in turn forced Morgan Management and Morgan Keegan to reduce the estimated values of these securities still held by the Funds and the RMK closed-end funds, leading to efforts to discourage redemptions by the Funds' shareholders and an unwillingness on the parts of Regions Bank and Morgan Keegan to cause the Fiduciary Accounts to redeem.

212.    This conflict of interest on the parts of Morgan Management and Morgan Keegan arising from the overlapping holdings by the Funds and the affiliated RMK closed-end funds was not disclosed.

213.    It was essential for the Funds, as bond funds, to maintain relatively stable NAVs so that the Funds' shareholders could redeem their shares on demand. This was necessary to avoid precipitous changes in their NAVs, which would cause shareholders to panic and seek to redeem shares, creating a run on the Funds and forcing the Funds to sell assets at disadvantageous prices because they are forced to sell assets to raise cash to pay to redeeming shareholders, which is what happened.

214.    As the Funds disclosed in their November 1, 2006 SAI, "Illiquid securities may be difficult to dispose of at a fair price at the times when either fund believes it is desirable to do so." This disclosure was false and misleading because "desirability" implies discretion—i.e., the absence of necessity; the far greater, but undisclosed, risk was that illiquid securities are likely to be difficult to dispose of at a fair price at the times when the fund finds

it is forced to do so, as when, for example, it has already sold all of its liquid securities to meet redemption demands or other liquidity needs.

215.    The RMK Defendants mismanaged the Funds and wasted their assets in that the RMK Defendants ignored the liquidity and valuation risks inherent in the thinly traded, complex, structured financial instruments and further ignored the need to maintain liquidity to meet redemptions and to maintain a sufficiently stable NAV to avoid mass redemptions by the Funds' shareholders. In connection with the Funds continuing offers to redeem their equity securities, all Defendants failed to disclose this risk.

### 2.    The Funds' Uncertain Net Asset Value

216.    Investment companies such as the Funds report their investment securities at value, which is defined as the quoted market price for securities for which market quotations are readily available.  If market quotations are not readily available, they report an estimate of value (fair value) as determined in good faith by the board of directors.

217.    As the SEC has informed investment companies, when market quotations are not readily available for a fund's securities, the pricing of such securities at good faith fair value in accordance with methods adopted by the fund's board of directors is "critical to ensuring that the prices at which fund shares are purchased and redeemed are fair, and do not result in dilution of shareholder interests or other harm to shareholders."

218.    If fund shares are overpriced, redeeming shareholders will receive a windfall at the expense of shareholders who remain in the fund, and purchasing shareholders will pay too much for their shares. Likewise, if fund shares are underpriced, redeeming shareholders will not receive their fair proportionate share of the fund's assets, and sales of shares in a fund would have dilutive effects.

219.    As the SEC has further informed investment companies, the ICA "requires mutual funds to price and redeem their shares at the net asset values . . . next computed after receipt of redemption requests, and to make prompt payment of redemption proceeds."

220.    The Funds' disclosures regarding how they valued securities for which market quotations were not readily available underwent a confusing evolution but in all instances omitted the material facts of the magnitude of the Funds' securities whose values were being estimated and variously omitted other material facts, as follows:

(a)    November 1, 2004 prospectus:

Calculating Share Price . . .. Securities traded in the over-the-counter market and listed securities for which no sales were reported on that date are stated at the last-quoted bid price. The Intermediate Bond Fund and the High Income Fund normally obtain market values for their portfolio securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities. Debt securities with remaining maturities of 60 days or less are valued at amortized cost, or original cost plus accrued interest, both of which approximate market value. When the funds believe that a market quote does not reflect a security's true value, the funds may substitute for the market quote a fair value estimate made according to methods approved by the Board of Directors. Because foreign markets may be open on days when U.S. markets are closed, the value of foreign securities could change on days when you can't buy or sell fund shares.

(b)    November 1, 2004 SAI:

VALUATION OF SHARES . . .. Securities traded in the over-the-counter market and listed securities for which no sales were reported on that date are stated at the last-quoted bid price. The Intermediate Fund and the High Income Fund normally obtain market values for their securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities. Debt securities with remaining maturities of 60 days or less are valued normally at amortized cost or original cost plus accrued interest accrued interest, both of which approximate market. When the funds believe that a market quote does not reflect a security's true value, the funds may substitute for the market value a fair value estimate made according to methods approved by the Board.

(c)    December 31, 2004 semi-annual report:

. . . .Securities traded in the over-the-counter market and listed securities for which no sale was reported on that date are stated at the last-quoted

bid price. The funds normally obtain market values for their securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities. Debt securities with remaining maturities of 60 days or less are valued at amortized cost, or original cost plus accrued interest, both of which approximate market. Investments in open-end registered investment companies are valued at net asset value. When the funds believe that a market quote does not reflect a security's true value, the funds may substitute for the market value a fair value estimate made according to methods approved by the Board of Directors. The values assigned to fair value investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, such estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

(d)     June 30, 2005 annual report

*Investment Valuations*—. . . . Securities for which no sales were reported for that day are valued at the last available bid quotation on the exchange or system where the security is principally traded. Long-term debt securities, including U. S. government securities, listed corporate bonds, other fixed income and asset-backed securities, and unlisted securities and private placement securities, are generally valued at the mean of the latest bid and asked price as furnished by an independent pricing service. Short-term debt securities having a maturity of sixty days or less from the valuation date may be valued at amortized cost, which approximates market value. Investments in open-end registered investment companies are valued at net asset value as reported by those investment companies. Investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by the Valuation Committee using procedures established by and under the direction of the Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

(e)     November 1, 2005 prospectus:

The Short Term Bond Fund, Intermediate Bond Fund and High Income Fund normally obtain market values for their portfolio securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities. Debt securities with remaining maturities of 60 days or less are valued at amortized cost, or original cost plus accrued interest, both of which approximate market value. When the funds believe that a market quote does not reflect a security's true value, the funds may substitute for the market quote a fair value estimate made according to methods approved by the Board of Directors. Because foreign markets may be open on days when U.S. markets are closed, the value of foreign securities could change on days when you can't buy or sell fund Shares.

When price quotations for certain securities are not readily available or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee. Such determinations shall be made in accordance with procedures approved by the Fund's Board. The Funds may use the fair value of a security to calculate their NAV when, for example, (1) a portfolio security is not traded in a public market or the principal market in which the security trades is closed, (2) trading in a portfolio security is suspended and not resumed prior to the normal market close, (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

There can be no assurance that a fund could purchase or sell a portfolio security at the price used to calculate the fund's NAV. In the case of "fair valued" portfolio securities, lack of information and uncertainty as to the significance of information may lead to a conclusion that a prior valuation is the best indication of a portfolio security's present value. Fair valuations generally remain unchanged until new information becomes available. Consequently, changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude than changes in the price of portfolio securities valued at their last sale price, by an independent pricing service, or based on market quotations.

(f)     November 1, 2005 SAI:

VALUATION OF SHARES . . . .The Intermediate Fund and the High

98

Income Fund normally obtain market values for their securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities.. . . When the funds believe that a market quote does not reflect a security's true value, the funds may substitute for the market value a fair value estimate made according to methods approved by the Board.

. . .

Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. U.S. Government securities for which market quotations are available shall be valued at a price provided by an independent pricing service or primary market dealer by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than 60 days, for which market quotations are readily available, shall be valued by an independent pricing service or primary market dealer. . . .

When price quotations for certain securities are not readily available or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee. Such determinations shall be made in accordance with procedures approved by the fund's Board. The fund may use the fair value of a security to calculate its NAV when, for example, (1) a portfolio security is not traded in a public market or the principal market in which the security trades is closed, (2) trading in a portfolio security is suspended and not resumed prior to the normal market close, (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

There can be no assurance that the fund could purchase or sell a portfolio security at the price used to calculate the fund's NAV. In the case of fair valued portfolio securities, lack of information and uncertainty as to the significance of information may lead to a conclusion that a prior valuation is the best indication of a portfolio security's present value. Fair valuations generally remain unchanged until new information becomes available. Consequently, changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude than changes in the price of portfolio securities valued at their last sale price, by an independent pricing service, or based on market quotations.

99

(g)    December 31, 2005 semi-annual report:

. . . Long-term debt securities, including U.S. government securities, listed corporate bonds, other fixed income andasset-backed securities and unlisted securities and private placement securities, are generally valued at the latest price furnished by an independent pricing service. . . . Investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by the Valuation Committee using procedures established by and under the direction of the Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

(h)    June 30, 2006 annual report

*Investment Valuations*—. . .    Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last-quoted bid price. Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. Long-term debt securities, including U. S. government securities, listed corporate bonds, other fixed income and asset-backed securities, and unlisted securities and private placement securities, are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than sixty days for which market quotations are readily available shall be valued by an independent pricing service or primary market dealer.. . . Investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by the Adviser's Valuation Committee using procedures established by and under the direction of the Company's Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ signifi-

cantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

(i) November 1, 2006 prospectus:

Account Policies – Calculating Share Price . . . .

Investments in securities listed or traded on a securities exchange are valued at the last quoted sales price on the exchange where the security is primarily traded as of close of business on the NYSE, usually 4:00 p.m. Eastern Time, on the valuation date.. . . Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last-quoted bid price. Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. Long-term debt securities, including U.S. government securities, listed corporate bonds, other fixed income and asset-backed securities, and unlisted securities and private placement securities, are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than sixty days for which market quotations are readily available shall be valued by an independent pricing service or primary market dealer.. . . Investments in open-end registered investment companies are valued at net asset value as described in those investment companies' prospectuses.

When price quotations for certain securities are not readily available or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee. Such determinations shall be made in accordance with procedures approved by the fund's Board. A fund may use the fair value of a security to calculate its NAV when, for example, (1) a portfolio security is not traded in a public market. . . , (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

Among the more specific factors that should be considered by the Valuation Committee in determining the fair value of a security are: (1) type of security; (2) financial statements of the issuer; (3) cost at date of purchase (generally used for initial valuation); (4) size of the Fund's holding; (5) for restricted securities, and discount from market value of unrestricted securities of the same class at the time of purchase; (6) the exis-

tence of a shelf registration for restricted securities; (7) information as to any transactions or offers with respect to the security; (8) special reports prepared by analysts; (9) the existence of merger proposals, tender offers or similar events affecting the security; (10) the price and extent of public trading in similar securities of the issuer or comparable companies (11) the fundamental analytical data relating to the investment; (12) the nature and duration of restrictions on disposition of the securities; and (13) and evaluation of the forces which influence the market in which these securities are purchased and sold.

There can be no assurance that a fund could purchase or sell a portfolio security at the price used to calculate the fund's NAV. In the case of "fair valued" portfolio securities, lack of information and uncertainty as to the significance of information may lead to a conclusion that a prior valuation is the best indication of a portfolio security's present value. Fair valuations generally remain unchanged until new information becomes available. Consequently, changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude than changes in the price of portfolio securities valued at their last sale price, by an independent pricing service, or based on market quotations.

(j)     November 1, 2006 SAI:

VALUATION OF SHARES . . .

. . . .Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last-quoted bid price. Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. Long-term debt securities, including U.S. government securities, listed corporate bonds, other fixed income and asset-backed securities, and unlisted securities and private placement securities, are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than 60 days for which market quotations are readily available shall be valued by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of 60 days or less shall be valued at cost with interest accrued or discount accreted to the date of maturity, unless such valuation, in the judgment of the Adviser, does not represent market value.

. . .

When price quotations for certain securities are not readily available or if

the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee. Such determinations shall be made in accordance with procedures approved by the fund's Board. A fund may use the fair value of a security to calculate its NAV when, for example, (1) a portfolio security is not traded in a public market or the principal market in which the security trades is closed, (2) trading in a portfolio security is suspended and not resumed prior to the normal market close, (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

There can be no assurance that a fund could purchase or sell a portfolio security at the price used to calculate the fund's NAV. In the case of fair valued portfolio securities, lack of information and uncertainty as to the significance of information may lead to a conclusion that a prior valuation is the best indication of a portfolio security's present value. Fair valuations generally remain unchanged until new information becomes available. Consequently, changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude than changes in the price of portfolio securities valued at their last sale price, by an independent pricing service, or based on market quotations.

(k)   December 31, 2006 semi-annual report:

*Investment Valuations* . . . . Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last quoted bid price. Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. Long-term debt securities, including U.S. government securities, listed corporate bonds, other fixed income and asset-backed securities and unlisted securities, are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than sixty days for which market quotations are readily available shall be valued by an independent pricing service or primary market dealer.. . . Investments in open-end registered investment companies, if any, are valued at NAV as reported by those investment companies. . . . Investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by the Adviser's Valuation

103

Committee using procedures established by and under the direction of the Company's Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

(l)     On October 3, 2007, after the Funds had already suffered a significant portion of the catastrophic losses suffered as of the initiation of this lawsuit, the Funds finally disclosed in the Funds' June 30, 2007 annual report to shareholders, although in an obscure manner buried near the end of the annual report to shareholders, most of the facts not previously disclosed, as set forth hereinafter:

*Investment Valuations* . . . . Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last quoted bid price.

Equity and debt securities issued in private placements are valued on the bid side by a primary market dealer. Long-term debt securities (including U.S. government securities, listed corporate bonds, other debt and asset-backed securities, and unlisted securities and private placement securities) are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than sixty days for which market quotations are readily available are valued by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of sixty days or less are valued at cost with interest accrued or discount accreted to the date of maturity, unless such valuation, in the judgment of Morgan Asset Management, Inc. (the "Adviser") does not represent market value.

Investments in open-end registered investment companies, if any, are valued at NAV as reported by those investment companies. Foreign securities denominated in foreign currencies, if any, are translated from the local currency into U.S. dollars using current exchange rates.

Investments for which market quotations are not readily available, or if

104

avail-able quotations are not believed to be reflective of market value, those securities are valued at fair value as determined by the Adviser's Valuation Committee using procedures established by and under the supervision of the Company's Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material. As of June 30, 2007, certain debt securities held by Regions Morgan Keegan Select Short Term Bond Fund, Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select High Income Fund were fair valued and the value of these securities represented approximately 29%, 51% and 59% of the net assets of the Funds.

*8  Below Investment Grade Debt Securities Risk* The Funds may invest in investment grade and below investment grade debt securities, including mortgage-backed and asset-backed securities. Below investment grade debt securities, commonly known as "junk bonds," involve a higher degree of credit risk than investment grade debt securities. In the event of an unanticipated default, a Fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the net asset value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experience financial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. The market prices of below investment grade debt securities are generally less sensitive to interest rate changes than higher-rated investments but are more sensitive to adverse economic or political changes or individual developments specific to the issuer than higher-rated investments. Periods of economic or political uncertainty and change, such as the recent market environment, can be expected to result in significant volatility of prices for these securities. Rating Services consider these securities to be speculative in nature.

See also Note 9—Security Valuations and Subsequent Events.

*9 Security Valuations and Subsequent Events* Liquidity and Valuation of Portfolio Securities—Recent instability in the markets for fixed income

securities, particularly mortgage-backed and asset-backed securities, has affected the liquidity of the Funds' portfolios. In addition, the Funds have experienced significant net redemptions of their shares.

Under current market conditions, many of the Funds' portfolio securities may be deemed to be illiquid. "Illiquid securities" are generally those that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued. This may result in illiquid securities being disposed of at a price different from the recorded value since the market price of illiquid securities generally is more volatile than that of more liquid securities. This illiquidity of portfolio securities may result in the Funds incurring greater losses on the sale of some portfolio securities than under more stable market conditions. Such losses can adversely impact the Funds' net asset values per share. The Adviser and its affiliates may periodically purchase shares of the Funds at net asset value or take other steps to provide liquidity but are not required to do so. Moreover, there is no assurance that these measures would be sufficient to avoid adverse impact on the Funds. From July 1, 2007 through August 31, 2007, the Adviser and its affiliates purchased approximately $30.0 million and $55.2 million in shares of Intermediate Bond Fund and High Income Fund, respectively.

The current market instability has also made it more difficult to obtain market quotations on many of the Funds' portfolio securities. In the absence of observable and reliable market quotations, portfolio securities are valued by the Adviser at their "fair value" under procedures established and monitored by the Funds' Board of Directors.

A Fund may use the fair value of a security to calculate its NAV when, for example, (1) a portfolio security is not traded in a public market or the principal market in which the security trades is closed, (2) trading in a portfolio security is suspended and not resumed prior to the normal market close, (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

Among the more specific factors that are considered by the Valuation Committee in determining the fair value of a security are: (1) type of security; (2) financial statements of the issuer; (3) cost at date of purchase (generally used for initial valuation); (4) for restricted securities, the discount from market value of unrestricted securities of the same class at the time of purchase; (5) the existence of a shelf registration for restricted

106

securities; (6) information as to any transactions or offers with respect to the security; (7) special reports prepared by analysts; (8) the existence of merger proposals, tender offers or similar events affecting the security; (9) the price and extent of public trading in similar securities of the issuer or comparable companies; (10) the fundamental analytical data relating to the investment; (11) the nature and duration of restrictions on disposition of the securities; and (12) evaluation of the forces which influence the market in which these securities are purchased and sold.

There can be no assurance that a Fund could purchase or sell a portfolio security at the price used to calculate the Fund's NAV. Changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude than changes in the price of portfolio securities valued at their last sale price, by an independent pricing service, or based on market quotations.

In light of the market instability and the complexity of fair value judgments, the Board of Directors, effective August 2007, has retained an independent valuation consultant to assist in determining the fair value of certain of the Funds' portfolio securities. Fair valuation procedures are currently being used to value a substantial portion of the assets of the Funds. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.

The degree of judgment involved in determining the fair value of an investment security is dependent upon the availability of quoted market prices or observable market parameters. When observable market prices and parameters do not exist, judgment is necessary to estimate fair value. The valuation process takes into consideration factors such as interest rate changes, movements in credit spreads, default rate assumptions, prepayment assumptions, type and quality of collateral, security seasoning, and market dislocation. Imprecision in estimating fair value can impact the amount of unrealized appreciation or depreciation recorded for a particular portfolio security and differences in the assumptions used could result in a different determination of fair value, and those differences could be material. The following table sets forth a sensitivity analysis to demonstrate the inherent volatility, on an absolute value basis, in the value of the Funds' "fair valued" investments at August 31, 2007. A hypothetical 10% change in the "fair value" of all such portfolio securities could result in an increase or decrease in valuation of the overall portfolio of the magnitude listed below. These measures do not reflect diversification benefits across categories of assets and, given the differing like-

107

lihood of such events occurring, these measures have not been aggregated:

| 10% Sensitivity Measure as of August 31, 2007*** | Short Term Bond Fund | Intermediate Bond Fund | High Income Fund |
|---|---|---|---|
| A-Rated Securities by NRSRO | $1,247,823 | $15,157,193 | $ 2,255,093 |
| B-Rated Securities by NRSRO | 1,059,312 | 18,846,403 | 13,757,143 |
| C-Rated Securities by NRSRO | — | 26,944 | 1,218,474 |
| Other/Unrated Securities | — | 599,625 | 12,502,886 |
| *** Unaudited. | | | |

*Report of Independent Registered Certified Public Accounting Firm for fiscal year ended 6/30/07 [dated 10/3/07]*

. . . .

As explained in Notes 2 and 9, the financial statements include securities valued at $26,065,956 (29 percent of net assets), $514,922,503 (51 percent of net assets) and $624,867,802 (59 percent of net assets) of Regions Morgan Keegan Select Short Term Bond Fund, Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select High Income Fund, respectively, whose fair values have been estimated in good faith by Morgan Asset Management, Inc.'s Valuation Committee under procedures established by the Funds' Board of Directors in the absence of readily ascertainable market values. However, these estimated values may differ significantly from the values that would have been used had a ready market for the securities existed, and the differences could be material.

(m)  December 31, 2007 semi-annual report:

*Investment Valuations* . . . .

. . . .

In light of the market instability and the complexity of fair value judgments, the Funds, effective August 2007, have retained an independent valuation consultant to assist in determining the fair value of certain of the Funds' portfolio securities. Fair valuation procedures are currently being used to value a substantial portion of the assets of the Funds. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.

221.  In RMK Select Fund's June 30, 2005 annual report, the fair valued securities held by the Short Term Fund were identified, constituting approximately six percent of the Fund's net asset value. The fair valued securities held by the Intermediate and High Income

108

Funds were not identified in RMK Select Fund's June 30, 2005 annual report.

222.    The disclosures in paragraph 220 were materially misleading for the following reasons:

(a)    Regarding all such disclosures except in the Short Term Fund's June 30, 2005 annual report and all three Funds' June 30, 2007 annual report, given the magnitude of restricted securities in the Funds' portfolios during all times relevant herein, and, accordingly, the magnitude of securities for which market quotations were not readily available, there was no disclosure of the following material facts:

(1)    The quantity and proportion of the Funds' assets for which market quotations were not readily available and whose values had to therefore be estimated, rendering their published NAVs highly uncertain estimates,

(2)    As required by SEC Form N-1A, Item 6, the effect of using fair value pricing on the valuation of the Funds' portfolios, and the Funds' respective NAVs, of a hypothetical percentage change in the estimated values of the Funds' fair-valued securities, including:

(A)    The percentage of such increase or decrease of each Fund's net assets and the dollar amount,

(B)    The percentage effect of such hypothetical change on each Fund's NAV per share on the date as of which such hypothetical change was calculated, and

(C)    To prominently and in plain English display all such disclosures at the beginning of the annual report, and

(3)    In the auditor's report in order to call investors' attention to the magnitude of uncertain valuations permeating the Funds' portfolios and NAVs and the effect of such uncertainty on the Funds' respective NAVs, which

109

disclosures were first partially made on October 3, 2007 in the Funds'
June 30, 2007 annual report to shareholders, which included the Funds'
June 30, 2007 financial statements and PwC's audit report (dated October
3, 2007) thereon.

(b)    Regarding the November 1, 2004 prospectus and SAI, there was no disclosure of
the following material facts:

(1)    That values derived from pricing services and matrix systems are esti-
mates of values subject to uncertainty that may differ significantly from
the values that would have been used had a ready market for the in-
vestments existed, and the differences could be material,

(2)    That such securities were vulnerable to becoming suddenly unsalable at
their estimated values upon shifting market sentiments that would likely
result in the substantial reductions in the values of such securities and
the Funds' NAVs,

(3)    Whether the Funds actually held securities whose values were esti-
mated, and

(4)    The factors considered in estimating the fair value of such securities,
which would reveal the substantial judgment and subjectivity required
to derive such values, the vulnerability of such valuations to changing
market sentiments, the complexity of the investment, and the adverse
effect of such judgment, subjectivity and complexity on the ability to
easily sell the investment—i.e., liquidity.

(c)    Regarding the Intermediate and High Income Funds' December 31, 2004 semi-
annual report, there was no disclosure of the following material facts:

(1)    That values derived from pricing services and matrix systems are esti-
mates of values subject to the disclosed inherent uncertainty of valuation,

110

(2)    That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities,

(3)    Whether the Funds actually held securities whose values were subject to the disclosed valuation risks and uncertainties, and

(4)    The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity.

(d)    Regarding the Intermediate and High Income Funds' June 30, 2005 annual report,

(1)    There was no disclosure of the following material facts:

(A)    That values derived from pricing services for thinly traded securities are estimates of values subject to the disclosed inherent uncertainty of valuation,

(B)    That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

(C)    Whether the Funds actually held securities whose values were subject to the disclosed valuation risks and uncertainties, and

(D)    The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations

111

to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity; and

(2)   Reference to the "internal matrix system" disclosed in the previous prospectus, SAI and semi-annual report is omitted with no disclosure as to the effect on the Funds' valuations of the apparent change in valuation methodology or why such a change was made.

(e)   In the November 1, 2005 prospectus and SAI, there was no disclosure of the following material facts:

(1)   That values derived from pricing services and matrix systems are estimates of values subject to the disclosed inherent uncertainty of valuation,

(2)   That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

(3)   The extent to which the Funds actually held securities for which there were no readily available market quotations and whose values must therefore be estimated and were subject to the disclosed valuation risks and uncertainties, and

(4)   The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity.

(f)   In the Funds' December 31, 2005 semi-annual report,

112

(1)  There was no disclosure of the following material facts:

  (A)  That values derived from pricing services for thinly traded securities are estimates of values subject to the disclosed inherent uncertainty of valuation,

  (B)  That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

  (C)  Whether the Funds actually held securities whose values were subject to the disclosed valuation risks and uncertainties, and

  (D)  The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity; and

(2)  Reference to the "internal matrix system" disclosed in the previous prospectus, SAI and semi-annual report is omitted, with no disclosure as to the effect on the Funds' valuations of the apparent change in valuation methodology or why such a change was made.

(g)  In the Funds' June 30, 2006 annual report,

(1)  There was no disclosure of the following material facts:

  (A)  That values derived from pricing services for thinly traded securities are estimates of values subject to the disclosed inherent uncertainty of valuation,

  (B)  That such securities were vulnerable to becoming suddenly unsal-

113

able at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

(C)     Whether the Funds actually held securities whose values were subject to the disclosed valuation risks and uncertainties, and

(D)     The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity; and

(2)     Reference to the "internal matrix system" disclosed in the previous prospectus, SAI and semi-annual report is omitted, with no disclosure as to the effect on the Funds' valuations of the apparent change in valuation methodology or why such a change was made.

(h)     In the November 1, 2006 prospectus, there was no disclosure of the following material facts:

(1)     Whether and to what extent the Funds relied on pricing services or matrix pricing for the values of their securities and whether pricing service valuations or matrix pricing are based on, or are deemed to be the same as, readily available market quotations or are based on estimated values and, therefore, the extent to which the valuation of portfolio securities is not based on readily available market quotations but on estimated values,

(2)     The risks regarding estimated valuations of thinly traded (i.e., illiquid) structured financial instruments—e.g., that values derived for as much as

114

half or more of the Funds' securities are nothing more than estimates of values subject to inherent uncertainty that may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material,

(3)     That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs, and

(4)     Whether and the extent to which the Funds actually held securities whose values were estimated and that were subject to the factors considered in estimating the fair value of such securities, which for the first time began to reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity.

(5)     Given the omission of any reference to matrix pricing in the November 1, 2006 prospectus, there was no disclosure of what appears to have been a material change in the pricing sources and methodologies used by the Funds that occurred some time during the Class Period, the effect of such change on the Funds' valuations, and why such change was made.

(i)     In the November 1, 2006 SAI, there was no disclosure of the following material facts:

(1)     Whether and to what extent the Funds relied on pricing services or matrix pricing for the values of their securities,

(2)     That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

(3)     Whether and the extent to which the Funds actually held securities whose values were estimated and subject to the disclosed valuation risks and uncertainties, and

(4)     The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to derive such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity.

(j)     In the December 31, 2006 semi-annual report, there was no disclosure of the following material facts:

(1)     Whether and to what extent the Funds relied on pricing services or matrix pricing for the values of their securities,

(2)     That values derived for some portion of the Funds' securities are estimates of values subject to the disclosed valuation risks and uncertainties,

(3)     That such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs,

(4)     Whether and the extent to which the Funds actually held securities whose values were estimated and subject to the disclosed valuation risks and uncertainties, and

116

> (5) The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to estimate such values and the inherent uncertainty of such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment— i.e., liquidity.

> (k) The composition of the valuation committee and the extent to which it interacted with the audit committee of the Funds' board of directors.

223. Based on the Funds' statements set out in paragraph 220, Defendants knew the extent to which the Funds' portfolios were subject to the need to estimate the values thereof because of the substantial amount of investments for which market quotations were not readily available, and thus knew the extent to which the Funds' published NAVs were highly uncertain estimates.

224. Defendants knew the effect of using fair value pricing, and of the uncertainty inherent in such estimated valuations, on the valuation of the Funds' portfolios and the Funds' respective NAVs. In fact, in connection with the Funds' 2007 audited financial statements, Defendants did calculate the effect of a hypothetical percentage change in the estimated values of the Funds' fair-valued securities, on:

> (a) The percentage of such increase or decrease of each Fund's net assets and the dollar amount, and

> (b) The percentage effect of such hypothetical change on each Fund's NAV per share on the date as of which such hypothetical change was calculated.

225. If Defendants did not know the effect of using fair value pricing on the valuation of the Funds' portfolios, and on the Funds' respective NAVs, of the uncertainty inherent in such valuations and of a hypothetical percentage change in the estimated values of the

117

Funds' fair-valued securities, they should have known or recklessly disregarded this information.

226.    Defendants knew, should have known, or recklessly ignored the following:

(a)    Values for thinly traded securities derived from pricing services and matrix systems are estimates of values subject to the inherent uncertainty of such valuations, and such valuations may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material;

(b)    Securities whose values had to be estimated were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs, exposing the Funds' to the risk of catastrophic losses because of the Funds' heavy investments in such securities;

(c)    The extent to which the Funds held securities for which there were no readily available market quotations and whose values had therefore to be estimated and were subject to the partially disclosed valuation risks and uncertainties;

(d)    The factors considered in estimating the fair value of such securities, which would reveal the substantial judgment and subjectivity required to estimate such values and the inherent uncertainty of such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity;

(e)    Whether and to what extent the Funds relied on pricing services or matrix pricing for the values of their securities and whether pricing service valuations or matrix pricing are based on, or are deemed to be the same as, readily available market quotations or are based on estimated values and, therefore,

118

the extent to which the valuation of portfolio securities is not based on readily available market quotations but on estimated values;

(f)     The risks regarding estimated valuations of thinly traded (i.e., illiquid) structured financial instruments—e.g., that values derived for as much as half or more of the Funds' securities are nothing more than estimates of values subject to inherent uncertainty that may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material; and

(g)     In view of the change in disclosures regarding the use of an internal matrix pricing system, whether there was a change in the pricing sources and methodologies used by the Funds during the period 2004-2006 and why.

227.    Because Morgan Management and Morgan Keegan were unable to determine the values of a large portion of the Funds' securities, the Funds were unable to file and issue their annual report for their fiscal year ended June 30, 2007 by the required filing date of August 29, 2007.

228.    In a NT-NSAR, filed on August 30, 2007, the Funds said that they could not timely file their annual reports for their fiscal year ended June 30, 2007, because their assets had been difficult to price due to the subprime mortgage crisis.

229.    Reuters reported on September 17, 2007, that the Funds could not file their annual reports for their fiscal year ended June 30, 2007, because their assets had been difficult to price due to the subprime mortgage crisis.

230.    Because Morgan Management and Morgan Keegan were unable to value a large portion of the Funds' portfolios for the Funds' June 30, 2007 financial statements, Morgan Management engaged an "independent valuation consultant to assist in determining the fair value of certain of the Fund's portfolio securities." This "independent valuation consultant" was Hyperion Brookfield Asset Management, Inc. ('HBAM"), a New York based investment

119

adviser and asset manager with professed expertise in fixed income securities of the type in which the Funds heavily invested. HBAM was an investment adviser for several fixed income mutual funds.

231.   In a prospectus supplement filed with the SEC by the Funds on August 13, 2007, the Funds disclosed the following (emphasis supplied):

> ### Liquidity and Valuation of Portfolio Securities.
>
> Recent instability in the markets for fixed income securities, particularly mort-gagebacked and asset-backed securities, has affected the liquidity of the Fund's portfolio. In addition, the Fund has experienced significant net redemptions of its shares. It is uncertain how long and to what extent these conditions will continue.
>
> Under current market conditions, many of the Fund's portfolio securities may be difficult to sell at a fair price when necessary to pay for redemptions from the Fund and for other purposes. This illiquidity of portfolio securities may result in the Fund incurring greater losses on the sale of some portfolio securities than under more stable market conditions. Such losses can adversely impact the Fund's net asset value per share. The Adviser and its affiliates may periodically purchase shares of the Fund or take other steps to provide liquidity but are not required to do so. Moreover, there is no assurance that these measures would be sufficient to avoid adverse impact on the Fund.
>
> The current market instability has also made it more difficult to obtain realistic values for the Fund's portfolio securities based on market quotations. In the absence of reliable market quotations, portfolio securities are valued by the Adviser at their "fair value" under procedures established and monitored by the Fund's Board of Directors. Fair valuation procedures are currently being used to *value a substantial portion of the assets of the Fund. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.* In light of the market instability and the *complexity of fair value judgments*, the Board of Directors has retained an independent valuation consultant to assist in determining the fair value of certain of the Fund's portfolio securities. For more information on fair valuation, consult the Prospectus section entitled "Account Policies – Calculating Share Price."

232.   By letter to the Funds' shareholders on August 10, 2007, Defendant Kelsoe, the Funds' manager, stated the following (emphasis supplied):

> So why is this happening, and what is the impact on our closed end and open

120

end funds? In my opinion, the de-leveraging, or sell-off of securities, by hedge funds and other financial institutions has created an *excessive supply of all types of fixed income securities*. This oversupply has pressured the balance sheets of all of Wall Street such that bid/offer spreads have widened and liquidity has dramatically declined over the last 30 to 60 days. Not only is supply higher than demand, but it exceeds the capacity to take these fixed income securities. Additionally, the rating agencies' sudden and drastic actions in downgrading securities have exacerbated these problems by triggering covenant violations and margin calls and creating even more supply in a very thin market.

Just this week, we've learned that a number of mortgage companies are having major problems, including American Home Mortgage, C-Bass, Luminent Mortgage and, most recently, Home Bank. These are not sub-prime lenders, but they are still finding it difficult to get financing to originate loans. Their problems have a direct or indirect impact on the market for all mortgage securities due to their size in the loan origination and servicing arenas.

At the annual shareholder meeting for our closed end funds just four weeks ago, we talked about the distinction between Net Asset Value (NAV) and market value. At that time, market values on all the funds had dropped to be more in line with the underlying NAV, or market value of the securities held in the portfolio. In the past few weeks there has been more volatility and downward pressure on the NAVs as a result of the difficulties in valuing these securities. *Unlike stocks that trade openly on exchanges and whose value can easily be determined at any point of the day, mortgage-related securities and CDOs trade via individual bids and offers made on trading desks across Wall Street*. As I mentioned earlier, the spreads between bid and offer prices continue to widen.

The lower valuations are no longer just showing up in the sub-prime mortgage securities as we have seen the pressure move further up the credit ladder to impact even AAA-rated bonds. Every fixed income security is subject to being devalued in this market, without regard to credit quality. Even bonds which continue to meet their payment schedules are under pricing pressure now. Commercial and corporate credit are feeling the crunch, and it is even beginning to touch stock values. As has been our practice with regard to the dividend, we will provide information to our board in the coming weeks in regard to the income expectations of the portfolios for the next few months.

233.    By letter to the Funds' shareholders on November 7, 2007, Defendant Kelsoe,

the Funds' manager, stated the following (emphasis supplied):

*Certainly some sectors have been more affected than others; one example in the headlines are CDO's. A key component that drives CDO pricing is the likelihood*

121

that future cash flows will continue to be received by various credit layers of the CDO in a timely manner. Certain events, such as downgrades, can cause a CDO manager or trustee to view the likelihood of cash flows to be lower than previously expected. This *potential loss of cash flow to the lower-rated tranches will obviously be a catalyst for weaker prices* of the bonds from these tranches. And when these events take place *in an already illiquid market*, such as the current one, the *downward pressure on market pricing is considerably magnified*.

With all this as a backdrop, our portfolios have been pressured across the board. *Many of our holdings are in the form of structured finance* created with *real-estate related* securities as collateral; *other areas of structured finance* categories include corporate bonds and loans, equipment leases and commercial real estate. Even the asset classes that are performing well have been severely devalued due to the CDO packaging. We have no crystal ball of what the future holds but continue to diligently manage the portfolios in the difficult environment.

In an effort to publish information beneficial to our shareholders in this uncertain time below we have provided information to general questions related to the funds:

**What exactly do you invest in?**

*Our investment objectives are clearly stated in the prospectus* of each fund, but in general, *we have always invested a large portion of our portfolios in "structured finance" fixed income securities*. Without going into great detail explaining structured finance, it is a fair assumption to say *the weakness in the portfolios relates to this area of investment*. A *large portion of structured finance securities are created with mortgage-related securities as the underlying collateral*. In the current market, uncertainty regarding real estate has caused these securities to decline in value. To compound the problem the secondary market in which these securities trade has become *very* illiquid. The primary market makers in this space had been the large "wire house" broker/dealers. In the current environment the dealers are long (own) enormous amounts of these deals that they are still trying to sell. Suffice it to say, the main participants in the secondary market are all sellers at this point.

**The net asset values of the funds appear to decline everyday. Can you explain?**

Part of the explanation is in our answer above. The worries regarding the real estate market are weighing on the perceived value of the securities we hold. The illiquidity of the secondary market for many of the securities we hold also is a contributing factor to the declining net asset value. Like all financial markets there must be a buyer for every seller. In the current market, many of the normal

dealers (many have been in the news taking write-downs on their balance sheets) that typically provide the trading liquidity of these securities are no longer providing such liquidity. In many cases *where there is no trading activity, bonds fall into a vacuum and are valued based on models projecting future cash flows*. There are no optimistic projections at this time!

234.    The Funds' portfolio manager attributes the Funds' losses primarily to its investments in structured financial instruments when market sentiment for these securities turned negative and everyone was trying to sell these securities at the same time. Funds' 2007 annual report pp. 14-15, 32-33.

235.    The market dislocations to which Kelsoe and Morgan Management attribute the dramatic decline in the Funds' NAVs in the summer and fall of 2007 had not occurred in 2006, were foreseeable and were actually foreseen by the RMK Defendants, and were disclosed in the prospectuses relating to many of the securities purchased by the Funds. *See* paragraph 197 *supra*.

236.    In the foregoing paragraphs 231-33, Defendants (i) revealed for the first time the previously undisclosed risks that lurked in the Funds' portfolios, but the disclosure was too late to be of any use to investors to enable them to avoid such risks, and (ii) confirmed that the causes of the Plaintiffs' and the Classes' losses in 2007 and early 2008 are attributable to the realization of these previously undisclosed risks.

237.    In valuing the Funds' thinly traded securities, or securities for which market quotations were not readily available, those securities' lack of a liquid market and committed market makers, *inter alia*, should have been taken into account in valuing the Funds' portfolios but were not.

238.    During at least 2006 and 2007, most if not all of the high-yield and structured financial instruments and mortgage/asset-backed securities purchased by the Funds were not traded on organized exchanges, and the terms of such securities were not standardized.

239.    Multiple market quotations (quotations based on actual sale/purchase transactions in the market for such securities) were not readily available for most if not all of the

high-yield and structured financial instruments and mortgage/asset-backed securities purchased by the Funds during the Class Period.

240.    According to SOP 93-1, the market risk of the high-yield and structured financial instruments and mortgage/asset-backed securities in which the Funds invested is often heightened by the absence of centralized exchanges for such securities and relatively thin trading markets, which make it difficult to liquidate holdings quickly and efficiently at any specific time and increase the volatility of the market price.

241.    According to SOP 93-1, there is generally no centralized or regulated procedure for pricing the high-yield and structured financial instruments and mortgage/asset-backed securities in which the Funds invested. Determination of market prices is difficult given the illiquid or sometimes nonexistent trading market for these securities.

242.    Because multiple market quotations were not readily available on most, if not all, days during 2006-2007 for most, if not all, of the high-yield and structured financial instruments and mortgage/asset-backed securities purchased and/or held by the Funds invested during that period, the values of such securities were required to be estimated in good faith. Such good faith security value estimates present unique reporting problems and financial statement disclosures issues.

243.    Securities should be stated in financial statements at amounts that represent what could be realized on a current sale. In the absence of bona fide offers to buy, those amounts are generally not determinable for securities that do not have readily ascertainable market values. The fair valuation procedures that funds' boards of directors are required to employ in such circumstances are designed to approximate the values that would have been established by market forces and are therefore subject to uncertainties.

244.    The prices provided by the pricing service or an internal matrix system used by the Funds were estimates of value and were therefore subject to uncertainties.

245.    Because of the Funds' uncertain net asset value and because of the unavailabil-

124

ity of market quotations for the extraordinarily large amount of high-yield and structured financial instruments and mortgage/asset-backed securities held by the Funds, the Funds' published asset valuations and net asset values were materially misstated because of the failure to disclose the uncertainty thereof and the failure to disclose the materiality of such uncertainty by disclosing the significant proportion of the Funds' respective portfolios subject to such uncertainty and the effect of such uncertainty on the Funds' NAVs, which concealed the great potential for catastrophic losses by the Funds.

246.    The Funds' board of directors was required to satisfy itself that all relevant factors were considered in valuing the Funds' portfolio securities during the Class Period and that the method or methods used to estimate value were acceptable. The Funds' board of directors knowingly or with reckless disregard did not satisfy itself either that all relevant factors were considered in valuing the Funds' portfolio securities or that the methods used to estimate value were acceptable.

247.    In connection with the Funds' offers to sell and sales of their shares and continuing offers to redeem their shares that made to the Funds' shareholders, Defendants failed to disclose material facts regarding the Funds' valuation practices and risks as set forth in paragraphs 222 and 226 above.

### 3.    The Funds' Extraordinary Credit Risk

248.    The allegations in the following paragraphs 249-62 are based on prospectuses for certain of the asset- and mortgage-backed securities purchased by the Funds, as well as on the Funds' annual and semi-annual reports. Asset- and mortgage-backed securities composed the predominant portion of the Funds' portfolios, but only a small fraction of those investments were the subject of registration statements filed with the SEC for which prospectuses were available. Thus, while these disclosures pertain to those asset- and mortgage-backed securities that were registered, they are also relevant to all of the asset- and mortgage-backed securities purchased by the Funds.

249.    The following table shows the extent to which the Funds' portfolios were composed of asset- and mortgage-backed securities and the portion of those securities for which prospectuses were found for the period June 30, 2004 through December 31, 2006; for each Fund, the table shows the total ABS/MBS in its portfolio for which prospectuses were found (i.e., those securities that were registered with the SEC and, therefore, not subject to any legal or contractual limits on their trading in the public markets), the dollar amount of all of the Fund's ABS/MBS based on the reported values, the ABS/MBS for which prospectuses were found as a percentage of all of the Fund's ABS/MBS (whether restricted or non-restricted, registered or not registered [many securities that were not classified as restricted in the Funds' annual, semi-annual and quarterly reports were nevertheless not the subject of a registration statement]), the dollar amount of the Fund's total investments by reported values, and all of the Fund's ABS/MBS as a percentage of the Fund's total investments.

| High Income Fund | 12/31/2006 | 06/30/2006 | 06/30/2005 | 06/30/2004 |
|---|---|---|---|---|
| Total ABS/MBS for which prospectuses were found | $ 66,771,924 | $136,512,765 | $ 178,151,583 | $101,997,649 |
| $ Amount of ALL of Fund's ABS/MBS | $707,365,854 | $701,298,606 | $672,064,440 | $592,329,036 |
| % of ALL ABS/MBS, restricted and non-restricted, registered and unregistered | 9.4% | 19.5% | 26.5% | 17.2% |
| Fund's total investments | $1,243,012,732 | $1,192,784,672 | $1,113,630,486 | $797,862,519 |
| All ABS/MBS as % of Fund's total investments | 56.9% | 58.8% | 60.3% | 74.2% |

| Intermediate Fund | 12/31/2006 | 06/30/2006 | 06/30/2005 | 06/30/2004 |
|---|---|---|---|---|
| Total ABS/MBS for which prospectuses were found | $127,791,627 | $74,660,729 | $95,195,178 | $24,001,378 |
| $ Amount of ALL of Fund's ABS/MBS | $588,421,217 | $493,922,691 | $383,263,411 | $195,833,003 |
| % of ALL ABS/MBS, restricted and non-restricted, registered and unregistered | 21.7% | 15.1% | 24.8% | 48.6% |
| Fund's total investments | $936,056,013 | $673,709,710 | $482,003,037 | $248,168,571 |
| All ABS/MBS as % of Fund's total investments | 62.9% | 73.3% | 79.5% | 78.9% |

| Short Term Fund | 12/31/2006 | 06/30/2006 | 06/30/2005 | 06/30/2004 |
|---|---|---|---|---|
| Total ABS/MBS for which prospectuses were found | $7,807,442 | $5,883,480 | $10,799,078 | NA |
| $ Amount of ALL of Fund's ABS/MBS | $32,663,899 | $34,387,242 | $32,586,573 | NA |
| % of ALL ABS/MBS, restricted and non-restricted, registered and unregistered | 23.9% | 17.1% | 33.1% | NA |
| Fund's total investments | $79,089,148 | $66,019,096 | $70,512,346 | NA |
| All ABS/MBS as % of Fund's total investments | 41.3% | 52.1% | 46.2% | NA |

250.    Based on the table in the preceding paragraph and allegations elsewhere herein, there is a positive correlation between the higher concentration of the High Income and Inter-

mediate Funds in asset- and mortgage-backed securities and the higher losses of those Funds as compared with the lower concentration of such investments in the Short Term Fund and its lower losses.

251.    Based on the table in paragraph 249 and allegations elsewhere herein (*see* paragraphs 183 *et seq. supra*), a substantial portion of each Fund's asset- and mortgage-backed investments consisted of securities that were not registered and that were, or should have been, classified as restricted and were, therefore, illiquid. *See*, e.g., paragraphs 197-98. Many of the asset- and mortgage-backed securities purchased and held by the Funds were not classified as restricted in the Funds' annual, semi-annual and quarterly reports even though they were not registered with the SEC or were no longer the subject of reports filed with the SEC.

252.    Merely because the asset- and mortgage-backed securities purchased by the Funds may have been registered with the SEC, they were nevertheless illiquid based on the lack of a trading market and the small number of holders thereof, as was disclosed in the '34 Act reports for those securities. *See* paragraph 197(f). Also, although most classes in a given deal are registered, almost every deal included classes (tranches) that were unregistered, and sometimes the Funds' purchased the unregistered classes, thus investing in restricted securities.

253.    The Funds' investments in the lower/lowest ranking tranches (classes M [known as "mezzanine" classes] and B) of asset- and mortgage-backed securities composed a substantial portion of their respective portfolios during all times relevant herein. The following tables show, as of June 30, 2006 as an example, the extent to which each Fund invested in the lower/lowest ranking tranches (highest number), along with other data that demonstrate the extraordinarily high credit risk of the Funds' investments in these tranches based on standard credit criteria such as FICO scores, combined loan-to-value exceeding 90% (which data sometimes but not always includes second or third mortgages), and the scope of the loan documentation:

(a)    Short Term Fund (data is from the prospectuses found for 17% of the Fund's

127

investments in asset- and mortgage-backed securities):

| Security Purchased by Fund | Tranche | % Interest of Class Purchased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Investment) | % FICO < 600 | % Loans w/ < Full Documentation | % C/LTV > 90% | Sponsor's Average % Delinquencies for Periods Shown | Sponsor's Average % Foreclosures for Period Shown | Fund's Class / Number of Principle Amount Classes | Short Term Fund's 6/30/06 Reported Values of ABS/MBS (000s omitted) |
|---|---|---|---|---|---|---|---|---|---|---|
| Bank of America 2004-B 2A2, 4.106% 3/25/34 | 2A2 | 2.9% | 5.8% | 0.2% | NA | 0.4% | 2.7% | 0.4% | 2/8 | $1,628 |
| Bear Stearns Commercial Mortgage Securities 2001-TOP2 A1, 6.080% 2/15/35 | A1 | | | | | | | | 1/14 | $1,143 |
| Chase Commercial Mortgage 1997-1 E, 7.370% 6/19/29 | E | 2.0% | 12.5% | NA | NA | 0.0% | | | 8/8 | $505 |
| Harborview Mortgage 2004-6 5A, 4.691% 8/19/34 | 5A | 11.6% | 18.1% | 1.0% | 61.0% | 3.7% | 3.3% | 1.1% | 1/7 | $1,650 |
| Harborview Mortgage 2004-4 3A, 2.975% 6/19/34 | 3A | 45.2% | 51.6% | 1.0% | 95.0% | 0.9% | 2.0% | 0.2% | 1/9 | $922 |
| Heller Mortgage 1999-PH1 A1, 6.500% 5/15/31 | A1 | 20.0% | 100.0% | NA | NA | 0.2% | NA | NA | 1/5 | $36 |
| **Averages** | | **16.3%** | **37.6%** | **0.7%** | **78.0%** | **1.0%** | **2.7%** | **0.6%** | **3/10** | |

(b)    Intermediate Bond Fund (data is from the prospectuses found for 15% of the

Fund's investments in asset- and mortgage-backed securities):

| Security Purchased by Fund | Tranche | % Interest of Class Purchased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Investment) | % FICO < 600 | % Loans w/ < Full Documentation | % C/LTV > 90% | Sponsor's Average % Delinquencies for Periods Shown | Sponsor's Average % Foreclosures for Period Shown | Fund's Class / Number of Principle Amount Classes | Intermediate Fund 6/30/06 Reported Values of ABS/MBS (000s omitted) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ace Securities 2004-IN1 M6, 8.823% 5/25/34 | M6 | 0.8% | 4.7% | 47.0% | 34.0% | 7.5% | 13.6% | 3.9% | 9/11 | $2,480 |
| Ace Securities 2005-HE2 M10, 8.573% 4/25/35 | M10 | 1.0% | 3.5% | 34.0% | 39.0% | 10.8% | 14.1% | 3.8% | 14/17 | $4,514 |
| Aircraft Finance Trust 1999-1A A1, 5.679% 5/15/24 | A1 | 50.0% | 100.0% | NA | NA | NA | NA | NA | 1/4 | $695 |
| Asset Securitization 2003-HE1 M4, 9.699% 1/15/33 | M4 | NA | NA | NA | NA | NA | NA | NA | ?/? | $799 |
| Bear Sterns Commercial Mortgage 2000-WF1 X, 0.426% 2/15/32 interest-only strips | IO | NA | NA | NA | NA | NA | NA | NA | IO | $1,076 |
| Delta Funding Home Equity 2000-1 B, 8.090% 5/15/30 | B | 4.2% | 6.0% | 56.7% | 24.3% | 0.0% | 9.1% | 5.0% | 10/10 | $1,401 |
| GS Mortgage Securities 2006-GG6 A4, 5.553% 4/10/38 | A4 | 26.0% | 79.0% | | | | | | 5/13 | $6,894 |
| GS AMP 2006-S2 M7, 7.250% 1/25/36 | M7 | 2.9% | 8.8% | 3.8% | 57.0% | 99.7% | 13.8% | 3.3% | 11/14 | $12,578 |
| Harborview Mortgage 2004-8 X, 0.771% 11/19/34 interest-only strips | IO | NA | NA | NA | NA | NA | NA | NA | IO | $713 |

| Security Purchased by Fund | Tranche | % Interest of Class Purchased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Investment) | % FICO < 600 | % Loans w/ < Full Documentation | % C/LTV > 90% | Sponsor's Average % Delinquencies for Periods Shown | Sponsor's Average % Foreclosures for Period Shown | Fund's Class / Number of Principle Amount Classes | Intermediate Fund 6/30/06 Reported Values of ABS/MBS (000s omitted) |
|---|---|---|---|---|---|---|---|---|---|---|
| Heller Mortgage 1999-PH1 A1, 6.500% 5/15/31 | A1 | 20.0% | 100.0% | NA | NA | 0.2% | NA | NA | 1/5 | $66 |
| Lease Investment Flight Trust 1 A1, 5.589% 7/15/31 | A1 | 29.2% | 100.0% | NA | NA | NA | NA | NA | 1/7 | $7,125 |
| Meritage Mortgage 2005-2 M11, 8.323% 11/25/35 | M11 | 1.3% | 4.2% | 15.0% | 17.0% | 33.0% | 2.2% | 2.4% | 15/18 | $4,135 |
| Mid-State Trust 2005-1 B, 7.758% 1/15/40 | B | 10.0% | 15.8% | NA | NA | NA | 5.2% | 3.3% | 4/4 | $11,859 |
| Park Place Securities 2005-WHQ2 M11, 7.823% 5/25/35 | M11 | 1.1% | 2.3% | 39.0% | 52.0% | 11.3% | 7.4% | 3.7% | 17/19 | $8,431 |
| Salomon Brothers Mortgage Securities VII 2001-1 B1, 9.000% 3/25/22 | B1 | 0.8% | 2.0% | 11.0% | NA | 0.0% | 3.2% | 0.7% | 4/9 | $272 |
| Soundview 2005-OPT1 M10, 8.573% 6/25/35 | M10 | 0.5% | 1.0% | 43.0% | 10.0% | 43.0% | 6.5% | 12.2% | 15/16 | $2,730 |
| Impac Secured Assets 2005-1 B3, 5.874% 7/25/35 | B3 | 1.4% | 4.7% | 0.5% | 88.0% | 1.4% | 6.0% | 1.8% | 14/17 | $8,891 |
| **Averages** | | **10.7%** | **30.9%** | **27.8%** | **40.2%** | **20.7%** | **8.1%** | **4.0%** | **6.7/10** | |

(c)   High Income Fund (data is from the prospectuses found for 20% of the Fund's investments in asset- and mortgage-backed securities):

| Security Purchased by Fund | Tranche | % Interest of Class Purchased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Investment) | % FICO < 600 | % Loans w/ < Full Documentation | % C/LTV > 90% | Sponsor's Average % Delinquencies for Periods Shown | Sponsor's Average % Foreclosures for Period Shown | Fund's Class / Number of Principle Amount Classes | High Income Fund 6/30/05 Reported Values of ABS/MBS (000s omitted) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ace Securities 2004-HE4 M11, 8.823% 12/25/34 | M11 | 1.0% | 2.8% | 32.0% | 34.0% | 10.4% | 14.0% | 3.9% | 13/15 | $2,807 |
| Aerco Limited 1X C1, 6.549% 7/15/23 | C1 | 8.6% | 27.9% | NA | NA | 0.0% | NA | NA | 4/6? | $4,252 |
| Aircraft Finance Trust 1999-1A A1, 5.679% 5/15/24 | A1 | 50.0% | 100.0% | NA | NA | NA | NA | NA | 1/4 | $34,402 |
| Airplanes Pass Through Trust 2001-1A A9, 5.749% 3/15/19 | A9 | 100.0% | 100.0% | NA | NA | NA | NA | NA | 1/3 | $38,440 |
| Harborview Mortgage 2004-8 X, 0.771% 11/19/34 interest-only strips | IO | NA | NA | NA | NA | NA | NA | NA | IO | $3,565 |
| Lease Investment Flight Trust 1 A1, 5.589% 7/15/31 | A1 | 29.2% | 100.0% | NA | NA | NA | NA | NA | 1/7 | $27,128 |
| Lease Investment Flight Trust 1 A2, 5.629% 7/15/31 | A2 | 19.0% | 71.0% | NA | NA | NA | NA | NA | 2/7 | $2,175 |
| Mellon Residential 2002-TBC2 X, 0.634% 8/15/32 interest-only strips | IO | NA | NA | NA | NA | NA | NA | NA | IO | $1,523 |

| Security Purchased by Fund | Tran che | % Interest of Class Pur-chased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Invest-ment) | % FICO < 600 | % Loans w/ < Full Docu-menta-tion | % C/LTV > 90% | Spon-sor's Average % Delin-quencies for Peri-ods Shown | Spon-sor's Aver-age % Fore-clo-sures for Period Shown | Fund's Class / Number of Principle Amount Classes | High In-come Fund 6/30/05 Reported Values of ABS/MBS (000s omit-ted) |
|---|---|---|---|---|---|---|---|---|---|---|
| New Century Home Equity Loan Trust 2006-S1 M8, 6.500% 3/25/36 (e) | M8 | 1.3% | 8.1% | 36.2% | 70.0% | 99.8% | 1.3% | 0.6% | 11/11 | $3,305 |
| Nomura Home Equity Loan Inc. 2005-HE1 B1, 7.773% 9/25/35 | B1 | 0.4% | 1.8% | 40.0% | 46.0% | 11.4% | 14.5% | 13.2% | 15/17 | $2,840 |
| Park Place Securities 2005-WCW1 M11, 7.823% 9/25/35 | M11 | 0.8% | 3.0% | 36.0% | 52.0% | 10.5% | 9.3% | 2.1% | 19/21 | $8,125 |
| Park Place Securities 2005-WCW3 M10, 7.823% 8/25/35 | M10 | 0.6% | 4.3% | 47.0% | 46.0% | 11.7% | 9.3% | 2.1% | 15/18* | $4,350 |
| Soundview Home Equity Loan Trust 2005-3 B2, 8.073% 6/25/35 | B2 | 1.3% | 2.6% | 5.5% | 52.0% | 9.9% | 16.5% | 7.3% | 16/18 | $3,596 |
| **Averages** | | **19.3%** | **38.3%** | **32.8%** | **50.0%** | **19.2%** | **10.8%** | **4.9%** | **6.4/10** | |

254.    As examples from the tables in the preceding paragraph:

(a)    The High Income Fund invested $8,125,000 in Park Place Securities 2005-WCW1, class M11, which tranche ranked 19 out of 21 tranches, thus making it one of the three (of 21) tranches to first absorb losses. The percentage interest of the class M11 in the mortgage pool was 0.8%, and a *three percent loss* to the pool would wipe out the Fund's entire investment. Thirty-six percent of the mortgage pool loans were to borrowers with FICO scores of 600 or less, 52% of the loans had less than full documentation, 10.5% of the mortgage pool loans had a loan-to-value of more than 90%, and the delinquency experience for this issuer was 9.3%.

(b)    The Intermediate Fund invested $2,730,000 in Soundview 2005-OPT1, class M10, which tranche ranked 15 out of 16 tranches, thus making it one of the two (of 16) tranches to first absorb losses. The percentage interest of the class M10 in the mortgage pool was 0.5%, and a *one percent loss* to the pool would wipe out the Fund's entire investment. Forty-three percent of the mortgage pool loans were to borrowers with FICO scores of 600 or less, 10% of the loans had less than full documentation, 43% of the mortgage pool loans had a

130

loan-to-value of more than 90%, and the delinquency/foreclosure experience for this issuer was 6.5%/12.2%. Defendant Morgan Keegan was one of the underwriters of this issue.

(c)    While the Short Term Fund's June 30, 2006 investments reflect a lower level of highly risky investments as compared to the High Income and Intermediate Funds, they were still extraordinary for a short-term fixed income fund. This resulted in its correspondingly lower loss than the other two Funds.

255.    A bad credit score is generally considered to be 600 or below.

256.    The averages for other periods are of a similar pattern to those for June 30, 2006, as shown by the following tables:

(a)    Short Term Fund (data is from the prospectuses found for 17% of the Fund's investments in asset- and mortgage-backed securities):

| Average as of | % Interest of Class Pur-chased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Invest-ment) | % FICO < 600 | % Loans w/ < Full Docu-menta-tion | % C/LTV > 90% | Sponsor's Average % Delin-quencies for Peri-ods Shown | Spon-sor's Aver-age % Fore-clo-sures for Period Shown | Fund's Class / Number of Princi-ple Amount Classes |
|---|---|---|---|---|---|---|---|---|
| June 30, 2004 | 2.9% | 5.8% | 0.2% | NA | 0.4% | 2.7% | 0.4% | 2/8 |
| June 30, 2005 | 23.3% | 42.4% | 0.6% | 58.3% | 1.1% | 3.3% | 1.0% | 4/10 |
| June 30, 2006 | 16.3% | 37.6% | 0.7% | 78.0% | 1.0% | 2.7% | 0.6% | 3/10 |
| December 31, 2006 | 11.0% | 21.8% | 9.8% | 76.0% | 3.6% | 5.4% | 2.5% | 3.7/10 |

(b)    Intermediate Bond Fund (data is from the prospectuses found for 15% of the Fund's investments in asset- and mortgage-backed securities):

| Average as of | % Interest of Class Pur-chased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Invest-ment) | % FICO < 600 | % Loans w/ < Full Docu-menta-tion | % C/LTV > 90% | Sponsor's Average % Delin-quencies for Peri-ods Shown | Spon-sor's Aver-age % Fore-clo-sures for Period Shown | Fund's Class / Number of Princi-ple Amount Classes |
|---|---|---|---|---|---|---|---|---|
| June 30, 2004 | 4.1% | 10.5% | 50.5% | 35.0% | 40.5% | 4.4% | 2.8% | 8.3/10 |
| June 30, 2005 | 5.8% | 17.1% | 31.0% | 32.0% | 23.1% | 5.9% | 4.1% | 7.7/10 |
| June 30, 2006 | 10.7% | 30.9% | 27.8% | 40.2% | 20.7% | 8.1% | 4.0% | 6.7/10 |
| December 31, 2006 | 5.9% | 16.6% | 27.1% | 54.7% | 13.2% | 9.0% | 3.3% | 6.8/10 |

131

(c)    High Income Fund (data is from the prospectuses found for 20% of the Fund's investments in asset- and mortgage-backed securities):

| Average as of | % Interest of Class Purchased by Funds. | Fund's % Interest + Cushion (% Loss that Wipes Out Fund's Investment) | % FICO < 600 | % Loans w/ < Full Documentation | % C/LTV > 90% | Sponsor's Average % Delinquencies for Periods Shown | Sponsor's Average % Foreclosures for Period Shown | Fund's Class / Number of Principle Amount Classes |
|---|---|---|---|---|---|---|---|---|
| June 30, 2004 | 8.5% | 15.3% | 48.0% | 37.2% | 28.3% | 3.5% | 1.7% | 8.2/10 |
| June 30, 2005 | 11.0% | 21.6% | 37.7% | 39.6% | 33.3% | 4.2% | 2.1% | 7.7/10 |
| June 30, 2006 | 19.3% | 38.3% | 32.8% | 50.0% | 19.2% | 10.8% | 4.9% | 6.4/10 |
| December 31, 2006 | 18.8% | 35.1% | 28.6% | 57.0% | 23.4% | 8.1% | 3.1% | 6.6/10 |

257.   Notwithstanding the Funds' substantial investments in these securities and Defendants' knowledge thereof, the Funds' prospectuses did not disclose the extent to which the Funds' investments were vulnerable to losses incurred on these highly risky investments, as alleged in the preceding paragraphs.

258.   The prospectuses for the relatively small portion of the Funds' asset- and mortgage-backed securities that were registered with the SEC disclosed, in addition to the liquidity risks addressed above, one or more of the following significant risks (many of which were typical disclosures) of the asset- and mortgage-backed securities purchased by the Funds – including risks associated with low FICO scores, high loan-to-value ratios, and less than full documentation – and, therefore, known to Defendants (these disclosures are taken verbatim from the prospectuses) (emphasis supplied):

(a)    AUTHORITY TO EFFECT OTHER BORROWINGS ENTAILS RISKS

None of the mortgage loans allow the borrower to grant a subordinate mortgage in the future. See "Description of the Mortgage Pool--Certain Terms and Characteristics of the Mortgage Loans--Subordinate Financing" in this prospectus supplement. Generally, mortgage loans require that prior to any subordinate loan being allowed, certain conditions must be satisfied. Substantially all of the mortgage loans permit the related borrower to incur indebtedness beyond the mortgage loan in the ordinary course of business, subject to certain conditions.

When a mortgage loan borrower (or its constituent members) also has one or

132

more other outstanding loans (even if subordinated or mezzanine loans that are not secured by a lien on the mortgaged property), the trust is subjected to additional risk. The borrower may have difficulty servicing and repaying multiple loans. The existence of another loan generally also will make it more difficult for the borrower to obtain refinancing of the mortgage loan and may thereby jeopardize repayment of the mortgage loan. Moreover, the need to service additional debt may reduce the cash flow available to the borrower to operate and maintain the mortgaged property. See "Description of the Mortgage Pool--Certain Terms and Characteristics to the Mortgage Loans--Subordinate Financing" in this prospectus supplement.

Additionally, if the borrower (or its constituent members) defaults on the mortgage loan and/or any other loan, actions taken by other lenders could impair the security available to the trust. If a junior lender files an involuntary petition for bankruptcy against the borrower (or the borrower files a voluntary petition to stay enforcement by a junior lender), the trust's ability to foreclose on the property would be automatically stayed, and principal and interest payments might not be made during the course of the bankruptcy case. The bankruptcy of another lender also may operate to stay foreclosure by the trust.

Further, if another loan secured by the mortgaged property is in default, the other lender may foreclose on the mortgaged property, absent an agreement to the contrary, thereby causing a delay in payments and/or an involuntary repayment of the mortgage loan prior to maturity. The trust may also be subject to the costs and administrative burdens of involvement in bankruptcy or foreclosure proceedings or related litigation.

(b)   LACK OF SKILLFUL PROPERTY MANAGEMENT ENTAILS RISKS

The successful operation of a real estate project depends upon the property manager's performance and viability. The property manager is generally responsible for:

o  responding to changes in the local market;

o  planning and implementing the rental structure;

o  leasing units in the property (for multifamily and multi-tenant commercial properties);

o  operating the property and providing building services;

o  managing operating expenses; and

o  assuring that maintenance and capital improvements are carried out in a timely fashion.

133

Properties deriving revenues primarily from short-term sources are generally more management intensive than properties leased to creditworthy tenants under long-term leases.

A good property manager, by controlling costs, providing appropriate service to tenants and seeing to the maintenance of improvements, can, in some cases, improve cash flow, reduce vacancy, leasing and repair costs and preserve building value. On the other hand, management errors can, in some cases, impair short-term cash flow and the long term viability of an income producing property.

We make no representation or warranty as to the skills of any present or future managers. Additionally, we cannot assure you that the property managers will be in a financial condition to fulfill their management responsibilities throughout the terms of their respective management agreements.

(c)   RISKS OF INSPECTIONS RELATING TO PROPERTIES

Licensed engineers or consultants inspected the mortgaged properties in connection with the origination of the mortgage loans to assess items such as structure, exterior walls, roofing, interior construction, mechanical and electrical systems and general condition of the site, buildings and other improvements. However, we can not assure you that all conditions requiring repair or replacement were identified.

(d)   ABSENCE OR INADEQUACY OF INSURANCE COVERAGE ENTAILS RISKS

The mortgaged properties may suffer casualty losses due to risks which were not covered by insurance or for which insurance coverage is inadequate. In addition, certain of the mortgaged properties are located in California and Texas and in coastal areas of Florida, states that have historically been at greater risk regarding acts of nature (such as hurricanes, floods and earthquakes) than other states. We can not assure you that borrowers will be able to maintain adequate insurance. Moreover, if reconstruction or any major repairs are required, changes in laws may materially affect the borrower's ability to effect such reconstruction or major repairs or may materially increase the cost thereof beyond the limits of existing insurance policies. As a result of any of the foregoing, the amount available to make distributions on the Offered Certificates could be reduced.

(e)   APPRAISALS AND MARKET STUDIES HAVE CERTAIN LIMITATIONS

An appraisal or other market analysis was conducted in respect of the mortgaged properties in connection with the origination or acquisition of the related

mortgage loan. The resulting estimates of value are the basis of the Cut-off Date LTV Ratios referred to herein. Those estimates represent the analysis and opinion of the person performing the appraisal or market analysis and are not guarantees of present or future value.

Moreover, the values of the mortgaged properties may have fluctuated significantly since the appraisal or market study was performed. In addition, appraisals seek to establish the amount a typically motivated buyer would pay a typically motivated seller. Such amount could be significantly higher than the amount obtained from the sale of a mortgaged property under a distress or liquidation sale. Information regarding the values of mortgaged properties available to the Depositor as of the Cut-off Date is presented in Annex A hereto for illustrative purposes only. See "Description of the Mortgage Pool--Assessments of Property Value and Condition--Appraisals" in this prospectus supplement.

(f)     SUBORDINATION OF SUBORDINATE OFFERED CERTIFICATES

As described in this prospectus supplement, unless your certificates are Class A-1, Class A-2 or Class X Certificates, your rights to receive distributions of amounts collected or advanced on or in respect of the mortgage loans will be subordinated to those of the holders of the offered certificates with an earlier alphabetical designation. See "Description of the Certificates--Distributions" and "--Subordination; Allocation of Losses and Certain Expenses" in this prospectus supplement and "Risk Factors--Subordination of the Subordinate Certificates; Effect of Losses on the Assets" in the prospectus.

(g)     RISKS RELATING TO CONFLICTS OF INTEREST

Conflicts Between Various Classes of Certificateholders. The Special Servicer is given considerable latitude in determining whether and in what manner to liquidate or modify defaulted mortgage loans. The Operating Adviser will be empowered to replace the Special Servicer. At any given time, the Operating Adviser will be controlled generally by a majority of the holders of the most subordinated (or, if the certificate principal balance thereof is less than 25% of its original certificate balance, the next most subordinated) class of certificates (that is, the Controlling Class) outstanding from time to time, and such holders may have interests in conflict with those of the holders of the other certificates. For instance, the holders of certificates of the Controlling Class might desire to mitigate the potential for loss to that Class from a troubled mortgage loan by deferring enforcement in the hope of maximizing future proceeds. However, the interests of the trust may be better served by prompt action, since delay followed by a market downturn could result in less proceeds to the trust than

would have been realized if earlier action had been taken.

The Special Servicer or an affiliate may acquire certain of the most subordinated certificates (including those of the initial Controlling Class). Under such circumstances, the Special Servicer itself may have interests that conflict with the interests of the other holders of the certificates.

Conflicts Between Trust or Trustee and each of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC. Conflicts of interest may arise between the trust and each of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC or their affiliates that engage in the acquisition, development, operation, financing and disposition of real estate.

Those conflicts may arise because each of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC and its affiliates intend to continue to actively acquire, develop, operate, finance and dispose of real estate-related assets in the ordinary course of their business. During the course of their business activities, each of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC or such affiliates may acquire or sell properties, or finance mortgage loans secured by properties, which may include the mortgaged properties or properties which are in the same markets as the mortgaged properties. In such case, the interests of each of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC or such affiliates may differ from, and compete with, the interests of the trust, and decisions made with respect to those assets may adversely affect the amount and timing of distributions with respect to the certificates.

Conflicts Between Managers and the Mortgage Loan Borrowers. Substantially all of the property managers for the mortgaged properties (or their affiliates) manage additional properties, including properties that may compete with the mortgaged properties. Affiliates of the managers, and certain of the managers themselves, also may own other properties, including competing properties. The managers of the mortgaged properties may accordingly experience conflicts of interest in the management of such mortgaged properties.

Conflicts Between Sellers of Mortgage Loans and Classes of Certificateholders. Affiliates of Heller Financial Capital Funding, Inc. and Prudential Mortgage Capital Funding, LLC may acquire certain of the Offered Certificates. Under such circumstances, they may become the Controlling Class, and as such have interests that may conflict with their interests as a Seller of the Mortgage Loans.

(h)     THE MORTGAGE LOANS WERE  UNDERWRITTEN  TO STANDARDS

136

WHICH DO NOT CONFORM TO THE STANDARDS OF FANNIE MAE OR FREDDIE MAC.

The underwriting standards of the originators are intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan. The originators consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property. As further described in this prospectus supplement, **the underwriting standards of the originators do not conform to Fannie Mae and Freddie Mac guidelines**.

In addition, mortgage loans originated by the originators generally bear higher rates of interest than mortgage loans originated in accordance with Fannie Mae and Freddie Mac guidelines and may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac guidelines.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in accordance with Fannie Mae and Freddie Mac guidelines. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. SEE "THE MORTGAGE POOL--UNDERWRITING STANDARDS" IN THIS PROSPECTUS SUPPLEMENT.

(i) MORTGAGE LOANS WITH HIGH COMBINED LOAN-TO-VALUE RATIOS LEAVE THE RELATED MORTGAGOR WITH LITTLE OR NO EQUITY IN THE RELATED MORTGAGED PROPERTY.

Approximately 36.45% of the Group I Mortgage Loans and approximately 40.93% of the Group II Mortgage Loans, in each case, by the related aggregate principal balance as of the Cut-off Date, had a combined loan-to-value ratio at origination in excess of 80%.

An overall decline in the residential real estate market, a rise in interest rates over a period of time and the condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of the mortgaged property from the appraised value at the time the Mortgage Loan was originated. If there is a reduction in the value of the mortgaged property, the combined loan-to-value ratio may increase over what it was at the time the Mortgage Loan was originated. Such an increase may reduce the likelihood

of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan, and any losses to the extent not covered by the credit enhancement may affect the yield to maturity of your certificates. There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review. **Investors should note that the values of the mortgaged properties may be insufficient to cover the outstanding principal balance of the Mortgage Loans**. There can be no assurance that the combined loan-to-value ratio of any Mortgage Loan determined at any time after origination will be less than or equal to its combined loan-to-value ratio at origination.

(j)     INTEREST ONLY MORTGAGE LOAN RISK.

Approximately 16.36% the Group I Mortgage Loans and approximately 31.80% of the Group II Mortgage Loans, in each case, by related aggregate principal balance as of the Cut-off Date, require the borrowers to make monthly payments only of accrued interest for the first two, three, five or ten years following origination. After such interest-only period, the borrower's monthly payment will be recalculated to cover both interest and principal so that the Mortgage Loan will amortize fully prior to its final payment date. If the monthly payment increases, the related borrower may not be able to pay the increased amount and may default or may refinance the related Mortgage Loan to avoid the higher payment. Because no principal payments may be made or advanced on such Mortgage Loans for two, three, five or ten years following origination, the certificateholders will receive smaller principal distributions during such period than they would have received if the related borrowers were required to make monthly payments of interest and principal for the entire lives of such Mortgage Loans. This slower rate of principal distributions may reduce the return on an investment in the Offered Certificates that are purchased at a discount.

(k)     THE MEZZANINE CERTIFICATES WILL BE MORE SENSITIVE TO LOSSES ON THE MORTGAGE LOANS THAN THE CLASS A CERTIFICATES BECAUSE THEY ARE SUBORDINATE TO THE CLASS A CERTIFICATES.

The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates will be progressively more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those as-

138

sumed by an investor in these certificates, the actual yield to maturity of these certificates may be lower than the yield anticipated by the investor based on such assumption. The timing of losses on the Mortgage Loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the Mortgage Loans, to the extent they exceed the amount of excess interest, overcollateralization and the aggregate certificate principal balance of the Class B Certificates, following distributions of principal on the related Distribution Date, will reduce the certificate principal balances of the Mezzanine Certificates beginning with the class of Mezzanine Certificates then outstanding with the lowest payment priority. As a result of such reductions, less interest will accrue on each such class of Mezzanine Certificates than would otherwise be the case. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of those certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

(l)     THE MEZZANINE CERTIFICATES GENERALLY WILL NOT BE ENTITLED TO RECEIVE PRINCIPAL PAYMENTS UNTIL DECEMBER 2007 WHICH MAY RESULT IN A GREATER RISK OF LOSS RELATING TO THESE CERTIFICATES.

**Unless the aggregate certificate principal balance of the Class A Certificates has been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until at least December 2007** or a later date as provided in this prospectus supplement or during any period in which delinquencies on the Mortgage Loans exceed the levels set forth under "Description of the Certificates--Principal Distributions on the Offered Certificates and the Class B Certificates" in this prospectus supplement. As a result, **the weighted average lives of the Mezzanine Certificates will be longer than would be the case if distributions of principal were allocated among all of the certificates at the same time**. As a result of the longer weighted average lives of the Mezzanine Certificates, the **holders of these certificates have a greater risk of suffering a loss on their investments**. Further, because such certificates might not receive any principal if the delinquency levels set forth under "Description of the Certificates--Principal Distributions on the Offered Certificates and the Class B Certificates" in this prospectus supplement are exceeded, it is possible for such certificates to receive no principal distributions on a particular Distribution

Date even if no losses have occurred on the mortgage pool.

(m)   THE RATE AND TIMING OF PRINCIPAL  DISTRIBUTIONS  ON THE
CLASS  A CERTIFICATES  AND THE   MEZZANINE   CERTIFICATES
WILL BE AFFECTED BY PREPAYMENT SPEEDS AND BY THE PRIOR-
ITY OF PAYMENT ON SUCH CERTIFICATES.

The rate and timing of distributions  allocable to principal on the Class A Cer-
tificates and the Mezzanine Certificates will depend, in general, on the rate and
timing of principal payments (including prepayments and collections upon de-
faults,  liquidations and repurchases) on the Mortgage Loans and the allocation
thereof to pay principal on such certificates as described in "Description of the
Certificates--Principal Distributions on the Offered Certificates and the Class
B Certificates" in this prospectus supplement. As is the case with mortgage
backed  pass-through  certificates generally,  the Offered Certificates are sub-
ject  to  **substantial  inherent  cash-flow  uncertainties  because the Mort-
gage Loans may be prepaid at any time**. However,  with respect  to  ap-
proximately **84.21%** of the  Mortgage Loans, by aggregate principal bal-
ance of the  Mortgage  Loans as of the Cut-off Date, a prepayment  may  sub-
ject  the  related  mortgagor  to  a  prepayment  charge.  A prepayment charge
may or may not act as a deterrent to prepayment of the related Mortgage Loan.
SEE "THE MORTGAGE POOL" IN THIS PROSPECTUS SUPPLEMENT.

Generally, when prevailing interest rates are increasing,  prepayment rates on
mortgage loans tend to decrease;  a decrease in the  prepayment  rates on the
Mortgage Loans will result in a reduced rate of return of principal to investors
in the  Class A  Certificates  and the  Mezzanine  Certificates  at a time  when
reinvestment  at such higher  prevailing  rates would be desirable.  Conversely,
when prevailing interest rates are declining, prepayment rates on mortgage
loans tend to increase; an increase in the prepayment rates on the Mortgage
Loans will result in a greater  rate of return of  principal  to  investors  in the
Class A Certificates and Mezzanine  Certificates at a time  when  reinvest-
ment at comparable yields may not be possible.

Distributions  of principal  will be made to the holders of the  Mezzanine Cer-
tificates   according  to the  priorities  described in  this  prospectus supple-
ment. The timing of commencement of principal distributions and the weighted
average life of each such class of certificates will be affected by the rates of
prepayment on the Mortgage Loans  experienced both before and after the
commencement of principal distributions on such classes. For further informa-
tion regarding the effect of principal  prepayments on the weighted  average
lives of the Offered  Certificates,  SEE "YIELD ON THE  CERTIFICATES"
IN THIS PROSPECTUS SUPPLEMENT,  INCLUDING  THE TABLES  EN-

TITLED "PERCENT OF INITIAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING AT THE SPECIFIED PERCENTAGES OF THE PREPAYMENT ASSUMPTION."

(n)   THE YIELD TO MATURITY ON THE OFFERED CERTIFICATES WILL DEPEND ON A VARIETY OF FACTORS.

The yield to maturity on the Offered Certificates will depend on:

o   the applicable pass-through rate thereon;

o   the applicable purchase price;

o   the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) and the allocation thereof to reduce the certificate principal balance of the Offered Certificates; and

o   the rate, timing and severity of realized losses on the Mortgage Loans, adjustments to the mortgage rates on the adjustable-rate Mortgage Loans included in the mortgage pool, the amount of excess interest generated by the Mortgage Loans and the allocation to the Offered Certificates of certain interest shortfalls.

In general, if the Offered Certificates are purchased at a premium and principal distributions thereon occur at a rate faster than anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that assumed at the time of purchase. Conversely, if the Offered Certificates are purchased at a discount and principal distributions thereon occur at a rate slower than that anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that originally assumed.

(o)   THE YIELD TO MATURITY ON THE MEZZANINE CERTIFICATES WILL BE PARTICULARLY SENSITIVE TO THE RATE OF PREPAYMENTS ON THE MORTGAGE LOANS.

The multiple class structure of the Mezzanine Certificates causes the yield of these classes to be particularly sensitive to changes in the rates of prepayment of the Mortgage Loans. Because distributions of principal will be made to the holders of such certificates according to the priorities described in this prospectus supplement, the yield to maturity on such classes of certificates will be sensitive to the rates of prepayment on the Mortgage Loans experienced both before and after the commencement of principal distributions on such classes. The yield to maturity on such classes of certificates will also be extremely sensitive to losses due to defaults on the Mortgage Loans (and the timing thereof), to the extent these losses are not covered by excess cashflow

141

otherwise  payable to the Class CE Certificates,  to the Class B Certificates or to a class of Mezzanine Certificates with a lower payment priority. Further-more, as described in this prospectus  supplement,  the timing of receipt of principal and interest by the Mezzanine  Certificates may be adversely  affected by losses even if these classes of certificates do not ultimately bear such loss.

(p)     INTEREST PAYMENTS ON THE MORTGAGE LOANS MAY BE  INSUF-FICIENT TO PAY INTEREST ON YOUR CERTIFICATES.

When a Mortgage Loan is prepaid in full, the mortgagor is charged  interest only up to the date on which  payment is made,  rather than for an entire month. This may result in a shortfall in interest collections  available for payment on the next Distribution  Date. Each servicer is required to cover a portion of the shortfall in interest collections that are attributable to voluntary prepayments in full on the related  Mortgage Loans,  but only up to the servicing fee (or in the case of Select  Portfolio  Servicing, Inc.,  one half of the servicing fee) payable to the related servicer for the related interest accrual period.  If the credit  en-hancement  is  insufficient  to cover this  shortfall in excess of the amount the servicer  covers,  you may incur a loss.  In addition,  the servicers will not cover shortfalls in interest collections due to bankruptcy  proceedings or the applica-tion of the Servicemembers  Civil Relief Act (the "Relief Act") or similar state or local laws. The Policy will not cover any such shortfalls.

On any Distribution Date, any shortfalls  resulting from the application of the Relief Act or  similar  state or local  laws and any  prepayment  interest short-falls  to the  extent  not  covered by  compensating  interest  paid by the related servicer will be allocated,  first,  to the  Class CE Certificates,  second,  to the Class B Certificates, **third, to the Class M-11 Certificates [the class pur-chased by one or more of the Funds],** fourth, to the Class M-10 Certificates, fifth, to the Class M-9 Certificates, sixth, to the Class M-8 Certificates,  sev-enth, to the Class M-7 Certificates,  eighth, to the Class M-6  Certificates, ninth,  to the Class M-5  Certificates,  tenth, to the Class M-4 Certificates, elev-enth, to the Class M-3 Certificates, twelfth, to the Class  M-2  Certificates, thirteenth,  to the  Class  M-1  Certificates  and fourteenth,  to the  Class A Certificates,  on a PRO RATA basis,  based on their respective  senior  interest distribution  amounts for such  Distribution  Date before such reduction.  The holders of the Offered  Certificates and the Class B Certificates will be entitled to reimbursement for any such interest  shortfalls but only to the extent of available funds and in the order of priority set forth under "Description of the Certificates--Overcollateralization  Provisions." If these  shortfalls  are  allo-cated  to the Offered  Certificates  and the Class B Certificates the amount of interest paid to those  certificates will be reduced, adversely affecting the yield

142

on your investment.

(q)     SUITABILITY OF THE OFFERED CERTIFICATES AS INVESTMENTS.

The Offered Certificates are not suitable investments for any investor that requires a **regular or predictable schedule of monthly payments** or payment on any specific date. The Offered Certificates are **complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze** the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

(r)     YOUR RISK OF LOSS MAY BE HIGHER THAN YOU EXPECT IF YOUR SECURITIES ARE BACKED BY LOANS THAT WERE UNDERWRITTEN TO STANDARDS WHICH DO NOT CONFORM TO THE STANDARDS OF FREDDIE MAC OR FANNIE MAE

. . **Substantially all of the loans in the trust fund will have been originated under standards that were less stringent than the standards generally acceptable to Freddie Mac and Fannie Mae with regard to the borrower's credit standing and repayment ability**. The related borrowers may have payment histories and debt-to-income ratios which would not satisfy Freddie Mac and Fannie Mae underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. In addition, on a case by case basis, the related seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its applicable underwriting risk category guidelines warrants an underwriting exception. **These exceptions would represent a further departure from the Freddie Mac and Fannie Mae standards**.

As a result of the application of less stringent underwriting standards, certain mortgage loans in a mortgage pool may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner. Furthermore, changes in the values of the related mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of these mortgage loans than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.

(s)     The Underwriting Guidelines are less stringent than the standards generally acceptable to more traditional lenders with regard to: (1) the applicant's credit standing and repayment ability and (2) the property offered as collateral. Ap-

plicants who qualify under the Underwriting Guidelines generally have payment histories and debt ratios which would not satisfy the underwriting guidelines of more traditional lenders and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies.

(t)    THE TYPES OF MORTGAGE LOANS INCLUDED IN THE TRUST FUND RELATED TO YOUR SECURITIES MAY BE ESPECIALLY PRONE TO DEFAULTS WHICH MAY EXPOSE YOUR SECURITIES TO GREATER LOSSES

The securities will be directly or indirectly backed by mortgage loans, manufactured housing conditional sales contracts and installment loan agreements. The types of mortgage loans included in the trust fund may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure. You should be aware that if the mortgaged properties fail to provide adequate security for the mortgage loans included in a trust fund, any resulting losses, to the extent not covered by credit support, will be allocated to the related securities in the manner described in the related prospectus supplement and consequently would adversely affect the yield to maturity on those securities. The depositor cannot assure you that the values of the mortgaged properties have remained or will remain at the appraised values on the dates of origination of the related mortgage loans. The prospectus supplement for each series of securities will describe the mortgage loans which are to be included in the trust fund related to your security and risks associated with those mortgage loans which you should carefully consider in connection with the purchase of your security.

(u)    YOUR RISK OF LOSS MAY BE HIGHER THAN YOU EXPECT IF YOUR SECURITIES ARE BACKED BY PARTIALLY UNSECURED HOME  EQUITY LOANS

**The trust fund may also include home equity loans that were originated with loan-to-value ratios or combined loan-to-value ratios in excess of the value of the related mortgaged property**. Under these circumstances, the trust fund could be treated as a general unsecured creditor as to any unsecured portion of any related loan. In the event of a default under a loan that is unsecured in part, the trust fund will have recourse only against the borrower's assets generally for the unsecured portion of the loan, along with all other general unsecured creditors of the borrower.

(v)    THE ORIGINATORS' UNDERWRITING STANDARDS ARE NOT AS STRINGENT AS THOSE OF MORE TRADITIONAL LENDERS OR OF FANNIE MAE AND FREDDIE MAC, WHICH MAY RESULT IN LOSSES

144

ALLOCATED TO THE OFFERED CERTIFICATES

. . .

The Originators' underwriting standards are primarily intended to assess the applicant's credit standing and ability to repay as well as the value and the adequacy of the mortgaged property as collateral for the mortgage loan. The Originators provide loans primarily to **borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines** but who generally have equity in their property and the apparent ability to repay. While the Originators' primary considerations in underwriting a mortgage loan are the applicant's credit standing and repayment ability, as well as the value and adequacy of the mortgaged property as collateral, the Originators also consider, among other things, the applicant's credit history and debt service-to-income ratio, and the type and occupancy status of the mortgaged property. The Originators' underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the Originators' first lien mortgage loan (or at any time thereafter), which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the Originators' loan- to-value ratio determination.

**As a result of such underwriting standards, the Mortgage Loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner**. To the extent the credit enhancement features described in this prospectus supplement are insufficient to cover such losses, holders of the related Certificates may suffer a loss on their investment.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. See "The Mortgage Pool—Underwriting Standards of the Originators" in this prospectus supplement.

(w) CERTAIN MORTGAGE LOANS HAVE HIGH LOAN-TO-VALUE RATIOS OR COMBINED LOAN-TO- VALUE RATIOS WHICH MAY PRESENT A GREATER RISK OF LOSS RELATING TO SUCH MORTGAGE LOANS

**Mortgage loans with a loan-to-value ratio (in the case of first liens) or combined loan-to-value ratio (in the case of second liens) of greater than**

145

**80% may present a greater risk of loss than mortgage loans with loan-to-value ratios (in the case of first liens) or combined loan-to-value ratios (in the case of second liens) of 80% or below**. Approximately 63.59% of the Group I Collateral Selection Date Mortgage Loans and approximately 64.21% of the Group II Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, had a loan-to-value ratio (in the case of first liens) or combined loan-to-value ratio (in the case of second liens) at origination in excess of 80% and are not covered by any primary mortgage insurance. No Collateral Selection Date Mortgage Loan had a loan-to-value ratio (in the case of first liens) or combined loan-to-value ratio (in the case of second liens) exceeding 100% at origination.

An overall decline in the residential real estate market, a rise in interest rates over a period of time and the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the appraised value at the time the Mortgage Loan was originated. If there is a reduction in value of the mortgaged property, the loan-to-value ratio (in the case of first liens) or combined loan-to-value ratio (in the case of second liens) may increase over what it was at the time of origination. Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan. There can be no assurance that the loan-to-value ratio (in the case of first liens) or combined loan-to- value ratio (in the case of second liens) of any Mortgage Loan determined at any time after origination is less than or equal to its original loan-to-value ratio (in the case of first liens) or combined loan-to-value ratio (in the case of second liens). Additionally, the Originators' determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios (in the case of first liens) or combined loan-to-value ratios (in the case of second liens) of the Mortgage Loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property. See "The Mortgage Pool--General" in this prospectus supplement.

(x)    MOST OF THE COLLATERAL SELECTION DATE MORTGAGE LOANS ARE NEWLY ORIGINATED AND HAVE LITTLE, IF ANY, PAYMENT HISTORY

None of the Collateral Selection Date Mortgage Loans are delinquent in their monthly payments as of the Collateral Selection Date. Investors should note, however, that certain of the Collateral Selection Date Mortgage Loans will have a first payment date occurring after the Collateral Selection Date and, therefore, such Collateral Selection Date Mortgage Loans could not have been delinquent in any monthly payment as of the Collateral Selection Date.

146

(y)  SIMULTANEOUS SECOND LIEN RISK

With respect to approximately 3.91% of the Group I Collateral Selection Date Mortgage Loans and approximately 2.56% of the Group II Collateral Selection Date Mortgage Loans, by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, at the time of origination of the first lien Mortgage Loan, the Originators also originated a second lien mortgage loan which will not be included in the trust. The weighted average loan-to-value ratio at origination of the first-lien on such Collateral Selection Date Mortgage Loans is approximately 79.97% and the weighted average combined loan-to-value ratio at origination of such Collateral Selection Date Mortgage Loans (including the second lien) is approximately 99.96%.

With respect to approximately 0.72% of the Group I Collateral Selection Date Mortgage Loans and approximately 0.71% of the Group II Collateral Selection Date Mortgage Loans, by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, at the time of origination of the first lien Mortgage Loan, the applicable Originator also originated a second lien mortgage loan which will be included in the Trust. The weighted average combined loan-to-value ratio at origination of such Collateral Selection Date Mortgage Loans (including the second lien) is approximately 100.00%.

With respect to such Collateral Selection Date Mortgage Loans, foreclosure frequency may be increased relative to Mortgage Loans that were originated without a simultaneous second lien because the mortgagors on such Collateral Selection Date Mortgage Loans have less equity in the mortgaged property. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the Originators or from any other lender.

(z)  THERE ARE VARIOUS RISKS ASSOCIATED WITH THE MEZZANINE CERTIFICATES

The weighted average lives of, and the yields to maturity on, the Mezzanine Certificates will be progressively more sensitive, in increasing order of their numerical class designations, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those assumed by an investor in such certificates, the actual yield to maturity on such certificate may be lower than the yield anticipated by such holder. The timing of losses on the Mortgage Loans will also affect an investor's yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the

Mortgage Loans, to the extent they exceed the amount of excess interest and overcollateralization following distributions of principal on the related Distribution Date, will reduce the certificate principal balance of the class of Mezzanine Certificates then outstanding with the highest numerical class designation. As a result of these reductions, less interest will accrue on these classes of certificates than would be the case if those losses were not so allocated. Once a realized loss is allocated to a Mezzanine Certificate, such written down amount will not be reinstated (except in the case of subsequent recoveries) and will not accrue interest. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of such certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" and "Description of the Certificates—Interest Rate Swap Agreement, the Swap Provider and the Swap Account" in this prospectus supplement.

Unless the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until at least the Distribution Date in September 2007 or a later date as provided in this prospectus supplement or during any period in which delinquencies or realized losses on the Mortgage Loans exceed certain levels described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement. As a result, the weighted average lives of such certificates will be longer than would be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of such certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels described under "Description of the Certificates—Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement are exceeded, it is possible for such certificates to receive no principal distributions on a particular distribution date even if no losses have occurred on the mortgage pool.

(aa) Historically, a variety of factors, including the appreciation of real estate values, have limited the loss and delinquency experience on sub-prime mortgage loans. There can be no assurance that factors beyond the control of Countrywide Home Loans, such as national or local economic conditions or a downturn in the real estate markets of its lending areas, will not result in increased rates of delinquencies and foreclosure losses in the future.

(bb) ADDITIONAL AND SUBSEQUENT MORTGAGE LOANS MAY HAVE CHARACTERISTICS THAT DIFFER FROM THOSE OF THE STATISTIC

148

CALCULATION MORTGAGE LOANS WHICH MAY REDUCE YOUR YIELD TO MATURITY.

Following the transfer of any additional mortgage loans and the subsequent mortgage loans to the trust, the characteristics of the mortgage loans may differ from the information presented in this prospectus supplement. The characteristics that may differ include, among others, the composition of the mortgage loans and of the borrowers of the                mortgage loans, the credit quality of the mortgage loans, the distribution by interest rate, the distribution by principal balance, the distribution by loan-to-value ratio and the distribution by remaining term to stated maturity. We recommend that you consider potential variances when making your investment decision concerning the offered certificates.

(cc)    BALLOON MORTGAGE LOAN RISK.

Mortgage Loans that are balloon loans pose a risk because a borrower must make a large lump sum payment of principal at the end of the loan term. If the borrower is unable to pay the lump sum or refinance such amount, the servicer will not be obligated to advance the principal portion of that lump sum payment, you may suffer a loss. Approximately 6.88% of the Group I Mortgage Loans and approximately 12.14% of the Group II Mortgage Loans, in each case, by related aggregate principal balance as of the Cut-off Date, are balloon loans.

(dd)    REDUCTION OR WITHDRAWAL OF RATINGS.

Each rating agency rating the Offered Certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the Offered Certificates, the **liquidity and market value of the affected certificates is likely to be reduced**.

(ee)    The information regarding **Long Beach's underwriting standards** has been provided by Long Beach. **None of the Depositor, the Trustee, the Underwriters or any of their affiliates has made any independent investigation of such information or has made or will make any representation as to the accuracy or completeness of such information**.

The Mortgage Loans were originated generally in accordance with guidelines established by Long Beach under its Full Documentation, Limited Doc or Stated Income residential loan programs. Long Beach's underwriting guidelines are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral and are also intended to consider the mortgagor's

149

credit standing and repayment ability. **On a case-by-case basis and only with the approval of two or more senior lending officers, Long Beach may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception**. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the applicant's current address. **It is expected that a substantial number of the Mortgage Loans to be included in the Mortgage Pool will represent exceptions to the underwriting guidelines.**

Under Long Beach's programs, during the underwriting process, Long Beach reviews and verifies the loan applicant's sources of income (**except under the Stated Income and Limited Doc loan programs**).

(ff) **Long Beach's underwriting guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the mortgagor's credit standing and repayment ability**. Mortgagors who qualify under the Long Beach's underwriting programs generally have payment histories and debt ratios **which would not satisfy Fannie Mae and Freddie Mac underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies**. Long Beach's underwriting guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors.

Under the "Limited Doc" and "Stated Income" residential loan programs, the mortgagor's employment and income sources must be stated on the mortgagor's application. The mortgagor's income as stated must be reasonable for the related occupation and **such determination as to reasonableness is subject to the loan underwriter's discretion**. However, the mortgagor's income as stated on the application **is not independently verified**. **Verification of employment is required for salaried mortgagors only**. Maximum loan-to-value ratios are generally lower under the Limited Doc and Stated Income residential loan programs than those permitted under the Full Documentation residential loan program. Except as otherwise stated above, the same mortgage credit, consumer credit and collateral property underwriting guidelines that apply to the Full Documentation residential loan program apply to the Limited Doc and Stated Income residential loan programs.

(gg) A number of the liens on improved real estate securing the loans will be junior to other liens on that real estate, which increases the risk of loss upon default.

Because the liens are junior, the rights of the trust to cause the property secur-

ing the loan to be sold upon default of the mortgagor or trustor are subordinate to those of the senior mortgagee or beneficiary. This extinguishes the junior mortgagee's or junior beneficiary's lien unless the servicer on behalf of the trust asserts its subordinate interest in the property in foreclosure litigation and, possibly, satisfies the defaulted senior loan or loans. Approximately 7.89% by principal balance of the loans are secured by subordinate liens on the applicable real estate. A number of the loans, particularly the group II fixed-rate loans, have combined loan-to-value ratios, based on their current principal balances, greater than 100%. As a result, the real estate securing those loans is not likely to provide adequate security if it becomes necessary to foreclose upon and sell the collateral. For a more complete description of the risks associated with junior mortgage liens, see "Legal Aspects of the Loans; Repurchase Obligations" in the prospectus.

(hh)   DELINQUENCY, LOAN DEFAULT AND LOSS INFORMATION

The Company began originating, purchasing and servicing home equity loans in January 1996, and thus has no significant historical experience with respect to the performance of such loans. Accordingly, no information has been included herein with respect to the Company's delinquency, loan loss or liquidation experience for home equity loans, inasmuch as such information as is available would likely not be indicative of the performance of the Home Equity Contracts comprising Sub-Pool HE.

(ii)   RELIANCE ON HISTORICAL DATA WITH RESPECT TO HOME EQUITY LOANS.

If you purchase a Sub-Pool HE Certificate, the return on your investment will depend largely on the performance of the Home Equity Contracts constituting Sub-Pool HE. We have disclosed the Company's historical delinquency experience with home equity loans under "The Contracts--Home Equity Contracts" herein, but the historical experience may not be an accurate prediction of the performance of the Home Equity Contracts constituting Sub-Pool HE for several reasons. First, the Company's historical experience with home equity loans is limited: it began purchasing and servicing them in January 1996. If the Company's historical experience were longer, or involved a larger number of home equity loans, the data might well be substantially different, and some investors might consider that data a better predictor of the performance of Sub-Pool HE. Second, historical experience with the performance of one pool of loans is never a completely reliable predictor of the future performance of another pool of loans. Third, the information incorporates some home equity loans that are not of the type to be included in Sub-Pool HE, and therefore the information presented is not necessarily indicative of the Company's delinquency experi-

151

ence with respect to home equity loans similar to the home equity contracts compromising Sub-Pool HE. You must not assume that Sub-Pool HE will experience delinquencies and losses identical to the historical data presented here.

(jj)    Our underwriting guidelines and credit scoring process weight significantly the applicant's creditworthiness and place less weight on the available equity in the related real estate being improved. While it is our policy not to exceed 100% in loan-to-value ratio on any loan, a substantial portion of the home improvement loans are expected to have loan-to-value ratios of 90% or more when considering the estimated value of the real estate, other liens senior to that of the home improvement loan, and the improvements being financed. Because we do not require appraisals on most home improvement loans with loan amounts of less than $30,000, which home improvement loans are expected to comprise a substantial portion of any loan pool, and given the many other factors that can affect the value of property securing a conventional home improvement loan, the related prospectus supplement will not provide detailed disclosure of loan-to-value ratios on the home improvement loans.

(kk)    In general, defaults on mortgage loans and contracts are expected to occur with greater frequency in their early years. The rate of default on cash out refinance, limited documentation or no documentation mortgage loans, and on loans with high loan-to-value ratios or combined loan-to-value ratios, as applicable, may be higher than for other types of loans. Likewise, the rate of default on loans that have been originated under lower than traditional underwriting standards may be higher than those originated under traditional standards. A trust fund may include mortgage loans or contracts that are one month or more delinquent at the time of offering of the related series of securities or which have recently been several months delinquent. The rate of default on delinquent mortgage loans or mortgage loans or contracts with a recent history of delinquency, including re-performing loans, is more likely to be higher than the rate of default on loans that have a current payment status.

**The rate of defaults and the severity of losses on mortgage loans or contracts with document deficiencies may be higher than for mortgage loans or contracts with no documentation deficiencies.** To the extent that any document relating to a loan is not in the possession of the trustee, the deficiency may make it difficult or impossible to realize on the mortgaged property in the event of foreclosure, which will affect the timing and the amount of liquidation proceeds received by the trustee.

(ll)    Prior to any purchase of a Mezzanine Certificate, consider the following factors that may adversely impact your yield: Because the Mezzanine Certificates receive interest and principal distributions after the Senior Certificates

receive  such distributions, there is a greater likelihood that  the  Mezzanine Certificates  will not receive the  distributions to which they are entitled on any distribution date.

(mm)   INTEREST ONLY LOANS INCREASE RISK OF LOSS

As of the Cut-off Date, approximately 5.22%, 46.26%  and  29.37% of the Group I Mortgage Loans,  Group  II Mortgage  Loans  and  the Mortgage Loans  in  the  aggregate, respectively,  have an initial interest only period. During this period, the  payment made by the related borrower will be less than it would  be  if the  related  Mortgage Loan amortized.  In  addition,  the principal balance of the  related  Mortgage Loan will not be  reduced because there  will  be no scheduled  monthly  payments of principal during  this  pe-riod.  As  a result,  no principal payments  will  be  made  to  the Offered Certificates  with respect to these Mortgage  Loans during their  interest  only period except in the case of a prepayment.

After the initial interest only period,  the scheduled  monthly payment on these Mortgage Loans  will  increase,  which may  result in increased  delinquencies by  the  related borrowers,  particularly  if interest  rates have increased and the borrower is unable to refinance**.  In  addition,  losses  may  be  greater  on these  Mortgage Loans  as a result of the Mortgage Loan not  amortizing during the  early  years of these  Mortgage  Loans.** Although the amount of principal included in each  scheduled  monthly  payment  for  a traditional mortgage  loan  is  relatively small  during the first few years  after the origina-tion  of  a mortgage  loan,  **in  the aggregate the amount can be significant.** Any resulting  delinquencies  and losses, to the extent not  covered  by credit enhancement,  will  be  allocated  to  the  related  Offered Certificates and Class B Certificates.

**Mortgage loans with an initial interest only period are relatively new in the mortgage marketplace. The performance of  these mortgage loans may be significantly  different from mortgage loans that amortize from origina-tion. In particular, there may be a higher expectation by these borrowers of refinancing  their mortgage loans with a new mortgage  loan,  in  par-ticular  one with an initial interest  only  period,  which  may  result in higher or lower prepayment  speeds  than  would   otherwise  be  the  case. In addition, the failure to build equity in the property by the related  bor-rower may affect the  delinquency  and  prepayment  of these mortgage loans.**

(nn)   THE RECORDING  OF  THE  MORTGAGES IN THE  NAME  OF MERS MAY AFFECT THE YIELD ON THE CERTIFICATES

153

The mortgages or assignments of mortgage for some of the Mortgage Loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc. or MERS, solely as nominee for the seller and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS system. However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the trustee, then any related expenses will be paid by the trust and will reduce the amount available to pay principal of and interest on the certificates.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to certificateholders and increase the amount of losses on the Mortgage Loans.

(oo)   RISKS ASSOCIATED WITH THE MEZZANINE CERTIFICATES AND THE CLASS B CERTIFICATES

The weighted average lives of, and the yields to maturity on, the Mezzanine Certificates, in increasing order of their numerical class designations, and then **the Class B Certificates**, will be progressively more sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such holder based on such assumption. The timing of losses on the Mortgage Loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the Mortgage Loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the Mortgage Loans, to the extent they exceed the amount of excess interest and overcollateralization following distributions of principal on the related Distribution Date, **first, will reduce the certificate principal balance of the class of Class B** Certificate then outstanding with the highest numerical class designation and second, will reduce the certificate principal balance of the class of Mezzanine Certificate then outstanding with the highest numerical class designation. As a result of such reductions, **less interest will accrue on such class of Class B**

154

Certificates and Mezzanine Certificates **than would otherwise be the case**. **Once a realized loss is allocated to a Class B Certificate or Mezzanine Certificate, no principal or interest will be distributable with respect to such written down amount** (except in the case of Subsequent Recoveries). However, the amount of any realized losses allocated to the Class B Certificates or Mezzanine Certificates may be distributed to the holders of the Class B Certificates or Mezzanine Certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement. [One or more of the Funds purchased Class B2 certificate.]

Unless the certificate principal balance of the Class A Certificates has been reduced to zero, neither the Mezzanine Certificates nor the Class B Certificates will be entitled to any principal distributions until at least August 2008 or a later date as provided in this prospectus supplement or during any period in which delinquencies or realized losses on the Mortgage Loans exceed certain levels. As a result, the weighted average lives of the Mezzanine Certificates and Class B Certificates will be longer than would otherwise be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of the Mezzanine Certificates and Class B Certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels occur, it is possible for such certificates to receive no principal distributions even if no losses have occurred on the Mortgage Loans.

(pp)   ALLOCATION OF LOSSES.

If, on any Distribution Date, there is not sufficient excess interest or overcollateralization (represented by the Class CE Certificates) **to absorb realized losses on the Mortgage Loans** as described under "Description of the Certificates—Overcollateraliza-tion Provisions" in this prospectus supplement, **then realized losses on the Mortgage Loans will be allocated first to the Class B-1A Certificates and Class B-1B Certificates on a pro rata basis, and then to the Class M-6, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 Certificates, in that order, in each case until the certificate principal balance of each such class has been reduced to zero**. In addition, any realized losses incurred on the Group I Mortgage Loans after the certificate principal balance of the Class M-1 Certificates has been reduced to zero will be allocated to the Class A-3 Certificates. The pooling and servicing agreement does not permit the allocation of realized losses on the Mortgage Loans to the Class A-1 Certificates or Class A-2 Certificates; however, investors in the Class A-1 Certificates and Class A-2 Certificates should

realize that under certain loss scenarios, there will not be enough principal and interest on the Mortgage Loans to pay the Class A-1 Certificates and Class A-2 Certificates all interest and principal amounts to which these certificates are then entitled. SEE "DESCRIPTION OF THE CERTIFI-CATES—ALLOCATION OF LOSSES; SUBORDINATION" IN THIS PROSPECTUS SUPPLEMENT.

**Once realized losses are allocated to the Class B Certificates, the Mezzanine Certificates and the Class A-3 Certificates, their certificate principal balances will be permanently reduced by the amount so allocated.** However, the amount of any realized losses allocated to the Class B Certificates, the Mezzanine Certificates and the Class A-3 Certificates may be distributed to the holders of those certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

(qq)   A lender may originate mortgage loans under a **reduced documentation program. These reduced documentation programs include an "EZ Documentation" program, where there is no verification of stated income, a "No Employment/Income Documentation" program, where there is no verification of employment or income, and a "No Ratio Documentation" program, where there is no stated income, thus eliminating ratio calculations. A reduced documentation program is designed to streamline the loan approval process and thereby improve the lender's competitive position among other loan originators. Under a reduced documentation program, relatively more emphasis is placed on credit score and property underwriting than on certain credit underwriting documentation concerning income and employment verification, which is waived**.

(rr)   YIELD SENSITIVITY OF THE MEZZANINE NOTES

If the Certificate Principal Balance of the Class C Certificates and the Note Balance of the Class B Notes and each class of Mezzanine Notes with a lower payment priority have been reduced to zero, the yield to maturity on any remaining classes of Mezzanine Notes will become extremely sensitive to losses on the HELOCs (and the timing thereof) that are covered by subordination, because the entire amount of any Realized Losses (to the extent not covered by Net Monthly Excess Cashflow), will be allocated to those Notes. The Original Note Balances of the Class M-1 Notes, the Class M-2 Notes, the Class M-3 Notes, the Class M-4 Notes, the Class M-5 Notes, the Class M-6 Notes, the Class M-7 Notes, the Class M-8 Notes, the Class B-1 Notes, the Class B-2 Notes and the Class B-3 Notes are approximately 6.90%, approximately 1.30%, approximately 2.05%, approximately 1.85%, approximately 1.00%, approxi-

156

mately 1.00%, approximately 1.15%, approximately 0.85%, approximately 0.95%, approximately 0.50% and approximately 0.50%, respectively, of the aggregate Principal Balance of the HELOCs as of the Cut-off Date. **Investors in the Mezzanine Notes should fully consider the risk that Realized Losses on the HELOCs could result in the failure of such investors to fully recover their investments**. In addition, once Realized Losses have been allocated to the Mezzanine Notes, such amounts with respect to such Notes will no longer accrue interest and will not be reinstated thereafter (except in the case of Subsequent Recoveries). However, Allocated Realized Loss Amounts may be paid to the holders of the Mezzanine Notes from Net Monthly Excess Cashflow in the priorities set forth under "Description of the Notes--Overcollateralization Provisions" in this prospectus supplement. [Class M-8 was the class purchased by the Funds.]

(ss)  Solely for purposes of determining distributions of principal and interest and the allocation of losses realized on the mortgage loans, the Class A-X Certificates will be **comprised of three components**: the **IO Component**, the PO-1 Component and the PO-2 Component. The IO Component is an interest-only component that will not have a component principal balance but will accrue interest on its component notional amount (initially, equal to $550,777,437). . . . The certificate principal balance, if any, of the Class A-X Certificates will equal the sum of the component principal balances of the PO-1 and PO-2 Components. . . . The holders of the Class A-X Certificates will be entitled to receive principal and interest distributions on any distribution date to the extent of the amount of principal and interest distributed with respect to the related components on such distribution date. **The holder of a Class A-X Certificate may not transfer any component separately.** [The Funds appear to have purchased only the IO.]

(tt)  Subordination is designed to provide the holders of certificates with a higher payment priority with protection against losses realized when the remaining unpaid principal balance on a mortgage loan exceeds the amount of proceeds recovered upon the liquidation of that mortgage loan. **This loss protection is accomplished by allocating the realized losses first, among the subordinate certificates, beginning with the subordinate certificates with the lowest payment priority**,. . .

(uu)  SOME ADDITIONAL RISKS ARE ASSOCIATED WITH THE CERTIFI-CATES

The weighted average lives of, and the yields to maturity on, the Class B-1, Class B-2, Class B-3 [class purchased by the Funds], Class B-4, Class B-5 and Class B-6 Certificates will be progressively more sensitive, in that order, to the

rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such holder based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans will reduce the certificate principal balance of the class of Class B Certificates then outstanding with the lowest payment priority.

(vv)    INTEREST DISTRIBUTIONS

Holders of each class of Senior Certificates will be entitled to receive interest distributions in an amount equal to the Accrued Certificate Interest on that class on each distribution date, to the extent of the Available Funds for the related Loan Group for that distribution date.

Holders of each class of Subordinate Certificates will be entitled to receive interest distributions in an amount equal to the Accrued Certificate Interest on that class on each distribution date, to the extent of remaining Group 1, Group 2, Group 3, Group 4 or Group 5 Available Funds for that distribution date after distributions of interest and principal to the Senior Certificates and distributions of interest and principal to any class of Subordinate Certificates having a higher payment priority.

. . .

PRINCIPAL DISTRIBUTIONS ON THE SUBORDINATE CERTIFICATES

Distributions in reduction of the Certificate Principal Balances of the Subordinate Certificates will be made pursuant to priority (c) of paragraph (F) above under "--Allocation of Available Funds." In accordance with such priority, the Available Funds for each Loan Group, if any, remaining after distributions of principal and interest on the related class or classes of Senior Certificates on such distribution date will be allocated to the Subordinate Certificates in an amount equal to each such class's Allocable Share for such distribution date, provided that no distribution of principal will be made on any such class (other than the Class B-1 Certificates) until all classes ranking prior thereto have received distributions of interest and principal, and such class has received distributions of interest, on such distribution date.

Notwithstanding the foregoing, if on any distribution date the aggregate Certificate Principal Balance of any class or classes of Senior Certificates would be

158

greater than the aggregate Stated Principal Balance of the mortgage loans in its related Loan Group, 100% of amounts otherwise allocable to the Subordinate Certificates in respect of principal will be distributed to such class or classes of Senior Certificates, pro-rata, as applicable, in reduction of the Certificate Principal Balances thereof, until the aggregate Certificate Principal Balance of such class or classes of Senior Certificates is equal to the aggregate Stated Principal Balance of the mortgage loans in its related Loan Group. See "--Allocation of Available Funds" in this prospectus supplement.

All unscheduled principal collections on the mortgage loans not otherwise distributable to the Senior Certificates will be allocated on a pro rata basis among the class of Subordinate Certificates with the highest payment priority then outstanding and each other class of Subordinate Certificates for which certain loss levels established for such class in the Agreement have not been exceeded. The related loss level on any distribution date would be satisfied as to any Class B-2, Class B-3, Class B-4, Class B-5 or Class B-6 Certificates, respectively, only if the sum of the current percentage interests in the mortgage loans evidenced by such class and each class, if any, subordinate thereto were at least equal to the sum of the initial percentage interests in the mortgage loans evidenced by such class and each class, if any, subordinate thereto.

(ww)   ADDITIONAL RISKS ASSOCIATED WITH THE MEZZANINE CERTIFICATES AND THE CLASS B CERTIFICATES

The weighted average lives of, and yields to maturity on, the Class B Certificates, the Class M-12 Certificates, the Class M-11 Certificates, the **Class M-10 Certificates** [class purchased by the Funds], the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates **will be more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on Mortgage Loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such investor based on such assumption**. The timing of losses on the Mortgage Loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of such Mortgage Loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. **Realized losses on the Mortgage Loans, to the extent they exceed the amount of overcollateralization and excess interest following distributions of principal on the related distribution date, will**

159

**reduce the certificate principal balance of the Class B Certificates**, the Class M-12 Certificates, the Class M-11 Certificates, the **Class M-10 Certificates**, the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates, **in that order**. As a result of such reductions, less interest will accrue on such class of Mezzanine Certificates or Class B Certificates, as applicable, than would otherwise be the case. Once a realized loss is allocated to a Mezzanine Certificate or a Class B Certificate, no principal or interest will be distributable with respect to such written down amount unless such written down amount is reinstated due to a subsequent recovery on a liquidated Mortgage Loan. However, the amount of any realized losses allocated to the Mezzanine Certificates or the Class B Certificates may be paid to the Mezzanine Certificates or the Class B Certificates, as applicable, on a later distribution date, according to the priorities set forth under "Description of the Certificates—Credit Enhancement--Excess Interest" in this prospectus supplement.

(xx)   EVENTS RELATED TO PRIOR SECURITIZATIONS

**In the past, and most recently in March 2005, the ratings of certain mortgage pass-through securities (including certain investment grade securities) issued by trusts containing mortgage loans that were originated or purchased by ACC or its affiliates have been downgraded** by the rating agencies that issued ratings on the mortgage-pass through securities at the time of issuance. Other mortgage pass-through securities issued by such trusts may also be the subject of ratings actions by a rating agency.

For ACC's existing securitizations, overcollateralization requirements for certain pools increase up to approximately twice the level otherwise required when the delinquency rates or realized losses for those pools exceed the specified limit. At March 31, 2005, an additional $10.7 million of overcollateralization was required to be maintained because the level of delinquency rates and realized losses of mortgage loans was in excess of specified delinquency rates and realized losses in certain securitization trusts. At March 31, 2005, ACC was required to maintain overcollateralization amounts of $21.5 million, which included the $10.7 million.

(yy)   ACC has historically experienced delinquency rates that are higher than those prevailing in the mortgage industry due to the inclusion of lower credit grade mortgage loans in its securitization trusts.

(zz)   With respect to any Mortgage Loans originated with a simultaneous second lien, foreclosure frequency may be increased relative to Mortgage Loans that

were originated without a simultaneous second lien because the mortgagors on Mortgage Loans with a simultaneous second lien have less equity in the mortgaged property **than is shown in the loan-to-value ratios set forth in this prospectus supplement**.  Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the Originators or from any other lender.

(aaa)   FICO SCORES

"FICO Scores" are statistical credit scores obtained by many mortgage lenders in connection with the loan application to help assess a borrower's creditworthiness.  FICO Scores are generated by models developed by a third party and are made available to lenders through three national credit bureaus. The models were derived by analyzing data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience.  FICO Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a FICO Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., that a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. In addition, it should be noted that FICO Scores were developed to indicate a level of default probability over a two-year period which does not correspond to the life of a mortgage loan. Furthermore, FICO Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a FICO Score does not take into consideration the effect of mortgage loan characteristics on the probability of repayment by the borrower. The FICO Scores set forth in the tables in Annex III to this prospectus supplement were obtained at the time of origination of the Initial Mortgage Loans.  None of the Seller, the Originators, the Master Servicer, the Trustee, the Underwriters or the Depositor makes any representations or warranties as to the actual performance of any Mortgage Loan or that a particular FICO Score should be relied upon as a basis for an expectation that the borrower will repay the Mortgage Loan according to its terms.

(bbb)   The following table evidences the high credit risk attendant to high loan-to-value loans; 92% of $51.2 million in repossessed assets had original loan-to-value ra-

161

tios of over 90%:

Repossessed Assets -- Distribution of Original Loan-to-Value Ratios of
Initial Assets

| Loan-to-Value Ratio (1) | Number of Repossessed Assets | Aggregate Scheduled Principal Balance | Percentage of Repossessed Asset Pool by Aggregate Scheduled Principal Balance |
|---|---|---|---|
| 61% - 70%............... | 1 | $ 24,397.35 | 0.05% |
| 71% - 75%............... | 2 | 36,626.95 | 0.07 |
| 76% - 80%............... | 7 | 226,103.29 | 0.44 |
| 81% - 85%............... | 19 | 530,096.31 | 1.04 |
| 86% - 90%............... | 94 | 3,079,597.61 | 6.01 |
| **91% - 95%............** | **515** | **16,542,682.65** | **32.30** |
| **96% - 100%...........** | **899** | **30,775,107.77** | **60.09** |
| Total................ | 1,537 | $51,214,611.93 | 100.00% |

(1) Rounded to nearest 1%.

The weighted average original Loan-to-Value Ratio of the Repossessed
Assets was approximately 95.97% as of the Cut-off Date.

259.   Notwithstanding the Funds' substantial investments in these securities and De-
fendants' knowledge of the risks related thereto, as set forth in the preceding paragraph, the
Funds' prospectuses did not disclose the risks identified in the preceding paragraph.

260.   The prospectus for Kodiak CDO 2006 1-A, held by each of the Funds from at
least December 31, 2006 through April 30, 2008, disclosed that the Class G Notes purchased
by the Funds were the eighth ranked tranche out of ten. The Class G and the two subordinated
classes to Class G constituted 16% of the entire fund and were designed to absorb the first
16% of defaults; accordingly, in the event that defaults were 16% or more of the fund, the
Funds' investment would be entirely wiped out.

261.   In a prospectus dated March 31, 2006, for a security purchased by the High In-
come Fund after March 31, 2006, the following was disclosed:

INCREASED USE OF NEW MORTGAGE LOAN PRODUCTS BY BOR-
ROWERS MAY RESULT IN DECLINE IN REAL ESTATE VALUES
GENERALLY

In recent years, borrowers have increasingly financed their homes with
new mortgage loan products, which in many cases have allowed them to pur-
chase homes that they might otherwise have been unable to afford. Many of
these new products feature low monthly payments during the initial years of

the loan that can increase (in some cases, significantly) over the loan term. There is little historical data with respect to these new mortgage loan products. Consequently, as borrowers face potentially higher monthly payments for the remaining terms of their loans, it is possible that, combined with other economic conditions such as increasing interest rates and deterioration of home values, borrower delinquencies and defaults could exceed anticipated levels. In that event, the securities, and your investment in the securities, may not perform as you anticipate.

262.   Seventeen months later, on the cover of a supplement to the same prospectus for the same security, dated August 30, 2007, Goldman, Sachs & Co. disclosed the following with respect to the same risk identified in the preceding paragraph, evidencing that the risks disclosed in the prospectuses of the securities purchased by the Funds (but not disclosed in the Funds' prospectuses) were beginning to be realized:

> **Recently, the Subprime Mortgage Loan Market has Experienced Increasing Levels of Delinquencies and Defaults; Increased Use of New Mortgage Loan Products by Borrowers May Result in Higher Levels of Delinquencies and Losses Generally**
>
> In recent years, borrowers have increasingly financed their homes with new mortgage loan products, which in many cases have allowed them to purchase homes that they might otherwise have been unable to afford. Many of these new products feature low monthly payments during the initial years of the loan that can increase (in some cases, significantly) over the loan term. As borrowers face potentially higher monthly payments for the remaining terms of their loans, it is possible that borrower delinquencies, defaults and losses could increase substantially.
>
> Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies, defaults and losses, and we cannot assure you that this will not continue. In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in additional increases in delinquencies, defaults and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

In recent months, in response to increased delinquencies and losses with respect to mortgage loans, many mortgage loan originators have implemented more conservative underwriting criteria for loans, particularly in the nonprime sectors. This may result in reduced availability of financing alternatives for mortgagors seeking to refinance their mortgage loans. The reduced availability of refinancing options for a mortgagor may result in higher rates of delinquencies, defaults and losses on the mortgage loans, particularly mortgagors with adjustable rate mortgage loans or in the case of interest only mortgage loans that experience significant increases in their monthly payments following the adjustment date or the end of the interest only period, respectively.

The increased levels of delinquencies and defaults, as well as a deterioration in general real estate market conditions, have also resulted generally in loan originators being required to repurchase an increasingly greater number of mortgage loans pursuant to early payment default and representation and warranty provisions in their loan sale agreements. This has led to a deterioration in the financial performance of many subprime loan originators, and in some cases, has caused certain loan originators to cease operations. See "—*Recent Developments Regarding Fremont Investment & Loan*" below.

Any such deterioration in the financial condition or regulatory status of Fremont Investment & Loan could adversely affect the ability of Fremont Investment & Loan to repurchase or substitute mortgage loans as to which a material breach of representation and warranty exists or to repurchase mortgage loans as to which an early payment default has occurred. If Fremont Investment & Loan is unable for any reason to satisfy its obligations to repurchase or substitute mortgage loans as to which a material breach of representation and warranty exists or to repurchase mortgage loans as to which an early payment default exists, neither the depositor nor any other person will be obligated to repurchase such loans.

Even in cases where an original loan seller has the economic ability to repurchase loans, the increasing volume of repurchase claims has resulted in longer periods between when a repurchase claim is presented and when it is resolved, and a greater proportion of claims being refused or contested by original loan sellers.

In response to the deterioration in the performance of subprime mortgage loans, the rating agencies have recently lowered ratings on a large number of subprime mortgage securitizations. There can be no assurance that the rating agencies will not continue to do so.

164

In light of the foregoing, you should consider the heightened risks associated with investing in the offered certificates, and the risk that your investment in the offered certificates may perform worse than you anticipate.

263.    The following diagram shows a typical deal involving mortgage-backed securities and the transactions between the home owner mortgagors and investors:

## TRANSACTION STRUCTURE



264.    The risks identified in paragraphs 197 and 249-62 do not comprehensively de-

scribe all of the liquidity, credit and other risks of the Funds' portfolios. These prospectus dis-

closures relate to trusts that invested in pools of mortgages (residential, commercial, home eq-

uity, manufactured housing), and the descriptions of the tranches relate to interests in such pools.

265.    The Funds also had significant investments in collateralized mortgage obliga-tions ("CMOs"), collateralized loan obligations ("CLOs"), and collateralized debt obligations ("CDOs") for all but one of which no prospectuses have been found. These are more complex instruments that often included tranches from different mortgage pools and slices of non-mortgage debt. CMOs are composed of tranches from different mortgage pools. Other tranches were combined with tranches from pools that included different types of debt: commercial mortgages, auto loans, student loans, credit card receivables, small business loans, and corporate loans that had been combined into CLOs. "The result was a highly het-erogeneous mixture of debt securities" in the form of CDOs. "CDOs were usually sold in private placements with confidentiality agreements. The nature of the securitization process has made it extremely difficult to determine and follow losses and increasing risk from one tranche and pool to another, and to reach the information about the original borrowers that is needed to estimate future cash flows and price." Kenneth E. Scott and John B. Taylor, *The Wall Street Journal*, "Why Toxic Assets Are So Hard to Clean Up: Securitization was mad-deningly complex. Mandated transparency is the only solution." July 21, 2009.

266.    Accordingly, the risks disclosed in the prospectuses of the registered deals were even greater regarding the non-registered deals in which the Funds heavily invested as a result of the greater illiquidity in unregistered securities and the greater complexity of the unregistered privately placed deals.

### 4.    The RMK Defendants Did Not Maintain the Funds' NAV Stability, as They and the Funds Represented They Would.

267.    In its Prospectus dated November 1, 2006, the High Income Fund disclosed that Morgan Management, in managing the High Income Fund's portfolio, would seek "a more stable net asset value" than would result from investing only in below investment grade corpo-

rate bonds. To that end, the RMK Defendants disclosed that they would (emphasis supplied):

> employ an active management approach that will emphasize the flexibility to al-
> locate assets across a wide range of asset classes and thereby provide the advan-
> tages of a *widely diversified high income portfolio*. . . . In addition to the tradi-
> tional below investment grade corporate market, the Adviser will strategically
> utilize asset-backed securities, mortgage-backed securities and other structured
> finance vehicles as well as convertible securities, preferred stock and other eq-
> uity securities. The Adviser believes that the opportunity to acquire a diverse set
> of assets will contribute to higher total returns and a *more stable net asset value*
> for the fund *than would result from investing in a single sector of the debt mar-
> ket such as below investment grade corporate bonds*. . . .

268.    An investor could reasonably conclude that the High Income Fund would be managed in a way to achieve greater NAV stability – i.e., less risk to an investor's capital – than other high-yield funds that invest primarily in below investment-grade bonds.

269.    Instead of "strategically utiliz[ing] asset-backed securities, mortgage-backed securities and other structured finance vehicles in addition to the traditional below invest-ment grade corporate market" and "widely diversif[ying] [its] high income portfolio," De-fendant Morgan Management so concentrated the High Income Fund's portfolio in the "as-set-backed securities, mortgage-backed securities and other structured finance vehicles" as to cause the Fund to be undiversified and unlike other high-yield funds.

270.    Recognizing the need to maintain "liquidity and flexibility" as a "defensive tac-tic" in "unusual market conditions," the Intermediate and High Income Funds disclosed that it would invest in investment-grade short-term securities.

271.    The Short Term Fund advertised in the Funds' common prospectuses that it would manage the Fund to limit "principal fluctuations"—i.e., preserve capital, which was its investment objective.

272.    Contrary to how the RMK Defendants said they would manage the Funds, the RMK Defendants failed to manage the Funds to maintain liquidity and stable NAVs.

5.     **The RMK Defendants Did Not Limit the Funds' Investments in a Single Industry, as They and the Funds Represented that They Would.**

273.    The Funds did not disclose in their common prospectus that they were subject to, and in violation of, a "fundamental" investment restriction that prohibited them from investing more than 25% of the Fund's total assets in the same industry. The Funds represented in their SAI that they "may not . . . [p]urchase the securities of any issuer (other than securities issued or guaranteed by the U.S. Government or any of its agencies or instrumentalities) if, as a result, 25% or more of the fund's total assets would be invested in the securities of companies whose principal business activities are in the same industry."

274.    A "fundamental" investment restriction is one that cannot be changed without shareholder approval. A violation of a "fundamental" investment restriction is a violation of section 13 of the ICA.

275.    Instead of adhering to this fundamental investment restriction, the RMK Defendants managed the Funds in such a manner as to expose them to concentration risk: the risk that a heavy concentration in one sector or in a type of fixed income security may result in a loss if that sector or type of security goes out of favor due to changing market sentiments or economic conditions, particularly if those securities trade in a thin market.

276.    The Funds violated the investment restriction against investing more than 25% in the same industry by investing more than 25% of total assets in securities issued by companies engaged in the mortgage loan industry, securities that are derivatives or packages of mortgage loans, and other securities dependent upon or related to the mortgage loan industry. Bloomberg reported that, as of June 30, 2007, the asset allocation of each of the Funds was as follows:

       (a)     High Income Fund:

- Government securities     0.00%
- Corporate bonds     25.09%

169

- Mortgages      52.32%
- Preferred stock      5.91%
- Municipal bonds      0.01%
- Equity      11.57%
- Cash and other      5.09%

(b) Intermediate Fund:

- Government securities      0.11%
- Corporate bonds      41.65%
- Mortgages      54.71%
- Preferred stock      2.67%
- Municipal bonds      0.00%
- Equity      0.00%
- Cash and other      0.87%

(c) Short Term Fund:

- Government securities      13.48%
- Corporate bonds      32.05%
- Mortgages      54.11%
- Cash and other      0.00%

277. The RMK Defendants represented that they knew how the assets of the Funds were allocated but misrepresented such allocations, as follows:

(a) As of June 30, 2007, Defendants disclosed the following allocation for the High Income Fund:

- Corporate Bonds      27.9%
- Collateralized Debt Obligations      21.0%
- Collateralized Mortgage Obligations      16.1%
- Common Stocks      11.9%
- Preferred Stocks      6.1%

170

- Equipment Leases     6.0%
- Home Equity Loans     4.7%
- Collateralized Loan Obligations     4.4%
- Franchise Loans     0.2%
- Other     0.1%
- Short-Term Investments     1.6%
- Total     100.0%

(b)     As of June 30, 2007, Defendants disclosed the following allocation for the Intermediate Fund:

- Corporate Bonds     42.8%
- Collateralized Debt Obligations     24.8%
- Collateralized Mortgage Obligations     14.7%
- Home Equity Loans     5.1%
- Equipment Leases     3.6%
- Preferred Stocks     2.7%
- Government & Agency Securities     2.2%
- Certificate-Backed Obligations     1.8%
- Manufactured Housing Loans     1.0%
- Credit Cards .     0.5%
- Franchise Loans     0.5%
- Short-Term Investments     0.3%
- Total     100.0%

(c)     As of June 30, 2007, Defendants disclosed the following allocation for the Short Term Fund:

- Corporate Bonds     32.5%
- Collateralized Debt Obligations     16.6%
- Collateralized Mortgage Obligations     14.9%

171

| | | |
|---|---|---|
| • | Government & Agency Securities | 9.5% |
| • | U.S. Treasury Obligations | 5.8% |
| • | Home Equity Loans | 3.1% |
| • | Equipment Leases | 5.1% |
| • | Commercial Loans. | 3.6% |
| • | Preferred Stocks | 2.7% |
| • | Certificate-Backed Obligations | 2.3% |
| • | Franchise Loans | 0.8% |
| • | Short-Term Investments | 3.1% |
| • | Total | 100.0% |

These disclosures were false in that they concealed the extent to which the Funds were concentrated in mortgage-related investments.

278.    According to the Intermediate Fund's June 30, 2005 annual report to shareholders, 32.2% of its total investments was invested in home equity loans and CMOs; however, in view of the nondisclosure of the Fund's full exposure to mortgage-related investments as of June 30, 2007, the Fund's mortgage-related investments likely exceeded the disclosed percentage (e.g., 9.5% was invested in CDOs, which likely included mortgage-related instruments).

279.    According to the Intermediate Fund's December 31, 2005 semi-annual report to shareholders, 27.1% of its total investments was invested in home equity loans and CMOs; however, in view of the nondisclosure of the Fund's full exposure to mortgage-related investments as of June 30, 2007, the Fund's mortgage-related investments likely exceeded the disclosed percentage (e.g., 14.6% was invested in CDOs, which likely included mortgage-related instruments).

280.    According to the High Income Fund's June 30, 2005 annual report to shareholders, over 27% of its total investments was invested in home equity and manufactured housing loans and CMOs; however, in view of the nondisclosure of the Fund's full exposure to mortgage-related investments as of June 30, 2007, the Fund's mortgage-related investments likely

172

exceeded the disclosed percentage.

281.    According to the Short Term Fund's June 30, 2005 annual report to shareholders, over 45% of its total investments was invested in commercial and residential mortgage backed securities.

282.    At no time during the Class Period did Defendants disclose that disclosed and undisclosed concentrations described in the preceding eight paragraphs violated the 25% limit on investments in the same industry.

283.    Besides impermissible industry concentration, the Funds were managed by the RMK Defendants in such a manner as to expose them to an undisclosed concentration of credit and market risk in that the Funds' portfolios were heavily invested in structured financial instruments and in a single industry, which risk required financial statement disclosure under Generally Accepted Accounting Principles. Thus, aside from whether the Funds' investments in mortgage- or real estate-related securities violated the letter of the 25% restriction on investing in a single industry, the Funds nevertheless were subject to the undisclosed concentration of market and credit risk with respect to such investments.

### 6.    The RMK Defendants Caused the High Income and Intermediate Funds to Misrepresent the Percentage of Asset-Backed Securities Held by Them

284.    The percentages of Intermediate Fund's and High Income Fund's portfolios invested in asset-backed securities were reported to be less than the actual percentages because "preference shares" were reported as "preferred stock" and "Corporate Bonds – Special Purpose Entities" were reported as "corporate bonds." In reality, both types of securities are asset-backed securities.

285.    "Preference shares" are not corporate preferred stock. Preference shares in asset-backed securities deals, also known as "equity tranches," are equivalent to purchasing the entire portfolio of underlying assets with a margin loan equal to the face value of the other tranches offered and with margin interest payments equal to the interest paid to investors in

those tranches. These are the most highly leveraged tranches in asset-backed deals. By purchasing preference shares, the Funds were investing in the assets collateralizing a given structured finance deal leveraged 50 or more times. Almost all of the securities in the Funds' portfolios classified by the RMK Defendants as "preferred stock" were "equity tranches."

286.   Virtually all of the securities in the Funds' portfolios classified by the RMK Defendants as "corporate bonds – special purpose entities" were not corporate bonds but were asset-backed securities. Craig McCann, *Regions Morgan Keegan: The Abuse of Structured Finance*, January 31, 2009, p. 7.

287.   The RMK Defendants caused the Funds to understate the extent to which asset-backed securities constituted the Intermediate and High Income Funds' portfolios by misrepresenting asset-backed securities as "preferred stock" or as "corporate bonds – special purpose entities." The following table shows the securities classified as "preferred stock" or as "corporate bonds – special purpose entities" in the Form N-CSR annual and semi-annual reports and Form N-Q quarterly reports to the SEC during the Class Period, a substantial portion of which was asset-backed securities, as a percentage of the Funds' respective net assets and the total percentage of net assets if such securities are included with what the RMK Defendants classified as asset-backed securities (including mortgage-backed securities):

| Period Ending: | Intermediate Fund (% of Net Assets) | | | High Income Fund (% of Net Assets) | | | Short Term Fund (% of Net Assets) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities |
| 12/31/04 | 0 | 0.1 | **87.5** | 0 | 0.2 | **72.4** | NA | NA | NA |
| 6/30/05 | 1.7 | 0.1 | **85.3** | 1.7 | 0.2 | **66.4** | 4.2 | 0 | 53.9 |
| 12/31/05 | 5.4 | 0 | **80.9** | 1.2 | 1.0 | **76.1** | 2.8 | 0 | 50.2 |
| 6/30/06 | 7.0 | 0 | **82.4** | 1.6 | 1.6 | **61.3** | 1.5 | 0 | 55.1 |
| 9/30/06 | 8.9 | 0 | **79.0** | 1.6 | 3.0 | **63.1** | 2.4 | 0 | 53.9 |
| 12/31/06 | 13.2 | 1.2 | **77.8** | 6.3 | 3.6 | **64.9** | 1.9 | 1.0 | 45.2 |
| 3/31/07 | 16.6 | 2.7 | **73.6** | 7.3 | 5.2 | **67.5** | 7.5 | 0.9 | 56.9 |
| 6/30/07 | 17.2 | 3.6 | **73.3** | 7.8 | 6.0 | **65.7** | 5.6 | 0.9 | 54.2 |
| 9/30/07 | 24.7 | 4.8 | **78.8** | 11.7 | 5.1 | **68.2** | 6.5 | 1.0 | 44.2 |

| Period Ending: | Intermediate Fund (% of Net Assets) | | | High Income Fund (% of Net Assets) | | | Short Term Fund (% of Net Assets) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities | Corporate Bonds – Special Purpose Entities | Preferred Stock | Total Asset-Backed Securities |
| 12/31/07 | 32.4 | 4.4 | **84.9** | 14.3 | 0.6 | **59.3** | 9.0 | 0.1 | **41.9** |
| 4/30/08 | 9.3 | 4.1 | **78.5** | 0 | 0 | **63.5** | 0.1 | 0 | **68.2** |

288.    Securities of the same type as a substantial portion of the values and percentages shown in the preceding table as "preferred stock" and "corporate bonds – special purpose entities" were reclassified from those categories to asset-backed securities in the reports for the periods ended September 30, 2007, December 31, 2007 and April 30, 2008, without disclosing the reclassification or the significance thereof.

289.    For example, the RMK Defendants caused the High Income Fund to disclose its investments in asset-backed securities to be 55% of the Fund's net assets as of March 31, 2007; based on the reclassification of "preferred stock' and "corporate bonds – special purpose entities" in the Fund's annual report as of April 30, 2008, the High Income Fund's investments in asset-backed securities as of March 31, 2007 were 66.6% of net assets, a 20% increase, with corresponding percentage reductions in the Fund's investments in corporate bonds (29% corrected to 22%) and preferred stock (5% corrected to 0.4%). Craig McCann, *Regions Morgan Keegan: The Abuse of Structured Finance*, January 31, 2009, p. 11.

290.    For a second example, the RMK Defendants caused the Intermediate Fund to disclose its investments in asset-backed securities to be 54% of the Fund's net assets as of March 31, 2007; based on the reclassification of "preferred stock' and "corporate bonds – special purpose entities" in the Fund's annual report as of April 30, 2008, the Intermediate Fund's investments in asset-backed securities as of March 31, 2007 were 63% of net assets, a 17% increase, with corresponding percentage reductions in the Fund's investments in corporate bonds (37% corrected to 29%) and preferred stock (2.7% corrected to 1.6%). *Id.*

291.    The following table shows the significance for the Intermediate and High In-

come Funds of the materially misleading misclassifications described in the preceding eight paragraphs as of March 31, 2007:

| Asset Class | Intermediate Fund | | High Income Fund | |
|---|---|---|---|---|
| | As Reported | Corrected | As Reported | Corrected |
| **Asset-backed securities** | **54.3%** | **63.3%** | **55.0%** | **66.6%** |
| **Corporate bonds** | **36.7%** | **28.8%** | **28.7%** | **21.8%** |
| Government & agency securities | 2.4% | 2.4% | | |
| Municipal securities | | | 0.1% | 0.1% |
| Common stocks | | | 9.0% | 9.0% |
| **Preferred stocks** | **2.7%** | **1.6%** | **5.2%** | **0.4%** |
| Cash | 3.6% | 3.6% | 1.8% | 1.8% |
| Other assets & liabilities | 0.2% | 0.2% | 0.2% | 0.2% |
| Net assets | 100.0% | 100.0% | 100.0% | 100.0% |

*Id.*

292.    The Intermediate and High Income Funds' extraordinarily heavy investments in structured finance securities were inconsistent with their investment objectives. Upon taking over management of these Funds from Morgan Management in July 2008, HBAM stated, in view of its "main priority" to be "to manage the Funds according to their stated investment objectives as outlined in the prospectus," its long-term strategy for the Funds was to increase exposure to high-yield and investment-grade corporate bonds and to decrease exposure to structured products and residential mortgage-backed securities."

### 7.    The RMK Defendants Did Not Limit the Funds' Use of Leverage, as They and the Funds Represented They Would.

293.    In their SAIs for 2004, 2005 and 2006, the Funds disclosed that, as a fundamental investment restriction, they would not use leverage for investment purposes but only on a temporary or emergency basis and would not borrow except from a bank or pursuant to reverse purchase agreements:

- The following are Intermediate Bond Fund's and High Income Fund's fundamental investment limitations set forth in their entirety. Each fund may not: . . . (2) Borrow money, except that the fund may borrow money for temporary or emergency purposes (not for leveraging or investment) in an amount not exceeding 33 1/3% of its total assets (including the

amount borrowed) less liabilities (other than borrowings).. . .

- The following investment limitations are not fundamental, and may be changed by the Board without shareholder approval. Intermediate Bond Fund and High Income Fund: …(4) May borrow money only (a) from a bank, or (b) by engaging in reverse repurchase agreements with any party (reverse repurchase agreements are treated as borrowings for purposes of fundamental investment limitation (2).

294. The Funds disclosed in their SAIs some of the risks arising from leverage created from borrowings used to purchase securities:

> To the extent the income or capital growth derived from securities purchased with funds received from leverage exceeds the cost of leverage, a fund's return will be greater than if leverage had not been used. Conversely, if the income or capital growth from the securities purchased with such funds is not sufficient to cover the cost of leverage, the return to a fund will be less than if leverage had not been used, and therefore the amount available for distribution to shareholders as dividends and other distributions will be reduced.

295. The Funds' SAI disclosures regarding collateralized mortgage obligations failed to disclose the leverage risks embedded in the low-priority high risk tranches of the structured finance deals in which the Funds invested:

- In a CMO, a series of bonds or certificates is issued in multiple classes. Each class of CMO, also referred to as a "tranche," is issued at a specific fixed or floating coupon rate and has a stated maturity or final distribution date. Principal prepayments on the Mortgage Assets may cause CMOs to be retired substantially earlier than their stated maturities or final distribution dates. Interest is paid or accrued on all classes of a CMO (other than any principal-only class) on a monthly, quarterly or semi-annual basis. The principal and interest on the Mortgage Assets may be allocated among the several classes of a CMO in many ways. In one structure, payments of principal, including any principal prepayments, on the Mortgage Assets are applied to the classes of a CMO in the order of their respective stated maturities or final distribution dates so that no payment of principal will be made on any class of the CMO until all other classes having an earlier stated maturity or final distribution date have been paid in full. In some CMO structures, all or a portion of the interest attributable to one or more of the CMO classes may be added to the principal amounts attributable to such classes, rather than passed through to certificate holders on a

177

current basis, until other classes of the CMO are paid in full.

- INVESTMENTS IN SUBORDINATED SECURITIES. Each fund may invest in subordinated classes of senior-subordinated securities ("Subordinated Securities"). . . .  Subordinated Securities typically subject the holder to greater risk than senior securities and tend to be rated in a lower rating category (frequently a substantially lower rating category) than the senior securities issued in respect of the same pool of assets. Subordinated Securities generally are likely to be more sensitive to changes in prepayment and interest rates, and the market for such securities may be less liquid than is the case for traditional fixed-income securities and senior mortgage-backed or asset-backed securities

296.    The disclosures in the preceding three paragraphs are false and misleading because:

(a)    These disclosures are limited to leverage arising from borrowings from banks or the use of reverse repurchase agreements in an amount not to exceed a ratio of 1.33-to-1;

(b)    The low-priority high risk tranches of the structured finance deals in which the Funds invested exposed the Funds and their investors to the credit risk equivalent of an investment in the underlying portfolio of assets leveraged up to between 10 to 50-to-1;

(c)    The Funds not only "may invest," but in fact did invest, and intended to continue to invest, in the lowest priority tranches;

(d)    These lowest priority tranches were already highly leveraged, thus exposing the Funds and their shareholders to the risks of even more substantial leverage;

(e)    These lowest priority, highly leveraged tranches were in deals with significant credit risk, exposing the Funds' shareholders to extraordinary credit risk; and

(f)    The Funds did pursue, and intended to continue to pursue, an investment strategy that depended heavily on such highly leveraged asset-backed securities, notwithstanding the Funds' disclosures that any leverage taken on by the Funds would

be temporary and limited to a ratio of 1.33-to-1.

297.    The disclosure regarding leverage risks in paragraph 294 materially understated such risk. Besides the potential loss due to the "cost of leverage" (e.g., interest), there is the much greater risk that any loss in net principal value will be magnified by the amount of the leverage employed to purchase the investment – e.g., if a security purchased for $100, of which $80 is borrowed (leverage) and $20 is paid in cash, declines by 20% ($20), the equity in the position (the original $20 paid that was not borrowed) is completely wiped out. In this example, the investment was leveraged five-to-one, and the 20% decline in the position's value wiped out 100% of the equity. Thus, the use of leverage substantially increases the risk of loss of the entire investment.

298.    The Funds' prospectuses during the Class Period were false and misleading because:

   (a)    The prospectuses failed to disclose the Intermediate and High Income Funds' highly concentrated credit risk as a result of their investments in low-priority tranches in structured finance deals.

   (b)    The prospectuses failed to disclose how the principal and interest payments of pools of fixed income securities can be sliced into tranches or the risks attendant thereto;

   (c)    The prospectuses instead described only the average interest rate risk, prepayment risk and credit risk of investing in mortgage-backed and asset-backed securities, not those risks as they related to the extraordinary credit risk inherent in these securities.

299.    The Funds' annual and semi-annual reports during all times relevant herein also failed to disclose the risk identified in the two preceding paragraphs and contained no disclosures of leverage risk.

300.    Not until the Funds' December 31, 2007, semi-annual report did the Funds dis-

close the following with respect to each of the Funds as an investment risk (emphasis supplied):

> The Fund's investments in mortgage-backed or asset-backed securities that are "subordinated" to other interests in the same pool *may increase credit risk* to the extent that the Fund as a holder of those securities may only receive payments after the pool's obligations to other investors have been satisfied.

301. Even this limited disclosure is grossly misleading; investments in mortgage-backed or asset-backed securities that are "subordinated" to other interests in the same pool not only "may increase credit risk," such securities in fact *do* increase credit risk and do so to an extraordinary degree, which was not disclosed. *See* paragraphs 249-62 *supra* for disclosures relating to the credit risk inherent in the low-ranking tranches in which the Funds invested, which information was not disclosed to the Funds' investors.

302. Finally, in the same December 31, 2007, semi-annual report that was issued after the Class Period, the RMK Defendants disclosed in their Management Discussion of Fund Performance the following with respect to the High Income Fund only (emphasis supplied):

> The structured finance category has taken the hardest hit so far due to the *implicit (i.e., built into the structures)* and explicit (*i.e.,* financed, or bought on margin) *leverage* employed for this asset category.

303. The disclosure in the preceding paragraph is the first time the RMK Defendants admitted that any of the Funds was investing in securities that created extraordinary leveraged credit risk for the High Income Fund and the Intermediate Fund and their shareholders.

304. The Funds disclosed their average credit quality in their annual and semi-annual reports as follows:

| Period Ending: | Short Term Fund | Intermediate Fund | High Income Fund |
|---|---|---|---|
| 12/31/04 | NA | A | BB |
| 6/30/05 | A | A- | BB- |
| 12/31/05 | A | A- | BB- |
| 6/30/06 | A | BBB+ | BB- |
| 12/31/06 | AA | A- | BB- |

180

| Period Ending: | Short Term Fund | Inter-mediate Fund | High Income Fund |
|---|---|---|---|
| 6/30/07 | A+ | A- | BB |
| 12/31/07 | AA | A- | BB |
| 4/30/08 | AA+ | BBB+ | BB |

305.    The undisclosed implicit leverage in the Funds' portfolios caused the disclosed average credit quality of the Funds' portfolios to be materially inflated.

**D.    THE MATERIALIZATION OF THE FUNDS' UNDISCLOSED EXTRAORDINARY CREDIT, CONCENTRATION, LIQUIDITY, VALUATION AND LEVERAGE RISKS CAUSED THE FUNDS' LOSSES**

306.    During the period July 1, 2007 through February 27, 2008, the Funds experienced substantial net redemptions:

(a)    Short Term Fund: $56.9 million, or 64% of its total net assets of $89.5 million at June 30, 2007.

(b)    Intermediate Fund: $551.9 million, or 54% of its total net assets of $1.013 billion at June 30, 2007.

(c)    High Income Fund: $500.6 million, or 47% of its total net assets of $1.057 billion at June 30, 2007.

307.    In a supplemental filing to the fund's prospectus on August 13, 2007, Morgan Management said the High Income Fund experienced significant redemptions.

308.    The asset-backed securities (including mortgage-backed securities) held by the Intermediate and High Income Funds' portfolios during all times relevant herein constituted 73%-88% and 61%-76% of their respective net assets, which far exceeded the holdings of almost all other high-yield funds, which were typically 16% of assets (84% being in corporate bonds in the average high-yield fund). Morningstar report (December 13, 2006). The Intermediate Fund's holdings of BBB-rated securities, about 60% of its assets in late 2006, was three times the average for its fund category. Morningstar report (November 26, 2006).

309.    The following table demonstrates that, as of September 30, 2007, of the Short Term Fund's several asset classes, the Fund's mortgage/asset-backed securities, both invest-

ment-grade and below-investment-grade, were the primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for over 97% of the Fund's loss; that the Fund's mortgage/asset-backed investment-grade securities accounted for 70% of the loss; and that the mortgage/asset-backed securities lost a much larger portion of their value calculated as a percentage of their cost (average of 26%) than did high-yield ("junk") corporate bonds, whose value actually increased (data based on the Short Term Fund's September 30, 2007 Form N-Q portfolio of investments):

| SHORT TERM FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 9/30 Value | Cost | 9/30/07 Value | Loss (Cost Less Value) | Loss on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 19.4 | $18,853,345 | $14,925,996 | $ 3,927,349 | 57.14% | 20.8% | 63.22% | 68.64% |
| Asset-Backed Securities - Below Investment Grade or Unrated | 2.3 | $ 3,641,171 | $1,808,056 | $ 1,833,115 | 26.67% | 50.3% | 100.00% | 100.00% |
| Corporate Bonds - Investment Grade | 33.4 | $25,950,317 | $25,771,777 | $ 178,540 | 2.60% | 0.7% | 19.50% | 23.38% |
| Corporate Bonds - Below Investment Grade or Unrated | 5.3 | $ 4,078,444 | $ 4,081,611 | $ (3,167) | -0.05% | -0.1% | 0.00% | 61.46% |
| Mortgage-Backed Securities - Investment Grade | 15.0 | $12,420,750 | $11,529,041 | $ 891,709 | 12.97% | 7.2% | 15.37% | 6.51% |
| Government & Agency Securities | 10.5 | $ 8,097,395 | $8,064,406 | $ 32,989 | 0.48% | 0.4% | 0.00% | 0.00% |
| U.S. Treasury Obligations | 6.4 | $ 4,932,385 | $4,947,155 | $ (14,770) | -0.21% | -0.3% | 0.00% | 0.00% |
| Preferred Securities | 1.0 | $ 807,000 | $ 780,000 | $ 27,000 | 0.39% | 3.3% | 100.00% | 100.00% |
| TOTAL | | $78,780,807 | $71,908,042 | $ 6,872,765 | 100.00% | 8.7% | | |

310.   The following table shows that, as of December 31, 2007, of the Short Term Fund's several asset classes, the Fund's mortgage/asset-backed securities were the primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for 88% of the Fund's loss: The Fund's mortgage/asset-backed investment-grade securities accounted for 55% of the loss, and the mortgage/asset-backed securities lost a much larger portion of their

value calculated as a percentage of their cost (average of 46%) than did high-yield ("junk")
corporate bonds (7.5%) (data based on the Short Term Fund's December 31, 2007 semi-annual
report)

| SHORT TERM FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 12/31/07 Value | Cost | 12/31/07 Value | Loss (Cost Less Value) | Loss / (Gain) on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 11.4% | $10,913,250 | $5,699,465 | $ 5,213,785 | 42.39% | 47.8% | 63.22% | 68.24% |
| Asset-Backed Securities – Below Investment Grade or Unrated | 1.3% | $ 4,390,930 | $657,026 | $ 3,733,904 | 30.36% | 85.0% | 61.11% | 61.11% |
| Corporate Bonds -- Investment Grade | 41.9% | $21,447,433 | $20,927,996 | $ 519,437 | 4.22% | 2.4% | 19.72% | 28.11% |
| Corporate Bonds - Below Investment Grade or Unrated | 4.7% | $2,503,465 | $ 2,316,458 | $ 187,007 | 1.52% | 7.5% | 0.00% | 100.00% |
| Government & Agency Securities | 6.6% | $ 3,321,448 | $3,313,601 | $ 7,847 | 0.06% | 0.2% | 0.00% | 0.00% |
| Mortgage-Backed Securities – Investment Grade | 18.9% | $11,032,412 | $9,458,759 | $ 1,573,653 | 12.80% | 14.3% | 11.20% | 6.87% |
| Mortgage-Backed Securities – Below Investment Grade | 1.2% | $ 920,279 | $ 597,253 | $ 323,026 | 2.63% | 35.1% | 0.00% | 0.00% |
| U.S. Treasury Obligations | 8.0% | $ 3,995,417 | $3,995,417 | $ 0 | 0.00% | 0.0% | 0.00% | 0.00% |
| Preferred Securities | 0.1% | $ 807,000 | $ 67,500 | $ 739,500 | 6.02% | 91.6% | 100.00% | 100.00% |
| TOTAL | | $60,549,205 | $48,251,046 | $12,298,159 | 100.00% | 20.3% | | |

311.    During the Class Period, in the Fund's annual and semi-annual reports and sales
materials, the RMK Defendants compared the Short Term Fund's performance to the Lehman
Brothers 1-3 Year U.S. Government/Credit Index, which is an index composed of securities in
the Government and Credit Indices. The Government Index includes Treasuries (i.e., public
obligations of the U.S. Treasury that have remaining maturities of more than one year) and
agencies (i.e., publicly issued debt of U.S. government agencies, quasi-federal corporations
and corporate or foreign debt guaranteed by the U.S. government). The Credit Index includes
publicly issued U.S. corporate and foreign debentures and secured notes that meet specified
maturity, liquidity and quality requirements.

312.   The following table demonstrates that, as of September 30, 2007, of the Intermediate Fund's several asset classes (including high-yield corporate bonds), the Fund's mortgage/asset-backed securities, both investment-grade and below-investment-grade, were the primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for over 90% of the Fund's loss; that the Fund's mortgage/asset-backed investment-grade securities accounted for 63% of the loss; and that the mortgage/asset-backed securities lost a much larger portion of their value calculated as a percentage of their cost (average of 49.7%) than did high-yield corporate bonds, whose value declined by a relatively modest 14.6% (data based on the Intermediate Fund's September 30, 2007 Form N-Q portfolio of investments):

| INTERMEDIATE BOND FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 9/30 Value | Cost | 9/30/07 Value | Loss (Cost Less Value) | Loss on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 32.7 | $264,282,371 | $ 154,186,411 | $110,095,960 | 56.61% | 41.7% | 79.78% | 71.60% |
| Asset-Backed Securities - Below Investment Grade or Unrated | 4.0 | $ 46,623,477 | $ 18,768,763 | $ 27,854,714 | 14.32% | 59.7% | 95.90% | 93.49% |
| Corporate Bonds - Investment Grade | 34.0 | $171,552,981 | $160,296,961 | $ 11,256,020 | 5.79% | 6.6% | 51.77% | 81.63% |
| Corporate Bonds - Below Investment Grade or Unrated | 4.8 | $ 26,600,606 | $ 22,724,351 | $ 3,876,255 | 1.99% | 14.6% | 57.55% | 100.00% |
| Mortgage-Backed Securities - Investment Grade | 10.9 | $ 68,721,343 | $ 51,297,485 | $ 17,423,858 | 8.96% | 25.4% | 56.78% | 22.14% |
| Mortgage-Backed Securities - Below Investment Grade or Unrated | 1.7 | $ 28,758,946 | $ 8,039,117 | $ 20,719,829 | 10.65% | 72.1% | 1.57% | 0.46% |
| Government & Agency Securities | 0.2 | $ 2,678,872 | $ 940,419 | $ 1,738,453 | 0.89% | 64.9% | | |
| Preferred Stocks | 4.8 | $ 23,961,020 | $ 22,451,000 | $ 1,510,020 | 0.78% | 6.3% | 100.00% | 100.00% |
| TOTAL | | $633,179,616 | $438,704,507 | $194,475,109 | 100.0% | 30.7% | | |

313.   The following table shows that, as of December 31, 2007, of the Intermediate Fund's several asset classes, the Fund's mortgage/asset-backed securities were the primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for 83% of the Fund's loss: The Fund's mortgage/asset-backed investment-grade securities accounted for

52% of the loss, and the mortgage/asset-backed securities lost a much larger portion of their value calculated as a percentage of their cost (average of 64%) than did high-yield corporate bonds, whose value declined by 29% (data based on the Intermediate Fund's December 31, 2007 semi-annual report):

| INTERMEDIATE BOND FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 12/31/07 Value | Cost | 12/31/07 Value | Loss (Cost Less Value) | Loss on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 19.8% | $166,053,920 | $33,389,548 | $132,664,372 | 47.99% | 79.89% | 91.6% | 88.5% |
| Asset-Backed Securities - Below Investment Grade or Unrated | 11.4% | $89,101,599 | $19,247,317 | $69,854,282 | 25.27% | 78.40% | 71.4% | 71.5% |
| Corporate Bonds - Investment Grade | 38.5% | $90,327,372 | $64,931,285 | $25,396,087 | 9.19% | 28.12% | 55.5% | 100.0% |
| Corporate Bonds - Below Investment Grade or Unrated | 4.1% | $9,826,776 | $7,007,067 | $2,819,709 | 1.02% | 28.69% | 33.6% | 100.0% |
| Government & Agency Securities | 0.4% | $ 2,585,921 | $ 641,584 | $ 1,944,337 | 0.70% | 75.19% | 0.00% | 0.00% |
| Mortgage-Backed Securities - Investment Grade | 8.6% | $24,632,622 | $14,451,364 | $10,181,258 | 3.68% | 41.33% | 62.4% | 46.3% |
| Mortgage-Backed Securities - Below Investment Grade or Unrated | 8.3% | $31,153,230 | $14,012,473 | $17,140,757 | 6.20% | 55.02% | 16.2% | 0.2% |
| Preferred Stocks | 4.4% | $23,961,020 | $7,504,000 | $16,457,020 | 5.95% | 68.68% | 100.00% | 100.00% |
| TOTAL | | $443,626,924 | $167,169,102 | $276,457,822 | 100.00% | 62.32% | | |

314.    During the Class Period, in the Fund's annual and semi-annual reports, prospectuses, and sales materials, the RMK Defendants compared the Intermediate Fund's performance to the Lehman Brothers Intermediate U.S. Aggregate Index, which is a broad-based unmanaged index of securities that covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities and asset-backed securities.

315.    The following table demonstrates that, as of September 30, 2007, of the High Income Fund's several asset classes (including high-yield corporate bonds), the Fund's mortgage/asset-backed securities, both investment-grade and below-investment-grade, were the

primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for over 84% of the Fund's loss and that the mortgage/asset-backed securities lost a much larger portion of their value calculated as a percentage of their cost (average of 47.3%) than did high-yield corporate bonds, whose value declined by a relatively modest 16.2% (data based on the High Income Fund's September 30, 2007 Form N-Q portfolio of investments):

| HIGH INCOME FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 9/30 Value | Cost | 9/30/07 Value | Loss (Cost Less Value) | Loss on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 8.1 | $ 53,558,559 | $ 33,622,360 | $ 19,936,199 | 6.44% | 37.2% | 99.92% | 99.92% |
| Asset-Backed Securities - Below Investment Grade or Unrated | 26.3 | $283,580,467 | $109,971,469 | $173,608,998 | 56.10% | 61.2% | 81.32% | 71.83% |
| Corporate Bonds - Investment Grade | 4.1 | $ 17,813,579 | $ 17,090,000 | $   723,579 | 0.23% | 4.1% | 100.00% | 100.00% |
| Corporate Bonds - Below Investment Grade or Unrated | 20.5 | $102,111,002 | $ 85,613,662 | $ 16,497,340 | 5.33% | 16.2% | 27.18% | 54.71% |
| Mortgage-Backed Securities - Investment Grade | 2.4 | $ 17,182,372 | $ 10,235,171 | $  6,947,201 | 2.24% | 40.4% | 81.61% | 2.81% |
| Mortgage-Backed Securities - Below Investment Grade or Unrated | 14.6 | $122,787,133 | $ 61,087,756 | $ 61,699,377 | 19.94% | 50.2% | 95.99% | 88.81% |
| Municipal Securities | 0.1 | $   121,378 | $   109,282 | $   12,096 | 0.00% | 10.0% | 0.00% | 0.00% |
| Common Stocks | 8.0 | $ 42,672,841 | $ 33,263,667 | $  9,409,174 | 3.04% | 22.0% | 33.69% | 51.79% |
| Preferred Stocks | 5.1 | $ 42,005,593 | $ 21,361,846 | $ 20,643,747 | 6.67% | 49.1% | 25.46% | 74.54% |
| TOTAL | | $681,832,924 | $372,355,213 | $309,477,711 | 100% | 45.4% | | |

316.   The following table shows that, as of December 31, 2007, of the High Income Fund's several asset classes, the Fund's mortgage/asset-backed securities were the primary contributors to the Fund's precipitous drop in its NAV in 2007, accounting for over 80% of the Fund's loss: The mortgage/asset-backed securities lost a much larger portion of their value calculated as a percentage of their cost (average of 78%) than did high-yield corporate bonds,

186

whose value declined by 38% (data based on the High Income Fund's December 31, 2007 semi-annual report):

| HIGH INCOME FUND | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % of Net Assets Based on 12/31/07 Value | Cost | 12/31/07 Value | Loss (Cost Less Value) | Loss on Asset Class as % of Total Loss | Loss as % of Cost | Fair-Valued Securities as % of Asset Class at Value | Restricted Securities as % of Asset Class at Value |
| Asset-Backed Securities - Investment-Grade | 3.6% | $50,918,233 | $5,721,655 | $45,196,578 | 12.4% | 88.8% | 99.6% | 99.6% |
| Asset-Backed Securities - Below Investment Grade or Unrated | 21.5% | $220,475,228 | $33,648,285 | $186,826,943 | 51.4% | 84.7% | 98.7% | 70.2% |
| Corporate Bonds - Investment Grade | 6.9% | $17,802,132 | $10,778,274 | $7,023,858 | 1.9% | 39.5% | 100.0% | 100.0% |
| Corporate Bonds - Below Investment Grade or Unrated | 23.0% | $58,046,002 | $35,999,329 | $22,046,673 | 6.1% | 38.0% | 33.3% | 51.1% |
| Mortgage-Backed Securities - Investment Grade | 0.7% | $4,292,402 | $1,197,927 | $3,094,475 | 0.9% | 72.1% | 27.8% | 27.8% |
| Mortgage-Backed Securities - Below Investment Grade or Unrated | 18.6% | $85,565,063 | $29,093,788 | $56,471,275 | 15.5% | 66.0% | 94.0% | 82.6% |
| Municipal Securities | 0.1% | $123,139 | $107,811 | $15,328 | 0.0% | 12.4% | 0.0% | 0.0% |
| Common Stocks | 10.8% | $40,110,198 | $17,008,427 | $23,101,771 | 6.4% | 57.6% | 11.1% | 44.0% |
| Preferred Stocks | 0.6% | $20,855,093 | $931,724 | $19,923,369 | 5.5% | 95.5% | 100.0% | 100.0% |
| TOTAL | | $510,378,867 | $146,678,597 | $363,700,270 | 100% | 71.3% | | |

317.    During the Class Period, in the Fund's annual and semi-annual reports, prospectuses, and sales materials, the RMK Defendants compared the High Income Fund's performance to the Lehman Brothers Ba U.S. High Yield Index, which is a broad-based unmanaged index of fixed rate, non-investment grade debt, including Canadian and global bonds (SEC registered) of issuers in non-emerging countries and original issue zeroes, step-up coupon structures and 144A securities. The index excluded structured finance securities and private placements. McCann, *Regions Morgan Keegan; The Abuse of Structured Finance*, p. 31 n. 26.

318.    The collapse of the Funds' respective net asset values, and the resulting catastrophic losses suffered by Plaintiffs and members of the Class and Subclass, occurred because of the following:

(a)     The Funds' assets were invested in violation of the 15% restriction on the amount of illiquid securities in which the Fund was permitted to invest;

(b)     The Funds were not properly valuing their portfolio securities to take into account all relevant factors, including the nature of the markets for such securities and the uncertainty inherent in the estimated values of such securities;

(c)     The valuations of the high-yield and structured financial instruments and mortgage/asset-backed securities in which the Funds heavily invested were uncertain and such uncertainty and the effect thereof on the Funds' NAVs was not disclosed to existing or prospective shareholders;

(d)     The Funds were heavily invested in illiquid or thinly traded mortgage/asset-backed and other structured financial instruments in concentrations exceeding what comparable funds held;

(e)     The Funds' investments exceeded the 25% limit on investments in a single industry;

(f)     The Funds' portfolios were exposed to concentrations of credit risk because of their heavy investments in CDOs;

(g)     Although the thinly traded structured financial instruments in which the Funds were substantially invested were relatively new instruments whose performance in adverse market conditions had not been tested, they, like other thinly traded securities like them, had a history of suddenly becoming unsalable at their estimated values;

(h)     The Funds' assets were not managed in accordance with the Short Term Fund's and Intermediate Fund's respective investment objectives and RMK Defendants' representations about how all three Funds would be managed;

(i)     The Funds' extraordinarily large (as compared with their respective peer short- and intermediate-term and high-yield bond funds) holdings of investments in

thinly traded, complex mortgage/asset-backed securities and other structured financial instruments whose estimated valuations were uncertain and that were highly vulnerable to becoming suddenly unsalable at the estimated values at which they were being carried upon shifting market sentiments;

(j)     The disproportionately huge concentration, credit, liquidity and valuation risks embedded in the Funds' portfolios;

(k)     The Funds' were managed in a manner that caused the composition of their respective portfolios to be far more risky than the benchmark indices against which the RMK Defendants measured the Funds' respective performances; and/or

(l)     The Funds heavily invested in structured finance deals and in the lower priority tranches of those deals, which exposed the Funds to the undisclosed extraordinary leveraged credit risk embedded in those tranches, which exacerbated the volatility inherent in those investments.

319.    If the Short Term Fund had (i) pursued its disclosed investment objective of preservation of capital by investing in short-term, investment-grade bonds, (ii)adhered to its disclosed investment restrictions on illiquid securities and investments in a single industry, (iii)properly disclosed the uncertainty inherent in the estimated values of its portfolio securities and properly managed its portfolio to take into account such uncertainty, (iv) been managed in a manner consistent with the benchmark against which its performance was measured, and/or (v) properly diversified its credit risk to avoid a risky concentration, the Fund's net asset value would not have plummeted as it did, and the Fund's shareholders would not have incurred the extraordinary losses they did.

320.    If the Intermediate Fund had (i) pursued its disclosed investment objective of investing in intermediate maturity, investment grade bonds, (ii)adhered to its disclosed investment restrictions on illiquid securities and investments in a single industry, (iii)properly

disclosed the uncertainty inherent in the estimated values of its portfolio securities and properly managed its portfolio to take into account such uncertainty, (iv) had, as it disclosed it would do, invested in investment grade, short-term securities to maintain the Fund's liquidity and flexibility, (v) been managed in a manner consistent with the benchmark against which its performance was measured, and/or (vi) properly diversified its credit risk to avoid a risky concentration, the Fund's net asset value would not have plummeted as it did, and the Fund's shareholders would not have incurred the extraordinary losses they did.

321.    If the High Income Fund had (i) adhered to its disclosed investment restrictions on illiquid securities and investments in a single industry, (ii) properly disclosed the uncertainty inherent in the estimated values of its portfolio securities and properly managed its portfolio to take into account such uncertainty, (iii) been managed in a manner consistent with the benchmark against which its performance was measured, and/or (iv) properly diversified its credit risk to avoid a risky concentration in asset- and mortgage-backed securities, the Fund's net asset value would not have plummeted as it did, and the Fund's shareholders would not have incurred the losses they did.

322.    If all of each Fund's shareholders had sought to redeem their shares in the respective Funds on or after October 3, 2007, they would not have received the published net asset value for that date or the NAV on the next date.  Mass redemptions would have forced the mass liquidation of the Funds' respective portfolios, forcing the Funds to sell portfolio securities at "fire sale prices" in a market that did not provide sufficient liquidity to allow all such securities to be sold at the prices at which they were carried by the Fund on said date.

323.    Following the end of the Funds' fiscal years ended June 30, 2007, there were three significant events: August 30, 2007, when the Company/Funds reported to the SEC in a NT-N-SAR that the Funds could not timely file with the SEC and issue to the Fund's shareholders their annual reports for their fiscal year ended June 30, 2007, because their assets had been difficult to price due to the subprime mortgage crisis; September 15, 2007, when

Reuters reported the Company/Funds' failure to timely file their financial statements; October 3, 2007, when the Funds' financial statements were finally issued.

324.   The following graph shows each Fund's NAV during the period July 1, 2007 to December 31, 2007:

<u>Short Term Fund</u>



## Intermediate Fund



## High Income Fund



325.    The following table shows the average monthly redemptions for the indicated periods:

**Average Monthly Redemptions 6/1/05-2/27/08**

| Period | STF | IBF | HIF |
|---|---|---|---|
| 6/1/05-6/30/06 | $   (2,440,770) | $ (10,767,920) | $  (15,032,204) |
| 7/1/06-6/30/07 | $   (2,156,255) | $ (14,539,558) | $  (24,227,465) |
| 7/1/07-12/31/07 | $  (12,585,751) | $(112,797,205) | $(100,806,853) |

326.    According to a Morningstar report dated October 13, 2007, the High Income Fund saw $375 million in net redemptions between July 1 and August 31, 2007.

327.    According to a Morningstar report dated February 20, 2008, the Intermediate Fund saw $516 million in net redemptions between July 1 and December 31, 2007.

328.    As set forth elsewhere herein, and as admitted by the RMK Defendants, the increased redemptions led to the Funds being forced to sell assets to meet those redemptions, and such sales led to increasing sales of illiquid securities at ever decreasing prices, precipitating further  declines in each Fund's NAV, leading to further redemptions and more sales of portfolio assets to pay the redemtions – i.e., a run on the Funds.

## E.    REGIONS FORESAW THE SUBPRIME DEBACLE IN 2006, AND THE RMK DEFENDANTS KNEW OF THE RISKS OF THE ILLIQUID SUBPRIME SECURITIES PURCHASED BY THE FUNDS

### 1.    Regions' Subprime Prescience

329.    EquiFirst Corporation, a Regions Bank subsidiary in 2006 and at one time the 12th largest non-prime wholesale mortgage originator in the U.S., was in the business of originating mortgage loans that it sold to third-party investors.

330.    According to the 2006 Regions Form 10-K, EquiFirst experienced a significant reduction in premiums related to loan sales as a result of much thinner interest rate spreads in the marketplace than existed in 2005 and an increase in early payment default losses in the last half of 2006.

331.    On January 19, 2007, Regions Bank announced that it had entered into an

agreement to sell EquiFirst to Barclays Bank PLC.

332.    Some time in 2006, Regions determined that the subprime credit market was headed for trouble and acted on that determination by selling EquiFirst Corporation.  As reported by the *Birmingham News* on July 14, 2007, Regions Chief Credit Officer, Mike Willoughby, said he and other top executives knew about a year earlier (i.e., in mid-2006) that unpaid loans were going to start hitting banks in the wallet, and he previously said Regions sold its subprime lending unit to avoid that contagion.

333.    In March 2008, Regions boasted in a self-congratulatory advertisement in *The Wall Street Journal* that it foresaw the subprime debacle (emphasis supplied):

> We don't have large sub-prime exposure. One of our first actions following the merger last year was to sell EquiFirst Corporation, a sub-prime lender and subsidiary of Regions. While we took some criticism for the small premium we received for EquiFirst, our decision proved sound, as *we were able to exit that business about two quarters ahead of the sub-prime market meltdown*. Importantly, as a result of the sale, we have very little direct remaining exposure to sub-prime lending – less than one tenth of one percent of our total loan portfolio as of year end 2007.

*The Wall Street Journal*, March 18, 2008, p. A-12.

334.    According to the 2007 Regions Form 10-K, EquiFirst was sold for $76 million, incurring a pre-tax loss on the disposition of $217.4 million, and the business related thereto was accounted for as a discontinued operation. The EquiFirst sale adversely affected Regions Bank's overall interest-earning asset yields, causing such yields to decline.

335.    In its 2008 Form 10-K, Regions disclosed that, "during the first quarter of 2007, Regions sold its non-conforming mortgage origination subsidiary, EquiFirst, for an original sales price of approximately $76 million and recorded an after-tax gain of approximately $1 million at the time of sale."

336.    EquiFirst accounted for a substantial portion of Regions Bank's loans held for sale to third parties. At December 31, 2006, EquiFirst accounted for 35% of all of Regions

Bank's loans held for sale and 52% of residential real estate mortgage loans held for sale. At December 31, 2007, Regions Bank's loans held for sale totaled $720.9 million, which, excluding $1.6 billion in divested loans, represented a decrease of $2.6 billion, due mainly to the sale of EquiFirst.

337.    Prior to the completion of the EquiFirst sale in 2007, Regions recorded approximately $142 million of after-tax losses related to EquiFirst's operations. The primary factor in the recognition of these losses was the significant and rapid deterioration of the subprime market during the first three months of 2007.

338.    Thus, in 2006, Regions and Regions Bank were sufficiently convinced of the coming "sub-prime market meltdown" to decide to sell a substantial portion of its business at a significant loss, which was the very same business in which the Funds were heavily investing in the form of highly risky asset- and mortgage-backed securities.

339.    There were extensive relationships between and among the Regions Morgan Keegan entities, including Regions, Morgan Keegan, Morgan Management, and Regions Bank. For example, there was one cross-directorship between the Funds and Regions; Regions owned and controlled Morgan Management and Morgan Keegan; the Funds were cross marketed by Morgan Keegan, Morgan Management and Regions Bank; and Morgan Management, Morgan Keegan and Regions Bank managed and administered the Funds and the investment of the Regions Bank trust accounts in the Funds pursuant to contractual relationships between and among them.

340.    These relationships resulted in Regions' knowledge of the subprime market imminent collapse being attributable to Morgan Management and Morgan Keegan. Either (i) Regions did not inform its own trust department, Morgan Management and Morgan Keegan of its view of the subprime market, or (ii) Regions did so inform its own trust department, Morgan Management and Morgan Keegan, but not the Funds' directors, and Morgan Management and Morgan Keegan ignored such information, or (iii) Regions did inform the

Regions Bank trust department, Morgan Management, Morgan Keegan and the Funds' directors, but they ignored such information and failed to take measures necessary to avoid or minimize the losses the Funds' shareholders incurred later in 2007 and 2008.

 **2.** **RMK Defendants' Knowledge of the Extraordinary Risks of the Sub-prime Securities Purchased by the Funds.**

 341. By no later than February 2007, the RMK Defendants necessarily became aware of the significantly increasing risks incurred by the Funds in continuing to hold many of their investments.  In February 2007, due to rising mortgage defaults and delinquencies, an index that served as a benchmark measure of the risk of residential mortgage-backed securities had substantially weakened, with the portion of the index based on subprime mortgages hitting record levels.

 342. The RMK Defendants' had actual knowledge of the liquidity risk inherent in the subprime securities purchased by the Funds, as these risks were disclosed in the prospectuses for these securities that were purchased by the Funds, but failed to disclose these risks to the shareholders. Paragraphs 197-215 *supra*. Regions Bank (RMK Trust) had actual knowledge of the Funds' aggravated liquidity risk as a result of the overlapping ownership by the Funds and the RMK closed-end funds of illiquid securities. Paragraph 641-42 *infra*.

 343. The RMK Defendants had actual knowledge of the proportion of the Funds' assets invested  in asset- and mortgage-backed securities that had to be fair valued but failed to disclose said proportion and its effect on the Funds' respective NAVs. Paragraphs 183, 216-47 *supra*.

 344. The RMK Defendants had actual knowledge of the extraordinary credit risk in the asset- and mortgage-backed securities purchased by the Funds, as these risks were disclosed in the prospectuses for these securities that were purchased by the Funds, but failed to disclose such risks. Paragraphs 249-63 *supra*.

 345. The RMK Defendants had actual knowledge of the Funds' single industry con-

centration, unstable NAV, and, leverage but failed to disclose such risks, Paragraphs 267-305 *supra*.

### 3. Kelsoe and Devaney/UCM: the RMK Defendants Knew the Funds Were Purchasing Illiquid Highly Risky Securities.

346.    As part of Defendant Edwards's management responsibilities with respect to the Fixed Income Capital Markets Group, Edwards exercised executive supervision over the investment management of the Funds as well as the closed-end bond funds, in which capacity he originally hired Defendants Kelsoe and Tannenhill as fixed income analysts prior to formation of any of the Funds.

347.    In 1999, upon formation of the first of the Funds, and before any of them had accumulated significant assets, Defendant Edwards appointed Defendants Kelsoe and Tannenhill as the portfolio manager and assistant portfolio manager, respectively, of the Funds.

348.    Neither Defendant Kelsoe nor Defendant Tannenhill had any prior experience in managing the portfolios of large publicly offered fixed income registered investment companies and, specifically, large open-end mutual funds. As the Funds grew rapidly in assets, Defendant Edwards continued to allow Defendants Kelsoe and Tannenhill to serve as the portfolio manager and assistant portfolio manager of the Funds, despite their lack of experience as portfolio managers of publicly offered fixed income registered investment companies, especially large open-end bond mutual funds.

349.    Defendant Edwards also served as chairman and/or as the dominant member of the Morgan Keegan internal investment committee, which was composed of other top management executives that established the parameters for fixed income investments that Morgan Keegan was purchasing for its own account and for resale to institutional and retail clients. Under the parameters established by the Morgan Keegan investment committee, Morgan Keegan was prohibited from purchasing for its own account or for resale as principal to institutional or individual clients (i.e., trading in) the types of asset- and mortgage-backed

197

securities and other structured financial instruments that became a staple investment of the Funds. Defendants Kelsoe and Tannenhill, however, were allowed to purchase these types of securities for the open-end and closed-end bond funds.

350.    The Morgan Keegan investment committee also reviewed and approved the investment strategy for the Select Funds, including the Funds, but did not prohibit the Funds from investing in the types of securities that the Committee prohibited for its own account and for resale to its customers.

351.    United Capital Markets, ("UCM") a brokerage firm formed in 1999 and located in Florida, and its principal owner, John Devaney, became a major supplier of structured mortgage-backed securities in the secondary market for the Funds as well as the RMK closed-end bond funds.

352.    At or prior to the time relevant herein, a Morgan Keegan official in the Morgan Keegan Fixed Income Capital Markets Group saw a published article about Devaney and UCM that indicated Kelsoe was a major customer of UCM, causing the Funds to purchase securities from UCM in the secondary market.

353.    The Morgan Keegan Fixed Income Capital Markets official showed the Devaney/UCM article to several other employees in the Morgan Keegan Fixed Income Capital Markets Group. Some of these employees became concerned about their investments in the Funds when they read about the profits that Devaney and UCM were making on the asset- and mortgage-backed securities that he was selling to Kelsoe for the Funds. These employees also became concerned that the securities that the Funds purchased from UCM were illiquid.

354.    Based on these concerns, these employees began selling their personal holdings in the Funds. When Defendant Edwards became aware of these sales, he became angry because he was concerned that word of such sales could have a negative impact on the Funds. Defendant Edwards prohibited employees in the Fixed Income Capital Market Group

198

from selling any of their holdings in the Funds.

355.    John Devaney was a bond salesman for a small Florida brokerage firm, and, with no prior bond trading experience, started trading CMOs for another small Florida brokerage firm. This he did for two and a half years before leaving to form United Capital Markets ("UCM") in 1999.

356.    In a November 1, 2004 profile in an industry publication (incisivemedia-credit US Credit – Devaney, November 1, 2004), UCM and Devaney are described as follows: "Six months ago, this man was running his business out of a three-bedroom residential house in Florida. Now his company is among the fastest-growing broker/dealers in the country."

357.    According to the profile, Devaney and UCM achieved their remarkable growth in a market plagued by "a conspicuous lack of liquidity" because the market for high-yield structured finance products is considerably less mature than the high-yield market for corporate bonds – e.g., since 1991, approximately $994.3 billion of high-yield corporate bonds were issued versus only $25.8 billion of high-yield structured securities.

358.    The publication reported that UCM exploits the inefficiencies in this market. Devaney says the benefit of trading the subordinated tranches of these high-yield structured finance products is that their secondary markets are among the most inefficient: "The secondary markets for some of these bonds have an incredible disconnect between the current trading levels and the fundamental credit quality of the collateral pools backing the securities."

359.    According to the publication, the immaturity of the high-yield structured market, together with a lack of transparency resulting from obscure deal structures backed by esoteric assets, has meant that many of the mainstream institutional investors who buy structured finance products at new issue are not always familiar with what they are buying.

360.    According to the publication, when investors in these structured products want to sell, there are very few places to go, noting that liquidity for these products is so limited

that most broker-dealers do not quote spreads below the double-A level with any regularity because the market simply does not move enough to provide indicative levels and because, where primary market issuance has dried up for a certain type of security, the underwriters on the original deals are often reluctant to commit capital to support them in the secondary market.

361.    According to the publication, one of UCM's customers who relied upon it for its research was Defendant Kelsoe, who was quoted as saying, "I have found John [Devaney] to be very aggressive in his ability to find interesting trading ideas. Devaney is an analyst, salesman and trader in one, which is a much more efficient use of my time. He conducts detailed and in-depth credit work on unusual structures and it's important for us that he is willing to commit his own capital to *illiquid securities*." (Emphasis supplied.).

362.    According to the publication, Armand Pastine of Maxim Group, another regional dealer in the structured finance secondary market, disagreed that UCM's trading as a principal provided liquidity: "The liquidity in this market is manufactured rather than provided."

363.    From time to time, Kelsoe caused the Funds to purchase high-yield structured finance instruments in an initial public offering through UCM on an agency basis, instead of directly from a member of the underwriting group, thereby causing the Funds to pay an unnecessary commission to UCM.

364.    UCM's research staff consisted of two persons. According to a Morningstar report (November 26, 2006), MAM did not have a corporate credit analyst, until it hired one in 2006.

365.    According to the publication, UCM "has been involved with some of the most distressed sectors in the asset-backed universe, including bonds backed by high loan-to-value (LTV) mortgages, aircraft leases, loans for manufactured housing, sub-prime credit cards and loans for franchise businesses," all of which are found in the High Income and

Intermediate Funds' portfolios.

366.    UCM bought high-yield structured financial products from far more customers than customers to whom it sold these securities; UCM had approximately 350 accounts that sold these securities to UCM but only 25-30 accounts to whom UCM sold these securities, among which were the Funds. Devaney maintained that he needed only this small number of sophisticated buyers to offload his inventory.

367.    One of UCM's biggest customers was Defendant Kelsoe, who was described by the publication as one of Devaney's "most valued" customers. The publication identified the High Income Fund as one of UCM's customers and described it as investing "almost exclusively in high-yield structured finance products."

368.    In another publication (CNNMoney.com,, July 30, 2007), in referring to the borrowers whose loans were securitized in the high-yield structured financial products in which he dealt, Devaney said, "The consumer has to be an idiot to take on those loans."

369.    In mid-June 2007, Devaney told his brokerage customers that there were 10 forced sellers of the high-yield structured financial instruments in which he was dealing, and that he sold to the Funds, for every one buyer.

F.    DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

370.    Defendants herein caused the Funds to misrepresent and/or omit material facts in the Funds' registration statement, as amended from time to time, in connection with the offer and sale of the Funds' shares in violation of the Securities Act of 1933 and in connection with the offer to redeem the Funds' shares in violation of the Securities Exchange Act of 1934 and Investment Company Act of 1940.

1.    **High Income Fund**

371.    In connection with the offer and sale of the High Income Fund's shares during the Class Period and the offer to redeem said Fund's shares during the  Class Period, the Defendants made the following explicit or implicit representations in the Fund's registration

statements or amendments thereto, including prospectuses and statements of additional information, and in annual and semi-annual reports and other documents filed with the SEC during the Class Periods and in sales materials and other sources of information for which the RMK Defendants and Defendant Company/Funds were responsible:

(a)     The High Income Fund provided the "opportunity for high current income" from a broad range of asset classes (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007, ¶ 130);

(b)     The High Income Fund might invest in investment grade, short-term securities to achieve liquidity and flexibility (*see*, e.g., the Fund's prospectuses dated November 1, 2004 and 2005 but this disclosure was not made in the Fund's November 1, 2006 prospectus);

(c)     The High Income Fund provided diversification across multiple fixed income asset classes (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007, ¶ 130);

(d)     The High Income Fund provided the "potential for lower NAV volatility than typical high-yield funds" (*see*, e.g., sales materials dated June 30, 2007, ¶ 129);

(e)     The High Income Fund had a "relatively conservative credit posture" that "reflect[ed] our goal of higher yields without excessive credit risk" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007, ¶ 130);

(f)     The High Income Fund would not invest solely in below-investment grade securities but would "strategically utilize asset-backed securities, mortgage-backed securities and other structured finance vehicles" (*see*, e.g., prospectus dated November 1, 2006, ¶ 267; sales materials dated June 30, 2007 and September 30, 2007, ¶ 130);

(g)     The High Income Fund's ability to "acquire a diverse set of assets [asset- and mortgage-backed securities] will contribute to higher total returns and a more

202

stable net asset value for the fund than would result from investing in a single sector of the debt market such as below investment grade corporate bonds" (*see*, e.g., prospectus dated November 1, 2006, ¶ 267);

(h)     The High Income Fund would not purchase any security if, after the purchase thereof, more than 15% of the Fund's portfolio consisted of illiquid securities (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 161-62, 168, 170-74, 183);

(i)     The Fund could not invest more than 25% of its net worth in a single industry (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 273-80);

(j)     The periodically disclosed asset allocations, including the proportion of its investments in asset- and mortgage-backed securities and other structured financial instruments (*see*, e.g., the Fund's annual and semi-annual reports dated June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, ¶¶ 273-92);

(k)     The Fund would not use leverage for investment purposes and would borrow only in limited circumstances (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 293-95);

(l)     The Fund's published NAVs were a reliable measure of the value of the Fund's net assets (inferred from, *inter alia*, the Fund's audited financial statements in its annual and semi-annual reports for June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, including PwC's audit report on the annual financial statements therein and the financial highlights published in the prospectuses dated November 1, 2004, 2005 and 2006);

(m)    The High Income Fund's performance could reasonably be compared to the Lehman Brothers Ba U.S. High Yield Index and the CSFB High Yield Index,

implying the risk of the High Income Fund was approximately that of the two high-yield indices and that the Fund's portfolio composition was approximately that of the indices, concealing from investors the risk inherent in the Funds' purportedly superior returns (*see*, e.g., the Fund's annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, and prospectuses dated November 1, 2004, 2005 and 2006).

372.    The representations and disclosures in the preceding paragraph were false or misleading in that they painted a picture of the High Income Fund as a fund whose net asset value was subject to only limited fluctuations, without the slightest hint of the Fund's extraordinary exposure to the undisclosed concentration, credit, liquidity and valuation risks embedded in the Fund's portfolio as a result of the Fund investing a far larger portion of its assets than did its peers in complex, thinly traded securities of uncertain valuation that could, and did, suddenly become unsalable at their estimated values, resulting in precipitous price reductions and catastrophic losses, and were otherwise false and misleading for failing to disclose the following material facts that Defendants knew, should have known, or were reckless in not knowing:

(a)    The "multiple fixed income asset classes" included an extraordinarily heavy concentration in complex, thinly traded, structured financial instruments that had a history of suddenly becoming unsalable at their estimated valuations and that held undisclosed concentration, liquidity, leverage and valuation risks that exposed investors in the Fund to a sudden and catastrophic loss as a result of changing market sentiments (paragraphs 183-91, 195-305);

(b)    Because of the High Income Fund's heavy concentration in such financial instruments, the Fund was not comparable to other high-yield funds (paragraphs 127, 146-48, 156, 159-60, 233, 305, 317, 318(d), 399);

204

(c)     Contrary to the disclosed representation that the Fund provided the "potential for lower NAV volatility than typical high-yield funds," the High Income Fund's heavy concentration in relatively new, complex, thinly traded structured financial instruments meant that the Fund provided the undisclosed potential of extraordinarily higher NAV volatility than typical high-yield funds (paragraphs 127, 146-48, 156, 159-60, 233, 305, 317, 318(d), 399);

(d)     The High Income Fund's heavy concentration in relatively new thinly traded (i.e., illiquid), complex, structured financial instruments meant that the Fund's purported "relatively conservative credit posture" and purported absence of "excessive credit risk" did not protect the Fund's shareholders from the concealed concentration, liquidity and valuation risks embedded in the Fund's portfolio of catastrophic losses as a result of its investments in such instruments (paragraphs 315, 316, 318);

(e)     The High Income Fund's disclosed "strategic use" of asset-backed securities, mortgage-backed securities and other structured finance vehicles to supplement its investments in below-investment grade securities resulted in an undisclosed extraordinarily heavy concentration in thinly traded (illiquid) securities (*Id.*);

(f)     The High Income Fund's disclosed "strategic use" of asset- and mortgage-backed securities and other structured finance vehicles to supplement its investments in below-investment grade securities resulted in an undisclosed extraordinarily heavy concentration of credit risk (paragraphs 248-66, 273-77, 280, 283);

(g)     The High Income Fund's disclosed "strategic use" of relatively new, thinly traded, complex, asset-backed securities, mortgage-backed securities and other structured financial instruments of uncertain valuation to supplement its in-

vestments in below-investment grade securities resulted in a portfolio with un-disclosed extraordinary concentration, liquidity and valuation risks vulnerable to precipitous price reductions (paragraphs 315, 316, 318);

(h)     The High Income Fund's disclosed ability to "acquire a diverse set of assets [that] will contribute to higher total returns and a more stable net asset value for the fund than would result from investing in a single sector of the debt market such as below investment grade corporate bonds" did not, in fact, con-tribute to a more stable net asset value but to a concealed potentially highly un-stable net asset value as a result of the Fund's extraordinarily heavy concentra-tion in thinly traded structured financial instruments of uncertain valuation (*Id.*);

(i)     The High Income Fund repeatedly purchased illiquid securities when, after the purchase thereof, more than 15% of the Fund's portfolio consisted of illiquid se-curities, resulting in undisclosed violations of its disclosed investment restriction against making such investments (paragraphs 162, 168-215);

(j)     The Fund repeatedly invested more than 25% of its net worth in a single indus-try, resulting in undisclosed violations of its disclosed investment restriction against making such investments (paragraphs 273-77, 280, 283);

(k)     The Fund's periodically disclosed asset allocation understated the extent to which it was invested in a single industry (paragraphs 276-77);

(l)     The Fund's disclosed asset allocation misrepresented the extent to which the Fund was invested in highly risky tranches of asset- and mortgage-backed secu-rities (paragraphs 284-89, 291-92);

(m)     The Fund employed investment leverage in the form of its investments in the low ranking tranches of asset- and mortgage-backed securities, which leverage significantly increased the undisclosed risk embedded in the Fund's portfolio

(paragraphs 293-305);

(n)  The Fund's reported NAVs were not a reliable measure of the value of the Fund's net assets but were merely estimates subject to sudden and precipitous reductions because an undisclosed large portion of the Fund's investments was in securities for which market quotations were not readily available and whose values had therefore to be estimated based on an undisclosed variety of factors that, if disclosed, would have revealed how judgmental, subjective and uncertain were the estimated values at which these assets were being carried on the Fund's books and records and reported to the Fund's shareholders (paragraphs 183-91, 197-246, 491, 566-75);

(o)  Because the Lehman Brothers Ba U.S. High Yield Index and the CSFB High Yield Index included only corporate bonds, the extent to which the composition of the High Income Fund's portfolio deviated from the Lehman and CSFB indices, and the High Income Fund's performance could not reasonably be compared to these indices as more than half of the Fund's portfolio consisted of asset-backed and mortgage-backed and other structured securities that were not comparable to corporate bonds, the misleading nature of which benchmarks is evidenced by the replacement thereof by the High Income Fund's new manager (HBAM) with the broader Barclays Capital U.S. Corporate High Yield Index, formerly known as the Lehman Brothers U.S. Corporate High Yield Index, of which latter index the Lehman Brothers Ba U.S. High Yield Index was a more narrowly focused component (paragraphs 308, 317);

(p)  The High Income Fund was run by a portfolio manager, Defendant Kelsoe, who applied unorthodox and risky investment strategies resulting in the High Income Fund being unlike all the other high-yield funds, with an unique mix of corporate and asset backed securities for a high yield fund and a performance

207

achieved by investing heavily in the lower tranches of CDOs and asset- and mortgage-backed securities ;

(q)    The closure of the High Income Fund to new investors increased the liquidity risk of the Fund;

(r)    The risks and omissions identified in paragraphs 197, 226, 258, 332-38.

373.    Defendant Morgan Management so concentrated the High Income Fund's portfolio in the "asset-backed securities, mortgage-backed securities and other structured finance vehicles" as to cause the Fund to be so undiversified, and so unlike other high-yield mutual funds, that Morgan Keegan now says it is not fair to compare the High Income Fund's performance to other high yield bond funds because the High Income Fund invested significantly in structured securities, and other high yield bond funds generally did not.

## 2.    Intermediate Bond Fund

374.    In connection with the offer and sale of the Intermediate Fund's shares during the Class Period and the offer to redeem said Fund's shares during the  Class Period, the Defendants made the following representations in the Fund's registration statements or amendments thereto, including prospectuses and statements of additional information and in annual and semi-annual reports and other documents filed with the SEC during all times relevant herein and in sales materials and other sources of information for which the RMK Defendants and Defendant Company/Funds were responsible:

(a)    The Intermediate Fund was a *bond* fund (as represented by its name) that would invest primarily in intermediate maturity, investment grade *bonds* (*see* e.g.,the Fund's prospectuses dated November 1, 2004, 2005, and 2006, and annual and semi-annual reports dated June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007);

(b)    The Intermediate Fund's investment objective was a "high level of income by investing in intermediate maturity, investment grade bonds [and] . . . . capital

208

growth as a secondary objective when consistent with the fund's primary objective" (*see* e.g.,the Fund's prospectuses dated November 1, 2004, 2005, and 2006, and annual and semi-annual reports dated June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007);

(c)  For liquidity and flexibility, the Intermediate Fund may invest in investment grade, short-term securities (*see*, e.g., the Fund's prospectuses dated November 1, 2004, 2005, 2006);

(d)  The Intermediate Fund provides "a higher level of current income than typical money market investments" (*see*, e.g., sales materials dated December 31, 2004, December 31, 2005, June 30, 2007, and September 30, 2007, ¶¶ 131, 134);

(e)  The Intermediate Fund provides a diversified portfolio of mostly investment-grade debt instruments, with some exposure to below-investment-grade assets (*see*, e.g., sales materials dated December 31, 2005 and September 30, 2007, ¶¶ 131, 134);

(f)  The Intermediate Fund focuses on "undervalued" and "out-of-favor" sectors and securities, "which still have solid credit fundamentals" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007, ¶ 134);

(g)  Because "the single best way to reduce the risk of any portfolio is through adequate diversification," the Intermediate Fund's "portfolio is diversified not only with regard to issuer, but also industry, security type and maturity" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007, ¶ 134);

(h)  The Intermediate Fund "does not invest in speculative derivatives" (*see*, e.g., sales materials dated December 31, 2005, June 30, 2007 and September 30, 2007, ¶¶ 132, 134);

(i)     Like all such fixed income funds, the Intermediate Fund offered "Consistent, Periodic Income through a monthly distribution of interest payments. . . . [allowing] investors to more accurately plan investment cash flows and provides steady income to those who need it," recognizing the importance of income to investors in the Intermediate Fund (*see*, e.g., sales literature dated June 30, 2007 and September 30, 2007);

(j)     The Intermediate Fund "seeks to MINIMIZE RISK" (*see*, e.g., sales materials dated December 31, 2004, December 31, 2005, and June 30, 2007 [emphasis in original], ¶ 132);

(k)     The Intermediate Fund would not purchase any security if, after the purchase thereof, more than 15% of the Fund's portfolio consisted of illiquid securities (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 161-62, 168, 171-77, 183);

(l)     The Intermediate Fund could not invest more than 25% of its net worth in a single industry (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 273-74, 277-80);

(m)     The periodically disclosed asset allocations, including the proportion of its investments in asset- and mortgage-backed securities and other structured financial instruments (*see*, e.g., annual and semi-annual reports dated June 30, 2004, December 31, 2004, June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007; sales materials dated June 30, 2007);

(n)     The Intermediate Fund would not use leverage for investment purposes and would borrow only in limited circumstances (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 293-95);

(o)     The Intermediate Fund was for investors whose investment objective is "capital preservation" (*see*, e.g., sales materials dated December 31, 2004, December

31, 2005, June 30, 2007, ¶¶ );

(p)     The Intermediate Fund offered "greater stability in principal value than that of long-term bonds" (*Id.*);

(q)     The Intermediate Fund offered a "diversified portfolio of investment-grade debt" (*Id.*);

(r)     The Intermediate Fund provided "balanced exposure across the investment-grade spectrum" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007);

(s)     The Intermediate Fund provided "greater liquidity" enabling investors to "re-deem any portion of their shares. . . at any time" (*see*, e.g., sales materials dated December 31, 2004, June 30, 2007 and September 30, 2007);

(t)     The Intermediate Fund's published NAVs were a reliable measure of the value of the Fund's net assets (inferred from, *inter alia*, the Fund's audited financial statements in its annual and semi-annual reports for June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, including PwC's audit report on the annual financial statements therein and the financial highlights published in the prospectuses dated November 1, 2004, 2005 and 2006);

(u)     The Intermediate Fund's performance could reasonably be compared to the Lehman Brothers Intermediate U. S. Aggregate Index, implying the risk of the Intermediate Fund was approximately that of the Lehman index and that the Fund's portfolio composition and relative safety was approximately that of the Lehman index (*see*, e.g., the Fund's annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, and prospectuses dated November 1, 2004, 2005 and 2006);

(v)     The Intermediate Fund disclosed in its annual and semi-annual reports as of

the following dates the following data regarding the market, credit and interest rate risks of its portfolio:

(1)   June 30, 2007:

- Average credit quality: A

- Duration: 6.36 years

- Average effective maturity: 8.48 years

- 84% of portfolio invested in securities rated investment-grade plus 7.4% in unrated securities; only 9.1% rated below-investment-grade

(2)   December 31, 2006:

- Average credit quality: A

- Duration: 5.59 years

- Average effective maturity: 7.45 years

- 80% of portfolio invested in securities rated investment-grade plus 2.9% in unrated securities; only 17% rated below-investment-grade

(3)   June 30, 2006:

- Average credit quality: BBB+

- Duration: 4.21 years

- Average effective maturity: 5.62 years

- 70.5% of portfolio invested in securities rated investment-grade plus 0.3% in unrated securities; only 29.2% rated below-investment-grade

(4)   December 31, 2005:

- Average credit quality: A-

- Duration: 3.52 years

- Average effective maturity: 4.7 years

- 69% of portfolio invested in securities rated investment-grade plus

212

      6.2% in unrated securities; only 24.9% rated below-investment-grade

(5)   June 30, 2005:

- Average credit quality: A
- Duration: 2.36 years
- Average effective maturity: 3.2 years
- 70% of portfolio invested in securities rated investment-grade plus 6.5% in unrated securities; only 23.2% rated below-investment-grade

(6)   December 31, 2004:

- Average credit quality: A
- Duration: 3.32 years
- Average effective maturity: 5.2 years
- Percentage of portfolio invested in securities rated investment-grade, unrated securities, or below-investment-grade not disclosed in summary form as above.

375.   The representations and disclosures in the preceding paragraph were false and misleading in that they painted a picture of the Intermediate Fund as a fund whose net asset value was subject to only limited fluctuations, without the slightest hint of the Fund's extraordinary exposure to the undisclosed concentration, credit, liquidity and valuation risks lurking in the Fund's portfolio as a result of the Fund investing a far larger portion of its assets than did its peers in complex, thinly traded structured financial instruments of uncertain valuation that had a history of suddenly becoming, and did suddenly become, unsalable at their estimated values as a result of shifting market sentiments, resulting in catastrophic losses, and were otherwise false and misleading for failing to disclose the following material facts that Defendants knew, should have known, or were reckless in not knowing:

213

(a)    The Intermediate Fund made extraordinarily heavy investments in complex, thinly traded, structured financial instruments that held undisclosed risks, including concentration, credit, liquidity, leverage and valuation risks that exposed investors in the Fund to sudden and catastrophic losses as a result of changing market sentiments (paragraphs 183-92, 195-305);

(b)    Based on its investment objective, the Intermediate Fund was properly perceived as being suitable for investors seeking to preserve their capital, but the Fund was not managed in a manner that preserved capital but instead was managed in a manner that substantially threatened shareholders' savings (paragraphs 161-283, 293-305);

(c)    The Intermediate Fund did not invest in investment grade, short-term securities to maintain the Fund's liquidity and flexibility, or failed to do so in prudent amounts, but instead heavily invested in thinly traded, complex, structured financial instruments of uncertain valuation that could suddenly become unsalable at their estimated values as a result of changing market sentiments (paragraphs 161-247;

(d)    Regarding the representation that the Intermediate Fund provided a higher level of current income than typical money market investments, Defendants falsely inferred that the Intermediate Fund provided safety that was comparable to that of a money market fund while failing to disclose that its pursuit of such higher current income meant heavily investing in highly risky, thinly traded structured financial instruments of uncertain valuation (paragraphs 161-283, 293-305);

(e)    Regarding the representation that the Intermediate Fund provided a diversified portfolio of mostly investment-grade debt instruments, with some exposure to below-investment-grade assets, Defendants failed to disclose the concentration, credit, liquidity and valuation risks embedded in a portfolio heavily in-

214

vested in thinly traded, structured financial instruments of uncertain valuation (paragraphs 161-305);

(f)     Regarding the representation that the Intermediate Fund focused on "undervalued" and "out-of-favor" sectors and securities, "which still have solid credit fundamentals," Defendants failed to disclose the concentration, credit, liquidity and valuation risks embedded in a portfolio heavily invested in thinly traded asset- and mortgage-backed securities and other structured financial instruments of uncertain valuation (*Id.*);

(g)     Regarding the representation that the Intermediate Fund's "portfolio is diversified not only with regard to issuer, but also industry, security type and maturity," the Fund was not diversified as to industry or "security type," and Defendants failed to disclose the extraordinary concentration, credit, liquidity and valuation risks embedded in a portfolio heavily invested in thinly traded, complex asset- and mortgage-backed securities and other structured financial instruments of uncertain valuation (*Id.*);

(h)     Regarding the representation that the Intermediate Fund's "portfolio is diversified not only with regard to issuer, but also industry, security type and maturity," Defendants failed to disclose the extraordinarily heavy concentration of credit risk (paragraphs 248-83);

(i)     Regarding the representation that the Intermediate Fund "does not invest in speculative derivatives,"

     (1)     The Fund in fact did invest in significant amounts of such securities— e.g., at December 31, 2005, the Fund held interest-only strips (commonly viewed as a speculative derivative security) totaling over $32 million, or 5.8% of the Fund's total investments, and at June 30, 2006, the Fund held almost $20 million in interest-only strips, or almost three

percent of the Fund's total investments;

(2)     The securities in which the Funds invested often included interest rate swaps, which are commonly considered derivatives;

(3)     The securities purchased by the Funds included significant investments in collateralized debt obligations and collateralized loan obligations, which are derivatives, according to Robert Engle, a Nobel laureate in economics ("Derivatives Trades Should All Be Transparent," *The Wall Street Journal*, May 15, 2009, p. A13);

(4)     Defendants failed to disclose the risks embedded in a portfolio heavily invested in thinly traded securities of uncertain valuation;

(j)     Regarding their recognition that investors in the Intermediate Fund are fixed income investors who would rely on the Fund for income, and therefore needed their investments to be safe, Defendants failed to disclose the risks embedded in a portfolio heavily invested in illiquid securities of uncertain valuation and the threat such securities posed to investors' savings, even though the RMK Defendants were warned by the prospectuses for these securities that they were not suitable for investors who rely on a stable income (paragraphs 161-247, 258(q));

(k)     Regarding the representation that the Intermediate Fund would not purchase any security if, after the purchase thereof, more than 15% of the Fund's portfolio consisted of illiquid securities, the Fund failed to adhere to this limitation and failed to disclose its violation of this restriction (paragraphs 161-62, 168-84, 187-92, 195-215);

(l)     Regarding the representation that the Intermediate Fund could not invest more than 25% of its net assets in a single industry, the Fund failed to adhere to this limitation and failed to disclose the Fund's violation of this restriction (para-

216

graphs 273-79, 282-83);

(m)    The Fund's periodically disclosed asset allocations greatly understated the extent to which it was invested in mortgage-related securities or in a single industry (paragraphs 276-77);

(n)    The Fund's disclosed asset allocation misrepresented the extent to which the Fund was invested in highly risky tranches of asset- and mortgage-backed securities (paragraphs 284-88, 290-92);

(o)    The Fund employed investment leverage in the form of its investments in the low ranking tranches of asset- and mortgage-backed securities, which leverage significantly increased the undisclosed risk embedded in the Fund's portfolio (paragraphs 293-305);

(p)    The Intermediate Fund was not for investors whose "investment objective is preservation of capital" because of its extraordinarily heavy investments in highly risky, complex, thinly traded, structured financial instruments of uncertain valuation  (paragraphs 161-328);

(q)    Regarding the Intermediate Fund's representation that it provided  "greater stability in principal value than that of long-term bonds," the Intermediate Fund did not provide such stability, and the Fund failed to disclose that the Fund was, as compared with all other bond funds regardless of maturity/duration, exposed to the extraordinary concentration, credit, leverage, liquidity and valuation risks (*Id.*);

(r)    Regarding the Intermediate Fund's representation that it provided a "diversified portfolio of investment-grade debt," the Fund did not provide a diversified portfolio but, instead, was heavily concentrated in real estate related securities (paragraphs 273-83);

(s)    The Intermediate Fund did not provide "balanced exposure across the invest-

217

ment-grade spectrum" because it was concentrated in a single industry and the Fund's extraordinarily large investments in thinly traded, complex, structured financial instruments of uncertain valuation with extraordinary credit risk exposed the Fund's investors to a sudden and catastrophic loss as a result of changing market sentiments (paragraphs 161-328);

(t)     The Intermediate Fund did not provide "greater liquidity" enabling investors to "redeem any portion of their shares. . . at any  time" as the Fund was able to do so only by substantially marking down portfolio securities in order to sell them to meet redemptions (paragraphs 161-247, 267-72, 323-28);

(u)     In disclosing that the Intermediate Fund "provides steady income to those who need it," the RMK Defendants recognized that many of those who invest in funds like the Intermediate Fund need their investments to be safe because they are dependent upon them for their income and, accordingly, cannot risk principal to the extent that their principal was put at risk by the Fund in the way its assets were invested;

(v)     The Intermediate Fund's reported NAVs were not a reliable measure of the value of the Fund's net assets but were merely estimates subject to sudden and precipitous reductions because an undisclosed large portion of the Fund's investments was in securities for which market quotations were not readily available and whose values had therefore to be estimated based on an undisclosed variety of factors that, if disclosed, would have revealed how judgmental, subjective and uncertain were the estimated values at which these assets were being carried on the Fund's books and records and reported to the Fund's shareholders (paragraphs 183-91, 197-247, 49 566-75);

(w)     Because the Lehman Brothers Intermediate Aggregate U.S. Index was not representative of the composition of the Intermediate Fund's portfolio, the extent

to which the Fund's performance deviated from the Lehman index meant that the Fund's performance could not reasonably be compared to the Lehman index, and the use of such index falsely portrayed the Fund's safety (paragraph 308);

(x)     Because of the Intermediate Fund's heavy concentration in such financial instruments, the Fund was not comparable to other intermediate bond funds (paragraphs 127, 146, 149-50, 154, 159-60, 233, 308, 312-13, 318(d), 399);

(y)     Regarding the Intermediate Fund's semi-annual disclosures of the extent to which the Fund was exposed to the risks of rising interest rates and borrowers that do not repay their loans, the failure to disclose the extraordinary unrelated concentration, credit, liquidity and valuation risks inherent in the Fund's heavy investments in thinly traded, complex asset- and mortgage-backed securities of uncertain valuation (paragraphs 161-266);

(z)     The Intermediate Bond Fund was run by a portfolio manager, Defendant Kelsoe, who applied investment strategies that were unorthodox and far more risky than strategies by even high-yield funds;

(aa)    The risks identified in paragraphs 197, 226, 258, 332-40.

### 3.     Short Term Fund

376.     In connection with the offer and sale of the Short Term Fund's shares, during the Class Period and the offer to redeem said Fund's shares during the Class Period, the Defendants made the following representations in the Fund's registration statements or amendments thereto, including prospectuses and statements of additional information and in annual and semi-annual reports and other documents filed with the SEC during all times relevant herein and in sales materials and other sources of information for which the RMK Defendants and Defendant Company/Funds were responsible:

(a)     The Short Term Fund was a "fund for investors who seek a high level of current income consistent with the preservation of capital" (*see*, e.g., Fund's pro-

219

spectuses dated November 1, 2005 and November 1, 2006);

(b)     The Short Term Fund's investment objective was "a high level of current income consistent with preservation of capital" (*see*, e.g., annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007);

(c)     The Short Term Fund would invest primarily in "one of the four highest categories" of investment grade bonds (*see*, e.g., Fund's prospectuses dated November 1, 2005 and November 1, 2006; sales materials dated June 30, 2007 and September 30, 2007);

(d)     The Short Term Fund's portfolio would "normally maintain a dollar-weighted average portfolio maturity of three years or less" in order to "moderate principal fluctuations" and "thus, provide a more stable net asset value" (*see*, e.g., Fund's prospectuses dated November 1, 2005 and November 1, 2006; sales materials dated June 30, 2007 and September 30, 2007);

(e)     The Short Term Fund represented in November 2005 that it "as a matter of non-fundamental operating policy, currently does not intend to invest in [restricted] securities in the coming year" (*see*, e.g., Fund's SAI dated November 1, 2005, ¶ 163);

(f)     The Short Term Fund, represented in November 2006, that it "will not purchase securities for which there is no readily available market . . . . , if immediately after and as a result, the value of such securities would exceed, in the aggregate, 15% of the fund's net assets" (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 161-63, 165, 168, 171-77, 183);

(g)     The Short Term Fund provides a "higher level of current income than typical CDs, savings accounts, or money market investments" (*see*, e.g., sales materials

220

dated June 30, 2007 and September 30, 2007);

(h)    The Short Term Fund provides a "greater stability in principal value than that of longer term bonds or bond fund" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007);

(i)    The Short Term Fund provides a "diversified portfolio of short-term investment-grade debt securities" (*see*, e.g., sales materials dated June 30, 2007 and September 30, 2007);

(j)    In connection with representing that the "single best way to reduce the risk of any portfolio is through adequate diversification," the Short Term Fund further represented that it "is diversified not only with regard to issuer, but also industry, security type and maturity" (*see*, e.g., sales materials dated September 30, 2007);

(k)    The Short Term Fund could not invest more than 25% of its net worth in a single industry (*see*, e.g., Statements of Additional Information dated November 1, 2005 and November 1, 2006, ¶¶ 276-77, 279, 282-83);

(l)    The periodically disclosed asset allocations (*see*, e.g., the Fund's annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007; sales materials dated June 30, 2007);

(m)    The Short Term Fund's published NAVs were a reliable measure of the value of the Fund's net assets (inferred from, *inter alia*, the Fund's audited financial statements in its annual and semi-annual reports for June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, including PwC's audit report on the annual financial statements therein and the financial highlights published in the prospectuses dated November 1, 2004, 2005 and 2006);

(n)    The Short Term Fund's performance could reasonably be compared to the Leh-

man Brothers 1-3 Year U.S. Government/Credit Index, implying the risk of the Short Term Fund was approximately that of the Lehman index and that the Fund's portfolio composition and relative safety was approximately that of the Lehman index (*see*, e.g., the Fund's annual and semi-annual reports dated June 30, 2005, December 31, 2005, June 30, 2006, December 31, 2006, and June 30, 2007, and prospectuses dated November 1, 2004, 2005 and 2006);

(o)   The Short Term Fund disclosed in its annual and semi-annual reports as of the following dates the following data regarding the market, credit and interest rate risks of its portfolio:

(1)   June 30, 2007:

- Average credit quality: A+
- Duration: 1.86 years
- Average effective maturity: 2.48 years
- 87% of portfolio invested in securities rated investment-grade plus 7% in unrated securities; only 5.6% rated below-investment-grade

(2)   December 31, 2006:

- Average credit quality: AA
- Duration: 1.76 years
- Average effective maturity: 2.35 years
- 83% of portfolio invested in securities rated investment-grade plus 4% in unrated securities; only 13% rated below-investment-grade

(3)   June 30, 2006:

- Average credit quality: A
- Duration: 1.47 years
- Average effective maturity: 1.96 years
- 73% of portfolio invested in securities rated investment-grade plus

222

5.7% in unrated securities; only 21.7% rated below-investment-grade

    (4)   December 31, 2005:

- Average credit quality: A

- Duration: 1.6 years

- Average effective maturity: 2.14 years

- 82% of portfolio invested in securities rated investment-grade plus 3.4% in unrated securities; only 17.5% rated below-investment-grade

    (5)   June 30, 2005:

- Average credit quality: A

- Duration: 1.64 years

- Average effective maturity: 2.2 years

- Percentage of portfolio invested in securities rated investment-grade, unrated, or below-investment-grade not disclosed in summary form as above.

377.    The representations and disclosures in the preceding paragraph were false and misleading in that they painted a picture of the Short Term Fund as a safe fund with a stable net asset value, without the slightest hint of the Fund's extraordinary (as compared with all other short-term bond funds) exposure to the undisclosed concentration, credit, liquidity and valuation risks lurking in the Fund's portfolio as a result of the Fund investing a far larger portion of its assets than did its peers in complex, thinly traded structured financial instruments of uncertain valuation that could, and did, suddenly become unsalable at their estimated values upon changing market sentiments, resulting in extraordinary losses (for a short-term bond fund), and were otherwise false and misleading for failing to disclose the following material facts that Defendants knew, should have known, or were reckless in not knowing:

(a)     The Short Term Fund was not a "fund for investors who seek a high level of current income consistent with the preservation of capital" because of its extraordinarily heavy investments (for a short-term bond fund) in complex, thinly traded structured financial instruments of uncertain valuation (paragraphs 161-91, 194-203, 205, 207-10, 222, 226);

(b)     The Short Term Fund was not managed in accordance with its investment objective of "a high level of current income consistent with preservation of capital" but instead focused solely on high current income without regard to, and in fact sacrificed, preservation of capital to achieve income modestly higher than other short-term funds (paragraphs 145, 146, 102, 103, 108-10, 249-56, 267-72, 287);

(c)     The Short Term Fund invested heavily (for a short-term bond fund) in thinly traded asset- and mortgage-backed securities and other structured financial instruments that held undisclosed concentration, credit, liquidity and valuation risks that materialized in 2007 to cause the Fund's extraordinary (for a short-term bond fund) loss in NAV (paragraphs 127, 146, 151-52, 158-60, 183, 185-87, 190, 196-200, 209-10, 233, 249-62, 309-10, 318(d));

(d)     The Short Term Fund did not maintain a portfolio that "moderate[d] principal fluctuations" and thus, did not "provide a more stable net asset value" because the duration/maturity of its portfolio did not protect it against the concentration, credit, liquidity and valuation risks imbedded in the thinly traded, complex structured financial instruments of uncertain valuation, which risks materialized in 2007 to cause the Fund's extraordinary (for a short-term bond fund) loss in NAV (paragraphs 127, 146, 151-52, 158-60, 183, 185-87, 190, 196-200, 209-10, 232-33, 249-62, 267-72, 310, 318(d));

(e)     Contrary to its representation in November 2005 that the Short Term Fund "cur-

rently does not intend to invest in [restricted] securities in the coming year," the Fund did make such investments in substantial amounts without disclosing its change of intent (paragraphs 183, 185-87, 190, 196-200, 209-10);

(f)     Contrary to its representation in November 2006, that it "will not purchase securities for which there is no readily available market . . ., if immediately after and as a result, the value of such securities would exceed, in the aggregate, 15% of the fund's net assets," the Short Term Fund made substantial investments in securities for which there was no readily available market and purchased such investments when, after the purchase thereof, the Fund held securities with an aggregate value substantially exceeding 15% of the Fund's net assets, without disclosing its violation of the 15% limitation (paragraphs 183, 185-87, 190, 194, 196-200, 209-10);

(g)     Regarding the Short Term Fund's representation that it provided a "higher level of current income than typical CDs, savings accounts, or money market investments," Defendants inferred that the Short Term Fund provided safety that was comparable to that of such universally recognized safe investments and failed to disclose that its pursuit of such "higher current income" meant heavily investing in thinly traded, exotic structured financial instruments of uncertain valuation (paragraphs 145, 146, 102, 103, 108-10, 222, 226, 249-56, 287);

(h)     Regarding the Short Term Fund's representation that it provided "greater stability in principal value than that of longer term bonds or bond fund," the Fund did not provide such stability, and the Fund failed to disclose that the Fund was, as compared with all other bond funds regardless of maturity/duration, exposed to the extraordinary concentration, liquidity and valuation risks inherent in heavily investing (for a short-term bond fund) in thinly traded, exotic structured financial instruments of uncertain valuation (paragraphs 127, 146,

225

151-52, 158-60, 183, 185-87, 190, 196-200, 209-10, 222, 226, 232-33, 249-62, 267-72, 310, 317(d));;

(i)    Regarding the Short Term Fund's representation that it provided a "diversified portfolio of short-term investment-grade debt securities," the Fund did not provide a diversified portfolio but, instead, heavily concentrated in mortgage-related securities, exceeding its disclosed 25% limit on investments in a single industry (paragraphs 233, 273-92) ;

(j)    Regarding the Short Term Fund's representation that it "is diversified not only with regard to issuer, but also industry, security type and maturity," the Fund was not diversified as to industry or "security type," and Defendants failed to disclose the concentration (for a short-term bond fund) of credit risk and extraordinarily heavy investments (for a short-term bond fund)  in thinly traded, exotic structured financial instruments of uncertain valuation (paragraphs 183, 185-87, 190, 196-200, 209-10, 232, 222, 226, 248-66, 273-92);

(k)    ""Regarding the Short Term Fund's representation that it was subject to a fundamental restriction that prohibited it from investing more than 25% of its net worth in a single industry, it failed to adhere to this restriction and failed to disclose the Fund's noncompliance with this fundamental investment restriction (paragraphs 271-76, 280, 282);

(l)    The Fund's periodically disclosed asset allocations understated the extent to which the Short Term Fund was invested in mortgage-related securities or in a single industry and did not disclose that such concentrations violated the 25% limits on investments in a single industry (paragraphs 273-83);

(m)    Regarding the Short Term Fund's semi-annual disclosures of the extent to which the Fund was exposed to the risks of rising interest rates and borrowers that do not repay their loans, the failure to disclose the extraordinary (for a

short-term bond fund) unrelated concentration, credit, liquidity and valuation risks inherent in the Fund's heavy investments in thinly traded, complex, asset- and mortgage-backed securities of uncertain valuation (paragraphs 161-266);

(n)    The Short Term Fund's reported NAVs were not a reliable measure of the value of the Fund's net assets but were merely estimates subject to sudden and precipitous reductions because an undisclosed large portion of the Fund's investments was in securities for which market quotations were not readily available and whose values had therefore to be estimated based on an undisclosed variety of factors that, if disclosed, would have revealed how judgmental, subjective and uncertain were the estimated values at which these assets were being carried on the Fund's books and records and reported to the Fund's shareholders (paragraphs 183-91, 197-246, 493, 567-75);

(o)    Because the Lehman Brothers 1-3 Year U.S. Government/Credit Index was not representative of the composition of the Short Term Fund's portfolio, the extent to which the Fund's performance deviated from the Lehman index meant that the Fund's performance could not reasonably be compared to the Lehman index and the use of such index falsely portrayed the Fund's safety (paragraphs 161-305, 308, 311, 395(h), 399);

(p)    The Short Term Fund was run by a portfolio manager, Defendant Kelsoe, who applied investment strategies that were unorthodox and far more risky than strategies by even high-yield funds;

(q)    The risks identified in paragraphs 197, 226, 258, 332-40.

**4.    The Funds' Prospectuses Omitted Additional Material Facts**

378.    In addition to the omissions from the Funds' prospectuses described in paragraphs 197- 199, 222, 226, 258, 338, 361-62, 364, and 367 above, the Company's prospectuses, which were distributed to the Funds' existing and prospective shareholders, did not dis-

close with respect to one or more of the three Funds the following material facts that Defendants knew, should have known, or were reckless in not knowing:

(a)     The Short Term Fund's existing comparatively heavy investment for a fund of its type in asset- and mortgage-backed securities and in the lower-ranking tranches thereof, and intent to continue such comparatively heavy investments, and the risks attendant to such an investment strategy (paragraphs 161-305);

(b)     The High Income and Intermediate Funds' existing heavy investment, and intent to continue to heavily invest, in asset- and mortgage-backed securities and in the lower-ranking tranches thereof and the risks attendant to such an investment strategy (*Id.*);

(c)     The proportion of the Funds' respective portfolios invested in asset- and mortgage-backed securities and that such proportions were substantially in excess of peer funds (paragraphs 284-92, 308).

(d)     Any disclosure of the risks of investing in subordinated securities, in which the Funds heavily invested; a generalized description of some of these risks appeared in the Funds' SAI, which was sent to a shareholder only upon request and which was incomplete and misleading for the reasons set forth in paragraphs 381-82 *infra*;

(e)     Any disclosure of the risks of investing in illiquid securities, in which the Funds heavily invested; a generalized description of some of these risks appeared in the Funds' SAI, which was sent to a shareholder only upon request and which was incomplete and misleading for the reasons set forth in paragraphs 383-85 *infra*.

**5.      The Funds' Misleading Statements of Additional Information**

379.     An SAI, which is sent to a mutual fund's shareholders only upon request, is not a prospectus, which is automatically sent to a mutual fund's shareholders.

228

(a)    Part A of a registered investment company's registration statement on SEC Form N-1A is the prospectus, which includes the information required under section 10(a) of the Securities Act of 1933. The prospectus provides essential information about the fund in a way that will help investors make informed decisions about whether to purchase the fund's shares described in the prospectus.

(b)    The SEC instructs registrants, in responding to the Items in Part A of Form N-1A, to avoid cross-references to the SAI or shareholder reports.

(c)    Part B includes the information required in a fund's SAI. The purpose of the SAI is to provide additional information about the fund that the SEC has concluded is not necessary or appropriate in the public interest or for the protection of investors to be in the prospectus, but that some investors may find useful.

(d)    Part B affords the fund an opportunity to expand discussions of the matters described in the prospectus by including additional information that the fund believes may be of interest to some investors.

380.   Defendants made incomplete, limited and misleading disclosures in the Funds' SAIs of the liquidity and other risks regarding the *below-investment grade securities* in which the Funds invested, *but not the asset- and mortgage-backed securities and other structured financial instruments* in which the Funds *heavily invested*, and which, unlike the below investment-grade securities in which the Funds' invested, accounted for most of the Funds' losses (paragraphs 308-16). Such partial, limited and misleading disclosures were irrelevant to the real risks of investing in the Funds and misleading because Defendants did not disclose in the Funds' prospectuses, SAIs or selling materials that the asset- and mortgage-backed securities and other structured financial instruments in which the Funds heavily invested were likewise:

(a)    Subject to such risks, including liquidity and additional risks (paragraphs 161-

229

305);

(b)    Subject to the risk that such instruments are subject to adverse publicity and changing investor perceptions and sentiments that are likely to affect the liquidity of such instruments and the ability of pricing services or the Funds' management to value such securities (paragraphs 197, 222, 226);

(c)    Traded in a market that is much thinner and less active than that for more conventional fixed income securities, which can adversely affect the prices of such instruments (paragraphs 161-247);

(d)    Because market quotations were not readily available for most, if not all, of such securities, subject to "fair value" procedures and involved judgment and significant uncertainty, rendering the Funds' respective NAVs highly uncertain (paragraphs 197-99, 222, 226);

(e)    Illiquid or exhibited the characteristics of illiquid securities that could suddenly become, and had a history of suddenly becoming, unsalable at their estimated values before the Funds could sell them at the estimated prices at which they were being carried on the Funds' records (paragraphs 161-215);

(f)    Subject to the value thereof suddenly, and without warning, dropping precipitously, because significantly over half of the High Income and Intermediate Funds' and up to half or more of the Short Term Fund's respective portfolios consisted of securities that exhibited such characteristics (*Id.*);

(g)    Investments in a single industry in excess of the 25% limit on such investments (paragraphs 233, 273-83); and

(h)    Subject to the concentration of credit risk (paragraphs 233, 248-66, 273-83).

381.    In the Funds' November 1, 2006 SAI, but not in the Funds' prospectuses or sales materials, the RMK Defendants described in limited and generalized terms some, but not all, of the risks inherent in "subordinated" securities without regard to making reference to the

230

specific securities held by the Funds, notwithstanding that Defendants knew, should have known, or were reckless in not knowing such risks:

> INVESTMENTS IN SUBORDINATED SECURITIES. Each fund may invest in subordinated classes of senior-subordinated securities ("Subordinated Securities"). Subordinated Securities have no governmental guarantee, and are subordinated in some manner as to the payment of principal and/or interest to the holders of more senior mortgage-backed or asset-backed securities arising out of the same pool of assets. The holders of Subordinated Securities typically are compensated with a higher stated yield than are the holders of more senior securities. On the other hand, Subordinated Securities typically subject the holder to greater risk than senior securities and tend to be rated in a lower rating category (frequently a substantially lower rating category) than the senior securities issued in respect of the same pool of assets. Subordinated Securities generally are likely to be more sensitive to changes in prepayment and interest rates, and the market for such securities may be less liquid than is the case for traditional fixed-income securities and senior mortgage-backed or asset-backed securities.

382.     Materially omitted from Defendants' SAI description of "subordinated" securities in the preceding paragraph, which information did not appear in the Funds' prospectuses or selling materials, were the following facts and conditions of the Funds' portfolios that Defendants knew, should have known, or were reckless in not knowing:

(a)     The magnitude of the Funds' investments in subordinated securities (paragraphs 198, 284-92, 308);

(b)     Because of their illiquidity and history of suddenly becoming unsalable at their estimated values and the magnitude of the Funds' holdings of such securities, the Funds' investments in subordinated securities exceeded the Funds' 15% restriction on illiquid securities (paragraphs 161-215);

(c)     Because the subordinated securities in which the Funds and their sibling RMK closed-end funds invested were illiquid, the substantial liquidity risk inherent in such securities (paragraph 385 *infra*);

(d)     The Funds' investments in subordinated securities exceeded the 25% limit on

investments in a single industry (paragraphs 198, 273-83, 308);

(e)    The Funds' investments in subordinated securities caused the Funds to take on enormous credit risk (paragraphs 248-66);

(f)    The subordinated securities in which the Funds so heavily invested were subject to the disclosed difficult, subjective and judgmental valuation process that was inherently uncertain (paragraphs 216-47);

(g)    The resulting uncertainty of the Funds' NAV in light of the extraordinarily large proportions of the Funds' respective portfolios invested in subordinated securities that were subject to the valuation uncertainty inherent in the process of valuing such securities (*Id.*);

(h)    The disclosure deficiencies and undisclosed material facts regarding the Funds' valuation disclosures described in paragraphs 222 and 226 above;

(i)    The liquidity risks identified in paragraph 197 above.

383.    In the Funds' November 1, 2006 SAI, but not in the Funds' prospectuses or sales materials, the RMK Defendants described in limited and generalized terms some, but not all, of the risks created by illiquid securities without regard to making reference to the specific types of securities held by the Funds, notwithstanding that Defendants knew, should have known, or were reckless in not knowing such risks:

**Illiquid and Restricted Securities (All Funds).** Illiquid investments are investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued. Under the supervision of the Board, the Adviser determines the liquidity of each fund's investments and, through reports from the Adviser, the Board monitors investments in illiquid instruments. In determining the liquidity of each fund's investments, the Adviser may consider various factors, including (1) the frequency of trades and quotations, (2) the number of dealers and prospective purchasers in the marketplace, (3) dealer undertakings to make a market, (4) the nature of the security (including any demand or tender features), and (5) the nature of the marketplace for trades (including the ability to assign or offset the fund's rights and obligations relating to the invest-

ment). Investments currently considered by the Adviser to be illiquid include repurchase agreements not entitling the holder to repayment of principal and payment of interest within seven days, non-government stripped fixed-rate mortgage-backed securities, and OTC options. Also, the Adviser may determine some restricted securities, government-stripped fixed-rate mortgage-backed securities, loans and other direct debt instruments, emerging market securities, and swap agreements to be illiquid. However, with respect to OTC options that the funds write, all or a portion of the value of the underlying instrument may be illiquid depending on the assets held to cover the option and the nature and terms of any agreement the funds may have to close out the option before expiration. In the absence of market quotations, illiquid investments are priced at fair value as determined in good faith by a committee appointed by the Board.

Illiquid securities may be difficult to dispose of at a fair price at the times when either fund believes it is desirable to do so. The market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that each fund pays for or recovers upon the sale of illiquid securities. Illiquid securities are also more difficult to value and thus the Adviser's judgment plays a greater role in the valuation process. Investment of each fund's assets in illiquid securities may restrict each fund's ability to take advantage of market opportunities. The risks associated with illiquid securities may be particularly acute in situations in which each fund's operations require cash and could result in each fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities.

384.    The SAI description of illiquid and restricted securities in the preceding paragraph appears 27 pages after the representation at the very beginning of the SAI that the Funds could not invest more than 15% of their respective net assets in illiquid securities, thereby significantly limiting the risk posed by illiquid securities, assuming that the Funds were managed by the RMK Defendants in adherence to this restriction.

385.    Materially omitted from Defendants' SAI description of illiquid and restricted securities in paragraph 383, which information did not appear in the Funds' prospectuses or selling materials, were the following facts and conditions of the Funds' portfolios that Defendants knew, should have known, or were reckless in not knowing:

233

(a)    The magnitude of the Funds' investments in illiquid securities (paragraphs 161-215);

(b)    The Funds' investments in illiquid securities exceeded the limitation on such investments described 27 pages earlier in the SAI so that the disclosed risk attendant to illiquid securities infected a substantial portion of the Funds' respective portfolios, not just 15%;

(c)    The Funds were heavily invested in illiquid securities or in thinly traded securities that were highly susceptible to suddenly becoming unsalable at their estimated values upon changing sentiments without allowing time to sell them at the prices at which they were being carried on the Funds' records (paragraphs 161-247);

(d)    The proportions of the Funds' respective portfolios that were subject to the disclosed difficult, subjective and judgmental valuation process that was inherently uncertain (paragraphs 183, 216-47);

(e)    The resulting uncertainty of the Funds' NAV in light of the extraordinarily large proportion of the Funds' respective portfolios subject to the valuation uncertainty inherent in the process of valuing illiquid securities (*Id.*);

(f)    The Funds and the RMK closed-end funds managed by Morgan Management were the virtual "market" for these already illiquid securities, and the holdings of such securities by the Funds and their sibling RMK closed-end funds constituted a dominant portion of such outstanding securities, seriously further restricting the Funds' ability to sell such securities (paragraphs 209-12);

(g)    The Funds' and RMK closed-end funds' overlapping holdings of the same illiquid securities provided a strong disincentive against Morgan Management causing the Funds to sell such securities in a forced sale at less than the values at which such securities were being carried, in response to redemptions or other-

wise, because such sales would cause the other Funds and the RMK closed-end funds to mark their holdings of such securities down to the sale price, resulting in the sale of the Funds' most liquid securities and leaving illiquid securities as an ever increasing percentage of the Funds' respective portfolios and reducing the Funds' needed liquidity to meet redemptions (paragraphs 211-12);

(h)     In determining the liquidity or illiquidity of the Funds' investments, Morgan Management regularly ignored the disclosed factors that determine liquidity or illiquidity, representing illiquid securities to be liquid (paragraphs 173-77, 201-202) ;

(i)     The disclosure deficiencies and undisclosed material facts regarding the Funds' valuation disclosures described in paragraphs 222 and 226 above;

(j)     The liquidity risks identified in paragraph 197 above.

## 6.     The Funds' Misleading Safety/Volatility Disclosures

386.     Defendants' misrepresentations regarding the High Income Fund's stable NAV were consistent with and reinforced by the Fund's reported NAV during the Fund's fiscal years ended June 30, 2002 through June 30, 2006, as disclosed in the High Income Fund's prospectuses under "Financial Highlights," during which period the Fund's NAV changed by only $0.14, from $10.42 to $10.56, or 1.33% over the five-year period, or an annual average of only 0.33%, versus $0.46 for the Intermediate Fund, from $9.93 to $10.39, or 4.5% over the same period, and versus $0.30 for the Short-Term Bond Fund, from $9.94 to $10.24, or 2.97% over the same period. Paragraphs 545-47 *infra*.

387.     From the disclosures set forth above, the Fund's historic NAV and the Financial Highlights, a reasonable investor would conclude that the High Income Fund was relatively safe with a stable NAV with no hint of the risk of the extraordinary decline suffered by the High Income Fund. *See* also paragraphs 395-99, 545-47 *infra*.

388.     The High Income Fund's standard deviation and Sharpe ratio falsely portrayed

235

it as the safest of all high-yield funds in 2006 and as a "low risk fund." <

389.     The Intermediate and High Income Funds were only modestly more volatile than a relevant benchmark. Craig McCann, *Regions Morgan Keegan: The Abuse of Structured Finance*, January 31, 2009, p. 4.

390.     Because the total returns of the Short Term and Intermediate Funds during the Class Period prior to their catastrophic losses were not comparable to high-yield funds, there was nothing in those returns to alert investors in those Funds to the extraordinary risk in those Funds. The following table shows the total returns (NAV appreciation/depreciation plus reinvested dividends) of the Short Term and Intermediate Funds (based on Class A shares), based on the Funds' annual reports for the indicated periods:

|  | 10 months | For the Year Ended | | | |
|  | 4/30/08 | 6/30/07 | 6/30/06 | 6/30/05 | 6/30/04 |
| Short Term Fund | -30.03% | 5.36% | 3.85% | 1.21% | 3.02% |
| Intermediate Fund | -76.98% | 2.88% | 5.77% | 6.05% | 4.68% |

391.     Defendants' misrepresentations regarding the Intermediate Fund's relative safety were consistent with and reinforced by the Fund's reported NAV during the Fund's fiscal years ended June 30, 2002 through June 30, 2006, as disclosed in the Intermediate Fund's prospectuses under "Financial Highlights," during which period the Fund's NAV moved within a range of only $0.46 for the Intermediate Fund, from $9.93 to $10.39, or 4.5% over the four-year period, or an annual average of only 1.13%. From the disclosures set forth above, the Fund's historic NAV and the Financial Highlights, a reasonable investor would conclude that the Intermediate Fund was relatively safe with a stable NAV with no hint of the risk of the extraordinary decline suffered by the Intermediate Fund. Company/Funds prospectus dated November 1, 2006, p. 56.

392.     Defendants' misrepresentations regarding the Short Term Fund's relative safety were consistent with and reinforced by the Fund's reported NAV during the Fund's fiscal years ended June 30, 2002 through June 30, 2006, as disclosed in the Short Term Fund's prospec-

tuses under "Financial Highlights," during which period the Fund's NAV moved within a range of only $0.30 for the Short Term Fund, from $9.94 to $10.24, or 2.97% over the four-year period, or an annual average of only 0.74%. From the disclosures set forth above, the Fund's historic NAV and the Financial Highlights, a reasonable investor would conclude that the Short Term Fund was safe with a stable NAV with no hint of the risk of the extraordinary decline suffered by the Short Term Fund. *Id.* at 54.

393.    During the Class Periods, the RMK Defendants, on a website that prominently displayed the Funds' affiliation with Regions and Regions Bank, under the heading "THE RELIABILITY OF INVESTING WISELY," advertised as follows (emphasis supplied):

> "When you invest in RMK Select Funds, *you know exactly where you're going and exactly what you own*. Each Fund has a *well defined*, *'no-surprises'* style of structured, *disciplined decision making*; each portfolio manager is *required* to select only the most promising investments *consistent with that style*."

394.    With respect to the Funds, the representations set forth in the preceding paragraph and paragraphs 130-42), as reinforced by the Funds' respective stable NAVs, were false and misleading in that Defendants knew, should have known, or were reckless in not knowing, but failed to disclose during the Class Period:

(a)    That the Funds' respective performances during said Class Period before the catastrophic decline in their respective NAVs were attributable to taking significant risks not taken by comparable funds (paragraphs 161-328);

(b)    That the Funds' respective performances, as compared with comparable funds, during said Class Period preceding the declines in the Funds' NAVs were attributable to their excessive investments in illiquid securities whose valuations were uncertain and with a history of suddenly becoming unsalable at their estimated valuations paragraphs 145-61, 161-328);

(c)    That the Funds' respective performances, as compared with comparable funds,

during said Class Period preceding the declines in the Funds' NAVs were attributable to their excessive investments in illiquid securities in violation of their disclosed limitation on such investments (paragraphs 145-61, 161-214);

(d)    That the valuation of an undisclosed but substantial portion of the Funds' respective portfolio securities, and therefore their respective NAVs, was based on mere estimates and, therefore, was subject to substantial uncertainty, rendering their respective NAVs highly uncertain (paragraphs 216-47);

(e)    That, because of their excessive investments in illiquid securities with a history of suddenly becoming unsalable at their uncertain estimated values,

(1)    the Funds' respective advertised NAVs were vulnerable to a precipitous decline as a result of adjusting the Funds' valuations to reflect sudden changes in the market conditions relating to such securities and the Funds' inability to sell such securities to raise needed cash (paragraphs 161-215, 306-28);

(2)    an investment in the Funds was subject to significantly greater risk than an investment in comparable short-term, intermediate-term or high income bond mutual funds (paragraphs 161-328);

(3)    the RMK Defendants had no reasonable basis for their representations that they believed that limited NAV fluctuation or a stable NAV could be achieved (*Id.*);

(f)    The extent to which the Funds' respective yields and income and source of dividends during all times relevant herein, as compared with comparable mutual funds, were dependent on

(1)    the Funds' excessive investments in illiquid securities whose estimated valuations were uncertain and that were known by Defendants to be vulnerable to suddenly becoming unsalable upon changing market sen-

238

timents or perceptions of the investment merit of such securities (paragraphs 161-247); and

(2) investment policies and practices that were inconsistent with limited NAV fluctuation, stable NAV and/or preservation of capital and that subjected shareholders in the Funds to risk and volatility substantially greater than those of comparable bond mutual funds (paragraphs 113-60, 306-28).

395. The Defendant Company/Funds' generalized and incomplete risk disclosures in their prospectuses, annual and semi-annual reports, and elsewhere, which were substantially uniform throughout all times relevant herein, were negated and rendered immaterial:

(a) With respect to all three Funds, by the specific disclosures relating to

- stable NAVs (paragraphs 267-68, 270-71, 386-90, 545-47);
- "lower NAV volatility than typical high-yield funds" (paragraph 129);
- "conservative credit posture" (paragraph 130);
- avoiding "excessive credit risk" (paragraph 130);
- diversification by investing in assets other than below investment-grade bonds (including the structured financial instruments that were a significant cause of the Funds' losses) (paragraphs 130-31, 134, 138, 267),
- "solid credit fundamentals" (paragraphs 134, 138);

(b) With respect to the Intermediate Fund,

- avoiding "speculative derivatives" (paragraphs 132, 134);"
- the Intermediate Fund was for investors whose "investment objective is preservation of capital" and offered "greater stability in principal value than that of long-term bonds" (paragraphs 131, 138); and,

(c) With respect to the Short Term Fund,

- the Fund's investment objective was preservation of capital (paragraphs

239

136, 138);

- the Fund would invest in a portfolio of investment-grade securities with an average maturity of three years or less (paragraph 138);

(d) By the financial performance of the Funds as reflected in their historic stable NAVs until July through November 2007 and as reflected in the "Financial Highlights" disclosed in the Fund's prospectuses (paragraphs 386-92, 545-47);

(e) As a result of the Funds' failures to disclose in their respective financial statements, or the footnotes thereto, the valuation uncertainty inherent in the Funds' respective NAVs and/or the magnitude of fair-valued securities and the effect on the Funds' NAV of a hypothetical change in the estimated values of such securities and the likelihood of such change (paragraphs 216-47);

(f) By comparing the Funds' respective performances with short-term, intermediate-term and high income bond indices (paragraph 399);

(g) By the RMK Defendants repeatedly comparing the Funds' respective performances with, respectively, Lehman Brothers 1-3 Year U. S. Government/Credit Index, the Lehman Brothers Intermediate U.S. Aggregate Index and the Lehman Brothers Ba U.S. High Yield Index, implying that the Funds were comparable in risk to such indices, without disclosing the unique risks embedded in, and portfolio composition of, the Funds that differentiated the Funds from their respective indices, as set forth above (paragraph 317); and

(h) With respect to the Funds' disclosure in their common prospectus of what they called the "principal risks" to which the RMK Defendants said the Funds were subject, neither valuation uncertainty nor liquidity risk was included in these "principal risks" (paragraph 405, Appendix A)

396. The Funds reported their results semi-annually, on June 30 and December 31.

397. There was nothing in the performances of the three Funds, as measured by their

respective total returns (realized and unrealized gains and losses plus investment income), during the period preceding October 3, 2007, when the Funds' 2007 financial statements were finally released, to prepare, or forewarn, investors in those Funds of the potential for the catastrophic losses that was first reported on October 3, 2007.

398.   Even when the Funds tardily reported their operating results on October 3, 2007, for their fiscal year ended June 30, 2007, the three Funds were down only modestly, according to what they reported on that date.  It was not until the Funds' semi-annual report for the six months ended December 31, 2007 was released on February 22, 2008, that the scope of the catastrophic losses was reported to the Funds' shareholders.

399.   Based on the Company/Funds's annual and semi-annual reports for the periods shown, the following table sets out the performances of the three Funds, as measured by their respective total returns, during the period relevant herein:

| High   Income   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| **AS OF DECEMBER 31, 2007** | | | | |
| CLASS A SHARES | -59.48% | -60.71% | -8.92% | 0.24% |
| (EXCLUDING SALES LOAD) | -58.44% | -59.70% | -8.46% | 0.53% |
| CLASS C SHARES | -58.97% | -60.31% | -8.92% | 0.02% |
| (EXCLUDING CDSC) | -58.56% | -59.91% | -8.92% | 0.02% |
| CLASS I SHARES | -58.39% | -59.60% | -8.23% | 0.77% |
| LEHMAN BROTHERS BA U.S. HIGH YIELD INDEX | 0.53% | 1.75% | 8.66% | — |
| | | | | |
| **AS OF JUNE 30, 2007** | | | | |
| CLASS A SHARES | -5.46% | -0.58% | 9.59% | 11.46% |
| (EXCLUDING SALES LOAD) | -3.04% | 1.97% | 10.15% | 11.81% |
| CLASS C SHARES | -4.24% | 0.44% | 9.60% | 11.25% |
| (EXCLUDING CDSC) | -3.28% | 1.46% | 9.60% | 11.25% |
| CLASS I SHARES | -2.92% | 2.22% | 10.42% | 12.08% |
| LEHMAN BROTHERS BA U.S. HIGH YIELD INDEX | 1.21% | 9.36% | 9.01% | N/A |
| | | | | |
| **AS OF DECEMBER 31, 2006** | | | | |
| CLASS A SHARES | 2.53% | 8.33% | 11.58% | 12.68% |
| (EXCLUDING SALES LOAD) | 5.16% | 11.11% | 12.15% | 13.05% |
| CLASS C SHARES | 3.85% | 9.45% | 11.59% | 12.49% |
| (EXCLUDING CDSC) | 4.90% | 10.55% | 11.59% | 12.49% |
| CLASS I SHARES | 5.29% | 11.38% | 12.42% | 13.32% |
| LEHMAN BROTHERS BA U.S. HIGH YIELD INDEX | 8.06% | 10.07% | 7.89% | N/A |
| | | | | |

| High   Income   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| **AS OF JUNE 30, 2006** | | | | |
| Class A Shares | 3.01% | 7.38% | 11.98% | 12.84% |
| (excluding sales load) | 5.65% | 10.13% | 12.55% | 13.23% |
| Class C Shares | 4.34% | 8.48% | 11.99% | 12.67% |
| (excluding cdsc) | 5.39% | 9.58% | 11.99% | 12.67% |
| Class I Shares | 5.78% | 10.40% | 12.82% | 13.50% |
| Lehman Brothers Ba U.S. High Yield Index | 1.86% | 2.47% | 6.94% | N/A |
| | | | | |
| **AS OF DECEMBER 31, 2005** | | | | |
| Class A Shares | 1.63% | 4.98% | 12.88% | 12.92% |
| (excluding sales load) | 4.24% | 7.67% | 13.45% | 13.34% |
| Class C Shares | 2.93% | 5.96% | 12.89% | 12.78% |
| (excluding cdsc) | 3.97% | 7.03% | 12.89% | 12.78% |
| Class I Shares | 4.36% | 7.83% | 13.73% | 13.61% |
| Lehman Brothers Ba U.S. High Yield Index | 0.06% | 2.88% | 8.25% | 6.82% |
| | | | | |
| **AS OF JUNE 30, 2005** | | | | |
| Class A Shares | N/A | 9.51% | 13.90% | 13.28% |
| (excluding sales load) | N/A | 12.32% | 14.47% | 13.74% |
| Class C Shares | N/A | 10.54% | 13.91% | 13.17% |
| (excluding cdsc) | N/A | 11.65% | 13.91% | 13.17% |
| Class I Shares | N/A | 12.48% | 14.76% | 14.01% |
| Lehman Brothers Ba U.S. High Yield Index | N/A | 10.83% | 8.79% | 7.28% |
| | | | | |
| **AS OF DECEMBER 31, 2004** | | | | |
| Class A Shares | 8.73% | 16.08% | 15.36% | 14.36% |
| (excluding sales load) | | | | |
| Class C Shares | 8.46% | 15.50% | 14.82% | 13.81% |
| (excluding cdsc) | | | | |
| Class I Shares | 8.86% | 16.36% | 15.67% | 14.65% |
| Lehman Brothers Ba U.S. High Yield Index | 8.36% | 9.61% | 8.49% | 7.50% |

| Intermediate   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| **AS OF DECEMBER 31, 2007** | | | | |
| CLASS A SHARES | -50.59% | -51.32% | -8.98% | -1.62% |
| (EXCLUDING SALES LOAD) | -49.58% | -50.33% | -8.62% | -1.40% |
| CLASS C SHARES | -50.23% | -51.06% | -8.95% | -1.76% |
| (EXCLUDING CDSC) | -49.73% | -50.56% | -8.95% | -1.76% |
| CLASS I SHARES | -49.40% | -50.09% | -8.35% | -1.13% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | 5.73% | 7.02% | 4.22% | — |
| | | | | |

| Intermediate   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| **AS OF JUNE 30, 2007** | | | | |
| CLASS A SHARES | -3.46% | 0.82% | 5.42% | 6.75% |
| (EXCLUDING SALES LOAD) | -1.48% | 2.88% | 5.85% | 7.01% |
| CLASS C SHARES | -2.64% | 1.40% | 5.44% | 6.63% |
| (EXCLUDING CDSC) | -1.66% | 2.42% | 5.44% | 6.63% |
| CLASS I SHARES | 1.37% | 3.03% | 6.09% | 7.28% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | 1.22% | 5.99% | 4.15% | N/A |
| **AS OF DECEMBER 31, 2006** | | | | |
| CLASS A SHARES | 2.34% | 5.02% | 6.36% | 7.40% |
| (EXCLUDING SALES LOAD) | 4.43% | 7.16% | 6.79% | 7.68% |
| CLASS C SHARES | 3.11% | 5.73% | 6.41% | 7.29% |
| (EXCLUDING CDSC) | 4.15% | 6.79% | 6.41% | 7.29% |
| CLASS I SHARES | 4.46% | 7.43% | 7.06% | 7.95% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | 4.72% | 4.58% | 4.70% | N/A |
| **AS OF JUNE 30, 2006** | | | | |
| CLASS A SHARES | 0.56% | 3.66% | 6.77% | 7.29% |
| (EXCLUDING SALES LOAD) | 2.61% | 5.77% | 7.20% | 7.59% |
| CLASS C SHARES | 1.52% | 4.46% | 6.83% | 7.22% |
| (EXCLUDING CDSC) | 2.54% | 5.51% | 6.83% | 7.22% |
| CLASS I SHARES | 2.84% | 6.14% | 7.48% | 7.87% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | -0.13% | 0.02% | 4.66% | N/A |
| **AS OF DECEMBER 31, 2005** | | | | |
| CLASS A SHARES | 1.02% | 3.13% | 7.27% | 7.43% |
| (EXCLUDING SALES LOAD) | 3.08% | 5.23% | 7.71% | 7.75% |
| CLASS C SHARES | 1.87% | 3.82% | 7.31% | 7.37% |
| (EXCLUDING CDSC) | 2.90% | 4.87% | 7.31% | 7.37% |
| CLASS I SHARES | 3.21% | 5.49% | 7.95% | 8.02% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | 0.16% | 2.01% | 5.50% | 5.72% |
| **AS OF JUNE 30, 2005** | | | | |
| CLASS A SHARES | N/A | 3.93% | 8.22% | 7.54% |
| (EXCLUDING SALES LOAD) | N/A | 6.05% | 8.65% | 7.88% |
| CLASS C SHARES | N/A | 4.53% | 8.26% | 7.49% |
| (EXCLUDING CDSC) | N/A | 5.58% | 8.26% | 7.49% |
| CLASS I SHARES | N/A | 6.21% | 8.92% | 8.15% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | N/A | 5.40% | 6.90% | 6.16% |
| **AS OF DECEMBER 31, 2004** | | | | |
| CLASS A SHARES | 3.88% | 7.00% | 9.15% | 8.20% |
| (EXCLUDING SALES LOAD) | N/A | N/A | N/A | N/A |
| CLASS C SHARES | 3.60% | 6.63% | 8.75% | 7.81% |
| (EXCLUDING CDSC) | N/A | N/A | N/A | N/A |

| Intermediate   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| CLASS I SHARES | 3.91% | 7.26% | 9.42% | 8.47% |
| LEHMAN BROTHERS INTERMEDIATE U.S. AGGREGATE INDEX | 3.49% | 3.74% | 7.23% | 6.36% |

| Short   Term   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| **AS OF DECEMBER 31, 2007** | | | | |
| CLASS A SHARES | -14.34% | -12.90% | 0.12% | 1.39% |
| (EXCLUDING SALES LOAD) | -13.03% | -11.57% | 0.42% | 1.61% |
| CLASS C SHARES | -14.03% | -12.75% | N/A | -3.06% |
| (EXCLUDING CDSC) | -13.16% | -11.87% | N/A | -3.06% |
| CLASS I SHARES | -12.82% | -11.25% | 0.72% | 1.96% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 4.57% | 6.83% | 3.38% | — |
| | | | | |
| **AS OF JUNE 30, 2007** | | | | |
| CLASS A SHARES | 0.15% | 3.78% | 4.06% | 3.77% |
| (EXCLUDING SALES LOAD) | 1.68% | 5.36% | 4.38% | 4.02% |
| CLASS C SHARES | 0.47% | 4.01% | N/A | 4.58% |
| (EXCLUDING CDSC) | 1.48% | 5.06% | N/A | 4.58% |
| CLASS I SHARES | 1.80% | 5.62% | 4.64% | 4.30% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 2.16% | 5.34% | 3.19% | N/A |
| | | | | |
| **AS OF DECEMBER 31, 2006** | | | | |
| CLASS A SHARES | 2.07% | 4.36% | 3.65% | 3.80% |
| (EXCLUDING SALES LOAD) | 3.62% | 5.95% | 3.96% | 4.07% |
| CLASS C SHARES | 2.49% | 4.49% | N/A | 5.25% |
| (EXCLUDING CDSC) | 3.53% | 5.54% | N/A | 5.25% |
| CLASS I SHARES | 3.75% | 6.11% | 4.25% | 4.35% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 3.11% | 4.25% | 3.27% | N/A |
| | | | | |
| **AS OF JUNE 30, 2006** | | | | |
| CLASS A SHARES | 0.71% | 2.29% | 3.48% | 3.47% |
| (EXCLUDING SALES LOAD) | 2.25% | 3.85% | 3.79% | 3.77% |
| CLASS C SHARES | 0.93% | N/A | N/A | 1.47% |
| (EXCLUDING CDSC) | 1.95% | N/A | N/A | 2.50% |
| CLASS I SHARES | 2.27% | 4.12% | 4.06% | 4.05% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 1.11% | 1.92% | 3.50% | N/A |
| | | | | |
| **AS OF DECEMBER 31, 2005** | | | | |
| CLASS A SHARES | 0.05% | 1.04% | N/A | 3.36% |
| (EXCLUDING SALES LOAD) | 1.57% | 2.58% | N/A | 3.68% |
| CLASS C SHARES | N/A | N/A | N/A | -0.46% |
| (EXCLUDING CDSC) | N/A | N/A | N/A | 0.54% |
| CLASS I SHARES | 1.81% | 2.95% | N/A | 4.00% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 0.81% | 1.77% | N/A | N/A |

| Short   Term   Fund | | | | |
|---|---|---|---|---|
| | SIX MONTHS | 1 YEAR | 5 YEAR | COMMENCE-MENT OF INVESTMENT OPERATIONS |
| | | | | |
| **AS OF JUNE 30, 2005** | 10 months | | | |
| CLASS A SHARES | -0.34% | 1.02% | N/A | 3.44% |
| (EXCLUDING SALES LOAD) | 1.21% | 2.51% | N/A | 3.78% |
| CLASS C SHARES | N/A | N/A | N/A | |
| (EXCLUDING CDSC) | N/A | N/A | N/A | |
| CLASS I SHARES | 1.35% | 2.80% | N/A | 4.04% |
| LEHMAN BROTHERS 1-3 YEAR U.S. GOVERNMENT/CREDIT INDEX | 1.10% | 2.23% | N/A | 4.23% |

400.    In the prospectus dated November 1, 2006 for the High Income Fund, but not for either the Intermediate or Short Term Funds, the RMK Defendants disclosed the following (emphasis supplied):

> The Adviser's "*bottom-up" strategy* focuses on identifying special or unusual opportunities where the Adviser decides that the market perception of, or demand for, a credit or structure has created an undervalued situation. The *analytical process concentrates on credit research, debt instrument structure* and covenant protection. Generally, when investing in below investment grade debt, the Adviser will seek to identify issuers and industries that it believes are likely to experience stable or improving conditions. Specific factors considered in the research process may include general industry trends, *cash flow generation capacity, asset valuation*, other debt maturities, capital availability, *collateral value and priority of payments*.

401.    If Morgan Management had performed the analysis described in the preceding paragraph, the concentrated credit risk inherent in the High Income and Intermediate Funds would have been apparent to Morgan Management. Either Morgan Management did not perform the analysis described in the preceding paragraph, or Morgan Management performed such an analysis but ignored the Funds' respective investment objectives, policies and restrictions in causing the Funds to incur these risks.

**G.    IDENTICAL DISCLOSURES BUT DISPARATE PERFORMANCES; DISPARATE DISCLOSURES BUT IDENTICAL PERFORMANCES: A COMPARISON OF THE PROSPECTUSES FOR THE RMK FIXED INCOME OPEN- AND CLOSED-END FUNDS**

402.    During the Class Period, Morgan Asset Management managed, and Morgan

Keegan underwrote, offered and sold shares in, and administered five open-end and four closed-end fixed income funds, three of which open-end funds are the subject of this litigation:

    (a)    Regions Morgan Keegan Select High Income Fund (open-end fund whose shareholders are included in the Classes);

    (b)    Regions Morgan Keegan Select Intermediate Bond Fund (open-end fund whose shareholders are included in the Classes);

    (c)    Regions Morgan Keegan Select Short Term Bond Fund (open-end fund whose shareholders are included in the Classes);

    (d)    Regions Morgan Keegan Select Fixed Income Fund (open-end fund) ("FIF");

    (e)    Regions Morgan Keegan Select Limited Maturity Fixed Income Fund (open-end fund) ("LMFIF");

    (f)    RMK Advantage Income Fund, Inc. (closed-end fund);

    (g)    RMK High Income Fund, Inc. (closed-end fund);

    (h)    RMK Multi-Sector High Income Fund, Inc. (closed-end fund);

    (i)    RMK Strategic Income Fund, Inc. (closed-end fund).

403.    Three RMK Select open-end funds and all four closed-end funds suffered catastrophic losses as a result of their investment practices during the Class Period, while two other of the RMK Select open-end fixed income funds suffered relatively small losses and performed in a manner consistent with the benchmark deemed relevant by Morgan Asset Management and Morgan Keegan. Appendix A shows the widely disparate performances of the five RMK Select open-end funds.

404.    Nothing in the disclosures of the High Income Fund, Intermediate Fund, Short Term Fund, FIF, or LMFIF suggested that the potential risk of loss in three of these funds was eight to ten times greater than in the other two—i.e., that the risk of potential loss was magnitudes greater in the three than in the other two.

405.    Although the Funds' respective performances were far worse than the perform-

ances of FIF and LMFIF, the prospectus disclosures of the five open-end "bond" funds were substantially identical, as seen from a comparison of the November 1, 2006 and March 30, 2006 prospectus disclosures of all five RMK Select open-end fixed income funds regarding their respective "principal risks." Appendix B (identical or substantively identical language that relates to two or more funds is underlined).

406.    The losses suffered by the High Income Fund were attributable to the heavy concentration in structured financial instruments. Appendix C demonstrates the extent to which the portfolios of the RMK Select High Income, Intermediate and Short Term Funds differed from the portfolios of the RMK Select open-end funds that were not managed by Kelsoe.

407.    Based on the preceding paragraph and Appendix C, the portfolios of the High Income and Intermediate Funds differed significantly from the portfolios of the two RMK Select fixed income open-end funds not managed by Kelsoe, and, accordingly, the resulting performances of the four open-end fixed income funds likewise differed substantially.

408.    Also, but to a lesser extent, the Short Term Fund's portfolio differed from FIF and LMFIF, with the same result that the Short Term Fund suffered a significantly greater loss than did the two RMK open-end fixed income funds that Kelsoe did not manage.

409.    While the Short Term Fund was similar in many respects to FIF and LMFIF, and even less risky in a number of respects (yield, duration, average effective maturity, number of holdings), it differed in one respect: its holdings of asset-backed securities (including mortgage-backed securities) (53.6% and 44.9% of its net assets at June 30, 2006 and June 30, 2007 respectively) substantially exceeded such holdings by FIF (26.2% and 31.2% of its net assets at May 31, 2006 and May 31, 2007 respectively) and LMFIF (30.1% and 37% of its net assets at May 31, 2006 and May 31, 2007 respectively). Likewise, LMFIF's higher 8% loss than FIF's 2% is attributable to LMFIF's higher investments in asset- and mortgage-backed securities. Appendix C.

410.    Notwithstanding the substantially different portfolios in which the five RMK Se-

247

lect open-end fixed income funds invested, and the accompanying different risks, the risk dis-closures of the High Income, Intermediate, and Short Term Funds were substantially identical to those of FIF and LMFIF and contained no hint of either the significantly different invest-ment policies and strategies or of the risk inherent in those different investment policies and strategies. Appendix B.

411.   Accordingly, the commonly understood indicators of risk in a fixed income port-folio—credit quality, yield, duration or maturity, number of securities (diversification), and even leverage—did not predict the catastrophic losses incurred by the High Income, Intermedi-ate and Short Term Funds; the key indicator of risk was the extent to which the Funds had heavily invested in asset- and mortgage-backed securities and their uncertain valuations. Ap-pendix B; paragraphs 306-28.

412.   The net asset value losses of the High Income and Intermediate Funds exceeded the losses of the RMK four closed-end funds (net asset value and market value) over a compa-rable period. Appendix D.

413.   The net asset value losses suffered by the High Income and Intermediate Funds were greater than those suffered by the RMK closed-end funds, even though the latter em-ployed leverage while the High Income and Intermediate Funds did not. Appendix F. The use of leverage increases a loss in net asset value as compared with what it would be in the absence of leverage.

414.   When compared with their respective benchmarks, the net asset value loss suf-fered by the Intermediate Fund was significantly greater than the NAV losses of the RMK closed-end funds: 85 percentage points for the Intermediate Fund versus 68-71 percentage points for the RMK closed-end funds. Appendix D.

415.   The portfolios of the High Income and Intermediate Funds resembled the portfo-lios of the RMK closed-end funds. Appendix E

416.   Based on the preceding paragraph, the High Income and Intermediate Funds and

the four RMK closed-end funds were predominantly invested in asset-backed securities (including mortgage-backed securities). The High Income Fund closely resembled the four RMK closed-end funds in its portfolio composition, differing only to the extent that the High Income Fund did not employ leverage. Appendices E, F.

417.    The Intermediate Fund deviated from the High Income Fund and the four RMK closed-end funds, but two of those deviations (average credit quality and yield) indicated the Intermediate Fund was a less risky fund than the High Income Fund or the RMK closed-end funds, while the third (duration and average effective maturity) indicated only a slightly more risky portfolio. Yet, its loss was greater than the High Income Fund and the RMK closed-end funds. Appendices A, C, D, E.

418.    While the losses of the High Income and Intermediate Funds were greater than those of the four RMK closed-end fixed income funds, significant risk disclosures in the prospectuses of the four RMK closed-end fixed income funds did not appear in the prospectuses of the High Income and Intermediate Funds, as demonstrated by excerpts from the Funds' November 1, 2006 prospectus and the prospectus for the RMK Multi-Sector High Income Fund, Inc., the last of the four RMK closed-end funds, dated January 9, 2006. Appendix F (emphasis supplied to show material differences).

419.    According to the prospectus disclosures referenced in the preceding paragraph, especially the heavy emphasis on risk as seen in the repetitious risk disclosures in the RMK Multi-Sector High Income Fund prospectus, an investment in the RMK Multi-Sector High Income Fund, Inc., was fraught with significantly greater risk than an investment in either the High Income Fund or the Intermediate Fund, and particularly the latter. However, the Intermediate Fund performed worse, in terms of its NAV, than did the Multi-Sector High Income Fund. Appendices D – F. Thus, the risk disclosures by the RMK Defendants for the High Income and Intermediate Funds inadequately warned investors of the true risks embedded in those funds.

249

420.    A Morgan Keegan spokesperson recently emphasized to a reporter the 2003 prospectus of the closed-end RMK High Income Fund that, among other warnings, says clients could lose some or all of their money in the fund, which exhibits "greater price volatility" and is "less liquid." ArkansasBusiness.com, www.arkansasbusiness.com/article.aspx?aID=115153&page=2, June 15, 2009. Such a disclosure was not made with respect to the Open-End Funds.

## V.    STATEMENT OF FACTS: PwC

### A.    PwC'S REQUIRED KNOWLEDGE, RESPONSIBILITIES AND DUTIES

#### 1.    Generally

421.    KPMG LLP ("KPMG") was the Company/Funds' independent public accountants for the fiscal years ended June 30, 2000 and June 30, 2001. On November 14, 2001, KPMG resigned as independent accountants for the Company. Following KPMG's resignation, the Company/Funds' audit committee selected PwC to be the auditor of the Funds' financial statements.

422.    In connection with its audits of the Funds' June 30, 2004, 2005 and 2006 annual financial statements and reports thereon, its reviews of the Funds' December 31, 2004, 2005 and 2006 semi-annual financial statements, its issuance of reports on the Funds' internal controls, and its affirmation of the information in the Funds' several prospectuses that was derived from the Funds' audited financial statements, PwC was required by SEC rules and regulations and by generally accepted accounting principles ("GAAP") and generally accepted auditing standards ("GAAS") to know about:  the Funds' failure to use valuation methods required by SEC rules and regulations and the required attendant disclosures, GAAP, and by the Funds' disclosures; the uncertain estimated values of the illiquid and market-untested structured financial instruments in which the Funds invested and attendant required disclosures; and the Funds' noncompliance with the limitations on investments in illiquid securities and a single industry and attendant required disclosures and with the In-

termediate and High Income Funds' respective investment objectives.

423.    The form and content of, and requirements for, financial statements of regis-tered investment companies such as the Funds are governed by SEC Regulation S-X and the interpretive releases (Accounting Series Releases) relating thereto. The Accounting Series Releases, or "ASRs," have been codified into the SEC's Codification of Financial Reporting Policies ("Codification").

424.    The American Institute of Certified Public Accountants ("AICPA") *Audit and Accounting Guide, Audits of Investment Companies* ("AICPA Guide") is an authoritative source that sets forth recommendations of the AICPA Investment Companies Special Com-mittee on the application of GAAS to audits of financial statements of investment compa-nies. The AICPA Guide also presents the committee's recommendations on and descriptions of financial accounting and reporting principles and practices for investment companies.[1]

425.    The AICPA Guide is consistent with the standards and principles covered by Rules 202 and 203 of the AICPA Code of Professional Conduct.

426.    The AICPA Guide applicable to PwC's audit of the Funds' 2004, 2005 and 2006 financial statements was the Guide that reflected relevant guidance contained in au-thoritative pronouncements through May 1, 2007.[2]

427.    Where the AICPA Guide is applicable, PwC auditors who audited the Funds' annual financial statements should have used the accounting treatments specified by the AICPA Guide or be prepared to justify another treatment, as discussed in paragraph 7 of Statement on Auditing Standards ("SAS") No. 69.

---

[1]    References herein are to the December 1, 2000 edition and to the May 1, 2007 edi-tion. Based on a review of the 2007 edition, material cited from the 2007 edition appears to be the same as the 2000 edition or relates to guidance in existence preceding May 1, 2007 and applicable during the Class Period.

[2]    See footnote 1.

428.    The AICPA Guide does not describe all auditing procedures necessary to perform an audit in accordance with generally accepted auditing standards. The Guide was not intended to limit or supplant the PwC auditors' individual judgment, initiative, imagination, or vigilance. Programs for each audit should be designed to meet its particular requirements, considering the size and kind of organization and the adequacy of internal control and risk management.

429.    Statements of Position of the AICPA Accounting Standards Division present the conclusions of at least two-thirds of the Accounting Standards Executive Committee, which is the senior technical body of the AICPA authorized to speak for the Institute in the areas of financial accounting and reporting. SAS No. 69, *The Meaning of* Present Fairly in Conformity With Generally Accepted Accounting Principles *in the Independent Auditor's Report*, identifies AICPA Statements of Position as sources of established accounting principles that an AICPA member should consider if the accounting treatment of a transaction or event is not specified by a pronouncement covered by Rule 203 of the AICPA Code of Professional Conduct. One of such statements of position is Statement of Position ("SOP") 93-1, and in relevant circumstances, the accounting treatment specified by SOP 93-1 should be used, or the member should be prepared to justify a conclusion that another treatment better presents the substance of the transaction in the circumstances.

430.    With respect to PwC's audits of the Funds' 2004, 2005 and 2006 annual financial statements, SOP 93-1 provided guidance on the Funds' financial reporting for the untested illiquid structured financial instruments held by them as investments. SOP 93-1 recommended procedures to be considered by PwC for reviewing the valuations of the Funds' investments reported in the Funds' financial statements.

431.    The Funds issued semi-annual reports, including financial statements that reported the Funds' net asset value, as of December 31, 2004, 2005 and 2006. Such financial statements should be complete and based on generally accepted accounting principles, which

252

should conform to the principles used in preparing the Funds' annual financial statements.

432.    It is customary for auditors to review registered investment companies' interim financial statements.  PwC reviewed the Funds' semi-annual financial statements as of December 31, 2004, 2005 and 2006.

433.    Investment companies are grouped according to their primary investment objectives, and the types of investments made by those funds reflect their stated objectives. The composition of an investment company's portfolio is primarily a function of the company's investment objectives and its market strategy to achieve them.

434.    The AICPA Guide provides that, before starting an audit of an investment company's financial statements, an auditor is to be familiar with, *inter alia*, the fund's business and operating characteristics, its industry generally, applicable statutes and regulations, SEC registration and reporting forms, the statistics that should be maintained by investment companies and the sources of such data, the company's investment objective and limitations and restrictions, and SEC Form N-SAR (a reporting form used by registered investment companies for semiannual and annual reports that provides current information and demonstrates compliance with the ICA).

435.    The second standard of auditing fieldwork, part of generally accepted auditing standards, states that "A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed." AICPA 2000/2007 Guide ¶ 2.107/2.150.

436.    The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing and extent of further audit procedures. AICPA 2007 Guide ¶ 2.150.

437.    SEC Form N-SAR requires PwC, as the auditor of the Funds' financial statements, to report annually to the SEC and to the Funds' directors and shareholders on the

253

Funds' internal control over financial reporting. AICPA 2007 Guide ¶ 2.150.

438.   According to the AICPA Guide, in its consideration of the Funds' internal control structure and whether that structure ensured compliance with the Funds' investment policies and restrictions, PwC should have reviewed such relevant Fund documents as the most recent prospectus, compliance items reported in the annual N-SAR report to the SEC, and other publicly filed documents, certificate of incorporation, bylaws, and minutes of board and audit committee and shareholder meetings. AICPA 2000/2007 Guide ¶ 2.101/2.144.

### 2.   Pricing and Valuation of the Funds' Thinly Traded Structured Financial Instruments

439.   PwC's principal objectives in auditing the Funds' investment accounts during the Class Period were to determine, *inter alia*, whether there was a reasonable assurance that the Funds' portfolio investments were properly valued. AICPA 2007 Guide ¶ 2.148.

440.   "Reasonable assurance" means a "high level of assurance." SAS No. 104.

441.   The AICPA Guide provides that the audit of an investment company's investment accounts is a significant portion of the overall audit because of the relative significance of those accounts and of the related income accounts. AICPA 2007 Guide ¶ 2.141.

442.   All relevant factors must be taken into account in performing good faith valuations. AICPA 2000 Guide ¶¶ 2.35, 2.36, 2.133.

443.   The AICPA Guide, citing ICA Rule 22c-1, informed the PwC auditors working on the audits of the Funds' financial statements that, under the ICA, open-end investment companies offering their shares to the public continuously are required to compute the Funds' respective net asset values per share daily to price Fund shares redeemed and sold. SOP 93-1 advised PwC auditors to consider reviewing the methods used by management to determine and update daily prices and the consistency of these methods from period to period and across similar securities.

254

444.    With respect to the fair valuation of securities for which market quotations are not readily available, the AICPA Guide makes clear such fair valuations are estimates, providing:

> 2.33    Situations may arise when quoted market prices are not readily available or when market quotations are available but it is questionable whether they represent fair value. Examples include instances when—
>
> - Market quotations and transactions are infrequent and the most recent quotations and transactions occurred substantially prior to the valuation date.
>
> - The market for the security is "thin" (that is, there are few transactions or market makers in the security, the spread between the bid and asked prices is large, and price quotations vary substantially either over time or among individual market makers).
>
> - . . .
>
> Similar circumstances may also affect the appropriateness of valuations supplied by pricing services. Situations such as those above are expected to be rare but may occur. In those cases, an investment company may establish a policy to substitute a good faith estimate of fair value for the quoted market price or pricing service valuation. Any policy adopted should be consistently applied in all situations where significant pricing differences are determined to exist.
>
> 2.34    In December 2003, the SEC adopted new Rule 38a-1 under the 1940 Act that requires registered investment companies . . . . to adopt policies and procedures reasonably designed to prevent violation of federal securities laws. . . . the SEC stated that Rule 38a-1 "requires funds to adopt policies and procedures that require the fund to monitor for circumstances that may necessitate the use of fair value prices; establish criteria for determining when market quotations are no longer reliable for a particular portfolio security; provide a methodology or methodologies by which the fund determines the current fair value of the portfolio security; and regularly review the appropriateness and accuracy of the method used in valuing securities, and make any necessary

255

adjustments.". . . . Further. . . . the SEC adopted rules which require investment companies . . . . to provide a brief explanation in their prospectuses of the circumstances under which they will use fair value prices and the effects of fair value pricing.

2.35   *Estimating Fair Values of Investments.* The SEC's *Codification of Financial Reporting Policies* provides guidance on the factors to be considered in, and on the responsibilities for and methods used for, the valuation of securities for which market quotations are not readily available [footnote citing Codification §§ 404.03 and 404.04]. . . . .

2.36   The objective of the estimating procedures is to state the securities at the amount at which they could be exchanged in a current transaction between willing parties, other than in a forced liquidation sale. The term current transaction means realization in an orderly disposition over a reasonable period. All relevant factors should be considered in selecting the method of estimating in good faith the fair value of each kind of security.

2.37   In estimating in good faith the fair value of a particular financial instrument, the board or its designee (the valuation committee) should, to the extent necessary, take into consideration all indications of fair value that are available. . . .[some of] the factors to be considered:

- Financial standing of the issuer
- Business and financial plan of the issuer and comparison of actual results with the plan
- Size of position held and the liquidity of the market
- Contractual restrictions on disposition
- Reported prices and the extent of public trading in similar financial instruments of the issuer or comparable companies
- Ability of the issuer to obtain needed financing
- Changes in the economic conditions affecting the issuer
- A recent purchase or sale of a security of the company
- Pricing by other dealers in similar securities
- Financial statements of investees

2.38   No single method exists for estimating fair value in good faith

256

because fair value depends on the facts and circumstances of each individual case. Valuation methods may be based on a . . . discount or premium from market, of a similar, freely traded security of the same issuer; on a yield to maturity with respect to debt issues; or on a combination of these and other methods. In addition, with respect to derivative products, other factors (such as volatility, interest . . . and term to maturity) should be considered. The board of directors should be satisfied, however, that the method used to estimate fair value in good faith is reasonable and appropriate and that the resulting valuation is representative of fair value.

2.39    The information considered and the basis for the valuation decision should be documented, and the supporting data should be retained. The board may appoint individuals to assist it in the estimation process and to make the necessary calculations. . . .  If considered material, the circumstances surrounding the substitution of good faith estimates of fair value for market quotations or pricing service valuations should be disclosed in the notes to the financial statements. . . .

AICPA 2007 Guide ¶¶ 2.33-2.39.

445.    With respect to AICPA Guide ¶ 2.34's admonition that, investment company prospectuses disclose "the circumstances under which they will use fair value prices and the effects of fair value pricing," the Funds' prospectuses did disclose the "circumstances under which fair value prices" would be used—namely, the absence of readily available market quotations—but did not disclose "the effects of fair value pricing"—namely, given the magnitude of fair-valued securities in the Funds' portfolios, that the prices at which the Funds' shareholders were purchasing and redeeming the Funds' shares were subject to substantial uncertainty and were vulnerable to a sudden precipitous decline in value.

446.    No single standard for determining "fair value . . . in good faith" can be laid down, since fair value depends upon the circumstances of each individual case. SEC Codification 404.03.b.iv.

447.    SEC Codification 404.03.b.iv. provides that directors of mutual funds whose

securities are being fair valued in good faith should consider the following factors:

(a)     The fundamental analytical data relating to the investment;

(b)     The nature and duration of restrictions on disposition of the securities;

(c)     An evaluation of the forces which influence the market in which these securities are purchased and sold;

(d)     Type of security;

(e)     Financial statements;

(f)     Cost at date of purchase;

(g)     Size of holding;

(h)     Discount from market value of unrestricted securities of the same class at time of purchase;

(i)     Special reports prepared by analysts;

(j)     Information as to any transactions or offers with respect to the security;

(k)     Price and extent of public trading in similar securities of the issuer or comparable companies.

448.     SEC Codification 404.03.b.iv. provides that the guidance described in the preceding paragraph does not purport to delineate all factors which may be considered. The directors should take into consideration all indications of value available to them in determining the "fair value" assigned to a particular security. The information so considered together with, to the extent practicable, judgment factors considered by the board of directors in reaching its decisions should be documented in the minutes of the directors' meeting and the supporting data retained for the inspection of the company's independent accountant.

449.     PwC's auditors should have become familiar with the provisions of the SEC's financial reporting releases on this subject, with emphasis on section 404.03 of SEC's *Codification of Financial Reporting Policies*. AICPA 2000/2007 Guide ¶ 2.133/2.182.

450.     In the case of investments valued by the investment company using a valuation

258

model, the auditor should assess the reasonableness and appropriateness of the model, including whether management has identified the significant assumptions and factors influencing the measurement of fair value, and whether the significant assumptions used are reasonable and the model is appropriate considering the entity's circumstances. (Significant assumptions cover matters that materially affect the fair value measurement and may include those that are sensitive to variation or uncertainty in amount or nature, and are susceptible to misapplication or bias.) AICPA 2007 Guide ¶ 2.182.

451.    Under Codification of Statements on Auditing Standards ("AU") section 328, the auditor's substantive tests of fair value measurements involve (a) testing management's significant assumptions, the valuation model, and the underlying data, (b) developing independent fair value estimates for corroborative purposes, or (c) examining subsequent events and transactions that confirm or disconfirm the estimate. AICPA 2000/2007 Guide ¶¶ 2.124, 2.126 / 2.141, 2.168, 2.170.

452.    In auditing the Funds' investment accounts, PwC should have considered the Funds' transactions with brokers and pricing services. AICPA 2007 Guide ¶ 2.141.

453.    To the extent that the estimated values of the Funds' securities were provided by dealers or pricing services, PwC should have considered whether controls maintained by the fund or by the pricing service provide reasonable assurance (i.e., high level of assurance) that material pricing errors would be prevented or detected, which controls could include, *inter alia*, testing methods used by the pricing service to obtain daily quotations, verifying daily changes of each security's fair value in excess of a stipulated percentage, verifying dealer quotations with other dealers on a test basis, and consideration of fair value that has not changed for a stipulated period. AICPA 2000/2007 Guide ¶ 2.131/2.176.

454.    To the extent that Morgan Management used internally developed matrix pricing to determine the fair value of the Funds' fair valued securities, PwC should have considered performing the following procedures on a test basis:

(a) Reviewing the matrix used;

(b) Determining that the results have been reviewed by the board of directors or its designees for reasonableness;

(c) Comparing sales proceeds from securities sold during the year with the value used on several days before the sale;

(d) Comparing fair values with values obtained from a second pricing matrix;

(e) Comparing fair values with quotations obtained from market makers.

AICPA 2000 Guide ¶ 2.132.

455. To the extent that the Funds' investments were valued using a valuation model, regardless of whether such model was developed internally or was one used by the Funds' outside pricing sources, PwC should have obtained an understanding of the entity's process for determining fair value, including:

(a) The controls over the process used to determine fair value measurements, including, for example, controls over data and the segregation of duties between investment management functions and those responsible for undertaking the valuations;

(b) The expertise and experience of those determining fair value measurements;

(c) The role of information technology in the valuation process;

(d) Significant assumptions used in determining fair value, as well as the process used to develop and apply management's assumptions, including whether management used available market information to development the assumptions;

(e) Documentation supporting management's assumptions;

(f) The controls over the consistency, timeliness, and reliability of data used in valuation models.

AICPA 2007 Guide ¶ 2.177.

260

456.    With respect to the Funds' securities for which there were no readily available market quotations, PwC should have evaluated whether the method of measurement was appropriate in the circumstances, which evaluation involved obtaining an understanding of management's rationale for selecting a particular valuation method by discussing with management its reasons for selecting that method. PwC also needed to consider whether:

(a)    Management had sufficiently evaluated and appropriately applied the criteria, if any, provided by GAAP to support the selected method;

(b)    The valuation method was appropriate in the circumstances given the nature of the item being valued;

(c)    The valuation method was appropriate in relation to the environment in which the Funds operated.

AICPA 2007 Guide ¶ 2.179.

457.    PwC should have tested the data used to develop the fair value measurements of the Funds' thinly traded structured financial instruments and the disclosures relating thereto and should have evaluated whether the fair value measurements were properly determined from such data and management's assumptions. PwC needed to evaluate whether the data on which the fair value measurements were based, including the data used in the work of a specialist, was accurate, complete and relevant; and whether fair value measurements were properly determined using such data and management's assumptions. PwC's tests might have included procedures such as verifying the source of the data, mathematical recomputation of inputs, and reviewing of information for internal consistency. AICPA 2007 Guide ¶ 2.181.

458.    PwC knew that, because the fee paid by an investment company to its adviser to manage its portfolio is a percentage of the value of the portfolio and because of the pressures on portfolio managers to achieve significant above average performance in a highly competitive industry to attract additional investment dollars, and because the Funds' senior

portfolio manager could earn a bonus based on the Funds' performance in comparison to the selected benchmark index of as much as half of his base compensation, a risk inherent in the valuation of portfolio securities by the management of the investment company is that management has an incentive to err on the high side when valuing portfolio securities. It is in part because of this incentive that auditors must be especially vigilant when auditing valuations of portfolio securities in the course of their audits of an investment company's financial statements.

459.    PwC was required to confirm that the prices used by the Funds to value their portfolio securities were reasonable.

460.    PwC was required to test the Funds' respective net asset values as computed on the Funds' price makeup sheets at the date of the Funds' financial statements and on selected interim dates. Such tests should have included procedures that, *inter alia*, traced quoted market prices to independent sources and, when independent sources were not available, to supporting documentation for investments stated at fair values, as determined by the Funds' board of directors.

461.    PwC was required to ascertain whether the pricing and valuation procedures used by the Funds complied with the disclosed accounting policies, applicable SEC rules and regulations, and generally accepted accounting principles.

462.    With respect to security values estimated in good faith by the Funds' board of directors, PwC was required to review the procedures employed by the board of directors for its continuing appraisal of such securities, determine whether the methods established for such valuations were followed, and make certain that these methods were reviewed and approved by the board of directors. PwC was required to review the procedures applied by the board of directors in valuing such securities and to inspect the underlying documentation to determine whether the procedures were reasonable and the documentation appropriate for that purpose.

463.    Pricing and valuation of the Funds' portfolio securities were part of the Funds' internal accounting controls, the examination or testing of which PwC was responsible in connection with its audits of the Funds' financial statements and on which PwC was required to report in addition to its audit report and opinion.

464.    SEC Form N-SAR states that the auditor's report on a registered investment company's internal controls should be "based on a review, study, and evaluation of the accounting system, internal accounting controls, . . . made during the audit of the financial statements. The report should disclose material weaknesses in the accounting system, the system of internal accounting control . . . that exist as of the end of the registrant's fiscal year. Disclosure of a material weakness should include an indication of any corrective action taken or proposed." PwC's reports on the Funds' internal controls were exhibits to the Funds' Form N-SAR reports and should have been addressed to the Funds' shareholders and board of directors.

465.    To the extent that the Funds' management was relying on a pricing service to price its securities, the Funds' management was obliged to understand how the pricing service was pricing those securities, including whether the pricing service was taking into account in pricing the Funds' securities those factors deemed relevant by the Funds' management and board of directors.  PwC was required to ascertain that the Funds' management had such an understanding.

466.    PwC knew that, under the ICA, an open-end mutual fund is required to compute its net asset value daily in order to price the fund's shares that are being redeemed and sold daily.

467.    The Funds were required to disclose those securities in their respective portfolios whose values were being estimated in accordance with fair value procedures, together with the magnitude of such securities, as material information but did not do so until October 3, 2007, even though such valuations were material throughout the Class Period.

468.    If PwC had diligently followed the guidance recited above and given the extraordinarily large proportion of the Funds' portfolios invested in securities requiring fair value estimates, PwC would have identified the uncertainty inherent in half or more of the Funds' respective portfolios, and either

(a)    Because of the limitation imposed by such uncertainty on the ability of PwC to properly audit the values of the Funds' assets, issued a qualified audit opinion as to the Funds' financial statements or disclaimed its ability to render such an opinion, and/or

(b)    Counseled the Funds' management to correctly disclose the magnitude of this uncertainty and the effect thereof on the Funds' net assets and NAV per share,

in either of which cases, the RMK Defendants' desired avoidance of either of which disclosures would have caused the Funds' management to reduce the amount of such fair-valued securities and thereby prevent or minimize the losses incurred in 2007.

**3.    The Use of and Need for Good Faith Fair Value Procedures; Valuation Uncertainty**

469.    In its annual financial statements for its fiscal year ended June 30, 2007, issued on October 3, 2007, the Funds and Defendants disclosed for the first time the dollar amount of the Funds' securities that were fair valued at June 30, 2006. Not disclosed were the percentages those dollar amounts represented of the Funds' portfolios at June 30, 2006.

470.    In its annual financial statements for its fiscal year ended June 30, 2007, issued on October 3, 2007, the Funds and Defendants disclosed the dollar amount of the Funds' securities that were fair valued at June 30, 2007.

471.    These disclosures were the first time the Funds disclosed the magnitude of the Funds' portfolio securities that were subject to the highly judgmental, uncertain estimated values of securities for which market quotations are not readily available.

472.    These fair valued securities were 18.2% and 30.7% of the Short Term Fund's

264

portfolio at June 30, 2006 and June 30, 2007 respectively, 55.8% and 50.4% of the Interme-
diate Fund's portfolio at June 30, 2006 and June 30, 2007 respectively, and 49.5% and
59.7% of the High Income Fund's portfolio at June 30, 2006 and June 30, 2007 respectively,
calculated as follows:

| | Investments in Securities (from annual reports) | | Fair Valued Investments: $ (from 2007 annual report) and as % of Investments in Securities (calculated) | | | |
|---|---|---|---|---|---|---|
| | 6/30/06 | 6/30/07 | 6/30/06 | | 6/30/07 | |
| Short Term Fund | $66,019,096 | $86,400,536 | $12,028,659 | 18.2% | $26,567,836 | 30.7% |
| Intermediate Fund | $ 673,709,710 | $1,020,989,624 | $ 376,056,341 | 55.8% | $ 514,922,503 | 50.4% |
| High Income Fund | $1,192,784,672 | $1,045,740,306 | $590,018,294 | 49.5% | $624,867,802 | 59.7% |

473.    Fair valued securities are those for which market quotations are not readily avail-
able.

474.    Fair valued securities are those that have not traded in significant volume for a
substantial period.

475.    Fair valued securities are illiquid securities.

476.    Fair valued securities are thinly traded.

477.    Defendants knew that fair valued securities are those for which market quota-
tions are not readily available, or have not traded in significant volume for a substantial period,
and disclosed same. *See* paragraph 220(d)-(l).

478.    PwC knew that the Funds and their management and directors understood that
fair valued securities are those for which market quotations are not readily available or have
not traded in significant volume for a substantial period. *See* paragraph 220(d)-(l).

479.    PwC and the RMK Defendants knew, by no later than August 21, 2006 (the date
of the issuance PwC's audit report on the Funds' 2006 financial statements),  that approxi-
mately half or more of each of the Intermediate Fund's and High Income Fund's, and 18% of
the Short Term Fund's, portfolio was fair valued at June 30, 2006.

480.    PwC and the RMK Defendants knew that, prior to October 3, 2007, and except for the Short Term Fund as of June 30, 2005, the Funds did not identify in their annual and semi-annual reports and quarterly schedules of portfolio securities those securities that were being fair valued or disclose in such reports the amount of their respective portfolios that were being fair valued.

481.    PwC and the RMK Defendants knew, or should have known, that the Funds were required to disclose in their annual and semi-annual reports and quarterly schedules of portfolio securities those of the Funds' investment securities that were being fair valued because such information was material to investors for the reasons set forth herein.

482.    PwC knew that trading activity in the high-yield bonds and structured financial instruments of the type in which the Funds invested is limited, that the market in which these securities are traded is thin, and that, accordingly, dealer quotations may not indicate the prices at which these securities may be bought or sold. Accordingly, PwC knew that the fair value of such securities should have been estimated by the Funds' board of directors and that the board of directors should have implemented good faith fair value procedures for this purpose.

483.    According to the AICPA Guide, investment companies such as the Funds report their investment securities at fair value, measured by quoted market prices for securities for which market quotations are readily available, or, if market quotations are not readily available, an estimate of value (fair value) as determined in good faith by the board of directors.

484.    Securities for which market quotations are not readily available are very difficult to price, and the estimated pricing thereof is based on subjective judgment.

485.    PwC knew that securities for which market quotations are not readily available are very difficult to price and that the estimated pricing thereof is based on subjective judgment.

486.    According to the AICPA Guide and Codification § 404.03, quotations for over-the-counter securities should ordinarily be obtained from more than one broker-dealer, unless they are available from an established market maker for that security. Quotations for several days should be reviewed. If a security has been sold infrequently or if the market in the security is thin, the reliability of market quotations should be considered. If market quotations for the security are deemed not reliable, an estimate of value, as determined in good faith by the board of directors, should be used.

487.    There were no established or indefinitely committed market makers for most if not all of the high-yield bonds and structured financial instruments in which the Funds invested during the Class Period, and any purported market quotations were not reliable indicators of market value.

488.    According to the AICPA Guide and Codification § 404.03, in certain circumstances, it may be necessary to estimate the fair value of securities if market quotations are not readily available. The objective of the estimating procedures is to state the securities at the amount the owner could reasonably expect to receive for them in a current sale, though the owner may not intend to sell them.

489.    Because a substantial portion of the high-yield bonds and structured financial instruments in which the Funds invested did not have readily ascertainable market values, the AICPA Guide and Codification § 404.03 required that their valuation should have been determined by the board of directors' fair valuation procedures that were designed to approximate the values that would have been established by market forces.

490.    According to the AICPA Guide and SOP 93-1, because the high-yield bonds and structured financial instruments in which the Funds invested did not have readily ascertainable market values and the valuation of such securities was, therefore, estimated, their valuation was subject to uncertainty.

491.    PwC was required to determine whether the Funds' board of directors on be-

half of the Funds was making, or should be making, good faith estimates of the value of the high-yield bonds and structured financial instruments in which the Funds invested and, therefore, determine whether the procedures employed were adequate or reasonable and, further, whether to qualify its opinions on the Funds' financial statements as a result of any inadequate or unreasonable procedures employed by the Funds' board of directors.

492.   Based on the disclosures on October 3, 2007, regarding the securities held by the Funds' as of June 30, 2006 whose fair values were estimated, and on information and belief based on an understanding that restricted securities are securities for which market quotations are not readily available and because securities are "fair-valued" when market quotations are not readily available, in connection with its efforts to test or verify the prices used by the Funds for the high-yield bonds and structured financial instruments in which the Funds invested, PwC was unable to obtain independent secondary quotations for a material number of such securities during the course of its audits of the Funds' 2004, 2005 and 2006 financial statements.

493.   Upon determining that market quotations were not readily available for a material portion of the Funds' portfolio securities, PwC was required to determine whether the procedures adopted by the Funds' board of directors for good faith fair value pricing of such securities were properly applied and whether all factors were taken into account in estimating the value of the Funds' securities.

494.   Because the Funds did not disclose that any of their securities were fair valued at June 30, 2006, the inference arises that such valuations were not performed. The same inference arises with respect to the Funds' June 30, 2005 and 2004 financial statements based on the number of restricted securities in each Fund's portfolio on said dates.

495.   Whether the Funds did not fair value securities when they should have done so, or did fair value such securities but did not disclose the extent to which it was doing so, PwC, in connection with its audits of the Funds' 2004, 2005 and 2006 financial statements:

(a)     Never advised the Funds' management and board of directors of the need to perform good faith estimates of value for those high-yield bonds and structured financial instruments for which secondary market quotations were not readily available, as PwC was required to do, or never advised the Funds' management and board of directors of the need to consider the effects, or potential effects, on the valuations of the Funds' assets of the substantial portion of the Funds' investment securities that were fair valued, especially in light of the Funds' respective investment objectives, policies and restrictions and how the RMK Defendants said how the Funds would be managed;

(b)     Never advised the Funds' board of directors to disclose in footnotes to the Funds' financial statements, that the Funds' net asset value was subject to significant uncertainty in light of the magnitude of the Funds' investments in fair valued securities or in securities that should have been fair valued, as PwC was required to do in view of the Funds' respective investment objectives, policies and restrictions;

(c)     Never disclosed, or advised the Funds' board of directors to disclose in footnotes to the Funds' financial statements or otherwise, that the Funds' net asset value was subject to significant uncertainty in light of the magnitude of each Fund's investments in fair valued securities or in securities that should have been fair valued, as PwC was required to do in view of the materiality of such facts and as PwC did do in connection with its audit of the Funds' 2007 financial statements;

(d)     Never added an explanatory paragraph to its standard reports to emphasize the uncertainty of the valuation of the Funds' investments in fair valued securities or in securities that should have been fair valued, as PwC was required to do and as PwC did do in connection with its audit of the Funds' 2007 and 2008

269

financial statements and as PwC's successor, Briggs, Bunting & Dougherty, LLP, did in connection with the Funds' audited financial statements for the six months ended October 31, 2008;

(e)     Never modified its opinions to report that the Funds' financial statements did not conform with generally accepted accounting principles or rendered an adverse opinion, as PwC was required to do;

(f)     Never included in its reports an explanatory paragraph disclosing the magnitude of the Funds' portfolios subject to good faith valuation estimates by the Funds' board of directors on behalf of the Funds in view of the absence of readily ascertainable market values, as PwC was required to do, in order that the Funds' 2004, 2005 and 2006 financial statements be fairly presented in accordance with generally accepted accounting principles, and as PwC did do in connection with its audit of the Funds' 2007 and 2008 financial statements and as PwC's successor, Briggs, Bunting & Dougherty, LLP, did in connection with the Funds' audited financial statements for the six months ended October 31, 2008; and

(g)     Never advised the Funds' board of directors that PwC was unable to render an unqualified opinion, or such an opinion without an explanatory paragraph, because of the limitation placed on the scope of its audits as a result of the magnitude of the Funds' portfolio securities subject to fair valuation procedures and the inherently uncertain values of such estimated valuations, as PwC was required to do.

496.     Despite the magnitude of fair valued securities in the Funds' portfolios, or securities for which market quotations were not readily available that required fair value estimates but were not fair-valued based on the failure to identify the substantial presence of fair-valued securities in the Funds' portfolio, PwC:

(a)     Never determined whether control procedures maintained by the Funds' management, or by the dealer or pricing service used by the Funds to value the high-yield bonds and structured financial instruments in which the Funds invested, provided reasonable assurance (i.e., high level of assurance) that material pricing errors would be prevented or detected, as directed by the AICPA Guide;

(b)     Never examined the methods used by the pricing service to obtain daily quotations or verify dealer quotations with other dealers on a test basis, as directed by the AICPA Guide;

(c)     Did not obtain independent quotations from dealers, as directed by the AICPA Guide; and

(d)     Never determined the pricing methodology used by the Funds' pricing services, whether such methodology included all relevant factors, as determined by the Funds' board of directors or otherwise, or whether such pricing services used matrix pricing, as directed by the AICPA Guide.

497.    If the securities in the Funds' portfolios requiring fair valuation procedures were not fair valued until the audit of the Funds' 2007, or 2006, financial statements, then, in connection with the 2006 audit, PwC never:

(a)     Reviewed the procedures employed by the Funds' board of directors in connection with the Funds' continuing appraisal of such securities, as PwC was required to do;

(b)     Determined whether the methods established by the Funds for such valuations were followed, as PwC was required to do;

(c)     Made certain that the methods established by the Funds for such valuations had been reviewed and approved by the Funds' board of directors, as PwC was required to do;

271

(d)    Inspected the documentation underlying such valuations to determine whether the procedures were reasonable and the documentation appropriate for the purpose of valuing such securities, as PwC was required to do;

(e)    Determined whether the procedures being used to value the Funds' high-yield bonds and structured financial instruments were consistent with the procedures disclosed in the Funds' prospectuses and annual and semi-annual reports as PwC was required to do; or

(f)    Determined whether the procedures being used to value the Funds' structured financial instruments were consistent with the procedures prescribed by the AICPA Guide ¶¶ 2.33-2.39 and Codification § 404.03.b.iv. *See* paragraphs 444 and 447.

498.    Because the high-yield bonds and structured financial instruments that were subject to good faith fair value procedures constituted a material portion of the Funds' portfolios and their respective NAVs during the Class Period, resulting in a material portion of the Funds' portfolio valuations being based on estimates of value, PwC should have advised the Funds' management and board of directors that the magnitude of such estimated values and the attendant risks and uncertainties should have been disclosed in the Funds' 2004, 2005, and 2006 financial statements and in PwC's audit reports thereon, as Defendants did do in the Funds' 2007 and 2008 financial statements and in PwC's reports thereon and as PwC's successor, Briggs, Bunting & Dougherty, LLP, did in connection with the Funds' audited financial statements for the six months ended October 31, 2008, because such estimates had a significant impact on the Funds' financial statements. SOP 94-6.

### 4.    The Funds' Noncompliance with Their Investment Restrictions

499.    SEC Codification § 404.03.a. provides (emphasis supplied):

Where the *propriety or validity of an investment* in a security by an investment company is questionable because of particular provisions of the Investment Company Act, or state law, or the *company's investment policy or other repre-*

*sentations* as stated in its filings with the Commission, or *legal obligations in respect of a contract* or transaction, a written opinion of legal counsel should also be obtained by the company's management, made available to the independent accountant, and a copy included in the working papers. *If the questions of propriety or validity are not satisfactorily resolved, the circumstances of the investment should be disclosed in the financial statements or notes thereto*.

500.     PwC should have reviewed such relevant investment company documents as the latest prospectus, SAI, certificate of incorporation, bylaws, and minutes of the board of directors' and shareholders' meetings to gain an understanding of the investment company's investment objectives and restrictions. AICPA 2000/2007 Guide ¶ 2.101/2.144.

501.     PwC should have considered whether the Funds' management had a program to prevent, deter, or detect noncompliance with the Funds' investment restrictions. *Id.*

502.     As part of the consideration described in the preceding paragraph, PwC should also have considered obtaining the written compliance policies and procedures designed to prevent violation of federal securities laws and meeting with the designated chief compliance officer responsible for administering those policies and procedures. *Id.*

503.     PwC should also have considered whether the program described in the second preceding paragraph identified noncompliance with the stated investment restrictions and tested the operation of the program to the extent considered necessary. *Id.*

504.     An investment company's failure to comply with its stated objectives and investment restrictions may be considered a possible illegal act that may have an indirect effect on the financial statements of the fund. *Id.*

505.     The Funds' failure to comply with their stated investment objectives and restrictions was a possible illegal act that had an indirect effect on the Funds' financial statements.

506.     The Funds represented that they would limit their investments in illiquid securities to 15% of their respective net assets and would limit their investments in a single industry to 25% of their respective portfolios.

507.   In fact, the Funds' investments in illiquid securities during all times relevant herein substantially exceeded their respective 15% limitations. Likewise, the Funds' investments in a single industry substantially exceeded their respective 25% limitations.

508.   PwC became aware, or should have become aware, of the illegal acts described in the second preceding paragraph in connection with its audit of the Funds' 2004, 2005 and 2006 financial statements, and, therefore, in view of the magnitude of the illegal acts described in the two preceding paragraphs and their demonstrably material effect on the Funds' financial statements for those years, PwC should have made a report to the SEC relating to such illegal acts and should have so informed the Funds' board of directors so that corrective action could have been taken to bring the Funds in compliance with said investment restrictions.

509.   PwC now says that, based on the allegations herein, the Funds' directors and management had sufficient knowledge that the Funds were not being managed in a manner that adhered to their respective investment objectives, policies and restrictions by no later than August 2006 and that this knowledge was sufficient to put the directors and management on notice of claims by the Funds against Defendants.

510.   PwC, in connection with its audit of the Funds' 2004, 2005 and 2006 financial statements, never disclosed, or advised the Funds' board of directors to disclose in footnotes to the Funds' financial statements, the substantial portion of the Funds' investment securities that were restricted, as PwC was required to do in view of the materiality of such facts and as PwC's successor, Briggs, Bunting & Dougherty, LLP, did in connection with the Funds' audited financial statements for the six months ended October 31, 2008.

511.   Despite the magnitude of fair valued securities in the Funds' portfolios, or securities for which market quotations were not readily available that required fair value estimates but were not fair-valued based on the failure to identify the substantial presence of fair-valued securities in the Funds' portfolio, PwC failed to do what it was required to do, as set forth in paragraphs 494--97.

274

512.    If the securities in the Funds' portfolios requiring fair valuation procedures were not fair valued until the audit of the Funds' 2007, or 2006, financial statements, PwC failed to do what it was required to do, as set forth in paragraph 497.

513.    Because the high-yield bonds and structured financial instruments that were subject to good faith fair value procedures constituted a material portion of the Funds' portfolios and their respective NAVs throughout all relevant times , resulting in a material portion of the Funds' portfolio valuations being based on estimates of value, the magnitude of such estimated values and the attendant risks and uncertainties should have been disclosed, as Defendants did in the Funds' 2007 and 2008 financial statements and as PwC's successor, Briggs, Bunting & Dougherty, LLP, did in connection with the Funds' financial statements for the six months ended October 31, 2008, because such estimates had a significant impact on the Funds' financial statements. SOP 94-6.

**5.      Concentration of Credit Risk**

514.    Statement of Financial Auditing Standards ("SFAS") 105, "Disclosure of Information about Financial Instruments with . . . Concentrations of Credit Risk," provides that an "entity shall disclose all significant concentrations of credit risk arising from *all* financial instruments . . . Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions."

515.    SOP 94-6 requires disclosure in financial statements of credit and industry concentrations.

516.    The Funds' concentration in the mortgage sector and in structured financial instruments should have been, but was not, disclosed in the Funds' financial statements.

517.    Such disclosures are not limited to investments in a single industry but include other concentrations that may be present but not readily apparent. For example, such concen-

trations include large investments in junk bonds and structured financial instruments like the CDOs in which the Funds heavily invested.

518.   If PwC had identified the extraordinary credit concentration in the Funds' portfolios, the Funds' management would have been forewarned of the need to reduce such concentration to bring the Funds' risk profiles within their stated investment objectives, policies, restrictions, and representations and could and would have done so by taking corrective action, which Defendants Company/Funds, Regions Bank, Morgan Keegan and Morgan Management had more than sufficient time to do before the subprime market collapsed later in 2007.

### 6.   The Risks of Material Misstatements Due to Fraud

519.   The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. AICPA 2007 Guide ¶ 2.103.

520.   PwC's auditors were required to engage in brainstorming to understand the Funds, their complex investments, the environment in which the Funds operated, and to discuss the potential of the risk of material misstatement in the Funds' financial statements. AICPA 2007 Guide ¶ 2.104.

521.   Members of the audit team should discuss the potential for material misstatement due to fraud in accordance with the requirements of AU § 316.14-.18. The discussion among the audit team members about the susceptibility of the entity's financial statements to material misstatement due to fraud should include a consideration of the known external and internal factors affecting the entity that might (a) create incentives/pressures for management and others to commit fraud, (b) provide the opportunity for fraud to be perpetrated, and (c)

276

indicate a culture or environment that enables management to rationalize committing fraud. The "brain storming" by the audit team members about the risks of material misstatement due to fraud also should continue throughout the audit.  AICPA 2007 Guide ¶ 2.104.

522.   Among the examples of factors unique to the investment company industry in general, and the Funds in particular, indicating the potential for the risk of fraudulent financial reporting, or the risks of material misstatements due to fraud, auditors are instructed to be aware of the following:

(a)   Significant investments for which market quotations are not readily available;

(b)   Inadequate procedures for estimating these values;

(c)   Significant investments in derivative financial instruments (e.g., the structured securities in which the Funds heavily invested) whose value is very difficult to estimate;

(d)   Inadequate monitoring of the fund's compliance with its prospectus requirements;

(e)   Lack of board members' understanding of how portfolio management intends to implement the fund's investment objectives, thereby creating a situation in which management can aggressively interpret or disregard policies in place (e.g., restrictions on illiquid securities and industry concentration);

(f)   Lack of board members' understanding of derivatives (e.g., the illiquid structured securities in which the Funds heavily invested) used by portfolio managers and involvement in approving or disapproving use of specific strategies, thereby creating a situation in which management can aggressively interpret or disregard policies in place;

(g)   Inadequate segregation of duties between operating (e.g., portfolio management, fund distribution) and compliance monitoring functions—e.g., a chief compliance officer who had no apparent experience in investment company

277

law and regulation versus portfolio management and fund distribution func-

tions assigned to personnel significantly more experienced in such matters;

(h)     Unusual or unexpected relationships may indicate a material misstatement due

to fraud such as investment performance substantially higher (or lower) when

compared to industry peers or other relevant benchmarks, which cannot be

readily attributed to the performance of specific securities where prices are

readily available in an active market;

(i)      Accounts, transactions, and assertions that have high inherent risk because

they involve a high degree of management judgment and subjectivity and are,

therefore, susceptible to manipulation by management;

(j)      Significant amounts of investments traded in "thin" markets, particularly

through one market maker (either exclusively or primarily);

(k)     Regarding fair valued investments, risks present in daily market valuation in-

clude lack of consideration of or availability of secondary/comparative pricing

sources and significant levels of pricing from brokers;

(l)      Regarding derivative instruments (e.g., structured securities in which the

Funds heavily invested), which are characterized by high inherent risk, risk

factors include lack of policy governing derivative investments, including a

clear definition of derivatives; lack of oversight over the use of derivative in-

vestments, including ongoing risk assessment of derivative instruments; lack

of adequate procedures to value derivatives; and lack of awareness or under-

standing of derivative transactions on the part of senior management or the

board of directors (e.g., Funds' management represents that Funds were not

investing in derivatives when in fact they were).

AICPA 2007 Guide ¶¶ 2.105, 2.107, 2.110, 2.111, 2.112, 2.113.

523.    Although fraud risk factors such as those described in the preceding paragraph

278

do not necessarily indicate the existence of fraud, they often are present in circumstances where fraud exists. AICPA 2007 Guide ¶ 2.108.

524.    Regarding securities that cannot be valued on the basis of prices determined on an active market, various risks exist, including the following:

(a)    To the extent that management is estimating the value of portfolio investments, even through generally recognized models, the risk of fraudulent misstatement through systematic bias ordinarily exists;

(b)    If an investment is valued through a single market maker (often the counter-party that sold the investment to the investment company), there is a risk that collusion occurred between that market maker and management in establishing a valuation for the investment;

(c)    In those cases where the independent valuation service estimates the value of securities that are not traded in the market, and of which the investment company, and other accounts managed by the same portfolio manager, may be the predominant, or sole, holder(s) of the securities, based predominantly, or solely, on information that is provided by the investment company, there is a risk that the information provided by management to the service is incomplete or otherwise biased;

(d)    If the market for a security is "thin," there is a risk that the investment company may be able to manipulate the quoted price by systematic purchases of the security in the market.

AICPA 2007 Guide ¶ 2.119.

525.    A "thin" market is one in which trades are typically sporadic, so that small changes in supply or demand can have a significant effect on quoted prices; usually, such securities have an extremely small "float" (i.e., freely tradable amounts owned by the public). AICPA 2007 Guide ¶ 2.119.

526.   A fund organization's program to prevent, deter, and detect fraud includes the periodic documentation of the fund's compliance with its investment objectives and restrictions. AICPA 2007 Guide ¶ 2.129.

527.   Audit procedures relevant to assessing the risks of material misstatement due to fraud include the following:

(a)   Analytical procedures such as comparing fund performance to benchmark indices and net investment income ratios to yield indices for comparable securities or investment funds;

(b)   Reading compliance summaries for individual funds and testing compliance determinations contained therein;

(c)   Testing inputs to valuation models for reasonableness in relation to published data or financial information services;

(d)   Reviewing minutes of board valuation committee meetings and considering whether the minutes adequately support valuations determined, or the procedures used to reach them.

AICPA 2007 Guide ¶  2.132.

528.    The failure to disclose in the notes to the Funds' 2004, 2005 and 2006 financial statements, and in PwC's audit reports on said financial statements, the magnitude of the Funds' securities whose values were estimated and, therefore, subject to significant uncertainty, was a material misstatement due to fraud within the meaning of AICPA 2007 Guide ¶¶ 2.101-2.140.

529.   The failure described in the preceding paragraph was a "previously unrecognized risk of material misstatement due to fraud." See AICPA 2007 Guide ¶ 2.133.

530.   The auditor with final responsibility for the audit should ascertain that there has been appropriate communication with the other audit team members throughout the audit regarding information or conditions indicative of risks of material misstatement due to fraud.

280

AICPA 2007 Guide ¶ 2.134.

**B.     PwC's Disclosure and Reporting Obligations**

531.    According to PwC, the Funds' directors and management had sufficient knowledge that the Funds were not being managed in a manner that adhered to their respective investment objectives, policies and restrictions by no later than mid-2006 and that this knowledge was sufficient to put the directors and management on notice of claims by the Funds against Defendants. PwC had the same knowledge.

532.    If PwC had properly carried out its duties in the course of its audit of the Funds' financial statements for their fiscal years ended June 30, 2006, PwC would have ascertained the failure either to properly value the Funds' high-yield bonds and structured financial instruments or to disclose the magnitude of the Funds' fair valued securities, the failure to disclose the uncertain value of a substantial portion of the Funds' portfolio securities and of the Funds' respective net asset values, and the Funds' excessive investments in illiquid high-yield bonds and structured financial instruments and in a single industry, all in violation of express restrictions on such investments and generally accepted accounting principles and SEC rules and regulations, as well as the Funds' own disclosures. If PwC had so ascertained such violative conduct in the course of such audits, it was required to inform the Funds' management and directors of such violative practices.

533.    SEC Codification § 404.03 provides that where "questions of propriety or validity [relating to a mutual fund's investments] are not satisfactorily resolved, the circumstances of the investment should be disclosed in the financial statements or notes thereto."

534.    The AICPA Guide provides that if PwC was unable to obtain sufficient evidential matter to support the Funds' management's assertions about the nature of a matter involving an uncertainty – e.g., the valuation of the Funds' high-yield bonds and structured financial instruments – and its presentation or disclosure in the Funds' financial statements, PwC should have considered the need to express a qualified opinion or to disclaim an opin-

281

ion because of a scope limitation.  PwC did not do so in connection with its audit of the Funds' 2004, 2005 and 2006 financial statements.   PwC did do so, in part, in connection with its audit of the Funds' 2007 financial statements.

535.   The AICPA Guide further provides that if PwC's audits of the Funds' financial statements revealed that the valuation procedures used by the Funds' board of directors were inadequate or unreasonable, or that the underlying documentation did not support the valuations, PwC should have modified its opinion for lack of conformity with generally accepted accounting principles or, depending on the significance to the financial statements of the securities subject to such valuation procedures, PwC should have issued an adverse opinion.

536.   SOP 93-1 provides that, even if PwC had concluded, in the course of its audit of the Funds' 2004. 2005 and 2006 annual financial statements, based on an examination of the available evidence, the process used to estimate the values of the Funds' high-yield bonds and structured financial instruments was reasonable, the documentation supportive, and the range of possible values of such securities was not significant, PwC might still have chosen to emphasize the existence of the uncertainties relating to such estimated valuations of such securities by including an explanatory paragraph in its audit report on those financial statements, as PwC did do in its October 3, 2007 audit report in connection with its audit of the Funds' 2007 financial statements.

537.   In light of the magnitude of the high-yield asset- and mortgage-backed securities and other structured financial instruments that were subject to good faith fair value procedures, PwC should have, with respect to the Funds' 2004, 2005 and 2006 financial statements, either:

(a)    Included an explanatory paragraph in its report on the Funds' financial statements disclosing the magnitude of the Funds' portfolios subject to good faith fair value estimates by the Funds' board of directors, along with an explanatory paragraph to emphasize the uncertainty of the valuation of such securities

and of the Funds' NAVs; or

(b)     Issued an opinion that was qualified because the Funds' financial statements and attendant disclosures failed to conform with generally accepted accounting principles; or

(c)     Issued an adverse opinion, or disclaimed its ability to issue an opinion, because of the limitation on the scope of its audit resulting from such valuation uncertainty or from the failure of the valuation of the high-yield bonds and structured financial instruments in which the Funds invested to be done in accordance with required and disclosed valuation procedures.

538.    PwC furnished to the Funds' officers and directors in connection with each of its audit of the Funds'2006 annual financial statements a "management letter" in which it commented on, *inter alia*, the Funds' internal controls. In this management letter PwC should have reported to the Funds' management and board of directors:

(a)     The failure to value the Funds' high-yield bonds and structured financial instruments in accordance with the Funds' disclosed valuation policy, applicable generally accepted accounting principles, and SEC rules and regulations;

(b)     The failure to disclose the uncertain estimated values of the Funds' substantial investments in high-yield bonds and structured financial instruments in accordance with applicable generally accepted accounting principles and SEC rules and regulations;

(c)     The failure and need to disclose the effect on the Funds' portfolio valuations and NAV per share of such uncertain estimated values of the Funds' substantial investments in high-yield bonds and structured financial instruments in light of the Funds' investment objectives and/or other representations regarding maintaining relatively stable NAVs; and

(d)     The failure to comply with the disclosed limitations on the Funds' investments

283

in illiquid securities and investments in a single industry.

539.   In its Form N-SAR report on the Funds' internal controls, PwC should have reported to the SEC by at least June 30, 2006, the Funds' directors and the Funds' shareholders the matters identified in the preceding paragraph.

540.    In its report to the Funds' shareholders on the Funds' annual 2004, 2005 and 2006 financial statements, or in footnotes to such financial statements, PwC should have disclosed, or advised the Funds to disclose, the matters identified in paragraph 538.

541.   If PwC had timely informed the Funds' management and directors, as set out above, the RMK Defendants could have caused the Funds to take corrective action to bring their valuation procedures into compliance with generally accepted accounting principles and SEC rules and regulations and disclosed accounting policies, and warned the Funds' shareholders and prospective investors about the uncertainty inherent in the estimated values of a substantial portion of the Funds' assets and, consequently, the uncertainty of the Funds' net asset values. Alternatively, the Funds' directors and management could have caused the Funds to take corrective action by reducing the amount of thinly traded structured financial instruments of uncertain valuation that had a history of suddenly becoming unsalable at their estimated values, to bring the Funds' investment practices into compliance with the Funds' respective investment objective, policies, restrictions and representations.

542.   If, in the absence of corrective action by the RMK Defendants, PwC had timely so informed the SEC, the Funds would have been compelled to suspend selling and redeeming their shares and take corrective action to bring their portfolios into compliance with their respective investment objectives, policies and restrictions.

## C.   PwC's False Direct Representations

543.   In connection with the offer and sale of, and offer to redeem the Funds' shares, Defendant PwC made the following representations in its report on the Funds' June 30, 2006 financial statements on and after August 21, 2006 (date of PwC's audit report), which ap-

peared in the Funds' registration statements or amendments thereto, including prospectuses and statements of additional information, and in annual reports and other documents filed with the SEC and distributed to the Funds' shareholders during the period following the issuance of said report:

> In our opinion, the accompanying statements of assets and liabilities, including the portfolios of investments, and the related statements of operations and of changes in net assets and the financial highlights present fairly, in all material respects, the financial position of Regions Morgan Keegan Select Short Term Bond Fund, Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select High Income Fund (hereafter referred to as the "Funds") at June 30, 2006, the results of each of their operations and the changes in each of their net assets for each of the years or periods presented and the financial highlights for the years and periods presented for Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select High Income Fund and the financial highlights for the three years or periods in the year then ended for Regions Morgan Keegan Select Short Term Bond Fund, in conformity with accounting principles generally accepted in the United States of America. These financial statements and financial highlights (hereafter referred to as "financial statements") are the responsibility of the Funds' management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits, which included confirmation of securities at June 30, 2006 by correspondence with the custodian and brokers, provide a reasonable basis for our opinion . . . . .

544.    In connection with the offer and sale of the Funds' shares, Defendant PwC made representations in its reports on the Funds' June 30, 2004 and June 30, 2005 financial statements identical or nearly or substantively identical to those recited in the preceding paragraph, which appeared in the Funds' registration statements or amendments thereto, in-

cluding prospectuses and statements of additional information, and in annual reports and other documents filed with the SEC and distributed to the Funds' shareholders during the period following the issuance of each of said reports.

545.   The Funds' June 30, 2006, annual report and prospectus dated November 1, 2006, contained a section entitled "Financial Highlights." This section contained excerpts from the Funds' audited financial statements for the preceding three years relating to, *inter alia*, total return, yield, NAV at the beginning and end of the period, income (loss) from investment operations, net investment income, net realized and unrealized gains (losses) on investments, distributions, and the ratio of net investment income to average net assets. The financial data that appeared in the "Financial Highlights" section of each of the Funds' prospectuses was examined by PwC.

546.   As an example, the following financial information for the five-year period July 31, 2001 through June 30, 2006 (September 1, 2001 through June 30, 2006 for the Short Term Fund) was disclosed in the "Financial Highlights" section of the Funds' November 1, 2006 prospectus (data is for Class A shares):

| FUND | NAV PER SHARE RANGE | | RANGE AS % OF AVERAGE NAV | NET INVEST-MENT INCOME AS % OF AV-ERAGE NET ASSETS | | RANGE AS % OF AV-ERAGE INCOME AS % OF NET ASSETS | ANNUAL TO-TAL RETURN | | RANGE AS % OF AVERAGE TOTAL RETURN | TOTAL ANNUAL DISTRIBUTIONS PER SHARE | | RANGE AS % OF AVERAGE DISTRI-BUTIONS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | High | Low | | High | Low | | High | Low | | High | Low | |
| Short Term Bond Fund | $ 10.24 | $ 9.94 | 2.97% | 4.18% | 2.76% | 40.92% | 6.57% | 1.21% | 138% | $ 0.44 | $ 0.29 | 41% |
| Intermediate Fund | $ 10.39 | $ 9.93 | 4.53% | 9.55% | 6.61% | 36.39% | 9.99% | 4.68% | 72% | $ 1.00 | $ 0.68 | 38% |
| High Income Fund | $ 10.56 | $ 10.42 | 1.33% | 13.52% | 10.23% | 27.71% | 14.05% | 10.13% | 32% | $ 1.44 | $ 1.17 | 21% |

547.   The table in the preceding paragraph demonstrates that the High Income Fund's NAV fluctuated the least (i.e., was the least volatile) of the three Funds and that the other performance measures likewise show the High Income Fund to be the least volatile. Thus, there was nothing in the performance data of the three Funds over the five-year period

July/September 2001 through June 2006 to suggest the potential for the Short Term Fund, Intermediate Fund and High Income Fund to encounter the extraordinary volatility experienced in 2007 and early 2008 or to incur the huge losses that the Funds did incur in 2007 and 2008. Especially significant is the relative stability of the High Income Fund's distributions, which are very important to investors in fixed income funds.

548.    The Funds' June 30, 2004 and June 30, 2005 annual reports and prospectuses dated subsequent to said annual reports likewise contained a section entitled "Financial Highlights." This section contained excerpts from the Funds' audited financial statements for the preceding three years relating to, *inter alia*, total return, yield, NAV at the beginning and end of the period, income (loss) from investment operations, net investment income, net realized and unrealized gains (losses) on investments, distributions, and the ratio of net investment income to average net assets. The financial data that appeared in the "Financial Highlights" section of each of the Funds' prospectuses was examined by PwC.

549.    During the Class Period, the Funds' annual reports to shareholders and prospectuses were reviewed by PwC, the Funds' directors and the other RMK Defendants.

550.    During the Class Period, the prospectuses contained in the Funds' registration statements were distributed, or made available, to prospective investors in the Funds and to the Funds' existing shareholders. The June 30, 2004, 2005 and 2006 annual and December 31, 2004, 2005 and 2006 semi-annual reports to shareholders were distributed, or made available, to existing Fund shareholders at the time they were issued and to prospective investors throughout the year following their issuance until the next annual report was issued.

551.    The Funds' 2004, 2005 and 2006 annual financial statements did not include a statement of cash flows; a statement of cash flows was required for the following reasons:

(a)    AICPA Guide ¶ 7.66 provides:

FASB Statement No. 102 exempts from the requirements to provide a statement of cash flows investment companies subject to the 1940

287

Act . . . provided that all of the following conditions are met:

a.   During the period, substantially all of the enterprise's invest-ments were highly liquid (for example, marketable securities and other assets for which a market is readily available).

b.   Substantially all of the enterprise's investments are carried at fair value. (Securities for which fair value is determined using ma-trix pricing techniques would meet this condition. Other securi-ties for which fair value is not readily determinable and for which fair value must be determined in good faith by the board of directors would not.)

(b)   The High Income and Intermediate Funds held securities the fair value of which was not readily determinable and the fair value of which was deter-mined in good faith by the board of directors as of June 30, 2006 and June 30, 2007 ranging from 50% to 60%. Paragraphs 187 and 472.

(c)   Given the magnitude of securities in the Funds' portfolios whose valuations were estimated, "substantially all" of the Funds' investments were not "highly liquid," and, therefore, the Funds failed to satisfy the requirement for the ex-emption from including a statement of cash flows.

552.   The representations, financial information and representations implicit in said financial information set forth in paragraphs 543-46 above were false and misleading in that:

(a)   PwC did not audit the Funds' financial statements in accordance with applica-ble auditing standards;

(b)   The Funds' financial statements were not presented in accordance with gener-ally accepted accounting principles;

(c)   With respect to the Financial Highlights, PwC failed to disclose that the Funds' financial results were obtained by investment practices that were in-consistent with, and prohibited by the Funds' restrictions, investment objec-tives, and RMK Defendants' representations about how the Funds would be managed;

288

(d)  In connection with the Financial Highlights, PwC failed to disclose that the Funds' financial results were obtained by investing in highly speculative illiquid high-yield bonds and structured financial instruments in excess of the 15% limitation on illiquid securities disclosed by the Funds and recommended by the SEC and in excess of the 25% limit on investments in a single industry;

(e)  In connection with the Financial Highlights, PwC failed to disclose that the Funds' financial statements from which the Financial Highlights were excerpted were not prepared in accordance with generally accepted accounting principles in that, *inter alia*, the financial statements failed to disclose the magnitude of fair valued securities, the material uncertainty inherent in the estimated values of such securities, and the effect thereof on the Funds' respective NAVs and NAVs per share during all times relevant herein and the ability of the Funds' shareholders to redeem their shares at a reasonably stable NAV per share;

(f)  In its reports on the Funds' financial statements and in connection with the Financial Highlights, in view of the magnitude of portfolio securities as to which secondary quotations were not available and which were subject to good faith fair value procedures, PwC failed to disclose the material valuation uncertainty of the high-yield bonds and structured financial instruments in which the Funds invested and the effect of such uncertainty on the Funds' net asset value, their financial statements and the Financial Highlights and ability of shareholders to redeem their shares;

(g)  PwC, in its reports on the Funds' financial statements, failed either (i) to qualify its opinions on the Funds' financial statements by including an exception to its opinions for the effect on said financial statements of the valuation of the Funds' securities for which market quotations were not readily available as de-

289

termined by the Funds' board of directors and the uncertainties attendant to the valuation of such securities, or (ii) to render adverse opinions, or disclaim an opinion, because of the limitation on the scope of its audit resulting from such valuation uncertainty or from the failure of the valuation of the high-yield bonds and structured financial instruments in which the Funds invested to be done in accordance with required and disclosed valuation procedures, or (iii) to include an explanatory paragraph disclosing the valuation risk inherent in the Funds' portfolios in view of the magnitude of securities subject to good faith fair value procedures;

(h)    PwC failed to apply appropriate audit procedures to the valuations of the Funds' high-yield bonds and structured financial instruments and failed to modify its audit reports to disclose the Funds' use of an improper valuation method for a significant portion of the Funds' portfolios or failure to apply fair value procedures, as the Funds disclosed would be applied when market quotations were not readily available;

(i)    PwC improperly relied upon the representations of the Funds' management as to the Funds' compliance with their investment restrictions and/or failed to conduct such tests as reasonable to ascertain the Funds' compliance with their disclosed investment restrictions;

(j)    PwC failed to ascertain whether the Funds' internal control and risk management were adequate to ensure compliance by the Funds with their disclosed investment restrictions;

(k)    PwC did not obtain reasonable assurance (high level of assurance) that the Funds were not violating their investment restrictions;

(l)    The Financial Highlights falsely portrayed the Funds as relatively stable (i.e., safe) fixed income investment vehicles providing a steady stream of dividends

and concealed the potential for great loss that lurked in each of the Funds' portfolios, which false portrayal would have been cured by the disclosures that PwC was required to make in its reports on the Funds' financial statements, or that PwC was required to advise the Funds to make in their financial statements and the footnotes thereto, in accordance with generally accepted accounting principles and applicable SEC rules; and

(m) The Funds' financial statements did not include the required statement of cash flows, which was required because of the magnitude of securities in the Funds' respective portfolios whose valuations were estimated, thus failing to satisfy the requirement for the exemption from including a statement of cash flows that substantially all of the Funds' investments be "highly liquid." AICPA Guide ¶ 7.66; SFAS 102.

553. The High Income Fund's yield (dividends as a percentage of NAV) was inflated to the extent that the dividend rate for the individual Funds was not sustainable. The actual portfolio income did not support the dividends being paid, resulting in the Fund's distributing capital to the shareholders, which was not disclosed and which was prohibited by the section 6.3 of the Company's articles of incorporation. For the year ended June 30, 2007, the High Income Fund's distributions (excluding distributions from net realized gain on investments) of $137,840,131 exceeded the Fund's net investment income of $125,790,468 by over $12 million.

554. In September, October and November 2008, new managers for the Funds (HBAM) reduced the High Income Fund's dividend by 92%, the Intermediate Fund's dividend by 94%, and the Short Term Fund's dividend by 63% to bring dividends in line with investment income, putting the dividends on a sustainable basis.

555. If PwC had not failed in its auditing function as alleged herein but instead had conducted the auditing procedures and tests described herein for the Funds' fiscal year ended

June 30, 2004, 2005 and 2006 with the care and diligence reasonably expected by the Plaintiffs and the Class, and in the manner reasonably expected by the Funds' management and board of directors in light of PwC's advertised expertise in matters relating to investment companies and the audits of their financial statements and in response to the reliance by the Funds' management and board of directors on PwC as invited by PwC, PwC would have reported to the directors that the Funds were engaging in the wrongful conduct described herein, and corrective actions could have been taken by the Funds' management that would have avoided or minimized the losses incurred by Plaintiffs and the class in 2007 and 2008.

556.   If PwC had disclosed, or informed the Funds' directors of the need to disclose, the matters required to be disclosed by the AICPA Guide in its report on the Funds' June 30, 2006 financial statements, the Funds' shareholders would have been informed of material facts relevant to their continuing holdings of the Funds' shares in connection with the Funds' continuing offers to redeem their shares from their respective shareholders.

557.   If PwC had disclosed, or had informed the Funds' directors of the need to disclose, the matters required to be disclosed by the AICPA Guide in its reports on the Funds' 2004, 2005 and 2006 annual financial statements, the Funds' management and directors would have been forewarned about the Funds' improper valuation practices, the valuation uncertainty relating to the Funds' largely estimated NAV, and the Funds' failure to adhere to the disclosed restrictions on illiquid securities and investments in a single industry, and, being forewarned, the Funds' directors would have caused corrective action to be taken by the Funds' management, thus avoiding the losses incurred by the Funds in 2007 and 2008.

558.   If PwC had informed Morgan Management, Morgan Keegan and the Funds' board of directors, in connection with its audits either of the Funds' 2004, 2005 or 2006 annual financial statements of the need to make the disclosures described herein, as PwC did in connection with its audit of the Funds' 2007 and 2008 financial statements, or that PwC was unable to render an unqualified opinion on the Funds' 2004, 2005 or 2006 financial state-

ments, or if PwC had included an explanatory paragraph in its reports on the Funds' 2004, 2005 or 2006 financial statements, as PwC did in connection with its audits of the Funds' 2007 and 2008 financial statements, or if PwC had informed the SEC and the Funds' shareholders of the above matters, the Fund's directors, to avoid the need for such disclosures or the loss of the Funds' assets through redemptions, would have caused corrective action to be taken by the Funds' management, thus avoiding the losses incurred by the Funds in 2007 and 2008.

559.   If PwC had informed Morgan Management, Morgan Keegan and the Funds' board of directors, in connection with its audit of the Funds' 2004, 2005 and 2006 annual financial statements of the need to make the disclosures described herein, as PwC did in connection with its audits of the Funds' 2007 and 2008 financial statements, or that PwC was unable to render an unqualified opinion on the Funds' financial statements, or if PwC had included an explanatory paragraph in its report on the Funds' 2004, 2005 and 2006 annual financial statements, as PwC did in connection with its audit of the Funds' 2007 and 2008 financial statements, or if PwC had informed the SEC and the Funds' shareholders of the above matters, Plaintiffs and the Class, being forewarned, could have avoided the losses incurred by them.

560.   If PwC had timely informed the Funds' management and directors in June 2006, or even as late as December 2006, that the Funds' portfolio securities exceeded the disclosed restriction on illiquid securities, the Funds would have sold such illiquid securities at a time when, despite the illiquid market for such securities, they could have been sold for substantially more than the prices to which they began to drop in 2007. If the Funds had sold such securities during the period from mid- to late-2006 to early 2007, they would have avoided the losses incurred in 2007 and 2008 as a result of their excessively heavy use of uncertainly valued illiquid securities, and the Funds' net asset value would not have declined, or would not have declined by nearly as much as it did decline.

293

561.    Notwithstanding the belated disclosures in October 2007 regarding the magnitude of the fair valued securities present in the Funds' portfolios at June 30, 2006 and the failure to make such disclosures in the June 30, 2006, 2005 and 2004 financial statements, at no time has PwC withdrawn its reports on the Funds' 2006, 2005 or 2004 financial statements, or taken any other steps to inform the Funds' shareholders of the violative nature of the investment policies used by the Funds during the Class Period.

**D.    THE FUNDS' 2004, 2005 AND 2006 FINANCIAL STATEMENTS WERE NOT PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND DID NOT INCLUDE ALL REQUIRED FINANCIAL STATEMENT DISCLOSURES**

562.    On April 25, 1938, the SEC issued SEC Accounting Series Release ("ASR") 4:

In cases where financial statements filed with the Commission pursuant to its rules and regulations under the Securities Act or the Exchange Act are prepared in accordance with accounting principles for which there is no substantial authoritative support, such financial statements will be presumed to be misleading, or inaccurate despite disclosures contained in the certificate of the accountant or in footnotes to the statements provided the matters involved are material. In cases where there is a difference of opinion between the Commission and the registrant as to the proper principles of accounting to be followed, disclosure will be accepted in lieu of correction of the financial statements themselves only if the points involved are such that there is substantial authoritative support for the practices followed by the registrant and the position of the Commission has not previously been expressed in rules, regulations or other official releases of the Commission, including the published opinions of its Chief Accountant.

563.    On December 20, 1973, the SEC's 1938 policy statement was updated to recognize the establishment of the Financial Accounting Standards Board ("FASB") through the issuance of Accounting Series Release 150. This Release stated, in relevant part:

Various Acts of Congress administered by the Securities and Exchange Commission clearly state the authority of the Commission to prescribe methods to be followed in the preparation of accounts and the form and content of financial statements to be filed under the Acts and responsibility to assure that investors are furnished with information necessary for informed investment decisions. In meeting this statutory responsibility effec-

> tively, in recognition of the expertise, energy and resources of the account-
> ing profession, and without abdicating its responsibilities, the Commission
> has historically looked to the standard setting bodies designated by the pro-
> fession to provide leadership in establishing and improving the accounting
> principles...

See also Financial Reporting Release No. 36.

564.    In addition, AU Section 411, which discusses the sources of established ac-

counting principles that are generally accepted in the United States and which sets forth a

hierarchy or such principles states:

> Rules and interpretive releases of the Securities and Exchange Commission
> (SEC) have an authority similar to category (a) [the highest level in the hi-
> erarchy of accounting principles] pronouncements for SEC registrants. In
> addition, the SEC staff issues Staff Accounting Bulletins that represent
> practices followed by the staff in administering SEC disclosure require-
> ments. Also, the Introduction to the FASB's EITF Abstracts states that the
> Securities and Exchange Commission's Chief Accountant has said that the
> SEC staff would challenge any accounting that differs from a consensus of
> the FASB Emerging Issues Task Force, because the consensus position
> represents the best thinking on areas for which there are no specific stan-
> dards.

565.    Based on the foregoing, the SEC is the final arbiter of accounting principles.

566.    SEC Regulation S-X § 210.4-01(a)(1) provides that financial statements that

are not prepared in accordance with generally accepted accounting principles are presumed

to be misleading.

567.    The SEC's Codification of Financial Reporting Policies, § 404.03.a, requires

that violations by an investment company of its investment objectives, policies and restric-

tions be disclosed in its financial statements or the footnotes thereto.

568.    The Funds' 2004, 2005 and 2006 annual financial statements were not pre-

pared, or presented, in accordance with generally accepted accounting principles because

they did not disclose:

(a)     The magnitude of the Funds' respective investment portfolios that was in-

vested in illiquid or restricted securities and that was required to be valued using good faith fair value procedures established by the Funds' board of directors, as was disclosed in the 2007 and 2008 financial statements, or that such required valuation using such procedures had not been done;

(b)    The methods used to perform such valuations, including the method(s) and significant assumptions used to estimate the fair values of the Funds' investments subject to such valuations;

(c)    The valuation uncertainty attendant to the Funds' high-yield bonds and structured financial instruments resulting from the estimated values of such securities and the effect of such uncertainty on the Funds' respective net asset values, including the extent to which the Funds' respective NAVs per share were estimated and the effect on such NAVs of a given change in such estimated values and the likelihood of such change;

(d)    That the Funds' investment practices were inconsistent with, contrary to, and prohibited by

    (1)    their disclosed investment restrictions limiting investments in illiquid securities and investments in a single industry,

    (2)    the representations of RMK Defendants regarding how the Funds would be managed, and

    (3)    with respect to the Short Term and Intermediate Funds, the investment objectives of those Funds to the extent that those investment objectives imposed upon the Funds and the RMK Defendants the obligation to manage them in a manner that preserved capital, as they represented they would do;

(e)    That the Funds failed to disclose the concentration of credit risk inherent in their heavy investments in structured financial instruments and in mortgage re-

lated securities.

569.    By failing to disclose the Funds' violations of their respective investment ob-

jectives, policies and restrictions in their respective financial statements, PwC failed to dis-

close in its reports on the Funds' 2004, 2005 and 2006 annual financial statements that the

Funds were violating the SEC requirement that such violations be so disclosed, a financial

statement disclosure required by generally accepted accounting principles.

570.    In its report on the Funds' annual financial statements for their fiscal years

ended June 30, 2004, 2005 and 2006, PwC falsely stated that the Funds' financial statements

were prepared in accordance with generally accepted accounting principles.  PwC's state-

ments were false because the financial statements violated the following generally accepted

accounting principles or otherwise omitted required financial statement disclosures:

(a)    The principle that financial reporting should provide information that is useful

to present and potential investors in making rational investment decisions and

that information should be comprehensible to those who have a reasonable un-

derstanding of business and economic activities (FASB Statement of Financial

Accounting Concepts No. 1, ¶ 34);

(b)    The principle that financial reporting should be conservative and refrain from

overstatement of net income or assets, choosing the alternative that provides a

lower net income or assets if confronted with a decision (FASB Statement of

Financial Accounting Concepts No. 1);

(c)    The principle that conservatism be used as a prudent reaction to uncertainty to

ensure that uncertainties and risks inherent in business situations are ade-

quately considered (FASB Statement of Financial Accounting Concepts No. 2,

¶¶ 95, 97);

(d)    The principle that financial reporting should be reliable in that it represents

what it purports to represent (FASB Statement of Financial Accounting Con-

cepts No. 2, ¶¶ 58-59);

(e)     The principle that the quality of reliability and, in particular, of representa-
tional faithfulness leaves no room for accounting representations that subordi-
nate substance to form  (FASB Statement of Financial Accounting Concepts
No. 2);

(f)     The concept of completeness that nothing material is left out of the informa-
tion that may be necessary to ensure that it validly represents underlying events
and conditions (FASB Statement of Financial Accounting Concepts No. 2);

(g)     The principle of materiality, which provides that the omission or misstatement
of an item in a financial report is material if, in light of the surrounding cir-
cumstances, the magnitude of the item is such that it is probable that the judg-
ment of a reasonable person relying upon the report would have been changed
or influenced by the inclusion or correction of the item (FASB Statement of
Financial Accounting Concepts No. 2, ¶ 132);

(h)     The concept that "the benefits of information may be increased by making it
more understandable and, hence, useful to a wider circle of users" (FASB
Concepts Statement No. 2) and that financial statement disclosures should be
expressed clearly (SAS No. 106);

(i)     Disclosure of accounting policies should identify and describe the accounting
principles followed by the reporting entity and the methods of applying those
principles that materially affect the financial statements (Accounting Principles
Board Opinion No. 22);

(j)     Disclosure of the methods and significant assumptions used to estimate the fair
value of the Funds' investments for which market quotations were not readily
available (FASB Statement of Financial Accounting Standards No. 107, ¶ 10);

(k)     The omission of a statement of cash flows from the Funds' financial state-

ments; and

(l)    The omission of material facts from the Funds' financial statement disclosures relating to the concentration, credit, liquidity and valuation risks and uncertainties embedded in the Funds' portfolios, the effect of such valuation uncertainties on the Funds' net assets and NAV per share, and violations of the Funds' respective investment objectives and/or restrictions, all as set forth herein.

571.    In the footnote disclosures to the Funds' 2007 financial statements, and in PwC's report on the Funds' 2007 financial statements, Defendants finally disclosed, albeit deficiently, the conditions and risks that had lurked in the Funds' portfolios, and should have been disclosed, throughout all times relevant herein, which nondisclosures violated GAAP. *See* paragraph 220(l) above.

### E.    PwC's Audits of the Funds' 2004, 2005 and 2006 Financial Statements Were Not Conducted in Accordance with Generally Accepted Auditing Standards

572.    Throughout all times relevant herein, PwC had continual and complete access to the Funds' books, records (as maintained by Morgan Management and Morgan Keegan), and the Funds' and Morgan Management's and Morgan Keegan's corporate, financial, operating and business information, as well as their business operations, and ample opportunity to observe their investment and accounting practices. PwC had superior access to and knowledge of all aspects of the Funds' business and was well informed as to their accounting practices.

573.    The phrase "fair value" is defined, for accounting purposes (FASB Statement Nos. 107 ¶ 5, 115) as: "The amount at which a financial instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale." "Fair value" is also defined as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." FASB SFAS No. 157 ¶ 5.

574.    GAAS specifically provides guidance (in AU Section 332) to auditors in audit-
ing investments in debt and equity securities. It states that: "The auditor should ascertain
whether investments are accounted for in conformity with generally accepted accounting
principles, including adequate disclosure of material matters." It further states that:

> If investments are carried at fair value or if fair value is disclosed for in-
> vestments carried at other than fair value, the auditor should obtain evi-
> dence corroborating the fair value. In some cases, the method for determin-
> ing fair value is specified by generally accepted accounting principles. For
> example, generally accepted accounting principles may require that the fair
> value of an investment be determined using quoted market prices or quota-
> tions as opposed to estimation techniques. In those cases, the auditor
> should evaluate whether the determination of fair value is consistent with
> the required valuation method. The following paragraphs provide guidance
> on audit evidence that may be used to corroborate assertions about fair
> value; the guidance should be considered in the context of specific ac-
> counting requirements.
>
> Quoted market prices for investments listed on national exchanges or over-
> the-counter markets are available from sources such as financial publica-
> tions, the exchanges, or the National Association of Securities Dealers
> Automated Quotations System (NASDAQ). For certain other investments,
> quoted market prices may be obtained from broker-dealers who are market
> makers in those investments. If quoted market prices are not available, es-
> timates of fair value frequently can be obtained from third-party sources
> based on proprietary models or from the entity based on internally devel-
> oped or acquired models.
>
> Quoted market prices obtained from financial publications or from national
> exchanges and NASDAQ are generally considered to provide sufficient
> evidence of the fair value of investments. However, for certain invest-
> ments, such as securities that do not trade regularly, the auditor should
> consider obtaining estimates of fair value from broker-dealers or other
> third-party sources. In some situations, the auditor may determine that it is
> necessary to obtain fair-value estimates from more than one pricing source.
> For example, this may be appropriate if a pricing source has a relationship
> with an entity that might impair its objectivity.
>
> For fair-value estimates obtained from broker-dealers and other third-party
> sources, the auditor should consider the applicability of the guidance in
> section 336 [Using the Work of a Specialist] or section 324 [Service Or-

ganizations]. The guidance in section 336 may be applicable if the third-party source derives the fair value of a security by using modeling or similar techniques. If an entity uses a pricing service to obtain prices of listed securities in the entity's portfolio, the guidance in section 324 may be appropriate.

In the case of investments valued by the entity using a valuation model, the auditor does not function as an appraiser and is not expected to substitute his or her judgment for that of the entity's management. Rather, the auditor generally should assess the reasonableness and appropriateness of the model. The auditor also should determine whether the market variables and assumptions used are reasonable and appropriately supported. Estimates of expected future cash flows should be based on reasonable and supportable assumptions. Further, the auditor should determine whether the entity has made appropriate disclosures about the method(s) and significant assumptions used to estimate the fair values of such investments.

The evaluation of the appropriateness of valuation models and each of the variables and assumptions used in the models may require considerable judgment and knowledge of valuation techniques, market factors that affect value, and market conditions, particularly in relation to similar investments that are traded. Accordingly, in some circumstances, the auditor may consider it necessary to involve a specialist in assessing the entity's fair-value estimates or related models.

575.    Because the Funds' financial statements during all times relevant herein did not include the required disclosures about the method(s) and significant assumptions used to estimate the fair values of the Funds' investments subject to such valuations, the inference arises that PwC failed to obtain such information and that, therefore, PwC failed to obtain evidence corroborating the investment valuations that the Funds purported to be reflected at fair value, thus violating AU § 332.

576.    In those instances where valuation models were used to arrive at the fair values of the Funds' assets, PwC violated AU Section 332 by failing to:

(a)    Assess the reasonableness and appropriateness of valuation models or assessing the reasonableness and appropriateness of valuation models or, instead, making audit judgments that no reasonable auditor would have made if con-

301

fronted with the same facts;

(b)     Determine whether the market variables and assumptions used in valuation models were reasonable and appropriately supported or, instead, making a determination that the market variables and assumptions used in valuation models were reasonable and appropriately supported when no reasonable auditor would have made the same determination if confronted with the same facts;

(c)      Assess the reasonableness and supportability of assumptions used in valuation models to estimate expected future cash flows of certain investments or, instead, assessing the reasonableness and supportability of assumptions used in valuation models to estimate expected future cash flows of certain investments and arriving at conclusions that no reasonable auditor would have arrived at if confronted with the same facts;

(d)     Determine whether the Funds had made appropriate disclosures about the methods and significant assumptions used to estimate the fair values of such investments or, instead, by making such determination and arriving at conclusions that no reasonable auditor would have arrived at if confronted with the same facts; or

(e)     Engage the services of an independent specialist to assess the reasonableness of the values ascribed to the Funds' illiquid investments which were purported to be reflected at fair value, as was done in connection with the audit of the Funds' 2007 financial statements.

577.    As a result of PwC's failures described in the preceding paragraph, PwC's audits were so deficient that they amounted to no audit at all.

578.    PwC did not comply with GAAS in that it either (a) performed its audits in a manner that constituted an extreme departure from GAAS and from the standards of ordinary care; or (b) failed to perform audit procedures that were appropriate and necessary un-

der the circumstances, such as investigating the Funds' questionable financial statement assertions as particularized herein, and made audit judgments that no reasonable auditor would have made if confronted with the same facts.

579. AU Section 561, "Subsequent Discovery of Facts Existing at the Date of the Auditor's Report," sets forth procedures to be followed by the auditor who, subsequent to the date of his report upon audited financial statements, becomes aware that facts may have existed at that date which might have affected his report had he then been aware of such facts. PwC had a responsibility under this GAAS to revisit at least its 2006 audit when put on notice that half of the Funds' portfolio consisted of fair valued securities whose valuations were highly uncertain, thus requiring disclosure, both in footnotes to the Funds' 2006 annual financial statements and a paragraph in PwC's audit report calling attention to such uncertainty, given the magnitude thereof and the effect on the Funds' respective NAVs, as was disclosed in the Funds' 2007 financial statements.

580. PwC failed to comply with AU Section 561, in that PwC failed to (i) advise the Funds to disclose that at least their 2006 financial statements were materially misstated and to (ii) advise the Funds:

> . . . to make appropriate disclosure of the newly discovered facts and their impact on the financial statements to persons who are known to be currently relying or who are likely to rely on the financial statements and the related auditor's report . . . If the client refuses to make the disclosures . . . the auditor should notify each member of the board of directors of such refusal and of the fact that, in the absence of disclosure by the client, the auditor should take the following steps to the extent applicable:
>
> a.   Notification to the client that the auditor's report must no longer be associated with the financial statements.
>
> b.   Notification to regulatory agencies having jurisdiction over the client that the auditor's report should no longer be relied upon.
>
> c.   Notification to each person known to the auditor to be relying on the financial statements that his report should no longer be relied upon.

AU Section 561.

581.   AU Section 311 provides that audit planning involves developing an overall strategy for the expected conduct and scope of the audit:

The auditor should obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with generally accepted auditing standards. That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements . . .Knowledge of the entity's business helps the auditor in:

(a)   Identifying areas that may need special consideration;

(b)   Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization;

(c)   Evaluating the reasonableness of estimates;

(d)   Evaluating the reasonableness of management representations.

(e)   Making judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures.

582.   PwC failed to:

(a)   Identify areas that needed special consideration, such as the appropriate valuation of securities for which market quotations were not readily available and the appropriate determination of illiquid securities or identified such areas but audited them in a manner that was so deficient that it amounted to no audit at all, while making audit judgments that no reasonable auditor would have made if confronted with the same facts;

(b)   Assess the conditions under which accounting data (such as the fair values of the Funds' illiquid investments) was produced, processed, reviewed, and accumulated within the organization or assessed such conditions and made audit judgments based upon said assessment that no reasonable auditor would have made if confronted with the same facts;

(c)   Evaluate the reasonableness of estimates and management's representations (such as estimates of the fair value of the Funds' investments and manage-

304

ments' representations regarding these fair values) or evaluated them in a manner which was so deficient that it amounted to no evaluation at all;

(d)     Judge the appropriateness of the accounting principles applied (such as the principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements) and the adequacy of disclosures in the Funds' financial statements (such as disclosure of the nature and the amount of the Funds' fair-valued, untested, novel, illiquid securities), or did so and arrived at judgments that no reasonable auditor would have arrived at if confronted with the same facts.

583.    AU Section 230 mandates that this overall strategy is to comprehend the fact that: "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report." Providing guidance on the concept of due professional care, AU Section 230 states:

> Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.
>
> Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.
>
> The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.

See also Securities Act Release No. 6349 (it is management's responsibility to identify factors peculiar to and necessary for an understanding and evaluation of an individual com-

pany).

584.    PwC violated GAAS by failing to exercise due professional care in the overall conduct and scope of its audits, including the planning and performance of these audits and the preparation of its audit report on the Funds' 2004, 2005 and 2006 annual financial statements as particularized below.

585.    AU Section 336 provides:

> The auditor's education and experience enable him or her to be knowledgeable about business matters in general, but the auditor is not expected to have the expertise of a person trained for or qualified to engage in the practice of another profession or occupation. During the audit, however, an auditor may encounter complex or subjective matters potentially material to the financial statements. Such matters may require special skill or knowledge and in the auditor's judgment require using the work of a specialist to obtain competent evidential matter.

> Examples of the types of matters that the auditor may decide require him or her to consider using the work of a specialist include, but are not limited to...Valuation [of]...restricted securities....

586.    In planning its audits, PwC failed to consider the facts and circumstances that indicated the existence of a substantially increased risk of material misstatement of the fair values assigned to the Funds' fair-valued investments – by failing to disclose the magnitude of such investments and the uncertain valuations thereof – and likewise failed to engage the services of a qualified and independent specialist to undertake a valuation of those investments for which market quotations were not readily available.

587.    AU Section 333 provides that, while an auditor may rely on management's representations as part of the evidential basis for the audit client's financial statement assertions, the auditor may not rely exclusively on such representations:

> During an audit, management makes many representations to the auditor, both oral and written, in response to specific inquiries or through the financial statements. Such representations from management are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford

a reasonable basis for an opinion regarding the financial statements under audit.

588.    PwC was required, but failed, to perform the above described audit procedures to corroborate management's representation that the Funds' investments in securities for which market quotations were not readily available were valued at their fair value and, accordingly, failed to comply with AU Section 333.

589.    If PwC had performed the necessary corroborative procedures it would have learned that the Funds' investments in securities for which market quotations were not readily available were not valued at their fair value as represented, and would have called all other management representations into question, including, e.g., regarding Morgan Management's determinations of the liquidity of the Funds' securities. As stated in AU Section 333:

> If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified.

590.    Given the materiality (*see* SEC Staff Accounting Bulletin No. 99) of the Funds' investments in securities for which market quotations were not readily available, and the pervasive impact of these investments on the Funds' financial statements, PwC should have significantly expanded the scope of its audit and the nature of its procedures in observance of GAAS (AU Section 312), which states that: "Higher risk may cause the auditor to expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence." PwC failed to do so, violating GAAS.

591.    AU Section 325 requires an auditor to report certain critical matters to a company's Audit Committee. These critical matters are referred to as "reportable conditions" and

are defined as issues relating to significant deficiencies in the design or operation of the internal control that could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

592.    AU Section 325 describes the following matters as reportable conditions:

(a)    Inadequate overall internal control design;

(b)    Absence of appropriate reviews and approvals of transactions, accounting entries, or systems output;

(c)    Inadequate procedures for appropriately assessing and applying accounting principles;

(d)    Inadequate provisions for the safeguarding of assets;

(e)    Absence of other controls considered appropriate for the type and level of transaction activity;

(f)    Evidence of failure of identified controls in preventing or detecting misstatements of accounting information;

(g)    Evidence that a system fails to provide complete and accurate output consistent with the entity's control objectives and current needs because of design flaws of the misapplication of controls;

(h)    Evidence of intentional override of internal control by those in authority to the detriment of the overall objectives of the system;

(i)    Evidence of failure to perform tasks that are part of internal control, such as reconciliations not prepared or not timely prepared;

(j)    Evidence of willful wrongdoing by employees or management;

(k)    Evidence of manipulation, falsification, or alteration of accounting records or supporting documents;

(l)    Evidence of intentional misapplication of accounting principles;

308

(m)     Evidence of misrepresentation by client personnel to the auditor;

(n)     Absence of a sufficient level of control consciousness within the organization; and

(o)     Evidence of undue bias or lack of objectivity by those responsible for accounting decisions.

593.     One or more of the above reportable conditions existed during all times relevant herein. For example, during all times relevant herein, the Funds identified a number of portfolio securities that were restricted. *See* paragraph 183 above. Notwithstanding that these securities possessed the characteristics of illiquid securities and that restricted securities are presumptively illiquid, Morgan Management and/or Morgan Keegan determined these securities to be liquid, thus overriding controls in place to protect the Funds' assets from the kinds of risks that materialized in 2007 and resulting in purchasing more illiquid securities when the portfolios already had more than 15% of their net assets in illiquid securities, violating that restriction, all of which contributed to the catastrophic losses suffered by the Funds' shareholders in 2007. PwC did not report to the Funds' board of directors these reportable conditions, thereby violating AU Section 332 and GAAS.

594.     Additional examples are found in the facts underlying the numerous disclosure deficiencies identified above, which include facts that at best suggest an incompetent management and board of directors for failing to recognize the nature of the Funds' investments or understand the risks assumed by the Funds or a grossly reckless management and board of directors and for failing to ensure the Funds were managed in accordance with the representations made to investors:

(a)     The fact that the Intermediate Fund represented it did not invest in derivatives, when it in fact did so;

(b)     The heavy concentration in all manner of exotic securities directly tied to the real estate industry;

309

(c)   The High Income Fund's and Intermediate Fund's heavy investments in the lowest ranking, and therefore riskiest, tranches of risky asset- and mortgage-backed securities.

595.   AU Section 329 "requires the use of analytical procedures in the planning and overall review stages of all audits." Analytical procedures involve comparisons of recorded amounts, or ratios developed from recorded amounts, to expectations developed by the auditor and include comparisons of the audited fund with its peers, including, e.g., the relative performance of the audited fund versus that of its peers and the reasons for any significant difference in such performance.

596.   AU Section 316 states that the following are examples of risk factors relating to misstatements arising from fraudulent financial reporting:

(a)   A significant portion of management's compensation represented by bonuses,

(b)   Stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow (Morgan Management's compensation for advisory services was based upon the Funds' net asset values);

(c)   An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices (Morgan Management's treatment of restricted asset- and mortgage-backed securities as liquid was "unusually aggressive," especially given the magnitude of such securities and the history of such securities suddenly becoming unsalable at their estimated values, a history of which PwC was knowledgeable because it was disclosed in prospectuses on offerings with which PwC was associated);

(d)   Domination of management by a single person or small group without compensating controls such as effective oversight by the board of directors or audit

310

committee (during all times relevant herein the Funds were managed by two portfolio managers, and, given what happened, either such management was not subject to effective oversight or the oversight was ignored);

(e)    Inadequate monitoring of significant controls;

(f)    Management failing to correct known reportable conditions on a timely basis (the purchases of illiquid securities in violation of the restriction against such purchases if they cause the Funds' illiquid securities to exceed 15% of net assets); or

(g)    Management displaying a significant disregard for regulatory authorities (the failure to adhere to the SEC's guidance regarding limiting illiquid securities, guidance concerning investing in novel untested fixed income securities, and the need for mutual funds to comply with investment objectives and restrictions).

597.    PwC failed to plan and execute its audits of the Funds' 2004, 2005 and 2006 financial statements with a view to the existence of these risk factors. Thus, PwC failed "to modify procedures" and to exhibit an "increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions," and an "increased recognition of the need to corroborate management explanations or representations concerning material matters," as required by AU Section 316.

598.    Based on the foregoing, PwC, contrary to its representations in its report on the Funds' 2004, 2005 and 2006 financial statements, did not conduct its audits of the Funds' financial statements in accordance with generally accepted auditing standards and the Funds' financial statements were not presented in conformity with generally accepted accounting principles.

599.    According to AU Section 411, "The Meaning of Present Fairly in Conformity

311

With Generally Accepted Accounting Principles in the Auditor's Report":

> The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on his judgment as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation...; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is neither too detailed nor too condensed...; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

600.    As particularized above, the financial statements which were disseminated to the investing public during all times relevant herein were not presented "fairly...in conformity with generally accepted accounting principles" because:

(a)     The accounting principles selected and applied in the preparation of the Funds' financial statements, particularly with respect to the failures to disclose the magnitude of fair-valued securities in the Funds' portfolios, the uncertainty inherent in the estimated valuations of those securities and the effect thereof on the Funds' respective NAVs, the methods and assumptions used to estimate the values of the Funds' thinly traded securities, the liquidity risk posed by portfolios so heavily invested in fair-valued illiquid securities, and the Funds' violations of their investment restrictions relating to the limit on illiquid securities and investments in a single industry, did not have general acceptance.

(b)     The accounting principles that pervasively impacted the Funds' financial statements, particularly those relating to the determination of the fair value of investments in securities for which market quotations were not readily available, were not appropriate in the circumstances.

312

(c)     The Funds' financial statements, including the related notes that failed to disclose critical information regarding the Funds' illiquid investments, were not informative of matters that affected their use, understanding, and interpretation.

(d)     The Funds' financial statements did not reflect the underlying events and related circumstances in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

(e)     The Funds' financial statements did not include a statement of cash flows, which was required by GAAP in view of the magnitude of securities in the Funds' portfolios whose valuations were estimated.

601.    Statements of Cash Flows were included in the Funds' financial statements for their fiscal year ended April 30, 2008. In their semi-annual report and financial statements for the six-month period ended October 31, 2008, the Funds provided the following explanation of the significance of a statement of cash flows: "*Cash Flow Information:* Each Fund invests in securities and distributes dividends and distributions which are paid in cash or are reinvested at the discretion of stockholders. These activities are reported in the Statement of Changes in Net Assets. Additional information on cash receipts and cash payments is presented in the Statement of Cash Flows. Cash, as used in the Statement of Cash Flows, is the amount reported as 'Cash' in the Statement of Assets and Liabilities, and does not include short-term investments."

602.    In Accounting Series Release No. 173, the SEC made the following comments pertaining to economic substance:

Another problem...is the need for emphasizing the importance of substance over form in determining accounting principles to be applied to particular transactions and situations. In addition to considering substance over form in particular transactions, it is important that the overall impres-

313

sion created by the financial statements be consistent with the business re-
alities of the company's financial position and operations.

We believe that the auditor must stand back from his resolution of particu-
lar accounting issues and assess the aggregate impact of the particular is-
sues upon a reasonable investor's perception of the economic substance of
the enterprise for which the financial statements are being presented.

603.    Based on the above, a reasonable investor was unable to perceive the true eco-
nomic substance of the Funds whose financial statements were being presented.

604.    In opining on the fairness of the Funds' 2004, 2005 and 2006 financial state-
ments, PwC represented that its audit included "assessing the accounting principles used and
significant estimates made by management, and evaluating the overall financial statement
presentation." This statement was false because PwC failed to properly "assess the aggregate
impact of the particular issues upon a reasonable investor's perception of the economic sub-
stance of the enterprise for which the financial statements are being presented" and for the
other reasons alleged herein.

605.    Based on the foregoing, PwC's audit of the Funds' financial statements for
their fiscal year ended June 30, 2004, 2005 and 2006 was not conducted in accordance with
one or more of the following generally accepted auditing standards:

(a)    General Standard No. 2, in that the audits were not performed by a person or
persons having adequate technical training and proficiency as an auditor, be-
cause, given the complex nature of the valuations required of the restricted
novel securities held by the Funds, it was incumbent upon PwC to ensure the
individuals who performed the audit had the requisite proficiency in areas that
would affect the presentation of those securities "fair value" under GAAP;

(b)    General Standard No. 2, in that an independence of mental attitude was not
maintained by PwC during said audits;

(c)    General Standard No. 3, in that due professional care was not exercised in the
performance of the audits and the preparation of PwC's reports on the Funds'

314

financial statements;

(d)    Standard of Field Work No. 1, in that the work was not adequately planned and assistants and work were not properly supervised or reviewed;

(e)    Standard of Field Work No. 2, in that PwC failed to obtain a sufficient understanding of the Funds' internal control structure to plan the audits and to determine the nature, timing, and extent of tests to be performed;

(f)    Standard of Field Work No. 3, in that sufficient, competent evidential matter was not obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the Funds' financial statements under audit;

(g)    Standard of Reporting No. 1, in that PwC's reports on the Funds' financial statements for each of said years stated falsely that the Funds' financial statements were presented in accordance with generally accepted accounting principles;

(h)    Standard of Reporting No. 3, in that PwC's reports on the Funds' financial statements failed to provide information required by generally accepted accounting principles but not disclosed in the Funds' financial statements or the footnotes thereto;

(i)    Standard of Reporting No. 4, in that PwC's reports improperly contained unqualified opinions on the Funds' financial statements because PwC had failed to conduct its audits of the Funds' financial statements in accordance with generally accepted auditing standards and, therefore, PwC had insufficient basis for expressing such unqualified opinions;

(j)    PwC failed to apply appropriate audit procedures to the valuations of the Funds' high-yield bonds and structured financial instruments for which multiple market quotations were not readily available;

315

(k)     PwC failed to modify its audit reports in light of the Funds' use of an improper valuation method for a significant portion of their investment portfolios;

(l)     PwC's audit reports failed to address the inadequacy of the valuation disclosures in the Funds' financial statements and the footnotes thereto;

(m)     PwC failed to modify its audit reports or call attention to the uncertainty of the Funds' respective net asset values caused by the uncertainty of the valuations of the Funds' excessive investments in illiquid high-yield bonds and structured financial instruments for which market quotations were not readily available or that were fair valued;

(n)     PwC failed to obtain reasonable assurance (i.e., high level of assurance) as to the fair values of up to half or more of the Funds' investments; and

(o)     PwC failed to obtain reasonable assurance (i.e., high level of assurance) as to the Funds' compliance with their investment restrictions.

606.    AU Section 508 required PwC to express a qualified opinion on the Funds' financial statements, in view of the scope limitation attributable to the uncertain valuation of the Funds' assets at June 30, 2006, failure to make required GAAP disclosures regarding such uncertainty, and the Funds' violations of their investment restrictions relating to excessive illiquid securities and investments in a single industry, and, in so doing, to disclose to the Funds' shareholders and prospective shareholders the nature and extent of the Funds' non-GAAP accounting and to provide those disclosures that the Funds' financial statements failed to provide, and for other reasons described above.

607.    PwC violated GAAS when it failed to express a qualified opinion on the Funds' June 30, 2004, 2005, and 2006 financial statements, or to include an explanatory paragraph calling attention to the extent to which the valuations of the Funds' assets as of June 30, 2004, 2005, and 2006 were subject to substantial uncertainty, and in failing to provide those material disclosures that the Funds' financial statements failed to provide.

316

608.    Pursuant to PwC's consent, PwC's reports on the Funds' 2004, 2005 and 2006 financial statements and the Funds' financial statements, including (a) Schedules of Investments as of June 30, 2004, 2005 and 2006 and as of each quarter-end during said fiscal years; (b) Statements of Assets and Liabilities as of June 30, 2004, 2005 and 2006; (c) Statements of Operations for the Years Ended December June 30, 2004, 2005 and 2006; (d) Statements of Changes in Net Assets for the Years Ended June 30, 2004, 2005 and 2006; (e) Financial Highlights; and (f) Notes to Financial Statements were incorporated by reference into the Funds' registration statement effective on and after August 21, 2006 and the prospectus used to offer and sell the Funds' shares during the Class Period and to redeem the Funds' shares during the  Class Period after August 21, 2006.

609.    According to AU Section 711, because a registration statement under the Securities Act of 1933 speaks as of its effective date, the independent accountant whose report is included in such a registration statement has a statutory responsibility that is determined in the light of the circumstances on that date. AU Section 711 states: "To sustain the burden of proof that he has made a 'reasonable investigation', as required under the Securities Act of 1933, an auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date or as close thereto as is reasonable and practicable in the circumstances." AU Section 711 states that the following procedures, *inter alia*, should generally be performed by the auditor:

(a)    Read the latest available interim financial statements; compare them with the financial statements being reported upon; and make any other comparisons considered appropriate in the circumstances. In order to make these procedures as meaningful as possible for the purpose expressed above, the auditor should inquire of officers and other executives having responsibility for financial and accounting matters as to whether the interim statements have been prepared on the same basis as that used for the statements under audit.

(b)   Read the available minutes of meetings of stockholders, directors, and appropriate committees; as to meetings for which minutes are not available, inquire about matters dealt with at such meetings.

(c)   Obtain a letter of representation from appropriate officials, generally the chief executive officer, chief financial officer, or others with equivalent positions in the entity, as to whether any events occurred subsequent to the date of the financial statements being reported on by the independent auditor that in the officer's opinion would require adjustment or disclosure in these statements.

(d)   Make such additional inquiries or perform such procedures as he considers necessary and appropriate to dispose of questions that arise in carrying out the foregoing procedures, inquiries, and discussions.

(e)   Read the entire prospectus and other pertinent portions of the registration statement.

(f)   Inquire of and obtain written representations from officers and other executives responsible for financial and accounting matters about whether any events have occurred, other than those reflected or disclosed in the registration statement, that, in the officers' or other executives' opinion, have a material effect on the audited financial statements included therein or that should be disclosed in order to keep those statements from being misleading.

610.   Of all the professionals involved in the offer and sale of the Funds' shares to the investing public, the auditor is the only one whose involvement is legally required by the federal securities laws. With this legally conferred franchise, however, comes the heavy responsibility of acting as the Plaintiffs' and putative class members' guardian by ensuring that the Funds' financial statements accurately and meaningfully depict its financial situation.

## VI.    DIRECTORS' DUTIES; RMK ORGANIZATION, RELATIONSHIPS AND CONFLICTS; STATUTORY POLICY, SAFE HARBOR

### A.    DUTIES OF THE DEFENDANT DIRECTORS

611.    By reason of their positions as directors of the Company/Funds, the Defendant directors owed the Company/Funds and its/their shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to manage the Company/Funds in a fair, honest, and equitable manner and to protect and preserve the Funds' assets.

612.    The Defendant directors were required to act solely in furtherance of the best interests of the Company/Funds and its/their shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit or in furtherance of the interest or benefit of the non-director Defendants herein.

613.    The Defendant directors exercised control over the wrongful acts complained of herein.

614.    The Defendant directors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company/Funds and the management thereof by Morgan Management and Morgan Keegan and the Funds' officers:

(a)    Exercise good faith and due care in ensuring that the assets of the Company/Funds were managed and administered by the Funds' officers, Morgan Management and Morgan Keegan in a manner that complied in all respects with the Funds' respective investment objectives, policies, restrictions, and representations to the Funds' shareholders and with all applicable federal and state laws, rules, regulations and requirements;

(b)    Exercise good faith and due care in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or

319

examinations, audits, or other financial information concerning the financial condition of the Company/Funds; and

(c)    Exercise good faith and due care in ensuring that the Company's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").

615.    The Defendant directors, and particularly the Defendant directors who were members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting for the Company/Funds and to ensure that the Funds' financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(a)    Make and keep books, records, and accounts, which accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b)    Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(1)    transactions are executed in accordance with management's authorization;

(2)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

616.    The Defendant directors, and particularly the Defendant directors who were members of the Audit Committee, were responsible for maintaining and establishing adequate risk management for the Company/Funds to ensure that the risks being assumed by the Funds as a result of how their assets were managed by Morgan Management and the Funds' officers were consistent with the Funds' respective stated investment objectives, policies, restrictions and representations made to the Funds' investors.

617.   The Defendant directors, and particularly the Defendant directors who were members of the Audit Committee, were responsible for establishing procedures, and for overseeing the implementation of such procedures, pursuant to which the Company/Funds's Valuation Committee determined the fair value in good faith of the Funds' investments for which market quotations were not readily available, or for which available quotations did not accurately reflect the current value of an investment.

**B.   THE INTERTWINED ORGANIZATIONAL AND CONTRACTUAL RELATIONSHIP BE-TWEEN MORGAN KEEGAN, MORGAN MANAGEMENT, REGIONS BANK AND RE-GIONS FINANCIAL'**

**1.   <u>The Investment Advisory Agreement</u>**

618.   Morgan Management was the investment adviser to the Company/Funds pur-suant to the Advisory Agreement between the Company and Morgan Management, effective as of June 25, 2001, and the Advisory Agreement, dated September 1, 2005. The Investment Advisory Agreement provided, in pertinent part (as to which provisions the Advisory Agreement, dated September 1, 2005, is nearly identical):

2. OBLIGATIONS OF AND SERVICES TO BE PROVIDED BY, THE AD-VISER. The Adviser undertakes to provide the services hereinafter set forth and to assume the following obligations:

A. INVESTMENT ADVISORY SERVICES.

(i) The *Adviser shall direct the investments of each Portfolio*, subject to and *in accordance with each Portfolio's investment objective, policies and limitations* as provided in its Prospectus and Statement of Additional Information (the "Prospectus") and other governing instruments, as amended from time to time, and any other directions and policies which the Board may issue to the Adviser from time to time.

(ii) The Adviser is authorized, in its discretion and without prior consultation with the Fund, to purchase and sell securities and other investments for each Portfolio.

B. CORPORATE MANAGEMENT SERVICES.

(i)  The Adviser shall furnish for the use of the Fund, office space and all neces-sary office facilities, equipment and personnel for servicing the investments of

the Fund.

(ii)  The Adviser shall pay the salaries of all personnel of the Fund or the Adviser performing services relating to research, statistical and investment activities.

5. COMPENSATION OF THE ADVISER. . . . The *value of net assets shall be determined pursuant to the applicable provisions of the Fund's Articles of Incorporation*, its By-Laws and the *1940 Act*.

Advisory Agreement by and between Morgan Keegan Select Fund, Inc., and Morgan Asset Management, Inc., paragraphs 2.A. (i), (ii), B.(i), (ii), and 5 (emphasis supplied).

### 2.    The Underwriting Agreement

619.   Morgan Keegan was the underwriter/distributor of the Funds' shares pursuant to an Underwriting Agreement between the Funds and Morgan Keegan dated March 30, 2001 ("Underwriting Agreement"). The Funds' shares were continuously offered for sale and were subject to the Funds' continuing offers to redeem.

620.   The Underwriting Agreement obligated Morgan Keegan to provide certain services and to bear certain expenses in connection with the sale, redemption and offers of redemption of the Funds' shares, including, but not limited to:

(a)    Distribution of prospectuses and reports to current and prospective shareholders;

(b)    Preparation and distribution of sales/redemption literature and advertising;

(c)    Administrative and overhead cost of distribution and redemptions such as the allocable costs of executive office time expended on developing, managing and operating the distribution/redemption program.

621.   Morgan Keegan also compensated investment brokers of Morgan Keegan and other persons who engaged in or supported distribution and redemption of shares and shareholder service based on the sales for which they were responsible and the average daily net asset value of Fund shares in accounts of their clients.

622.   Morgan Keegan paid special additional compensation and promotional incen-

tives to investment brokers for sales of fund shares.

623.    Pursuant to the Underwriting Agreement, Morgan Keegan received as compensation for its services a 3.0% sales charge on most purchases of the Funds' shares.

624.    The Underwriting Agreement provides:

1.    . . . The Fund authorizes the Distributor, as exclusive agent for the Fund, subject to applicable federal and state law and the Articles of Incorporation and By-laws of the Fund: (a) to promote the Fund; (b) to solicit orders for the purchase of the Shares of subject to such terms and conditions as the Fund may specify; and (c) to accept orders for the purchase of the Shares on behalf of the applicable Portfolio. The Distributor shall comply with all applicable federal and state laws . . . .

625.    Paragraph 8 of the Underwriting Agreement between the Company/Funds and Morgan Keegan ("Distributor") states:

The Distributor agrees to indemnify, defend and hold the Fund, its several officers and directors, and any person who controls the Fund within the meaning of Section 15 of the 1933 Act, free and harmless from and  against  any and all  claims,  demands,  liabilities  and  expenses (including the cost of investigating  or defending such claims,  demands or  liabilities  and any counsel fees incurred in connection  therewith) which the Fund,  its  officers  or directors,  or any such  controlling person may incur,  under the 1933 Act or under common law or  otherwise, arising out of or based upon any alleged untrue  statement of a material fact contained in information furnished in writing by the Distributor to the Fund for use in the  Registration  Statement or  arising  out of or based upon any alleged  omission by the  Distributor to state a material fact in connection  with such  information  required to be stated in the Registration  Statement  or  necessary  to  make  such  information  not misleading.

**3.    The Fund Accounting Service and Administration Agreements**

626.    Pursuant to the Fund Accounting Service Agreement between Morgan Keegan and the Company/Funds, dated July 1, 2005, Morgan Keegan provided services to each Fund, which included, portfolio accounting and valuation and financial reporting, and compliance control.

627.    The Fund Accounting Service Agreement and between the Company and Mor-

gan Keegan provided, *inter alia*:

> WHEREAS, Morgan Keegan is a brokerage firm, and is capable of providing, among other things, record keeping and fund accounting services in accordance with the 1940 Act, and the Securities Exchange Act of 1934 (the "1934 Act"), and the current prospectus of the Fund as filed with the Securities and Exchange Commission under the Securities Act of 1933 (the "1933 Act");

> . . .

> 1. SERVICES. Morgan Keegan agrees to provide all mutual fund accounting services to the Fund on behalf of each Portfolio required to conduct the business of the Fund or otherwise required under the 1940 Act, except such services as are normally performed by the investment adviser, the Fund's independent accountant, and the officers of the Fund. Such services shall include, without limitation, the following:

> A.   PORTFOLIO ACCOUNTING SERVICES:

> . . .

>> (3)   For each security identified by the Fund on behalf of each Portfolio for pricing, obtain a price for each valuation date from a pricing source approved by the Fund's Board of Directors. Apply the price to the security's portfolio position to determine its market value as of valuation day. In the event that a price for a given security identified for pricing is not available from the normal pricing sources for a given valuation date, obtain a price from alternative source or sources identified by the Fund's investment adviser.

>> (4)   For each security not identified for pricing, determine its market value as of each valuation date using a method identified by the Fund from among the following:

>>> (a)   Market value equals book value;

>>> (b)   Market value equals face value;

>>> (c)   Market value equals book value less any amortization balance or plus any accretion balance (amortized cost method);

>>> (d)   Another method approved by the Fund's Board of Directors or its Valuation Committee.

. . .

(9)   Provide the portfolio-based reports requested in writing by the Fund or the Fund's investment adviser in a format as agreed to from time to time.  Issue requested reports to the recipient and with the frequency identified in the request.

C. FUND VALUATION AND FINANCIAL REPORTING SERVICES:

(1)   Account for share purchases, sales, exchanges, transfers, dividend reinvestment, and other share activity as reported on a timely basis by the Fund's transfer agent.

. . .

(3)   . . . as of each valuation date produce the set of financial statements in the format agreed to from time to time. Issue the statements to the recipients identified in writing by the Fund on behalf of each Portfolio and with the specified frequency.

(4)   For each day the Fund is open as defined in the Fund's prospectus, determine net asset value according to the accounting policies and procedures set forth in the Fund's prospectus.

(5)   Calculate per share net asset value, per share net earnings, and other per share amounts reflective of Fund and Portfolio operation at such time as required by the nature and characteristics of the Fund and each Portfolio. . . ..

(6)   Communicate per share price for each valuation date to newspapers, the Fund's transfer agent, the Fund's investment adviser, and other parties as specified by the Fund's Administrator.

(7)   Prepare a monthly proof package of reports in the format agreed to from time to time which documents the adequacy of accounting detail to support month-end ledger balances and reports. Distribute this package to the recipients identified in writing by the Fund behalf of each Portfolio.

. . .

E.   COMPLIANCE CONTROL SERVICES:

(1)   Make the Fund's accounting records and the requested portfolio-based reporting identified above available to the investment adviser upon request in a timely fashion so as to support their compliance-monitoring review. Provide the compliance reporting in the format requested by the Fund. Issue the requested reports to

325

the recipients and with the frequency identified in this request.

(2)    Make the Fund's accounting records and the requested portfolio-based and compliance reporting identified above available upon request in a timely fashion, to the Fund's financial accountant, so as to support the Fund's compliance with all applicable regulatory filings including N-1A filings, N-SAR filing and any applicable IRS filings, and preparation of the Fund's financial statements.

(3)    Make the Fund's accounting records identified above available upon request to Securities and Exchange Commission representatives, to the Fund's auditors and to designated Fund agents for their review as to the propriety of the Fund's accounting records and the Fund's operations.

(4)    Maintain at Morgan Keegan's expense, and preserve at the Fund's expense in accordance with the 1940 Act and the rules thereunder, all such accounting records, which shall at all times be the property of the Fund.

. . .

3.    RESPONSIBILITY OF MORGAN KEEGAN & COMPANY, INC. Morgan Keegan shall be held to the exercise of reasonable care in carrying out the provisions of this Agreement, but shall be indemnified by and shall be without liability to the Fund for any action taken or omitted by it in good faith without negligence or willful misconduct. Morgan Keegan shall be entitled to rely on and may act upon the reasonable advice of the Fund's auditors or of counsel (who may be counsel of the Fund) on all matters, and shall not be liable for any action reasonably taken or omitted pursuant to such advice.

. . .

628.    Pursuant to the Fund Accounting Service Agreement, Morgan Keegan is liable to the Company/Funds for any negligence on Morgan Keegan's part in providing the services to the Company/Funds provided for by the Fund Accounting Service Agreement.

629.    The Company, on behalf of the Short Term Fund, and Morgan Keegan also entered into an Administration Agreement, dated February 18, 2005, pursuant to which Morgan Keegan provided office space and equipment and all other administrative, executive, and

clerical functions for the Company.

630.    Defendant Maxwell signed the Fund Accounting Service Agreement and the Administration Agreement on behalf of both the Company/Funds and Morgan Keegan in his capacity as secretary of both corporations.

631.    Pursuant to paragraph 9.3 of the Administration Agreement described in the second preceding paragraph, Morgan Keegan is obligated to "indemnify [Short Term Fund] and hold it harmless from and against any and all losses, damages and expenses, including reasonable attorneys' fees and expenses incurred by the [the Company/Funds] which result from: (i) the Administrator's failure to comply with the terms of this Agreement; or (ii) the Administrator's lack of good faith in performing its obligations hereunder; or (iii) the Administrator's negligence or misconduct or that of its employees, agents or contractors in connection herewith."

632.    Based on the facts alleged herein, Morgan Keegan, which conducted and had complete control over the distribution and redemption of the Funds' shares, the accounting and asset valuation functions of the Company/Funds, the Funds' compliance with their respective investment objectives, policies and restrictions and applicable laws, rules and regulations at all times relevant herein, and the Funds' administration and operations with respect to everything except the investment of the Funds' assets, breached and/or otherwise violated:

(a)    The Underwriting Agreement by failing to (i) comply with applicable federal and state laws in connection with its distribution and redemption of the Funds' shares, (ii) ensure that the Funds' registration statement and prospectuses did not contain fraudulent or misleading financial or other information or omit material facts, (iii) exercise, in connection with the distribution and redemption of the Company/Funds' shares, the requisite due diligence to ferret out all material facts relating to the Funds so that they may be disclosed, including all material facts bearing on the Funds' financial condition and the Funds' invest-

327

ment practices and risks, (iv) ensure that the Funds' June 30, 2006 annual financial statements and report and December 31, 2006 semi-annual financial statements and report were not false and misleading, and (v) ensure that all sales/redemption materials accurately described the risks of the Funds and did not contain promises, representations, or other matters that should not have been made because they inaccurately portrayed the risk profile of the Funds or the manner in which they were being managed;

(b)     The Fund Accounting Service Agreement by failing to (i) ensure that the Funds' financial statements accurately, and fully complied with GAAP, (ii) ensure that the Funds' June 30, 2006 annual financial statements and report and December 31, 2006 semi-annual financial statements and report were not false and misleading, (iii) properly value the Funds' investments and disclose the uncertainty inherent in such valuations, the magnitude of the Funds' investments subject to such uncertain valuations, the effect thereof on the Funds' respective NAVs, and the magnitude of the Funds' illiquid securities; (iv) ensure that the Funds complied with their respective investment objectives, policies and restrictions; and (v) ensure that internal controls were adequate to detect and avoid risks that were incompatible with the Funds' investment objectives, policies and restrictions and representations regarding how the Funds were being, and would be, managed.

633.   Plaintiffs properly relied on Morgan Keegan to inform them and/or the Company/Funds of any financial or other matters or risks that would adversely affect the Funds and that required disclosure in the Funds' registration statement, prospectus, SAI, or annual and semi-annual reports or advertising, or of promises, representations, or other matters contained in advertising or other disclosure documents that should not be made because they inaccurately portrayed the risk profile of the Funds or the manner in which they were being

managed.

634.    In carrying out its due diligence responsibilities in connection with underwriting the Funds' securities, Morgan Keegan was uniquely positioned to know the facts alleged herein to have been omitted or misrepresented because Morgan Keegan was also responsible for valuing the Funds' securities and overseeing the Funds' compliance with their respective investment objectives, policies, restrictions and representations.

### 4.    The Investment Advisory Service Agreements

635.    On April 1, 2003, Regions Bank, Regions Morgan Keegan Trust FSB, a federally chartered savings bank and formerly Morgan Keegan Trust Company, and Morgan Management entered into an Investment Advisory Services Agreement (the "2003 Agreement") pursuant to which Morgan Management agreed to render advice and to perform certain services as with respect to the investment of assets held in fiduciary accounts under the management of Bank or RMK Trust.

636.    Pursuant to the 2003 Agreement, Morgan Management was to provide certain enumerated services, including "investment advice and supervision" for the benefit of the Fiduciary Accounts; advising Regions Trust in connection with recommending securities, money market instruments, and other investments to be purchased for or sold by the Fiduciary Accounts; and assisting Regions Trust as trustee for the benefit of the Fiduciary Accounts in its periodic reviews of assets held in the Fiduciary Accounts;

637.    The 2003 Agreement also provided, where Regions Bank or RMK Trust themselves had investment discretion, for authorization for Morgan Management "to exercise investment discretion with respect to [the Fiduciary Accounts] and to initiate the purchase or sale of securities or other assets therefor on a transaction-by-transaction basis without prior approval from [Regions Bank] or [Regions Trust]." The 2007 Agreement contained a nearly identical provision.

638.    On February 5, 2007, a new Investment Advisory Services Agreement (the

329

"2007 Agreement") was entered into between Regions Bank, d/b/a Regions Morgan Keegan Trust, and Morgan Management for investment advice, asset reviews, lists of approved securities, and other related services to Regions Trust as trustee for the benefit of the Fiduciary Accounts.

639.   The services provided by Morgan Management pursuant to the 2007 Agreement were substantially the same as those provided under the 2003 Agreement, with the following addition: "Performing due diligence on Morgan Keegan investment products, e.g., separate account platform, annually and making a report to [Regions Trust] of findings."

640.   Under the 2003 and 2007 Agreements, the services provided for therein were to be performed by Morgan Management for the benefit of the Fiduciary Accounts "with ordinary skill and diligence."

641.   Under the 2003 and 2007 Agreements, Regions Bank and RMK Trust "shall be responsible for compliance with applicable law governing [Regions] Bank's and [RMK Trust's] respective management and administration of the [Fiduciary Accounts] and with the terms and provisions of the instruments and agreements creating each [Fiduciary Account]."

642.   The 2003 and 2007 Agreements provided that Regions Bank and RMK Trust (in the 2003 Agreement) each (emphasis supplied):

> . . . acknowledges that [Morgan Management] or its affiliates may from time to time have an interest in a security, instrument or other asset the purchase or sale of which is recommended by [Morgan Management] and that [Morgan Management] may have a conflict of interest under such circumstances. [Morgan Management] shall advise [Regions Bank] or [RMK Trust], as the case may be, in writing of any known *potential* conflicts of interest arising out of any transaction recommended by [Morgan Management] and the capacity in which [Morgan Management] acts in such recommended transaction, and [Morgan Management] *shall not complete such transaction without the consent of* [Regions Bank] or [RMK Trust], as the case may be; provided, that the parties agree that no conflict of interest shall arise as a result of the involvement of an [Morgan Management] affiliate in a transaction where such affiliate is also an affiliate of [Regions Bank] or [RMK Trust] and where there are no other circumstances giving rise to a

330

conflict of interest.

643.    Pursuant to the provision recited in the preceding paragraph, Morgan Management was obligated to notify Regions Bank and RMK Trust with respect to Morgan Management's conflicting interests arising from the overlapping purchases, sales and holdings by the Funds and the RMK closed-end funds of illiquid securities, as alleged above. *See* paragraphs 207-12, 342, 385(g), 740, 755. The identification of such conflicting interests informed Regions Bank and RMK Trust of the Funds' violations of their respective investment objectives, policies and restrictions and should have led to corrective action to cure such violations.

644.    The 2003 and 2007 Agreements provided that each of Regions Bank, RMK Trust and Morgan Management had the right to review and approve in advance of use any advertising or preprinted client or customer materials that mention the others by name or that indicate that Regions Bank or RMK Trust have employed Morgan Management. Morgan Management also had the right to review and approve any form client or customer agreements used by Regions Bank or RMK Trust if and to the extent such agreements would affect the scope of Morgan Management's legal relationship with Regions Bank's or RMK Trust's customers and clients or Morgan Management's liability to such customers and clients.

645.    Pursuant to the 2003 and 2007 Agreements, Regions Bank and RMK Trust paid to Morgan Management $3,500,000 and $8,250,000, respectively, annually. This was in addition to the management and other fees paid to Morgan Management and Morgan Keegan based on the assets held in the Funds.

### 5.    Regions Morgan Keegan Held Itself Out as a Single Unified Enterprise

646.    Regions treated the revenue generated by Morgan Management as generated by Morgan Keegan. In its 2008 Form 10-K annual report, Regions said: "Primary drivers of 2007 earnings, other than a full-year impact of the AmSouth merger, were Regions' solid fee

331

income, record performance at Morgan Keegan. . . ."Thus, while shareholders in the Funds managed by Morgan Management and Morgan Keegan suffered catastrophic losses, Regions bragged about Morgan Keegan's "record performance."

647.    According to Regions, Morgan Keegan managed the Funds and provided Regions Bank's trust services. In its Form 10-K annual reports for its fiscal years ended December 31, 2006, 2007 and 2008 (emphasis supplied), Regions described Morgan Keegan's trust and investment advisory functions:

> Regions provides brokerage, investment banking and *trust services* in over 300 offices of Morgan Keegan & Company, Inc. . . .
>
> Morgan Keegan & Company, Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corporation, is a full-service regional brokerage and investment banking firm. Morgan Keegan offers products and services including securities brokerage, asset management, financial planning, *mutual funds*, securities underwriting, sales and trading, and investment banking. Morgan Keegan also *manages the delivery of trust services, which are provided pursuant to the trust powers of Regions Bank.*
>
> *Regulation of Morgan Keegan.*   As a *registered investment adviser* and broker-dealer, Morgan Keegan is subject to regulation and examination by the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), the New York Stock Exchange ("NYSE") and other self-regulatory organizations ("SROs"), which may affect its manner of operation and profitability . . . . Rules and regulations for *registered investment advisers* include limitations on the ability of investment advisers to charge performance-based or non-refundable fees to clients, record-keeping and reporting requirements, disclosure requirements, limitations on principal transactions between an adviser or its affiliates and advisory clients, and anti-fraud standards.
>
> Morgan Keegan is registered as an *investment adviser* in the following states: Alabama, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and the

District of Columbia.

Morgan Keegan's pre-tax income was negatively affected during 2007 by $42.8 million in losses on investments in *two open-ended mutual funds managed by Morgan Keegan*, a subsidiary of Regions. The Company, through Morgan Keegan, purchased fund shares in order to provide liquidity to the funds. The carrying value of these investments, which is equal to their estimated market value, was approximately $64.6 million as of December 31, 2007.

Also included in other assets during the year were investments of approximately $55.0 million in the Regions Morgan Keegan ("RMK") Select High Income Fund and approximately $75.0 million in the RMK Select Intermediate Bond Fund, purchased by Morgan Keegan to provide liquidity support to these funds. Both of these funds are *proprietary open-end mutual funds managed by Morgan Keegan*. A portion of the Regions Morgan Keegan Select High Income Fund investments were [sic] sold during 2007. During 2007, Regions recognized total losses of approximately $42.8 million on these investments in accordance with the equity method of accounting, the majority of which is included in other non-interest expense. These investments are recorded at market value in other assets in the consolidated balance sheet and totaled approximately $64.6 million at December 31, 2007.

During 2007, Regions invested approximately $130 million in *two open-end mutual funds managed by Morgan Keegan*. Regions accounts for these investments using the equity method. At December 31, 2007, total assets of these funds were approximately $331 million, while Regions' investment in the funds was approximately $65 million and is included in other assets. During 2007, Regions recognized losses associated with these investments of approximately $43 million, the majority of which is included in other non-interest expense.

Morgan Keegan's pre-tax income was negatively affected during 2008 by $49.4 million in losses on investments in *two open-end mutual funds managed by Morgan Keegan*. These losses totaled $42.8 million in 2007.

Included in professional fees during 2008 and 2007 were $7.4 million and $34.6 million, respectively, of merger-related charges. The 2008 increase is primarily due to higher *legal expenses incurred at Morgan Keegan*.

On June 4, 2007, the Illinois Secretary of State, Securities Department ("ISD") issued a Notice of Hearing alleging that Morgan Keegan failed to properly disclose limitations on transferability of shares of *certain mutual funds advised by an affiliate of Morgan Keegan*.

648.    Nowhere in its 2006 or 2007 Form 10-K annual reports does Regions mention "Morgan Asset Management," except in a list of subsidiaries at the end of the report.Nowhere in its 2008 Form 10-K does Regions mention "Morgan Asset Management"; Morgan Asset Management is not identified as the manager of the Regions' mutual funds but is referenced as "an affiliate" of Morgan Keegan, and legal fees attributable to the mutual fund litigation are described as being incurred solely by Morgan Keegan.

649.    Regions 2007 Form 10-K annual report provides additional detail regarding its relationship with Morgan Keegan. Regions Bank provided its trust services through Morgan Keegan: "Regions provides investment banking, brokerage and *trust services* in over 400 offices of Morgan Keegan & Company, Inc. ("Morgan Keegan"), a subsidiary of Regions and one of the largest investment firms based in the South. Morgan Keegan contributed $165.9 million to consolidated net income in 2007. Its lines of business include private client retail brokerage services, fixed-income capital markets, equity capital markets, *trust and asset management*." "Regions' *primary source of* brokerage, investment banking and *trust revenue* is its subsidiary, *Morgan Keegan*. Morgan Keegan's revenues are predominantly recorded in the brokerage and investment banking and *trust department* income lines of the consolidated statements of income, while a smaller portion is reported in other non-interest income." "In addition to General Banking/Treasury, Regions has designated as distinct reportable segments the activity of its Investment Banking/Brokerage/*Trust* and Insurance divisions. Investment Banking/Brokerage/*Trust* includes *trust activities* and all brokerage and investment activities *associated with Morgan Keegan*." (Emphasis supplied.).

650.    Throughout the Class Period, Regions aggressively used its and Morgan Keegan's names to brand the retail investment services offered by Regions Bank, Regions, Morgan Keegan and Morgan Management as "Regions Morgan Keegan." For example, in public filings and statements, Regions said (emphasis supplied):

(a)     "Regions Trust ... has been combined with Morgan Keegan Trust Co. to form

334

Regions Morgan Keegan Trust . . . Regions is also combining the investment management expertise of Morgan Keegan and Regions Trust into Morgan Asset Management .... "

(b)    "Regions [Financial's] investment and securities brokerage, **trust and asset management division, Morgan Keegan, Inc.,** provides services from over 400 offices."

(c)    "As a Regions Morgan Keegan Trust client, you enjoy: ... Investment Intellect: Your investments are professionally managed by Morgan Asset Management, our nationally-recognized investment manager."

(d)    "Morgan Keegan . . . offers products and services including asset management . . . *Morgan Keegan also manages the delivery of trust services, which are provided pursuant to the trust powers of Regions Bank."*

(e)    *"Regions [Financial Corporation] provides . . .* brokerage and *trust services in over 400 offices of Morgan Keegan . .* " *Morgan Keegan's lines of business include . .. trust and asset management.* "

(f)    "Regions [Financial Corporation's] primary source of brokerage, investment banking, and trust revenue is its subsidiary, Morgan Keegan. Morgan Keegan's revenues are predominantly recorded in the brokerage and investment banking and trust department income lines ... "

(g)    "In addition to General Banking/Treasury, Regions [Financial Corporation] has designated as distinct reportable segments the activity of its Investment Banking/Brokerage/Trust and Insurance divisions Investment Banking/Brokerage/Trust includes *trust activities* and all brokerage and investment activities *associated with Morgan Keegan."*

651.    Regions Financial's strategy of cross branding and cross marketing its banking and Morgan Keegan's brokerage, mutual fund and asset management services was very suc-

cessful as Morgan Keegan flourished during 2007, in part from Morgan Keegan's "healthy fixed-income capital markets activity," even though the Funds it managed suffered catastrophic losses in those same fixed income capital markets. As Regions reported in its 2007 Form 10-K: "Results for 2007 were strong across the board and included strong private client revenues, healthy fixed-income capital markets activity, solid equity capital markets revenues from good investment banking transaction flow, and *higher trust and asset management fees*." (Emphasis supplied.).

652.   The Regions/Morgan Keegan cross-branding has been recognized by financial analysts. A recent newspaper report noted that "Regions has been very consistent about Morgan Keegan being a part of their core business," a financial analyst is quoted as saying. The report goes on to say "Regions has integrated Morgan Keegan into its banking units, 'making sure they cross-sell and expanding relationships across both entities,'" again quoting the analyst.

653.   Among other cross branding tactics, Morgan Management personnel misrepresented themselves as Regions Morgan Keegan Trust officers. At the annual investment luncheons sponsored by Regions Bank at "The Club" in Birmingham, Alabama, presentations were made by persons who identified themselves as Regions Bank trust officers (e.g., Defendant Sullivan) but who were actually officers and/or employees of Morgan Management.

654.   In its 2007 Form 10-K, Regions did not separately identify its 2007 operating results from its mutual fund management business, instead apparently including that activity with Morgan Keegan's "asset management division": "Revenues from the private client division, which was the top revenue producing line of business, totaled $393.5 million, or 30 percent of Morgan Keegan's total revenue in 2007 compared to $305.1 million, or 30 percent in 2006. The private client line of business benefited from equity markets volatility, as well as the *increased number of financial advisors and branch outlets* in 2007 related to

336

*opening Morgan Keegan offices in former AmSouth branches* throughout the footprint.

*Fixed-income capital markets revenue* totaled $244.4 million and $187.4 million in 2007 and 2006, respectively, benefiting from higher trading volumes. Equity capital markets revenue totaled $103.3 million in 2007, essentially unchanged from the 2006 level. The *asset management division* produced $188.9 million of revenue in 2007 and $149.5 million in 2006." (Emphasis supplied.).

655.    According to the Regions 2007 Form 10-K, "Asset Management," which—based on the absence of any reference to "Morgan Asset Management" or separate segment for mutual funds—appears to include Morgan Management's management of the Funds and the other Regions Morgan Keegan Select open-end funds and the RMK closed-end funds, is treated as a "division" of Morgan Keegan, and RMK Trust revenues are included in Morgan Keegan's operating results:

**Table 7—Morgan Keegan Revenue by Division**

| | Private Client | | Fixed-Income Capital | | Equity Capital Markets | | Regions MK Trust | | Asset Management | | Interest and Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(Dollars in thousands)* | | | | | | | |
| **2007** | | | | | | | | | | | | | |
| Gross revenue | $ | 393,511 | $ | 244,407 | $ | 103,289 | $ | 225,853 | $ | 188,905 | $ | 144,227 | |
| Percent of gross revenue | | 30.3% | | 18.8% | | 7.9% | | 17.4% | | 14.5% | | 11.1% | |
| **2006** | | | | | | | | | | | | | |
| Gross revenue | $ | 305,098 | $ | 187,425 | $ | 103,282 | $ | 131,218 | $ | 149,511 | $ | 152,137 | |
| Percent of gross revenue | | 29.7% | | 18.2% | | 10.0% | | 12.8% | | 14.5% | | 14.8% | |
| **2005** | | | | | | | | | | | | | |
| Gross revenue | $ | 248,397 | $ | 160,062 | $ | 86,478 | $ | 103,225 | $ | 125,410 | $ | 86,681 | |
| Percent of gross revenue | | 30.7% | | 19.8% | | 10.7% | | 12.7% | | 15.5% | | 10.6% | |

656.    In its 2007 Form 10-K, Regions and Morgan Keegan, the manager of the Funds, disclosed that Morgan Keegan employed sophisticated modeling to assist it in managing its interest and market risk exposures: "To manage trading risks arising from interest rate and equity price risks, Regions uses a Value at Risk ("VAR") model to estimate the potential fair value the Company [Regions Financial] could lose on its trading positions given a specified statistical confidence level and time-to-liquidate time horizon. The end-of-period VAR was approximately $1.8 million as of December 31, 2007 and approximately $910,000

as of December 31, 2006. Maximum daily VAR utilization during 2007 was $6.8 million and average daily VAR during the same period was $1.2 million."

657.    In its 2007 Form 10-K, Regions and Morgan Keegan, in a further disclosure of its fixed income securities trading activities, Regions and Morgan Keegan explained, "The exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, the absolute and relative levels of interest rates, and market volatility."

658.    According to Regions' 2007 Form 10-K, Morgan Keegan also traded in derivative securities analogous to those in which the Funds so heavily invested: "The Company also maintains a derivatives trading portfolio of interest rate swaps, option contracts, and futures and forward commitments used to meet the needs of its customers. The portfolio is used to generate trading profit and help clients manage market risk. The Company is subject to the risk that a counter-party will fail to perform. These trading derivatives are recorded in other assets and other liabilities. The net fair value of the trading portfolio at December 31, 2007 and 2006 was $36.2 million and $18.6 million, respectively."

659.    Regions Bank marketed the Funds at its various branches and recommended to persons seeking to invest in Regions Bank certificates of deposit to instead invest in the Funds through a "Morgan Keegan desk" on the Regions Bank branch premises.

660.    Notwithstanding Regions' portrayal of its organization, Morgan Management was the investment adviser to the Company/Funds pursuant to the Advisory Agreement between the Company and Morgan Management, effective as of June 25, 2001, and the Advisory Agreement, dated September 1, 2005.

## C.    THE RMK DEFENDANTS' DUTY TO THE FIDUCIARY ACCOUNTS AND CONFLICTING INTERESTS

661.    Pursuant to the Investment Advisory Service Agreements between RMK Trust and Morgan Management, Morgan Management and RMK Trust caused the Fiduciary Ac-

counts to invest in the Company/Funds and effectuated the distribution of the Company/Funds' shares to the Fiduciary Accounts.

662.   To the extent that the Funds' shares were distributed to, or for the benefit of, the Fiduciary Accounts via the Investment Advisory Service Agreements between RMK Trust and Morgan Management, such shares were distributed without the benefit of the due diligence normally performed by the principal underwriter of an issuer's shares, to the detriment of the Funds.

663.   As a result of the intertwined contractual (pursuant to the Advisory Agreement, the Fund Accounting Service Agreement, the Investment Advisory Service Agreements the Administration Agreement, and the Underwriting Agreement), corporate and other relationships between and among them, and the shared responsibilities for administering the Funds and the Fiduciary Accounts, Regions Bank, Morgan Keegan, and Morgan Management collectively owed a fiduciary duty to the Fiduciary Subclass in connection with the management and administration of the Fiduciary Accounts.

664.   Regions Bank (doing business as "Regions Morgan Keegan Trust," a corporate trustee) delegated to Morgan Management its trustee investment function pursuant to certain Investment Advisory Service Agreements, and Morgan Management and Morgan Keegan jointly managed and administered the Funds and the Fiduciary Accounts at least to the extent that they were invested in the Funds.

665.   Regions Bank's trust officers were no more than trust administrators, the investment management function of managing the trusts having been delegated to Morgan Management (directly via the Investment Advisory Service Agreements) and Morgan Keegan (indirectly via the Investment Advisory Service Agreements with respect to Morgan Management, which shared or delegated its administrative functions, including relating to the Fiduciary Class's accounts, with and to Morgan Keegan).

666.   Regions Bank's delegation of its investment responsibilities to its affiliates

339

was allowed under Alabama statutes sections 19-3B-807 and 19-3B-903, provided, however, the trustee is obliged under section 19-3B-807(3) to review and monitor the agents (i.e., Morgan Management and Morgan Keegan) to which such delegation was made.

667.   Regions (through its subsidiaries Regions Bank, Morgan Management and Morgan Keegan), Regions Bank, and Morgan Management and Morgan Keegan, to which Regions Bank delegated certain of its fiduciary functions and responsibilities with respect to the Fiduciary Subclass, owed a fiduciary duty to said Subclass.

668.   Recognizing the conflict between its interests as a Defendant in this class action, or as an affiliate of the other RMK Defendants herein, on the one hand, and its interests and duties as a fiduciary for the Fiduciary Accounts that purchased, otherwise acquired, or held, shares of one or more of the Funds on the other, Regions Bank petitioned the Judge of Probate of Jefferson County, Alabama for an order appointing a Trustee *ad Litem* "for the limited and specific purposes of monitoring, evaluating, and participating in the Class Actions and taking any and all appropriate actions on behalf of" the Fiduciary Subclass's accounts. The Jefferson County Probate Court granted that petition, finding in its Amended Order Appointing Trustee *ad Litem* that "Regions Bank has an apparent or actual conflict of interest in the evaluation and pursuit of the Class Actions and the possible assertion of other claims concerning the Funds against Morgan Keegan & Co., Morgan Asset Management, Inc., and other affiliates of Regions Bank."

669.   This belated recognition related to a conflict of interest that did not begin upon the filing of this class action but in fact infected the relationships between and among Regions Bank (RMK Trust), Morgan Management and Morgan Keegan and the Fiduciary Subclass at least throughout the Class Period. Although possessing, or privy to, knowledge about the deterioration of the subprime securities market, Regions Bank, Morgan Management, and Morgan Keegan preferred their interests, and the interests of their affiliates, over the interests of the Fiduciary Subclass in connection with any decision by Regions Bank (RMK

340

Trust), Morgan Management or Morgan Keegan to cause the Fiduciary Subclass's accounts, or to advise or direct such accounts, to redeem their shares in the Funds at any time after June 30, 2006. Not only would such a massive redemption have forced the Funds to sell a large proportion of their respective portfolios, it would have removed substantial assets from the management of Morgan Management and the administration of Morgan Keegan, thus significantly reducing the asset-based fees of both Morgan Management and Morgan Keegan, to the substantial detriment of Regions Bank's parent, Regions, and Regions Bank, Morgan Keegan, and Morgan Management and their officers and employees.

670.    As a result of the Investment Advisory Service Agreements and the manner in which Morgan Management managed the Funds' investments, Regions Bank (RMK Trust) was conflicted and it and Morgan Management relinquished the management flexibility necessary to manage the three open-end Funds in accordance with their respective investment objectives, policies and restrictions and the Fiduciary Accounts in accordance with Morgan Management's and Regions Bank's fiduciary duties to said accounts, to the detriment of the Funds and their shareholders, including the Fiduciary Accounts.

## D.    THE FEDERAL STATUTORY POLICY RELATING TO REGISTERED INVESTMENT COMPANIES

671.    It is the policy of the Investment Company Act of 1940 ("ICA"), effectuated through that statute and the Securities Act of 1933, that investors in mutual funds are adversely affected:

> (1) when investors purchase, . . . receive dividends upon, . . . sell, or surrender securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their managements;

> (2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters, brokers, or dealers, in the interest of special classes of their se-

curity holders, or in the interest of other investment companies or persons en-
gaged in other lines of business, rather than in the interest of all classes of
such companies' security holders;

. . .

"(5) when investment companies, in keeping their accounts, in maintaining
reserves, and in computing their earnings and the asset value of their out-
standing securities, employ unsound or misleading methods, or are not sub-
ject to adequate independent scrutiny.

15 U.S.C. §§ 80a-1(b)(1), (2), (5).

672.    The following description of the purposes of the ICA appears on the SEC's

website:

> The Act requires these companies to disclose their financial condition and
> investment policies to investors when stock is initially sold and, subse-
> quently, on a regular basis. The focus of this Act is on disclosure to the in-
> vesting public of information about the fund and its investment objectives,
> as well as on investment company structure and operations.

## E.    NO STATUTORY SAFE HARBOR

673.    The statutory safe harbor provided for forward-looking statements under cer-

tain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint.  The statements alleged to be false and misleading herein all relate to existing

facts and conditions.  In addition, to the extent certain of the statements alleged to be false

might be characterized as forward-looking, the specific statements pleaded herein were not

identified as "forward-looking statements" when made, or if they were so identified, they

were not accompanied by the requisite language adequately informing investors that actual

results "could differ materially from those projected."  To the extent there were any forward-

looking statements, there were no meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the purportedly for-

ward-looking statement; in fact, as set forth above, many such purportedly "cautionary"

statements were themselves false and misleading because they represented that certain

events "may" or "could" occur, when in fact they had already occurred or already existed, as

342

Plaintiffs allege.

## VII.   CLAIMS

674.   With respect to any applicable statute of limitations, this action was commenced (i) within one year of the date on which Plaintiffs first discovered, or could have discovered by the exercise of reasonable diligence, the facts constituting the breaches and other wrongful conduct alleged herein, or (ii) within one year of the date on which the Funds were injured or became aware of their injury. Prior to Plaintiffs' discovery, Defendants concealed the bases for the claims asserted herein.

675.   With respect to the claims asserted herein pursuant to **§§** 11, 12(a)(2), and 15 of the Securities Act, this action has been commenced within one year of the date on which Plaintiffs first discovered, or should have discovered, the facts constituting the violations by the exercise of reasonable diligence.

676.   The Funds offered and sold shares of their capital stock during the Class Period to Plaintiffs and other members of the Class.

677.   The shares of the Funds' capital stock sold to Plaintiffs and other members of the Class are securities within the meaning of the Securities Act, the Exchange Act, and the ICA.

678.   The ICA § 7 provides that an investment company cannot offer for sale or sell or purchase or redeem, or offer to redeem, its shares unless it is registered under the ICA:

(a) No investment company organized or otherwise created under the laws of the United States or of a State and having a board of directors, unless registered under section 8, shall directly or indirectly—

(1) offer for sale, sell, or deliver after sale, by the use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person; or offer for sale, sell, or deliver after sale any such security or interest, having reason to believe that such security or interest will be made the subject of a public offering by use of the mails or any means or instrumentality of interstate commerce;

343

(2) purchase, redeem, retire, or otherwise acquire or attempt to acquire, by use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person;

(b) No depositor or trustee of or underwriter for any investment company, organized or otherwise created under the laws of the United States or of a State and not having a board of directors, unless such company is registered under section 8 or exempt under section 6, shall directly or indirectly—

(1)     offer for sale, sell, or deliver after sale, by use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security of which such company is the issuer; or offer for sale, sell, or deliver after sale any such security or interest, having reason to believe that such security or interest will be made the subject of a public offering by use of the mails or any means or instrumentality of interstate commerce;

(2)     purchase, redeem, or otherwise acquire or attempt to acquire, by use of the mails or any means or  instrumentality of interstate commerce, any security or any interest in a security of which such company is the issuer;

. . . .

679.   The ICA § 8 requires a registered investment company to file a registration statement pursuant to the Securities Act of 1933 with respect to the redeemable securities issued by it to public investors.

680.   The ICA § 8(b) requires a registered investment company to recite its policies regarding borrowing money, concentration its investments in a particular industry or group of industries, all investment policies that are changeable only by vote of the shareholders, and all policies deemed matters of fundamental policy.

681.   The ICA § 22 addresses the distribution, redemption and repurchase of redeemable securities.

682.   Pursuant to Securities Act Rule 156, under the federal securities laws, it is unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, to use sales literature that is materially misleading in connection with the offer or sale of securities issued by an investment company. Sales litera-

344

ture is materially misleading if it (1) contains an untrue statement of a material fact or (2) omits to state a material fact necessary in order to make a statement made, in the light of the circumstances of its use, not misleading.

683.    Pursuant to Rule 156, in determining whether a particular description, representation, illustration, or other statement involving a material fact is misleading, weight should be given to all pertinent factors, including but not limited to:

(a)    A statement could be misleading because of the absence of explanations, qualifications, limitations or other statements necessary or appropriate to make such statement not misleading;

(b)    Representations about past or future investment performance could be misleading because of statements or omissions made involving a material fact, including situations where:

(1)    Portrayals of past income or stability of assets convey an impression of the net investment results achieved by an actual investment would not be justified under the circumstances; and

(2)    Representations, whether express or implied, about future investment performance, including

(A)    Representations as to security or safety of capital or income associated with an investment;

(B)    Representations implying that future safety or income may be inferred from or predicted based on past investment performance; or

(C)    Portrayals of past performance made in a manner that would imply that safety of principal or income realized in the past would be repeated in the future.

(c)    Statements about the characteristics or attributes of a registered investment company could be misleading because of:

345

(1)   Statements about possible investment methodology that do not give equal prominence to discussion of the risks or limitations associated therewith;

(2)   Exaggerated or unsubstantiated claims about management skill or techniques, characteristics of the investment company or an investment in securities issued by such company or security or safety of an investment in such investment company; and

(3)   Unwarranted or incompletely explained comparisons to other investment vehicles or to indices.

**COUNT I**

**VIOLATION OF THE SECURITIES ACT OF 1933 § 11: ALL DEFENDANTS EXCEPT DEFENDANT DIRECTORS AND OFFICERS, REGIONS AND MK HOLDING**

684.   This Count I is asserted by Plaintiffs and Class against the Company/Funds, Morgan Keegan, Morgan Management and Regions Bank, and PwC (hereinafter "§ 11 Defendants").

685.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except to the extent any allegations contained above contain any facts that are unnecessary or irrelevant for purposes of stating a claim under Section 11, including but not limited to allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the § 11 Defendants other than strict liability or negligence and allegations relating to loss causation, as to which the burden of proof is on Defendants.

686.   The § 11 Defendants prepared, or participated in the preparation of, or reviewed parts or all of the registration statements and all amendments thereto during the Class Period, including the prospectus, statement of additional information, and exhibits included in said registration statements and amendments.

687.   Morgan Keegan, Morgan Management and Regions Bank either purchased from the Funds, each of which was an "issuer" within the meaning of the Securities Act of 1933, with a view to, or offered or sold for the Funds in connection with, the distribution of

346

a security, namely shares of the Funds' common stock, or participated or had a direct or indirect participation in any such undertaking, or participated or had a participation in the direct or indirect underwriting of any such undertaking.

688.    Alternatively, Defendants Morgan Management, Morgan Keegan and Regions Bank are liable as controlling persons of the Company/Funds, as set forth below.

689.    It is the policy of the ICA, effectuated through that statute and the Securities Act of 1933, that investors in mutual funds are entitled to "adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their managements." ICA § 1(b)(1).

690.    The § 11 Defendants, except PwC, caused to be effected a distribution of shares of the Funds' capital stock to the public pursuant to a SEC Form N-1A registration statement, dated October 27, 1998, as amended on October 28, 1999, June 6, 2000, June 30, 2006, August 17, 2000, August 18, 2000, August 25, 2000, October 30, 2000, November 11, 2007, October 26, 2001, October 28, 2002, October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006, and November 29, 2007, that was in effect during the Class Period.  This registration statement, during the Class Period, contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements in the registration statement not misleading, as set forth above.

691.    Each of the § 11 Defendants, other than PwC, either signed the registration statement and the amendments thereto, was a director of the Funds at the time of the filing of those portions thereof with respect to which their liability is asserted herein, or consented to being named in such registration statement or amendments thereto as a director.

692.    Plaintiffs did not know that the representations made to them by Defendants

347

regarding the matters described above were untrue and did not know the above alleged material facts that were not disclosed.

693.    PwC consented to being named in the registration statement and the amendments thereto as having prepared or certified portions of the registration statement or as having prepared or certified reports used in connection with the registration statement. Liability is asserted herein against PwC in connection with those portions of the registration statement and amendments thereto prepared or certified by PwC or otherwise attributable to statements or reports prepared or certified by PwC and those statements therein made by PwC based on its authority and professional expertise.

694.    PwC:

(a)    Performed accounting and auditing services in connection with such registration statements and each and every amendment thereto during the Class Period;

(b)    Reviewed, or was required to review, those disclosures in such registration statements and amendments thereto related to matters for which it had responsibility as the auditor of the Funds' financial statements; and

(c)    Reviewed, or was required to review, the extent to which the Funds were managed in a manner consistent with their investment objectives and restrictions as disclosed in such registration statements and otherwise and in compliance with applicable laws, rules and regulations applicable to registered investment companies.

695.    The Funds and their board of directors and their shareholders and prospective shareholders relied upon the expertise of PwC with respect to those matters for which, as the auditor of the Funds' financial statements, PwC was responsible in connection with such registration statements.

696.    Plaintiffs and the other members of the Class are entitled to recover from De-

348

fendants pursuant to § 11 of the Securities Act damages as follows:

(a)     With respect to shares purchased, including shares purchased upon reinvesting dividends paid by the Funds in respect of such shares, during the Class Period and held on the date this suit was initiated, damages in an amount equal to the difference between the amount paid therefor (including any "load" or commission paid in connection with the purchase of such shares), but not to exceed the price at which the shares were offered to the public, and the net asset value of such shares on the date this action was initiated without reduction for dividends paid in respect of such shares and without interest;

(b)     With respect to shares purchased, including shares purchased upon reinvesting dividends paid by the Funds in respect of such shares, during the Class Period and redeemed before this action was initiated, damages in an amount equal to the difference between the amount paid therefor (including the "load" or commission paid in connection with the purchase of such shares), but not to exceed the price at which the shares were offered to the public, and the price at which such shares were redeemed without reduction for dividends paid in respect of such shares and without interest; or

(c)     With respect to shares purchased, including shares purchased upon reinvesting dividends paid by the Funds in respect of such shares, during the Class Period and redeemed after this action was initiated but before judgment, damages in an amount equal to the difference between the amount paid therefor (including the "load" or commission paid in connection with the purchase of such shares), but not to exceed the price at which the shares were offered to the public, and the price at which such shares were redeemed (if such damages shall be less than the damages representing the difference between the amount paid for the shares and the net asset value thereof at the time this suit was brought) without

reduction for dividends paid in respect of such shares and without interest.

697.   Upon investing in the Funds, investors acquired an equity interest in the Funds entitling them to share in, and receive their *pro rata* share of, any capital gains or losses and interest or other income received by the Funds, all in the form of dividends paid monthly.

698.    Upon investing in the Funds, investors also acquired a put option in the form of the redeemable shares issued by the Fund as an open-end registered investment company, pursuant to which put option they were entitled to "put" their shares to the Funds at the then current NAV – to compel the Fund to purchase from them their shares at the current NAV.

699.   A "put" is a "security" within the meaning of the Securities Act of 1933.

700.   The put was a continuing obligation of the Funds during the  Class Period and was exercisable at the sole discretion of the share/putholder of the Funds' redeemable shares.

701.   Because the put operated to allow holders of the Funds' redeemable shares to return them to the Funds at the then current NAV – i.e., gave the Funds' investors the opportunity to rescind their investment, return their shares to the Funds and receive their money back – the put also represented a continuous offering of the shares to the existing shareholders.

702.   Investors in the Funds were obliged to sell their shares back to the Funds only by exercising their put option; investors in the Funds could not sell their shares in any market because there was no market for the Funds' shares. Accordingly, the Funds and the put issued to their shareholders were the exclusive means by which investors in the Funds could dispose of their investments.

703.   Pursuant to ICA § 22(e), the Funds were required to price and redeem their shares at their respective NAVs next computed after receipt of redemption requests – i.e., after the shareholder's exercise of the put option against the Fund – and to make prompt pay of redemption (put) proceeds.

704.   The put options held by the Funds' shareholders during the  Class Period were

the subject of a continuously effective registration statement under the Securities Act of 1933.

705.    That continuously effective put registration statement was false and misleading for the reasons alleged above.

706.    It is the policy of the ICA, effectuated through that statute and the Securities Act of 1933, that investors in mutual funds are entitled to "adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their managements." ICA § 1(b)(1).

707.    Plaintiffs and the other members of the Class are entitled to recover from Defendants pursuant to § 11 of the Securities Act damages as follows:

(a)    With respect to put options purchased, including put options purchased upon reinvesting dividends paid by the Funds in respect of such securities, during or before the Class Period and held on the date this suit was initiated, damages in an amount equal to the difference between the amount paid therefor (including any "load" or commission paid in connection with the purchase of such securities), but not to exceed the price at which the securities were offered to the public, and the net asset value of such securities on the date this action was initiated without reduction for dividends paid in respect of such securities and without interest;

(b)    With respect to put options purchased, including put options purchased upon reinvesting dividends paid by the Funds in respect of such securities, during or before the Class Period and exercised before this action was initiated, damages in an amount equal to the difference between the amount paid therefor (including the "load" or commission paid in connection with the purchase of such securities), but not to exceed the price at which the securities were of-

351

fered to the public, and the price at which such put options were exercised without reduction for dividends paid in respect of such securities and without interest; or

(c)     With respect to put options purchased, including put options purchased upon reinvesting dividends paid by the Funds in respect of such securities, during or before the  Class Period and redeemed after this action was initiated but before judgment, damages in an amount equal to the difference between the amount paid therefor (including the "load" or commission paid in connection with the purchase of such shares), but not to exceed the price at which the securities were offered to the public, and the price at which such put options were exercised (if such damages shall be less than the damages representing the difference between the amount paid for the securities and the net asset value thereof at the time this suit was brought) without reduction for dividends paid in respect of such securities and without interest.

## COUNT II
### VIOLATION OF THE SECURITIES ACT OF 1933 § 12(a)(2): ALL DEFENDANTS EXCEPT REGIONS , PWC AND MK HOLDING

708.    This Count II is asserted by the Plaintiffs and Class against Morgan Keegan as underwriter of the Funds' shares and Morgan Management and Regions Bank as participants in the distribution of the Funds' shares through Regions Bank and/or other subsidiaries and trust departments of subsidiaries owned or controlled by Regions (hereinafter the "§ 12 Defendants").

709.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except to the extent any allegations contained above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under Section 12, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the § 12 Defendants other than strict liability or negligence.

352

710.  Alternatively, Defendants Morgan Management, Morgan Keegan and Regions Bank are liable as controlling persons of the Company/Funds, as set forth below.

711.  The § 12 Defendants offered and sold a security, namely shares of the Funds' common stock, by means of a prospectus or were controlling persons of the Funds or of those who offered and sold the Funds' shares.  This prospectus contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the § 12 Defendants knew, or in the exercise of reasonable care the § 12 Defendants would have known, were false or were material facts which were required to be disclosed to prevent the representations that were made from being misleading.

712.  The § 12 Defendants actively solicited the sale of the Funds' shares to serve their own financial interests. Morgan Management received management fees based on the aggregate net assets of the Funds, Morgan Keegan received commissions and administrative fees based on such sales or on the aggregate net assets of the Funds, and Regions, through Regions Bank or other subsidiaries and trust departments of subsidiaries owned or controlled by Regions, received compensation for participating in the distribution of the Funds' shares and/or fees based on their customers' accounts holding such shares.

713.  Plaintiffs did not know that the representations made to them in connection with the distribution to them by the § 12 Defendants regarding the matters described above were untrue and did not know the above described material facts that were not disclosed.

714.  As a result of the matters set forth herein, pursuant to § 12(a)(2) of the Securities Act, Plaintiffs and Class members are entitled to recover the consideration paid for their Fund shares with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

715.  Plaintiffs and putative Class members who do not opt out hereby tender their shares in the Funds.

716.   The § 12 Defendants are liable to Plaintiffs and class members pursuant to § 12(a)(2) of the Securities Act as sellers of the Funds' shares.

## COUNT III
### LIABILITY UNDER THE SECURITIES ACT §15: ALL DEFENDANTS EXCEPT COMPANY/FUNDS AND PWC

717.   This Count III is brought by Plaintiffs and the Class pursuant to §15 of the Securities Act, 15 U.S.C. § 77o, against the officers and directors of the Funds and the Company, as controlling persons of the Company/Funds; Morgan Management, as the controlling person of the Company/Funds; Holding, as the controlling person of Morgan Management; Regions, as the controlling person of Regions Bank, Morgan Keegan and Holding  (hereinafter "Controlling Person Defendants"); and certain of the individual Defendants as officers and directors of Morgan Management, Morgan Keegan, Holding, Regions Bank, and Regions with respect to the claims asserted in Claims I and II.

718.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except to the extent any allegations contained above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under Section 15, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendant other than strict liability or negligence.

719.   Prior to July 1, 2008, the Funds' shareholders had not elected the Company/Funds' directors since June 26, 2003; the Company/Funds did not hold annual shareholder meetings for the purpose of electing directors. The Defendant directors were initially selected by Morgan Management, and the Funds' directors were not, and had not been, subject to annual election by the Funds' shareholders. Because the Funds' shareholders did not annually elect the Funds' directors, Morgan Management and Morgan Keegan effectively controlled the Company/Funds and, therefore, owed a fiduciary duty to the Funds' shareholders.

720.   Given their dominance over the Company/Funds' Board, Morgan Management

and Morgan Keegan usurped the Board's functions and performed the functions of the Board through their agents the nominal directors of the Company/Funds.

721.   In 2006 and early 2007, Regions determined that the subprime credit market was headed for trouble and acted on that determination by selling its subprime lending unit, EquiFirst Corporation.   Regions either did not inform Morgan Management and the Defendant officers and directors of its view of the subprime market, even though it was obliged to do so, or it did so inform Morgan Management but not the Funds' directors, and Morgan Management ignored such information, or Morgan Management and the Funds' directors were so informed but both the Funds' directors and Morgan Management ignored such information and failed to take measures necessary to avoid the losses the Funds' shareholders incurred later in 2007 and 2008.

722.   The Funds were required to adhere to their respective investment objectives, policies and restrictions, and the Corporate Fiduciary Defendants were required to manage the Funds in compliance with said investment objectives, policies and restrictions.

723.   Each of the Controlling Person Defendants was a controlling person of the § 11 Defendants (except PwC) or § 12 Defendants. Such persons were controlling persons of the Funds by virtue of his or her position as a director or senior officer of the Company, the Funds, Morgan Management, Morgan Keegan, or of the wholly owing parent of any of the foregoing corporate entities; or by virtue of its position as the manager of, and investment advisor to, the Funds; or as the wholly owing parent of any of the foregoing non-Fund corporate entities.

724.   Each of the RMK Defendants was a participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on his or her having signed the registration statements and/or having otherwise participated in the process which allowed the offerings of the Funds' shares to be successfully completed.

355

## COUNT IV
### VIOLATION OF INVESTMENT COMPANY ACT §§ 13, 22, 30, 34(b), 47(b): ALL DEFENDANTS

725.    This Count IV is asserted by Plaintiffs and the Class against all Defendants.

726.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except to the extent any allegations contained above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under the ICA, including allegations that may be interpreted to sound in fraud.

727.    Defendants are persons who (i) made untrue statements of material facts in a registration statement, amendments thereto, reports, accounts, records and other documents filed or transmitted pursuant to the ICA, or the keeping of which is required pursuant to § 31(a) of the ICA and/or (ii) in connection with such filing, transmitting, or keeping any such document, omitted to state therein facts necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading, all as set forth above, including but not limited to the Funds' violation of their fundamental investment restriction relating to the limit on investments in a single industry, which violation was also a violation of § 13 of the Investment Company Act.

728.    For purposes of § 34(b) of the ICA, any part of any registration statement, reports, records and other documents filed or transmitted pursuant to the ICA which is signed or certified by an accountant or auditor in its capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document. Defendant directors signed the Funds' registration statement and amendments thereto and signed the Funds' reports on the Funds' internal controls pursuant to SEC Form N-SAR. PwC signed its reports regarding the Funds' financial statements for their fiscal years ended June 30, 2004, 2005 and 2006 and certified such financial statements, which were part of the Funds' registration statement, as amended from time to time during the Class Period, and signed its reports on the Funds' internal con-

356

trols pursuant to SEC Form N-SAR.  The Funds' President and Treasurer signed and/or cer-
tified the Funds' annual and semi-annual reports on Forms N-CSR or N-CSRS as "fully
compl[ying] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act
of 1934, as amended; and 2. The information contained in the Report fairly presents, in all
material respects, the financial condition and results of operations of the Fund."

729.    By engaging in the conduct described herein, Defendants violated § 34(b) of
the ICA, as amended, and, pursuant to § 1(b)(1) and (5) of the ICA, the interests of those
who invested in the Funds were adversely affected because (i) such investors purchased,
paid for, exchanged, received dividends upon, voted, refrained from voting, sold, or surren-
dered shares issued by the Funds without adequate, accurate, and explicit information, fairly
presented, concerning the character of such shares and the circumstances, policies, and fi-
nancial responsibility of the Funds and their management and (ii) the Funds, in keeping their
accounts and in computing their earnings and the asset value of their outstanding securities,
employed unsound or misleading methods, and were not subjected to adequate independent
scrutiny.

730.    The ICA regulates both the sale (i.e., the purchases of an open-end fund's
shares by investors) and redemption (sales by investors of their open-end fund shares to the
fund) of redeemable securities issued by open-end registered investment companies.

731.    The ICA recognizes that the accurate calculation of net asset value is critical to
both the sale of redeemable securities and the redemption thereof, as provided by ICA § 22.
15 U.S.C. § 80a-22. SEC Rel. 40-4006 (a proposal that was adopted relating "to the manner
in which the net asset value of a redeemable security issued by a registered investment com-
pany is to be computed for purposes of the distribution. redemption, and repurchase of the
security" and further noting that "uniformity with respect to the calculation of net asset value
of redeemable securities issued by registered investment companies would be in the public
interest and in the interest of investors.").

357

732.   The term "current net asset value" is used in ICA § 22 relating to the "distribution, redemption, and repurchase of redeemable securities" and the concept of "net asset value" is employed in the definition of the term "redeemable security" in ICA 2(a)(32).

733.   In consideration of the interests recited in the preceding two paragraphs, the SEC promulgated ICA Rule 2a-4, 17 C.F.R. § 270.2a-4, which, *inter alia*, provides that:

> (a) The current net asset value of any redeemable security issued by a registered investment company used in computing periodically the current price for the purpose of distrIbution, redemption, and repurchase means an amount which reflects calculations, whether or not recorded in the books of account, made substantially in accordance with the following, with estimates used where necessary or appropriate:

> (1) Portfolio securities with respect to which market quotations are readily available shall be valued at current market value, and other securities and assets shall be valued at fair value as determined in good faith. by the board of directors of the registered company.

734.   For the reasons alleged above, the financial statement and other disclosures by Defendants attendant to the Funds' NAVs during the  Class were false and misleading.

735.   As a result of such conduct, pursuant to § 47(b) of the ICA, Plaintiffs and the other members of the Class are entitled to rescind their purchases or holdings of the Funds' shares during the Class Period or are otherwise entitled to damages in an amount to be proved at trial.

736.   By virtue of their control and discretionary authority over the Fiduciary Accounts, Regions Bank (RMK Trust), Morgan Keegan and Morgan Management determined whether, when and the extent to which the Funds' shares held in these accounts would be redeemed.

737.   In connection with the Funds' continuing offers to the Funds' shareholders to redeem their respective shares, Regions Bank (RMK Trust), Morgan Keegan, and Morgan Management, which received the Funds' continuing offers to redeem and which were bound by their shared fiduciary duty to the Fiduciary  Subclass to continuously evaluate whether

they should direct or otherwise cause the Fiduciary Accounts to continue to hold or redeem the Funds' shares, failed to direct or otherwise cause the Fiduciary Subclass's accounts to redeem the Funds' shares held by such accounts during the Class Period.

738.    Regions, Regions Bank, Morgan Keegan and Morgan Management failed to do so even though they had determined in 2006, or learned of such determination by Regions in 2006, that the subprime credit market was headed for serious trouble and knew, or should have known, of the substantial subprime holdings in the Funds' portfolios and even though Regions Bank was obliged by statute to review and monitor Morgan Keegan's and Morgan Management's administration of the Fiduciary Subclass accounts pursuant to the authority delegated to them by the Investment Advisory Service Agreements.

739.    As a result of sharing officers and directors and other executives and employees, Regions' knowledge of the subprime market and its decision to sell its subprime lending subsidiary was attributable to Regions Bank, Morgan Keegan and Morgan Management.

740.    By not later than December 31, 2006, as a result of its knowledge of the subprime markets, Regions Bank should have directed Morgan Management to redeem the Fiduciary Accounts' shareholdings in the Funds. However, because such shareholders constituted a substantial portion of the respective portfolios of the three Funds, and because of the overlapping holdings among the three Funds and their four closed-end fund siblings also managed by Morgan Management, Regions Bank was precluded from exercising its fiduciary duty for fear that such a sudden mass redemption would cause the NAVs of the Funds to decline and to precipitate a run on the Funds by the remaining shareholders.

741.    Because the Funds, Morgan Management and Regions Bank failed to comply with the ICA §§ 13, 30, and 34(b), the Investment Advisory Service Agreements pursuant to which the assets of the Fiduciary Accounts were invested in the Funds during the Class Period and continued to be invested and in the Funds and were held on July 1, 2007 are void and unenforceable pursuant to the ICA § 47(b) and must be rescinded, thereby rescinding all invest-

ments held in the Funds pursuant to said Investment Advisory Service Agreements and not re-deemed during the Class Period or by July 1, 2007.

## COUNT V
### VIOLATION OF SECURITIES EXCHANGE ACT OF 1934 § 10(b) AND RULE 10b-5: FUNDS, MORGAN MANAGEMENT, MORGAN KEEGAN AND REGIONS

742.    This Count V is asserted by Plaintiffs and the Class against Defendants Company/Funds, Morgan Management, Morgan Keegan and Regions Bank.

743.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

744.    The Company/Funds was an "open-end company" and "management invest-ment company" within the meaning of ICA § 5(a), 15 U.S.C. § 80a-5(a), which provides that an "open-end company" is "a management company which is offering for sale or has out-standing any redeemable security of which it is the issuer."

745.    Each of the portfolios (Funds) of the Company issued redeemable common stock – i.e., a "security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, is entitled (whether absolutely or only out of surplus) to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof." ICA § 2(32), 15 U.S.C. § 80a-2(32).

746.    Pursuant to Articles Fourth and Sixth, Section 6.6, of the Company/Funds' Articles of Incorporation, investors who purchased shares of the Company/Funds' common stock entered into a contract between them and the Company/Fund pursuant to which they were given the right to redeem those shares at their NAV per share:

> FOURTH: The purposes for which the Corporation is formed are to act as an open-end management investment company, as contemplated by the Invest-ment Company Act of 1940, as amended (the "1940 Act"), . . .

> Section 6.6. Redemption by Stockholders. Each holder of Shares shall have the right at such times as may be permitted by the Corporation to require the

Corporation to redeem all or any part of his Shares at a redemption price per Share equal to the net asset value per Share as of such time as the Board of Directors shall have prescribed by resolution, minus any applicable sales charge or redemption or repurchase fee. In the absence of such resolution, the redemption price per Share shall be the net asset value next determined (in accordance with Section 6.7) after acceptance of a request for redemption in proper form less such charges as are determined by the Board of Directors and described in the Corporation's registration statement under the Securities Act of 1933, except that Shares may be redeemed by an underwriter at (a) the net asset value next determined after such requests are received by a dealer with whom such underwriter has a sales agreement or (b) the net asset value determined at a later time. . . .

747. In connection with the Funds' continuing offers to their respective shareholders to redeem their respective shares of common stock pursuant to their contractual and statutory obligations, Defendants Company/Funds, Morgan Management, Morgan Keegan and Regions Bank, directly and indirectly,

    (a)    Employed devices, schemes, or artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

    (c)    Engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit on the Funds' shareholders.

748. In connection with Defendants Company/Funds', Morgan Management's, Morgan Keegan's and Regions Bank's continuing offers to the Funds' existing shareholders to redeem the Funds' respective shares of common stock, Defendants Morgan Management, Morgan Keegan and Regions Bank, knowingly and directly participated in the conduct giving rise to the liability asserted herein, or acted in reckless disregard of said Defendants' and the Company/Funds' failures to disclose material facts, as set forth herein.

749. Alternatively, Defendants Morgan Management, Morgan Keegan and Regions Bank are liable as controlling persons of the Company/Funds, as set forth below.

750.   PwC knowingly, or with reckless disregard, participated directly in the violative conduct alleged above and as alleged herein.

751.   Accordingly, Defendants Company/Funds, Morgan Management, Morgan Keegan, Regions Bank, and PwC are liable to the Class for fraudulently failing to disclose to the Class material facts in connection with the Company/Funds' continuing offers to redeem their shares, thus preventing such shareholders from redeeming their shares at NAVs that significantly exceeded those after July 2007, all in violation of Section 10(b) of the '34 Act and Rule 10b-5 thereunder.

### COUNT VI
### VIOLATION OF SECURITIES EXCHANGE ACT OF 1934 §§ 10(b) AND RULE 10b-5: RE-GIONS BANK, MORGAN KEEGAN, AND MORGAN MANAGEMENT – FIDUCIARY SUB-CLASS

752.   This Count VI is asserted by Plaintiffs on behalf of the Fiduciary Subclass a-gainst Defendants Regions Bank (RMK Trust), Morgan Keegan, and Morgan Management.

753.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

754.   Alternatively, Defendants Morgan Management, Morgan Keegan and Regions Bank are liable as controlling persons of the Company/Funds, as set forth below.

755.   In connection with Regions Bank's conflict of interest, as described above, and as a result thereof, and given their fiduciary duty to the Fiduciary Class, Regions Bank (RMK Trust), Morgan Keegan and Morgan Management owed to the Fiduciary Class a duty to disclose to said Class, or to a person or persons appointed to represent the interests of said Class, their conflict of interest, their interest in causing the Fiduciary Class accounts to in-vest in the Funds, their analysis of the subprime market and their decision to sell their sub-prime lender subsidiary/affiliate, together with all of the other material facts alleged herein (e.g., concentration, credit, liquidity and valuation risks and uncertainties and the Funds' vio-lations of their respective investment objectives, policies and restrictions, including the sub-

stantial overlapping ownership of thinly traded securities by the Funds and by the RMK closed-end funds that were managed by Morgan Management and Morgan Keegan), and the need for the Fiduciary Class, or the person or persons appointed to represent the interests of said Class, to waive said conflict and consent to the continued investment of said Class's assets in the Funds, all of which was necessary for Regions Bank (RMK Trust), Morgan Keegan and Morgan Management to obtain the required consents of the Fiduciary Class to the investment of their assets in the Funds and to the continuation of such investments and to refrain from redeeming their shares in the Funds.

756.    By failing to obtain said consents, and by engaging in conduct alleged herein, Regions Bank (RMK Trust), Morgan Keegan and Morgan Management managed the Fiduciary Class accounts artfully and deceitfully for their gain and advantage.

757.    As a result of said conduct, Regions Bank (RMK Trust), Morgan Keegan and Morgan Management breached the fiduciary duties owed to the Fiduciary Class by Regions Bank (RMK Trust), Morgan Management and Morgan Keegan to redeem the Fiduciary Class's shares in the Funds, which fiduciary duty breaches were accompanied by said Defendants' failure to disclose material facts and failure to obtain the required waivers by the Fiduciary Class, or by the person or persons appointed to represent the interests of said Class, of said Defendants' conflicting interests in maintaining said Class's investments in the Funds, thus constituting manipulative or deceptive conduct and, further, constituted devices, schemes, or artifices to defraud the Fiduciary Class, or acts, practices, or courses of business that operated or would operate as a fraud or deceit on the Fiduciary Classes, all in violation of § 10(b) of the '34 Act and Rule 10b-5 thereunder, the Fiduciary Class incurred catastrophic losses.

### COUNT VII
### LIABILITY UNDER THE SECURITIES EXCHANGE ACT §20: DEFENDANT OFFICERS AND DIRECTORS, REGIONS, HOLDING

758.    This Count VII is brought by Plaintiffs and the Class and Subclass pursuant to

§ 20 of the Securities Exchange Act, 15 U.S.C. § 78t, against the RMK Defendants: i.e., against the officers and directors of the Company/Funds, as controlling persons of the Company/Funds; Morgan Management, as a controlling person of the Company/Funds; Holding, as the controlling person of Morgan Management; Regions, as the controlling person of Regions Bank, Morgan Management and Morgan Keegan; Morgan Keegan, as a controlling person of the Company/Funds; and certain of the individual Defendants as officers and directors of Morgan Management, Morgan Keegan, Holding, Regions Bank, and Regions (hereinafter "Controlling Person Defendants").

759.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except to the extent any allegations contained above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under Section 20.

760.    Each of the corporate RMK Defendants, by virtue of its position as the manager of, and investment advisor to, the Funds; as the administrator of the Funds; or as the wholly owing parent of any of the foregoing non-Fund corporate entities, were controlling persons of the Company/Funds.

761.    Prior to July 1, 2008, the Funds' shareholders had not elected the Company/Funds' directors since June 26, 2003; the Company/Funds did not hold annual shareholder meetings for the purpose of electing directors. The Defendant directors were initially selected by Morgan Management, and the Funds' directors were not, and had not been, subject to annual election by the Funds' shareholders. Because the Funds' shareholders did not annually elect the Funds' directors, Morgan Management and Morgan Keegan effectively controlled the Company/Funds and, therefore, owed a fiduciary duty to the Funds' shareholders.

762.    The Controlling Person Defendants managed the Funds, which had no employees of their own, and directly or indirectly controlled the Funds, or were officers or directors of the Funds, or occupied a similar status or performed similar functions, or were

employees of the Funds or controlling persons of the Funds and materially participated in the conduct giving rise to the liability asserted herein, or were a broker-dealer or agent who materially participated in such conduct, and are, therefore, liable jointly and severally.

763.    Morgan Management and Morgan Keegan directly or indirectly controlled the Company/Funds via the Advisory Agreement and Fund Accounting Service Agreement between the Company/Funds and Morgan Management and Morgan Keegan, respectively, pursuant to which all of the business, administrative, managerial, clerical and/or other functions attendant to the operation of any business were performed by Morgan Management and Morgan Keegan, including providing officers and employees to the Company/Funds. Pursuant to these Agreements, Morgan Management and Morgan Keegan functioned as the effective officers and directors of the Company/Funds, or occupied a similar status or performed similar functions, or were employees of the Company/Funds or controlling persons of the Company/Funds and of Morgan Management and Morgan Keegan, or were a broker-dealer or agent,

764.    The Controlling Person Defendants, and in particular Regions Financial and Regions Bank are persons who controlled the Company/Funds, which is/are liable under § 10(b) and Rule 10b-5 thereunder to the extent that the Controlling Person Defendants' wrongful conduct is attributable to the Company/Funds, shall also be liable jointly and severally with and to the same extent as the Company/Funds to Plaintiffs and the  Class to whom such controlled persons are liable.

765.    Given their dominance over the Company/Funds' Board, Morgan Management and Morgan Keegan usurped the Board's functions and performed the functions of the Board through their agents the nominal directors of the Company/Funds.

766.    The Funds were required to adhere to their respective investment objectives, policies and restrictions, and the RMK Defendants were required to manage the Funds in compliance with said investment objectives, policies and restrictions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the class, pray for judgment against Defendants as follows:

A.   Declaring this action to be a proper class action, consisting of the Class and the Fiduciary Subclass; and

B.   Awarding Plaintiffs and the other members of the  Class and the Fiduciary Subclass rescission or compensatory or rescissory damages based either on said Class and Subclass members' fraudulently induced purchases or on their being induced not to redeem because of Defendants' fraudulent continuing offers to redeem the Funds' shares; and

C.   Awarding to Plaintiffs and the other members of the Class and Fiduciary Subclass  prejudgment interest in the manner and at the maximum rate where permitted by law; and

D.   Awarding to Plaintiffs and the other members of the Class and Fiduciary Subclass costs and expenses of this litigation, including reasonable attorneys' fees and costs, including experts' fees and costs; and

E.   Declaring that no other Defendant be allowed contribution or indemnification from the Company/Funds; and

F.   Declaring that the Company/Funds be allowed contribution and/or indemnification from and against the other Defendants; and

G.   Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  November 30, 2009

**APPERSON, CRUMP & MAXWELL, PLC**

*s/ Jerome A. Broadhurst*____
Jerome A. Broadhurst, TNBPR12529
Charles D. Reaves, TNBPR 22550
6000 Poplar Avenue, Suite 400
Memphis, TN  38119-3972
(901) 260-5133 direct
(901) 435-5133 fax
creaves44@comcast.net
jbroadhurst@appersoncrump.com

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
  Vernon J. Vander Weide
  Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN  55402-2422
Telephone: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com
tseifert@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN PLLP**
Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone:  612-339-6900
Fax: 612-339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com

**ATTORNEYS FOR PLAINTIFFS**

## APPENDIX A

| Total Return Class A Shares | RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Select Short Term Bond Fund | RMK Select Fixed Income Fund (FIF) | RMK Select Limited Maturity Fixed Income Fund (LMFIF) |
|---|---|---|---|---|---|
| 5/1/07-4/30/08 | -72.99% | -77.99% | -31.08% | | |
| Benchmark | 0.34% | 7.07% | 7.18% | | |
| 6/1/07-5/31/08 | | | | -2.27% | -7.59% |
| Benchmark | | | | 7.1% | 6.96% |
| 1/1/07-12/31/07 | -60.71% | - 51.32% | -12.90% | | |
| Benchmark | 1.75% | 7.02% | 6.83% | | |
| 12/1/06-11/30/07 | | | | -3.97% | -6.66% |
| Benchmark | | | | 6.36% | 6.63% |

# APPENDIX B

Identical or substantively identical language that relates to two or more funds is underlined.

| RMK Select High Income Fund -73% | RMK Select Intermediate Bond Fund -78% | RMK Select Short Term Bond Fund -31% | RMK Select Fixed Income Fund (FIF) -2% | RMK Select Limited Maturity Fixed Income Fund (LMFIF) -8% |
|---|---|---|---|---|
| Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you could lose money by investing in the fund. In addition, the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies. There is no guarantee that the fund will meet its goals. An investment in the fund is not a bank deposit and is not insured or guaranteed by the FDIC or any other government agency. | Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you could lose money by investing in the fund. In addition, the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies. There is no guarantee that the fund will meet its goals. An investment in the fund is not a bank deposit and is not insured or guaranteed by the FDIC or any other government agency. | Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you could lose money by investing in the fund. In addition, the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies. There is no guarantee that the fund will meet its goals. An investment in the fund is not a bank deposit and is not insured or guaranteed by the FDIC or any other government agency. | Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you could lose money by investing in the fund. In addition, the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies. There is no guarantee that the fund will meet its goals. An investment in the fund is not a bank deposit and is not insured or guaranteed by the FDIC or any other government agency. | Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you could lose money by investing in the fund. In addition, the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies. There is no guarantee that the fund will meet its goals. An investment in the fund is not a bank deposit and is not insured or guaranteed by the FDIC or any other government agency. |
| The fund's investment performance is subject to a variety of risks, including the following principal risks: | The fund's investment performance is subject to a variety of risks, including the following principal risks: | The fund's investment performance is subject to a variety of risks, including the following principal risks: | The fund's investment performance is subject to a variety of risks, including the following principal risks: | The fund's investment performance is subject to a variety of risks, including the following principal risks: |

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Select Short Term Bond Fund | RMK Select Fixed Income Fund (FIF) | RMK Select Limited Maturity Fixed Income Fund (LMFIF) |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

**FIXED-INCOME SECURITIES RISKs.** Prices of fixed-rate debt securities generally move in the opposite direction of interest rates. The interest payments on fixed-rate debt securities do not change when interest rates change. Therefore, since the price of these securities can be expected to decrease when interest rates increase, you can expect that the value of investments in the fund may go down. Although the Adviser attempts to anticipate interest rate movements, there is no guarantee that it will be able to do so. In addition, longer term debt securities will experience greater price volatility than debt securities with shorter maturities. You can expect the net asset value of the fund to fluctuate accordingly.

**FIXED-INCOME SECURITIES RISKS.** Prices of fixed-rate debt securities generally move in the opposite direction of interest rates. The interest payments on fixed-rate debt securities do not change when interest rates change. Therefore, since the price of these securities can be expected to decrease when interest rates increase, you can expect that the value of investments in the fund may go down. Although the Adviser attempts to anticipate interest rate movements, there is no guarantee that it will be able to do so. In addition, longer term debt securities will experience greater price volatility than debt securities with shorter maturities. You can expect the net asset value of the fund to fluctuate accordingly.

**RMK Select High Income Fund**

**-73%**

*Credit Risk.* Credit risk refers to an issuer's ability to make payments of principal and interest when they are due. Bond prices typically decline if the issuer's credit quality deteriorates. Lower grade securities may experience high default rates, which could mean that the fund may lose some or all of its investments in such securities. If this occurs, the fund's net asset value and ability to pay dividends to shareholders would be adversely affected.

**RMK Select Intermediate Bond Fund**

**-78%**

*Credit Risk.* Credit risk refers to an issuer's ability to make payments of principal and interest when they are due. Bond prices typically decline if the issuer's credit quality deteriorates. Lower grade securities may experience high default rates, which could mean that the fund may lose some or all of its investments in such securities. If this occurs, the fund's net asset value and ability to pay dividends to shareholders would be adversely affected.

**RMK Select Short Term Bond Fund**

**-31%**

*Credit Risk.* Credit risk refers to an issuer's ability to make payments of principal and interest when they are due. Bond prices typically decline if the issuer's credit quality deteriorates. Lower grade securities may experience high default rates, which could mean that the fund may lose some or all of its investments in such securities. If this occurs, the fund's net asset value and ability to pay dividends to shareholders would be adversely affected.

**RMK Select Fixed Income Fund (FIF)**

**-2%**

*Credit Risks.* Credit risk is the possibility that an issuer will default on a security by failing to pay interest or principal when due. If an issuer defaults, the fund will lose money. Many fixed-income securities receive credit ratings from services such as Standard & Poor's and Moody's. These services assign ratings to securities by assessing the likelihood of issuer default. Lower credit ratings correspond to higher credit risk. If a security has not received a rating, the fund must rely entirely upon the Adviser's credit assessment. Fixed-income securities generally compensate for greater credit risk by paying interest at a higher rate. The difference between the yield of a security and the yield of a U.S. Treasury security with a comparable maturity (the spread) measures the additional interest paid for risk. Spreads may increase generally in response to adverse economic or market conditions. A security's spread may also increase if the security's rating is lowered, or the security is perceived to have an increased credit risk. An increase in the spread will cause the price of the security to decline. Credit risk includes the possibility that a party to a transaction involving the fund will fail to meet its obligations. This could cause the fund to lose the benefit of the transaction or prevent the fund from selling or buying other securities to implement its investment strategy. [continued below at "*Below Investment Grade Bond Risk*"]

**RMK Select Limited Maturity Fixed Income Fund (LMFIF)**

**-8%**

*Credit Risks.* Credit risk is the possibility that an issuer will default on a security by failing to pay interest or principal when due. If an issuer defaults, the fund will lose money. Many fixed-income securities receive credit ratings from services such as Standard & Poor's and Moody's. These services assign ratings to securities by assessing the likelihood of issuer default. Lower credit ratings correspond to higher credit risk. If a security has not received a rating, the fund must rely entirely upon the Adviser's credit assessment. Fixed-income securities generally compensate for greater credit risk by paying interest at a higher rate. The difference between the yield of a security and the yield of a U.S. Treasury security with a comparable maturity (the spread) measures the additional interest paid for risk. Spreads may increase generally in response to adverse economic or market conditions. A security's spread may also increase if the security's rating is lowered, or the security is perceived to have an increased credit risk. An increase in the spread will cause the price of the security to decline. Credit risk includes the possibility that a party to a transaction involving the fund will fail to meet its obligations. This could cause the fund to lose the benefit of the transaction or prevent the fund from selling or buying other securities to implement its investment strategy. [continued below at "*Below Investment Grade Bond Risk*"]

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Select Short Term Bond Fund | RMK Select Fixed Income Fund (FIF) | RMK Select Limited Maturity Fixed Income Fund (LMFIF) |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

*Interest Rate and Related Risks.* Interest rate risk is the risk that debt securities will decline in value because of changes in market interest rates. Generally, when market interest rates rise, the value of debt securities declines, and vice versa. The fund's investment in such securities means that the net asset value of the fund will tend to decline if market interest rates rise. During periods of rising interest rates, the average life of certain types of securities in which the fund will invest may be extended because of slower than expected principal payments. This may lock in a below market interest rate, increase the security's duration (the estimated period until the principal and interest are paid in full) and reduce the value of the security. This is known as extension risk. During periods of declining interest rates, the issuer of a security may exercise its option to prepay principal earlier than scheduled, forcing the fund to reinvest in lower yielding securities. This is known as call or prepayment risk. Market factors, such as the demand for particular fixed-income securities, may also cause the price of certain fixed-income securities to fall while the prices of other securities rise or remain unchanged. In addition, the prices of long-term debt obligations generally fluctuate more than prices of short-term debt obligations as interest rates change.

*Interest Rate and Related Risks.* Interest rate risk is the risk that debt securities will decline in value because of changes in market interest rates. Generally, when market interest rates rise, the value of debt securities declines, and vice versa. The fund's investment in such securities means that the net asset value of the fund will tend to decline if market interest rates rise. During periods of rising interest rates, the average life of certain types of securities in which the fund will invest may be extended because of slower than expected principal payments. This may lock in a below market interest rate, increase the security's duration (the estimated period until the principal and interest are paid in full) and reduce the value of the security. This is known as extension risk. During periods of declining interest rates, the issuer of a security may exercise its option to prepay principal earlier than scheduled, forcing the fund to reinvest in lower yielding securities. This is known as call or prepayment risk. Market factors, such as the demand for particular fixed-income securities, may also cause the price of certain fixed-income securities to fall while the prices of other securities rise or remain unchanged. In addition, the prices of long-term debt obligations generally fluctuate more than prices of short-term debt obligations as interest rates change.

*Interest Rate Risk.* Interest rate risk is the risk that debt securities will decline in value because of changes in market interest rates. Generally, when market interest rates rise, the value of debt securities declines, and vice versa. The fund's investment in such securities means that the net asset value of the fund will tend to decline if market interest rates rise. The prices of long-term debt obligations generally fluctuate more than prices of short-term debt obligations as interest rates change.

INTEREST RATE RISKS. Prices of fixed-income securities rise and fall in response to changes in the interest rate paid on similar securities. Generally, when interest rates rise, prices of fixed-income securities fall. However, market factors, such as the demand for particular fixed-income securities, may cause the price of certain fixed-income securities to fall while the prices of other securities rise or remain unchanged. Interest rate changes have a greater effect on the price of fixed-income securities with longer durations.

INTEREST RATE RISKS. Prices of fixed-income securities rise and fall in response to changes in the interest rate paid on similar securities. Generally, when interest rates rise, prices of fixed-income securities fall. However, market factors, such as the demand for particular fixed-income securities, may cause the price of certain fixed-income securities to fall while the prices of other securities rise or remain unchanged. Interest rate changes have a greater effect on the price of fixed-income securities with longer durations.

| **RMK Select High Income Fund** | **RMK Select Intermediate Bond Fund** | **RMK Select Short Term Bond Fund** | **RMK Select Fixed Income Fund (FIF)** | **RMK Select Limited Maturity Fixed Income Fund (LMFIF)** |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

*Intermediate Term Bond Risk.* Bonds (debt) that have average maturities generally ranging from 1 to 10 years normally offer higher yields but less price stability than short-term bonds and offer greater price stability but lower yields than long term bonds.

*Value Investing Risk.* The fund focuses its investments on securities that the Adviser believes are undervalued or inexpensive relative to other investments. These types of securities may present risks in addition to the general risks associated with investing in them. These securities generally are selected on the basis of an issuer's economic fundamentals relative to current market price. Such securities are subject to the risk of mis-estimation of certain business and economic fundamental factors. In addition, during certain time periods, market dynamics may favor "growth" securities over "value" securities. Disciplined adherence to a "value" investment mandate during such periods can result in significant underperformance relative to overall market indices and other managed investment vehicles that pursue growth style investments and/or flexible style mandates.

*Value Investing Risk.* The fund focuses its investments on securities that the Adviser believes are undervalued or inexpensive relative to other investments. These types of securities may present risks in addition to the general risks associated with investing in them. These securities generally are selected on the basis of an issuer's economic fundamentals relative to current market price. Such securities are subject to the risk of mis-estimation of certain business and economic fundamental factors. In addition, during certain time periods, market dynamics may favor "growth" securities over "value" securities. Disciplined adherence to a "value" investment mandate during such periods can result in significant underperformance relative to overall market indices and other managed investment vehicles that pursue growth style investments and/or flexible style mandates.

*Value Investing Risk.* The fund focuses its investments on securities that the Adviser believes are undervalued or inexpensive relative to other investments. These types of securities may present risks in addition to the general risks associated with investing in them. These securities generally are selected on the basis of an issuer's economic fundamentals relative to current market price. Such securities are subject to the risk of mis-estimation of certain business and economic fundamental factors. In addition, during certain time periods, market dynamics may favor "growth" securities over "value" securities. Disciplined adherence to a "value" investment mandate during such periods can result in significant underperformance relative to overall market indices and other managed investment vehicles that pursue growth style investments and/or flexible style mandates.

CALL RISKS. Call risk is the possibility that an issuer may redeem a fixed-income security before maturity (a call) at a price below its current market price. An increase in the likelihood of a call may reduce the security's price. If a fixed-income security is called, the fund may have to reinvest the proceeds in other fixed-income securities with lower interest rates, higher credit risks or other less favorable characteristics.

CALL RISKS. Call risk is the possibility that an issuer may redeem a fixed-income security before maturity (a call) at a price below its current market price. An increase in the likelihood of a call may reduce the security's price. If a fixed-income security is called, the fund may have to reinvest the proceeds in other fixed-income securities with lower interest rates, higher credit risks or other less favorable characteristics.

373

| **RMK Select High Income Fund** | **RMK Select Intermediate Bond Fund** | **RMK Select Short Term Bond Fund** | **RMK Select Fixed Income Fund (FIF)** | **RMK Select Limited Maturity Fixed Income Fund (LMFIF)** |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

| | | | | |
|---|---|---|---|---|
| *Investment Grade Bond Risk.* Investment grade bonds are considered less risky than bonds whose ratings are below investment grade; however, ratings are no guarantee of quality. The credit quality of these bonds can decline which would normally cause the prices of these bonds to decline. | *Investment Grade Bond Risk.* Investment grade bonds are considered less risky than bonds whose ratings are below investment grade; however, ratings are no guarantee of quality. The credit quality of these bonds can decline which would normally cause the prices of these bonds to decline. | *Investment Grade Bond Risk.* Investment grade bonds are considered less risky than bonds whose ratings are below investment grade; however, ratings are no guarantee of quality. The credit quality of these bonds can decline which would normally cause the prices of these bonds to decline. | | |

| **RMK Select High Income Fund** | **RMK Select Intermediate Bond Fund** | **RMK Select Short Term Bond Fund** | **RMK Select Fixed Income Fund (FIF)** | **RMK Select Limited Maturity Fixed Income Fund (LMFIF)** |
| :---: | :---: | :---: | :---: | :---: |
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

**RMK Select High Income Fund**

**-73%**

*Below Investment Grade Bond Risk*. The fund invests primarily in below investment grade bonds. These bonds involve a higher degree of credit risk. The market prices of below investment grade bonds are generally less sensitive to interest rate changes than higher-rated investments, but more sensitive to adverse economic or political changes, or individual developments specific to the issuer. In the event of an unanticipated default, the fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experience financial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. Periods of economic or political uncertainty and change can be expected to result in volatility of prices of these securities. NRSROs consider such bonds to be speculative in nature. [Repeated to compare with other 2 funds.]

**RMK Select Intermediate Bond Fund**

**-78%**

*Below Investment Grade Bond Risk*. These bonds, commonly known as "junk bonds," involve a higher degree of credit risk. In the event of an unanticipated default, the fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experience financial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. The market prices of below investment grade bonds are generally less sensitive to interest rate changes than higher-rated investments but are more sensitive to adverse economic or political changes or individual developments specific to the issuer. Periods of economic or political uncertainty and change can be expected to result in volatility of prices of these securities. NRSROs consider these bonds to be speculative in nature.

**RMK Select Short Term Bond Fund**

**-31%**

*Below Investment Grade Bond Risk*. These bonds, commonly known as "junk bonds," involve a higher degree of credit risk. In the event of an unanticipated default, the fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experiencefinancial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. The market prices of below investment grade bonds are generally less sensitive to interest rate changes than higher-rated investments but are more sensitive to adverse economic or political changes or individual developments specific to the issuer. Periods of economic or political uncertainty and change can be expected to result in volatility of prices of these securities. NRSROs consider these bonds to be speculative in nature.

**RMK Select Fixed Income Fund (FIF)**

**-2%**

[continued from "CREDIT RISKS" above] Below investment grade debt securities are commonly referred to as "junk bonds" and are considered speculative with respect to an issuer's capacity to pay interest and repay principal. They involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities.

**RMK Select Limited Maturity Fixed Income Fund (LMFIF)**

**-8%**

[continued from "CREDIT RISKS" above] Below investment grade debt securities are commonly referred to as "junk bonds" and are considered speculative with respect to an issuer's capacity to pay interest and repay principal. They involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Select Short Term Bond Fund | RMK Select Fixed Income Fund (FIF) | RMK Select Limited Maturity Fixed Income Fund (LMFIF) |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

| | | | | |
|---|---|---|---|---|
| *Mortgage-Backed and Asset-Backed Securities Risk.* Mortgage-backed and asset-backed securities are subject to prepayment risk. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities. | *Mortgage-Backed and Asset-Backed Securities Risk.* Mortgage-backed and asset-backed securities are subject to prepayment risk. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities. | *Mortgage-Backed and Asset-Backed Securities Risk.* Mortgage-backed and asset-backed securities are subject to prepayment risk. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities. | PREPAYMENT RISKS. Mortgage-backed and asset-backed securities are subject to risks of prepayment. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities. | PREPAYMENT RISKS. Mortgage-backed and asset-backed securities are subject to risks of prepayment. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities. |

376

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Select Short Term Bond Fund | RMK Select Fixed Income Fund (FIF) | RMK Select Limited Maturity Fixed Income Fund (LMFIF) |
|---|---|---|---|---|
| **-73%** | **-78%** | **-31%** | **-2%** | **-8%** |

*Distressed Securities Risk.* Distressed securities frequently do not produce income while they are outstanding. The fund may be required to bear certain extraordinary expenses in order to protect and recover its investment in certain distressed securities. Therefore, to the extent the fund seeks capital growth through investment in distressed securities, its current income may be diminished. The fund also will be subject to significant uncertainty as to when and in what manner and for what value the obligations evidenced by the distressed securities will eventually be satisfied (e.g., through a liquidation of the obligor's assets, an exchange offer or plan of reorganization involving the distressed securities or a payment of some amount in satisfaction of the obligation).

*Selection Risk.* This means that the particular securities that are selected by the Adviser may underperform the market or those securities selected by other funds with similar objectives.

*Selection Risk.* This means that the particular securities that are selected by the Adviser may underperform the market or those securities selected by other funds with similar objectives.

*Selection Risk.* This means that the particular securities that are selected by the Adviser may underperform the market or those securities selected by other funds with similar objectives.

SECURITY SELECTION RISk. The particular securities that are selected by the Adviser for the fund may underperform the market or those securities selected by other funds with similar objectives.

SECURITY SELECTION RISK. The particular securities that are selected by the Adviser for the fund may underperform the market or those securities selected by other funds with similar objectives.

## APPENDIX C

The following data are as of June 30, 2007 for the High Income, Intermediate and Short Term Funds and as of May 31, 2007 for the two RMK open-end fixed income funds not managed by Defendant Kelsoe (asset allocation percentages are of net assets; loss percentages are of net asset value for the year-ended April 30, 2008 [High Income, Intermediate and Short Term Funds] or May 31, 2008 [FIF, LMFIF] and are from Appendix A):

| Portfolio Characteristics / Composition | RMK Select High Income Fund -73% | RMK Select Intermediate Bond Fund -78% | RMK Select Short Term Bond Fund -31% | RMK Select Fixed Income Fund (FIF) -2% | RMK Select Limited Maturity Fixed Income Fund (LMFIF) -8% |
|---|---|---|---|---|---|
| **Statistics:** | | | | | |
| Average Credit Quality | BB | A- | A+ | AAA | AAA |
| Current Yield | 12.38% | 6.97% | 5.17% | 5.72% | 4.97% |
| Yield to Maturity | 12.89% | 7.92% | 6.52% | 6.12% | 5.84% |
| Duration (years) | 4.45 | 6.36 | 1.86 | 4.25 | 1.66 |
| Average Effective Maturity (years) | 5.93 | 8.48 | 2.48 | 6.08 | 2.22 |
| Percentage of Leveraged Assets | 0% | 0% | 0% | 0% | 0% |
| Total Number of Holdings | 327 | 193 | 76 | 62 | 20 |
| **Asset Allocation:** | | | | | |
| Asset-Backed Securities Investment-Grade | 5.3% | 36.6% | 30.5% | 2.1% | 9.1% |
| Asset-Backed Securities Below Investment-Grade | 30.7% | 1.0% | 0.0% | - | - |
| Corporate Bonds Investment-Grade | 2.2% | 41.1% | 28.5% | 20.5% | 1.6% |
| Corporate Bonds Below Investment-Grade | 25.4% | 2.0% | 2.8% | - | - |
| Mortgage-Backed Securities Investment-Grade | 3.7% | 14.1% | 14.4% | 29.1% | 27.9% |
| Mortgage-Backed Securities Below Investment-Grade | 12.2% | 0.8% | 0.0% | - | - |
| U.S., Government & Agency, Municipal Securities | 0.1% | 2.2% | 14.7% | 45.9% | 50.8% |
| Common Stocks | 11.8% | 0.0% | 0.0% | 0.0% | 0.0% |
| Preferred Stocks | 6.0% | 2.7% | 2.6% | 0.0% | 0.0% |
| Short-Term Investments | 1.6% | 0.3% | 3.0% | 8.7% | 21.6% |
| Certificates of Deposit | 0.0% | 0.0% | 0.0% | 5.9% | 4.8% |
| Total Investments as % of Net Assets | 99.0% | 100.8% | 96.5% | 112.2% | 115.8% |

The following data are as of June 30, 2006 for the High Income, Intermediate and Short Term Funds and as of May 31, 2006 for the two RMK open-end fixed income funds not managed by

378

Defendant Kelsoe (asset allocation percentages are of net assets; loss percentages are of net asset value for the year-ended April 30, 2008 [High Income, Intermediate and Short Term Funds] or May 31, 2008 [FIF, LMFIF] and are from Appendix A):

| Portfolio Characteristics / Composition | RMK Select High Income Fund -73% | RMK Select Intermediate Bond Fund -78% | RMK Select Short Term Bond Fund -31% | RMK Select Fixed Income Fund (FIF) -2% | RMK Select Limited Maturity Fixed Income Fund (LMFIF) -8% |
|---|---|---|---|---|---|
| **Statistics:** | | | | | |
| Average Credit Quality | BB- | BBB+ | A | AA | AA |
| Current Yield | 10.92% | 6.69% | 4.37% | 5.62% | 4.72% |
| Yield to Maturity | 12.88% | 7.93% | 5.97% | 5.77% | 5.97% |
| Duration (years) | 3.61 | 4.21 | 1.47 | 3.56 | 1.48 |
| Average Effective Maturity (years) | 4.81 | 5.62 | 1.96 | 4.75 | 1.89 |
| Percentage of Leveraged Assets | 0% | 0% | 0% | 0% | 0% |
| Total Number of Holdings | 315 | 157 | 72 | 81 | 29 |
| **Asset Allocation:** | | | | | |
| Asset-Backed Securities Investment-Grade | 5.7% | 58.0% | 39.8% | 0.6% | 14.9% |
| Asset-Backed Securities Below Investment-Grade | 35.5% | 5.2% | 1.8% | - | - |
| Corporate Bonds Investment-Grade | 0.0% | 18.1% | 31.7% | 32.9% | 14.2% |
| Corporate Bonds Below Investment-Grade | 26.2% | 1.1% | 10.0% | - | - |
| Mortgage-Backed Securities Investment-Grade | 1.0% | 11.1% | 11.6% | 25.6% | 15.2% |
| Mortgage-Backed Securities Below Investment-Grade | 15.9% | 1.1% | 0.4% | - | - |
| U.S., Government & Agency, Municipal Securities | 0.1% | 2.7% | 4.2% | 38.8% | 52.0% |
| Common Stocks | 9.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| Preferred Stocks | 1.6% | 0.0% | 0.0% | 0.0% | 0.0% |
| Short-Term Investments | 0.7h% | 1.4% | 0.1% | 9.2% | 5.5% |
| Mutual Funds | 0.0% | 0.0% | 0.0% | 13.9% | 22.3% |
| Certificates of Deposit | 0.0% | 0.0% | 0.0% | 4.4% | 3.4% |
| Total Investments as % of Net Assets | 99.3% | 101.0% | 99.6% | 116.2% | 122.0% |

**APPENDIX D**

| Total Return | RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Advan-tage Income Fund, Inc. | RMK High Income Fund, Inc. | RMK Multi-Sector High Income Fund, Inc. | RMK Strategic Income Fund, Inc. |
|---|---|---|---|---|---|---|
| 5/1/07-4/30/08 | **-72.99%** | **-77.99%** | | | | |
| Benchmark | **0.34%** | **7.07%** | | | | |
| 4/1/07-3/31/08: | | | | | | |
| Market Value | | | **-73.61%** | **-72.40%** | **-72.67%** | **-74.01%** |
| Net Asset Value | | | **-68.89%** | **-68.72%** | **-72.48%** | **-70.24%** |
| Benchmark | | | **-1.25%** | **-1.25%** | **-1.25%** | **-1.25%** |

# APPENDIX E

The following data are as of June 30, 2007 for the High Income and Intermediate Funds and as of March 31, 2007 for the four RMK closed-end funds (asset allocation percentages are of net assets; loss percentages are of net asset value for year-ended April 30, 2008 [High Income and Intermediate Funds] or March 31, 2008 [RMK closed-end funds] and are from Appendix D):

| Portfolio Characteristics / Composition | RMK Select High Income Fund 73% | RMK Select Intermediate Bond Fund 78% | RMK Advantage Income Fund, Inc. 69% | RMK High Income Fund, Inc. 69% | RMK Multi-Sector High Income Fund, Inc. 72% | RMK Strategic Income Fund, Inc. 70% |
|---|---|---|---|---|---|---|
| **Statistics:** | | | | | | |
| Average Credit Quality | BB | A- | BB | BB | BB | BB |
| Current Yield | 12.38% | 6.97% | 10.98% | 11.05% | 10.69% | 11.34% |
| Yield to Maturity | 12.89% | 7.92% | 12.13% | 12.05% | 12.40% | 12.15% |
| Duration (years) | 4.45 | 6.36 | 4.29 | 4.26 | 4.49 | 4.30 |
| Average Effective Maturity (years) | 5.93 | 8.48 | 5.71 | 5.68 | 5.99 | 5.74 |
| Percentage of Leveraged Assets | 0 | 0 | 26% | 27% | 27% | 28% |
| Total Number of Holdings | 327 | 193 | 307 | 310 | 302 | 326 |
| **Asset Allocation:** | | | | | | |
| Asset-Backed Securities Investment-Grade | 5.3% | 36.6% | 19.6% | 16.2% | 16.6% | 23.3% |
| Asset-Backed Securities Below Investment-Grade | 30.7% | 1.0% | 34.4% | 35.1% | 38.0% | 30.9% |
| Corporate Bonds Investment-Grade | 2.2% | 41.1% | 3.3% | 3.9% | 3.4% | 3.3% |
| Corporate Bonds Below Investment-Grade | 25.4% | 2.0% | 35.8% | 37.7% | 33.8% | 35.5% |
| Mortgage-Backed Securities Investment-Grade | 3.7% | 14.1% | 6.6% | 8.0% | 7.5% | 9.6% |
| Mortgage-Backed Securities Below Investment-Grade | 12.2% | 0.8% | 12.9% | 12.4% | 15.6% | 12.7% |
| Government & Agency, Municipal Securities | 0.1% | 2.2% | 0.0% | 0.2% | 0.0% | 0.2% |
| Common Stocks | 11.8% | 0.0% | 12.0% | 12.4% | 11.7% | 12.4% |
| Preferred Stocks | 6.0% | 2.7% | 5.0% | 5.1% | 5.4% | 4.4% |
| Short-Term Investments | 1.6% | 0.3% | 2.6% | 2.5% | 0.5% | 3.3% |
| Total Investments as % of Net Assets | 99.0% | 100.8% | 132.4% | 133.5% | 132.5% | 135.6% |

The following data are as of June 30, 2006 for the High Income and Intermediate Funds and as of March 31, 2006 for the four RMK closed-end funds (asset allocation percentages are of net

assets; loss percentages are of net asset value for year-ended April 30, 2008 [High Income and Intermediate Funds] or March 31, 2008 [RMK closed-end funds] and are from Appendix D):

| Portfolio Characteristics / Composition | RMK Select High Income Fund 73% | RMK Select Intermediate Bond Fund 78% | RMK Advantage Income Fund, Inc. 69% | RMK High Income Fund, Inc. 69% | RMK Multi-Sector High Income Fund, Inc. 72% | RMK Strategic Income Fund, Inc. 70% |
|---|---|---|---|---|---|---|
| **Statistics:** | | | | | | |
| Average Credit Quality | BB- | BBB+ | BB- | BB | BB- | BB |
| Current Yield | 10.92% | 6.69% | 10.71% | 10.27% | 9.01% | 10.77% |
| Yield to Maturity | 12.88% | 7.93% | 12.79% | 12.53% | 13.21% | 12.59% |
| Duration (years) | 3.61 | 4.21 | 3.32 | 3.48 | 3.22 | 3.43 |
| Average Effective Maturity (years) | 4.81 | 5.62 | 4.42 | 4.64 | 4.29 | 4.57 |
| Percentage of Leveraged Assets | 0 | 0 | 26% | 27% | 0% | 26% |
| Total Number of Holdings | 315 | 157 | 260 | 256 | 174 | 267 |
| **Asset Allocation:** | | | | | | |
| Asset-Backed Securities Investment-Grade | 5.7% | 58.0% | 14.0% | 12.9% | 9.2% | 18.7% |
| Asset-Backed Securities Below Investment-Grade | 35.5% | 5.2% | 42.2% | 41.6% | 32.1% | 35.9% |
| Corporate Bonds Investment-Grade | 0.0% | 18.1% | 1.4% | 1.3% | 1.9% | 1.1% |
| Corporate Bonds Below Investment-Grade | 26.2% | 1.1% | 34.5% | 34.6% | 24.5% | 33.1% |
| Mortgage-Backed Securities Investment-Grade | 1.0% | 11.1% | 4.4% | 4.7% | 2.5% | 7.6% |
| Mortgage-Backed Securities Below Investment-Grade | 15.9% | 1.1% | 14.2% | 15.3% | 14.4% | 13.2% |
| Government & Agency, Municipal Securities | 0.1% | 2.7% | 0.2% | 0.9% | 0.0% | 1.0% |
| Common Stocks | 9.3% | 0.0% | 12.7% | 13.1% | 5.2% | 19.1% |
| Preferred Stocks | 1.6% | 0.0% | 3.7% | 2.2% | 2.3% | 1.9% |
| Short-Term Investments | 0.7h% | 1.4% | 3.9% | 9.2% | 5.5% | 5.7% |
| Total Investments as % of Net Assets | 99.3% | 101.0% | 134.9% | 135.9% | 99.4% | 137.4% |

# APPENDIX F

Emphasis is supplied to show material differences in the excerpted disclosures.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

**COVER:**

**Regions Morgan Keegan Select Short Term Bond Fund**

A bond fund for investors who seek a high level of current income consistent with the preservation of capital.

**Regions Morgan Keegan Select Intermediate Bond Fund**

A bond fund for investors who seek to earn a high level of income primarily from intermediate maturity, investment grade bonds.

**Regions Morgan Keegan Select High Income Fund**

A bond fund for investors who can accept higher risk and seek to earn a high level of income primarily from below investment grade bonds.

Third page:

Shares of Morgan Keegan Select Fund, Inc., like shares of all mutual funds, are not bank deposits or obligations, are not guaranteed by any bank, and are not insured or guaranteed by the U.S. government, the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve Board, or any other government agency. Investment in mutual funds involves investment risk, including <u>possible loss of principal</u>.

Pages 3 (Short Term Fund), 11 (Intermediate Fund), 20 (High Income Fund):

Investing in the fund involves risks common to any investment in securities. As with any mutual fund, the value of the fund's shares will change and you <u>could lose money</u> by investing in the fund.

Page 2: Principal Investment Strategies     Page 10: Principal Investment Strategies

**COVER:**

THE FUND'S ANTICIPATED INVESTMENT OF A MAJORITY OF ITS TOTAL ASSETS IN BELOW INVESTMENT GRADE DEBT SECURITIES AND ITS EXPECTED USE OF LEVERAGE INVOLVE A <u>HIGH DEGREE OF RISK</u>. STOCKHOLDERS CAN LOSE SOME OR <u>ALL OF THEIR INVESTMENT</u>. SEE "RISKS" BEGINNING ON PAGE 26 OF THIS PROSPECTUS.

Page 2: INVESTMENT POLICIES

**RMK Select High Income Fund**

**-73%**

**RMK Select Intermediate Bond Fund**

**-78%**

**RMK Multi-Sector High Income Fund, Inc**

**-72%**

Regions Morgan Keegan Select High Income Fund ("High Income Fund"), seeks to achieve its investment objectives by investing a majority of its total assets in below investment grade debt securities that the Adviser believes offer attractive yield and capital appreciation potential. These securities include, but are not limited to, corporate bonds, mortgage-backed and asset-backed securities and other structured finance vehicles, convertible debt securities, U.S. government securities and municipal and foreign government obligations. Below investment grade debt securities are rated Ba1 or lower by Moody's, BB+ or lower by S&P, comparably rated by another NRSRO or, if unrated, determined by the Adviser to be of comparable quality. Up to 100% of the fund's total assets may consist of debt securities that are rated below investment grade and their unrated equivalents (deemed by the Adviser to be of comparable quality).

The fund may invest up to 10% of its total assets in distressed securities, which include securities: issued by a company in a bankruptcy reorganization proceeding; subject to some other form of public or private debt restructuring; otherwise in default or in significant risk of being in default as to the payment of interest or repayment of principal; or trading at prices substantially below other below investment grade debt securities of companies in similar industries. Distressed securities are generally rated Ca or lower by Moody's or CC or lower by another NRSRO or are unrated but considered by the Adviser to be of comparable quality. The fund may also invest in other securities providing the potential for high income or a combination of high income and capital growth

Under normal circumstances, Regions Morgan Keegan Select Intermediate Bond Fund ("Intermediate Bond Fund"), seeks to achieve its investment objectives by investing at least 80% of its assets in debt securities. The fund invests primarily in investment grade, intermediate term maturity bonds (those bonds rated investment grade by at least one NRSRO with effective maturities of 1 to 10 years) that the Adviser believes offer attractive yield and capital appreciation potential. Investment grade debt securities purchased by the fund will be rated, at the time of investment, Baa3 or higher by Moody's, BBB- or higher by S&P, within one of the four highest ratings classes by another NRSRO or, if unrated, determined by the Adviser to be of comparable quality. If a security satisfies the fund's minimum rating criteria at the time of purchase and is subsequently downgraded below such rating, the fund will not be required to dispose of such security. If a downgrade occurs, the Adviser will consider what action, including the sale of such security, is in the best interest of the fund and its shareholders. The fund may invest in U.S. government securities, corporate bonds, debentures, notes, preferred stock, mortgage-backed and asset-backed securities. Moreover, in addition to purchasing investment grade securities to fulfill its investment objectives, the fund may invest up to 35% of its assets in below investment grade debt securities (commonly referred to as "junk bonds"), convertible securities and common stocks. Below investment grade debt securities are rated Ba1 or lower by Moody's, BB+ or lower by S&P, comparably rated by

The Fund intends to focus its investments in below investment grade securities. Under normal market conditions, the Fund anticipates that it will invest at least 50% of its total assets in below investment grade securities. Below investment grade debt securities are rated Ba1 or lower by Moody's Investors Service, Inc. ("Moody's"), BB+ or lower by Standard & Poor's Ratings Group ("S&P"), comparably rated by another nationally recognized statistical rating organization (each a "rating agency") or, if unrated, determined by the Adviser to be of comparable quality. Below investment grade debt securities are commonly referred to as "junk bonds" and are considered speculative with respect to an issuer's capacity to pay interest and repay principal. They involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities. The Fund may invest up to 20% of its total assets in distressed securities, which include securities: issued by a company in a bankruptcy reorganization proceeding; subject to some other form of public or private debt restructuring; otherwise in default or in significant risk of being in default as to the payment of interest or repayment of principal; or trading at prices substantially below other below investment grade debt securities of companies in similar industries. Distressed securities are generally rated Ca1 or lower by Moody's or CC+ or lower by S&P, comparably rated by another rating agency or are unrated but considered by the Adviser to be of comparable quality.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| | | |
|---|---|---|
| if the Adviser expects to achieve the fund's investment objectives with such investments. | another NRSRO or, if unrated, determined by the Adviser to be of comparable quality. The policy of the fund under normal circumstances is to keep the portfolio's average effective maturity between 3 and 10 years. | |
| No disclosure regarding leverage. | No disclosure regarding leverage. | Page 3: USE OF LEVERAGE BY THE FUND<br><br>The Fund may use leverage through bank borrowings, reverse repurchase agreements or other transactions involving indebtedness. . . . Leverage creates an opportunity for increased income and capital appreciation for common stockholders, but at the same time involves a high degree of risk. There can be no assurance that a leveraging strategy will be utilized or that it will be successful during any period in which it is used. See "Leverage" and "Risks – Leverage Risk." |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 6: Risks-General<br><br>Because the Fund expects to invest a majority of its assets in below investment grade debt securities, investment in the Fund's common shares involves a <u>high degree of risk</u>. <u>The Fund should not constitute a complete investment program for any investor</u>. |
| Pages 7 (Short Term Fund), 15 (Intermediate Fund), 25 (High Income Fund) regarding INVESTMENT RISK:<br><br>Investment in mutual funds involves investment risk, including possible loss of principal.<br><br>Page 1 (Short Term Fund, Intermediate Fund, High Income Fund):<br><br>Morgan Keegan Select Fund, Inc. (the "Company") offers three bond funds to investors with varied investment objectives, from investors with short-term goals who <u>wish to take little investment risk</u> to those investors who have long-term goals and are willing to bear the risks of high-yield, below investment grade bonds for potentially greater rewards. | | Page 6:<br><br>INVESTMENT RISK. An investment in the Fund is subject to investment risk, including the risk of <u>loss of the entire principal that a common stockholder invests</u>. At any point in time, the Fund's common shares may be worth less than the amount originally paid for them, even after taking into account the reinvestment of dividends and other distributions. An investment in the Fund's common shares represents an indirect investment in the <u>securities owned by the Fund</u>. The value of these securities, like other market investments, may move up or down, <u>sometimes rapidly and unpredictably</u>. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 7:<br><br>LEVERAGE RISK. Leverage creates an opportunity for an increased return to common stockholders, but it is a speculative technique because it increases the Fund's exposure to capital risk. . . . .<br><br>Use of leverage may increase the likelihood that the net asset value of the Fund and market value of its common shares will be more volatile, and the yield and total return to common stockholders will tend to fluctuate more in response to changes in interest rates. |

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

*Below Investment Grade Bond Risk.* The fund invests primarily in below investment grade bonds. These bonds involve a higher degree of credit risk. The market prices of below investment grade bonds are generally less sensitive to interest rate changes than higher-rated investments, but more sensitive to adverse economic or political changes, or individual developments specific to the issuer. In the event of an unanticipated default, the fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experience financial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. Periods of economic or political uncertainty and change can be expected to result in volatility of prices of these securities. NRSROs consider such bonds to be speculative in nature.

*Below Investment Grade Bond Risk.* These bonds, commonly known as "junk bonds," involve a higher degree of credit risk. In the event of an unanticipated default, the fund would experience a reduction in its income, a decline in the market value of the securities so affected and a decline in the value of its shares. During an economic downturn or period of rising interest rates, highly leveraged and other below investment grade issuers may experience financial stress that could adversely affect their ability to service principal and interest payment obligations, to meet projected business goals and to obtain additional financing. The market prices of below investment grade bonds are generally less sensitive to interest rate changes than higher-rated investments but are more sensitive to adverse economic or political changes or individual developments specific to the issuer. Periods of economic or political uncertainty and change can be expected to result in volatility of prices of these securities. NRSROs consider these bonds to be speculative in nature.

Page 8:

BELOW INVESTMENT GRADE SECURITIES RISK. Below investment grade debt securities are commonly referred to as "junk bonds." Below investment grade securities are considered speculative with respect to an issuer's capacity to pay interest and repay principal and are susceptible to default or decline in market value due to adverse economic and business developments. These securities are less liquid than investment grade securities.

*Mortgage-Backed and Asset-Backed Securities Risk.* Mortgage-backed and asset-backed securities are subject to prepayment risk. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available. Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall. Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities.

Page 9:

MORTGAGE-BACKED SECURITIES RISK. Mortgage-backed securities may have less potential for capital appreciation than comparable fixed-income securities, due to prepayment risk, which is the likelihood of increased prepayments of mortgages as interest rates decline. A mortgage-backed security's stated maturity may be shortened by unscheduled prepayments on the underlying mortgages, and, therefore, it is not possible to predict accurately the security's return to the Fund. If the Fund buys mortgage-backed securities at a premium, mortgage foreclosures and prepayments of principal by mortgagors (which usually may be made at any time without penalty) may result in some loss of the Fund's principal investment to the extent of the premium paid. Alternatively, in a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

|  |  | instrument. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the under-lying mortgage properties. In certain instances, third-party guarantees or other forms of credit support can reduce the credit risk. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 9:<br><br>ASSET-BACKED SECURITIES RISK. Payment of interest and repayment of principal on asset-backed securities may be largely dependent upon the cash flows generated by the assets backing the securities and, in certain cases, supported by letters of credit, surety bonds or other credit enhancements. <u>Asset-backed security values may also be affected by the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables or the entities providing the credit enhancement</u>. In addition, these securities may be subject to prepayment risk. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Pages 9-10:<br><br>CORPORATE BONDS RISK. The Fund's investments in corporate bonds are subject to a number of the <u>risks described in this Prospectus</u>, including management risk, interest rate risk, inflation risk, deflation risk, below investment grade securities risk, foreign securities risk and <u>illiquid and restricted securities risks</u>. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 12:<br><br><u>ILLIQUID AND RESTRICTED SECURITIES RISKS. Illiquid securities may be difficult to dispose of at a fair price at the times when the Fund believes it is desirable to do so. Market prices of illiquid securities generally are more volatile than those of more liquid securities, which may adversely affect the price that the Fund pays for or recovers upon the sale of illiquid securities. Illiquid securities are also more difficult to value, and the Adviser's judgment may play a greater role in the valuation process. Investment of the Fund's assets in illiquid securities may restrict the Fund's ability to take advantage of market opportunities. The risks associated with illiquid securities may be particularly acute in situations in which the Fund's operations require cash and could result in the Fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities. Restricted securities have contractual restrictions on their public resale, which may make it more difficult to value them, limit the Fund's ability to dispose of them and lower the amount the Fund could realize upon their sale.</u> |

| **RMK Select High Income Fund** | **RMK Select Intermediate Bond Fund** | **RMK Multi-Sector High Income Fund, Inc** |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 12: |

DERIVATIVES RISK. Even a small investment in derivatives can have a significant impact on the Fund's exposure to fluctuations in interest rates or currency exchange rates. If changes in a derivative's value do not correspond to changes in the value of the Fund's other investments, the Fund may not fully benefit from or could lose money on the derivative position. In addition, some derivatives involve risk of loss if the person who issued the derivative defaults on its obligation. Certain derivatives may be less liquid and more difficult to value than others.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

**Page 19:**

The Adviser's investment approach is driven by a strong value-oriented philosophy. The Adviser concentrates on identifying specific sectors and securities that present the most attractive combination of current income and principal performance relative to alternative investments. This "value-investing" approach generally emphasizes the analysis and selection of individual securities over attempting to forecast macro-economic trends or interest rate movements.

The Adviser's "bottom-up" strategy focuses on identifying special or unusual opportunities where the Adviser decides that the market perception of, or demand for, a credit or structure has created an undervalued situation. The analytical process concentrates on credit research, debt instrument structure and covenant protection. Generally, when investing in below investment grade debt, the Adviser will seek to identify issuers and industries that it believes are likely to experience stable or improving conditions. Specific factors considered in the research process may include general industry trends, cash flow generation capacity, asset valuation, other debt maturities, capital availability, collateral value and priority of payments.

No similar prospectus disclosure.

**Page 16:**

The Adviser's investment approach is driven by a strong value-oriented philosophy. The Adviser concentrates on identifying specific sectors, or asset categories, and securities that present the most attractive combination of current income and principal performance relative to alternative investments. Typically, these sectors include below investment grade corporate bonds, investment grade corporate bonds, medium- and lower- rated mortgage-backed securities, commercial mortgages, preferred stocks, and other asset-backed securities. This "value-investing" approach generally emphasizes the analysis and selection of individual securities over attempting to forecast macro-economic trends or interest rate movements. The Adviser will employ an active management approach that will emphasize the flexibility to allocate Fund assets across a wide range of asset categories.

The Adviser's "bottom-up" strategy focuses on identifying special or unusual opportunities where the Adviser decides that the market perception of, or demand for, a credit or structure has created an undervalued situation. The analytical process concentrates on credit research, debt instrument structure and covenant protection. Generally, when investing in below investment grade debt securities, the Adviser will seek to identify issuers and industries that it believes are likely to experience stable or improving conditions. Specific factors considered in the research process may include general industry trends, cash flow generation capacity, asset valuation, other debt maturities, capital availability, collateral value and priority of payments.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 16:<br><br>The ratings of a rating agency represent its opinion as to the credit quality of the debt securities it undertakes to rate and <u>do not evaluate market risk</u>. <u>Ratings are not absolute standards of credit quality; consequently, debt securities with the same maturity, duration, coupon, and rating may have different yields. Rating agencies may fail to make timely changes in credit ratings and an issuer's current financial condition may be better or worse than a rating indicates</u>. Appendix A to the Statement of Additional Information describes the various ratings assigned to debt securities by Moody's, S&P and Fitch Ratings. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 18:<br><br>Since the risk of default is higher for below investment grade securities than investment grade securities, <u>the Adviser's research and credit analysis are an especially important part of managing securities of this type</u>. The Adviser will attempt to identify those issuers of below investment grade securities whose financial conditions the Adviser believes are adequate to meet future obligations or have improved or are expected to improve in the future. <u>The Adviser's analysis focuses on relative values based on such factors as interest or dividend coverage, asset coverage, earnings prospects and the experience and managerial strength of the issuer</u>. |

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| The less comprehensive disclosure (see above) was not repeated for this Fund. | The less comprehensive disclosure (see above) was not repeated for this Fund. | Pages 18-19: |

Pages 18-19:

MORTGAGE-BACKED SECURITIES. Mortgage-backed securities represent direct or indirect participations in, or are secured by and payable from, mortgage loans secured by real property and include single- and multi-class pass-through securities and collateralized mortgage obligations. U.S. government mortgage backed securities include mortgage-backed securities issued or guaranteed as to the payment of principal and interest (but not as to market value) by Ginnie Mae (also known as the Government National Mortgage Association), Fannie Mae (also known as the Federal National Mortgage Association), Freddie Mac (also known as the Federal Home Loan Mortgage Corporation) or other government-sponsored enterprises. Other mortgage-backed securities are issued by private issuers. Private issuers are generally originators of and investors in mortgage loans, including savings associations, mortgage bankers, commercial banks, investment bankers and special purpose entities. Payments of principal and interest (but not the market value) of such private mortgage-backed securities may be supported by pools of mortgage loans or other mortgage-backed securities that are guaranteed, directly or indirectly, by the U.S. government or one of its agencies or instrumentalities, or they may be issued without any government guarantee of the underlying mortgage assets but with some form of non-government credit enhancement. Non-governmental mortgage-backed securities may offer higher yields than those issued by government entities, but may also be subject to greater price changes than governmental issues.

Some mortgage-backed securities, such as collateralized mortgage obligations, make payments of both principal and interest at a variety of intervals; others make semiannual interest payments at a predetermined rate and repay principal at maturity (like a typical bond). Stripped mortgage-backed securities are created when the interest and principal components of a mortgage-backed security are separated and sold as individual securities. In the case of a stripped mortgage-backed security, the holder of the principal-only, or "PO," security receives the principal payments made by the underlying mortgage, while the holder of the interest-only, or "IO," security receives interest payments from the same underlying mortgage.

Mortgage-backed securities are based on different types of mortgages including those on commercial real estate or residential properties. These securities often have stated maturities of up to thirty years when they are issued, depending upon the length of the mortgages underlying the securities. In practice, however, unscheduled or early payments of principal and interest on the underlying mortgages may make the securities' effective maturity shorter than this, and the prevailing interest rates may be higher or lower than the current yield of the Fund's portfolio at the time the Fund receives the payments for reinvestment.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| The less comprehensive prospectus disclosure (see above) was not repeated for this Fund. | The less comprehensive prospectus disclosure (see above) was not repeated for this Fund. | Page 19:<br><br>ASSET-BACKED SECURITIES. Asset-backed securities represent direct or indirect participations in, or are secured by and payable from, pools of assets such as, among other things, motor vehicle installment sales contracts, installment loan contracts, leases of various types of real and personal property, and receivables from revolving credit (credit card) agreements or a combination of the foregoing. These assets are securitized through the use of trusts and special purpose corporations. Credit enhancements, such as various forms of cash collateral accounts or letters of credit, may support payments of principal and interest on asset-backed securities. Although these securities may be supported by letters of credit or other credit enhancements, payment of interest and principal ultimately depends upon individuals paying the underlying loans or accounts, which payment may be affected adversely by general downturns in the economy. Asset-backed securities are subject to the same risk of prepayment described below with respect to mortgage-backed securities. <u>The risk that recovery on repossessed collateral might be unavailable or inadequate to support payments, however, is greater for asset-backed securities than for mortgage-backed securities</u>. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 19:<br><br>CORPORATE BONDS. Corporate bonds are debt obligations issued by U.S. and foreign corporations and other business entities. Corporate bonds may be either secured or unsecured. Collateral used for secured debt includes, but is not limited to, real property, machinery, equipment, accounts receivable, stocks, bonds or notes. If a bond is unsecured, it is known as a debenture. Bondholders, as creditors, have a prior legal claim over common and preferred stockholders as to both income and assets of the corporation for the principal and interest due them and may have a prior claim over other creditors if liens or mortgages are involved. Interest on corporate bonds may be fixed rate, floating rate, adjustable rate, zero coupon, contingent, deferred, or have payment-in-kind features. Interest on corporate bonds is typically paid semi-annually and is fully taxable to the bondholder. Corporate bonds contain elements of both interest-rate risk and credit risk. The market value of a corporate bond generally may be expected to rise and fall inversely with interest rates and may also be affected by the credit rating of the corporation, the corporation's performance and perceptions of the corporation in the marketplace. Corporate bonds usually yield more than government or agency bonds due to the presence of credit risk. |

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 21: |

PRIVATE PLACEMENTS. Securities sold in private placement transactions between their issuers and their purchasers are neither listed on an exchange nor traded in the OTC secondary market. In many cases, privately placed securities will be subject to contractual or legal restrictions on transfer. <u>As a result of the absence of a public trading market, privately placed securities may in turn be less liquid and more difficult to value than publicly traded securities. Although privately placed securities may be resold in privately negotiated transactions, the prices realized from the sales could, **due to illiquidity,** be less than those originally paid by the Fund or less than if such securities were more widely traded. In addition, issuers whose securities are not publicly traded may not be subject to the disclosure and other investor protection requirements that may be applicable if their securities were publicly traded.</u> If any privately placed securities held by the Fund are required to be registered under the securities laws of one or more jurisdictions before being resold, the Fund may be required to bear the expenses of registration.

393

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| No similar prospectus disclosure. | No similar prospectus disclosure. | Pages 21-22: |

ILLIQUID AND RESTRICTED SECURITIES. Illiquid investments are investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued. Investments currently considered by the Adviser to be illiquid include repurchase agreements not entitling the holder to repayment of principal and payment of interest within seven days, non-government stripped fixed-rate mortgage-backed securities, and OTC options. In the absence of readily available market quotations a committee appointed by the Fund's Board will price illiquid investments at a fair value as determined in good faith. Valuing illiquid securities typically requires greater judgment than valuing securities for which there is an active trading market. The market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that the Fund pays for or recovers upon the sale of illiquid securities. Investment of the Fund's assets in illiquid securities may restrict the Fund's ability to take advantage of market opportunities. The risks associated with illiquid securities may be particularly acute in situations in which the Fund's operations require cash and could result in the Fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities.

The Fund may invest in restricted securities, which are securities that may not be sold to the public without an effective registration statement under the Securities Act of 1933 Act, as amended (the "1933 Act"). The restriction on public sale may make it more difficult to value such securities, limit the Fund's ability to dispose of them and lower the amount the Fund could realize upon their sale. Before they are registered, restricted securities may be sold only in a privately negotiated transaction or pursuant to an exemption from registration. Rule 144A under the 1933 Act establishes a "safe harbor" from the registration requirements of the 1933 Act for resales of certain securities to qualified institutional buyers. An insufficient number of qualified institutional buyers interested in purchasing Rule 144A-eligible securities held by the Fund, however, could affect adversely the marketability of such portfolio securities and the Fund might be unable to dispose of such securities promptly or at reasonable prices.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

No similar prospectus disclosure.

No similar prospectus disclosure.

Page 22:

DERIVATIVES. The Fund may, but is not required to, use various derivatives, including those described below, to earn income, facilitate portfolio management and mitigate risks. Such derivatives are generally accepted under modern portfolio management practices and are regularly used by closed-end management investment companies and other institutional investors. Although the Adviser seeks to use these practices to further the Fund's investment objectives, no assurance can be given that these practices will achieve that result. The Fund may purchase and sell derivative instruments such as exchange-listed and OTC put and call options on securities, financial futures, equity, fixed-income and interest rate indices, and other financial instruments. It may purchase and sell financial futures contracts and options thereon. Moreover, the Fund may enter into various interest rate transactions such as swaps, caps, floors or collars and enter into various currency transactions such as currency forward contracts, currency futures contracts, currency swaps or options on currency or currency futures or credit transactions and credit default swaps. The Fund may also purchase derivative instruments that combine features of several of these instruments. The Fund generally seeks to use derivatives as a portfolio management or hedging technique to seek to protect against possible adverse changes in the market value of securities held in or to be purchased for its portfolio, protect the value of its portfolio, facilitate the sale of certain securities for investment purposes, manage its effective interest rate exposure, protect against changes in currency exchange rates, manage the effective maturity or duration of its portfolio or establish positions in the derivatives markets as a temporary substitute for purchasing or selling particular securities. The Fund may use derivatives for non-hedging purposes to enhance potential gain, although no more than 5% of its net assets will be committed to initial margin and premiums for those positions.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |
| No similar prospectus disclosure. | No similar prospectus disclosure. | |

Page 25:

LEVERAGE

Although leverage creates an opportunity for increased income and capital appreciation for common stockholders, at the same time it <u>involves a high degree of risk</u>. Leverage will increase the Fund's exposure to capital risk. <u>Successful use of leverage depends on the Adviser's ability to predict correctly interest rates and market movements and the Fund's continued access to bank borrowings, reverse repurchase agreements or other vehicles for leverage on favorable terms</u>. There is no assurance that the use of a leveraging strategy will be successful during any period in which it is used.

The premise underlying the use of leverage is that the costs of leveraging generally will be based on short-term rates, which normally will be lower than the return (including the potential for capital appreciation) that the Fund can earn on the longer-term portfolio investments that it makes with the proceeds obtained through the leverage. Thus, the common stockholders would benefit from an incremental return. However, if the differential between the return on the Fund's investments and the cost of leverage were to narrow, the incremental benefit would be reduced and could be eliminated or even become negative. Furthermore, <u>if long-term rates rise, the net asset value of the Fund's common shares will reflect the resulting decline in the value of a larger aggregate amount of portfolio assets than the Fund would hold if it had not leveraged. Thus, leveraging exaggerates changes in the value of and in the yield on the Fund's portfolio. This, in turn, may result in greater volatility of both the net asset value and the market price of the common shares.</u>

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| | | |
|---|---|---|
| No similar prospectus disclosure. | No similar prospectus disclosure. | Pages 25-26: |

EFFECTS OF LEVERAGE

Assuming borrowings in the amount of approximately 30% of the Fund's total assets (including the amounts obtained through leverage), and an annual interest rate of 4.65% payable on such leverage based on market rates as of the date of this Prospectus, the annual return that the Fund's portfolio must experience (net of expenses) in order to cover those interest payments would be 1.4%.

The following table is designed to illustrate the effect of the foregoing level of leverage on the return to a common stockholder, assuming hypothetical annual returns (net of expenses) of the Fund's portfolio of -10% to 10%. As the table shows, the leverage generally increases the return to common stockholders when portfolio return is positive and greater than the cost of leverage and decreases the return when the portfolio return is negative or less than the cost of leverage. The figures appearing in the table are hypothetical and actual returns may be greater or less than those appearing in the table.

. . .

During the time in which the Fund is utilizing leverage, the amount of the fees paid to the Adviser for investment management and administrative services will be higher than if the Fund did not utilize leverage because the fees paid will be calculated based on the Fund's Managed Assets, which include assets purchased with leverage proceeds. Therefore, the Adviser will have a financial incentive to leverage the Fund, which may create a conflict of interest between the Adviser and the common stockholders. Because payments on any borrowings and/or dividends on any preferred shares would be paid by the Fund at a specified rate, only its common stockholders would bear the Fund's fees and expenses.

| | | |
|---|---|---|
| The less comprehensive disclosure (see above) was not repeated for this Fund. | The less comprehensive disclosure (see above) was not repeated for this Fund. | Page 26: |

INVESTMENT RISK. An investment in the Fund is subject to investment risk, including the risk of loss of the entire principal that a common stockholder invests. At any point in time the Fund's common shares may be worth less than the amount originally paid for them, even after taking into account the reinvestment of dividends and other  distributions. An investment in the Fund's common shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|:---:|:---:|:---:|
| **-73%** | **-78%** | **-72%** |

| | | |
|---|---|---|
| No similar prospectus disclosure. | No similar prospectus disclosure. | Pages 27-28: |

Pages 27-28:

LEVERAGE RISK. Borrowings or other transactions involving Fund indebtedness (other than for temporary or emergency purposes) and any preferred shares issued by the Fund all would be considered "senior securities" for purposes of the 1940 Act and would constitute leverage. <u>Leverage creates an opportunity for an increased return to common stockholders, but it is a speculative technique in that it will increase the Fund's exposure to capital risk. Unless the income and capital appreciation, if any, on securities acquired with borrowed funds or other leverage proceeds exceed the cost of the leverage, the use of leverage will diminish the investment performance of the common shares. Successful use of leverage depends on the Adviser's ability to predict correctly interest rates and market movements, and there is no assurance that the use of a leveraging strategy will increase stockholder returns during any period in which it is used.</u>

<u>Use of leverage may increase the likelihood that the net asset value of the Fund and market value of its common shares will be more volatile, and the yield and total return to common stockholders will tend to fluctuate more in response to changes in interest rates. If the market value of the Fund's portfolio declines, any leverage will result in a greater decrease in net asset value to common stockholders than if the Fund were not leveraged. Such greater net asset value decrease will also tend to cause a greater decline in the market price for the common shares.</u>

. . .

. . . To the extent necessary, the Fund intends to repay indebtedness or to purchase or redeem preferred shares to maintain the required asset coverage. Doing so may require the Fund to liquidate portfolio securities at a time when it would not otherwise be desirable to do so. . . .

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

The less comprehensive disclosure (see above) was not repeated for this Fund.

The less comprehensive disclosure (see above) was not repeated for this Fund.

Pages 28-29:

BELOW INVESTMENT GRADE SECURITIES RISK. Below investment grade securities are subject to the following risks, among others:

Adverse changes in economic conditions are more likely to lead to a weakened capacity of a below investment grade issuer to make principal payments and interest payments than an investment grade issuer. The principal amount of below investment grade securities outstanding has proliferated in the past decade as an increasing number of issuers have used below investment grade debt securities for corporate financing. An economic downturn could adversely affect the ability of highly leveraged issuers to service their obligations or to repay their obligations upon maturity.

Similarly, downturns in profitability in specific industries could adversely affect the ability of below investment grade issuers in those industries to meet their obligations. The market values of lower quality securities tend to reflect individual developments of the issuer to a greater extent than do higher quality securities, which react primarily to fluctuations in the general level of interest rates.

The secondary market for below investment grade securities may not be as liquid as the secondary market for more highly rated securities, a factor that may have an adverse effect on the Fund's ability to dispose of a particular security when necessary to meet its liquidity needs. There are fewer dealers in the market for below investment grade securities than investment grade obligations. The prices quoted by different dealers may vary significantly and the spread between the bid and asked price is generally much larger than for higher quality instruments. Under adverse market or economic conditions, the secondary market for below investment grade securities could contract further, independent of any specific adverse change in the condition of a particular issuer, **and these instruments may become illiquid**. As a result, the Fund could find it more difficult to sell these securities or may be able to sell the securities only at prices lower than if such securities were widely traded. Prices realized upon the sale of such lower-rated or unrated securities, under these circumstances, may be less than the prices used in calculating the Fund's net asset value.

Since investors generally perceive that there are greater risks associated with lower quality securities of the type in which the Fund may invest its assets, the yields and prices of such securities may tend to fluctuate more than those for higher-rated securities. In the lower quality segments of the debt securities market, changes in perceptions of issuers' creditworthiness tend to occur more frequently and in a more pronounced manner than do changes in higher quality segments of the debt securities market, resulting in greater yield and price volatility.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

The less comprehensive disclosure (see above) was not repeated for this Fund.

The less comprehensive disclosure (see above) was not repeated for this Fund.

Pages 29-30:

MORTGAGE-BACKED SECURITIES RISK. Mortgage-backed securities may have less potential for capital appreciation than comparable fixed-income securities, due to prepayment risk, which is the likelihood of increased prepayments of mortgages as interest rates decline. If the Fund buys mortgage-backed securities at a premium, mortgage foreclosures and prepayments of principal by mortgagors (which usually may be made at any time without penalty) may result in some loss of the Fund's principal investment to the extent of the premium paid. A mortgage-backed security's stated maturity may be shortened by unscheduled prepayments on the underlying mortgages, and, therefore, it is not possible to predict accurately the security's return to the Fund. Moreover, with respect to certain stripped mortgage-backed securities, if the underlying mortgage securities experience greater than anticipated prepayments of principal, the Fund may fail to fully recoup its initial investment. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term instrument. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties. In certain instances, third-party guarantees or other forms of credit support can reduce the credit risk.

No similar prospectus disclosure.

No similar prospectus disclosure.

Page 30:

ASSET-BACKED SECURITIES RISK. Payment of interest and repayment of principal on asset-backed securities may be largely dependent upon the cash flows generated by the assets backing the securities and, in certain cases, supported by letters of credit, surety bonds or other credit enhancements. Asset-backed security values may also be affected by the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables or the entities providing the credit enhancement. In addition, the underlying assets are subject to prepayments that shorten the securities' weighted average maturity and may lower their return.

| RMK Select High Income Fund | RMK Select Intermediate Bond Fund | RMK Multi-Sector High Income Fund, Inc |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

| | | |
|---|---|---|
| No similar prospectus disclosure. | No similar prospectus disclosure. | Page 30:<br><br>CORPORATE BONDS RISK. The Fund's investments in corporate bonds are subject to a number of risks described in the Prospectus, including management risk, interest rate risk, inflation risk, deflation risk, below investment grade securities risk, foreign securities risk and illiquid and restricted securities risks. |
| No similar prospectus disclosure. | No similar prospectus disclosure. | Pages 31-32:<br><br>ILLIQUID AND RESTRICTED SECURITIES RISKS. Illiquid securities may be difficult to dispose of at a fair price at the times when the Fund believes it is desirable to do so. Market prices of illiquid securities generally are more volatile than those of more liquid securities, which may adversely affect the price that the Fund pays for or recovers upon the sale of illiquid securities. Illiquid securities are also more difficult to value, and the Adviser's judgment as to value will often be given greater weight than market quotations, if any exist. If market quotations are not available, illiquid securities will be valued in accordance with procedures established by the Fund's Board, including the use of outside pricing services. Investment of the Fund's capital in illiquid securities may restrict the Fund's ability to take advantage of market opportunities. The risks associated with illiquid securities may be particularly acute in situations in which the Fund's operations require cash and could result in the Fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities.<br><br>Restricted securities have contractual restrictions on their public resale, which may make it more difficult to value them, may limit the Fund's ability to dispose of them and may lower the amount the Fund could realize upon their sale. To enable the Fund to sell its holdings of a restricted security not registered under the 1933 Act, the Fund may have to cause those securities to be registered. The expenses of registering restricted securities may be negotiated by the Fund with the issuer at the time the Fund buys the securities. When the Fund must arrange registration because the Fund wishes to sell the security, a considerable period may elapse between the time the decision is made to sell the security and the time the security is registered so that the Fund could sell it. The Fund would bear the risks of any downward price fluctuation during that period. |

| **RMK Select High Income Fund** | **RMK Select Intermediate Bond Fund** | **RMK Multi-Sector High Income Fund, Inc** |
|---|---|---|
| **-73%** | **-78%** | **-72%** |

No similar prospectus disclosure.

No similar prospectus disclosure.

DERIVATIVES RISK. Even a small investment in derivatives can have a significant impact on the Fund's exposure to fluctuations in interest rates or currency exchange rates. There may be an imperfect correlation between the values of such instruments and the underlying assets. If changes in a derivative's value do not correspond to changes in the value of the Fund's other investments, the Fund may not fully benefit from or could lose money on the derivative position. In addition, some derivatives involve risk of loss if the person who issued the derivative defaults on its obligation. Moreover, certain derivatives may be less liquid and more difficult to value than others. Furthermore, the ability to successfully use derivatives depends on the Adviser's ability to predict pertinent market movements, which cannot be assured. Thus, the use of derivatives may result in losses greater than if they had not been used, may require the Fund to sell or purchase portfolio securities at inopportune times or for prices other than current market values, may limit the amount of appreciation the Fund can realize on an investment or may cause the Fund to hold a security that it might otherwise sell.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this 30th day of November, 2009, a true and correct copy of the foregoing served by electronic means via e-mail transmission (including the Court's ECF System) to the following:

Shepherd D. Tate, Esq.
Michael A. Brady, Esq.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

Matthew M. Curley, Esq.
Michael L. Dagley, Esq.
W. Brantley Phillips, Jr.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

David B. Tulchin
D. Andrew Pietro
David E. Swarts
**Sullivan & Cromwell, LLP**
125 Broad Street
New York, NY 10004

Peter J. Anderson, Esq.
S. Lawrence Polk, Esq.
**Sutherland Asbill & Brennan LLP**
999 Peachtree Street, NE
Atlanta, GA 30309-3996

Jeffrey Maletta, Esq.
Nicole A. Baker
**K & L Gates**
1601 K Street NW
Washington, DC 20006

Emily Nicklin, Esq.
Timothy A. Duffy
**Kirkland & Ellis**
200 East Randolph Dr., Ste. 5400
Chicago, IL 60601-6636


Leo Maurice Bearman, Jr.
Eugene J. Podesta, Jr.
**Baker Donelson Bearman Caldwell
& Berkowitz**
165 Madison Avenue, Suite 2000
Memphis, TN 38103


Kevin C. Logue, Esq.
Asa R. Danes, Esq.
**Paul, Hastings, Janofsky & Walker LLP**
75 East 55th Street
New York, NY 10022


<u>s/Jerome A. Broadhurst</u>
Jerome A. Broadhurst