IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE & ERISA LITIGATION, | ) ) ) ) ) | Case No. 2:09-md-2009-SHM |
| This Document Relates to: | ) ) | |
| *In re Regions Morgan Keegan Open-End Mutual Fund Litigation,* | ) ) ) | |
| No. 2:07-cv-02784-SHM-dvk | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
FILED BY MORGAN ASSET MANAGEMENT, INC.,
MORGAN KEEGAN & COMPANY, INC., AND MK HOLDING, INC.**

Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN  37201
(615) 742-6200

Shepherd D. Tate
Michael A. Brady
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee  38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management, Inc.,
Morgan Keegan & Company, Inc., and MK
Holding, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................5

I.      Overview of the Funds at Issue.................................................................5

        A.      The Funds' Public Filings...........................................................5

        B.      The Funds' Performance and the Credit Crisis.............................8

II.     The Parties ...............................................................................................12

APPLICABLE LEGAL STANDARDS .......................................................................13

I.      Federal Rule of Civil Procedure 12(b)(6) .................................................13

II.     Federal Rule of Civil Procedure 9(b) and the PSLRA................................14

ARGUMENT..........................................................................................................15

I.      Plaintiffs' claims of corporate mismanagement are not actionable under the
        federal securities laws...............................................................................15

II.     Plaintiffs do not have standing to pursue "holder" claims.................................19

III.    The Funds disclosed all required information regarding an investment in the
        Funds.......................................................................................................20

        A.      The Funds disclosed the risk inherent in the Funds' portfolios. ............23

                1.      The Funds disclosed the reasonably foreseeable risks associated
                        with an investment in the Funds. ...............................................23

                2.      The Funds' performance and peer comparisons fail to give rise to a
                        duty to make additional risk disclosures....................................27

        B.      The Funds fully disclosed the liquidity risk and no additional disclosures
                were required. ........................................................................30

                1.      The Funds' offering documents fully disclosed the liquidity risk
                        associated with the Funds' portfolio securities...........................30

                2.      The Funds had no duty to make additional disclosures regarding
                        liquidity....................................................................33

|     | C. | The Funds adequately disclosed the Funds' fair valuation procedures and the associated risks | 36 |
|     | D. | The Funds met the duty of disclosure regarding concentration | 39 |
|     | E. | The Funds' offering documents properly included returns of an appropriate broad-based market index | 42 |
|     | F. | Plaintiffs' claim that the Funds used "implicit leverage" fails to state a violation of applicable investment guidelines and restrictions | 43 |
|     | G. | Federal law did not impose a duty on the Funds to disclose the other information called for by Plaintiffs | 44 |
|     | H. | Plaintiffs' allegations against PwC do not give rise to liability against Morgan Keegan | 45 |
|     | I. | Plaintiffs fail to specify each Defendant's role in the allegedly fraudulent scheme | 46 |
| IV. | Plaintiffs fail to adequately plead that Morgan Keegan and/or MAM are "statutory sellers" under Section 12(a)(2) of the 1933 Act | | 46 |
| V. | Plaintiffs' Section 10(b) and Rule 10b-5 claims fail as a matter of law | | 47 |
| VI. | The CAC must be dismissed because Plaintiffs cannot establish loss causation | | 49 |
|     | A. | The allegations of the CAC affirmatively establish that any loss was caused by factors other than the alleged misrepresentations | 50 |
|     |     | 1. The CAC affirmatively alleges that mismanagement, not misrepresentation, caused the decline in the Funds' NAV | 50 |
|     |     | 2. The CAC establishes that any losses resulted from the effect of market forces on the Funds' underlying assets | 51 |
|     | B. | Plaintiffs' "but for" allegations do not establish loss causation | 52 |
| VII. | Plaintiffs do not adequately plead claims for "Control Person" liability under Section 15 of the 1933 Act or Section 20 of the 1934 Act | | 53 |
| VIII. | Plaintiffs' ICA claims must be dismissed. | | 55 |
| CONCLUSION | | | 59 |
| CERTIFICATE OF SERVICE | | | 60 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander* v. *Sandoval*,
    532 U.S. 275 (2001)....................................................................................................56

*Am. Iron & Steel Inst.* v. *OSHA*,
    939 F.2d 975 (D.C. Cir. 1991)....................................................................................40

*Andropolis* v. *Red Robin Gourmet Burgers, Inc.*,
    505 F. Supp. 2d 662 (D. Colo. 2007)..........................................................................15

*Argiropoulos* v. *Kopp*,
    2007 U.S. Dist. LEXIS 22351 (D. Md. Mar. 26, 2007)..............................................19

*Ashcroft* v. *Iqbal*,
    129 S. Ct. 1937 (2009)..........................................................................................13, 56

*Atkinson* v. *Morgan Asset Mgmt., Inc.*,
    2009 WL 3245550 (W.D. Tenn. Sept. 23, 2009).......................................................59

*Azzolini* v. *CorTS Trust II for Provident Fin. Trust I*,
    2005 U.S. Dist. LEXIS 31853 (E.D. Tenn. Sept. 16, 2005)..............................54, 55

*Azzolini* v. *CorTS Trust II for Provident Fin. Trust I*,
    2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005)........................................................50

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...................................................................................................13

*Bellikoff* v. *Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir 2007)........................................................................................56

*Benzon* v. *Morgan Stanley Distribs., Inc.*,
    420 F.3d 598 (6th Cir. 2005) .....................................................................................22

*Blackmoss Inv., Inc.* v. *ACA Capital Holdings, Inc.*,
    2010 U.S. Dist. LEXIS 2899 (S.D.N.Y. Jan. 14, 2010)......................................22, 23

*Blue Chip Stamps* v. *Manor Drug Stores*,
    421 U.S. 723, 754-55 (1975) .........................................................................19, 20, 47

*Coffey* v. *Foamex L.P.*,
    2 F.3d 157 (6th Cir. 1993) .........................................................................................14

*Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co., Inc.*,
  800 F.2d 177 (7th Cir. 1986) ................................................................................................20

*Cozzarelli* v. *Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...............................................................................................14

*D.E. & J Ltd. P'ship* v. *Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003)..................................................................................5

*D.E. & J. Ltd. P'ship* v. *Conaway*,
  133 Fed. Appx. 994 (6th Cir. 2005)......................................................................................52

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005).................................................................................................49, 50, 51

*Fidel* v. *Farley*,
  392 F.3d 220 (6th Cir. 2005) ...............................................................................................49

*GFL Advantage Fund, Ltd.* v. *Colkitt*,
  272 F.3d 189 (3d Cir. 2001)..................................................................................................58

*Gustafson* v. *Alloyd Co., Inc.*,
  513 U.S. 561 (1995)...............................................................................................................21

*Hensley Mfg., Inc.* v. *ProPride, Inc.*,
  579 F.3d 603 (6th Cir. 2009) ...............................................................................................13

*Herman & MacLean* v. *Huddleston*,
  459 U.S. 375 (1983)...............................................................................................................21

*In re Aetna, Inc. Sec. Litig.*,
  2009 WL 1619636 (E.D. Pa. June 9, 2009).....................................................................27, 49

*In re Am. Funds Fees Litig.*,
  2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005) .....................................................18

*In re Am. Serv. Group, Inc.*,
  2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ..................................................................48

*In re Bridgestone Sec. Litig.*,
  430 F. Supp. 2d 728 (M.D. Tenn. 2006).............................................................................5, 19

*In re Century Bus. Servs. Sec. Litig.*,
  2002 WL 32254513 (N.D. Ohio June 27, 2002)...................................................................55

*In re Charles Schwab Corp. Sec. Litig.*,
  2009 WL 1371409 (N.D. Cal. May 15, 2009) ......................................................................18

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................45

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) .............................................................14

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   2000 U.S. Dist. LEXIS 94 (S.D.N.Y. Jan. 6, 2000)...............................18

*In re Eaton Vance Mut. Funds Fee Litig.*,
   380 F. Supp. 2d 222 (S.D.N.Y. 2005)..............................................18, 57

*In re Envoy Corp. Sec. Litig.*,
   133 F. Supp. 2d 647 (M.D. Tenn. 2001)...............................................55

*In re Fannie Mae Sec., Deriv. & ERISA Litig.*,
   503 F. Supp. 2d 25 (D.D.C. 2007).........................................................59

*In re First Marblehead Corp. Sec. Litig.*,
   639 F. Supp. 2d 145 (D. Mass. 2009) ..................................................51

*In re Franklin Mut. Funds Fee Litig.*,
   388 F. Supp. 2d 451 (D.N.J. 2005) .......................................................18

*In re Goldman Sachs Mut. Funds Fee Litig.*,
   2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006).........................18

*In re the Goodyear Tire & Rubber Co. Sec. Litig.*,
   436 F. Supp. 2d 873 (N.D. Ohio 2006)............................................28, 44

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ...........................................46, 48

*In re Huntington Bancshares Inc. Sec. Litig.*,
   2009 WL 4666455 (S.D. Ohio Dec. 4, 2009) .......................................28

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)....................................................22

*In re Lord Abbett Mut. Funds Fee Litig.*,
   407 F. Supp. 2d 616 (D.N.J. 2005) ..................................................18, 58

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................14

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003)....................................................50

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
("*In re Merrill Lynch*"), 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...........................19, 21, 56, 57

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
("*In re MLIM*"), 434 F. Supp. 2d 233 (S.D.N.Y. 2006) ..............................................21, 22, 50

*In re Morgan Stanley Tech. Fund Sec. Litig.* ("*Morgan Stanley I*"),
643 F. Supp. 2d 366 (S.D.N.Y. 2009) ........................................................................21, 23, 44

*In re Morgan Stanley Info. Fund Sec. Litig.* ("*Morgan Stanley II*"),
2010 WL 252294 (2d Cir. Jan. 25, 2010) ................................................................................23

*In re Orion Sec. Litig.*,
2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009).........................................................................47

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)..................................................................................54

*In re Refco, Inc. Sec. Litig.*,
609 F. Supp. 2d 304 (S.D.N.Y. 2009).....................................................................................48

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004).........................................................................................47

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006).................................................................................53, 56

*In re SCB Computer Tech., Inc.*,
149 F. Supp. 2d 334 (W.D. Tenn. 2001)..................................................................................48

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000)..................................................................................55

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
2004 U.S. Dist. LEXIS 24867 (N.D. Cal. Jul. 27, 2004)........................................................56

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..................................................................................45

*In re WebSecure, Inc. Sec. Litig.*,
182 F.R.D. 364 (D. Mass. 1998)..............................................................................................47

*In re WorldCom, Inc., Sec. Litig.*,
2004 U.S. Dist. LEXIS 8661 (S.D.N.Y. May 19, 2004).........................................................55

*In re Worldcom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004)......................................................................................23

*Indiana State Dist. Council of Laborers* v. *Omnicare, Inc.,*
    583 F.3d 935 (6th Cir. 2009) ................................................................22

*Jacobs* v. *Bremner,*
    378 F. Supp. 2d 861 (N.D. Ill. 2005) ...........................................56, 57

*James* v. *Gerber Prods. Co.,*
    483 F.2d 944 (6th Cir. 1973) ............................................................20

*Korland* v. *Capital Research & Mgmt Co.,*
    2009 WL 936612 (C.D. Cal. Feb. 10, 2009)......................................56

*Kramer* v. *Western Pac. Indus., Inc.,*
    546 A.2d 348 (Del. 1988) ................................................................19

*Landers* v. *Morgan Asset Mgmt, Inc.,*
    No. 2:08-cv-02260-SHM-dvk (W.D. Tenn.) ..................................2, 19

*Levine* v. *Prudential-Bache Prop., Inc.,*
    855 F. Supp. 924 (N.D. Ill. 1994) ....................................................15

*Madden* v. *Deloitte & Touche, LLP,*
    118 Fed. Appx. 150 (9th Cir. Nov. 23, 2004).....................................46

*N.Y. State Teachers' Ret'mt Sys.* v. *Fremont Gen. Corp.,*
    2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ..................................45

*Olkey* v. *Hyperion 1999 Term Trust, Inc.,*
    98 F.3d 2 (2d Cir. 1996)............................................................28, 49

*Olmsted* v. *Pruco Life Ins. Co.,*
    283 F.3d 429 (2d Cir. 2002).......................................................56, 57

*P.R. Diamonds, Inc.* v. *Chandler,*
    364 F.3d 671 (6th Cir. 2004) .....................................................53, 54

*Panter* v. *Marshall Field & Co.,*
    646 F.2d 271 (7th Cir. 1981) ............................................................15

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.,*
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)................................................22

*Penn Mont Secs.* v. *Frucher,*
    502 F. Supp. 2d 443 (E.D. Pa. 2007) ................................................19

*Phillips* v. *Morgan Stanley Dean Witter High Income Adv. Trust III,*
    2002 WL 31119441 (S.D.N.Y. Sept. 25, 2002)...................................41

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988).................................................................................46

*Pollio* v. *MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)....................................................27

*Rabin* v. *JPMorgan Chase Bank.*,
    2007 WL 2295795 (N.D. Ill. Aug. 3, 2007) ............................................20

*Recupito* v. *Prudential Sec., Inc.*,
    112 F. Supp. 2d 448 (D. Md. 2000)........................................................44

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................14

*Sanders Confectionery Prods., Inc.* v. *Heller Fin., Inc.*,
    973 F.2d 474 (6th Cir. 1992) .................................................................53

*Sante Fe Indus., Inc.* v. *Green*,
    430 U.S. 462 (1977)...............................................................................15

*Sheppard* v. *TCW/DW Term Trust 2000*,
    938 F. Supp. 171 (S.D.N.Y. 1996) .........................................................44

*Simmons* v. *Wolfson*,
    428 F.2d 455 (6th Cir. 1970) .................................................................20

*Smith* v. *Am. Nat'l Bank & Trust Co.*,
    982 F.2d 936 (6th Cir. 1992) .................................................................46

*Steadman* v. *SEC*,
    603 F.2d 1126 (5th Cir. 1979) ...............................................................57

*Stegall* v. *Ladner*,
    394 F. Supp. 2d 358 (D. Mass. 2005) .....................................................18

*Stonecipher* v. *Lehman ABS Corp.*,
    2006 U.S. Dist. LEXIS 34146 (S.D.N.Y. May 26, 2006)..........................45

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)...............................................................................48

*Tellabs, Inc.* v. *Makor Issues & Rights, LTD*,
    551 U.S. 308 (2007)..........................................................................5, 49

*Transamerica Mortgage Advisors, Inc.* v. *Lewis*,
    444 U.S. 11 (1979).................................................................................57

*White* v. *Heartland High-Yield Mun. Bond Fund*,
   237 F. Supp. 2d 982 (E.D. Wis. 2002)..............................................................56, 57

*Zerman* v. *Jacobs*,
   510 F. Supp. 132 (S.D.N.Y. 1981) ...........................................................................58

## STATUTES AND REGULATIONS

15 U.S.C. § 77k...........................................................................................*passim*

15 U.S.C. § 77l............................................................................................*passim*

15 U.S.C. § 77o......................................................................................53, 54

15 U.S.C. § 78bb.............................................................................................59

15 U.S.C. § 78j.................................................................................................2

15 U.S.C. § 78t...............................................................................................53

15 U.S.C. § 78u-4(b)(1) ...............................................................................15

15 U.S.C. § 80a-2.............................................................................................8

15 U.S.C. § 80a-8.............................................................................................7

15 U.S.C. § 80a-33.........................................................................................57

15 U.S.C. § 80a-46.........................................................................................57

15 U.S.C. § 80b-1, *et seq.* ........................................................................2, 55

17 C.F.R. § 270.2a-4(a) ...................................................................................8

17 C.F.R. §§ 270.8b-10.................................................................................22

17 C.F.R. § 270.8b-15......................................................................................6

17 C.F.R. § 270.30b1-5....................................................................................6

17 C.F.R. § 270-30e-1.......................................................................................6

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 8(a)(2) ...............................................................................................................13

Rule 9(b) .............................................................................................................. *passim*

Rule 12(b)(6) ...........................................................................................................13

**SEC RELEASES**

Disclosure of Mut. Fund Performance & Portfolio Managers,
   Inv. Co. Act Rel. No. 19,382, 1993 SEC LEXIS 780 (April 6, 1993) ............................42, 43

Guidelines for the Preparation of Form N-8B-1, Item 4(d), Inv. Co. Act Rel. No. 7,221,
   1972 SEC LEXIS 1494 (June 9, 1972) ..........................................................................41, 42

Merrill Lynch Money Markets Inc.,
   SEC No-Action Letter, 1994 SEC No-Act. LEXIS 236, at *2 (Jan. 14, 1994) ......................35

Reg. Form Used by Open-end Inv. Mgmt. Inv. Co.,
   Inv. Co. Act Rel. No. 13,436, 1983 SEC LEXIS 1030 (Aug. 12, 1983) ................................40

Reg. Form Used by Open-End Inv. Mgmt. Cos.,
   Inv. Co. Act Rel. No. 23,064, 1998 SEC LEXIS 438 (Mar. 13, 1998) ................25, 36, 43, 45

Repurchase Offers by Closed-End Mgmt. Inv. Co.,
   Inv. Co. Act Rel. No. 19,399, 1993 SEC LEXIS 782 (Apr. 7, 1993) ......................................30

Resale of Restricted Sec.,
   Inv. Co. Act Rel. No. 17,452, 1990 SEC LEXIS 739 (Apr. 23, 1990) ......................32, 34, 35

Morgan Keegan & Company, Inc. ("Morgan Keegan"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. ("MK Holding") respectfully submit this memorandum in support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC").

## PRELIMINARY STATEMENT

This case is an effort by Plaintiffs to recover losses caused by the sudden and unprecedented crisis that affected a significant segment of the credit markets in mid-2007. Plaintiffs allege that they purchased and/or held shares in three mutual funds, Regions Morgan Keegan Select High Income Fund (the "High Income Fund,"), Regions Morgan Keegan Select Intermediate Bond Fund (the "Intermediate Fund") and Regions Morgan Keegan Select Short Term Bond Fund (the "Short Term Fund") (collectively, the "Open-End Funds" or the "Funds").[1] The Funds are "fixed income" funds in that they invest principally in a wide variety of debt instruments. Since inception, each of them has held, to varying degrees, asset-backed securities in its respective portfolio. These holdings were entirely consistent with their investment parameters as communicated to investors in the Funds' offering documents.

For more than seven years the Funds provided investors, including Plaintiffs, with returns that were generally superior to other fixed income funds with similar objectives. The credit crisis, described repeatedly (and disingenuously) in the CAC as "shifting market sentiments," eventually (by late 2008) impacted the markets for all asset classes. The first to be hit, however, was the market for asset-backed securities and other similar securities, which in mid-2007 evaporated

---

[1]     Each of the Funds is a series of Morgan Keegan Select Fund, Inc. ("MK Select"), an open-end management investment company organized under the laws of the state of Maryland and registered with the SEC under the Investment Company Act of 1940. The names of the Funds and the investment company at issue in this action changed on July 29, 2008, upon shareholder approval of Hyperion Brookfield Asset Management, Inc., as the new investment adviser to the Funds. *See* MK Select Fund, Inc., Prospectus Supplement at 1 (July 29, 2008) (attached as Exhibit N to the Declaration of Matthew M. Curley, dated February 11, 2010 ("Curley Decl.")).

virtually overnight. This resulted in sharp and immediate reductions in the prices at which such securities could be sold, and a resulting drop in the Funds' net asset values ("NAV's"), which must be based on the current values of the securities owned by the Funds.

After years of enjoying high returns, Plaintiffs now seek to recover any losses they incurred when the Funds' share prices declined. They have made claims based on fraud under §§ 11 and 12(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k and 77l, and §§ 10(b) and 20 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 thereunder. In addition, Plaintiffs ask the Court to create implied private rights of action under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80b-1, *et seq.*, a request consistently rejected by other courts.

Although cloaked in numerous allegations of nondisclosure – that the Funds failed to disclose investments in overly risky securities and that they were failing to observe liquidity and concentration limitations and valuation procedures – the CAC really alleges mismanagement, a lack of prudence and care. The essence of the CAC is that Defendants did foresee, or should have foreseen, the credit crisis but nonetheless failed to act to protect the Funds from loss. Indeed, in a separate action pending before this Court filed by many of these Plaintiffs and their lawyers, *Landers* v. *Morgan Asset Management, Inc.*, Plaintiffs expressly make derivative claims for mismanagement based on virtually the same allegations as those in the CAC.[2] Because allegations of mismanagement do not support claims under the federal securities laws, the CAC should be dismissed.

The true nature of Plaintiffs' claims is evident in that the CAC fails to allege any material

---

[2]      As demonstrated in defendants' motions to dismiss in *Landers*, now *sub judice*, plaintiffs' derivative claims likewise must fail because plaintiffs did not make demand on the Funds' board of directors prior to filing suit or demonstrate that demand would be futile.

omissions.   The Funds' offering documents unequivocally disclosed the Funds' investment objectives and strategies, the nature of the investments each Fund would and did make, the Funds' pricing and valuation procedures and the reasonably foreseeable risks associated with an investment in the Funds, including the risks that ultimately materialized.   The Funds' portfolio composition was also publicly disclosed on a regular basis.

Although Plaintiffs' CAC runs to 400 pages and frequently references the Funds' offering documents, they fail even to acknowledge the many disclosures in those documents that address the precise risks at issue here.   For example, with respect to the risks of the High Income Funds' portfolio securities, MK Select disclosed (among other things):

- "Up to 100% of the fund's total assets may consist of debt securities that are rated below investment grade and their unrated equivalents. . . ."

  *See, e.g.,* MK Select, Prospectus, Nov. 1, 2004, at 6 ("Nov. 2004 Prosp.") (Curley Decl. Exh. A); MK Select, Prospectus, Nov. 1, 2005, at 16 ("Nov. 2005 Prosp.") (Curley Decl. Exh. F); MK Select, Prospectus, Nov. 1, 2006, at 18 ("Nov. 2006 Prosp.") (Curley Decl. Exh. I); MK Select, Prospectus, Nov. 1, 2007, at 20 ("Nov. 2007 Prosp.") (Curley Decl. Exh. L).

- "Below investment grade debt securities are commonly referred to as 'junk bonds' and are considered speculative with respect to an issuer's capacity to pay interest and repay principal.   They involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities."

  *See, e.g.,* Nov. 2006 Prosp. at 18 (Curley Decl. Exh. I); Nov. 2007 Prosp. at 20 (Curley Decl. Exh. L).

- "[Below investment grade bonds] involve a higher degree of credit risk. . . .   The market prices of below investment grade bonds are . . . more sensitive to adverse economic or political changes or individual developments specific to the issuer. . . . [Rating agencies] consider such bonds to be speculative in nature."

  *See, e.g.,* Nov. 2004 Prosp. at 7 (Curley Decl. Exh. A); MK Select, Prospectus, Feb. 18, 2005, at 2 ("Feb. 2005 Prosp.") (Curley Decl. Exh. C); Nov. 2005 Prosp. at 3 (Curley Decl. Exh. F); Nov. 2006 Prosp. at 20 (Curley Decl. Exh. I); Nov. 2007 Prosp. at 3-4 (Curley Decl. Exh. L).

With respect to liquidity, MK Select disclosed (among other things):

- "Illiquid securities may be difficult to dispose of at a fair price at the times when either fund believes it is desirable to do so. The market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that each fund pays for or recovers upon the sale of illiquid securities . . . . The risks associated with illiquid securities may be particularly acute in situations in which each fund's operations require cash and could result in each fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities."

  *See, e.g.,* MK Select, SAI, Nov. 1, 2005, at 28 ("Nov. 2005 SAI") (Curley Decl. Exh. G); MK Select, SAI, Nov. 1, 2006, at 29-30 ("Nov. 2006 SAI") (Curley Decl. Exh. J); MK Select, SAI, Nov. 1, 2007, at 32 ("Nov. 2007 SAI") (Curley Decl. Exh. M).

- "The market for below investment grade bonds may be thinner and less active than that for higher-quality debt securities, which can adversely affect the prices at which the former are sold."

  *See, e.g.,* Nov. 2005 SAI, at 14 (Curley Decl. Exh. G); Nov. 2006 SAI, at 13 (Curley Decl. Exh. J); Nov. 2007, SAI, at 16 (Curley Decl. Exh. M).

And, as to pricing, MK Select disclosed (among other things):

- "When price quotations for certain securities are not readily available or if the available quotations are not believed to be reflective of market value, those securities shall be valued at 'fair value' as determined in good faith by the Adviser's Valuation Committee. . . . There can be no assurance that the fund could purchase or sell a portfolio security at the price used to calculate the fund's NAV."

  *See, e.g.,* Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F); Nov. 2006 Prosp. at 40-41 (Curley Decl. Exh. I); Nov. 2007 Prosp. at 43 (Curley Decl. Exh. L).

- "The market prices of below investment grade bonds may fluctuate more than those of higher-quality debt securities and may decline significantly in periods of general economic difficulty. . . ."

  *See, e.g.,* Nov. 2005 SAI, at 14 (Curley Decl. Exh. G); Nov. 2006 SAI, at 13 (Curley Decl. Exh. J); Nov. 2007, SAI, at 15 (Curley Decl. Exh. M).

These and other disclosures in the Funds' offering documents clearly put a reasonable investor on notice of the risks associated with an investment in the Funds. The law requires nothing more. Had the Funds included every disclosure that Plaintiffs claim was omitted—even using the precise language preferred by Plaintiffs—investors would have faced an impenetrable document, likely as prolix as Plaintiffs' CAC, that would have confused rather than informed.

In short, the CAC identifies no actionable misstatements or omissions. Plaintiffs' case

amounts to nothing more than a fraud-by-hindsight theory of liability premised on the Funds' ultimate performance and allegations of mismanagement. In addition to these fundamental flaws, Plaintiffs' own allegations establish an absence of any loss caused by any alleged misstatement or omission, an absence which bars their recovery on any of their claims. Finally, the CAC also is devoid of adequate allegations demonstrating scienter and control person liability and it fails to state a claim under the ICA. For the reasons set forth herein, the CAC should be dismissed.

## STATEMENT OF FACTS

### I.   Overview of the Funds at Issue

#### A.   The Funds' Public Filings[3]

The Funds at issue were offered as a series of MK Select. The Intermediate and High Income Funds began operations in March 1999 and the Short Term Fund came under Defendants' management in November 2005. (CAC ¶ 37.)

In connection with the Funds' offering of shares to the public, SEC rules required the Funds to file a Form N-1A registration statement, which must be updated periodically. (CAC ¶ 113.)[4] The disclosures for a registration statement required by Form N-1A are divided into three parts: Part A, which contains the requirements for a fund's prospectus; Part B, which contains the requirements for a fund's Statement of Additional Information ("SAI"), which expands on the information in the prospectus and must be provided to investors upon request; and Part C, which contains requirements

---

[3]      In considering a motion to dismiss, "courts must consider the complaint in its entirety, as well as other . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citations omitted). Such documents include "the full text of securities filings, the company prospectus, analysts' reports, and statements integral to a complaint," as well as documents that are "referred to in the complaint and are central to the plaintiff's claim." *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728, 732 (M.D. Tenn. 2006) (citations omitted). Courts may also take notice of market trends and relevant media reports. *See D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003).

[4]      Form N-1A provides considerable guidance with respect to the content of the disclosures that must be set forth in a fund's offering documents. *See* Form N-1A, Part A (Curley Decl. Exh. X).

for exhibits and other information, all of which is publicly available and filed with the SEC.  (CAC ¶ 379.) *See also* Form N-1A (Curley Decl. Exh. X).  As the law permits, the Funds incorporated into the Prospectuses the SAIs and additional information from the Funds' Annual Reports.  *See id.*, Gen. Instruction D(1)(b).  Accordingly, the additional disclosures in the SAI and Annual Report are part of the disclosures to be considered in evaluating allegations that information was omitted.[5]

The Funds annually updated their offering documents by filing a post-effective amendment to the registration statement that became effective November 1 of each year, including a Prospectus and SAI, updated as required.  *See* 17 C.F.R. § 270.8b-15.  (CAC ¶ 690 (identifying amendments).)  The Funds also filed with the SEC and disseminated to shareholders annual and semi-annual shareholder reports, Form N-CSR (*see* 17 C.F.R. § 270.30e-1), and a quarterly portfolio schedule, listing assets held by the Funds during that period, Form N-Q (*see* 17 C.F.R. § 270.30b1-5).

The Funds complied with the requirements in Form N-1A that objectives and investment strategies be set forth.  For example, in MK Select's November 2006 Prospectus, the High Income Fund's investment objective was seeking "a high level of income by investing in below investment grade bonds (commonly referred to as 'junk bonds')," with "capital growth as a secondary objective when consistent with the fund's primary objective," to be achieved through the investment of up to 100% of the Fund's assets in junk bonds and up to 10% of its total assets in distressed securities.  *See* Nov. 2006 Prosp. at 18 (Curley Decl. Exh. I).  The investment objective for the Intermediate Fund was described as seeking "a high level of income by investing in intermediate maturity,

---

[5]    Plaintiffs either overlook or ignore this central principle of the ICA's disclosure regime.  In their "Appendix" they purport to compare disclosures in the Funds' Prospectuses with allegedly more detailed and complete risk disclosures in other Morgan Keegan closed and open-end funds.  *See* CAC Appendices A-F. But many of the disclosures allegedly "omitted" from the Funds' Prospectuses appear virtually verbatim in the SAIs incorporated into the Prospectuses.   As discussed *infra* at pp. 28-30, the Appendix thus, inadvertently or intentionally, misleadingly implies that Defendants left out disclosures which they in fact made.  Defendants have submitted herewith the Funds' complete offering documents.

investment grade bonds," with "capital growth as a secondary objective when consistent with the primary objective," to be achieved through investment of at least 80% of the Fund's assets in debt securities and up to 35% of its assets in below investment grade debt securities, or "junk bonds." *See id.* at 10. The Short Term Fund sought "a high level of current income consistent with preservation of capital." *Id.* at 2.

The Funds' offering documents further described the Funds' investment strategies and objectives that the Funds' investment adviser, MAM, could pursue, and provided a detailed discussion of the risks inherent in an investment in each Fund. *See id.* at 3-4, 11-12, 20-22. The Adviser had very broad discretion in implementing these strategies, subject to only a few limitations that were disclosed in the Prospectus and SAI.

One limitation was concentration. The Funds may not "[p]urchase any security (other than U.S. Government Securities) if, as a result, 25% or more of the fund's total assets (taken at current value) would be invested in any one industry . . . ." Nov. 2006 SAI at 2 (Curley Decl. Exh. J) (Short Term Fund); *see also id.* at 3 (High Income and Intermediate Bond Funds).[6]

A second limitation related to liquidity, the ability to sell securities to meet redemptions. The Funds disclosed a non-fundamental investment restriction (*i.e.*, a restriction that could be changed by the Board) that each fund "[m]ay not purchase any security if, as a result, more than 15% of its net assets would be invested in securities that are illiquid because they are subject to legal or contractual restrictions on resale or because they cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued." *Id.* at 4; *see also*

---

[6]    Section 8(b)(1)(E) of the ICA requires an investment company to disclose in its registration statement the investment company's policy with respect to concentrating its investments in a particular industry or group of industries, with "concentration" typically defined as an investment of more than 25% of its assets in the securities of issuers in a single industry. *See* 15 U.S.C. § 80a-8(b)(1)(E); Form N-1A, Item 4(b)(1), Instruction 4 (Curley Decl. Exh. X).

*id.* at 2. This liquidity restriction applies at the time of purchase. *See id.* In the event that more than 15% of a Fund's assets *subsequently become* illiquid due to unfavorable market conditions, the Funds were not required to sell illiquid holdings. *See id.* Rather, they stated that they "would consider appropriate steps to protect liquidity." *Id.* at 4. MAM, as investment adviser to the Funds, was given authority to make judgments on whether securities were liquid under a multifactor test. *Id.* at 29.

Finally, the Funds were to provide a daily net asset value ("NAV") per share, the price at which Fund shares would be sold or redeemed. The Prospectuses disclosed the procedures for calculating NAV, stating that the Funds would use closing market prices or market quotations for portfolio securities when readily available. *See, e.g.,* Nov. 2006 Prosp. at 40 (Curley Decl. Exh. I). When closing market prices or market quotations were not available or considered to be unreliable, the Funds disclosed that they could use a security's fair value, *id.* at 40, and disclosed that such fair value would be determined in good faith by the Adviser's Valuation Committee using procedures established by, and under the supervision of, MK Select's Board. *Id.*[7]

## B.    The Funds' Performance and the Credit Crisis

For the seven years preceding the credit crisis in mid-2007, the Funds performed well by any measure. As the CAC acknowledges, as of December 31, 2006, the annualized return from inception (in 1999) for each class of the High Income Fund ranged from 12.49-13.32%, the Intermediate Fund's annualized return ranged from 7.29-7.95% and the Short Term Fund ranged from 3.8-5.25%. (CAC ¶ 399.) Fund analyst Morningstar described the Funds' performance as "impressive" and the Intermediate Fund ranked ahead of "98% of intermediate-term bond category

---

[7]    The requirements under the ICA for calculating NAV are set out at 15 U.S.C. § 80a-2(a)(41); 17 C.F.R. § 270.2a-4(a). There is no allegation that the procedures set out in the Prospectuses were not in compliance with these requirements.

rivals." Lawrence Jones, *Regions Morgan Keegan Select Hi Inc. C RHICX*, Morningstar's Take, Feb. 14, 2006 (Curley Decl. Exh. KK); Lawrence Jones, *Regions Morgan Keegan Select Int Bd C RIBCX*, Morningstar's Take, Jul. 3, 2006 (Curley Decl. Exh. LL). The Funds performed so well that Morningstar awarded the Intermediate and High Income Funds its prestigious five-star rating. (CAC ¶ 140.)

As disclosed, the Funds could and did invest in a wide variety of bonds and other debt-related instruments, including ordinary corporate bonds, loans, mortgage-backed securities, asset-backed securities and other credit products. The Funds had no difficulty buying and selling these securities prior to the credit crisis in 2007, as evidenced by the financial statements in the Annual Report incorporated into the Prospectus that reveal a high portfolio turnover rate throughout this period.[8]

This changed abruptly in mid-2007, when unprecedented problems in the subprime mortgage market triggered a credit crisis that caused steep declines in the value of virtually all asset classes. Economists now trace the roots of the crisis in significant part to deterioration in the market for mortgage-backed securities, particularly those composed of subprime mortgages, which ultimately declined in value more than other classes of assets.[9]

The CAC euphemistically refers to the sudden freezing of the worldwide credit markets as "shifting market sentiments," suggesting something gradual and measured. (*See, e.g.,* CAC ¶ 4.)

---

[8]    *See, e.g.,* MK Select, Semi-Annual Report, Dec. 31, 2006 at 52-55 (Curley Decl. Exh. U).

[9]    Initially, the prevailing view was that mortgage-related losses would be limited. *See* Ben S. Bernanke, Chairman, Bd. of Gov'rs of Fed. Reserve Sys., *The Economic Outlook*, Testimony Before the Jt. Econ. Comm., U.S. Cong., Mar. 28, 2007 (Curley Decl. Exh. Y) ( "[T]he impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."). And, even if mortgage-related losses were to spread, effects were widely expected to be temporary. *See* Int'l Monetary Fund, *Global Financial Stability Report*, April 2007, at 7 (Curley Decl. Exh. BB) ("[E]ven under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses.").

But the downturn accelerated dramatically in June 2007. Two Bear Stearns-related hedge funds had incurred significant losses in mortgage-backed securities and Bear Stearns had agreed to loan the funds $3.2 billion to bail them out. Kate Kelly & Serena Ng, *Lifeline: Bear Stearns Bails Out Fund with Big Loan*, Wall St. J., June 23, 2007, at A-1 (Curley Decl. Exh. II); *see also* Kate Kelly, Serena Ng, & David Reilly, *Two Big Funds at Bear Stearns Face Shutdown*, Wall St. J., June 20, 2007, at A-1 (Curley Decl. Exh. HH).

A few weeks later, on July 11, 2007, Standard & Poor's and Moody's Ratings Services downgraded more than 1,000 bonds valued at over $17 billion. Serena Ng & Ruth Simon, *Ratings Cuts by S&P, Moody's Rattle Investors*, Wall St. J., July 11, 2007, at A-1 (Curley Decl. Exh. CC). As former Federal Reserve Chairman Alan Greenspan explained, "[o]n August 9, 2007, and the days immediately following, financial markets in much of the world seized up. Virtually overnight, the insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged." Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec. 12, 2007 (Curley Decl. Exh. FF).[10] As a result, a significant portion of even the highest-rated securities held by the Funds essentially became illiquid overnight.

---

[10]    In effect, "the markets for subprime mortgage-backed securities became illiquid at the very time that highly leveraged investors such as hedge funds needed to adjust positions or trade out of losing positions . . . . As a result, hedge funds stopped trading, and the [CDO] market and related credit derivatives markets essentially ceased to exist." Randall Dodd, *Subprime: Tentacles of a Crisis*, Fin. & Dev. (Int'l Monetary Fund), Dec. 2007, at 6 (Curley Decl. Exh. GG). The Bank of England's *Financial Stability Report* issued in October 2007 is to the same effect:

> [L]osses in [Mortgage Backed Securities] seemed to trigger a wider loss of confidence in all structured credit products and rating agencies' valuation models. A vicious spiral appeared to begin in which heightened uncertainty about the future value of complex assets and rising risk aversion caused many investors to want to sell but few to buy. Prices fell well outside the range of historical experience and in some cases there appeared to be no market-clearing price for some assets. Investors who had mistakenly made inferences about market and liquidity risk from credit ratings incurred large unexpected losses, contributing to further pressure to sell.

Bank of England, *Financial Stability Report*, Oct. 2007, at 19 (Curley Decl. Exh. EE).

The bond ratings downgrades continued into October 2007, when Moody's downgraded thousands more mortgage-backed securities originally worth $33.4 billion. *See* Aparajita Saha-Bubna & Carrick Mollenkamp, *CDO Ratings Are Whacked by Moody's*, Wall St. J., Oct. 27, 2007, at B-1 (Curley Decl. Exh. DD). As Chairman Bernanke testified, "[a]s mortgage losses have mounted, investors have questioned the reliability of credit ratings, especially those of structured products." Ben S. Bernanke, Chairman, Bd. of Gov'rs of Fed. Reserve Sys., *The Economic Outlook*, Testimony Before the Joint Econ. Comm., U.S. Cong., Nov. 8, 2007 (Curley Decl. Exh. AA).[11]

As the crisis exploded onto the front pages, many investors in the Fund reacted by redeeming their shares. During July and August 2007, investors in the High Income Fund alone redeemed $375 million, more than a third of the total assets of that Fund. (*See* CAC ¶ 326.) On August 13, 2007, the Funds disclosed that they had retained Hyperion Brookfield Asset Management ("Hyperion") as a valuation consultant because of the inherent difficulty of valuing assets for which there suddenly was no market, and further discussed the liquidity and valuation difficulties. *See* MK Select, Prosp. Supp., Aug. 13, 2007 (Curley Decl. Exh. K).

There is no question that the unprecedented and unforeseen credit crisis caused the Funds' losses. The CAC admits as much. (CAC ¶ 121 ("[I]n the summer of 2007, buyers of, including purported market makers for, these financial instruments . . . purchased by the Funds disappeared . . . . caus[ing] the values of all similar types of such securities to drop dramatically . . . .

---

[11]    None of this was foreseen by high-level economic policymakers. To the contrary, Chairman Bernanke testified in March 2007 that "[o]verall, the economy appears likely to continue to expand at a moderate pace over coming quarters. As the inventory of unsold new homes is worked off, the drag from residential investment should wane. Consumer spending appears solid, and business investment seems likely to post moderate gains." Bernanke, *The Economic Outlook*, Mar. 28, 2007 (Curley Decl. Exh. Y). Then-Treasury Secretary Henry Paulson testified in June 2007 that "[t]he global economy continues to be very robust." Henry M. Paulson, Jr., Secretary, Dept. of the Treasury, *The State of the Int'l Fin. Sys.*, Testimony Before the House Comm. on Fin. Servs., U.S. House of Reps., June 20, 2007 (Curley Decl. Exh. Z).

translat[ing] into losses in the Funds' net asset value per share . . . .") Plaintiffs' current claims, however, seek a guarantee against these losses based on the assertion that the Funds failed to make adequate disclosures. These are nothing more than "fraud-by-hindsight" claims.

## II.    The Parties

Plaintiffs purport to represent essentially two overlapping classes: (1) persons who purchased shares in the Funds between December 6, 2004, and December 6, 2008; and (2) persons who held shares in the Funds on July 1, 2007, and sold the shares after that date for an amount less than that day's NAV, or an amount less than the purchase price. These classes purport to include all Trusts and Custodial Accounts for which Regions Bank is a trustee or a directed trustee, custodian, or agent. (CAC ¶ 106.)   Within these classes Plaintiffs further seek to represent an alleged "Fiduciary Subclass" consisting of beneficiaries of trusts or fiduciary accounts managed by RMK Trust, and on whose behalf investments were made in the Funds. (*Id.* ¶ 107.)

The CAC names 26 Defendants and an unspecified number of John Does.  The named defendants include Morgan Keegan, a registered broker-dealer with 400 offices in 19 states and more than 4500 employees.  Morgan Keegan acted as underwriter and distributor of the Funds' shares.  Pursuant to a Fund Accounting Services Agreement, it also provided the Funds with administrative and accounting services. (*Id.* ¶ 45.)

MAM is a registered investment adviser that served as the Funds' investment adviser pursuant to an Investment Advisory Agreement. (*Id.* ¶ 40.)  MAM employee James Kelsoe served as the Funds' portfolio manager. (*Id.* ¶ 83.)  MAM managed the Funds' portfolio securities until July 29, 2008.  On that date, Hyperion assumed the role of investment adviser to the Funds and MAM ceased any relationship with the Funds.  MAM is a wholly owned subsidiary of MK Holding. (*Id.* ¶ 40.)  Both MK Holding and Morgan Keegan are subsidiaries of Regions Financial Corporation ("Regions"), a publicly held bank holding company. The remaining Defendants are the

Funds' outside auditor, PricewaterhouseCoopers ("PwC"), individual officers and directors of the various corporate entities named in this action, including officers of MAM, Morgan Keegan and MK Select, and the former independent directors of MK Select and the Funds.[12]

## APPLICABLE LEGAL STANDARDS

**I.      Federal Rule of Civil Procedure 12(b)(6)**

In *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the minimum pleading standards for a complaint, holding that Rule 8(a)(2) requires a "showing" by a plaintiff that he is entitled to relief and that this substantive threshold is not achieved by "blanket assertion[s]." *Id.* at 555 n.3.  Thus, to survive a motion to dismiss under Rule 12(b)(6), allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555.  Stating a claim for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted).

Just last year, in *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court expounded on *Twombly*'s underlying principles.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Id.* at 1949.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.  A complaint has "facial plausibility" when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.  The inference of a "mere possibility of misconduct" is insufficient. *Id.* at 1950; *see also Hensley Mfg., Inc.* v. *ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir.

---

[12]      To the extent relevant to this motion, Morgan Keegan, MAM, and MK Holding incorporate the arguments set forth in the separate motions to dismiss made by Regions, PwC, the Independent Officers and Directors, and the other Individual Defendants.

13

2009).

## II.    Federal Rule of Civil Procedure 9(b) and the PSLRA

The CAC is also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) requires that all averments of fraud or mistake be pleaded with particularity. *See Coffey* v. *Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993). A plaintiff implicates Rule 9(b) where, as here, the complaint "sounds in fraud" by alleging "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citation and internal quotation marks omitted). Rule 9(b) applies even where a non-fraud cause of action is premised on allegations of fraud. *See Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (applying Rule 9(b) to claims under §§ 11 and 12(a)(2)).

All of Plaintiffs' claims are based upon allegations of fraud. For example, Plaintiffs allege that "[e]ach of the RMK Defendants is liable as a participant in a *fraudulent scheme and course of conduct that operated as a fraud or deceit* on purchasers of the Funds [sic] shares by disseminating materially false and misleading statements and/or concealing material adverse facts." (CAC ¶ 103 (emphasis supplied).) Furthermore, Plaintiffs rely upon the same allegations to plead all of their causes of action (*See, e.g.,* CAC ¶¶ 685, 709, 743, 753), and thus, cannot disclaim reliance on fraud allegations to avoid the pleading requirements of Rule 9(b). *See Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006).

The PSLRA also requires that where Plaintiffs invoke § 10(b) and Rule 10b-5, as they do here, they must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

14

formed." *See* 15 U.S.C. § 78u-4(b)(1).

## ARGUMENT

**I.    Plaintiffs' claims of corporate mismanagement are not actionable under the federal securities laws.**

Plaintiffs cast this action as one based on alleged omissions.  As discussed below, they can do so only by ignoring the disclosure requirements set by law and the actual disclosures in the Funds' offering documents.  When the allegations in the CAC are examined in light of what the law requires and the Funds' actually disclosed, what emerges are claims for losses allegedly incurred as a result of mismanagement, which are not actionable under the federal securities laws, and which may be pursued, if at all, derivatively (as Plaintiffs are doing in a separate action).

The CAC expressly asserts that the Plaintiffs lost money because the Funds were mismanaged.  This kind of claim, however, cannot be maintained under the federal securities laws. *See Sante Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 474-80 (1977).[13]  Indeed, when the "central thrust" of the claim is mismanagement rather than concealment of material information, a complaint should be dismissed. *See Panter* v. *Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (quotations and citations omitted).

The CAC is often quite upfront about its central premise.  It alleges that by early 2007, Defendants Regions, MAM, and Morgan Keegan had "knowledge of the subprime market [sic] imminent collapse" but they inexplicably failed to pass this foresight on to other Defendants, or Defendants "ignored such information and failed to take measures necessary to avoid or minimize

---

[13]    The "federal securities laws were not intended to create a federal remedy for corporate misconduct traditionally left to state regulation, including 'transactions which constitute no more than internal corporate mismanagement' or breach of fiduciary duties." *Andropolis* v. *Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007) (citing and quoting *Sante Fe Indus.* v. *Green*, 430 U.S. at 474-79). Moreover, "a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Id.* at 682 (citations omitted); *Levine* v. *Prudential-Bache Prop., Inc.*, 855 F. Supp. 924, 934 (N.D. Ill. 1994).

the losses the Funds' shareholders accrued later in 2007 and 2008." (CAC ¶ 340.)

These are not isolated allegations. The CAC is replete with other charges of mismanagement as well. For example, when describing the issues common to the proposed class, Plaintiffs cast their claims in terms of alleged mismanagement:

- "Whether Defendants are responsible for the omissions of material facts in connection with the Funds' sales of their shares during the Class Period regarding the Funds' noncompliance with their respective investment objectives, policies and restrictions, the uncertain value of the Funds' assets, the Funds' pricing, the Funds' valuation practices, the illiquidity of the Funds' assets, and the risks involved in owning the Funds' shares, including concentration, credit, and illiquidity risks and valuation uncertainty, as alleged herein." (*Id.* ¶ 111(f).)

- "Whether the Funds were managed in a manner inconsistent with their respective objectives, policies, and investment restrictions and RMK Defendants' representations about how the Funds would be managed." (*Id.* ¶ 111(h).)

- "Whether the RMK Defendants engaged in, or failed to identify, portfolio transactions that were inconsistent with the Funds' investment objectives, policies and restrictions and that violated the 1940 Act as alleged herein." (*Id.* ¶ 111(i).)

- "Whether the Funds, Morgan Keegan, and [MAM] affirmatively determined the liquidity of each security, or lack thereof, purchased by the Funds at the time of purchase." (*Id.* ¶ 111(j).)

Thus, Plaintiffs themselves acknowledge that the heart of their complaint is assertions of mismanagement.

Plaintiffs likewise assert that their losses were caused by mismanagement of the Funds:

- "These extraordinary losses in share value were caused . . . by the failure of the Funds to have complied with required and disclosed procedures relating to the manner in which the Funds' assets were invested, the maintenance of the liquidity of their assets, the lack of liquidity in their Funds' portfolios, the pricing of their assets, the valuation procedures used to price the assets, the uncertainty inherent in the estimated value of their assets, and/or the failure to disclose such breaches and failures and conditions in the Funds' portfolios . . . ." (*Id.* ¶ 120.)

- "The Funds' extraordinary losses were not caused by economic or market forces or by forces that could not have been largely or completely ameliorated or avoided if the Funds' [sic] had been managed in accordance with their disclosed investment objectives, policies and restrictions and applicable regulatory limitations regarding restricted (*i.e.*, illiquid) securities." (*Id.* ¶ 122.)

- "[T]he Funds' management failed to implement the necessary risk management procedures to avoid the catastrophic losses incurred by the Funds." (*Id.* ¶ 144.)

- Claiming that the "collapse of the Funds' respective net asset values, and the resulting catastrophic losses suffered by Plaintiffs and members of the Class and Subclass" was because the Funds failed: (1) to pursue their disclosed investment objectives; (2) to adhere to their investment restrictions regarding liquidity and concentration; (3) to properly manage its portfolio to take account of uncertainty in the estimated values of certain securities; (4) to manage themselves in a manner consistent with the way other funds against which they were benchmarked were managed; and (5) to properly diversity credit risk to avoid a risky concentration of assets. (*Id.* ¶¶ 318-21.)

Plaintiffs build on their mismanagement theme in the more than 140 paragraphs appearing under the caption "Defendants' Undisclosed and Misrepresented Risks and Violations of the Funds' Investment Objectives, Policies and Restrictions" (*Id.* ¶¶ 161-305):

- "During the Class Periods, the Funds were managed so that the Funds were exposed to substantial liquidity risk . . . ." (*Id.* ¶ 181.)

- "The RMK Defendants mismanaged the Funds and wasted their assets . . . ." (*Id.* ¶ 215.)

- "Contrary to how the RMK Defendants said they would manage the Funds, the RMK Defendants failed to manage the Funds to maintain liquidity and stable NAVs." (*Id.* ¶ 272.)

- "Instead of adhering to this fundamental investment restriction [regarding concentration], the RMK Defendants managed the Funds in such a manner as to expose them to concentration risk . . . ." (*Id.* ¶ 275.) "The Funds violated the investment restriction against investing more than 25% in the same industry . . . ." (*Id.* ¶ 276.)

- "[T]he Funds were managed by the RMK Defendants in such a manner as to expose them to an undisclosed concentration of credit and market risk . . . ." (*Id.* ¶ 283.)

Plaintiffs' listing of "Defendants' Misrepresentations and Omissions" likewise is nothing more than a recitation of investment guidelines and objectives coupled with allegations that the Funds failed to

meet them. (*See, e.g., Id.* ¶¶ 371-72, 374-77.) [14]

Claims that a defendant mismanaged a mutual fund so that the assets of the fund were diminished and the shares of the fund lost value are derivative claims and may not be asserted directly by a shareholder. *See, e.g., In re Charles Schwab Corp. Sec. Litig.*, 2009 WL 1371409, at *6 (N.D. Cal. May 15, 2009) ("If . . . plaintiffs' theory is one of mismanagement of the corporation somehow led to diminution in the fund's assets, that too must be a derivative claim . . . ."); *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 U.S. Dist. LEXIS 1542, at *20 (S.D.N.Y. Jan. 17, 2006) ("[D]efendants failed to disclose information to investors and mismanaged the Funds . . . . are claims of mismanagement of assets by defendants which fail to allege any injury independent of the alleged injury to the Funds."); *Stegall* v. *Ladner*, 394 F. Supp. 2d 358, 364 (D. Mass. 2005) ("Plaintiff's allegations relate to a diminution in the total assets of the Funds and only derivatively did this injury harm each shareholder."); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 464 (D.N.J. 2005) (claims of misconduct that "reduced the net asset per share value" did not constitute "an injury distinct from that suffered by the funds" and were derivative); *In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 626 (D.N.J. 2005) ("[T]he injury [Defendants] allegedly caused Fund shareholders (depletion of Fund assets) is indistinguishable from injury they caused the Funds themselves: the mere fact that Fund assets ultimately belong to the Fund shareholders does not render depletion of those assets injury suffered by the shareholders that is distinct from injury suffered by the Funds."). [15]

---

[14]    Plaintiffs also tie their claims to alleged injuries to the Funds: "With respect to any applicable statute of limitations, this action was commenced . . . within one year of the date *on which the Funds were injured or became aware of their injury*." (CAC ¶ 674 (emphasis supplied).)

[15]    Numerous courts have reached like conclusions. *See In re Am. Funds Fees Litig.*, 2005 U.S. Dist. LEXIS 41884, at *18-19 (C.D. Cal. Dec. 16, 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 234 (S.D.N.Y. 2005), *aff'd sub nom Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 U.S. Dist. LEXIS 94, at *13-15 (S.D.N.Y. Jan. 6,

The fact that Plaintiffs' claims, although often couched in allegations of nondisclosure, are in fact claims for mismanagement is confirmed by the fact that many of these same Plaintiffs, represented by the same lawyers, are pursuing a derivative action in this Court on behalf of MK Select based on the very same allegations of mismanagement. *See Landers* v. *Morgan Asset Mgmt, Inc.*, No. 2:08-cv-02260-SHM-dvk (W.D. Tenn.). Vast sections of the complaints in both actions are substantially identical. (*Compare, e.g.,* CAC ¶ 215 *with Landers* FADC ¶ 163; CAC ¶¶ 275, 283, 319 *with Landers* FADC ¶¶ 201, 209, 245; CAC ¶ 674 *with Landers* FADC ¶ 688.) The wholesale overlap of the allegations in these pleadings demonstrates that the claims brought here are claims of mismanagement and, as such, Plaintiffs have not stated a direct claim under the federal securities laws.

## II.   Plaintiffs do not have standing to pursue "holder" claims.

The second class defined in the CAC consists of "holders"—*i.e.*, persons "[w]ho refrained from redeeming" from March 1, 2007 to April 30, 2008. (CAC ¶ 2(a)(2).) These claims are purportedly brought under §§ 11 and 10(b). (CAC ¶¶ 697-707 (§ 11 claim); 742-57 (§ 10(b) claims).) Allegations premised on a shareholder's "holding" of securities do not give rise to claims under the 1933 Act or 1934 Act.

In *Blue Chip Stamps* v. *Manor Drug Stores*, the Supreme Court ruled that holders of securities are barred from bringing an action under § 10(b) and Rule 10b-5 because a person must be a "purchaser or seller" of securities to have standing to assert such claims. 421 U.S. 723, 754-55 (1975). The Supreme Court explained that holders of securities do not fit within the statutory

---

2000); *In re Merrill Lynch & Co. Research Reports Sec. Litig.* (*"In re Merrill Lynch"*), 272 F. Supp. 2d 243, 260 (S.D.N.Y. 2003); *Argiropoulos* v. *Kopp*, 2007 U.S. Dist. LEXIS 22351, at *18 (D. Md. Mar. 26, 2007); *Penn Mont Secs.* v. *Frucher*, 502 F. Supp. 2d 443, 463 (E.D. Pa. 2007); *Kramer* v. *Western Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988).

definition of a "purchaser or seller" because they "are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." *Id.* at 737-38.

Plaintiffs' holder claims fit squarely within the *Blue Chip Stamps* rule. Plaintiffs allege that shareholders held their shares and did not redeem them at earlier higher NAVs because of the alleged misrepresentations and/or omissions. (CAC ¶¶ 747, 751, 757.)  The class definition includes investors "[w]ho refrained from redeeming the Funds' shares." (CAC ¶ 2(a)(2).)  These allegations make clear that Plaintiffs "are actual[ly] shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." *Blue Chip Stamps*, 421 U.S. at 749.  Thus, they have no claim under § 10(b) or Rule 10b-5. [16]

Although *Blue Chip Stamps* considered holder claims in the context of § 10(b), the purchaser/seller standing requirement applies equally to Plaintiffs' 1933 Act claims. *See Simmons* v. *Wolfson*, 428 F.2d 455, 456 (6th Cir. 1970) ("[O]nly purchasers have standing to sue for violations of the 1933 Act.").  This is consistent with the plain text of § 11, which allows claims only by a person "*acquiring* such security." 15 U.S.C. § 77k(a) (emphasis supplied).  Plaintiffs likewise cannot base their § 11 claim on holder allegations.

## III.    The Funds disclosed all required information regarding an investment in the Funds.

While at bottom Plaintiffs' claims are that the Funds were mismanaged, they attempt to

---

[16]    Members of the putative "Fiduciary Subclass" similarly do not have standing to bring a claim under § 10(b) or Rule 10b-5, because as beneficiaries of a trust account, these putative class members did not purchase or sell securities. *See Blue Chip Stamps, supra*; *see also Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co., Inc.*, 800 F.2d 177, 181 (7th Cir. 1986) (holding that beneficiaries had no standing to bring § 10(b) claim); *Rabin* v. *JPMorgan Chase Bank.*, 2007 WL 2295795, at *4-5 (N.D. Ill. Aug. 3, 2007) (same). *But see James v. Gerber Prods. Co.*, 483 F.2d 944, 948 (6th Cir. 1973) (Pre-*Blue Chip Stamps* case holding that beneficiary of testamentary trust had standing).

bootstrap these into disclosure claims under §§ 11 and 12(a)(2) of the 1933 Act by alleging that the Funds' offering documents, principally their Prospectuses, failed to disclose information concerning the general risk associated with an investment in the Funds and the risk associated with liquidity, concentration and pricing of the Funds' portfolio securities.  (CAC ¶¶ 370-401.)  But because the Funds fully disclosed the risks associated with investing in the Funds, Plaintiffs' claims must fail.

Section 11 of the 1933 Act provides that a person acquiring such security may sue specified persons if any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[17]  15 U.S.C. § 77k(a).  Section 12 provides a right of action against those who "sell" securities by means of a prospectus which contains an untrue statement of material fact or which omits to state a material fact necessary in order to make statements made not misleading. 15 U.S.C. § 77l(a)(2).  The Supreme Court has held that the prospectus referred to in § 12 is the prospectus contained in the registration statement.  *See Gustafson* v. *Alloyd Co., Inc.*, 513 U.S. 561 (1995).  Therefore, Plaintiffs' claims place at issue the Prospectus used by the Funds, and the SAI and Annual Report incorporated as permitted by SEC regulations.

Plaintiffs allege omissions, principally undisclosed risks.  To state a claim under § 11 based on alleged omissions, there must be a duty to disclose the allegedly omitted material information. *See In re Morgan Stanley Tech. Fund Sec. Litig.* ("*Morgan Stanley I*"), 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd sub nom In re Morgan Stanley Info. Fund Sec. Litig.* (*Morgan Stanley II*), 2010 WL 252294 (2d Cir. Jan. 25, 2010); *see also In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.* ("*In re MLIM*"), 434 F. Supp. 233, 237 (S.D.N.Y. 2006); *In re Merrill Lynch*, 272 F. Supp. 2d at

---

[17]     As an initial matter, an investment adviser to the Funds such as MAM is not among those who may be held liable for alleged violations of § 11.  *See* 15 U.S.C. § 77k(a); *see also Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 382 n.13 (1983).

248. "A duty to disclose arises either (1) through an explicit regulatory or statutory requirement, or (2) when the omitted information is otherwise 'material,' or in other words, 'when disclosure is necessary to make prior statements not misleading.'" *In re MLIM*, 434 F. Supp. 2d at 238 (quoting *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)). To be material, the allegedly omitted information must be such that "a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *Id.* (quoting *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997)). Plaintiffs may not rely on hindsight, but rather, must allege facts that show a defendant "possessed the omitted information at the time the registration statement became effective." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (quotations and citations omitted). Indeed, "[t]he securities laws do not require clairvoyance in the preparation of offering documents, and a misstatement or omission can only be actionable where it was material as of the date the offering documents became effective." *Blackmoss Inv., Inc.* v. *ACA Capital Holdings, Inc.*, 2010 U.S. Dist. LEXIS 2899, at *18-19 (S.D.N.Y. Jan. 14, 2010) (quotations and citations omitted).[18]

"Whether a duty to disclose exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder." *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) (citations omitted), *aff'd in relevant part* 2009 U.S. App. LEXIS 20652 (2d Cir. Sept. 17, 2009). The disclosure requirements concerning the Funds' offering documents are governed, in significant part, by Form N-1A (Curley Decl. Exh. X), which "is promulgated by the SEC and sets forth detailed requirements for information to be included in a prospectus." *Benzon* v. *Morgan Stanley Distribs., Inc.*, 420 F.3d

---

[18] Because Plaintiffs allege that the Funds' misrepresentations and omissions were fraudulent (*see, e.g.,* CAC ¶ 103), they also must describe each alleged omission with the particularity required by Rule 9(b). *See Indiana State Dist. Council of Laborers* v. *Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir. 2009).

598, 608 (6th Cir. 2005); *see also* 17 C.F.R. §§ 270.8b-10.

"The purpose of the prospectus is to provide *essential information* about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus." *Morgan Stanley I*, 643 F. Supp. 2d at 375 (quoting Form N-1A). "Funds should limit disclosure in prospectuses generally to information that is necessary for an average or typical investor to make an investment decision. Detailed or highly technical discussions, as well as information that may be helpful to more sophisticated investors, dilute the effect of necessary prospectus disclosure . . . ." *Blackmoss Inv., Inc.*, 2010 U.S. Dist. LEXIS 2899 at *22. And, there is no obligation to disclose "general risks that are present throughout the market." *Morgan Stanley II*, 2010 WL 252294, at *12, or to disclose general economic matters, trends and possibilities or other things that have "become 'matters of general public knowledge.'" *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (quoting *Seibert* v. *Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)).

### A.     The Funds disclosed the risk inherent in the Funds' portfolios.

As set forth below, the Funds' offering documents disclosed the risk factors which Plaintiffs allege were omitted. Such "disclosure of information alleged in the Complaint to have been withheld from prospective investors renders the Complaint insufficient as a matter of law." *Blackmoss Inv., Inc.*, 2010 U.S. Dist. LEXIS 2899 at *21-22.

#### 1.     The Funds disclosed the reasonably foreseeable risks associated with an investment in the Funds.

Form N-1A requires a fund to disclose investment objectives and principal investment strategies, certain investment restrictions and guidelines, and "the principal risks of investing in the Fund, including the risks to which the Fund's particular portfolio as a whole is expected to be subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, or total return." Form N-1A, Item 4(b) and (c) (Curley Decl. Exh. X). A more expansive

discussion of a fund's objective strategies and risks is called for in the SAI. *See id.* Part B, Item 11.

Plaintiffs allege that the Funds failed to disclose the true "credit risk" posed by the Funds' portfolios and that the undisclosed risk resulted in their loss. (CAC ¶¶ 248-266; 283.) Since at least 2005, however, the Funds' offering documents have contained disclosures of credit risk, generally, and warned specifically of the risk and effect of possible broad-based drops in the market.[19]

As an initial matter, each of the Funds fully disclosed its principal investment strategies and the principal risks associated with an investment in the Fund as required by Form N-1A. Each of the Funds disclosed that up to a certain percentage of each Fund's portfolio could be invested in debt securities and, in particular, below investment grade debt securities. *See* Nov. 2006 Prosp. at 2 (Short Term); 10 (Intermediate); 18-19 (High Income) (Curley Decl. Exh. I). The Funds also disclosed the risks associated with an investment in such securities, including their "speculative" nature. *Id.* at 3-4 (Short Term); 11-12 (Intermediate); 20-22 (High Income). These risk disclosures ranged from those that were general in nature (*e.g.*, "you could lose money by investing in the fund;" "the performance of the fund depends on the Adviser's ability to implement the fund's investment strategies," *id.* at 20), to very detailed disclosures about the risks associated with investments in junk bonds and asset-backed securities (*e.g.*, "Below investment grade debt securities are commonly referred to as 'junk bonds' and . . . involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or

---

[19]    Though all prospectuses included discussion of "credit risk" and included similar or partial explanations and warnings regarding such risk, the November 2005 Prospectuses offered extensive detail:

> Credit risk is the risk that the issuer of the bond will not pay or is perceived as less likely to pay the interest and principal payments when due. Bond prices typically decline if the issuer's credit quality deteriorates. The ability of the issuers of the securities held by the fund to meet their obligations might be affected by economic developments in a specific industry, state or region. . . . A broad-based market drop may also cause a bond's price to fall.

Nov. 2005  Prosp. at 3, 10, & 17 (Curley Decl. Exh. F).

change, than higher-rated debt securities." *Id.* at 18, 20-22). The Funds' SAI, which is part of the registration statement and is incorporated into the Prospectus, contained even broader and more detailed risk descriptions. *See* Nov. 2006 SAI at 4-34 (Curley Decl. Exh. J). The Funds' duty of disclosure required nothing more. *See* Reg. Form Used by Open-End Inv. Mgmt. Cos., Inv. Co. Act Rel. No. 23064, 1998 SEC LEXIS 438, at *88 (Mar. 13, 1998) (fund must disclose "risks to which the fund's particular portfolio as a whole is expected to be subject and to discuss the circumstances that are reasonably likely to affect adversely the fund's net asset value, yield, or total return").

The Funds' offering documents also included specific risk disclosures regarding the types of securities in which the Funds might invest:

1) **Commercial Mortgage-Backed Securities (All Funds)** – "Commercial mortgage-backed securities generally are multi-class debt or pass-through certificates secured by mortgage loans on commercial properties . . . . [C]ommercial lending generally is viewed as exposing the lender to a greater risk of loss than one- to four-family residential lending . . . . [A]dverse changes in economic conditions and circumstances are more likely to have an adverse impact on mortgage-backed securities secured by loans on commercial properties than on those secured by loans on residential properties." Nov. 2006 SAI at 7 (Curley Decl. Exh. J).

2) **Collateralized Mortgage Obligations ("CMOs") (All Funds)** – "Some CMO classes are structured to pay interest at rates that are adjusted in accordance with a formula, such as a multiple or fraction of the change in a specified interest rate index, so as to pay at a rate that will be attractive in certain interest rate environments but not in others . . . . The market value of such securities generally is more volatile than that of a fixed rate obligation . . . ." *Id.* at 8.

3) **Adjustable Rate Mortgage Securities ("ARM Securities") (All Funds)** – "ARM securities represent a right to receive interest payments at a rate that is adjusted to reflect the interest earned on a pool of ARMs . . . . Borrowers under ARMs experiencing negative amortization may take longer to build up their equity in the underlying property and may be more likely to default." *Id.* at 9.

4) **Credit-enhanced Securities (All Funds)** – "Credit enhancements do not provide protection against changes in the market value of the security . . . . Delinquency or loss in excess of that anticipated could adversely affect the return on an investment in such a security." *Id.* at 10.

5) **Subordinated Securities (All Funds)** – "Subordinated Securities have no governmental guarantee, and are subordinated in some manner as to the payment of principal and/or interest to the holders of more senior mortgage-backed or asset-

backed securities arising out of the same pool of assets . . . . Subordinated Securities generally are likely to be more sensitive to changes in prepayment and interest rates, and the market for such securities may be less liquid than is the case for traditional fixed-income securities and senior mortgage- or asset-backed securities." *Id.* at 10-11.

6) **Collateralized Bond Obligations ("CBOs") (All Funds)** – "Collateralized bond obligations . . . are structured securities backed by a diversified pool of high yield, public or private fixed income securities . . . . Lower CBO tranches represent lower degrees of credit quality and pay higher interest rates that are intended to compensate for the attendant risks . . . . The return on the lower tranches of CBOs is especially sensitive to the rate of defaults in the collateral pool." *Id.* at 12.

7) **Collateralized Loan Obligations ("CLOs") (All Funds)** – "Collateralized loan obligations . . . are asset-backed securities issued by a trust or other entity that are collateralized by a pool of loans, which may include, among others . . . loans that may be rated below investment grade or equivalent unrated loans. . . . Like the underlying loans, CLOs are subject to credit risk." *Id.* at 12.

8) **Below Investment Grade Bonds (All Funds)** – "Below investment grade bonds have poor protection with respect to the payment of interest and repayment of principal, or may be in default. These securities are often considered to be speculative and involve greater risk of loss or price changes due to changes in the issuer's capacity to pay. The market prices of below investment grade bonds may fluctuate more than those of higher-quality debt securities and may decline significantly in periods of general economic difficulty . . . ." *Id.* at 13.

Largely ignoring these disclosures, Plaintiffs allege that the Funds failed to disclose an "extraordinarily heavy concentration of credit risk." (CAC ¶ 372(f).) This allegation does not support a claim. *First*, Plaintiffs' attempts to characterize the gravity of any particular risk cannot undermine the detailed and specific warnings of the risks associated with each type of security that the Funds might purchase. The Funds disclosed that their portfolios held significant percentages of below investment grade debt securities[20] and the risk attendant to such investments. *See, e.g.,* Nov.

---

[20] By way of example, the High Income Fund's prospectus disclosed, throughout the class period, that the Fund "seeks to achieve its objectives by investing a majority of its assets in below investment grade debt securities" and that "[u]p to 100% of the fund's total assets may consist of debt securities that are rated below investment grade and their unrated equivalents." Nov. 2004 Prosp. at 6 (Curley Decl. Exh. A); Nov. 2005 Prosp. at 16 (Curley Decl. Exh. F); Nov. 2006 Prosp. at 18 (Curley Decl. Exh. I). *See also* Nov. 2004 Prosp. at 1 (Curley Decl. Exh. A) (noting that the Intermediate Fund "may invest up to 35% of its assets in below investment grade bonds"); Nov. 2005 Prosp. at 9 (Curley Decl. Exh. F)(same); Nov. 2006 Prosp. at 10 (Curley Decl. Exh. I) (same).

2005 SAI at 6-32 (Curley Decl. Exh. G). Moreover, the individual securities in each portfolio were listed by category in the Annual Report, Semi-Annual Report and quarterly filings. *See* MK Select, Semi-Annual Report, Dec. 31, 2004 (Curley Decl. Exh. O); MK Select, Annual Report, June 30, 2005 (Curley Decl. Exh. P); MK Select, Semi-Annual Report, Dec. 31, 2005 (Curley Decl. Exh. Q); MK Select, Quarterly Schedule of Assets, May 30, 2006 (Curley Decl. Exh. R); MK Select, Annual Report, June 30, 2006 (Curley Decl. Exh. S); MK Select, Quarterly Schedule of Assets, Nov. 28, 2006 (Curley Decl. Exh. T); MK Select, Semi-Annual Report, Dec. 31, 2006 (Curley Decl. Exh. U); MK Select, Quarterly Schedule of Assets, May 30, 2007 (Curley Decl. Exh. V); MK Select, Annual Report, June 30, 2007 (Curley Decl. Exh. W). *Second*, Plaintiffs plead no facts to support the existence of any undisclosed "extraordinary" risk at the time of the effective date of the Funds' offering documents (*i.e.*, Nov. 2006) or that such a risk was knowable at that time. The Funds' respective performance from mid-2007 onward in the wake of the credit crisis is irrelevant hindsight.

### 2.   The Funds' performance and peer comparisons fail to give rise to a duty to make additional risk disclosures.

Plaintiffs mischaracterize the Funds' extensive risk disclosures as "limited and generalized" and claim that these "disclosures . . . were negated and rendered immaterial by" the Funds' historically stable NAV, which reflected consistent returns and limited volatility.   (CAC ¶¶ 381, 395.) In other words, according to Plaintiffs, the Funds' record of past stability and success should somehow as a matter of law be deemed to negate or override the Funds' actual disclosures of risk. This makes no sense, and there is no law to support this radical notion. Indeed, "[i]t is well-established . . . that [d]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy," and "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Pollio* v. *MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009)

(quotations and citations omitted); *see also In re Aetna, Inc. Sec. Litig.*, 2009 WL 1619636, at *24 (E.D. Pa. June 9, 2009) (same). Here, of course, the risks related to portfolio securities were disclosed. No one—not even the Chairman of the Federal Reserve System—predicted the credit crisis in mid-2007.

Plaintiffs also inappropriately challenge the adequacy of the Funds' risk disclosures by comparing the Funds' underperformance relative to "peer" funds in 2007. This apples-and-oranges comparison is simply wrong. *See Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("It is hardly a sound argument . . . to say that some other unspecified income funds performed better. That is only to say in hindsight that the managers of those funds turned out to be more skillful in their predictions."); *see also In re Huntington Bancshares Inc. Sec. Litig.*, 2009 WL 4666455, at *6 (S.D. Ohio Dec. 4, 2009) (rejecting allegations of fraud by hindsight); *In re the Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 903-904 (N.D. Ohio 2006) (same). Plaintiffs also compare the risk disclosures contained in the prospectus for the Multi-Sector High Income Fund (a closed-end fund that is not at issue in this action) with the Funds' disclosures. Relying on this comparison, Plaintiffs conclude that the "High Income and Intermediate Funds inadequately warned investors of the true risks embedded in those funds," in light of the allegation that "the Intermediate Fund performed worse, in terms of its NAV, than did the Multi-Sector High Income Fund." (CAC ¶ 419; *see also id.* ¶¶ 249-250, 402-420.)

Plaintiffs allege that the MK Select Multi-Sector High Income Fund ("Multi-Sector Fund") provided superior disclosure in its prospectus that showed that an investment in that fund was "fraught with significantly greater risk," (CAC ¶ 419), effectively arguing that the Multi-Sector Fund adequately warned of such risks, while the High Income Fund and the Intermediate Fund did not. Plaintiffs set forth the purported differences in Appendix F to the CAC, which uses the formulation "no similar prospectus disclosure" when attempting to highlight supposed omissions

from the Funds' documents.  Plaintiffs can make this claim only by ignoring the Funds' SAI, which is incorporated into the Funds' Prospectus, so that the additional disclosures must be considered as a matter of law when evaluating Plaintiffs' claims.  *See* Form N-1A, General Instructions D(1)(b) (Curley Decl. Exh. X).  The SAI, in fact, sets out a detailed description of the characteristics and risks of the securities in which the Funds may invest, and "a summary of related risks."  *See, e.g.,* Nov. 2006 SAI at 4-34 (Curley Decl. Exh. J); Nov. 2005 SAI at 6-32 (Curley Decl. Exh. G).  A handful of examples shows how inherently misguided Plaintiffs' argument is:

Appendix F, (CAC at pg. 386), highlights the following language in the Multi-Sector Fund prospectus concerning below investment grade securities:  "These securities are less liquid than investment grade securities."  The language set out by Plaintiffs in their Appendix from the High Income and Intermediate Funds identifies no similar statement.  The Funds' 2006 SAI and 2005 SAI, however, contains an extended discussion of below investment grade securities that states in relevant part: "The market for below investment grade bonds may be thinner and less active than for higher quality debt securities, which can adversely affect the prices at which the former are sold. . . . Adverse publicity and changing investor perceptions may affect the liquidity of below investment grade bonds."  Nov. 2006 SAI at 13-14 (Curley Decl. Exh. J); Nov. 2005 SAI at 14-15 (Curley Decl. Exh. G).

In another example, CAC Appendix F indicates the Funds omitted significant disclosure concerning "Illiquid and Restricted Securities Risk."  (*See* CAC at pg. 387.)  Almost all of this disclosure appears *verbatim* in the Funds' SAI, along with an extended discussion of Rule 144A. *See* Nov. 2006 SAI at 29-30 (Curley Decl. Exh. J); Nov. 2005 SAI at 27-28 (Curley Decl. Exh. G). In the same vein, the allegedly omitted discussion of mortgage-backed securities (*see* CAC at pg. 391) is included in even greater detail in the 2006 SAI.  *See* Nov. 2006 SAI at 5-10 (Curley Decl. Exh. J); *see also* Nov. 2005 SAI at 7-11 (Curley Decl. Exh. G).  The same is true for the allegedly

omitted discussion of asset-backed securities, (CAC at pg. 392), which appears in the SAI. *See* Nov. 2006 SAI at 4-5 (Curley Decl. Exh. J); Nov. 2005 SAI at 6-7 (Curley Decl. Exh. G). A final glaring example appears on page 390 of the CAC, where Appendix F cites the Multi-Sector Fund's discussion of the importance of the adviser's research and analysis. Although the CAC alleges that there is no similar disclosure, the language appears *verbatim* in the Funds' SAI. *See* Nov. 2006 SAI at 14 (Curley Decl. Exh. J); Nov. 2005 SAI at 14-15 (Curley Decl. Exh. G).[21]

**B.      The Funds fully disclosed the liquidity risk and no additional disclosures were required.**

Plaintiffs allege that the Funds failed to adequately disclose the extent to which the Funds would invest in "illiquid" securities, or securities for which a market might not be readily available. (*See generally* CAC ¶¶ 161-215.) As discussed below, this assertion is untrue.

It is important to recognize that the principal reasons for liquidity in mutual fund portfolios is to enable funds to meet redemptions, to provide flexibility in portfolio management, and to facilitate valuation, not to assure that any particular security or class of securities does not decline in price. *See, e.g.,* Repurchase Offers by Closed-End Mgmt. Inv. Co., Inv. Co. Act Rel. No. 19,399, 1993 SEC LEXIS 782, at *7 (Apr. 7, 1993) (liquidity requirements ensure portfolio securities can be sold and proceeds used to meet redemptions in a timely manner). Here, any alleged lack of liquidity did not injure shareholders. Despite massive redemptions beginning in July 2007, the Funds were able to meet all redemption requests in a timely manner. In any event, the Funds fully disclosed the potential economic liquidity risk associated with the Funds' portfolio securities.

**1.      The Funds' offering documents fully disclosed the liquidity risk associated with the Funds' portfolio securities.**

The Funds' offering documents contained extensive discussions of the liquidity risk for

---

[21]      The High Income and Intermediate Funds' November 2004 SAI contains similar extensive disclosures. *See* Nov. 2004 SAI at 3-28 (Curley Decl. Exh. B).

specific types of securities in which the Funds might invest, including, *inter alia*, below investment

grade bonds, subordinated securities, and certain categories of asset-backed securities. *See* Nov.

2006 SAI at 8, 10, 13, 29-30 (Curley Decl. Exh. J). In November 2004, the Funds' SAI specifically

warned:

> Illiquid securities may be difficult to dispose of at a fair price at the times when
> either fund believes it is desirable to do so. The market price of illiquid securities
> generally is more volatile than that of more liquid securities, which may adversely
> affect the price that each fund pays for or recovers upon the sale of illiquid securities.
> Illiquid securities are also more difficult to value and thus the Adviser's judgment
> plays a greater role in the valuation process. Investment of each fund's assets in
> illiquid securities may restrict each fund's ability to take advantage of market
> opportunities. The risks associated with illiquid securities may be particularly acute
> in situations in which each fund's operations require cash and could result in each
> fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid
> securities.

Nov. 2004 SAI at 23 (Curley Decl. Exh. B); *see also* Nov. 2005 SAI at 27 (Curley Decl. Exh. G);

Nov. 2006 SAI at 29 (Curley Decl. Exh. J). Finally, the Funds disclosed that any illiquid securities

were generally fair valued, and such securities carried the additional risks that their values may be

subjective and vulnerable to changing market sentiments. *See, e.g.*, Nov. 2005 SAI at 28 (Curley

Decl. Exh. G).

    The Funds' SAI noted that the Funds would invest significantly in below investment grade

securities.[22] Indeed, although Plaintiffs claim that the disclosures were "incomplete, limited and

misleading," Plaintiffs concede that the registration statements did warn of the liquidity risks

associated with such securities. (CAC ¶ 380.) As previously discussed, the Funds disclosed that

certain specific securities in their portfolios, such as subordinated securities and junk bonds,

---

[22]    *See, e.g.*, Nov. 1, 2004 Prosp. (High Income) at Cover Page (Curley Decl. Exh. A); Nov. 1, 2005
Prosp. (High Income) at Cover Page (Curley Decl. Exh. F); *see also* Lawrence Jones, *Regions Morgan
Keegan Select Int Bd C RIBCX*, Morningstar's Take, July 3, 2006 (Curley Decl. Exh. LL) (warning investors
in the Intermediate Bond Fund that the majority of the Fund's investments were rated BBB, which "can be
downgraded to junk status, making them more volatile and less liquid").

traditionally bore liquidity risk. *See* Nov. 2006 SAI. at 10-11, 13-14, 29-30 (Curley Decl. Exh. J).

The foregoing disclosures standing alone are sufficient to defeat Plaintiffs' claim. Plaintiffs' own pleadings, however, further demonstrate they were made aware, at all relevant times, of the nature of the Funds' portfolio securities and the liquidity risk associated with such holdings. The numbers and calculations upon which Plaintiffs rely in the CAC were taken directly from the Funds' annual and semi-annual reports, which were readily available to Plaintiffs throughout the class period. For example, Plaintiffs posit that "restricted securities are illiquid," and allege that, under their definition of an "illiquid security," the Funds violated the stated 15% restriction on illiquid securities in every year of the class period, as early as 2004. (CAC ¶ 183.) Plaintiffs base this allegation on information purportedly taken from the Funds' Annual, Semi-Annual, and Quarterly Reports, starting in 2004. (CAC ¶¶ 170; 183.)

Plaintiffs' premise is wrong. Since the promulgation of SEC Rule 144A in 1990, qualifying "restricted" securities have been freely tradable among institutional investors. The SEC expressly contemplated that Rule 144A securities could be determined to be liquid by investment companies for purposes of calculating liquidity percentages. *See* Resale of Restricted Securities, Inv. Co. Act Rel. No. 17,452, 1990 SEC LEXIS 739, at *2, 7-8 (Apr. 23, 1990).

But even accepting Plaintiffs' premise that restricted securities such as Rule 144A securities are illiquid, the liquidity risk in the Funds' portfolios was fully disclosed. Throughout the alleged class period, the Annual Reports and Semi-Annual Reports specifically identify each portfolio security that the Fund deems to be liquid under Rule 144A.[23] The allegedly "illiquid" component of each portfolio was thus disclosed.

Moreover, contrary to Plaintiffs' allegations, the risks of the Rule 144A market were

---

[23]    These securities are marked with an "(a)" in the Schedule of Investments, with the explanation that the Adviser has determined these securities to be liquid.

disclosed in the Funds' offering documents: "[a]n insufficient number of qualified institutional buyers interested in purchasing Rule 144A-eligible securities held by a fund, however, could affect adversely the marketability of such portfolio securities and a fund might be unable to dispose of such securities promptly or at reasonable prices." Nov. 1, 2006 SAI at 30 (Curley Decl. Exh. J); Nov. 1, 2005 SAI at 28 (Curley Decl. Exh. G).

Finally, in case there were any doubt, as early as 2003, leading mutual fund analyst Morningstar commented on the High Income Fund's "heavy tilt towards asset-backeds, which can be illiquid."[24] All this, in combination with the Funds' quarterly disclosures of portfolio securities, put any reasonable investor on notice that securities in the Funds' portfolio bore significant liquidity risk.

### 2.      The Funds had no duty to make additional disclosures regarding liquidity.

Plaintiffs claim that additional disclosures regarding liquidity were required because the Funds allegedly exceeded applicable investment limitations concerning the purchase of illiquid securities. (*See, e.g.,* CAC ¶¶ 180-182; 380.) This is incorrect. *First*, the CAC is devoid of any allegations that the Funds purchased illiquid securities in violation of any applicable investment limitation. *Second*, as discussed above, whether the Funds violated any particular investment limitation is a question of mismanagement and not whether the Funds violated a duty of disclosure under the federal securities laws.

The Funds disclosed that they may not "purchase any security if, as a result, more than 15% of its net assets would be invested in securities that are illiquid because they are subject to legal or contractual restrictions on resale or because they cannot be sold or disposed of in the ordinary

---

[24]      Lynn Russell, *Regions Morgan Keegan Select Hi Inc. C RHICX*, Morningstar's Take, Mar. 3, 2003 (Curley Decl. Exh. JJ).

course of business at approximately the prices at which they are valued."[25]  Nov. 2006 SAI at 4

(Curley Decl. Exh. J); *see also id.* at 2.  The Funds further disclosed that:

> [W]henever an investment policy or limitation states a maximum percentage of a
> fund's assets that may be invested in any security or other asset, or sets forth a
> policy regarding quality standards, such standard or percentage limitation will be
> determined at the time of a fund's acquisition of such security or other asset.
> Accordingly, any subsequent change in values, net assets or other circumstances
> will not be considered when determining whether the investment complies with a
> fund's investment policies and limitations.

*Id.* at 1 (Curley Decl. Exh. J).

    Thus, the Funds' disclosures made clear that the relevant inquiry is whether the purchase of

a particular security would result in more than 15% of net assets being in illiquid securities, not

whether subsequent events changed the liquidity of securities held by the Funds.  *Id.*  So, while

Plaintiffs contend that the percentage of illiquid securities held by the Funds exceeded 15% at

various points in time (CAC ¶ 164), they plead no particularized facts demonstrating that this was

the result of the purchase of an illiquid security.

    As noted above, what Plaintiffs include in their definition of an illiquid security is based on

a number of false assumptions.  (*See generally Id.* ¶¶ 172-215.)  For example, while Plaintiffs allege

that "[r]estricted securities are illiquid securities," (*Id.* ¶ 177), it is indisputable that the SEC

contemplated that large numbers of technically "restricted" fixed income securities would be traded

in a large, liquid institutional market under the authority of SEC Rule 144A.  *See* Inv. Co. Act Rel.

No. 17,452, 1990 SEC LEXIS 739, at *2, 7-8.  This market is fully described in the Funds' SAI,

along with the risks related to liquidity of these securities.  Nov. 1, 2006 SAI at 30 (Curley Decl.

---

[25]    The Funds defined "illiquid investments" as "investments that cannot be sold or disposed of in the
ordinary course of business at approximately the prices at which they are valued."  Nov. 2006 SAI at 29
(Curley Decl. Exh. J).  The Funds further disclosed that "[i]nvestments currently considered by the Adviser
to be illiquid include repurchase agreements not entitling the holder to repayment of principal and payment
of interest within seven days, non-government stripped fixed-rate mortgage-backed securities," and OTC
options.  *Id.*

Exh. J).

Again, Plaintiffs are questioning management's judgment, not the Funds' disclosures. Relevant SEC guidance states that whether a given security is "illiquid" defies the easy categorization suggested by Plaintiffs, and, rather, is subjective. An "illiquid" security is "any security that cannot be disposed of within seven days in the ordinary course of business at approximately the amount at which the company has valued the instrument." Inv. Co. Act Rel. No. 17,452, 1990 SEC LEXIS 739, at *41-42. The Funds' board had discretion to determine whether a restricted security is illiquid: "[t]he determination of the liquidity of Rule 144A securities [*i.e.*, restricted securities] in the portfolio of an investment company issuing redeemable securities is a question of fact for the board of directors to determine, based on the trading markets for the specific security." *Id.* at 41.[26] The SEC has declined to "require[e] that any particular factors be considered by investment companies in making liquidity determinations," but noted that "factors that would be reasonable for a board of directors to take into account" would include the frequency of trades and price quotations for the security, the number of potential purchasers such as dealers willing to purchase/sell the security, dealer undertakings to make a market in the security, and the nature of the security and the marketplace in which it trades. *Id.* at 43. The board may delegate the liquidity determinations to the adviser, as this board did here with MAM, subject to oversight.[27] Given this wide-ranging discretion, any allegation that Defendants committed an error in judgment in

---

[26]     *See also* Merrill Lynch Money Markets Inc., SEC No-Action Letter, 1994 SEC No-Act. LEXIS 236, at *2 (Jan. 14, 1994) ("The Commission has, however, permitted an open-end investment company's board of directors to determine that Rule 144A and foreign securities are liquid, despite their restricted nature. Similarly, in reliance on the Commission's position, the staff has stated that a fund's board of directors may determine that certain mortgage-backed securities and municipal lease obligations are liquid using the same Rule 144A analysis.").

[27]     *See* Nov. 2006 SAI, at 29 (Curley Decl. Exh. J).  SEC guidance has indicated that boards may delegate day-to-day determinations of liquidity to the adviser subject to oversight. *See* Inv. Co. Rel. No. 17,452, 1990 SEC LEXIS 739, at *41 n.61.

determining the liquidity or illiquidity of a given security at most alleges mismanagement.

**C.      The Funds adequately disclosed the Funds' fair valuation procedures and the associated risks.**

Plaintiffs allege that the Funds' offering documents failed to disclose how the Funds calculated NAV, including how certain securities were "fair valued."   (CAC ¶¶ 216-247.) Significantly, Plaintiffs do not allege that as a result of the fair value procedures any specific security was mispriced or that the Funds' NAV were wrong at any specific point, with the result that any purchaser paid too much for shares in any Fund.  Instead, Plaintiffs allege that fair valued securities had "uncertain values" that were subject to becoming "unsalable at their estimated values upon shifting market sentiments." (*See, e.g.,* CAC ¶ 22.)  In other words, if the market's appetite for a security declines, that security is likely to decline in price.  These allegations on their face do not state a claim.

But in any event, the Funds' fair value practices and the consequences of fair valuation were fully disclosed.  Regarding valuation, Form N-1A requires funds to "provide a brief explanation of the circumstances under which it will use fair value pricing and the effects of fair value pricing." Form N-1A, Item 6(a)(1) (Curley Decl. Exh. X); *see also id.*, Item 18(c)(1) (requiring a description of valuation procedures used to determine NAV and the public offering price of a fund's shares); Inv. Co. Act. Rel. No. 23,064, 1998 SEC LEXIS 438, at *21-22 (requiring funds to follow "principles of plain English, using language that is concise, straightforward and easy to understand").

As early as 2005 and certainly by 2006, the Funds disclosed the circumstances in which a security would be fair valued:

> When price quotations for certain securities are not readily available or if the available quotations are not believed to be reflective of market value, those securities shall be valued at "fair value" as determined in good faith by the Adviser's Valuation Committee.   Such determinations shall be made in accordance with procedures approved by the Funds' Board.  A fund may use the fair value of a security to

> calculate its NAV when, for example, (1) a portfolio security is not traded in a public market or the principal market in which the security trades is closed, (2) trading in a portfolio security is suspended and not resumed prior to the normal market close, (3) a portfolio security is not traded in significant volume for a substantial period, or (4) the Adviser determines that the quotation or price for a portfolio security provided by a dealer or independent pricing services is inaccurate.

Nov. 2006 Prosp. at 40 (Curley Decl. Exh. I); *see also* Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F).

The Funds fully disclosed that fair value pricing was a subjective process, which was done "in good faith by the Adviser's Valuation Committee . . . . in accordance with the procedures approved by the Funds' Board." *Id.* The Funds also disclosed the factors considered by the Valuation Committee in determining fair value. *See* Nov. 2006 Prosp. at 41 (Curley Decl. Exh. I). These detailed disclosures far exceeded the Funds' duty to disclose the circumstances under which the Funds would use fair value pricing and the valuation process. (CAC ¶ 222.)[28]

Likewise, by at least 2005, the Funds disclosed the effects of using fair value pricing as required by Form N-1A, including price volatility and the uncertain ability to sell such assets at a fair price.

Concerning price volatility, as early as 2005, the Funds' SAI cautioned,

> Fair valuations generally remain unchanged until new information becomes available. Consequently, changes in the fair valuation of portfolio securities may be less frequent and of greater magnitude . . . .

Nov. 2005 SAI at 38 (Curley Decl. Exh. G); *see also* Nov. 2006 SAI at 41 (Curley Decl. Exh. J) (same). The June 30, 2005 Annual Report added, "because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a

---

[28]    The Funds had no duty to disclose which of the Funds' assets were fair valued, or the effect of a "hypothetical percentage change" in the estimated value of the Funds' securities. (CAC ¶ 224.) The Funds were only required to disclose the circumstances under which the Fund would use fair value pricing and the effects of using such pricing. *See* Form N-1A, Item 6(a)(1) (Curley Decl. Exh. X).

ready market for the investments existed, and the differences could be material." MK Select, Annual Report, June 30, 2005 at 54 (Curley Decl. Exh. P).

Also, as early as 2005, the Funds' prospectus plainly stated, "There can be no assurance that a fund could purchase or sell a portfolio security at the [fair value price] used to calculate the Fund's NAV." Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F); *see also* Nov. 2006 Prosp. at 40 (Curley Decl. Exh. I). The SAI contained similar cautionary language. *See* Nov. 2005 SAI at 38 (Curley Decl. Exh. G); Nov. 2006 SAI at 41 (Curley Decl. Exh. J).

The Funds' disclosure regarding the reason for fair value pricing (when market quotes were not readily available) and the examples of the types of securities that would be fair valued (securities "not traded in a public market" or "not traded in significant volume for a substantial period"), *see, e.g.,* Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F), put reasonable investors on notice of the effects of using fair value pricing. Plaintiffs do not identify any additional material information omitted from the Funds' offering documents.

Furthermore, Plaintiffs concede that by November 2006, they were aware of "the substantial judgment and subjectivity required to derive [fair] values, the vulnerability of [fair] valuations to changing market sentiments, the complexity of [fair-valued securities], and the adverse effect" that these factors may have on the liquidity of fair-valued securities.[29] (CAC ¶ 222(h)(4).) Finally, the

---

[29]    In their allegations concerning the November 2004 and 2005 Prospectuses, Plaintiffs complain that the Funds' failure to disclose the manner of fair value pricing hid from investors "the substantial judgment and subjectivity required to derive [fair values], the vulnerability of [fair] valuations to changing market sentiments, the complexity of [fair-valued securities], and the adverse effect" that these factors may have on the liquidity of fair-valued securities. (CAC ¶¶ 222(b)(4) and 222(e)(4).)

Three subparagraphs later, Plaintiffs assert that as of the filing of the Funds' November 2006 Prospectus, they were on notice of "the substantial judgment and subjectivity required to derive [fair] values, the vulnerability of [fair values] to changing market sentiments, the complexity of [fair-valued securities], and the adverse effect" that these factors may have on the liquidity of fair-valued securities. (CAC ¶ 222(h)(4).) This language is copied from one section alleging inadequacies of the November 2004 and 2005 Prospectuses and pasted verbatim into the section referring to what had been "reveal[ed]" to investors at the time of the filing of the November 2006 Prospectus. (*Id.*)

Funds' disclosures have always included a thorough description of the process by which NAV is calculated, including the use of fair value estimates to support the calculation.[30] By at least 2005, the Funds specifically cautioned that the Funds' calculation of NAV was subject to a degree of uncertainty and unreliability.[31] Indeed, any reasonable investor would conclude that if certain of the Funds assets may be fair valued,[32] and fair values "do not necessarily represent amounts that might ultimately be realized,"[33] the resulting NAV necessarily would have a degree of uncertainty associated with it.

In sum, by 2005, the Funds had fully disclosed the circumstances and effects of fair value pricing; namely, that the Funds might fair value securities under certain circumstances, that the valuation process was subjective, that the decision as to which assets would be fair valued was delegated to the discretion of the adviser, MAM, and that fair values were "inherently uncertain" and could differ significantly and materially from the values that might be realized upon sale.

Because Plaintiffs fail to allege that Defendants had any duty to make additional disclosures or that additional disclosures would be material to the average investor, their claims based on "fair value" pricing fail.

### D.    The Funds met the duty of disclosure regarding concentration.

Form N-1A requires the disclosure of "any policy to concentrate securities of issuers in a particular industry or group of industries (*i.e.*, investing more than 25% of a Fund's net assets in a

---

[30]    *See, e.g.*, Nov. 2004 Prosp. (High & Intermediate Funds) at 16-17 (Curley Decl. Exh. A); Feb. 2005 Prosp. (Short-Term Fund) at 13 (Curley Decl. Exh. C).

[31]    For example, the Funds' November 2005 Prospectus cautioned, "There can be no assurance that the Fund could purchase or sell a portfolio security at the price used to calculate the Funds' NAV." Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F); Nov. 2006 Prosp. at 41 (Curley Decl. Exh. I) (same).

[32]    Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F); Nov. 2006 Prosp. at 41 (Curley Decl. Exh. I).

[33]    Nov. 2005 SAI at 38 (Curley Decl. Exh. G); Nov. 2006 SAI at 41 (Curley Decl. Exh. J).

particular industry or group of industries)." Form N-1A, Item 4(b)(4) (Curley Decl. Exh. X).  In accordance with this requirement, the Funds disclosed that:

> **Each fund may not:** . . . Purchase any security (other than U.S. Government Securities) if, as a result, 25% or more of the fund's total assets (taken at current value) would be invested in any one industry (in the utilities category, gas, electric, water and telephone companies will be considered as being in separate industries).

Nov. 2006 SAI at 2 (Curley Decl. Exh. J); *see also id.* at 3.  Plaintiffs contend that the Funds violated this investment restriction by holding more than 25% of the Funds assets in securities from the "mortgage loan industry" and that the Funds failed to disclose this.[34]  (CAC ¶ 276, 282.) Plaintiffs, however, fail to allege facts demonstrating that there was any such violation to disclose. Moreover, as is the case with Plaintiffs' claims concerning liquidity, claims involving the Funds' concentration limitation are, in effect, claims that defendants mismanaged the funds.

Plaintiffs base their allegations on the flawed premise that the "mortgage loan industry" constitutes a single "industry."  Relevant SEC guidance states that "[i]n determining industry classifications, the staff will ordinarily use the current Directory of Companies Filing Annual Reports with the Securities and Exchange Commission, (the "Directory") published by the Commission."  Reg. Form used by Open-end Inv. Mgmt. Inv. Co., Inv. Co. Act Rel. No. 13,436, 1983 SEC LEXIS 1030, at *207 (Aug. 12, 1983).  The CAC certainly does not identify any "mortgage loan industry" derived from the SEC's Directory.[35]  This is not surprising because using

---

[34]    As discussed in connection with Plaintiffs' allegations regarding liquidity, throughout the alleged class period, the Annual Reports, Semi-Annual Reports, and Quarterly Reports specifically identified each portfolio security held by the Funds.  At all relevant times the Funds' "concentration" of securities in any one industry were available for all to see.

[35]    For all filings with the SEC, corporations also are instructed to classify their businesses by using the Standard Industrial Classification ("SIC") Code List.  "The Standard Industrial Classification ('SIC') system is a categorization scheme devised by the Office of Management and Budget commonly used in developing industry economic profiles." *Am. Iron & Steel Inst.* v. *OSHA*, 939 F.2d 975, 985 n.6 (D.C. Cir. 1991).  The SIC list contains codes for hundreds of industries, but no code exists for a so-called "mortgage loan industry." *See* Office of Management and Budget, Standard Industrial Classification Manual (1987); http://www.sec.gov/info/edgar/siccodes.htm (last accessed Feb. 9, 2010).

"mortgage loan industry" would result in an overly broad classification—a result which the SEC staff has cautioned investment companies to avoid: "Classifications should not be so broad that the primary economic characteristics of the companies in one class are materially different." Guidelines for the Preparation of Form N-8B-1, Item 4(d), Inv. Co. Act Rel. No. 7,221, 1972 SEC LEXIS 1494, at *25 (June 9, 1972).

Plaintiffs purport to tally the reported percentages of various types of securities such as home equity loans, CMOs, manufactured housing loans, and commercial and residential mortgage backed securities from the Funds 2005 annual and semi-annual reports. (CAC ¶¶ 278-81.)[36] Plaintiffs allege that the Funds' cumulative holdings of these various securities ranged from 27% to 45% of total assets. (*Id.*) At best, what Plaintiffs allege is that the Funds held more than 25% of their securities in several industries that might be related to mortgages, rather than in a single, so-called "mortgage loan industry." This is clearly insufficient. *See, e.g., Phillips* v. *Morgan Stanley Dean Witter High Income Adv. Trust III,* 2002 WL 31119441, at *3-4 (S.D.N.Y. Sept. 25, 2002) (holding plaintiffs failed to state a valid claim regarding industry concentration when they alleged defendants over-concentrated in a general telecommunications "group of industries").

Finally, this limitation restricts a Fund from purchasing a security if, when it "[p]urchase[s] any security . . . as a result, 25% or more of the fund's total assets (taken at current value) would be invested in any one industry." Nov. 2006 SAI at 2 (Curley Decl. Exh. J); *see also id.* at 3. It is the position of the SEC staff that "when securities of a given industry come to constitute more than

---

[36]     Plaintiffs also allege that Defendants mischaracterized "preference shares" as "preferred stock" and "Corporate Bonds-Special Purpose Entities" as "corporate bonds," when, according to Plaintiffs, both were types of asset-backed securities. (CAC ¶¶ 284-292.) Plaintiffs, however, do not identify any particular security that the Funds allegedly mischaracterized and provide no support for their allegations that these securities were mischaracterized, apart from a self-published marketing piece authored by Craig McCann, an expert witness soliciting claimants pursuing claims against Morgan Keegan. (*Id.* ¶¶ 286, 289.) Plaintiffs ignore the fact that the Funds followed the Bloomberg characterization of the securities in question.

25% of the value of the Registrant's assets by reason of changes in value in either the concentrated securities or the other securities, the excess need not be sold." Inv. Co. Act Rel., No. 7,221, 1972 SEC LEXIS 1494, at *25. Even if Plaintiffs' mischaracterization of a "mortgage loan industry" is accepted, they have alleged no facts sufficient to determine whether the alleged excessive concentration was due to securities purchased or to a change in value of the securities already held by the Funds.[37]

### E.    The Funds' offering documents properly included returns of an appropriate broad-based market index.

Form N-1A requires a fund to select a "broad-based market index" against which it must compare the Fund's performance in its registration statement and other public filings. Form N-1A, Items 2(c)(2)(iii); 22(b)(7), Instruction 5 (Curley Decl. Exh. X). Plaintiffs challenge the Funds' choice of various Lehman and CSFB indices, arguing that the Funds should have used different indices that Plaintiffs claim more closely corresponded to the content of the Funds' portfolios. (CAC ¶¶ 371(m); 372(o); 374(u); 375(w); 376(n); 377(o).) Mere quibbling with the Funds' exercise of their discretion in choosing an index is insufficient to state a claim under the federal securities laws.

Funds are afforded "considerable flexibility in selecting a broad-based index that [the fund] believes best reflects the market(s) in which it invests." Disclosure of Mut. Fund Performance & Portfolio Managers, Inv. Co. Act. Rel. No. 19,382, 1993 SEC LEXIS 780, *17 (April 6, 1993). The only requirement is "that a broad-based securities market index, such as the S&P 500, the Nikkei Index, or the Lehman Corporate Bond Index be used," and that the broad-based index "provide[]

---

[37]    Plaintiffs' allegations further demonstrate that the allegedly omitted information was available to Plaintiffs as early as 2005. For example, Plaintiffs claim in the CAC that the Funds' June 30, 2005, Annual Report revealed that all three of the Funds had invested more than 25% of each Fund's assets in a single industry, as that term is defined by the Plaintiffs. (CAC ¶¶ 278, 280, 281.)

investors with a performance indicator of the overall applicable stock or bond markets, as appropriate." *Id.* at *19 n.21; *see also* Inv. Co. Act Rel. No. 23,064, 1998 SEC LEXIS 438, at *57. Otherwise, the SEC imposes only general limitations on a fund's discretion to choose a comparable index, requiring that "the index [be] created and administered by an organization that is not an affiliated person of the fund, its adviser or principal underwriter, unless the index is widely recognized and used." Inv. Co. Act Rel. No. 19,382, 1993 SEC LEXIS 780 at *21.[38] Given the degree of discretion afforded to funds in choosing an index, the Funds met their duty of disclosure regarding the inclusion of the indices at issue.

### F.   Plaintiffs' claim that the Funds used "implicit leverage" fails to state a violation of applicable investment guidelines and restrictions.

The Funds' investment guidelines restrict the Funds from "[b]orrowing money, except that the fund may borrow money for temporary or emergency purposes (not for leveraging or investment) in an amount not exceeding 33 1/3% of its total assets . . . ." Nov. 2006 SAI at 3 (Curley Decl. Exh. J). Plaintiffs attempt to bootstrap this into a "misrepresentation" by alleging that the Funds violated this restriction by investing in subordinated tranches of structured securities that, Plaintiffs speculate, bore risk equivalent to buying securities on margin, or with "implicit leverage." (CAC ¶¶ 293-305.) This allegation is without merit—the restriction speaks to borrowing money, not to the possibility of exposure to "leveraged credit risk."

---

[38]   The SEC requires the Funds to choose an index to give prospective investors an idea of how the Fund is performing versus the broader "market" as a whole. *See* Inv. Co. Act Release No. 19,382, 1993 SEC LEXIS 780 at *19. It is not intended to constitute a representation that "the risk of the [Funds] was approximately that of the [chosen] indices and that the Fund[s'] portfolio composition was approximately that of the [chosen] indices. . . ." (CAC ¶ 371(m).) The SEC specifically has rejected such an interpretation, holding that Funds are not required to undertake a "peer group" comparison where a fund would be required to show how the fund "performed in comparison with other funds having similar investment objectives. The Commission has not adopted this approach." Inv. Co. Act. Rel. No. 19,382, 1993 SEC LEXIS 780 at *19-20.

**G.    Federal law did not impose a duty on the Funds to disclose the other information called for by Plaintiffs.**

Plaintiffs assert various other "omissions,"[39] essentially alleging that the Funds failed to predict the future because the Funds did not disclose the exact time and manner in which each of the otherwise disclosed risk factors might materialize.  Plaintiffs further allege that the Funds were required to disparage their portfolios by referring to "extraordinary" credit risk and "complex, exotic" securities. (*See, e.g.*, CAC ¶ 182.)   Such allegations amount to nothing more than stylistic quibbling with the manner in which the disclosures were made or the emphasis with which they were made, and do not state a claim under the federal securities laws. *See Recupito* v. *Prudential Sec., Inc.*, 112 F. Supp. 2d 448, 457 (D. Md. 2000) (holding that there is no duty to characterize subordinated commercial mortgage-backed securities as "extremely illiquid"); *see also Sheppard* v. *TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (no duty to characterize mortgage-backed securities as "exotic mortgage derivatives," or "describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested").

Similarly, Plaintiffs allege that the Funds "did not disclose the extent to which the Funds' investments were vulnerable to losses incurred on these highly risky [asset- and mortgage-backed securities]. . . ." (CAC ¶ 257.)  Plaintiffs then proceed to quote thirty pages from the prospectus of an unspecified security in which the Funds allegedly invested, and then assert, in conclusory fashion, that "[t]he Funds' prospectuses did not disclose the risks identified in the preceding [thirty-page] paragraph." (*Id.* at 258-259; *see also* ¶¶ 261-262.)  The Funds had no duty to reprint or

---

[39]     Plaintiffs' CAC rests almost entirely on omissions regardless of Plaintiffs' characterizations of certain statements as "misrepresentations." *See, e.g., Morgan Stanley I*, 643 F. Supp. 2d at 380.  In any event, Plaintiffs cannot manufacture "laundry lists" of allegedly false or misleading statements, then create a parallel list of purported reasons why the listed statements were allegedly misleading. (CAC ¶¶ 370-401.) This practice "falls short of describing the reason or reasons *why* each statement was misleading." *In re Goodyear Sec. Litig.*, 436 F. Supp. 2d at 904.  Plaintiffs cannot "repeatedly refer[] to a list of alleged improprieties that may or may not have anything to do with the statements" listed. *Id.*

otherwise provide such disclosures merely because the Funds may have held the security in question. Indeed, to do so would be contrary to SEC guidance. *See* Inv. Co. Act. Rel. No. 23,064, 1998 SEC LEXIS 438, at *87-88 ("In the Commission's view, disclosing the risks of each possible portfolio investment, rather than the overall risks of investing in a fund, does not help investors evaluate a particular fund or compare the risks of the fund with those of other funds."); *see also Stonecipher* v. *Lehman ABS Corp.*, 2006 U.S. Dist. LEXIS 34146 (S.D.N.Y. May 26, 2006). Moreover, Plaintiffs have pleaded no facts demonstrating why the thirty pages of disclosures quoted were material to the Funds' holdings as a whole, and not just to a single, unspecified security.

## H.   Plaintiffs' allegations against PwC do not give rise to liability against Morgan Keegan.

Plaintiffs assert claims against PwC in its capacity as the Funds' auditor, alleging that PWC violated GAAP and GAAS by failing to uncover the same alleged misrepresentations and omissions that Plaintiffs allege the Funds had a duty to disclose. (CAC ¶¶ 421-610.)  Where Plaintiffs allege that offering documents are misleading due to noncompliance with GAAP or GAAS, their pleading must satisfy a high degree of particularity. *See N.Y. State Teachers' Ret'mt Sys.* v. *Fremont Gen. Corp.*, 2009 WL 3112574, *13 (C.D. Cal. Sept. 25, 2009); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1181-82, 1186 (N.D. Cal. 2004).  They fail to do so here.

Moreover, to the extent Plaintiffs' claims against Morgan Keegan are premised on the incorporation of any allegedly false and misleading financial statements into the Funds' registration statement, § 11 provides an affirmative defense for underwriters who reasonably rely on auditors' statements. Here, the CAC does not adequately allege that Morgan Keegan's (or any Defendants') reliance on PwC's accounting-related statements during this period was unreasonable. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008). For this reason, the allegations against PwC do not support a claim against other Defendants.

I.      **Plaintiffs fail to specify each Defendant's role in the allegedly fraudulent scheme.**

Rule 9(b) and the PSLRA require Plaintiffs to plead each defendant's involvement in making each allegedly fraudulent statement. *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 985 (S.D. Ohio 2008). Instead, Plaintiffs rely on the bare assertions that the "RMK Defendants caused the Funds to" commit certain acts that purportedly constituted securities fraud, without specifying each defendant's role in the alleged fraud. (*See, e.g.*, CAC ¶¶ 287; 284-292.) Such pleading fails as a matter of law.

IV.     **Plaintiffs fail to adequately plead that Morgan Keegan and/or MAM are "statutory sellers" under Section 12(a)(2) of the 1933 Act.**

Under § 12(a)(2), a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading" shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77l(a)(2). A "seller" is defined as "the owner who passed title, or other interest in the security, to the buyer for value" and/or (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter* v. *Dahl*, 486 U.S. 622, 642, 647 (1988); *see also Smith* v. *Am. Nat'l Bank & Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992).

MAM, as investment adviser to the Funds, did not solicit any purchases of the Funds whatsoever and Plaintiffs do not plead otherwise. Plaintiffs' sole allegation related to MAM's receipt of a contractual fee for managing the Funds (CAC ¶ 712) is insufficient to transform MAM into a statutory seller under § 12(a)(2). *See, e.g.*, *Madden* v. *Deloitte & Touche, LLP*, 118 Fed. Appx. 150, 154 (9th Cir. Nov. 23, 2004) (dismissing § 12(a)(2) claim against financial adviser to merger in the absence of allegations of solicitation).

Plaintiffs' allegations regarding Morgan Keegan's role as underwriter, standing alone, are

likewise insufficient. Plaintiffs do not allege that Morgan Keegan solicited or had any role in the sale of shares to Plaintiffs. Plaintiffs offer nothing more than generalized allegations against the "Section 12 Defendants" and do not specify any actions taken by any Defendant to sell or solicit the purchase of shares to Plaintiffs. (CAC ¶ 708.)[40]

Without more, such conclusory allegations that Defendants were statutory "sellers" are insufficient to state a claim. *See In re Orion Sec. Litig.*, 2009 WL 2601952, *2 (S.D.N.Y. Aug. 20, 2009); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004) (holding that "the complaint [in a § 12(a)(2) case] must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser"); *In re WebSecure, Inc. Sec. Litig.*, 182 F.R.D. 364, 368 (D. Mass. 1998) (same).

## V.     Plaintiffs' Section 10(b) and Rule 10b-5 claims fail as a matter of law.

As set forth above, Plaintiffs' claims under § 10(b) of the 1934 Act fail as a matter of law because Plaintiffs purport to bring those claims in their capacity as holders of shares. *See Blue Chip Stamps*, 421 U.S. at 754-55. In addition to constituting disallowed "holder" claims, Plaintiffs' claims fail to satisfy the heightened pleading standards of the PSLRA and Rule 9(b).

The PSLRA imposes two heightened pleading requirements for securities fraud claims. *First*, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that

---

[40]     Plaintiffs' class allegations offer no greater specificity: "The class that Plaintiffs seek to represent includes all persons and entities that . . . purchased any . . . shares of the Short Term, Intermediate, and High Income Funds' redeemable common stock from the Funds, and distributed through Morgan Keegan, Regions Bank and its trust department, or *otherwise*, at any time during the period from December 6, 2004 through December 6, 2008 inclusive . . . ." (CAC ¶ 106 (emphasis supplied).)

belief is formed." *In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334, 344 (W.D. Tenn. 2001) (quoting 15 U.S.C. § 78u-4(b)(1)). *Second*, "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4b(2)). "[T]he PSLRA mandates that district courts 'shall on the motion of any defendant, dismiss the complaint if the requirements of [§ 78u-4(b)(1) and (2)] are not met.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(3)(A)). Plaintiffs fail on both counts.

*First*, Plaintiffs fail to identify any misleading statements attributable to Morgan Keegan or MAM. Rather, Plaintiffs allege that unspecified "Defendants herein caused the Funds to misrepresent and/or omit material facts in the Funds' registration statement. . . ." (CAC ¶ 370), but fail to specify each Defendant's role with respect to statements alleged to be misleading. (*See, e.g.*, CAC ¶¶ 284-292.) This is clearly insufficient. *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d at 985 (plaintiffs must "enlighten each defendant as to his or her particular part in the alleged fraud") (citations and quotation omitted). [41]

Moreover, many of the alleged misstatements are non-actionable "puffery" or forward-looking statements protected under the "bespeaks caution" doctrine. For example, Plaintiffs allege that the Funds misrepresented that they would seek "a more stable net asset value" and then

---

[41]   Plaintiffs admit that they cannot plead particularized facts demonstrating primary liability on the part of each defendant (CAC ¶¶ 97, 104), and that they are pursuing recovery against Regions and MK Holding based on a theory of secondary liability (*id.* ¶¶ 45-46, 88). The Supreme Court has held that there is no cause of action for aiding and abetting securities fraud. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008); *see also In re Am. Serv. Group, Inc.*, 2009 WL 1348163, *45 (M.D. Tenn. Mar. 31, 2009); *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 311-312 (S.D.N.Y. 2009) (noting that a defendant "must actually make a false or misleading statement in order to be held liable under Section 10(b)" (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997)). Plaintiffs' "secondary liability" claims must be dismissed.

subsequently "failed to manage the Funds to maintain liquidity and stable NAVs."[42]  (CAC ¶¶ 267-272.)  These and other statements of corporate optimism are not actionable under the federal securities laws.  *See, e.g., Olkey*, 98 F.3d at 8 ("To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted."); *In re Aetna, Inc. Sec. Litig.*, 2009 WL 1619636, at *25 (representation of commitment to "disciplined pricing" was "immaterial and not actionable because they are puffery, vague, and non-specific expressions of corporate optimism on which reasonable investors would not have relied").

*Second*, Plaintiffs also fail to plead scienter as required by the PSLRA.  Allegations of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Plaintiffs have failed to plead any particularized facts demonstrating that any Defendant possessed the requisite level of scienter, but rather rely on repeating conclusory allegations of negligence, recklessness, and/or knowing misconduct.  (*See, e.g.*, CAC ¶¶ 339-345; 371-377.)  Nor may Plaintiffs premise scienter on allegations of the Funds' performance or diminution in the Funds' NAV, corporate affiliation, breach of fiduciary, contractual relationship or mismanagement.  *See, e.g., Fidel* v. *Farley*, 392 F.3d 220, 231-33 (6th Cir. 2005).  Such allegations fall fatally short of the heightened pleading standards of Rule 9(b) and the PSLRA.

## VI.   The CAC must be dismissed because Plaintiffs cannot establish loss causation.

It is fundamental that private securities actions exist "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that *misrepresentations actually cause*."  *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005)

---

[42]   Similar vague, optimistic statements alleged to be "fraudulent" include statements that that the Funds provided, *inter alia*, the "potential for lower NAV volatility" (CAC ¶ 129), the "opportunity for high current income" and a "relatively conservative credit posture" (*id.* ¶ 371(a), (e)), and that the Funds "seek[] to minimize risk" (*id.* ¶ 374(j)).

(emphasis supplied). The federal securities laws are not a guarantee against losses. Thus, "loss causation" requires a direct, causal connection between the alleged misrepresentation and the plaintiffs' loss; "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires." *Id.* at 343 (emphasis in original). Where the loss is not caused by the alleged misrepresentations or omissions, Plaintiffs' claims are barred. *See* 15 U.S.C. § 77k(e); § 77l(b); *Dura* 544 U.S. at 345; *see also Azzolini* v. *CorTS Trust II for Provident Fin. Trust I*, 2005 WL 3448053, *5-6 (E.D. Tenn. Dec. 14, 2005) (Dismissal is required "[i]f it is apparent on the face of the complaint the decline in share value is not related to any material misstatement and/or omission."); *In re MLIM*, 434 F. Supp. 2d at 238-39 (same).

### A.   The allegations of the CAC affirmatively establish that any loss was caused by factors other than the alleged misrepresentations.

#### 1.   The CAC affirmatively alleges that mismanagement, not misrepresentation, caused the decline in the Funds' NAV.

As discussed above, the CAC alleges mismanagement throughout its 400 pages. For example, the CAC states that the Funds lost money because portfolio securities declined in value as the result of the credit crisis, exacerbated by massive redemptions. (CAC ¶¶ 5, 306-318.) According to the CAC, the Funds lost value because the Funds' managers made bad investments and failed to take action to avoid the losses. (CAC ¶¶ 318-21.) Indeed, the CAC is very specific in alleging that Defendants knew or should have known in early 2007 that the credit crisis would strike, but "failed to take measures necessary to avoid or minimize the losses the Funds' shareholders incurred later in 2007 and 2008." (CAC ¶ 340.) Thus, Plaintiffs allege that their loss was caused not by an omission or misstatement in a prospectus but rather by poor portfolio management which occurred after the date of the last relevant Prospectus (November 1, 2006). These allegations establish affirmatively that Plaintiffs' alleged losses are not causally connected to the alleged misstatements and omissions in the CAC. *See, e.g., In re Merrill Lynch & Co. Research*

*Reports Sec. Litig.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) (dismissing complaint where affirmative defense of loss causation appears on the face of the complaint).

>  **2.      The CAC establishes that any losses resulted from the effect of market forces on the Funds' underlying assets.**

As the Supreme Court has noted, a decline in price does not establish loss causation: "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343; *see also In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 165 (D. Mass. 2009) ("[W]hen the plaintiff's loss coincides with a market phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases.") (quoting *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).  Here, the decline in the Funds' daily NAV was caused by the market-wide drop in value of the type of securities in which the Funds were invested.

The CAC acknowledges that this decline was caused by the sudden lack of a market for the type of securities held by the Funds and the direct impact of that asset devaluation on the NAV of the Funds:

>  As the subprime events unfolded in the fixed income markets in the summer of 2007, buyers of, including purported market makers for, these financial instruments disproportionately (compared with their respective peer funds) purchased by the Funds disappeared, as such securities became suspect even when the underlying collateral continued to pay principal and interest.  This resulted in a far greater supply of such securities than a demand for such securities that in turn caused the values of all similar types of such securities to drop dramatically. . . . In an open-end fund, such as the Funds, such drops in aggregate asset values are immediately translated into losses in the Funds' net asset value per share because the per share price at which open-end funds buy and sell their shares is the value of the net assets of the fund – *i.e.*, the value of assets minus liabilities – divided by the number of outstanding shares.

(CAC ¶ 121; *see also id.* ¶¶ 128, 322-328.)

Thus, the losses were caused by declines in the value of the Funds' underlying securities. This is not fraud. Plaintiffs further concede that the decline in the Funds' NAV was "attributable approximately equally to the loss in the values of the Funds' investments and net redemptions caused by the Funds' plummeting net asset values." (*Id.* ¶ 5.) The Funds' per-share NAV losses were simply direct translations of "drops in aggregate asset values" of their holdings, which could not possibly be affected by the Defendants' representations to the market. "The events experienced by the fixed income securities markets in 2007 affected all fixed income mutual funds but had a far greater adverse effect on the Funds than on their . . . peers because the Funds' portfolios were significantly different than their respective peer funds." (*Id.* ¶ 123.) This attributes the loss to factors other than securities fraud, meaning that claims under the federal securities laws must be dismissed. [43]

## B.    Plaintiffs' "but for" allegations do not establish loss causation.

With the benefit of hindsight, Plaintiffs speculate that additional warnings would have dissuaded them from purchasing shares of the Funds in the first place, and allege that Defendants "caused Plaintiffs and other members of the Class and Subclass herein to invest in the Funds [sic] shares on the basis of false and misleading information. . . ." (CAC ¶ 103.) Purporting to tie the decision to purchase shares to the alleged misrepresentations or omissions, however, at most only implicates *transaction* causation, *i.e.*, a claim that the Plaintiffs would not have purchased shares in

---

[43]    Plaintiffs fail to allege the purchase of shares at prices that were inflated due to misrepresentations or omissions. At most, they allege "uncertain" values. Plaintiffs likewise have not pleaded a "corrective disclosure" that revealed an alleged falsity or omission in Defendants' previous statements. *See D.E. & J. Ltd. P'ship* v. *Conaway*, 133 Fed. Appx. 994, 999-1000 (6th Cir. 2005) (dismissing securities class action where plaintiffs "did not plead that the alleged fraud became known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss). Plaintiffs allege that Defendants did not disclose the allegedly omitted facts until Fall 2007, after the funds had already suffered most of their losses. (CAC ¶¶ 187-88, 234-236.) A corrective disclosure purportedly causing a loss by revealing fraud cannot occur after Plaintiffs allegedly suffered their loss.

the Funds "but for" the misrepresentation, not *loss* causation.

In *In re Salomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006), investors alleged that "Plaintiffs were damaged because the . . . Funds purchased fund assets in contravention of the investment guidelines disclosed in the Fund Prospectuses and other Fund documents." (omissions in original). In dismissing plaintiffs' claims, the court reasoned that any decline in NAV is simply a function of the success or failure of the fund's investment strategies. *Id.* at 590. The court concluded that plaintiffs' allegation that defendants' omissions caused them to purchase poorer quality funds established nothing more than transaction causation, and dismissed plaintiffs' §§ 11, 12(a)(2) and 10(b) claims. *Id.* at 589-90. "While [allegations of transaction causation] may explain why plaintiff purchased the [defendant's] stock, it does not explain why it lost money on the purchase, the very question that the loss causation allegation must answer." *Id.* at 590-91 (quoting *Emergent Cap. Inv. Mgmt.* v. *Stonepath Group*, 343 F.3d 189, 198 (2d Cir. 2003)). The same is true here.

## VII. Plaintiffs do not adequately plead claims for "Control Person" liability under Section 15 of the 1933 Act or Section 20 of the 1934 Act.

Counts III and VII of the CAC purport to state a claim for "control person" liability under § 15 of the 1933 Act, 15 U.S.C. § 77o, and § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), against certain Defendants, including MAM, Morgan Keegan, and MK Holding. But Plaintiffs have failed to allege facts sufficient to support control person liability.

*First*, Plaintiffs have failed to sufficiently allege a primary violation of the federal securities laws. This alone dooms Plaintiffs' control person claims. *See P.R. Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004).

*Second*, even if a primary violation had been adequately alleged, Plaintiffs have failed to allege that MAM, Morgan Keegan, or MK Holding is a "control person" with respect to any alleged primary violator. *See Sanders Confectionery Prods., Inc.* v. *Heller Fin., Inc.*, 973 F.2d 474, 485-86

(6th Cir. 1992); *see also P.R. Diamonds*, 364 F.3d at 696-97. Plaintiffs must allege facts showing that these Defendants possessed both "power to control the specific transaction or activity upon which the primary violation is predicated" as well as "actual participation (*i.e.*, exercise [of] control) in the operations of the primary violator in general." *Azzolini* v. *CorTS Trust II for Provident Fin. Trust I*, 2005 U.S. Dist. LEXIS 31853, at *42 (E.D. Tenn. Sept. 16, 2005) (citations omitted); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000) (same).

The CAC contains only conclusory allegations of control person status. For their § 15 claim, Plaintiffs assert that "the Controlling Person Defendants . . . were controlling persons of the Funds . . . by virtue of its position as the manager of, and investment adviser to, the Fund; or as the wholly owning parent of any of the foregoing non-Fund corporate entities," and "based on his or her having signed the registration statements and/or having otherwise participated in the process which allowed the offerings of the Funds' shares to be successfully completed." (CAC ¶¶ 723-724.) Plaintiffs also allege that MAM "initially selected" the directors, and that "[b]ecause the Funds' shareholders did not annually elect the Funds' directors, [MAM] and Morgan Keegan effectively controlled the Company/Funds and therefore owed a fiduciary duty to the Funds' shareholders." (*Id.* ¶¶ 719, 761.)

For their § 20(a) claim, Plaintiffs allege that "[e]ach of the corporate RMK Defendants, by virtue of its position as the manager of, and investment adviser to, the Funds; as the administrator of the Funds, or as the wholly owning parent of any of the foregoing non-Fund corporate entities, were controlling persons of the Company/Funds." (*Id.* ¶¶ 760; 101-102.) Without specifying which Defendants, Plaintiffs assert that certain "Controlling Person Defendants . . . materially participated in the conduct giving rise to the liability asserted herein, or were a broker-dealer or agent who materially participated in such conduct, and are, therefore, liable jointly and severally." (*Id.* ¶ 762.) Finally, Plaintiffs allege that MAM and Morgan Keegan "directly or

indirectly controlled the Company/Funds via the Advisory Agreement and Fund Accounting

Service Agreement," pursuant to which they "functioned as the effective officers and directors of

the Company/Funds, or occupied a similar status or performed similar functions, or were employees

of the Company/Funds, or controlling persons of the Company/Funds and of [MAM] and Morgan

Keegan, or were a broker dealer or agent." (*Id.* ¶ 763.)

These allegations fall well short. With respect to MK Holding, Plaintiffs allege only that it

is "the wholly owning parent of [MAM]." (CAC ¶ 44.) With respect to MAM and Morgan

Keegan, Plaintiffs rely entirely upon corporate affiliation and/or contractual relationships (CAC ¶¶

723, 763). These allegations, standing alone, are insufficient to state a claim of control. *Azzolini*,

2005 U.S. Dist. LEXIS 31853, at *42 (control person status based on corporate affiliation

insufficient to state a claim); *In re WorldCom, Inc., Sec. Litig.*, 2004 U.S. Dist. LEXIS 8661, at *10

(S.D.N.Y. May 19, 2004) (rejecting the assertion that a "parent/subsidiary relationship is a

sufficient basis from which to infer control"). Because Plaintiffs have not adequately alleged a

primary violation and control, Plaintiffs' control person liability claims should be dismissed.[44]

## VIII. Plaintiffs' ICA claims must be dismissed.

Count IV of the CAC purports to assert claims against all Defendants for violations of §§ 13,

22, 30 34(b), and 47(b) of the ICA, 15 U.S.C. §§ 80b-1 *et seq.* (CAC ¶¶ 725-41.) Plaintiffs assert

that, as a result of supposed violations of these statutes, they are entitled, "pursuant to § 47(b) . . . to

rescind their purchases or holdings of the Funds' shares during the class period or are otherwise

---

[44]     Some district courts in the Sixth Circuit have used an even more exacting standard that requires culpable participation: "To establish liability under § 20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000) (citing *Boguslavsky* v. *Kaplan*, 159 F. 3d 715, 720 (2d Cir. 1998)); *see also In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 664 (M.D. Tenn. 2001); *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *24-25 (N.D. Ohio June 27, 2002). Plaintiffs' conclusory allegations discussed in this section likewise fail to plead culpable participation.

entitled to damages. . . ." (CAC ¶ 735.) This is incorrect. There is no private right of action under any of the provisions of the ICA cited in the Complaint other than § 47(b), and that section has no application here.

Following the Supreme Court's decision in *Alexander* v. *Sandoval*, 532 U.S. 275 (2001), virtually every court to consider the issue has found that no implied private right of action exists under various provisions of the ICA. *See, e.g., Bellikoff* v. *Eaton Vance Corp.*, 481 F.3d 110, 117 (2d Cir 2007) (§§ 34(b), 36(a) and 48(a)); *Olmsted* v. *Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002) (§§ 26(f) and 27(i)); *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 870 (D. Md. 2005) (§§ 34(b) and 36(a)); *Jacobs* v. *Bremner*, 378 F. Supp. 2d 861, 866 (N.D. Ill. 2005) (§ 36(a)); *In re Merrill Lynch*, 272 F. Supp. 2d at 255-56 (§ 34(b)); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 24867, at *30 (N.D. Cal. Jul. 27, 2004) (§§ 22 and 34(b)); *White* v. *Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002) (§§ 22 and 34(b)). *See also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 591-93 & n.12 (collecting cases); *Korland* v. *Capital Research & Mgmt Co.*, 2009 WL 936612, at *4 (C.D. Cal. Feb. 10, 2009) (collecting additional cases).[45]

The courts in *Bellikoff* and *Olmsted* looked to four factors to evaluate the existence of a private cause of action: (1) whether the statute at issue explicitly provides for a private right of action; (2) whether the statute at issue contains rights-creating language with respect to a particular class, meaning that it describes individuals whom the statute is designed to protect; (3) whether the statute provides for alternative enforcement; and (4) whether other sections explicitly provide a private right of action, which suggests that Congress intended to omit such language in other

---

[45]   As the Supreme Court recently underscored in the context of a constitutional tort action, "implied causes of action are disfavored," and the Court therefore has been reluctant to extend them "to any new context or new category of defendants." *Iqbal*, 129 S. Ct. at 1948 (citation and internal quotation marks omitted)

sections. *See Olmsted*, 283 F.3d at 432–33.

This Court likewise should decline to create a private right of action under the sections of the ICA at issue here. *First*, these sections do not explicitly provide for a private right of action. *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 868; *In re Eaton Vance*, 380 F. Supp. 2d at 231; *White*, 237 F. Supp. 2d at 987; *see also* 15 U.S.C. § 80a-33(b). *Second*, the ICA contains no rights-creating language. *In re Eaton Vance*, 380 F. Supp. 2d at 232; *see also* 15 U.S.C. § 80a-33(b); *In re Merrill Lynch*, 272 F. Supp. 2d at 257. *Third*, the ICA provides an alternative enforcement method authorizing SEC enforcement of all sections of the Act. *In re Eaton Vance*, 380 F. Supp. 2d at 232; *In re Merrill Lynch*, 272 F. Supp. 2d at 257-58. *Finally*, § 36(b), not at issue here, explicitly provides for a private right of action. *In re Merrill Lynch*, 272 F. Supp. 2d at 258 (noting that Congress had the opportunity to amend § 34(b) to provide a private right of action at the same time that it amended § 36(b) to provide such a right); *see also Jacobs*, 378 F. Supp. 2d at 866.[46]

Plaintiffs also cite § 47(b) which provides that a "contract that is made, or whose performance involves a violation of the ICA" "is unenforceable by either party . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of [the ICA]." 15 U.S.C. § 80a-46(b). This statutory language authorizes only a "limited private remedy" consisting of a suit for rescission or for an injunction against continued operation of the contract, and for restitution but not private damages. *See Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U.S. 11, 20-21, 24 (1979)

---

[46]     In their claim for relief, Plaintiffs include a claim under § 30 of the ICA. (CAC ¶ 741.)  Plaintiffs, however, have pleaded no facts from which Defendants can determine their theory of liability under this section.  Furthermore, there is no private cause of action under § 30, for the reasons stated herein.  Section 30 is an informational provision that empowers the SEC to require investment companies to make public filings, and governs the content of those filings.  To the extent it contemplates enforcement, such enforcement actions must be brought by the SEC.  *See, e.g.*, *Steadman* v. *SEC*, 603 F.2d 1126 (5th Cir. 1979), *aff'd* 450 U.S. 91 (1981).

(construing similar rescission provision of Investment Advisers Act).

No remedy under § 47(b) is available to plaintiffs given the CAC's failure to allege that Plaintiffs are or were parties to any contract that is illegal on its face or that could not be performed without a violation of the federal securities laws. *See, e.g., GFL Advantage Fund, Ltd.* v. *Colkitt,* 272 F.3d 189, 200-202 (3d Cir. 2001) (under the voidability provisions of the 1934 Act "only unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to lawful contracts") (citation and internal quotation marks omitted); *Zerman* v. *Jacobs,* 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd,* 672 F.2d 901 (2d Cir. 1981)(same); *In re Lord Abbett Mut. Funds Fee Litig.,* 407 F. Supp. 2d at 645-35 (same, with regard to similar provision of the Investment Advisors Act).[47]

---

[47] To the extent the Court were to imply a private right of action under any of the sections of the ICA at issue in this action, Plaintiffs may only enforce the obligations under the relevant ICA sections against MK Select and not against Morgan Keegan, MAM or MK Holding.

## CONCLUSION

This Court should dismiss the CAC with prejudice.[48]

Respectfully submitted,


/s/ Matthew M. Curley
Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615)742-6200

Shepherd D. Tate
Michael A. Brady
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, TN 38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management, Inc.,
Morgan Keegan & Company, Inc., and MK
Holding, Inc.*

---

[48]     Pursuant to this Court's Order dated September 23, 2008, Plaintiffs' CAC purports to consolidate certain named pending actions and "all other substantively related actions arising out of or related to the same facts as alleged, or involving claims similar to those alleged . . . which have been filed, may be filed, or are transferred to this Court." (CAC ¶ 1.) Plaintiffs also purport to represent a "Fiduciary Subclass" brought on behalf of beneficiaries of trusts for which Regions Bank served as trustee. (*Id.* ¶ 107.) Therefore, the arguments set forth in the instant motion to dismiss concerning claims under the federal securities laws are applicable to actions which have been filed in or transferred to this judicial district (the "Consolidated Actions") and which likewise assert such claims under the federal securities laws concerning the Open-End Funds. These Consolidated Actions should be dismissed.

Certain of the Consolidated Actions otherwise assert state law claims based on misrepresentations and/or omissions by Defendants in connection with the purchase and/or sale of the Funds shared. Such claims are precluded under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb, and must be dismissed. *See In re Fannie Mae Sec., Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 32 (D.D.C. 2007) (dismissing state-law claims as precluded by SLUSA, notwithstanding the fact that the claims had been brought as separate individual opt-out actions); *see also Atkinson v. Morgan Asset Mgmt., Inc.*, 2009 WL 3245550 (W.D. Tenn. Sept. 23, 2009) (denying motion to remand and dismissing Plaintiffs' state-law claims as precluded by SLUSA).

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2010, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following and/or served the following via U.S. Mail:

**APPERSON CRUMP PLC**
CHARLES D. REAVES
JEROME A. BROADHURST
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954

**KIRKLAND & ELLIS, LLP**
TIMOTHY DUFFY, ESQ.
EMILY NICKLIN, ESQ.
KRISTOPHER RITTER, ESQ.
300 North LaSalle
Chicago, IL 60654

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
VERNON J. VANDER WEIDE
THOMAS V. SEIFERT
333 South Seventh St., Suite 1140
Minneapolis, MN 55402-2422

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
LEO BEARMAN, ESQ.
EUGENE PODESTA, ESQ.
165 Madison Avenue
First Tennessee Building
Memphis, TN 38103

**LOCKRIDGE GRINDAL NAUEN PLLP**
RICHARD A. LOCKRIDGE
GREGG M. FISHBEIN
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

**K&L GATES LLP**
JEFFREY B. MALETTA, ESQ.
NICOLE A. BAKER, ESQ.
1601 K Street, NW
Washington; D.C. 20006-1600

**ZIMMERMAN REED, P.L.L.P.**
CAROLYN G. ANDERSON
TIMOTHY J. BECKER
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

**SUTHERLAND ASBILL & BRENNAN, LLP**
S. LAWRENCE POLK
999 Peachtree Street NE
Atlanta, GA 30309

**MAYNARD COOPER & GALE PC**
PETER S. FRUIN
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203

**SULLIVAN & CROMWELL LLP**
DAVID B. TULCHIN
DAVID E. SWARTS
125 Broad Street
New York, New York 1004

**PAUL HASTINGS JANOFSKY & WALKER LLP**
Kevin C. Logue
Asa R. Danes
75 E. 55th Street
New York, NY 10022

/s/ Matthew M. Curley

60