# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## MEMPHIS DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION )<br><br>This Document Relates to:<br>*In re Regions Morgan Keegan Open-End Mutual Fund Litigation*,<br>No. 2:07-cv-02784-SMH-dvk | MDL Docket No. 2009<br><br>Judge Samuel H. Mays, Jr.<br><br>Magistrate Judge Diane K. Vescovo<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Telephone: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
gmfishbein@locklaw.com

*Co-Lead Counsel for Plaintiffs*

**APPERSON CRUMP PLC**
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954
(901) 260-5133 direct
(901) 435-5133 fax
jbroadhurst@appersoncrump.com

*Liaison Counsel for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS RELEVANT TO DEFENDANTS' MOTIONS......................... 3

I.   THE FUNDS' UNDISCLOSED RISKS ..................................................................... 4

    A.   MAM/MK's Disclosure Examples ................................................... 5

    B.   The Funds and the Credit Crisis ...................................................... 7

    C.   The Funds Did Not Disclose Their Risks. ........................................ 9

        1.   The Funds' disclosures regarding risk were grossly inadequate. ............ 9

        2.   MSF's *prospectus* disclosures versus the Funds' *SAI* disclosures. ....... 13

    D.   The Funds' Undisclosed Liquidity Risk. ....................................... 16

        1.   The Funds' documents did not disclose the Funds' liquidity risk......... 16

        2.   The Funds and RMK Defendants were required to make additional liquidity risk disclosures because the Funds were violating their disclosed investment restriction on illiquid securities. .......................... 20

    E.   The Funds' Valuation Risk Was Not Disclosed. ............................. 22

        1.   The Funds' valuation procedures, and the impact of the Funds' fair valued securities on the Funds, were not disclosed. ............................. 22

        2.   The Funds' undifferentiated valuation disclosures were meaningless. . 24

    F.   Disclosures Regarding Concentration, Benchmarks and Leverage. .............. 27

        1.   The Funds failed to disclose their concentration in real estate related securities and their credit concentration. ............................................... 27

        2.   The Funds misleadingly compared their performance to non-comparable benchmarks. ....................................................................... 27

        3.   The Funds' undisclosed use of leverage............................................... 29

        4.   Plaintiffs allege nondisclosures, not characterizations of disclosures... 29

    G.   MAM/MK Was Responsible for Ensuring the Funds' Financial Statements Conformed to GAAP. ....................................................................... 31

II.   LOSS CAUSATION ........................................................................................ 32

    A.   Plaintiffs' Allegations Causally Link the Funds' Defective Disclosures and Their Losses................................................................................... 32

    B.   Plaintiffs Allege the Funds Were Injured in 2006............................ 33

III.   MAM/MK AND RB WERE SELLERS UNDER § 12(a)(2) ............................ 34

IV.   PLAINTIFFS' § 10(b) CLAIMS...................................................................... 37

|      | A.   | Plaintiffs Identify Misleading Statements Attributable to Defendants............ 37 |
|      |      | 1.   MAM/MK. ........................................................................................ 37 |
|      |      | 2.   Other Defendants. ........................................................................... 38 |
|      | B.   | The Misleading Statements Alleged in the CAC Are Actionable. ................. 39 |
|      | C.   | Plaintiffs Have Alleged Scienter Based on Actual Knowledge. .................... 40 |
|      |      | 1.   Plaintiffs' allege Defendants acted knowingly. ..................................... 40 |
|      |      | 2.   Plaintiffs have alleged knowable fraud based on foreseeable risks that were actually foreseen and not "fraud by hindsight." ........................... 41 |

V.    **FACTS RELATING TO RB'S LIABILITY** ................................................................ 43

VI.   **CONTROLLING PERSON LIABILITY** ................................................................... 45

|      | A.   | MAM/MK as Controlling Persons. ............................................................... 45 |
|      | B.   | Director Defendants as Controlling Persons. ................................................ 47 |
|      | C.   | Individual Defendants as Controlling Persons. ............................................. 47 |
|      | D.   | RF as Controlling Person. ............................................................................ 48 |

VII.  **FACTS RELATING TO THE FUNDS' § 11 LIABILITY** ............................................ 49

STANDARD OF REVIEW .................................................................................... 49

I.    **RULE 12(b)(6) STANDARD** .............................................................................. 49

II.   **PLEADING STANDARDS UNDER THE PSLRA** ................................................... 50

ARGUMENT ....................................................................................................... 52

I.    **THE CAC IS ALL ABOUT NOT DISCLOSING THE FUNDS' MISMANAGEMENT** ........ 52

II.   **THE FUNDS DID NOT DISCLOSE ALL REQUIRED INFORMATION REGARDING AN INVESTMENT IN THE FUNDS.** ........................................................................... 55

|      | A.   | The Funds Failed to Disclose Their Liquidity Risk. ..................................... 56 |
|      | B.   | Identical Disclosures but Disparate Performances. ....................................... 59 |
|      | C.   | Plaintiffs Adequately Allege Defendants' Failure to Disclose the Funds' Violations of the Restriction against Concentration in a Single Industry. ...... 60 |
|      | D.   | Defendants' Selection of Certain Broad-Based Securities Indices for Comparison with the Funds' Performances Was False and Misleading. ........ 63 |
|      | E.   | The Challenged Disclosures Were Neither "Puffery" Nor Are They Protected by the Bespeaks Caution Doctrine................................................. 65 |
|      |      | 1.   Puffery. ............................................................................................. 65 |
|      |      | 2.   Bespeaks caution. ............................................................................. 67 |

III.   **PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION.** ........................................... 69

    A.   Loss Causation for Section 10b-5 Claims. ...................................... 69

        1.   Mismanagement versus misrepresentation/omissions as loss causation. ....................................................................................... 71

            a.   RMK Defendants. ........................................................ 71

            b.   PwC. ............................................................................ 74

        2. Defendants' "market-is-to-blame" argument is meritless. .......................... 75

        3.   Plaintiffs need not allege inflated valuations or corrective disclosures to allege loss causation. ....................................... 78

        4.   Plaintiffs allege the funds' valuations were misstated. ......................... 80

        5.   Possibly leaked information led to losses. ............................................ 85

    B.   Plaintiffs' Allegations Causally Link the Funds' Misstated Valuations and Their Losses. ................................................................................... 87

        1.   PwC's misstatements. .................................................................... 87

        3.   Plaintiffs allege their losses were caused by PwC's statements. ........... 91

    C.   Loss Causation for §§ 11 and 12 Claims. ...................................... 92

IV.   **PLAINTIFFS ADEQUATELY ALLEGE EACH DEFENDANT'S ROLE AND SCIENTER.** ... 93

    A.   Each Defendant's Role. ................................................................... 93

    B.   Plaintiffs Have Adequately Alleged Scienter. ................................. 96

V.   **SECTIONS 11, 13 STATUTE OF LIMITATIONS** .................................................. 99

VI.   **PLAINTIFFS PROPERLY ASSERT CLAIMS AS HOLDERS OF THE FUNDS' REDEEMABLE SHARES.** ............................................................................. 102

    A.   The '33 and '34 Acts Define the Terms "Purchase" and "Sale" to Include Contractual Obligations to Purchase or Sell Securities and Do Not Limit the Terms to Encompass Only Actual Purchases or Sales. ................................. 102

    B.   The Fiduciary Accounts Have Standing to Assert Their '34 Act Claim. ....... 108

        1.   The need for the Fiduciary Accounts' consent limited the investment discretion given to RB/RMK Trust and MAM/MK. ......................... 108

        2.   RB/RMK Trust's and MAM/MK's conflicting interests and self-dealing required the Fiduciary Accounts' consents to their continued holding of Fund shares purchased on their behalf by MAM/MK. ........................ 112

        3.   RB/RMK Trust and MAM/MK owed a duty to the Fiduciary Accounts to disclose their conflicts and the need to redeem. .............................. 115

VII.   **STATEMENTS OF ADDITIONAL INFORMATION AND MORNINGSTAR REPORTS ARE**

**NOT PROSPECTUSES.** ........................................................................... 115

    A.    The SAIs Are Not to Include Required Prospectus Disclosures. .................. 116

    B.    In Any Event, Even the SAIs Are False and Misleading. ............................ 118

    C.    The Morningstar Reports. ................................................................. 120

VIII.  **PLAINTIFFS ADEQUATELY ALLEGE MAM/MK AND RB WERE STATUTORY SELLERS UNDER § 12(a)(2)** . ...................................................................... 122

IX.    **DEFENDANTS ARE LIABLE AS CONTROL PERSONS UNDER § 15 OF THE SECURITIES ACT AND § 20 OF THE SECURITIES EXCHANGE ACT**............................................. 127

    A.    Legal Standard. ............................................................................... 127

    B.    Plaintiffs Adequately Allege That RF Was a Control Person pursuant to §§ 15 and 20.................................................................................................. 128

    C.    Plaintiffs Have Adequately Alleged That MAM/MK Were Control Persons pursuant to §§ 15 and 20.................................................................. 130

    D.    Plaintiffs Have Adequately Alleged That the Individual Defendants Were Control Persons pursuant to §§ 15 and 20..................................................... 131

    E.    Plaintiffs Have Adequately Alleged that the "Independent" Directors Were Control Persons pursuant to §§ 15 and 20..................................................... 133

X.    **THE ICA PROVIDES RELIEF FOR VIOLATIONS THEREOF; PLAINTIFFS BY CONTRACT HAVE A PRIVATE CAUSE OF ACTION FOR ICA VIOLATIONS.**............ 136

CONCLUSION................................................................................................. 140

# TABLE OF AUTHORITIES

## Cases

*Ala. OB/GYN Specialists, PC v. Cynosure, Inc.* 2003 WL 297560 (W.D. Tenn. Feb. 7, 2003) ................................................................................................................................ 65

*Alameda County Emples. Ret. Ass'n v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 2004 U.S. Dist. LEXIS 8661 (S.D.N.Y. May 18, 2004) .............................................................. 130

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .......................................................................... 136

*Arlington Heights Police Pension Fund v. Poder*, 700 F. Supp. 405 (N.D. Ill. 1988)........ 110

*Arlington Heights Police Pension Fund v. Poder*, 712 F. Supp. 680 (N.D. Ill. 1989)........ 111

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)................................................................................. 50

*Bailey v. Philadelphia, W. & B. R. Co.*, 4 Del. 389 (Del. 1846) ......................................... 105

*Beach v. Healthways, Inc.*, 2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) .................. 51, 128

*Beaver County Ret. Bd. v. LCA-Vision Inc.*, 2009 WL 806714 (S.D. Ohio March 25, 2009) ................................................................................................................................ 97

*Benedict v.Cooperstock,* 23 F.Supp.2d 754 (E.D. Mich.1998) ...................................... 95, 96

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).......................................... 103

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001)....................................... 3

*Briarwood Investments, Inc. v. Care Inv. Trust Inc.*, 2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ...................................................................................................................... 93

*Brick v. Dominion Mortgage & Realty Trust*, 442 F. Supp. 283 (W.D. N.Y. 1977)........... 101

*Capri v. Murphy,* 856 F.2d 473 (2d. Cir. 1988)................................................................... 126

*Caremark, Inc. v. Coram Healthcare Carp.*, 113 F.3d 645 (7th Cir. 1997)......................... 77

*Carson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 WL 34076402 (W.D. Ark. Mar. 30, 1998) ...................................................................................................... 120

*Casella v. Webb*, 883 F.2d 805 (9th Cir. 1989) .................................................................... 66

*Cent. Laborers Pension Fund v. Merix Corp.*, 2005 WL 2244 (D. Or. Sept. 15, 2005)..... 126

*Central Bank of Denver, N.A.*, 511 U.S. 164 (1994) .......................................................... 136

*City of Monroe Empl. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) ..... 66, 96

*Cohen v. Prudential-Bache Sec., Inc.*, 713 F. Supp. 653 (S.D.N.Y. 1989).......................... 66

*Cole v. Laws*, 76 S.W.3d 878 (Ark. 2002)........................................................................... 113

*Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir. 1986) .... 108, 112

*D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994 (6th Cir. 2005).............................. 78

*Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996).......................... 126

*DelPorte v. Shearson, Hammill & Co., Inc.*, 548 F.2d 1149 (5th Cir. 1977)..................... 112

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). .................................................... 69, 79

*Eastgate Vill. Water & Sewer Ass'n v. Davis*, 183 P.3d 873 (Mont. 2008) ....................... 105

*Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993)......................................... 120

*Endo v. Arthur Andersen & Co.*, 163 F.3d 463 (7th Cir. 1999) ........................................... 81

*Exec. Bd. of the Mo. Baptist Convention v. Windermere Baptist Conf. Ctr.*, 280 S.W.2d 678 (Mo. Ct. App. 2009)........................................................................................... 105

*Family Sav. & Loan Asso. Shareholders Protective Committee v. Stewart*, 194 A.2d 118 (Md. 1963) ........................................................................................................... 105

*Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943 (W.D. Tenn. 1999) .................... 65

*Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971)............. 57

*Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2005) ................................................................ 97, 99

*First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334 (6th Cir. 1987)......................... 65

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. Minn. 2001)..... 96

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008) .................................................... 50, 51

*Gallagher v. Croghan Colonial Bank*, 89 F.3d 275 (6th Cir. 1996) ..................................... 61

*Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973)......................................... 57

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ........................... 138, 139

*Gosselin v. First Trust Advisors L.P.,* 2009 WL 5064295 (N.D. Ill. Dec. 17, 2009).......... 131

*Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980) ......................................... 56

*Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508 (S.D. N.Y. 2000)................................... 101

*Hamilton Partners, Ltd., L.P. v. Sunbeam Corp.*, 2001 WL 34556527  (S.D. Fla. July 3, 2001) .................................................................................................................................. 59

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .............................................. 66

*Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392 (7th Cir. 1994) ..................... 67

*Hartford Acci. & Indem. Co. v. W. S. Dickey Clay Mfg. Co.*, 24 A.2d 315  (Del. 1942).... 105

*Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727 (Tenn. Ct. App. 1980) ................. 71, 76

*Hastings v. Wilson*, 516 F.3d 1055 (8th Cir. 2008) ........................................................... 104

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) .................................................... 96, 97

*Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981) ................................................................. 135

*Herman & MacLean v. Huddleston,* 459 U.S. 375 (1983).................................................... 94

*Holloman v. Regions Bank*, No. 2:10-cv-00268-RDP (Jefferson County Circuit Court, Alabama, November 13, 2009)................................................................................................ 55

*Hosey v. Burgess*, 890 S.W.2d 262 (Ark. 1995)................................................................ 113

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998).......... 68, 119

*In re America Service Group, Inc.*, 2009 WL 1348163 (M.D. Tenn. 2009) ..... 70, 77, 97, 128

*In re Brooks Automation Inc. Sec. Litig.*, 2007 WL 4754051 (D. Mass. Nov. 6, 2007) ....... 70

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002) ...................................................... 136

*In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006)............. 96, 132

*In re Century Business Services Sec. Litig*, 2002 WL 32254513 (N.D. Ohio June 27, 2002) .................................................................................................................................... 95

*In re Charles Schwab Corp. Sec. Litig.*, 2009 WL 1371409 (N.D. Cal. May 15, 2009) ...... 53

*In re Charles Schwab Corp. Sec. Litig.,* 2010 WL 1261705 (N.D. Cal. Mar. 30, 2010). ..... 61

*In re Charles Schwab Corp. Sec. Litig*, 257 F.R.D. 534 (N.D. Cal. 2009) ................... passim

*In re Charles Schwab Corp. Sec. Litig*, 2009 WL 262456 (N.D. Cal. 2009)...................... 133

*In re Comshare*, 183 F.3d 542, 553 (6th Cir. 1999) ............................................................ 98

*In re Convergent Technologies Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991) ........................... 120

*In Re Countrywide Fin. Corp. Sec. Lit.*, 588 F.Supp. 2d 1132 (C.D. Cal. 2008)................. 77

*In Re Countrywide Financial Corporation Securities Litigation*, 588 F. Supp. 2d 1132 (2008).................................................................................................................................. 79

vii

*In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34 (D. Mass. 2006)........................... 70

*In re Direct General Corp*., 398 F. Supp. 2d 888 (M.D. Tenn. 2006) ...................... 131, 133

*In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357 (3d Cir. 1993)............................. 68

*In re Electronic Data Systems Corporation "ERISA" Litigation*, 305 F. Supp.2d 658 (E.D.
  Tex. 2004)................................................................................................................... 124

*In re Enron Corp. Sec.,* 2004 WL 3410449 (S.D. Tex. April 6, 2004) ...................... 129, 131

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 2010 WL 1253114 (D. Mass.
  Mar. 31, 2010) ........................................................................................................... passim

*In re F & M Distribs. Inc. Sec. Litig.*, 937 F. Supp. 647 (E.D. Mich. 1996)............... 66, 124

*In re FirstEnergy Corp. Sec. Litig.*, 316 F.Supp.2d 581 (N.D. Ohio 2004)................. 95, 132

*In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004).......................................... 65

*In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D. N.J. 2005) ......................... 54

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9ᵗʰ Cir. 2008)....................................... 69

*In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005)........ 129

*In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772 (S.D. N.Y. Jan. 17, 2006) . 53

In re *Goodyear Tire & Rubber Co. Deriv. Litig.*, 2007 WL 43557 (N.D. Ohio Jan. 5, 2007)
  ...................................................................................................................................... 95

*In re Hayes Lemmerz Intern., Inc*., 271 F. Supp. 2d 1007 (E.D. Mich. 2003). ........... 132, 134

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) ............................... 128

*In re Huntington Bancshares Inc. Sec. Litig.*, 2009 WL 4666455 (S.D. Ohio Dec. 4,  2009)
  ...................................................................................................................................... 97

*In re Indep. Energy Holdings, PLC Sec. Litig.,* 154 F.Supp.2d 741 (S.D.N.Y.2001)......... 130

*In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371 (S.D.N.Y.2001)................. 134

*In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616 (D. N.J. 2005)...... 54,138, 139

*In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995).................................. 66

*In re Merix Corp. Secs. Litig*., 275 Fed. Appx. 599 (9th Cir. Apr. 22, 2008)................... 127

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 389 F. Supp. 2d 429 (S.D.N.Y.
  2003) ........................................................................................................................... 70

*In re MoneyGram Int'l, Inc*., 626 F. Supp. 2d 947 (D. Minn. 2009) ................................... 99

*In re Mutual Funds Invest. Litig.*, 566 F.3d 111 (4th Cir. 2009)....................................... 136

*In re Nat'l Century Fin. Enter., Inc*., 504 F.Supp.2d 287 (S.D. Ohio 2007)...................... 134

*In re National Century Financial Enterprises, Inc*., 504 F.Supp.2d 287 (S.D. Ohio 2007)
  ............................................................................................................................... 128, 135

*In re NationsMart Corp. Securities Litigation*, 130 F.3d 309 (8th Cir. 1997) ................... 123

*In re New York Trust Co*., 294 N.Y. 596 (N.Y. 1945)....................................................... 114

*In re Orion Sec. Litig*., 2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) ............................. 125

*In re Paracelsus Corp.*, 6 F. Supp. 2d 626 (S.D. Tex. 1998) ........................................... 124

*In re Philip Servs. Corp. Sec. Litig*., 383 F. Supp. 2d 463 (S.D.N.Y. 2004)...................... 133

*In re Prison Realty Sec. Litig*., 117 F. Supp. 2d 681 (M.D. Tenn. 2000)...................... passim

*In re Regions Morgan Keegan ERISA Litig.*, 2010 WL 809950 (W.D. Tenn. Mar. 9, 2010)
  ................................................................................................................................ passim

*In re Royal Appliance Sec. Litig.*, 1995 WL 490131 (6th Cir. 1995).................................. 68

*In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 234 (W.D. Tenn. 2001) ......... 97

*In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999) ..... .50, 65, 66, 126

*In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 527 (S.D. Ohio 2000)............ 95

*In re Solomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579 (S.D. N.Y. 2006) ................................................................................................................... 77

*In re TCW/DW North American Gov't Income Trust Sec. Litig.,* 941 F. Supp. 326 (S.D.N.Y. 1996) ..................................................................................................................... 67

*In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858 (E.D. Tenn. 2005) .. 51, 70, 78, 96

*In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472 (N.D. Ga. 1997)........................................ 66

*In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490 (W.D. Wash. 2009) ............................................................................................... 125, 126

*In re Westinghouse Sec. Litig.*, 90 F. 3d 696, 717 (3d. Cir. 1996) ...................................... 124

*In re Williams Secs. Litig. - WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ...................... 79

*In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003)............................... 133

*In re WorldCom, Inc., Sec. Litig.,* 2004 WL 1097786 (S.D.N.Y. May 18, 2004).............. 130

*In the Matter of Piper Capital Management, Inc. et al.*, Initial Decision Release No. 175 File No. 3-9657 November 30, 2000 ................................................................. 64

*In the Matter of Piper Capital Management, Inc. et al.*, Securities Act of 1933 Release No. 8276, August 26, 2003 ....................................................................................... 65

*Isquith v. Middle South Utilities, Inc*., 847 F.2d 186 (5th Cir. 1998).................................... 57

*Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir.1999). ............................................... 7

*James F. Powers Foundry Co. v. Miller*, 166 Md. 590 (Md. 1934).................................... 105

*James v. Gerber Prods. Co*., 483 F.2d 944 (6th Cir. 1973)................................................. 107

*James v. Pirelli Armstrong Tire Corp*., 305 F.3d 439 (6th Cir. 2002) ................................ 115

*Johnson v. Songwriter Collective, LLC*, 2006 WL 861490 (M.D. Tenn. Mar. 28, 2006)..... 71

*Kayne v. Painewebber, Inc*., 703 F. Supp. 1334 (N.D. Ill. 1989),...................................... 112

*Kern County Land Co. v. Occidental Petro. Corp.*, 411 U.S. 582 (1973)........................... 103

*Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009)............................... 51, 97, 136

*Krohn v. Huron Mem. Hosp*., 173 F.3d 542 (6th Cir. 1999) .............................................. 114

*Krouner v. American Heritage Fund, Inc.,* 1996 WL 393584 (S.D.N.Y. July 15, 1996)..... 67

*Lawson v. Household Finance Corp*., 17 Del. Ch. 343 (Del. Ch. 1930)............................. 105

*League of United Latin Amer. Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007)............. 49

*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir.2005) ............................................... 76

*Levine v. AtriCure, Inc.,* 508 F. Supp. 2d 268 (S.D.N.Y. 2007) .................................... 79, 87

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008) .................................................. 96, 97, 98

*Little Caesar Enterp., Inc. v. OPPCO, LLC*, 219 F.3d 547 (6th Cir. 2000)......................... 65

*Lyons v. Stovall*, 188 F.3d 327 (6th Cir.1999).................................................................... 4

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998) ...................................... 127

*Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.*, 572 F. Supp. 1475 (D. Mass. 1983) .......................................................................................... 110

*Mathers Fund, Inc. v. Colwell Company,* 564 F. 2d 780 (7th Cir. 1977)............................ 138

*Mayer v. Mylod*, 988 F.2d 635 (6th Cir. 1993).................................................................. 66

*McClaren v. Keystone Memphis, LLC*, 2010 WL 56084 (W.D. Tenn. Jan. 5, 2010).......... 123

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006)............... 106, 115

*Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985)............................................................ 128

*Milman v. Box Hill Sys.*, 72 F. Supp. 2d 220 (S.D.N.Y. 1999) ...................................... 69

*Montcalm County Bd. Of Commissioners v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225
(W.D. Mich. 1993)....................................................................................... 127

*N.J. v. Sprint*, 314 F.Supp.2d 1119 (D. Kan. 2004)........................................... 133

*Nat'l Mining Ass'n v. United States Dep't of Interior*, 177 F.3d 1 (D.C. Cir. 1999) .......... 135

*New Orleans Opera Ass'n v. S. Reg'l Opera Endowment Fund*, 993 So. 2d 791 (La.App. 4
Cir. 2008) ................................................................................................. 105

*Norris v. Wirtz*, 719 F.2d 256 (7th Cir. 1983) ..................................................... 111

*Northstar Financial Advisors, Inc., v. Schwab Investments,* 609 F. Supp.2d 938 (N.D. Calif.
2009); ....................................................................................... 61, 62, 64, 136, 137

*Nowak v. Hedke*, 75 N.W.2d 13 (Neb. 2009) ..................................................... 114

*O'Brien v. Continental Ill. Nat'l Bank & Trust Co.*, 593 F.2d 54 (7th Cir. 1979) ..... 108, 110,
111, 112

*Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2 (2d Cir. N.Y. 1996) ………………………. 67

*Olmsted v. Pruco Life Insurance Company*, 283 F.3d 429 (2d Cir. 2002)......................... 136

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management*, 595 F.3d 86
(2d Cir. 2010)........................................................................................... 117

*Operation King's Dream v. Connerly*, 501 F.3d 584 (6th Cir. 2007) ................................ 65

*Ormond v. Anthem, Inc.*, 2008 WL 906157 (S.D. Ind. Mar. 31, 2008)............................ 103

*Phillips v. Morgan Stanley Dean Witter High Income Adv. Trust III,* 2002 WL 31119441
(S.D.N.Y. Sept. 25, 2002),.......................................................................... 62

*Pinter v. Dahl*, 486 U.S. 622 (1988)................................................................... 123

*Pollack v. Laidlaw Holdings, Inc.,* 1995 WL 261518 (S.D.N.Y. May 3, 1995) ................ 130

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004)...................... 96, 97, 128, 136

*Quinton v. Gavin*, 2001 WL 119 (Mass. Super. Ct. Feb. 12, 2001) ................................ 114

*Ray v. Citigroup Global Mkts.*, 482 F.3d 991 (7th Cir. 2007).................................... 80

*Rice v. Regions Bank*, No. 2:10-cv-00268 (N.D. Ala. March 8, 2010) ............................. 53

*Rodney v. KPMG Peat Marwick,* 143 F.3d 1140 (8th Cir. 1998) .................................. passim

*Sanders Confectionary Prod., Inc. v. Heller Fin., Inc.*, 973 F.2d 474 (6th Cir. 1992).128, 135

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) ...................................... 65

*Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir.1989) ...................................... 128

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980)............................... 56

*SEC v. State Street Bank and Trust Company*, Dkt. No. 1, (D. Mass. February 4, 2010).... 87,
106

*SEC v. Zandford*, 535 U.S. 813 (2002)............................................................. 115

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ....................................... 70

*Siemers v. Wells Fargo & Co.*, 2007 WL 760750 (N.D. Cal. Mar. 9, 2007) ..................... 79

*Simmons v. Wolfson*, 428 F.2d 455 (6th Cir. 1970).............................................. 107

*Smith v. American National Bank and Trust Co.*, 982 F.2d 936 (6th Cir. 1992) ............... 123

*Stavroff v. Meyo,* 1997 WL 720475 (6th Cir. Nov. 12, 1997)................................. 128

x

*Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005) ...................................... 54

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ............................. 65

*Sutter v. Sutter Ranching Corp.*, 14 P.3d 58 (Okla. 2000) ................................... 105

*Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ............................... 50

*Tower Bank & Trust Co. v. Bank One, N.A.*, 2006 WL 2092332 (N.D. Ind. July 26, 2006) ............................................................................................................ 111

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ........................................................ 114

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ........................ 56, 66, 67, 122

*Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588 (2001) ....................... 103

*White v Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002) ............................................................................................................... passim

*White v. Heartland High-Yield Mun. Bond Fund*, 2:00-cv-01388, Dkt. No. 312 (May 11, 2005) ...................................................................................................... 77

*Zerman v. Jacobs*, 510 F. Supp. 132 (S.D. N.Y. 1981) ...................................... 138

## Statutes

Investment Company Act of 1940 § 1(b) .............................................................. 137

Investment Company Act of 1940 § 2(a)(31) ...................................................... 106

Investment Company Act of 1940 § 2(a)(32) ...................................................... 104

Investment Company Act of 1940 § 5(a)(1) ........................................................ 104

Investment Company Act of 1940 § 7 ................................................................. 104

Investment Company Act of 1940 § 8 ........................................................... 104, 106

Investment Company Act of 1940 § 9 ................................................................. 106

Investment Company Act of 1940 § 13 ............................................................... 137

Investment Company Act of 1940 § 15 ............................................................... 106

Investment Company Act of 1940 § 22 ......................................................... 138, 139

Investment Company Act of 1940 § 24 ............................................................... 106

Investment Company Act of 1940 § 30(e) .......................................................... 138

Investment Company Act of 1940 § 34(b) ..................................................... 41, 138

Investment Company Act of 1940 § 36(b) ........................................................... 54

Investment Company Act of 1940 § 47(b) .................................................... 137, 138

Private Securities Litigation Reform Act , 15 U.S.C. § 78u-4(b)(2).................... 50

Securities Act of 1933 § 2(a)(3) ........................................................................ 103

Securities Act of 1933 § 10(a) ........................................................................... 116

Securities Act of 1933 § 11 ........................................................................... passim

Securities Act of 1933 § 12(a)(2) .................................................................. passim

Securities Act of 1933 15(a) .............................................................................. 127

Securities Act of 1933 § 17(a) ............................................................................ 41

Securities Exchange Act of 1934 § 3(a)(14) ………………………………………...103

Securities Exchange Act of 1934 § 10(b)........................................................ passim

Securities Exchange Act of 1934 § 20(a) ..................................................... 127, 136

## Other Authorities

*Heartland Advisors Order*, Release IC-28136 ................................................... 106

ICA Release No. 13436 (1983), 1983 WL 35814 (S.E.C. Release No.) (August 12, 1983) 60
ICA Release No. 19382, 1993 WL 101994 ........................................................................ 63
ICA Release No. 23064, 1998 WL 107729 (June 1, 1998) ................................................. 61
*In the Matter of Evergreen Investment Management Company,* LLC, SEC Release No. IC-
    28759, June 8, 2009 ......................................................................................... 15, 106
*In the Matter of Jon D. Hammes, Albert Gary Shilling, Allan H. Stefl, and Linda F.
    Stephenson*, Release No. IC-26290 (Dec. 11, 2003) ........................................... 93
*Registration Form Used by Open-End Management Investment Companies Securities Act,
    63 Fed. Reg. 13,916 (Mar. 23, 1998)* ........................................................... 117
SEC Form N-1A ......................................................................................................... passim
SEC Release No. 33-7512 .................................................................................. 9, 119, 121
*SEC v. Heartland Advisors Inc.*, No. 2:03-cv-01427-CNC (E.D. Wisc. Dec. 11, 2003), Dkt.
    No. 395; SEC Release No. IC-28136 (January 25, 2008) ................................... 93

## Rules

Fed.R.Evid. 201 .............................................................................................................. 3
Federal Rule of Civil Procedure 9(b) ..................................................................... 50, 51, 95
Federal Rules of Civil Procedure 12(b)(6) ....................................................... 7, 51, 79, 124
Securities Exchange Act of 1934 Rule 10b-5 ............................................... 2, 41, 106, 111

## Treatises

Fletcher, Cyclopedia of Corporations, Vol. 7A, § 3634 (Thomson/West 2006) ............... 105
George T. Bogert, Trusts (6th ed. 1987) ......................................................................... 113
Restatement (Second) of Trusts .......................................................................... 113, 114
Restatement (Third) of Trusts (2007). ................................................................. 113, 114
Scott on Trusts (3rd ed. 1967) ........................................................................................ 113

## Regulations

17 C.F.R. § 210.1-01(b) ................................................................................................. 81
17 C.F.R. § 230.405 ..................................................................................................... 128
17 C.F.R. § 240.12b-2 .................................................................................................. 134

Lead Plaintiffs,[1] submit this consolidated memorandum in opposition to the motions to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") by Defendants Morgan Keegan Select Fund, Inc.;[2] Blair, Johnson, Mann, McFadden, Pittman, Stone, and Willis ("Director Defendants"); Morgan, Alderman, Anthony, Sullivan, J. C. Weller, J. T. Weller, Edwards, Maxwell, George, Wood, Kelsoe, Tannehill, and Gamble ("Individual Defendants"); Regions Financial Corporation ("RF") and Regions Bank ("RB"); Morgan Keegan & Co., Inc. ("MK"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. (together "MAM/MK"); and PricewaterhouseCoopers ("PwC").[3]

Plaintiffs filed their CAC on November 30, 2009 (Dkt. No. 218). Notwithstanding that the CAC contains extensive detailed factual allegations, Defendants have moved to dismiss. Now, regulatory actions have been initiated by four states, the Securities and Exchange Commission ("SEC"), and the Financial Industry Regulatory Authority ("FINRA") against certain Defendants. These actions, which are the product of their joint investigation and access to documents and persons that have not been available to Plaintiffs, largely mirror and strongly buttress many of the CAC's allegations and, most importantly, confirm the merits of this class action, which began over two years ago on December 6, 2007 and which encompasses a broader range of wrongful conduct in more detail against a greater number of wrongdoers seeking recovery for a larger number of injured investors.

## PRELIMINARY STATEMENT

This class action by Plaintiffs is against the Funds, MAM (the Funds' investment ad-

---

[1] Lead Plaintiffs, the "RMK Open-End Funds Group," are Kathryn S. Cashdollar Estate, Dajalis Ltd., Jeanette H. Landers, H. Austin Landers, and Frank D. Tutor.

[2] Morgan Keegan Select Fund, Inc. ("Company"), before they were liquidated in June 2009, consisted of three portfolios: Regions Morgan Keegan Select Short Term Bond Fund ("STF"), Regions Morgan Keegan Select Intermediate Bond Fund ("IBF"), and Regions Morgan Keegan Select High Income Fund ("HIF") ("the Funds"). Morgan Keegan Select Fund, Inc. is now known as Helios Select Fund, Inc. and the "Regions Morgan Keegan" was replaced with "Helios" for its three portfolios following transfer of the Funds' investment advisory agreements to Hyperion Brookfield Asset Management ("HBAM") on July 29, 2008.

[3] Defendants' briefs are at, respectively, Dkt Nos. 233-1, 229-1, 226-1, 227-1, 222-1, and 228-1.

1

viser), MK (the Funds' distributor and administrator), the Director Defendants (the Funds' "outside" directors), the Individual Defendants (officers and key employees of MAM/MK), RB (also a distributor of the Funds), RF and MK Holding (controlling persons of RB and MAM/MK), and PwC, the Funds' auditor.[4] Plaintiffs assert claims under the Securities Act of 1933 ("'33 Act") §§ 11 and 12(a)(2), the Securities Exchange Act of 1934 ("'34 Act")  § 10(b) and Rule 10b-5 thereunder, and the Investment Company Act of 1940 ("ICA").

Defendants caused or allowed the Funds to take on concentration, credit, liquidity and valuation risks by investing an extraordinarily large portion of their portfolios in thinly traded securities of uncertain valuation that risked suddenly becoming unsalable at their estimated values upon shifting market sentiments. The Funds' heavy investments in these securities violated their disclosed investment objectives, policies and restrictions and substantially exceeded such types of investments and risks by their respective peer funds. The concealed risks inherent in such investments materialized in the fall 2007 when the Funds' assets became unsalable at their estimated values, and the Funds lost almost $1 billion in asset value.

Notwithstanding that the Funds were advertised as either as safe as, or safer than, other funds in their peer groups, the Funds suffered catastrophic losses unmatched by their peers. Through February 2008, STF lost $17.1 million (23%), IBF $405.5 million (70%), and HIF $515.0 million (72%). The direct cause of these losses was the composition of the Funds' portfolios that exposed them to vastly higher risks than their respective peers.

In August 2007, the Funds disclosed they were unable to value their portfolios and had retained an outside consultant to assist in "fair valuing" the illiquid securities held in the portfolios. The true extent of the Funds' over-concentration in illiquid, so called "fair-valued" securities was first revealed in the Funds' annual report that was filed with the SEC on October 4, 2007, and highlighted by PwC in its auditor's report. This report disclosed that as of June 30, 2006 and 2007, STF had 18.2% and 30.7% of its assets, respectively, in-

---

[4]     MAM/MK, the Funds' officers and directors and MAM/MK's corporate controlling persons are collectively sometimes referred to as the " Defendants."

2

vested in "fair valued" or illiquid securities; IBF had 55.8% and 50.4% invested in such securities; and HIF 49.5% and 59.8%. These investments significantly exceeded the SEC's 15%-of-assets limitation on illiquid securities. These "fair valued" securities included or were *in addition* to the Funds' illiquid "restricted securities."

Defendants acknowledge Plaintiffs allege that the RMK Defendants' mismanagement of the Funds caused Plaintiffs' losses and that the Funds "bore significant liquidity risk"; Defendants do not dispute that Plaintiffs allege this mismanagement consisted of directing the Funds' heavy investment in highly volatile illiquid securities in violation of their investment objectives, policies and restrictions. Defendants do not dispute that Plaintiffs allege these violations or that the dominance in the Funds' portfolios of securities with speculative valuations were not disclosed. Beyond that, Defendants' briefs are a jumble of contradictory, conclusory arguments that rarely address the CAC's detailed allegations; where Defendants do address the CAC's allegations, they invariably dispute their truth, which is not appropriate under Rule 12(b)(6).

## STATEMENT OF FACTS RELEVANT TO DEFENDANTS' MOTIONS

Plaintiffs herein set out those facts relevant to Defendants' motions to dismiss, according to the issues raised by Defendants' motions.[5] As noted above, regulatory proceedings have been initiated by the SEC,[6] FINRA[7] and four states[8] alleging facts that, in signifi-

---

[5]     Unless otherwise noted, all paragraph ("¶") and Appendix ("Appx.") references are to the CAC, all exhibit ("Ex.") references are to the Declaration of Jerome A. Broadhurst, and all emphases are supplied.

[6]     SEC Order Instituting Administrative and Cease-and-Desist Proceedings pursuant to Section 8A of the Securities Act of 1933, Release No. 33-9116, April 7, 2010 ("SEC Action"), Ex. 1. The SEC Action names MAM/MK, Kelsoe and J.T. Weller as Respondents. Plaintiffs request that the Court take judicial notice of these pleadings.  A court may consider materials outside the complaint that are integral to the complaint, matters of public record, or materials otherwise appropriate for the taking of judicial notice under Federal Rule of Evidence 201. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001). The Federal Rules of Evidence permit the Court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). A district court must take judicial notice "if requested by a party and supplied with the necessary information," Fed.R.Evid. 201(d), and such notice may be taken "at any stage of the proceeding." Fed.R.Evid. 201(f).  Furthermore, "it is well-settled that '[f]ederal courts may take judicial notice of proceedings in other courts of

3

cant part, reflect and support the facts alleged in the CAC. The SEC Action relates to valuation issues as to all three Funds, the FINRA Action to all three Funds with a particular focus on IBF and, to a lesser extent, STF, and the States Action to HIF and IBF.

## I.   THE FUNDS' UNDISCLOSED RISKS

Defendants argue that all required disclosures were made. MAM/MK Br. at 20-46. However, the CAC includes extensive detailed allegations regarding the Funds' undisclosed risks. Most of the disclosures for which Defendants seek credit are found not in the prospectus but in the Funds' Statements of Additional Information ("SAIs").[9]

In its effort to demonstrate full disclosure, MAM/MK repeatedly fails to distinguish between and among STF, IBF and HIF. *See, e.g.,* MAM/MK Br. at 3. MAM/MK ignores Plaintiffs' allegation that largely the same disclosures were made with respect to the three Funds as well as other RMK funds not at issue here without regard to their vastly different investment objectives, policies, risks and results, so that the disclosures were meaningless in terms of identifying the risks unique to each Fund.[10] *Id.* ¶¶ 395, 402-20, Appx. A-F.

While MAM/MK emphasizes the disclosed risks regarding generic "below investment-grade" securities, such disclosures related to both conventional corporate "junk" bonds and exotic asset- and mortgage-backed securities ("ABS/MBS"). However, the primary

---

record.'" *See Lyons v. Stovall*, 188 F.3d 327, 332 n. 3 (6th Cir.1999) (quotation omitted).

[7]      Financial Industry Regulatory Authority, Department of Enforcement v. Morgan Keegan & Company, Inc., Disciplinary Proceeding No. 2007011164501 ("FINRA Action"), Ex. 2.

[8]      Joint Administrative Proceeding File Nos. Alabama: SC-2010-0016, Kentucky: 2010-Ask Havlik-021, Mississippi: S-08-0050, South Carolina: 08011 ("States Action"), Ex. 3. The States Action names as Respondents Defendants MAM, MK, Kelsoe, Sullivan and Wood and alleges violations of the states' respective securities acts. See *Id.* at ¶ 32 for scope of investigation.

[9]      *See infra* regarding argument that the SAI is not a prospectus and that the prospectus must contain all material facts "essential" to an informed investment decision.

[10]      These other RMK funds include two other RMK Select open-end bond funds (Fixed Income Fund ("FIF") and Limited Maturity Fixed Income Fund ("LMFIF"), neither of which was managed by Kelsoe or Tannehill, and four closed-end funds (RMK Advantage Income Fund, Inc., RMK High Income Fund, Inc., RMK Multi-Sector High Income Fund, Inc. ("MSF"), RMK Strategic Income Fund, Inc.), none of which is at issue here and all four of which were managed by Kelsoe. ¶ 402, Appx. A-F.

cause of Plaintiffs' losses was *not* corporate junk bonds but the complex ABS/MBS, *both investment-grade and below investment-grade*, in which the Funds heavily invested, as the RMK Defendants admit. ¶¶ 145-48 (comparing HIF with all other high-yield funds—e.g., HIF's loss as of March 14, 2008, was more than 11 times worse than the median high-yield fund and three times worse than the next worst fund), ¶ 233 (MAM/MK letter to Funds' shareholders in November 2007 that "…in general, *we have always invested a large portion of our portfolios in "structured finance" fixed income securities*. . . . it is a fair assumption to say *the weakness in the portfolios relates to this area of investment*. A *large portion of structured finance securities are created with mortgage-related securities as the underlying collateral*."), ¶¶ 308-18, 380. Indeed, a major deficiency in MAM/MK's disclosure presentation is its failure to identify the disclosures that portrayed the risks of IBF and STF in light of their disproportionately (as compared with their peers and their referenced but unrepresentative benchmarks) heavy investments in ABS/MBS. ¶¶ 309-14, 318-20; Ex. 2 ¶¶ 12, 16-17, 35.

In weaving through MAM/MK's tortured effort at wringing disclosures out of remote places, it is crucial to keep in mind that the disclosure documents that were automatically furnished to the Funds' investors (prospectuses, annual and semi-annual reports, and sales materials) contained *none* of the risk disclosures that MAM/MK now acknowledges were so important. Instead, these documents assured investors as to the safety and stability of the Funds. ¶¶ 130-39, 386-95, 400-01; Exs. 2 ¶ 2; 3 ¶¶ 55-76. MAM/MK is forced to rely on the Funds' SAIs, which were provided to investors only on request, for what it says were disclosures of the undisclosed risks alleged in the CAC. Nowhere does MAM/MK address Plaintiffs' allegations that the Funds' investment practices, regardless of the extent to which they were disclosed, contradicted and violated the Funds' investment objectives, policies and restrictions and that those violations were NOT disclosed. ¶¶ 6, 129-44, 161-305.

A.   **MAM/MK's Disclosure Examples**

MAM/MK cites a handful of disclosures. MAM/MK Br. at 3-4, 16-17. Regarding

the disclosure that "Up to 100% of the fund's total assets may consist of debt securities that are rated below investment-grade…," this disclosure relates only to HIF, not IBF or STF. Appx. F at 384; e.g., Curley Decl. Ex. I at 2, 10, 18. The disclosure recited in the second bullet, including the reference to "less liquid," relates only to HIF in the Funds' November 1, 2006 prospectus, and was not said about STF or IBF.[11] These two liquidity risk disclosures (Br. at 4) appeared in the SAIs, not in the prospectuses. They were in any event misleading because they failed to disclose, *inter alia*, the percentages of illiquid, thinly traded or fair valued securities held by the Funds, as was finally done in the Funds' October 3, 2007, financial statements, and were negated by the disclosures in each annual, semi-annual, and quarterly report that the securities designated as "restricted" were nevertheless liquid. ¶¶ 201, 220(l), 236, 383-85. The first time this kind of disclosure appears in the *prospectus* is in the August 13, 2007 supplement. ¶ 231. The Funds' October 3, 2007 financial statements were the first time the disclosure that the "market price of illiquid securities generally is more volatile…" appeared in a communication automatically sent to the Funds' shareholders (as distinguished from the SAIs that were sent only on request). ¶ 220(l).

The disclosure identified in the third bullet (MAM/MK Br. at 3) is identical as to the three Funds and is substantively the same as FIF and LMFIF, but the five funds had widely disparate results, ranging from losses of 2% (FIF) and 8% (LMFIF) to 31% (STF), 78% (IBF) and 73% (HIF). Appx. B. The disclosures identified in the last two bullet points (MAM/MK Br. at 4) are also deficient for, *inter alia*, failing to disclose the amount of securities for which market prices were not readily available and the focus on below investment-grade, which did not cause the Funds' losses, instead of the concentration in ABS/MBS, in-

---

[11]    While a liquidity risk disclosure did appear as to STF, IBF, and HIF in their November 1, *2007* prospectus, such disclosures were *after* the liquidity risk had already materialized and the Funds had begun to incur their losses. Curley Decl. Ex. L at 4, 13, 20, 24; ¶¶ 309, 312, 315, 324. These belated disclosures in late 2007 of all three Funds' liquidity risk and the losses caused by such risk by the time such disclosures were made demonstrate the materiality thereof and the need for such disclosures in the Funds' earlier prospectuses in the Class Period in view of the existence of such risk throughout the Class Period. ¶ 183.

cluding both investment-grade and below investment-grade, which did. ¶¶ 220(d)-(l), 222, 233. The last such disclosure appeared only in the SAI, not the Funds' prospectuses.

MAM/MK's failure to distinguish between the Funds, notwithstanding their different investment objectives and polices, is consistent with how they managed them. That they now seek to take advantage of disclosures that appeared only in the SAIs proves (i) the materiality of such disclosures and, thus, (ii) the need for such information to have been included in the prospectuses. MAM/MK admits that information disclosed in the other RMK funds' *prospectuses* was found in only the Funds' SAIs. MAM/MK Br. at 6 n. 5.

### B.   The Funds and the Credit Crisis

MAM/MK relies on materials that are not referenced in the CAC to argue that the credit crisis is to be blamed for the Funds' and Plaintiffs' losses. MAM/MK Br. at 8-12. MAM/MK does so notwithstanding that the RMK Defendants repeatedly concede Plaintiffs allege the Funds' losses were caused by the RMK Defendants' mismanagement in directing the Funds to invest in exotic illiquid securities in violation of each Fund's investment objectives, policies, restrictions, and representations. MAM/MK's blame game is simply posing an alternative theme in opposition to the facts alleged in the CAC, which requires it to improperly resort to "evidence" outside the CAC  and is not allowed by Rule 12(b)(6).[12]

Plaintiffs allege that their losses were caused by the Funds' extraordinarily disproportionate investments (compared to their peers) in illiquid exotic ABS/MBS and that these investments rendered the Funds uniquely vulnerable to the credit crisis, causing Plaintiffs' shocking losses. ¶¶ 116-28, 145-60, 249-50, 276, 292, 308-18, 380, 404-19, Appx. C. HIF and IBF, whose portfolios resembled the RMK closed-end funds, performed as badly or worse than did the RMK closed-end funds, but the latter's risk disclosures were far more robust than those of HIF/IBF. ¶¶ 402-04, 412-19, Appx. D-F. On the other hand, although

---

[12]    In ruling on a motion to dismiss, a court may consider only evidence contained or asserted in the pleadings; generally, matters outside the pleadings may not be considered in ruling on a motion to dismiss. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999).

the Funds' portfolios were far more heavily invested in ABS/MBS than were the portfolios of the other two RMK open-end bond funds, with the resulting vastly disparate performances, all five Funds' disclosures were substantially the same. ¶¶ 402-11, Appx. A-C.

That Standard & Poor's downgraded 1000 bonds tied to subprime mortgages in July 2007 (MAM/MK Br. at 10, Curley Decl. Ex. CC) is irrelevant to Plaintiffs' allegations that the Funds should not have been so heavily invested in such bonds in the first place. This was because such investments violated the Funds' investment objectives, policies and restrictions, and should never have been acquired or should have been divested long before July 2007, thereby avoiding the Funds' losses. ¶¶ 116-28, 161-215, 248-305, 318-21, 468, 518, 532, 541-42, 555-60. That the Federal Reserve Board Chairman may or may not have foreseen the subprime debacle is beside the point, because RF did foresee it and acted on its analysis when it decided to sell its subprime lending subsidiary in 2006. ¶¶ 329-40.

That the Funds' investments in ABS/MBS far exceeded the bounds prescribed by their investment objectives, policies and restrictions is evidenced by the fact that other bond funds that shared their investment objectives (including high-yield funds) did not heavily invest in such securities and, consequently, did not even remotely suffer such catastrophic losses. ¶¶ 119-27, 145-60, 308, Appx. C. That such investments were outside the Funds' investment objectives is further evidenced by the fact that, when the new investment adviser took over in July 2008, it announced it would remake the Funds' portfolios to comply with their respective investment objectives by increasing the Funds' "exposure to high-yield and investment-grade corporate bonds and to decrease exposure to structured products and residential mortgage-backed securities." ¶ 292.

Instead of arguing that the CAC fails to state a claim, Defendants seek to excuse their gross mismanagement. For example, MAM/MK says the markets for the Funds' ABS/MBS became illiquid at an inopportune time. MAM/MK Br. at 10 n. 10. But this is *precisely* the risk that Plaintiffs allege infected the Funds as a result of the RMK Defendants' mismanagement, rendering them vulnerable to the credit crisis in a way that no other

bond fund was, that such thinly traded securities periodically collapsed, that Defendants were warned of such risks, that such risks were not disclosed, and that the Funds should not have been so heavily invested in such securities. ¶¶ 145-60, 180-215. Defendants represented to the Funds' shareholders the need for the Funds to maintain liquidity and flexibility and represented they would cause the Funds to do so and would maintain the Funds' NAV stability. ¶¶ 204, 267-72. While all other bond funds were built on a solid foundation of rock that enabled them to withstand the credit tsunami with minimal to no losses, the Funds were built on a flimsy foundation of sand that completely washed away when the storm hit.

### C. The Funds Did Not Disclose Their Risks.

#### 1. The Funds' disclosures regarding risk were grossly inadequate.

MAM/MK says the Funds' prospectuses disclosed that "a certain percentage of each Fund's portfolio could be invested in debt securities" (hardly a surprise, since these were bond funds after all) and, "in particular, below investment-grade securities." MAM/MK Br. at 23-24; Ex. 2 ¶ 66. But STF was not supposed to invest more than 10% and IBF not more than 35% in below investment-grade securities. Curley Decl. Ex. I at 2, 10. While here and elsewhere MAM/MK repeatedly cites generic boilerplate disclosures about below investment-grade risk (MAM/MK Br. at 3-4, 24-26), it was not below investment-grade securities that caused the losses; *it was the Funds' investments in illiquid ABS/MBS, both investment-grade and below investment-grade, that did*.[13] Nor do these disclosures come close to informing the Funds' shareholders about the Funds' liquidity, credit, leverage, concentration, and valuation risks that caused the Funds' losses. ¶¶ 161-328.

The boilerplate disclosure that "you could lose money" (MAM/MK Br. at 24) is hardly a material fact but is more of the sort of commonly understood generic fact of life that does not require disclosure.[14] This anemic disclosure is to be compared with that of the

---

[13]      ¶¶ 5-6, 120-27, 249, 308-18; Ex. 3 ¶ 45 ("Despite listing generic risk factors, Respondents' prospectuses failed to notify prospective customers that the Funds were largely composed of structured debt instruments and the specific risks associated with structured debt instruments.").

[14]      SEC Release No. 33-7512: In adopting revisions to Form N-1A, the SEC sought to

9

RMK closed-end funds: "STOCKHOLDERS CAN LOSE SOME OR *ALL* OF THEIR IN-VESTMENT." ¶ 420; Appx. F at 383 (capitalization in original). Defendants now admit the Funds carried "above-market risks," but this was not disclosed. ¶ 7. The disclosure identified by MAM/MK relating to "…greater risk of loss…greater price volatility and are less liquid…" (MAM/MK Br. at 24-25) relates NOT to STF or IBF but to HIF only. Curley Decl. Ex. I at 2, 10, 18, 22-22.

Citing the prospectus generic disclosure about credit risk, MAM/MK says the Funds' credit risk was disclosed. MAM/MK Br. at 24 n. 19 ("A broad-based market drop may also cause a bond's price to fall."). This bland disclosure is *nothing* more than the type of "general economic matters, trends and possibilities" that need not be disclosed. What was not disclosed were the extraordinary credit risks taken on by the Funds in their ABS/MBS investments. ¶¶ 248-66. These risks included, *inter alia*, the Funds' huge investments in highly speculative tranches of ABS/MBS that were extraordinarily vulnerable to defaults because they were among the lowest ranking tranches that would be among the first to absorb such losses; low FICO credit scores; lack of loan documentation; nonconforming loan underwriting standards; the unsuitability of the Funds' investments in view of the Funds' investment objectives and the types of persons who invested in the Funds (as admitted by Defendants, namely, investors who require "a regular or predictable schedule of monthly payments"); loan-to-value ratios exceeding 90% borrowers with little or no payment history; likelihood of greater default on loans that required interest-only payments; and the amount of losses as a percentage of the entire collateral pool that would wipe out the Funds' investments. ¶¶ 253-66, 375(u). These facts were uniquely material to these Funds because of the prominence of these investments in the Funds' portfolios.

MAM/MK correctly says that the Funds were required to disclose "risks to which the fund's *particular* portfolio as a whole is *expected to be subject* and to discuss the *cir-*

---

"eliminate jargon and boilerplate." *Id.* at 5. Ex. 17.

*cumstances* that are *reasonably likely to affect adversely* the fund's net asset value, yield, or total return." MAM/MK Br. at 25; SEC Form N-1A Item 4 (Curley Decl. Ex. X at 18). The Funds' insipidly generic disclosures did not address the unique characteristics of the Funds' portfolios as compared with their peers, and therefore did not come close to disclosing the extraordinary risk that the Funds held the potential for losses of a vastly greater magnitude than their respective peers. ¶¶ 402-20, Appx. A-F. The SAI disclosures on which MAM/MK relies contained what MAM/MK calls "specific risk disclosures regarding the types of securities in which the Funds might invest"; MAM/MK also says that "the detailed and specific warnings of the risks associated with each type of security" were sufficient. MAM/MK Br. at 25-26. But these disclosures were in the SAIs instead of the prospectuses, were irrelevant, described the security but not the risks alleged in the CAC, and were otherwise false and misleading. ¶¶ 371-97. By arguing that the disclosures contained in the MSF *prospectus* are found in the Funds' *SAIs* (MAM/MK Br. at 28-29), MAM/MK tacitly admits that these disclosures were not in the Funds' prospectus, admits they were material, and thereby implicitly concedes that they should have been in the Funds' prospectuses. ¶ 419, Appx. F.

The SAI disclosure regarding "Subordinated Securities (All Funds)" (MAM/MK Br. at 25-26) was false and misleading. ¶¶ 295-302, 381-82; Ex. 3 ¶ 44. The descriptions of the various types of securities (Br. at 25-26), while not inaccurate, were nevertheless false and misleading for the same reasons as regarding subordinated securities generally. ¶ 382. Others of the referenced disclosures were meaningless generalized disclosures (e.g., "...CLOs are subject to credit risk").The quoted SAI statements do contain one disclosure that hints at a major risk that permeated the Funds: "The return on the lower tranches of *CBOs* is especially sensitive to the rate of defaults in the collateral pool." Br. at 26. This statement was also true of *all* of the *other* ABS/MBS (CDOs) held by the Funds (CMOs and CLOs), not just *CBOs*. ¶¶ 126, 253-56, 264-65. Nevertheless, this disclosure (in the SAIs only) does not remotely suggest the extent to which the Funds were subject to this risk. ¶ 395.

The Funds were required by Generally Accepted Accounting Principles ("GAAP")

and SEC requirements to disclose their concentration of credit risk. ¶¶ 283, 514-18. The Funds failed to disclose the extraordinary risks associated with the securities purchased by the Funds as set out in the *prospectuses for those securities*. ¶¶ 197-99, 203-14, 248-66. The simple fact that the Funds' annual, semi-annual, and quarterly reports listed securities by category (MAM/MK Br. at 27) did not even come close to disclosing the concentration in real estate related investments or in illiquid, fair valued securities with extraordinary credit, valuation, leverage and liquidity risk, actually misrepresented the liquidity risk, and did not disclose the Funds' violative investment practices. ¶¶ 161-203, 209-15, 222-26, 249-57, 276, 293-303, 382, 385.

Incredibly, MAM/MK says, "Plaintiffs *plead no facts* to support the existence of any undisclosed '*extraordinary*' risk at the time of the effective date of the Funds' offering documents (i.e., Nov. 2006) or that such risk was *knowable* at that time." MAM/MK Br. at 27. This statement is frivolous and is belied by the above and following allegations:

- ¶¶ 126-27, 308: Comparing Funds' holdings of risky securities with their peers;

- ¶¶ 173-96, 209-10: Percentage of illiquid securities on several dates throughout the Class Period, which necessarily includes dates on which the Funds amended their registration statement with a new prospectus, which data was certainly not only "knowable" but was actually known to Defendants as this comes from the Funds' own documents and clearly shows violations of investment restrictions;

- ¶¶ 197-99: Liquidity risk disclosures in *prospectuses for the securities in which the Funds invested*, which risk was not disclosed in the Funds' prospectuses, alleging that the "RMK Defendants were explicitly warned in the prospectuses for such securities of the liquidity risk that was subsequently realized";

- ¶ 201: Defendants improperly designated restricted securities as "liquid";

- ¶¶ 203-05: RMK Defendants knew of the illiquid nature of the structured financial instruments that dominated the Funds' portfolios;

- ¶¶ 220-22: Disclosures made in each prospectus, SAI, and semi-annual and annual report regarding the valuation of the Funds' thinly traded securities, each of which disclosures was false and misleading for the reasons alleged;

- ¶ 223: Based on what was disclosed, Defendants knew the extent to which the Funds were subject to extraordinary (because of the undisclosed proportion of the Funds' portfolios in such securities) valuation risks relating to thinly traded

securities and therefore knew the extent to which the Funds' published NAVs throughout the Class Period were highly uncertain estimates;

- ¶¶ 248-62: During the Class Period, the Funds' were subject to extraordinary credit risk, which risk—including the proportion of ABS/MBS held by the Funds (¶ 249), the illiquid nature thereof (¶¶ 251-52), the proportion of the Funds' portfolios in the riskiest ABS/MBS tranches (¶¶ 253-56), the verbal descriptions of the risks in the prospectuses for a small portion of the ABS/MBS investments purchased by the Funds (¶¶ 258-62)—was known to Defendants (¶¶ 257-58), notwithstanding that the data in ¶¶ 253-56 understates the Funds' risks because it is based on prospectuses for only a small fraction of the Funds' ABS/MBS (¶¶ 253-56, 258, 264-65);

- ¶¶ 161-211: During the Class Period, each of the Funds invested more than the permitted 15% of their portfolios in illiquid securities;

- ¶¶ 273-76, 278-81: During the Class Period, each of the Funds invested more than the permitted 25% of their portfolios in real estate securities.

These risks are based on the Funds' investments during the Class Period, were extraordinary because these investments violated both the Funds' own investment limitations and greatly exceeded their respective peers, and were known to Defendants because the RMK Defendants could and did read the prospectuses they received which described the risks of the Funds' ABS/MBS investments in detail, knew they were making these investments for the Funds, and are able to do basic arithmetic to know the percentages of the Funds' assets invested in such high risk securities. ¶¶ 162-215, 308, 373.[15] The unusual risks of the subprime market were "knowable" to RF, and, in fact, it acted on this knowledge in 2006. ¶¶ 329-40. The Funds' risk disclosures in their SAIs were "generalized and incomplete," disclosing "some, but not all, of the risks inherent in" the ABS/MBS purchased by the Funds. ¶¶ 378-81, 395. Plaintiffs also comprehensively allege the factors that "negated" the Funds' generalized risk disclosures and rendered them "incomplete." ¶¶ 139-41, 380-97.

    **2.**    **MSF's *prospectus* disclosures versus the Funds' *SAI* disclosures.**

MAM/MK admits the disclosures from MSF's *prospectus* were not in the Funds' *prospectuses*. MAM/MK Br. at 29 ("Plaintiffs can make this claim only by ignoring the

---

[15]    *But see* Ex. 3 ¶¶ 125-26 (MAM purchased many ABS/MBS without having any information about them). This is reckless disregard in the extreme.

Funds' SAI…"). By picking these examples from the MSF prospectus, MAM/MK is conceding the materiality thereof and further conceding that these disclosures were required to be disclosed in the prospectus, not the SAI.

MSF (another RMK fund not at issue here) said in its *prospectus* that the *below investment-grade securities* in which it invested "*are* less liquid than investment-grade securities" whereas the Funds' *SAI* said the market for such securities "*may* be thinner and less active than for higher quality debt securities." Appx. F at p. 386.[16] Defendants contend these securities "became" illiquid when the key fact is that they "were" illiquid or *currently possessed* the characteristics of securities that can become unsalable overnight. This risk was not disclosed anywhere by the Funds (even in their SAIs) but was disclosed in the MSF prospectus. Also, while this SAI disclosure was made regarding *below investment-grade* securities generally, it was not made regarding the ABS/MBS, *both investment-grade and below investment-grade*, in which the Funds so heavily invested.

Regarding MAM/MK's second example regarding illiquid and restricted securities (Br. at 29), even the Funds' SAI disclosures were false and misleading. ¶¶ 201, 214, 383-85, Appx. F at 387. As to the third and fourth SAI examples regarding ABS/MBS (Br. at 29-30), these are descriptions of the various types of such securities; with a single exception (the underlined text on page 392 of the CAC regarding asset-backed securities, which appears in the referenced SAIs), these disclosures *contain no risk disclosures*, either in general terms or with respect to the Funds' heavy investments therein. *See* ¶¶ 381-82. Even the single referenced risk disclosure relates to asset-backed securities, not mortgage-backed securities, suggests the latter are safer, but is wholly negated by the undisclosed extraordinarily high credit risk embedded in the Funds' mortgage-backed securities. ¶¶ 253-60.

MAM/MK's fifth example relates to the importance of research and analysis when investing in these securities (MAM/MK Br. at 30). MAM/MK is again admitting the materi-

---

[16]     Regarding the significance of "may" versus "are," *see* Argument VII.B. *infra* .

ality of a disclosure not found in the Funds' prospectus. In any event, not disclosed in the SAI was MAM's meager credit research capability (one person) and its reliance on a small broker/dealer whose research staff was no more capable, thus rendering this disclosure, regardless of where it was, false and misleading. ¶¶ 361, 364.[17] Frequently, MAM purchased ABS/MBS securities without even knowing their composition. Ex. 3 ¶¶ 125, 151. None of these SAIs disclose the extent to which these securities and their attendant risks (virtually all of which were undisclosed even in the SAIs) dominated the Funds' portfolios, as was finally done in the Funds' 2007 annual report belatedly issued in October 2007. ¶¶ 469-72.

HIF's and IBF's portfolios resembled the RMK closed-end funds' portfolios. ¶ 415, Appx. E. HIF closely resembled the four RMK closed-end funds in its portfolio composition, differing only to the extent that HIF did not employ leverage to the extent that the closed-end funds did. ¶ 416, Appx. E, F. MAM/MK ignores most of the MSF *prospectus* disclosures that were *not* made in either the Funds' prospectuses or even in their SAIs, e.g.:

- investors "can lose some or *all* of their investment" (CAC at 383);

- MSF's disclosed percentage of its investments in below investment-grade and distressed assets as compared with IBF's disclosure that it could invest only 35% of its assets in below investment-grade securities and nothing in distressed assets (CAC at 384; Ex. 2 ¶ 13);

- MSF's use of leverage and the attendant risks (CAC at 385, 396-98);

- MSF "should not constitute a complete investment program for any investor" (¶ 385);[18]

---

[17]    This small broker/dealer was located in Florida and was a major source of the Funds' purchases of their ABS/MBS and, through MAM/MK's reliance on it, for pricing these securities as well. ¶¶ 351, 357-67. In *In the Matter of Evergreen Investment Management Company, LLC*, SEC Release No. IC-28759, June 8, 2009, at ¶¶ 11, 15, 29, the SEC found an investment adviser to have improperly relied on "an individual broker/dealer located in Florida" for pricing of its fund's ABS/MBS without having reviewed or approved the broker/dealer's pricing methodology. Ex. 45.

[18]    Morningstar said the same thing about HIF and IBF. Curley Decl. Exs. JJ-LL. But they did not disclose this in their prospectuses, as did MSF, even though MAM/MK clearly knew the risks of these Funds. Exs. 2 ¶ 13 (IBF "overweight in asset-backed securities" and corporate bonds results in "*far different risks than the broad market and than what most investors would expect from their fixed income portfolio*" so that IBF "*simply does not act like a traditional bond fund*. . . . Clearly [the fund] acts differently than the market, but the *magnitude of that difference is comparatively large*. Again, this is all a result of the holdings within the fund. . . .

- Risk that investor in MSF could lose "the entire principal that a common stock-holder invests" and that the value of the investments made by the MSF "may move up or down, sometimes rapidly and unpredictably" (¶¶ 385, 397);

- Risk of MSF's use of derivatives (CAC at 388, 395, 402), while IBF denied use of derivatives and neither HIF nor STF disclosed the risks of derivatives, even though the Funds contained investments commonly deemed derivatives (¶¶ 132, 134, 276, 375(i), 522, 594);

- Limits regarding credit ratings (CAC at 390);

- Risks inherent in MSF's investments in private placements, acknowledging their illiquidity and the absence of disclosure requirements (CAC at 393) (*Cf.* ¶¶ 197, 199 [alleging the disclosures found in prospectuses for the ABS/MBS purchased by the Funds but not disclosed in the Funds' prospectuses], 201 [representing restricted securities to be liquid]);

- MSF's prospectus contains disclosures regarding liquidity risks on numerous pages (CAC at 387, 393, 394, 399, 401, 402).

**D.   The Funds' Undisclosed Liquidity Risk.**

**1.   The Funds' documents did not disclose the Funds' liquidity risk.**

MAM/MK contends the Funds' liquidity risk was fully disclosed. MAM/MK Br. at 30-36. MAM/MK is manifestly wrong. Significantly, MAM/MK concedes the importance of maintaining liquidity for open-end funds to meet redemptions and to facilitate valuation, but, as Plaintiffs allege, the Funds failed to do so. *Id.* at 30; ¶¶ 125, 204-06, 213-15, 270-72.

MAM/MK disputes the CAC regarding liquidity by relying exclusively on SAI disclosures, *citing not a single prospectus disclosure of liquidity risk*. Indeed, the term "liquid-

---

[T]here are some risk exposures with this fund that are just different than more traditional bond funds. In addition, this fund has a fair amount of liquidity risk . . . .), ¶ 33 (from a 2006 MK analysis of IBF: "Issues included in the portfolio are generally the inferior tranches in structured deals." As a consequence, "They trade at large discounts due to a lack of demand and liquidity." ), ¶ 79 (IBF's "special risks" made it "unsuitable for many retail investors and that should have been clearly disclosed to investors."), ¶ 80; 3 ¶ 114 (MK official recognizes in May 2007 that IBF is not appropriate as a "core fixed income holding in an investor's portfolio," the official candidly stating, "What worries me about this bond fund is the tracking error and the potential risks associated with all that asset-backed exposure. Mr & Mrs Jones don't expect that kind of risk from their bond funds. The bond exposure is not supposed to be where you take risks. I'd bet that most of the people who hold that fund have no idea what's it's actually invested in. I'm just as sure that most of our FAs have no idea what's in that fund either. They think the return are [sic[ great because the PM is so smart." "If people are using RMK as their core, or only bond fund, I think it's only a matter of time before we have some very unhappy investors."), ¶¶ 115-16.

ity" appears only once in HIF's and IBF's November 1, 2004 and 2005 prospectuses but even then only with respect to how, "for liquidity and flexibility, the fund may invest in investment grade, short-term securities" and only once regarding STF (2005). Curley Decl. Exs. A at 1, 6; F at 2, 9, 17. The terms "illiquidity" or "liquidity risk" do not appear at all in the prospectuses for any of the three Funds. In its November 1, 2006 prospectus, HIF drops the disclosure regarding purchasing short-term investment-grade securities "for liquidity and flexibility" and discloses for the first time that *below investment-grade* securities "are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities"; this disclosure is not made by IBF (which continued to represent "for liquidity and flexibility, the fund may invest in investment grade, short-term securities") or STF. Curley Decl. Ex. I at 2, 10, 18.

Regarding MAM/MK's bare unsupported argument that "lack of liquidity did not injure shareholders" and that the Funds were able to meet "massive redemptions," Plaintiffs have specifically alleged the contrary. ¶¶ 318-28. Indeed, MAM/MK's assertion is directly contrary to its own statement in August 2007, in which MAM/MK itself admitted the adverse effect on the Funds (i.e., injury) of the "massive redemptions" in July-August 2007. ¶ 231 (Funds' liquidity affected by "significant net redemptions").[19]

MAM/MK recites an SAI liquidity disclosure (MAM/MK Br. at 31) that appears 27 pages after the Funds' SAI representation that the Funds would not invest more than 15% of their net assets in illiquid securities. This disclosure was false and misleading and was negated by the Funds' disclosures minimizing the impact of illiquid securities on the Funds' portfolios and outright denial that the Funds had any illiquid securities. ¶¶ 201, 383-85.

MAM/MK's attempt to demonstrate adequate disclosure regarding the valuation uncertainty of illiquid securities is equally unsuccessful. Br. at 31. MAM/MK is again forced

---

[19]    IBF and HIF were able to meet "massive redemptions" in August 2007 only with capital infusions from an RMK entity, and these redemtions were the result of preferential treatment of favored accounts. *See* footnote 93 *infra*.

to rely on an SAI disclosure that "any illiquid securities were generally fair valued, and such securities carried the additional risks that their values may be subjective and vulnerable to changing market sentiments." *Id.* Again, MAM/MK implicitly concedes the materiality of this disclosure, the link between valuation and liquidity, and that the disclosure did not appear in the prospectus. Contrary to MAM/MK's assertion, the November 2005 SAI does not disclose that fair valued illiquid securities "may be vulnerable to changing market sentiments." *Id.*; Curley Decl. Ex. G at 28. Regardless, to the extent that such disclosure is read into what is disclosed about illiquid securities, the disclosure is negated because the SAI also says the Funds will not invest more than 15% of their assets in illiquid securities, and the presence of illiquid securities in the Funds' portfolios is not disclosed. MAM/MK's assertions prove the materiality of disclosing the percentages of fair valued securities held by the Funds, as was finally done in October 2007 (except as to STF in 2005). ¶¶ 183, 469-72.

Interestingly, MAM/MK relies on a Morningstar analyst, Lawrence Jones. MAM/MK Br. at 31 n. 22. MAM/MK ignores Jones's statement that RMK lacked the risk controls necessary to protect the Funds' investors from securities that could hurt them. ¶ 144. Again, MAM/MK focuses on disclosures relating to "below investment-grade securities" when the Funds' losses were primarily caused by the risks inherent in investment-grade and below investment-grade ABS/MBS and their unique credit risk.

MAM/MK says liquidity risk was disclosed, because Plaintiffs were able to calculate it from the Funds' reports, but then says Plaintiffs' calculations are really all wrong because all of the restricted securities were not really illiquid but were liquid, and then ends up saying that the restricted securities, whether liquid or illiquid, were identified and that, therefore, the "'illiquid' component of each portfolio was thus disclosed." Br. at 32. MAM/MK's confused and contradictory argument mirrors the confusion and equivocation that afflicted the Funds' disclosures regarding liquidity risk. While now appearing to concede that "restricted securities" were illiquid, the quantity of illiquid securities significantly exceeded

18

such securities. ¶¶ 161-215.[20] The Funds' reports during the Class Period, by themselves, painted a very incomplete picture of the Funds' liquidity and valuation risk, both because of missing information regarding fair valued securities, the data found from other sources, and the representation that all of the Funds' restricted securities were actually liquid. MAM/MK does not, and cannot, contend that the fair valued component was disclosed. While the "restricted securities" were identified, the fair valued securities were not, as they finally were in October 2007, at which time the fair valued securities at June 30, 2006 were also identified for the first time. ¶¶ 183, 469-72.

At a minimum, MAM/MK is simply disputing Plaintiffs' allegations that the Funds' holdings of illiquid securities exceeded the 15% limitation, a wholly improper argument at this time. Significantly, MAM/MK concedes that SEC guidance provides that restricted securities may be determined to be liquid but only if they do not exhibit the characteristics of illiquid securities. MAM/MK Br. at 35 (citing ICA Rel. No. 17452). The CAC contains extensive allegations as to the characteristics of illiquid securities, that securities in the Funds' portfolios possessed these characteristics, and that securities possessing these characteristics exceeded the disclosed 15% limitation on illiquid securities. ¶¶ 172-77, 180-215, 473-78.

Amazingly, MAM/MK relies on a statement in early *2003* (almost two years before the beginning of the Class Period) about HIF (*not IBF* or *STF*) from a Morningstar *analyst*, *not even in an SAI*, for an observation about HIF's "heavy tilt towards asset-backeds, which can be illiquid"! MAM/MK Br. at 33. Again, MAM/MK is conceding a material fact that was not disclosed in the Fund's prospectuses about any of the three Funds. Even more amaz-

---

[20]   Plaintiffs' calculations of fair valued illiquid securities were based on the disclosures in the October 2007 annual report; these calculations could not have been done before the October 2007 disclosures. ¶¶ 180-183(a), 189, 220, 220(l), 222, 469-72. The calculations of illiquid securities are based on both restricted securities disclosed in the Funds' annual, semi-annual and quarterly reports and SEC filings by the issuers of the ABS/MBS purchased by the Funds, the lack of such filings regarding securities not identified as restricted securities, Bloomberg, and the RMK closed-end funds' filings; thus, this information is derived in large part from sources other than the Funds' reports and not at all from the Funds' prospectuses and SAIs. ¶¶ 183, 195-98, 209, 469-72.

ing, after many pages of alternately denying the Funds were subjected to significant liquidity risk and then arguing such risk was disclosed (Br. at 23-33), MAM/MK says the Funds' annual, semi-annual and quarterly listings of their securities, together with "[a]ll this" (i.e., including the Morningstar analysis) "put any reasonable investor on notice that securities in the Funds' portfolio [sic] *bore significant liquidity risk.*" Br. at 33. Thus, MAM/MK makes the remarkable admission that the Funds really did hold securities that "*bore significant liquidity risk.*" *Id.* Having made this significant admission, the only question is whether this "significant liquidity risk" was disclosed in the Funds' prospectuses; it clearly was not.

> **2.    The Funds and RMK Defendants were required to make additional liquidity risk disclosures because the Funds were violating their disclosed investment restriction on illiquid securities.**

MAM/MK contends the Funds had no duty to make additional disclosures regarding liquidity because the 15% investment restriction is determined after the purchase of illiquid securities and Plaintiffs do not allege the Funds' illiquidity resulted from the purchase of illiquid securities. MAM/MK Br. at 33-34. MAM/MK is wrong.

Plaintiffs do allege that the Funds purchased of illiquid securities after which the Funds held more than 15% in illiquid securities. ¶¶ 180, 183, 192-94, 200. For example, at June 30, 2006, IBF's holdings of restricted securities, fair valued, and otherwise illiquid securities totaled $494.7 million, or 73.4% of its portfolio; during its fiscal year 2006, IBF had net purchases of fair valued (i.e., illiquid) securities of $107 million. ¶¶ 174-76, 183, 192. From June 30, 2006 to June 30, 2007, IBF's fair valued securities increased from $376.1 million to $514.9 million and its total illiquid securities increased from $494.7 million to $835.9 million. ¶ 183. During its 2007 fiscal year, IBF had net purchases of fair valued securities of $176,720,932. Curley Decl. Ex. W at 82.

The illiquid securities purchased by all three Funds during 2006 and 2007 exceeded the fair valued securities purchased during that period. ¶¶ 183, 195-96. Defendants admit that securities for which market quotations are not readily available are illiquid securities and that such securities must be fair valued. ¶ 174; Curley Decl. Exs. B at 22-23, G at 27, J

20

at 29, 41. Thus, the CAC clearly alleges that the Funds purchased illiquid securities in violation of the 15% restriction. ¶¶ 161-96, 209-10. Moreover, the RMK Defendants knew that the Funds were purchasing illiquid securities. ¶¶ 361, 367.

Again, MAM/MK is disputing the truth of Plaintiffs' allegations, not that these allegations fail to state a claim. MAM/MK says Plaintiffs incorrectly included in illiquid securities the "technically 'restricted' fixed income securities," contending these securities could be deemed to be liquid, citing SEC Rel. No. 17452. Br. at 34. As MAM/MK correctly notes, Rel. No. 17452 identifies the factors that determine whether a security is illiquid. Notably, MAM/MK does not dispute that Plaintiffs allege the liquidity characteristics that determine whether a security is illiquid, whether "restricted," fair valued, or otherwise possessing these characteristics.[21] In yet another contradictory argument, while contending that the restricted securities were really liquid, MAM/MK says that the liquidity risk of these securities was fully disclosed, but again only in the SAI. Br. at 34.

MAM/MK's argument on the liquidity issue boils down to whether the Funds' management and board, along with MAM/MK, correctly determined the liquidity of the Funds' *restricted* securities. MAM/MK on the one hand says liquidity risk was disclosed but on the other says it was correct in deeming all of the Funds' restricted securities to be liquid, thereby rendering immaterial any disclosure about liquidity risk. Significantly, MAM/MK does not even attempt to respond to Plaintiffs' allegations that, applying the liquidity factors, a substantial portion of the Funds' *non-restricted* securities (including fair valued securities) were illiquid. ¶¶ 180-84, 188, 190, 195-99, 209-10. Whoever made the liquidity determinations for the Funds' restricted securities ignored the relevant liquidity factors or were otherwise careless in identifying such securities. ¶¶ 201-02.[22] Even if the restricted securities

---

[21]    ¶¶ 173-77, 180, 183-84, 187-88, 195-96, 198-99, 203, 207, 209-11, 469-72; *see* MAM/MK Br. at 35. As discussed supra, MAM/MK also says the "illiquid component" of each Fund's portfolio was identified, but the reference is to the securities designated "restricted." MAM/MK Br. at 32.

[22]    MAM/MK correctly says that the "day-to-day determinations of liquidity" may be delegated by a fund's board of directors to its adviser "subject to oversight." MAM/MK Br. at 35 n.

could be determined to be liquid on a given day, they still carried a substantial liquidity risk, which risk was not properly managed, neither of which was disclosed. ¶ 144.

### E. The Funds' Valuation Risk Was Not Disclosed.

#### 1. The Funds' valuation procedures, and the impact of the Funds' fair valued securities on the Funds, were not disclosed.

MAM/MK wrongly says that the Funds disclosed their use of fair value procedures and the attendant risks. Br. at 36-39. In a selective quote of a CAC allegation, MAM/MK leaves out key words, which are italicized in the following quote from ¶ 222: the Funds' fair valued securities were subject to "becoming *suddenly* unsalable at their estimated values upon shifting market sentiments *that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs.*" ¶¶ 222(b)(2), (c)(2), (d)(1)(B), (e)(2), (f)(1)(B), (g)(1)(B), (h)(3), (i)(3), (j)(3); 226. Plaintiffs allege more than "if the market's appetite for a security declines, that security is likely to decline in price." MAM/MK Br. at 36.

The Funds' reports and prospectuses prior to October 2007 did not disclose, even though required by SEC Form N-1A, the effect of using fair value pricing on the valuation of the Funds' portfolios—e.g., how a hypothetical percentage change in the estimated values of the Funds' fair-valued securities affected the Funds' NAVs. Notwithstanding the magnitude of the Funds' holdings of fair valued securities, this fact was not disclosed until the Funds' 2007 annual report issued October 4, 2007.[23]

While Plaintiffs do not allege the dollar value for any security was incorrect at any time during the Class Period, the values of fair valued securities were misstated because the extent to which the Funds' aggregate NAVs were uncertain and purely subjective was not disclosed during most of the Class Period. ¶¶ 220, 222, 245. Such speculative valuations

---

27. A key issue, as to which Plaintiffs cannot possibly have any information at this point to allege anything (¶ 97), is just what kind of oversight did the Funds' board exercise.

[23]    MAM/MK says three times that the Funds were required to disclose the "effects of fair value pricing." Br. at 36-37, citing Form N-1A Item 6. Without explanation, MAM/MK disputes that those "effects of fair value pricing" do not include disclosing how changes in the estimated values would affect a fund's NAV, as the Funds actually did in their June 30, 2007 financial statements. ¶¶ 220(l), 222(a), 472.

were vulnerable to manipulation, and these were manipulated. Ex. 1 ¶¶ 28-40.[24] The required disclosures, at least, warn investors of this very real risk.[25]

Plaintiffs identify each of the Funds' prospectuses' and reports' valuation disclosures during the Class Period and allege how each of these disclosures was materially false and misleading. ¶¶ 220, 222. For example, none of the Funds' reports prior to October 2007 disclosed the quantity and proportion of the Funds' assets for which market quotations were not readily available and were therefore "fair valued," rendering their published NAVs highly speculative estimates. ¶ 222(a)(1). Thus, while the Funds generically disclosed that securities for which market quotations are not readily available are "fair valued" (universally true), there was no indication that any of the Funds' securities were affected by this disclosure, or that the Funds' overall NAV was materially affected by such uncertainty. ¶¶ 223-26.

In another example, the Funds' November 1, 2005 prospectus/SAI and June 30, 2006 annual report did not disclose (1) that values for thinly traded securities are estimates of values subject to inherent uncertainty, (2) that such securities were vulnerable to becoming suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial reductions in the values of such securities and the Funds' NAVs, (3) whether the Funds actually held securities whose values were subject to the disclosed valuation uncertainties, and (4) the factors considered in estimating the fair value of such securities, which would have revealed the substantial judgment and subjectivity required to derive

---

[24]   Defendants engaged in a practice known as "smoothing"—the incremental reduction of fair values to avoid a sudden large impact on a fund's NAV. Ex. 1 ¶¶ 29-33. In connection with their demand on the Funds' new directors in *Landers*, Plaintiffs inquired as to whether the Funds had engaged in such a practice. Ex. 46. The required information was not provided.

[25]   PwC reads Plaintiffs' allegations to say that if the Funds had tried to sell the violative holdings of toxic securities to comply with their investment objectives, policies and restrictions, the losses incurred in 2007 and 2008 would simply have been incurred in 2006. PwC Br. at 17, 18, *Landers v. Morgan Asset Management, Inc*., No. 2:08-cv-02260-SMH-dvk (W.D. Tenn.), Dkt. No. 61-1 ("PwC *Landers* Br."). If the sale of these securities in 2006 would have resulted in the Funds NAVs dropping by up to 78%, then those securities were in fact overvalued from at least August 2006 forward—i.e., the depths to which the Funds' NAVs plunged in 2007-2008 were their true value in 2006. Thus, MAM/MK incorrectly says the CAC alleges the "poor portfolio management [ ] occurred after the date of the last relevant Prospectus." MAM/MK Br. at 50.

such values, the vulnerability of such valuations to changing market sentiments, the complexity of the investment, and the adverse effect of such judgment, subjectivity and complexity on the ability to easily sell the investment—i.e., liquidity. ¶¶ 222(e), 222(g).[26]

Likewise, the Funds' November 1, 2006 prospectus and SAI did not disclose, *inter alia*, the risks regarding estimated valuations of thinly traded structured financial instruments—e.g., that values derived for up to half or more of the Funds' securities were nothing more than speculative estimates of values subject to inherent uncertainty that may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material. ¶ 222(h)-(i). Indeed, during the Class Period, neither the prospectus nor the SAI ever disclosed that the estimated values of fair valued securities were subject to inherent uncertainty, and, prior to October 2007, there was no disclosure in any form that the Funds held any investments subject to such uncertainty. ¶ 220. Besides omitting material facts, the Funds' valuation disclosures underwent a confusing evolution during the Class Period. ¶¶ 220, 222.[27]

### 2. The Funds' undifferentiated valuation disclosures were meaningless.

MAM/MK's argument that the Funds' disclosures put reasonable investors on notice "of the *effects of using fair value pricing*" (MAM/MK Br. at 39) is patently untrue. Given the Funds' massive holdings of fair valued securities at June 30, 2006 and 2007, the effect on the Funds required that the proportion of such securities be disclosed. If only a small amount of illiquid fair valued securities had been involved (e.g., less than the 15% limit), the disclosure may not have been as critical. But that was not the case. The quantity of fair valued securities is known only for June 30, 2006 (55.8% for IBF; 49.5% for HIF; 18.2%

---

[26]    Because of these nondisclosures, contrary to MAM/MK's assertion (Br. at 37, 39), the November 2005 prospectus did not disclose either the uncertainty or the subjectivity inherent in utilizing fair value procedures to estimate the prices of the Funds' securities. Curley Decl. Ex. F at 32-33; *cf.* the disclosure in the October 4, 2007 annual report. ¶ 220(l).

[27]    An "internal matrix system" disclosed in earlier prospectuses, SAIs and reports mysteriously disappeared from subsequent disclosures with no explanation as to the effect on the Funds' valuations of the apparent change in valuation methodology or why it was made. ¶¶ 222(d)(2), 222(f)(2).

for STF) and June 30, 2007 (50.4% for IBF; 59.7% for HIF; 30.2% for STF) and not for any prior date in the Class Period. ¶¶ 183, 221. Without this quantitative disclosure, investors in the Funds could not know how incredibly vulnerable the Funds were to the kind of catastrophic losses suffered in 2007-2008. The abstract generic disclosure of "the effects of using fair value pricing" was meaningless.[28]

MAM/MK argues that they disclosed that the Funds' NAV was subject "to a degree of uncertainty and unreliability" and that any reasonable investor would conclude the Funds' aggregate NAV "necessarily would have a degree of uncertainty associated with it." MAM/MK Br. at 39. But that is precisely the issue: the "degree" to which the Funds were subject to the disclosed uncertainty and "unreliability" was not disclosed until October 2007. Without such disclosure, an investor had no way of knowing the relevance or significance of these disclosures to the Funds.

The disclosures cited by MAM/MK were generic and in no way described the unique risks of the Funds. MAM/MK Br. at 36-38, Curley Decl. Ex. I at 40, 41. The referenced November 2006 prospectus disclosure relates to STF, IBF, and HIF and does not differentiate among them. The same is true regarding the reference to the November 2005 prospectus at 32. Br. at 37-38, Curley Decl. Ex. F. Regarding MAM/MK's references to the November 2005 and November 2006 SAIs (Br. at 37-38, Curley Decl. Exs. G at 38, J at 41), the SAIs relate to all three Funds, and the disclosures do not differentiate among them. The June 30, 2005 annual report disclosure about "inherent uncertainty of valuation…" (Br. at 37-38, Curley Decl. Ex. P at 54) relates to all three Funds. That such disclosures contained

---

[28]     MAM/MK argues that alleging the failure to accompany the numbers shown in a financial statement with verbal disclosures of the uncertainty regarding those numbers, even though no single dollar number is alleged to be incorrect, fails to state a claim. This precise argument was rejected in *White v Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002). In that case, the court held that allegations that defendants were required to disclose the valuation uncertainty attendant to the high-yield bonds in which the two Heartland funds invested, and the failure to disclose that the valuations of the funds' shares were so uncertain as to be essentially meaningless, stated a claim under § 11 of the '33 Act. The court so ruled even though, as PwC there argued, plaintiffs did not identify "how or to what extent the financial statements themselves may have been inaccurate." *Id.* at 985.

25

not a hint of the risk of catastrophic losses is demonstrated by the fact that while HIF lost 73% and IBF lost 78%, STF lost much less, 31%.[29] Appx. A.

The same conclusion is reached by comparing the Funds' valuation disclosures with those of the other two RMK open-end bond funds, FIF and LMFIF. The Funds' prospectus disclosures regarding calculating share price (NAV), on which MAM/MK relies for its contention that the valuation uncertainty was adequately disclosed (MAM/MK Br. at 36-37, Curley Decl. Exs. I at 40, F at 32), are nearly identical to those in the FIF/LMFIF prospectus. *Cf.* Ex. 4 at 69. This disclosure was false and misleading. ¶¶ 220(e), 220(i), 222(a), 222(e), 222(h). Similarly, the June 30, 2005 annual report disclosure about "inherent uncertainty of valuation…" (Br. at 37-38, Curley Decl. Ex. P at 54) is identical to the disclosure by FIF/LMFIF. *Cf.* Ex. 5 at 104. These Fund disclosures were likewise false and misleading. ¶¶ 220(d), 222(a), 222(d). FIF lost 2% and LMFIF lost 8%. Appx. A. The Funds lost a lot more. *Id.*

The one way to have made the generalized disclosures material to the unique risks posed by the Funds' unusual portfolios, and meaningful to investors, was to disclose the percentages of illiquid and fair valued securities held by the Funds and to relate the disclosures regarding uncertainty and subjectivity to those percentages, coupled with the disclosure that such investment practices violated the Funds' investment objectives, policies and restrictions. The first time that Defendants disclosed anything at all in terms of the *quantity* of securities being fair valued—i.e., anything beyond simply reciting standard accounting/valuation policies in the abstract—was on August 13, 2007, when, in a prospectus supplement, the Funds disclosed that "[f]air valuation procedures are *currently* being used to value a *substantial portion* of the assets of the Fund." ¶¶ 231, 236.

That the Funds were unique was recognized by Morningstar, observing that "[a] lot of mutual funds didn't own much of this stuff" and that the High Income Fund was "the one

---

[29] Although less than the losses of IBF and HIF, STF's losses were magnitudes worse than its peers. ¶¶ 151-52.

real big exception." ¶ 127. Kelsoe was described as having an "intoxication" with ABS/MBS investments. *Id.* IBF's and HIF's ABS/MBS holdings were four to 5.5 times more than were such holdings by other high-yield funds, but IBF was not even supposed to be a high-yield fund. ¶¶ 131-35, 308. MAM/MK fails to address a fundamental problem facing Defendants: no matter what was disclosed or where, IBF and STF were not supposed to be remotely this risky. Their investment objectives and sales materials described them as safe bond funds that preserved capital. ¶¶ 131-39; Ex. 3 ¶¶ 55-76. Even HIF was advertised by the RMK Defendants as providing "lower NAV volatility than typical high-yield funds," and the RMK Defendants touted HIF's "relatively conservative credit posture" that reflected their "goal of higher yields without excessive credit risk." ¶¶ 129-30.

### F.   Disclosures Regarding Concentration, Benchmarks and Leverage.

#### 1.   The Funds failed to disclose their concentration in real estate related securities and their credit concentration.

Contrary to MAM/MK's arguments (MAM/MK Br. at 39-42), Plaintiffs do allege a violation of the Funds' disclosures regarding limiting investments in a single industry.  The Funds had a very high exposure to real estate debt, as distinguished from government, municipal or corporate debt, and this exposure exceeded the 25% limit. ¶¶ 275-76, 278-82. Besides industry concentration, the Funds were exposed to an undisclosed concentration of credit and market risk, which was required to be disclosed by GAAP. ¶¶ 283, 514-18; Ex. 3 ¶ 16.c. The Funds' ABS/MBS made up the vast proportion of the Funds' illiquid investments (64%-100%) during most of the Class Period. ¶ 198(e). HIF's and IBF's marketing materials concealed this fact, creating a false picture of diversification. Ex. 3 ¶¶ 55-64

#### 2.   The Funds misleadingly compared their performance to non-comparable benchmarks.

The Funds compared their respective performances to broad-based bond indices. ¶¶ 311, 314, 317, 371(m), 374(u), 376(n). These comparisons were false and misleading. ¶¶ 372(o), 375(w), 377(o), 395(g). The index used by HIF contained only corporate bonds and did not include structured financial instruments. ¶ 372(o). HIF's new investment adviser in

2008 replaced the index used by HIF during the Class Period with a different index. *Id.*

MAM/MK argues the Funds' record of NAV stability and comparisons to their respective peers did not require additional disclosures to distinguish the Funds and their peers. MAM/MK Br. at 27-30. MAM/MK also says Plaintiffs' "apples-and-oranges comparison" of the Funds' underperformance to peer funds in 2007 is "simply wrong." *Id.* But MAM/MK repeatedly compared the Funds to their purported peers throughout the Class Period.[30] The RMK Defendants did not disclose what made the Funds perform differently from their category peers to the extent that they did so. ¶¶ 372(o), 373, 375(w), 377(o). In touting the Morningstar risk-adjusted ratings of HIF and IBF, comparing their performances to their respective peer bond funds, the RMK Defendants did not explain that these Funds' performances could not be compared to their peers because their portfolios consisted of "apples" while their peers' portfolios consisted of "oranges," as they do now. ¶¶ 140-41, 373; Curley Decl. Ex. O at 2; *see also* Ex. 2 ¶ 10.

HIF, IBF and STF included in their respective names "high income," "intermediate bond," and "short-term," fitting them in the widely accepted categories of bond funds. The RMK Defendants repeatedly held out HIF and IBF as high-yield and intermediate-term funds, respectively—e.g.:

> However, during these challenging economic and political times, [IBF] and [HIF] continued to perform well *relative to their peers and their respective benchmark indices*. Both funds have Morningstar's highest five-star rating and continue to rank near the top of their *respective categories*. [IBF] ranked in the top 2% of all *intermediate-term bond funds* for the 1-year and 5-year periods ended December 31, 2004 and [HIF] ranked in the top 4% of all *high-yield bond funds* for the 1-year period and it ranked in the top 2% of all *high-yield bond funds* for the 5-year period ended December 31, 2004, according to Morningstar.

Curley Decl. Ex. O at 2. This statement contains no disclaimer that the comparisons are "apples-and-oranges" and should, therefore, be ignored.

There was nothing in the Funds' pre-collapse performances to suggest the potential

---

[30] ¶¶ 140-41, 371(m), 374(u), 376(n); *see* e.g., Curley Decl. Ex. S at 4, 7-9, 14, 17-19, 28, 31-33.

for catastrophic losses. ¶ 267 (touting in prospectus HIF's investment techniques that would produce a "more stable net asset value for the fund than would result from investing in [only] below investment-grade bonds"), ¶ 388 (HIF's performance caused it to be perceived as the safest of all high-yield funds in 2006 and as a "low risk fund"), ¶ 389 (IBF and HIF were only modestly more volatile than relevant benchmarks), ¶¶ 390-94 (STF's and IBF's performances during the Class Period were not comparable to high-yield funds, so that nothing in their performances suggested STF and IBF were taking on unusual risks for such funds), ¶¶ 397-99 (nothing in the Funds' performances during the period preceding October 3, 2007 that would have suggested the potential for losses of 31%-78%).

### 3.   The Funds' undisclosed use of leverage.

MAM/MK focuses only on Plaintiffs' allegation of the violation of the prohibition against borrowing. MAM/MK Br. at 43. MAM/MK ignores the allegation of undisclosed leverage risk. ¶¶ 285, 295-99. The RMK Defendants admit the Funds were subject to implicit leverage risk, which was not disclosed until December 31, 2007. ¶ 302-03. The undisclosed leverage risk caused the credit quality disclosed in the Funds' annual and semi-annual reports to be materially inflated. ¶¶ 304-05; *see* Ex. 3 at ¶ 16.c.

### 4.   Plaintiffs allege nondisclosures, not characterizations of disclosures.

The critical risk in the subordinated interests purchased by the Funds—that the Funds would not get paid until after senior tranches are paid (i.e., classes held by the Funds were among the first to absorb all losses)—was not disclosed until 2008. ¶¶ 300-01; Ex. 3 ¶ 44. This case is not a dispute about whether disclosures were properly characterized—e.g., the Funds' securities should have been characterized as "extremely liquid." MAM/MK Br. at 44-45. There was no disclosure of liquidity risk whatsoever; indeed, the Funds and the RMK Defendants persistently disclosed all of the Funds' securities were liquid. ¶ 201.

Notwithstanding that the CAC clearly alleges otherwise, MAM/MK attempts to dismiss the detailed allegations of credit risk found in the prospectuses for several ABS/MBS purchased by the Funds as from a prospectus for a single "unspecified security." MAM/MK

Br. at 44. In fact, the disclosures set out in ¶ 258 represent a composite of disclosures from *all* of the prospectuses for the ABS/MBS purchased by the Funds that were registered with the SEC, as the CAC makes crystal clear. ¶¶ 248, 253 (identifying the securities whose prospectus disclosures are recited), ¶¶ 256, 258. These prospectus disclosures represent only 17% of STF's ABS/MBS, 15% of IBF's, and 20% of HIF's. ¶ 253. The disclosures are taken verbatim from the prospectuses. Because prospectuses were found only for CMOs, and, with a single exception, none were found for the Funds' CDOs (which are more complex and have even fewer investors), these disclosures and data derived from these prospectuses actually greatly understate the risks posed by the Funds' heavy ABS/MBS investments. ¶¶ 199, 253-57, 264. The risks of the unregistered deals, especially the CDOs, are even greater. ¶¶ 265-66.[31] But, at this early stage of the litigation, before discovery, this is what Plaintiffs were able to uncover from publicly filed documents. That the risk disclosures in these CMO prospectuses were indeed material and predictive of the what befell the Funds is demonstrated by Goldman Sachs's August 2007 supplement to a March 2006 prospectus for a security purchased by the Funds, in which supplement Goldman described how the warnings in the earlier prospectus came to fruition. ¶¶ 261-62..

The small glimpse offered by this handful of prospectuses into the risk borne by the Funds because of their ABS/MBS holdings belies RMK Defendants' sales materials portraying the Funds as safe or offering low volatility. While the deal prospectuses' verbal disclosures are highly informative, their data are particularly compelling. As of June 30, 2006, STF, on average, held 16% of the tranche in which it invested, while IBF held 11% and HIF held 19%, meaning that either they held a very dominant position or there were very few holders, a liquidity factor. ¶ 253. Similarly, if, on average, borrowers representing 37% of

---

[31]     MAM/MK's confusion about the sources of these disclosure allegations might be thought to be perplexing as one would reasonably assume MAM had these prospectuses and carefully read them at the time the Funds purchased these securities, and that the Director Defendants did also. However, MAM did not have these prospectuses. Ex. 3 ¶¶ 125-26. Thus, these disclosures and their source prospectuses apparently come as a great surprise to MAM/MK.

the pools of loans in which the Funds invested defaulted, STF's *entire* investment would be wiped out, while *78% of the loans in STF's pools had less than full documentation. Id.*

As to IBF, if on average 31% defaulted, its investments would be *completely* wiped out: 28% of the borrowers had FICO scores of less than 600, 40% of the loans lacked full documentation, and 21% had loan-to-value ("LTV") ratios greater than 90%. *Id.* IBF's tranche, on average, was seventh of ten. The tale for HIF is only a little less grim; if 38% of the borrowers in HIF's loan pools defaulted, HIF would lose its *entire* investment: the FICO score of 33% of its debtors was less than 600, 50% of the loans lacked full documentation, 19% of the loans had LTV ratios of more than 90%, and HIF's average tranche ranked sixth out of ten. *Id.*; *see also* ¶¶ 254, 260. Thus, for IBF's CMO investments, the average percentages of borrowers with FICO scores of less than 600 (28%) and the average amount of loans with less than full documentation (40%) almost equaled or exceeded the average loss ratio that would wipe out IBF's entire investments in these loan pools (31%).

The summary data for the entire Class Period for each of the Funds equally reflect the shocking credit and liquidity risk assumed by the Funds. For example, STF's percentage interest in the tranches purchased by it ranged from 11% to 23%, IBF's from 4% to 11%, and HIF's from 8% to 19%. ¶ 256. Significantly, these percentages are for *each Fund*; many of the securities purchased by one Fund were also purchased by the other Funds and by the RMK closed-end funds—e.g., at March 31, 2007, 55% of STF's investments were also held by IBF. Because illiquid or thinly traded securities also require fair valuation, as Defendants admit, the Funds' dominant holdings in these thinly traded individual classes also greatly exacerbated their valuation risk.[32]

### G.   MAM/MK Was Responsible for Ensuring the Funds' Financial Statements Conformed to GAAP.

MAM/MK argues that Plaintiffs' allegations against PwC do not give rise to liability

---

[32]   ¶¶ 173-77, 180-94, 197(b)(1), 203, 207-12,  216-17, 220(l), 222-226, 238-45, 342, 385(g), 473-77, 643, 740, 755.

against MK and that Plaintiffs fail to allege noncompliance with GAAP with the requisite particularity! MAM/MK Br. at 45. Once again, MAM/MK is wrong. Plaintiffs allege the accounting issues, including noncompliance with GAAP, with great specificity. ¶¶ 439-571.

MK was responsible for the valuation of the Funds' securities and the preparation of their financial statements. ¶¶ 626-27. Plaintiffs allege MK failed to ensure that the Funds' financial statements complied with GAAP. ¶ 632. While PwC audited the Funds' financial statements, which includes opining as to whether the financial statements complied with GAAP, the financial statements are the Funds' responsibility, and the Funds' management (MK in this instance) was responsible for preparing them to comply with GAAP, as PwC reminded MAM/MK in each of its audit reports on the Funds' financial statements.[33]

## II.   LOSS CAUSATION

### A.   Plaintiffs' Allegations Causally Link the Funds' Defective Disclosures and Their Losses.

Plaintiffs allege that the RMK Defendants mismanaged the Funds by causing the Funds to invest so heavily in illiquid ABS/MBS contrary to the Funds' disclosed investment objectives, policies and restrictions regarding illiquid securities, concentration in a single industry, and prohibition of leverage. ¶¶ 4, 116-28, 161-215, 273-83, 293-305. As a result of such investments, the Funds assumed liquidity, valuation, concentration, credit, and leverage risks unmatched by any other bond fund. ¶¶ 146-58, 197-99, 216-83, 293-305. Plaintiffs allege these risks materialized as STF's, IBF's and HIF's NAVs precipitously declined by 23%, 70% and 72% through early 2008. ¶¶ 5-7, 306-28.[34] Plaintiffs so mismanaged the Funds as to render them non-viable and their management contracts worthless. ¶¶ 39, 93.

As a result of Defendants' mismanagement, Plaintiffs allege, the Funds' NAVs were misstated because of the failure to disclose their illiquidity and speculative valuations, ren-

---

[33]    E.g., Curley Decl. Ex. S at 70 ("These financial statements and financial highlights … are the responsibility of the Funds' management").

[34]    See also Ex. 2 ¶ 1 ("All of these funds invested heavily in structured products which caused them serious financial difficulties beginning in early 2007 and led to their collapse later that year, costing investors well over a billion dollars.").

dering the Funds' NAVs illusory, with not a hint of the huge valuation and other risks to which the Funds exposed their investors and the violations of the Funds' investment objectives, policies and restrictions. ¶¶ 216-72, 293-322, 372(n), 375(v), 377(n), 499-513, 566-71. Also, Defendants' fair value procedures did not take into account all relevant factors, such as illiquidity. ¶¶ 226(d), 246, 318(b), 442, 444 (2.36, 2.37), 496(d). The defective prospectus disclosures infected the Funds' financial statement disclosures, rendering the Funds' financial statements in violation of GAAP. ¶¶ 469-518, 531-42, 562-71.

### B.    Plaintiffs Allege the Funds Were Injured in 2006.

PwC has asserted in *Landers* that, on the basis of allegations very similar to the CAC's, the Funds were already injured in August 2006 as a result of the RMK Defendants' mismanagement, PwC's deficient 2006 audit and the Funds' defective 2006 financial statements—i.e., that the Funds were injured in August 2006 because the Funds were illiquid and the values of the Funds' assets were grossly uncertain. PwC *Landers* Br. at 17, 18.[35] PwC reads such allegations to say that if the Funds had tried to sell the violative holdings of toxic securities in August 2006 to comply with their investment objectives, policies and restrictions, the losses incurred in 2007 and 2008 would simply have been incurred in 2006. *Id.*

If the sale of these securities in 2006 would have forced the Funds to drop their NAVs by up to their 78% loss in 2007-2008, then those securities were in fact overvalued from at least August 2006 forward (i.e., the depths to which the Funds' NAVs plunged in 2007-2008 were the true value in 2006), and class members who invested thereafter were damaged by paying a much higher NAV per share. Plaintiffs allege that the Funds and MAM/MK and their directors failed to take into account the relevant factors (e.g., illiquidity and valuation uncertainty) in estimating the values of the Funds' fair valued securities.[36]

---

[35]    MAM/MK says the CAC's allegations are virtually the same as the FADC's. MAM/MK Br. at 2.

[36]    ¶¶ 220(i), 220(l), 222(b)(4), 222(c)(4), 222(d)(1)(D), 222(e)(4), 222(f)(4), 222(g)(1)(D), 222(h)(4), 222(i)(4), 222(j)(5), 226(d), 246-47, 318(b), 372(n), 375(v), 377(n), 400, 442, 444-48, 453-55, 462-63, 465, 491, 493, 657. MAM/MK says, irrelevantly, that the CAC does not estimate the damages caused by the fraud. MAM/MK Br. at 52 n. 43. The CAC does allege how § 11 damages can be computed. ¶¶ 696, 707. The data for estimating damages based on the

Because the CAC alleges the Funds' portfolios throughout the Class Period were af-
flicted by the same violative investment practices as in August 2006, PwC's concession that
these allegations show the Funds were injured by August 2006 is likewise true from the be-
ginning of the Class Period to August 2006. ¶¶ 180-91, 195-203, 205-15, 222-26, 234-45. If
PwC had blown its auditor's whistle on the RMK Defendants' mismanagement of the Funds
in its 2004 audit—when 70% of IBF's and 65% of HIF's portfolios were in illiquid securi-
ties—Plaintiffs and the class that invested in the Funds during the entire Class Period would
have been spared their enormous losses.[37]

### III.  MAM/MK AND RB WERE SELLERS UNDER § 12(a)(2)

MAM/MK and RB contend that the CAC fails to allege that they were "sellers" of
the Funds' shares for purposes of Plaintiffs' § 12(a)(2) claims. MAM/MK Br. at 46-47;
RF/RB Br. at 8; Directors' Br. at 5-6. Contrary to these assertions, the CAC does allege
facts making each of MAM/MK, RB and the Directors a "seller."

Plaintiffs allege they invested in the Funds. ¶¶ 12-30. The only source of their pur-
chases was MK, because it was the "exclusive" distributor of the Funds' shares. ¶¶ 619, 624.
Purchasers of Class A and Class C shares paid a fee to compensate MK for services and ex-
penses relating to the sale and distribution of the Funds' shares. ¶ 47. MK distributed the
Funds' prospectuses, prepared and distributed sales materials to prospective investors and
actively solicited the purchase of the Funds' shares. ¶¶ 107, 619-20, 624 (MK was author-
ized "to solicit orders for the purchase of the [Funds'] Shares"), 712. Director Defendants

---

measure of damages provided by § 11 is not available to Plaintiffs and, therefore, no estimate
could be made. However, the CAC does include allegations from which an overall estimate of
damages can be made: The total assets of the three Funds dropped from $2.2 billion at Decem-
ber 31, 2006, to $372.5 million at December 31, 2007, attributable approximately equally to the
loss in the values of the Funds' investments and net redemptions caused by the Funds' plum-
meting net asset values. ¶ 5. This means that, of the loss of $1.85 billion in assets, approxi-
mately $925 million is attributable to the loss in value of the Funds' assets as of December 31,
2007. This loss approximates the loss under Count V as of that date. Plaintiffs further allege the
net asset value per share of the STF, IBF, and HIF dropped 23%, 70% and 72% respectively
during 2007 and early 2008. Id.

[37]    ¶¶ 220, 222, 226(d), 246-47, 306-22, 318(b), 372(n), 375(v), 377(n), 400, 442, 444-48,
453-55, 462-63, 465, 491, 493, 657; PwC Landers Br. at 17, 18.

reviewed and signed the various amendments to the Funds' registration statement. ¶¶ 59-67.

Plaintiffs allege that they purchased the Funds' shares from the Funds and that they were distributed through MK and RB during the Class Period. ¶ 106. MAM/MK's employees prepared, reviewed, and signed the registration statement and amendments, investor reports, sales materials and websites used to sell Funds' shares;[38] MK and RB offered, sold, distributed, and actively solicited the purchase of the Funds' shares and investors purchased such shares.[39] RB aggressively marketed the Funds, persuading persons seeking to invest in RB certificates of deposit to instead invest in the Funds, and MK and RB actively solicited purchases of the Funds' shares for their financial interest.[40]

Plaintiffs allege MAM/MK/RB actively solicited investors to invest in HIF by telling them, falsely, that the Fund, *inter alia*, was diversified across multiple fixed income asset classes and offered potentially "*lower NAV volatility* than *typical high-yield* funds," had a "*relatively conservative credit* posture" that "reflect[ed] our goal of higher yields *without excessive credit risk*," and that it offered the "opportunity to acquire a *diverse* set of assets [that] will contribute to higher total returns and a *more stable net asset value* for the fund *than would result from investing* in a single sector of the debt market such as *below investment grade* corporate bonds." ¶¶ 129, 130, 267, 371-72; Ex. 3 ¶¶ 75-76, 152.

Plaintiffs allege MAM/MK/RB actively solicited investors to invest in IBF by telling

---

[38]    Ex. 3 ¶¶ 106-08. MAM has admitted that, "in its role as Fund Manager, it was involved in drafting and/or approving marketing materials." *Rice v. Regions Financial Corporation*, No. CV-2009-900689 (Jefferson County Circuit Court, Alabama) (filed in *Rice v. Regions Financial Corporation*, No. 2:10-cv-00268-RDP (N.D. Ala. Feb. 4, 2010), Dkt. No. 1-36 at ¶ 8. Ex. 11.

[39]    ¶¶ 41, 45, 47, 49, 50, 53-56, 58-60, 75-78, 83-84, 97-99, 101, 103-04, 106, 129-34, 138-39, 311, 314, 317, 371, 374, 376, 402, 619-24, 687, 676, 711-12, 729.

[40]    ¶¶ 2(b), 42-49, 53-56, 96, 106-09, 635-39, 642-44, 647, 649-50, 653 (representing themselves as RMK Trust officers at an annual investment luncheon sponsored by RB, MAM officials sold MAM's services), 659-62, 664-66, 686-87, 690, 708, 711-13, 736-38, 740, 747-48, 755. "Regions' bank employees referred bank customers to MKC agents which were assigned to service the bank branches. The bank employees contacted bank customers, scheduled appointments between bank customers and MKC agents, and were often present for the meetings between bank customers and the MKC agents. These meetings were regularly held at bank branch offices." Ex. 3 ¶ 41.

them, falsely, that it provided "a higher level of current income than *typical money market* investments"; focused on "undervalued" and "out-of-favor" sectors and securities, "which still have *solid credit fundamentals*"; had a "portfolio [that] is *diversified* not only with re-gard to issuer, but also *industry*, *security type* and maturity" because the "single *best way to reduce* the *risk* of any portfolio is *through adequate diversification*"; "*does not invest in speculative derivatives*"; was for investors whose investment objective is "*capital preserva-tion*"; offered "*greater stability in principal value than that of long-term bonds*"; offered a "*diversified portfolio of investment-grade debt*"; "seeks to MINIMIZE RISK"; provided "balanced exposure across the investment-grade spectrum" and "*greater liquidity*" enabling investors to "redeem any portion of their shares. . . at any time." ¶¶ 131-34, 374-75; Exs. 2 ¶¶ 15-37, 100-05; 3 ¶¶ 65-74, 145-47, 152. Recognizing the importance of income to IBF's investors, MAM/MK/RB said IBF offered "Consistent, Periodic Income through a *monthly* distribution of *interest payments*...[allowing] investors to more accurately plan investment cash flows and provides *steady income to those who need it*." ¶ 374(i). Yet MAM/ MK/RB knowingly invested IBF's portfolio in assets that were wholly unsuitable for such investors, and knowingly put older investors on a fixed income in IBF. ¶ 258(q); Ex. 3 ¶¶ 137-39.[41]

Plaintiffs allege MAM/MK/RB actively solicited investors to invest in STF by telling them, falsely, that the Fund sought to provide "capital *preservation* by maintaining a portfo-lio of investment-grade debt securities"; would invest primarily in "*one of the four highest credit rating categories*" of investment grade bonds; would "normally maintain a dollar-weighted average portfolio maturity of three years or less" in order to "*moderate principal fluctuations*" and "thus, provide a *more stable net asset value*"; provided a "higher level of current income *than typical CDs, savings accounts, or money market investments*," "greater stability in principal value than that of longer term bonds or bond fund," and a "*diversified*

---

[41]     The following is a typical disclosure in an ABS/MBS prospectus: "The Offered Certifi-cates are not suitable investments for any investor that requires a *regular or predictable sched-ule of monthly payments* or *payment on any specific date*." *Id.*

*portfolio* of short-term *investment-grade* debt securities." ¶¶ 138, 376-77; Ex. 2 ¶¶ 38-47. MAM/MK/RB also told investors that the "single *best way to reduce the risk of any portfolio is through adequate diversification*" and represented that STF "is *diversified* not only with regard to issuer, but also *industry*, *security type* and maturity"; and informed investors that "short-term bonds offer *less volatility* than long-term investments and potentially greater income and total return *than money market and other conservative investments*." *Id.*

Offering further assurances to entice investors to buy the Funds' shares, on a website that prominently displayed the Funds' affiliation with RB, under the heading "THE RELI-ABILITY OF INVESTING WISELY," MAM/MK and RB represented as follows:

> When you invest in RMK Select Funds, *you know exactly where you're going and exactly what you own*. Each Fund has a *well defined*, *'no-surprises'* style of structured, *disciplined decision making*; each portfolio manager is *required* to select only the most promising investments *consistent with that style*.

¶ 139; Exs. 7; 2 ¶ 89 (MK's marketing materials failed to disclosed IBF's and STF's risks).[42]

## IV.  PLAINTIFFS' § 10(b) CLAIMS

### A.  Plaintiffs Identify Misleading Statements Attributable to Defendants.

Defendants argue Plaintiffs fail to state a claim under § 10(b). MAM/MK Br. at 47-49; RF/RB Br. at 9-13; Funds' Br. at 9-13. They are wrong.

#### 1.  MAM/MK.

MAM/MK says Plaintiffs do not identify any misleading statements attributable to MAM/MK. MAM/MK Br. at 48. MAM/MK is wrong. By virtue of their complete control of, and responsibility for, the Funds' management, all of the Funds' alleged misleading statements are attributable to MAM/MK in the first instance, as well as to the Funds' direc-tors who signed the Funds' registration statement and amendments thereto and reviewed the Funds' reports to shareholders.

---

[42]   MAM/MK fastens on the "or otherwise" clause of ¶ 106, which simply acknowledges that MK might have distributed the Funds' shares through other brokers. ¶ 621. Nevertheless, as open-end funds, Plaintiffs could not purchase the Funds' shares from any source other than from or through MK, as principal underwriter and distributor.

Plaintiffs allege the Funds' prospectuses and registration statement, annual, semi-annual and quarterly reports, and sales materials were misleading for failing to disclose numerous material facts. ¶¶ 197, 220-47, 253-58, 273-305, 370-401; *see* Exs. 1 ¶ 40; 3 ¶¶ 55-77. MAM/MK prepared, reviewed, and signed the registration statement amendments used to sell the Funds' shares and reports to shareholders. ¶¶ 41, 59-60, 75-78, 83-84, 97-99, 103-04. MK distributed prospectuses and prepared and distributed sales materials. ¶ 620.

MK was responsible for the Funds' accounting and valuations, which included preparing the Funds' annual, semi-annual and quarterly reports, and compliance. ¶¶ 626-27. The Funds could act only through MAM/MK, which provided all of the Funds' officers and employees, statistical information, reports, and facilities. ¶¶ 40-41, 45-46, 52, 96-99, 101, 618. Therefore, the Funds' statements in their prospectuses, sales materials, and shareholders reports were statements prepared by MAM/MK.

MAM/MK is incorrect that Plaintiffs predicate liability on aiding and abetting, citing ¶ 104. MAM/MK Br. at 48 n. 41. Paragraph 104 alleges direct participation and combining to engage in wrongful conduct. Plaintiffs' claims against MAM/MK (and the other Defendants) are not predicated on aiding and abetting but on the statements by MAM/MK and their employees, some of whom were officers of the Funds but were not employed by the Funds but by MAM/MK, and all of whom were responsible for the Funds' management. The RMK Defendants are alleged to be liable under § 10(b) as either direct participants or as controlling persons of direct participants. ¶¶ 748-49, 758-66.

### 2.   Other Defendants.

Contrary to its argument (RF/RB Br. at 9), RB directly participated in the sale of the Funds' shares and, in connection therewith, distributed sales materials and prospectuses containing the misstatements alleged herein. *See* discussion *supra*.

As to the Funds' argument that no statements of any kind can be ascribed to it because it had no officers or employees, if that were the law,[43] no mutual fund could ever be

---

[43]    Such an interpretation of the '33 Act's registration requirements would lead to its com-

held liable for issuing fraudulent prospectuses, annual and semi-annual reports. Understandably, the Funds provide no authority for such a remarkable position. Funds' Br. at 9-10. The Funds contracted with MAM/MK for its management, which performed all of the Funds' functions to enable it to engage in business as an investment company. ¶¶ 36, 40-41, 45-46, 50, 52, 59-86, 96-99, 101, 618-34. Plaintiffs have identified the Fund-issued documents that contained false and misleading statements to include prospectuses, SAIs, sales materials, and annual, semi-annual and quarterly reports. ¶¶ 59-67, 75-78, 83-84, 183, 690.

Each of the amendments to the Funds' registration statement was signed by the Company itself. E.g., Ex. 6, signature page. These were indisputably the Funds' statements.

### B.    The Misleading Statements Alleged in the CAC Are Actionable.

MAM/MK contends "many" of the alleged misstatements are "puffery" or forward-looking statements protected by the "bespeaks caution" doctrine. MAM/MK Br. at 48-49. From the "many" alleged misstatements (and Plaintiffs agree there were many misstatements), MAM/MK identify only five, which they claim were puffery or are protected by the "bespeaks caution" doctrine. MAM/MK Br. at 48-49 n. 42. The five statements cited by MAM/MK are statements of present intention that were belied by their then current investment practices; instead of directing the Funds to invest in securities that would produce a stable NAV, which is something bond investors prize, MAM/MK directed the Funds to invest in securities that had a history of being highly volatile. ¶¶ 372-73, 375, 377. Also, Plaintiffs allege that the statements that MAM/MK minimizes as "puffery" negated whatever meaningful risk disclosures MAM/MK made. ¶¶ 130-42, 395.

Plaintiffs' allegations of false and misleading statements relate to the Funds' investment objectives, policies and restrictions that the Funds represented they would comply with and that they were contractually and by law required to comply with; statements of investment objectives and policies are "forward-looking," because they inform investors of how

---

plete evisceration, as all corporations would, like mutual funds, contract out their management, thus immunizing them from '33 Act liability.

their fund will be managed, but are required disclosures. SEC Form N-1A, Item 4 (Curley Decl. Ex. X). The statements alleged to be false and misleading herein all relate to existing facts and conditions. ¶ 673. Moreover, to the extent certain of the statements alleged to be false might be characterized as forward-looking, the specific statements pleaded herein were not identified as "forward-looking statements" when made, or if they were so identified, they were not accompanied by the requisite language adequately informing investors that actual results "could differ materially from those projected." *Id.* To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the pur-portedly forward-looking statement; in fact, many such purportedly "cautionary" statements were themselves false and misleading because they represented that certain events "may" or "could" occur, when in fact they had already occurred or already existed, as Plaintiffs al-lege. *Id.* MAM/MK makes no effort to show that what it contends to be forward-looking statements come within the statutory safe harbor for such statements.

### C.   Plaintiffs Have Alleged Scienter Based on Actual Knowledge.

#### 1.   Plaintiffs' allege Defendants acted knowingly.

Contrary to MAM/MK's assertion, Plaintiffs' "repeat[ed] allegations of negligence, recklessness, and/or knowing misconduct" (MAM/MK Br. at 49) are supported by extensive particular factual allegations. As MAM/MK acknowledges, Plaintiffs base many of their al-legations on the Funds' own reports, although they claim that if Plaintiffs can make these allegations, there was full disclosure. MAM/MK Br. at 32. MAM/MK thus tacitly acknowl-edges that the Funds' reports, which were prepared and reviewed by MAM/MK and the Funds' directors, demonstrate their knowledge.[44] PwC agrees.[45]

---

[44]   While it is certainly "plausible" (*see* discussion *infra*) that the outside sources of critical information alleged in the CAC (e.g., the prospectuses for the securities purchased by the Funds) were obtained and carefully read by Defendants, thus supporting their knowledge of the matters alleged herein, that appears not to be the case. Thus, Defendants acted with reckless dis-regard for the truth.

[45]   PwC *Landers* Br. at 13-15 (Plaintiffs have adequately alleged that the Funds' directors and management possessed actionable knowledge of their mismanagement of the Funds by not

Defendants RF, MAM/MK and PwC knew of the liquidity risks embedded in the ABS/MBS purchased by the Funds since MK was an underwriter of some of these securities (including at least two of which were purchased by the Funds), PwC was the auditor for many such securities (including at least 20 of such securities purchased by the Funds), and an RF subsidiary (the one it decided to unload in 2006) was an issuer of such securities. ¶¶ 99, 205. Defendants knew the extent to which the Funds' portfolios were subject to the need to estimate the values thereof because of the (undisclosed) substantial amount of investments for which market quotations were not readily available, and thus knew the extent to which the Funds' published NAVs were highly uncertain estimates. ¶¶ 223-24. They also knew the effect of using fair value pricing, and of the uncertainty inherent in such estimated valuations, on the valuation of the Funds' portfolios and the Funds' respective NAVs. *Id.* [46]

MK supposedly had special expertise in analyzing market risk. MK, disclosed by RF as the Funds' manager, of which MAM was a division, employed sophisticated modeling to assist it in managing its interest and market risk exposures: "To manage trading risks arising from interest rate and equity price risks, Regions uses a Value at Risk ("VAR") model to estimate the potential fair value [RF] could lose on its trading positions given a specified statistical confidence level and time-to-liquidate time horizon." ¶¶ 655-58.

### 2. Plaintiffs have alleged knowable fraud based on foreseeable risks that were actually foreseen and not "fraud by hindsight."

In another of Defendants' formulaic, reflexive arguments in disregard of the CAC's allegations, RF/RB says Plaintiffs have alleged nothing more than "fraud by hindsight." RF/RB Br. at 10. RF/RB is wrong. The CAC's alleged undisclosed risks are also alleged to have been, not only foreseeable, but actually foreseen by Defendants.

The extraordinary liquidity, valuation, concentration, and credit risks embedded in

---

later than August 2006).

[46]     The SEC determined, on the basis of its investigation, that MAM/MK, Kelsoe and Weller "willfully violated" §§ 17(a) of the '33 Act, 10(b) of the '34 Act and Rule 10b-5 thereunder, and 22 (and Rule 22c-1) and 34(b) of the ICA. Ex. 1 ¶¶ 41, 45, 46.

the Funds' portfolios were certainly knowable; any ignorance of these conditions could be nothing but willful and extreme reckless disregard for the truth. ¶¶ 173-75, 183, 197-99, 201, 205, 220-22, 249-63, 341-67.[47] For example, STF did disclose the percentage of fair valued securities in its portfolio in June 2005; inexplicably, neither HIF nor IBF did in June 2005, and none of the Funds did at any other time during the Class Period. ¶¶ 183, 221.

RB's conflicting interests regarding redemptions and securities purchased by MAM/MK for the three open-end Funds and four closed-end funds either forced it to knowingly make choices or, in light of the fiduciary source of its conflicting interests, to recklessly disregard its fiduciary responsibilities. ¶¶ 664-70. The CAC also alleges RF/RB's knowledge/scienter regarding specific omissions or otherwise misleading statements. ¶¶ 372, 375, 378, 381-83, 394, 711, 748. As noted, PwC reads allegations that are substantially the same as the CAC's allegations as adequately alleging knowledge on the part of the RMK Defendants of their actionable wrongful conduct. PwC *Landers* Br. at 13-15.

RF studied the subprime market in 2006 and concluded it should get out of that business by dumping EquiFirst at a loss of $217 million because of what it foresaw as an impending debacle. ¶¶ 329-40, 721. RF/RB tries to explain away these allegations. RF/RB Br. at 12. In doing so, RF/RB tries to belittle a high ranking executive's comments, calling him "*a* Regions credit officer." *Id.* at 13 n. 12. In fact, he was *the* Regions *Chief* Credit Officer. ¶ 332. In trying to minimize its Chief Credit Officer's statement about RF's view *in 2006* of the impending subprime collapse and its decision to jettison its subprime subsidiary,

---

[47]     Ex. 3 ¶ 93 (In an internal MK profile on IBF dated September 30, 2006, MK said, "Issues included in the portfolio are generally the inferior *tranches in structured deals. They trade at large discounts due* to a *lack of demand and liquidity*."). These statements never appeared again. *Id.* at ¶¶ 94, 101, 111. MAM purchased many ABS/MBS without any information about them. *Id.* at 125-26. Contributing to the RMK Defendants' reckless mismanagement of the Funds' was their totally ineffective compliance effort. Exs. 2 ¶ 88 (Wood's "non-substantive review of advertising" amounted to no review at all); 3 ¶¶ 127-30 (Wood failed in her oversight responsibilities), 131-32 (MK official recognizes HIF/IBF prospectus was not clear on items relevant to his due diligence effort in July 2007), 153-54 ("Proper compliance review of the holdings within the Fund portfolios would have detected millions of dollars of holdings that had been misclassified. The misclassification caused the creation of incorrect prospectuses, inaccurate SEC filings, and misleading marketing material.").

RF/RB says, not only *implausibly* but incredulously, that it makes major decisions (like unloading cheaply a subsidiary that accounted for 35% of its loans sold for securitization) impulsively on little more than a whim and a prayer, and that it is no more than dumb luck ("fortuitous") if those impulses turn out well. RF would have this Court believe that it takes out an advertisement in *The Wall Street Journal* to boast about its incredible luck at escaping the subprime meltdown, while taking pains to point out that those who criticized this move were wrong![48] RF/RB's argument clearly raises a disputed fact issue:[49] what analysis RF had done that led it to sell EquiFirst or was the decision a random shot in the dark.

## V.    FACTS RELATING TO RB'S LIABILITY

RF/RB says Plaintiffs do not allege RF/RB engaged in wrongful conduct. RF/RB Br. at 4-5, 7-9. RF/RB says Plaintiffs allege it "withheld unspecified information from the Funds' directors (¶ 74) but explain this not at all." RF/RB Br. at 4. Plaintiffs do explain the information withheld by RF/RB, viz. RF's foresight of the impending collapse of the subprime market in 2006, which, despite RF/RB's fiduciary obligations, it did not disclose to the Funds' directors or management. ¶¶ 74, 329-40, 721. The CAC's allegations are based on RF's Chief Credit Officer's statements and RF's advertised boast that it foresaw the "sub-prime market meltdown." ¶ 332-33 (RF's words).

Notwithstanding its prescience, notwithstanding the fiduciary obligations it owed to its trust accounts, and notwithstanding the RF/RB credo of "Doing What Is Right," RF/RB continued to push its trust accounts into the Funds, ignoring the conflicting interests inherent in the RMK organization's aggressive sale and distribution of the Funds' shares and its failure to advise its fiduciary accounts to redeem their Fund shares. ¶¶ 48-58, 108-09, 211, 642-

---

[48]    It may be plausibly inferred that discovery will show that RF's top executives took an entirely different position before the RF board in justifying their bonuses for 2006.

[49]    In a nearly identical situation, the negative statements of a bank's top executive about the credit risk of subprime mortgage-backed securities were deemed to "facially show" the bank's knowledge of the risks of such securities when it sold them to its clients while avoiding such securities for its own account. *Workers Compensation Reinsurance Association v. Wells Fargo Bank*, Ramsey County (Minnesota) District Court, 62 civ 08-10825, Amended Report/Order of Master: August 29, 2009 at Memorandum p. 5 (Ex. 47).

43, 659, 661-70, 736-40.

Plaintiffs do not contend that the RMK organization's aggressive cross-selling constituted wrongful conduct. *See* RF/RB Br. at 4. Instead, it was RF/RB/MAM/MK's cross-marketing/branding and interwoven enterprises, including a joint marketing arrangement between MAM and RB for fiduciary services as "Regions Morgan Keegan Trust," which operated as a single integrated concern with interlocking officers and directors, that distributed the Funds' shares for the profit of the entire RMK organization, while it withheld material information from the Funds, their shareholders, and those to whom it owed a fiduciary duty. ¶¶ 42, 48-60, 96, 101, 108-09, 139, 211, 339, 618-70, 736-40.[50]

RB says, "Plaintiffs here do not and cannot allege that Regions Bank *participated* in either issuing or underwriting the Funds." RF/RB Br. at 7. RB is wrong. Plaintiffs allege with particularity how RB (and its trust department, RMK Trust) "participated" in the underwriting/distribution of the Funds' shares.[51] Likewise, Plaintiffs allege RB made misleading statements, because of its role in distributing the Funds' shares, which included marketing the Funds on the RF/RB/MK website and distributing prospectuses on RB's premises. *Id.*; Ex. 7. RB drafted and/or approved communications sent to Fund shareholders. ¶¶ 99, 644. MAM officials identified themselves as RB trust officers at investment presentations sponsored by RB. ¶ 653. RB could not distribute or market the Funds without providing prospectuses, and prospectuses were provided to investors in the Funds, as required by

---

[50]    *See* Ex. 3 at ¶¶ 16.a., 40 (RF "purchased [MK] with the intent of increasing [RF's] profitability. [RF] sought to benefit from [MK's] expertise in generating fee revenue."), 144 ("RFC purchased MKC with the intent of converting Regions Bank customers to MKC customers. RFC sought to increase fee-based profits by cross-selling MKC fee-based products to bank customers. More money could be made on broker-dealer fees than on the interest spread on interest-bearing deposits."), ¶ 145 ("planned referral program designed to funnel bank customers to [MK] agents"), ¶¶ 146-48, 150 ("MAM encouraged the use of the Intermediate Bond Fund by including the fund in many of the Trust Mutual Fund Portfolio Models."). In a completely callous disregard of the disastrous losses suffered by the Funds' shareholders through the RMK Defendants' mismanagement, RF trumpeted in early 2008 that MK had a "record performance" in 2007! ¶ 646.
[51]    ¶¶ 2(b), 42, 49, 53-56, 106-09, 635-39, 642-44, 647, 649-50, 653, 659, 661-62, 664-66, 686-87, 690, 708, 711-13, 736-38, 740, 747-48, 755.

law.[52] The defective prospectus disclosures are chargeable to RB.

## VI.  CONTROLLING PERSON LIABILITY

Certain Defendants contend Plaintiffs fail to allege facts that they controlled the Funds. MAM/MK Br. at 53-55; RF/RB Br. at 15-17; Directors' Br. at 6-8. They are wrong.

### A.  MAM/MK as Controlling Persons.

Contrary to MAM/MK's assertion (MAM/MK Br. at 53), Plaintiffs have clearly alleged a primary violation of the federal securities law. MAM/MK says Plaintiffs must allege facts showing that MAM/MK and MK Holding "possessed both 'power to control the specific transaction or activity upon which the primary violation is predicated' and well as 'actual participation (i.e., exercise [of] control) in the operations of highlighted the primary violator in general.'" *Id.* at 54. Plaintiffs have done exactly that.

The Funds had no employees; even their officers were employed by MAM/MK. The Funds were completely dependent upon MAM/MK for their entire business. Thus, the Funds' wrongful conduct was the RMK Defendants' wrongful conduct, and the mismanagers of the Funds were RMK Defendants who both carried out the Funds' wrongful conduct and controlled the Funds through their management, as investment adviser, administrator, and distributor. ¶¶ 58, 97, 102, 762-63. According to RF's public filings, MK Holding appears to be nothing more than a corporation with no business activity other than owning MAM.[53] Its parent was RF, which, through its subsidiaries RB and MK aggressively marketed the Funds through "Morgan Keegan desks" located at RB branches. ¶¶ 53, 654, 659.

---

[52]    '33 Act § 5. The Court may reasonably infer that the Funds' prospectuses were available at the "Morgan Keegan desk" at RB branches. ¶ 660.

[53]    Even that seems somewhat unclear because RF described MAM as a "division" of MK, and MAM's identity seems to have been merged with MK's. ¶¶ 46, 647-55. In any event, MK Holding had a single class of stock owned by RF, and its board consisted of Defendants Morgan, J. C. Weller and Maxwell, all of whom were officers and a director of the Funds and MAM. ¶¶ 59, 77, 80; Ex. 48. MAM started life as a subsidiary of MK and, after RF acquired MK, became a subsidiary of MK Holding. Ex. 3 ¶ 34. This corporate musical chairs demonstrates RF's control of MAM/MK. Notwithstanding these changes, RF's reference in its SEC filings to MAM as a "division" of MK suggests that MAM was not viewed as a separate legal entity.

MAM/MK and RF/RB were inextricably intertwined through contractual arrangements and the organization's cross-marketing/branding. ¶¶ 48-50, 339, 618-60, 647-55, 763. RB/MAM/MK distributed the Funds' shares to the trusts that RB hired MAM/MK to manage. ¶¶ 55-56, 635-45. RF/RB and MAM/MK held themselves out as a single unified enterprise offering one-stop full financial services. ¶¶ 110, 139, 646-60; Ex. 7.

The Funds' officers and three directors (Morgan, Alderman, and Willis) also were or had been officers of, or otherwise employed by, and a director of MAM/MK or RF/RB. ¶¶ 59-60, 67, 75-78, 80-83, 85, 96, 99, 101, 339. The Funds' portfolio managers were awarded employee stock options to purchase *RF* stock as determined by the *RF board of directors*. ¶ 86. The Funds' shareholders did not elect the Funds' directors during the Class Period; therefore, MAM/MK, who selected them, effectively controlled the Funds and owed a fiduciary duty to the Funds' shareholders. ¶¶ 719-20, 761. Given their dominance over the Funds' board, MAM/MK usurped the Board's functions and performed the functions of the board through their agents, the nominal directors of the Funds. ¶ 720.

MAM/MK was a controlling person of the Funds by virtue of its position as the manager of, investment advisor to, and distributor for, the Funds; MAM/MK participated in the violations of §§ 11 and § 12(a)(2) based on having otherwise participated in the process which allowed the offerings of the Funds' shares to be successfully completed. ¶¶ 723-24, 760, 762; Ex. 3 ¶¶ 37-39. MAM/MK was required to manage the Funds in accordance with their investment objectives, policies and restrictions. ¶¶ 722, 766. They did not. ¶¶ 718, 759.

MAM/MK and RF/RB held controlling positions in the Funds. ¶¶ 55-56. RMK Trust's holdings of the Funds' various classes during the Class Period ranged from 14% to 96%. ¶ 55. RMK Trust's purchases of the Funds' shares during the Class Period for its trust accounts were 76% of STF, 17% of IBF, and 10% of HIF. ¶ 56. The RMK organization was the single largest principal shareholder of the Funds during the Class Period, and owned most of STF during most of the Class Period.[54]

---

[54]    At November 1, 2005, the RMK organization held 28% and 30% of two IBF classes,

**B.      Director Defendants as Controlling Persons.**

Director Defendants say Plaintiffs must allege culpable participation by them. Plaintiffs do so. ¶¶ 59-70. There are only two sources of control: the so-called independent directors or MAM/MK, which employed the people who managed the Funds and which had the contractual management of the Funds, and RF/RB, which, together with MK, were the Funds' largest shareholders.

The Director Defendants clearly were not answerable to the Funds' shareholders, as they were not required to stand for election at any time during the Class Period. ¶ 719. Director Defendants signed the registration statement, reviewed the Funds' financial statements, conferred with PwC, reviewed prospectuses and reports to shareholders, and determined annually whether to continue the Funds' contractual arrangements with MAM/MK (the Advisory Agreement, Underwriting Agreement, and 12b-1 plan). ¶¶ 59-70, 615-17. Thus, the Director Defendants were in charge of all of the Funds' principal functions.

**C.      Individual Defendants as Controlling Persons.**

Contrary to the Individual Defendants' argument (Ind. Defs' Br. at 6), Plaintiffs have established primary violations of §§ 11 or 12(a)(2). Regarding their second argument—that Plaintiffs do not adequately allege controlling person liability or that any of these Defendants could and did exercise actual control over the Funds' operations—they are wrong.

Plaintiffs allege each of the Individual Defendants' positions with the Funds and MAM/MK, which descriptions indicate their functions. ¶¶ 59, 60, 75-85. Each of these Defendants signed the Funds' registration statement or amendments thereto and other communications to the Funds' shareholders. *Id.* As the Funds had no management (officers or employees) of their own, it was these Defendants who controlled the Company, and it was

---

35% of one HIF class, and 60% of one STF class; at November 1, 2006, the RMK organization held 23% and 29% of two IBF classes, 46% of one HIF class, and 20% and 91% of two STF classes; at November 1, 2007, the RMK organization held 22% and 43% of two IBF classes, 45% of one HIF class, and 77%, 17% and 96% of all three STF classes. Curley Decl. Exs. B at 51, G at 55, J at 54-55, M at 63.

through these Defendants, all of whom were employed by and were also officers of, MAM/MK or RF/RB, that MAM/MK managed and controlled the Funds. ¶¶ 95-101.

Plaintiffs also allege "culpable participation." *See* Ind. Defs' Br. at 7 n. 6; ¶¶ 59, 60, 75-85, 95-101.

### D.    RF as Controlling Person.

RF/RB says Plaintiffs must allege both "power to control the specific transaction or activity upon which the primary violation is predicated" and "actual participation…in the operations of the primary violator." Plaintiffs have done so regarding RB. *See* RF/RB Br. at 3-5, acknowledging ¶¶ 32, 33, 42, 48, 49, 53, 58, 106-08, 211, 659, 665, 760.

Plaintiffs allege that RF wholly owned MK Holding and MK and MK Holding wholly owned MAM, which necessarily includes voting securities. ¶¶ 40, 44, 45, 48.[55] Besides its ownership of RB and MAM/MK, RF was more than the wholly owning parent; it had knowledge that it withheld, or if not withheld, that it knew was not being acted on regarding its 2006 analysis of the subprime market and its coming collapse. ¶¶ 329-40, 721. RF's knowledge is attributable to MAM/MK because of the interlocking officers and directors. ¶¶ 59, 60, 96, 101, 339-40.

RF operated as a single unified entity and cross-branded and marketed its financial services, including the Funds and MK. ¶¶ 48-50, 139,[56] 646-60. RF actually described MK as its "trust and asset management *division*" (i.e., not a separate corporate entity) or otherwise identified MK as the subsidiary through which RF provided trust, mutual funds and investment advisory services. ¶¶ 647-50, 654; Exs. 7, 3 ¶¶ 25 (RMK Trust "is the trust and asset management unit of [RF] and operates as a unit of [MK]".), 36.

---

[55]    The RMK/MAM/MK corporate structure is unclear. ¶¶ 40, 42-43, 46, 650, 653-55. MAM described itself in press releases as "the investment advisory arm of Regions Financial Corporation." ¶ 43. RF fails to identify MAM as a separate corporate subsidiary and, instead, treated MAM's business, without even naming MAM, as one of MK's divisions. ¶¶ 650, 654-55. RF repeatedly referred to MK's "investment management expertise," "asset management," and "asset management division." *Id.*

[56]    While Defendants attack such representations as ¶ 139 as "puffery," they are relevant to establish the intertwined RMK organization and RF's liability as a controlling person.

Thus, RF/RB is wrong when it says that Plaintiffs' claims for control are "based solely on allegations that Regions is the 'wholly owning parent' corporation of Regions Bank and Morgan Keegan." RF/RB Br. at 16. RF/RB ignores the interlocking directors, officers and employees and RF's knowledge. For the same reason RF is wrong to say Plaintiffs "do not even attempt to plead culpable participation." *Id.* at 17 n. 14.[57]

## VII.   FACTS RELATING TO THE FUNDS' § 11 LIABILITY

The Funds argue that the "Plaintiffs have not alleged that the Funds signed the registration statement." Funds' Br. at 7-8. Plaintiffs allege that the Funds' officers and directors signed the Funds' registration statement as officers and directors of the Funds. ¶¶ 59-67, 75-78. The Company, on behalf of the Funds, did sign the registration statement. E.g., Ex. 6.

The Funds also state that the Funds cannot be sued because they were only "portfolios" or "series," inferring, apparently, that only the Company can be liable. Br. at 7, 12. The Funds are wrong. By expressly providing that each "series" or "portfolio" is liable for its own debts, the Company's Articles of Incorporation contemplate actions against the individual portfolios:

> Section 6.4. Assets and Liabilities of Series and Classes. . . . The assets belonging to each particular Series or Class shall be charged with the liabilities of that Series or Class and all expenses, costs, charges and reserves attributable to that Series or Class, as the case may be.

Ex. 8.

## STANDARD OF REVIEW

## I.   RULE 12(b)(6) STANDARD

When considering a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must construe the complaint in the light most favorable to plaintiffs and accept all well-pled factual allegations as true. *League of United Latin Amer. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *Tellabs v. Makor Is-*

---

[57]   RF has admitted in related litigation that it is "the ultimate parent company of Regions Bank, MAM and Morgan Keegan." *Rice*, Dkt. No. 1-36 at ¶ 10 (Ex. 11).

*sues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (same regarding a motion to dismiss claims of federal securities law violations). The complaint may state either direct or inferential allegations respecting the material elements of the claims pleaded and the allegations must be taken in their entirety. *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008).

While a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face," plausible does not mean "probable" but simply that the complaint must present more than a "sheer possibility" that the defendant acted unlawfully. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its *experience* and *common sense.*" *Id.* at 1940. Ultimately, the "plausibility" standard asks whether the "factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949; *In re Regions Morgan Keegan ERISA Litig.*, 2010 WL 809950, at *3 (W.D. Tenn. Mar. 9, 2010) ("*RMK ERISA Litig.*") ("specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'") (citation omitted) (Ex. 9). "To survive a motion to dismiss, a complaint ultimately must demonstrate 'facial plausibility,' defined as 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citation omitted).

## II.   PLEADING STANDARDS UNDER THE PSLRA

A complaint alleging fraud must be plead with particularity under Federal Rule of Civil Procedure 9(b). The Private Securities Litigation Reform Act ("PSLRA") provides for heightened pleading of the state of mind element of securities fraud.[58]   *Frank,* 547 F.3d at 570; 15 U.S.C. § 78u-4(b)(2). A complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and *at least as compelling* as

---

[58]   Claims brought pursuant to §§ 11 and 12 of the '33 Act are not subject to PSLRA's heightened pleading standards, but are instead subject to Rule 8 standards.  *See, e.g., In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 687-88 (M.D. Tenn. 2000); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 937-38 (M.D. Tenn. 1999)

any opposing inference one could draw from the facts alleged." *Frank,* 547 F.3d at 571 (citing *Tellabs,* 551 U.S. at 324 (emphasis in original)). Where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward. *Id.*

Requiring the plaintiff to simply plead a strong inference at least as compelling as the defendant's has replaced the Sixth Circuit's former, more stringent standard, which allowed plaintiffs only the most plausible of competing inferences. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009). Thus, "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *Frank*, 547 F.3d at 571. The PSLRA's heightened pleading standard does not convert a motion to dismiss "into some sort of preliminary summary judgment motion in which the parties compare their respective collections of supporting facts and inferences." *Beach v. Healthways, Inc.*, 2009 WL 650408, at *3 (M.D. Tenn. Mar. 9, 2009) (quoting *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 878 (E.D. Tenn. 2005)) (Ex. 10).

Contrary to *Beach*, and Rule 12(b)(6), in support of their motions to dismiss, Defendants have posited their "collections of supporting facts and inferences," both as to disclosures and loss causation, in opposition to the specific and particular allegations in the CAC. For example, the Individual Defendants say "the Funds' offering documents disclosed the very *risk factors that ultimately materialized and caused Plaintiffs' losses*." Ind. Defs' Br. at 3-4. This is in complete contradiction to the CAC's extensive allegations of the Funds' undisclosed risks and that those risks materialized to cause Plaintiffs' losses. ¶¶ 161-420, 531-71, Appx. B, F. These disputes are for the jury to resolve.

Defendants also contradict themselves. For example, RF/RB says "Although plaintiffs' claims are couched in terms of a *failure to disclose the risks* associated with investing in the Funds, the *essence* of the *allegations* is that defendants *mismanaged* the Funds..." RF/RB Br. at 2. Then it says, "*all* of plaintiffs' *claims* are *based on allegations* of *fraud*..." (i.e., misrepresentations), citing the PSLRA's pleading requirements and Rule 9(b), neither

of which applies to mismanagement. *Id.* at 6; *see also* Ind. Defs' Br. at 3-4, 4 n. 4.

## ARGUMENT

Four things stand out that are fatal to Defendants' motions to dismiss: (i) Defendants admit Plaintiffs allege that the Defendants' mismanagement of the Funds caused Plaintiffs' losses; (ii) Defendants do not dispute that Plaintiffs allege this mismanagement consisted of directing the Funds to heavily invest in highly volatile illiquid securities in violation of their investment objectives, policies and restrictions; (iii) Defendants do not dispute that Plaintiffs allege these violations and the dominance in the Funds' portfolios of securities with uncertain valuations were not disclosed; and (iv) in order to contest Plaintiffs' disclosure allegations, Defendants must rely on the Funds' SAIs because, as Defendants are forced to concede, the Funds' prospectuses did not contain such disclosures.

## I.   THE CAC IS ALL ABOUT NOT DISCLOSING THE FUNDS' MISMANAGEMENT

Defendants argue that the CAC is about mismanagement, not disclosures.[59] Given that argument, one is left to wonder why MAM/MK spends five pages on mismanagement and 27 pages on disclosure issues. MAM/MK's emphasis is understandable because the CAC contains more than 600 disclosure-related terms, and every claim except one (Count IV) is based wholly on deficient disclosures.

MAM/MK concedes the CAC includes "numerous allegations of nondisclosure," including that the Funds "were failing to observe liquidity and concentration limitations and valuation procedures," and that the "CAC rests almost entirely on omissions." MAM/MK Br. at 2, 44 n. 39. MAM/MK also says, "the CAC really alleges mismanagement, a lack of prudence and care." *Id.* But later on MAM/MK says, "All of Plaintiffs' claims are based upon allegations of fraud." *Id.* at 14.

MAM/MK even goes so far as to adopt the arguments by plaintiffs in a related ac-

---

[59]   MAM/MK Br. at 15; Ind. Defs' Br. at 4-5; Funds' Br. at 2-3; RF/RB Br. at 2. Defendants also argue that the CAC alleges that mismanagement, not misrepresentations or omissions, caused Plaintiffs' losses. That argument is addressed *infra*.

tion.[60] *See Id.* at 15 n. 13. In *Atkinson*, where the complaint included less extensive allegations of undisclosed mismanagement than the CAC,[61] this Court agreed with MAM/MK that the case was primarily about disclosure, holding that "allegations of omissions or other deceitful activity are irreparably interwoven throughout Plaintiffs' causes of action." *Atkinson*, Dkt. No. 29 at 20. Thus, not only does MAM/MK make contradictory arguments but, most significantly, its argument here is contrary to this Court's prior holding, and MAM/MK simply ignores it, making no effort to explain it.[62]

Unquestionably, the Funds were mismanaged.[63] The issue is whether the undisclosed investment practices constituting that mismanagement violated the federal securities disclosure laws. MAM/MK admits Plaintiffs have adequately alleged that their losses were caused by Defendants' mismanagement of the Funds by failing to adhere to disclosed investment practices and restrictions. MAM/MK Br. at 16. This states claims under federal securities law. *Rodney v. KPMG Peat Marwick,* 143 F.3d 1140, 1145-46 (8th Cir. 1998) (failure to disclose violation of funds' self-imposed restrictions is a basis for imposing liability on auditor under § 11); *White v Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002) (same).

Defendants cite no authority for the proposition that the presence of mismanagement renders federal securities claims inapplicable.[64] On its face, Defendants' theory that federal

---

[60]      *See* Plaintiffs' briefs in *Atkinson v. Morgan Asset Management, Inc.*, No. 08-2694  (W.D. Tenn.) ("*Atkinson*"), Dkt. Nos. 14-2, 19.

[61]      *See* complaint in *Atkinson*, Dkt. No. 4-3.

[62]      Defendants' taking contradictory positions without regard to merits is not confined to this case. In *Rice v. Regions Bank*, No. 2:10-cv-00268 (N.D. Ala. March 8, 2010), Dkt. No. 19 (Ex. 49), RF, RB, MAM and Kelsoe were chastised by Judge Proctor for "taking inconsistent positions" that evidenced "an intent to 'make a mockery of the judicial system.'" *Id.* at 28-31.

[63]      Plaintiffs' allegations of MAM/MK's mismanagement of the Funds are buttressed by the regulatory actions. *See, e.g.*, Ex. 3 ¶¶ 124-34.

[64]      None of the cases cited by MAM/MK support this proposition. In *In re Charles Schwab Corp. Sec. Litig.*, 2009 WL 1371409 (N.D. Cal. May 15, 2009) (Ex. 50), the court, which had already upheld the plaintiffs' federal securities claims based on allegations very similar to those in this case, 257 F.R.D. 534, denied plaintiffs' efforts to salvage dismissed state claims (e.g., breach of fiduciary duty) because they were derivative under applicable Massachusetts law. In *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772 (S.D. N.Y. Jan. 17, 2006) (Ex.

disclosure claims that involve mismanagement are negated because what was undisclosed was mismanagement is preposterous, immunizing from the federal disclosure regime mismanagement, notwithstanding that the SEC's guidance for prospectuses and reports require management-related disclosures. SEC Form N-1A Item 4 (Curley Decl. Ex. X).

The Funds take a slightly different tack. They say, "plaintiffs allege that the Funds' offering documents failed to disclose information concerning the *general risk* associated with an investment in the Funds and the risk associated with liquidity, …" Funds' Br. at 3. This is a shocking statement to make. In extensive and detailed allegations, Plaintiffs allege specific, not general, risks that were not disclosed: liquidity risk and violations of the limits on illiquid securities (¶¶ 161-215), the extent to which the Funds' portfolios were subject to speculative valuations (¶¶ 216-47), the extraordinary credit risk embedded in the Funds' portfolios (¶¶ 248-66), the extent to which the Funds' violative investment practices deviated from their disclosed benchmarks and from their peers,[65] false representations regarding safety and maintaining NAV stability while investing in volatile ABS/MBS (¶¶ 129-43, 267-72, 386-97), falsely representing portfolio diversification while concentrating the Funds' investments in mortgage-backed securities and high credit risk loans to consumers in excess of the disclosed single industry limits (¶¶ 273-83), misrepresenting the percentages

---

51), the plaintiffs alleged no disclosure-based claims under the federal securities laws, only violations of the ICA, Investment Advisers Act ("IAA"), and state law claims for excessive 12b-1 fees. The court said these were derivative claims under Delaware law and no private right of action under the ICA sections was alleged. *Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005), involved a discussion of whether plaintiffs' claim under ICA § 36(a) was a direct or derivative claim, concluding plaintiffs' 36(a) claim was a derivative claim according to applicable Massachusetts law. Again, this has nothing to do with whether federal disclosure claims that involve mismanagement are negated because what was undisclosed was mismanagement. *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D. N.J. 2005), is a class action alleging excessive fees, false and misleading information, and improper payments to brokers to steer investors into the funds in violation of ICA §§ 34(b), 36(a), and 36(b) and IAA § 215; no claims were asserted under the '33 Act, and no private cause of action was held to exist under ICA § 34(b). *In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616 (D. N.J. 2005), involved class and derivative claims under the ICA for excessively compensating brokers to steer investors to the funds. Plaintiffs' ICA § 36(b) claim was held to be improperly pleaded as a direct rather than a derivative claim; no claims were asserted under the '33 Act.

[65]     ¶¶ 121, 123-25, 127, 145-60, 308, 311, 314, 317, 318, 371(m), 372(o), 373, 374(u), 375(w), 376(n), 377(o), 402-20, Appx. B, F.

of ABS/MBS in the Funds' portfolios (¶¶ 284-92), misrepresenting the Funds' exposure to leverage (¶¶ 293-305), false and misleading financial statements that did not conform to GAAP (¶¶ 562-71), the use of disclosures that failed to differentiate the Funds from their peers and the failure to disclose the risks unique to the Funds and how these Funds differed from their peers as a result of their aggressive investment in thinly traded securities whose values were highly speculative (¶¶ 402-20, Appx. B, F).[66]

## II.   THE FUNDS DID NOT DISCLOSE ALL REQUIRED INFORMATION REGARDING AN INVESTMENT IN THE FUNDS.

This Court, an Alabama state court, and two federal and four state regulatory agencies have determined that, or the adequacy of allegations that, the sales of the Funds' shares involved false and misleading disclosures. In *RMK ERISA Litig*., this Court denied defendants' motions to dismiss disclosure claims that are based on far more general allegations than those herein.[67] In *Rice*, the court denied motions to dismiss by Defendants RF, RB, MAM and Kelsoe of claims under the five state securities acts based on allegations of defective disclosures similar to those herein. Ex. 11. In *Holloman v. Regions Bank*, No. 2:10-cv-00268-RDP (Jefferson County Circuit Court, Alabama, November 13, 2009) (Exs. 12, 13), the same court denied RB's and MAM's motions to dismiss.[68] Finally, in initiating its enforcement action, the SEC has determined that from at least January 2007 to July 2007, the Funds NAVs were inflated as a result of MK's manipulating the fair value determinations of the Funds' illiquid securities ABS/MBS. Ex. 1 ¶¶ 11-40. Likewise, FINRA has determined that, from January 1, 2007 through December 31, 2007, MK used "false and misleading

---

[66]   Falsely representing a fund's diversification, or failing to adhere to represented diversification, was one of the major abuses that led to the passage of the ICA. *In re Charles Schwab Corp. Securities Litigation*, No. 3:08-cv-01510 WHA, SEC Brief *Amicus Curiae* ("SEC *Amicus* Brief"), Dkt. No. 506-1 (Ex. 52) at 5-6.

[67]   2010 WL 809950, at *14 (Ex. 9); Amended Consolidated Supplemental Class Action Complaint for Violation of ERISA (Ex. 67), Dkt. No. 170 ¶¶ 267-68 424; *Cf*. ¶¶ 129-39, 162, 183, 197, 201, 220, 222, 249, 258, 267-75, 284, 287, 293-99, 371-420.

[68]   In denying defendants' motions to dismiss, Judge Vance ordered plaintiff to replead her misrepresentation claim. She did. Ex. 14. Defendants have not moved to dismiss plaintiff's amended complaint. *Holloman* involves two RMK closed-end funds.

sales materials" in connection with its sales of shares in the Funds and that the Funds' investments in ABS/MBS "caused the funds to experience serious financial difficulties beginning in early 2007 and led to their collapse later that year," leading FINRA to initiate an enforcement action against MK. Ex. 2 ¶ 1. The states found that the respondents made false and misleading statements by failing to disclose the Funds' risks in SEC filings and sales materials, misclassified portfolio holdings and used inappropriate benchmarks for comparing the Funds' performances. Ex. 3 ¶¶ 44-54; 55-77.

A.    **The Funds Failed to Disclose Their Liquidity Risk.**

MAM/MK on the one hand says liquidity risk was disclosed but on the other says it was correct in deeming all of the Funds' restricted securities to be liquid, thereby rendering immaterial any disclosure about liquidity risk. The Funds disclosed at the beginning of their SAIs that they would limit investments in illiquid securities to 15% of their assets, while 27 pages later they include a generic liquidity risk disclosure that omitted material facts, but in their reports to shareholders they said all of their restricted securities were liquid. Courts routinely hold that disclosure ambiguity is resolved against the defendant.

Courts have consistently held that disclosures must be clear, complete and cannot be contradictory or spread out piece-meal within the same document or buried in a mass of verbiage.  Disclosure is inadequate under the federal securities laws if it takes a financial analyst to discern the truth. *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1089 (1991) (where disclosures conflict, "if it takes a financial analyst to spot the tension between [the truth and the misleading], whatever is misleading will remain materially so, and liability should follow"); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980) (disclosure cannot be buried in a mass of information that would give the correct impression only when pieced together; proxy statement was inadequate in that it failed to disclose with sufficient clarity the effect of a proposal on a corporation's control where the data necessary to calculate the impact of the proposal was spread over two pages); *Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980) (method of  presentation that obscures or distorts signifi-

cance of material facts violates § 11); *Gould v. American-Hawaiian Steamship Company*, 535 F.2d 761, 774 (3d Cir. 1976) (information may be so "buried" in a proxy statement that it constitutes a material misstatement or omission of fact, observing that "nowhere [is there] a statement giving emphasis to the conflicts of interest similar to that given to the board's approval of the merger agreement" [citations omitted]); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973) ("it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts").

Moreover, emphasis and gloss cannot be used to conceal negative information.  In *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 200-03 (5th Cir. 1998), the court reversed a district court's holding that the manner of disclosure is not actionable under either § 11 of the 1933 Act or § 10(b) of the 1934 Act.  In reaching its holding, the Fifth Circuit expressly rejected the district court's statement that "emphasizing and glossing do not create liability." *Id*. at 200-201.  The court of appeals reasoned that courts facing claims under federal securities laws "have long recognized that reviewing the context in which a disclosure appears is an essential part of determining the disclosure's adequacy." *Id*. at 201.  The Fifth Circuit concluded that relevant case law clearly supported its conclusion that in the right circumstances, emphasis and gloss can create liability under both §§ 11 and 10(b).  *Id*. at 203. *Accord*, *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971).

Defendants argue that securities issued under SEC Rule 144A are liquid securities if so declared by the Funds' board of directors and, therefore, are not subject to the 15% illiquidity limitation. MAM/MK Br. at 32-33.[69] This argument ignores Rule 144A's provisions.

The Funds had substantial investments in "restricted securities," acquired under SEC Rule 144A. Rule 144A provides that securities issued in non-public offerings pursuant to its provisions may be sold initially or resold only to "qualified institutional buyers" ("QIBs"), institutional buyers that own and invest assets of at least $100 million. A security issued

---

[69]     Restricted securities were identified by "(a)" in the quarterly lists of the Funds' holdings.

pursuant to Rule 144A is classified as "restricted" because it cannot be sold to the general public. A 144A security can be determined to be "liquid", and if so, this security is not deemed to be part of the 15% limit on illiquid securities, provided that the security is not otherwise illiquid—i.e., does not possess the characteristics of an illiquid security. '33 Act Release No. 6862, 1990 WL 311657 (April 23, 1990) ("1990 Release") (Ex. 15). Just because the security is a Rule 144A security does not mean that it is automatically liquid, since the board must make the liquidity determination based on a reasonable inquiry:

> The determination of the liquidity of Rule 144A securities in the portfolio of an investment company issuing redeemable securities is a *question of fact* for the board of directors to determine, *based upon the trading markets* for the specific security. The board should consider the *unregistered nature* of a Rule 144A security *as one of the factors* it evaluates in determining whether or not a security is illiquid. Generally, an illiquid security is any security that cannot be disposed of within seven days in the ordinary course of business at approximately the amount at which the company has valued the instrument.

1990 Release at 11. Thus, whether the particular security is actually liquid is a *fact issue.*

The factors to be considered in the board's determination of whether a 144A security is liquid include the frequency of trades and quotes for the security, the number of dealers willing to purchase or sell the security, the number of other potential purchasers, dealer undertakings to make a market in the security, and the nature of the security and the nature of the marketplace trades, the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer. *Id.*; s*ee* ¶¶ 173-77.

The liquidity determination is not a one-time thing; the liquidity of restricted securities must be continuously monitored for compliance with the 15% limitation on illiquid securities. The 1990 Release further states:

> The Board (or its delegatee) should also continue to monitor the liquidity of Rule 144A securities. If as a result of changed conditions, it is determined that a  Rule 144A security is no longer liquid, the fund's holdings of illiquid securities  should be reviewed and the board should determine if any steps are required to assure that the [fifteen] percent test continues to be satisfied.

1990 Release at 32 n. 61. Accordingly, a Rule 144A security that subsequently becomes il-

liquid must thereupon be included within the 15% illiquidity limitation. In addition to the foregoing liquidity factors, a 144A security could be determined to be illiquid if the issuer is not continuing to make available appropriate financial information that would enable it to be resold to QIBs. This was the case for many of the Funds' securities, both restricted and unrestricted. ¶¶ 183, 188-90, 197(b)(1), 199. [70]

Thus, a Rule 144A security is not liquid as a matter of law, and the Director and Individual Defendants were required to affirmatively determine liquidity at the time of purchase of each security and to continue to monitor the liquidity of such security. If the security subsequently became illiquid, it was subject to the 15% illiquidity limitation. Based on the liquidity factors identified in the 1990 Release, Plaintiffs allege that most of the Funds' restricted and non-restricted securities were illiquid. ¶¶ 173-211. Regardless, the issue is not one to be resolved at this stage of the litigation. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 2010 WL 1253114, at * 5 (D. Mass. Mar. 31, 2010) (to the extent there is a factual dispute concerning whether Rule 144A securities were illiquid, that dispute is not subject to resolution at a motion to dismiss.) (Ex. 16).

Defendants argue that they have properly disclosed that a delay in selling a 144A security at a reasonable price might result if there were an insufficient number of QIBs interested in purchasing the security. MAM/MK Br. at 32-33. However, this statement appears only in the SAI and not in the prospectuses. It also fails to disclose that in the event of such subsequent illiquidity, there would be a violation of the 15% illiquidity limitation if the fund already held 15% of its assets in other illiquid securities.

**B.    Identical Disclosures but Disparate Performances.**

Nowhere in MAM/MK's disclosure arguments does MAM/MK address Plaintiffs'

---

[70]      *See Hamilton Partners, Ltd., L.P. v. Sunbeam Corp.*, 2001 WL 34556527, at *8-11  (S.D. Fla. July 3, 2001) (market for debentures sold pursuant to Rule 144A was not efficient because the debentures were thinly traded, were not priced efficiently, and aftermarket pricing information could only be obtained by calling around, rather than relying on a market where bids, asks, and transactions are quoted publicly and accurate transaction data and information is available.) (Ex. 53).

allegations that HIF, IBF and STF had far greater losses than two other RMK open-end bond funds (FIF and LMFIF) notwithstanding substantially identical disclosures. ¶¶ 403-10, Appx. A-C. These disparate performances are attributable to the extent to which HIF, IBF and STF, managed by Defendants Kelsoe and Tannehill, invested in ABS/MBS, while FIF/LMFIF, managed by others, did not. ¶ 411.

On the other hand, HIF's and IBF's losses were comparable to those of the RMK closed-end fixed income funds. This is true even though the latter had significantly stronger risk disclosures in their prospectuses, reflecting their much greater risk. ¶¶ 412-13, 418-19, Appx. D-F. HIF and IBF, like the four RMK closed-end funds, were predominantly invested in ABS/MBS. ¶¶ 415-16. Even though IBF was supposed to be a safer fund than HIF and the four RMK closed-end funds, its loss was greater than the others' losses. ¶ 417.

## C.    Plaintiffs Adequately Allege Defendants' Failure to Disclose the Funds' Violations of the Restriction against Concentration in a Single Industry.

Plaintiffs allege in detail that the Defendants failed to disclose that they did not limit the Funds' investments in a single industry to not more than 25% of assets, as required by the Funds' fundamental investment restriction requiring such limitation. ¶¶ 273-83. Defendants' argument that the Funds' prospectuses disclosed concentration is based on the "Guidelines for Form N-1A" (the "Guides").[71] Guide 19 says "the staff will ordinarily use the current Directory of Companies Filing Annual Reports with the Securities and Exchange Commission" in determining industry concentration. This Directory is based on the Standard Industrial Classification ("SIC") Code list, which Defendants argue should be controlling as to Plaintiffs' allegations with respect to non-disclosure of concentration and violation of the 25% limit on concentration in any industry. The Guides are advisory only.[72] Guide 19 states that a registrant "may select its own industry classifications," subject to certain cave-

---

[71]    ICA Release No. 13436 (1983), 1983 WL 35814 (August 12, 1983) (the "1983 Release") (Ex. 54).

[72]    The introduction to the Guides states: "Registrants should be aware that these Guidelines are not rules of the Commission and, except as noted herein, represent the views of the staff of the Division of Investment Management rather than an official position of the Commission."

ats. *See*, *generally*, SEC *Amicus* Brief at 5-9.[73]

Regardless, the 1983 Release and Guides have been superseded by ICA Release No. 23,064, 1998 WL 107729 (June 1, 1998) (the "1998 Release") (Ex. 17). The 1998 Release revised SEC Form N-1A. The Guides were not republished in the 1998 Release, unlike their publication in conjunction with the 1983 Release on which Defendants rely.[74] In taking this action, the SEC said, "the Guides collectively have not been reviewed since 1983" and "(c)ertain Division positions in the Guides … have become outdated." (1998 Release at 41).

The 1998 Release adopts the concentration level of 25% of assets from Guide 19 as the test determining industry concentration, but the 1998 Release does not adopt the remainder of Guide 19.[75] Because the Guides, including Guide 19, were not republished in the 1998 Release, there has been no published position by the SEC since that time defining what constitutes an "industry" for purposes of determining application of the 25% limit on industry concentration. As a result, there is no legal requirement that the "industry" be an industry category as defined by the SIC Code. *Northstar Financial Advisors, Inc., v. Schwab Investments,* 609 F. Supp.2d 938, 948 (N.D. Calif. 2009); *In re Charles Schwab Corp. Sec. Litig.,* 2010 WL 1261705, at *6 (N.D. Cal. Mar. 30, 2010).

Regardless, the issue of what constitutes an "industry" and whether the mortgage loan industry is an appropriate industry for purposes of the Funds' 25% concentration limitation is a factual issue that cannot be resolved in a motion to dismiss.[76] In *Northstar* , the

---

[73]    "An agency's construction of a statutory scheme that it is entrusted to administer is entitled to a degree of deference." *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277 (6th Cir. 1996) (citations omitted) (cited in *RMK ERISA Litig.*, 2010 WL 809950, at *5 n. 10).

[74]    "The Guides have not been republished with Form N-1A, as amended. Neither the guides nor the GCLs [General Comment Letters] will apply to registration statements prepared on the amended Form [N-1A]. The Commission also is rescinding the Guides Releases." 1998 Release at 98 n. 214.

[75]    The 1998 Release states: "The Commission's staff has taken the position for purposes of the concentration disclosure requirement that a fund investing more than 25% of its assets in an industry is concentrating in that industry [footnote reference to Guide 19]." 1998 Release at 16.

[76]    Although Defendants argue that Plaintiffs should be bound by the SIC industry classifications, Defendants themselves have not employed the SIC Code categories. In the Funds' formal concentration restriction limiting investments in any one industry to 25% of the Funds' total assets, an exception is carved out for the "utilities category" with gas, electric, water, and tele-

court denied a motion to dismiss where defendants had reclassified mortgage-backed securi-
ties as not being an "industry" for purposes of the 25% single industry limitation without
getting shareholder approval:

> The Court finds that whether the Fund violated the concentration policy which
> prohibits investing more than 25% of the Fund's assets in a single industry turns
> on whether mortgage-backed securities are properly considered an "industry", a
> factual matter which the parties presently dispute. If, as plaintiff alleges, mort-
> gage-backed securities constitute an "industry", the fund bypassed – and effec-
> tively violated – the concentration policy by improperly reclassifying mortgage-
> backed securities. If, as defendants contend, the Fund's reclassification of mort-
> gage-backed securities was reasonable, there was no violation of the concentra-
> tion policy. This cannot be resolved at the current stage of the pleadings.

609 F. Supp.2d at 948);.

Defendants state that Plaintiffs, in order to allege breach of the 25% industry concen-
tration limit, have improperly combined various industry categories set forth in the Funds'
portfolios, such as home equity loans, CMOs, manufactured housing loans, and commercial
and residential mortgage backed securities, which Defendants characterize as "several in-
dustries that might be related to mortgages." But none of these sub-categories has a specific
SIC Code, indicating that they were self-selected by Defendants in order to subdivide and
therefore mask what otherwise would be an obvious concentration in a single industry.[77]

Defendants argue that the Funds' annual and semi-annual reports identified each port-
folio security and at all relevant times the Funds' concentration in any industry was avail-
able for all to see. MAM/MK Br. at 40 n.34. This argument ignores the self-selected, obvi-

---

phone companies being deemed to be "separate industries." Although there is an SIC Code for
"Utilities, combinations of" (SIC Code 4939), there are no separate SIC Codes for gas compa-
nies, electric companies, water companies, or telephone companies.

[77]    Item 4 of Form N-1A, Instruction 4, requires a registrant to disclose any concentration in
any industry or "group of industries." If Defendants desired to classify the above listing as a
group of industries related to mortgages, they were required to disclose this concentration in
such a group of industries. Plaintiffs, however, are relying on non-disclosure of a violation of the
25% limit on concentration in a single industry – the mortgage loan industry. Defendants
cite *Phillips v. Morgan Stanley Dean Witter High Income Adv. Trust III*, 2002 WL 31119441
(S.D.N.Y. Sept. 25, 2002), which related to whether it is possible to state a claim for over con-
centration in a group of industries *in the absence of a restriction* relating to a group of indus-
tries; accordingly, it is not applicable here.

ously related subcategories used by the Funds to mask the degree of investments in a single industry and that, in any event, were misleading. ¶¶ 276-80, 286-92; Ex. 3 ¶¶ 49-51. None of these classifications alleged by Defendants to be separate industries had a separate SIC Code. Further, there are numerous securities listed under these self-selected subcategories which defy identification in the absence of access to the underlying prospectuses for the particular portfolio security.[78] Moreover, disclosing a 25% concentration limit while including lists of incomprehensibly named individual securities is the kind of disclosure abuse roundly condemned by the courts.

Finally, Defendants argue that Plaintiffs' allegations are deficient because there is no allegation that the disproportionate concentration did not occur because of a change in valuation of one or the other category, or that there were subsequent purchases of the concentrated securities after the concentrated category exceeded 25% of assets solely due to a valuation change. This argument is also baseless, as the Funds' reports demonstrate.[79]

### D. Defendants' Selection of Certain Broad-Based Securities Indices for Comparison with the Funds' Performances Was False and Misleading.

Defendants' use of broad-based indices for comparing the Funds' performances was false and misleading because they failed to disclose the differences between the composition of these indices and the composition of the Funds' portfolios. Ex. 2 ¶¶ 35, 69, 83.

A fund is required to discuss any differences between a broad-based index and its portfolio "that are not readily apparent." ICA Release No. 19382, 1993 WL 101994, at *6 (Ex. 18). Also, the SEC has advised funds "to compare their performance with other, more

---

[78]   For example, in the June 30, 2006 annual report, under the category "Collateralized Debt Obligations – 22.8%", the following securities, held by IBF and constituting the two largest positions, are illustrative of the numerous others in that category: G Square Finance 2006-1A C1, 6.537%, 4/5/51 and Trapecz LLC 2006-10 A D2, 8.700%, 6/5/41. Curley Decl. Ex. S at 20. A potential investor could not determine whether these (or others in the category bearing similar non-descriptive names) contain mortgage related securities.

[79]   The reports to shareholders show purchases by the Funds of CMOs from period to period. E.g., Cf. Curley Decl. Exs. S at 24-25 (IBF's CMOs total cost of $76,551,354 at June 30, 2006) and U at 25 (IBF's CMOs total cost of $128,276,504 at December 31, 2006), indicating purchases of approximately $50 million in CMOs from June to December 2006.

narrowly-based indexes." *Id.*

Plaintiffs allege that the indices selected by the Funds for purposes of performance comparisons falsely conveyed the impression that the Funds were conventional short- or intermediate-term or high-yield bond funds similar to other funds using the same broad-based indices.[80] Defendants' failure to correct this misconception by disclosing the dramatic differences between the composition of the selected broad-based indices and the Funds' portfolios, or by failing to adopt more narrowly focused, more market appropriate indices to supplement the broad-based indices, as advised by the SEC, misled investors about the inherent risks implicit in the Funds' portfolios.[81] The use of benchmark indices that did not include a major type of investment by the Funds (ABS/MBS) was materially false and misleading.[82]

---

[80]    ¶¶ 140-41, 154-59, 311, 314, 317, 371(m), 372(o), 374(u), 375(w), 376(n), 377(o).

[81]    The Funds' portfolio managers' bonus of as much as 50% of their base salary in part determined by performance versus the Funds' benchmarks served as a motive for selecting benchmarks that could be easily beaten by deviating from their composition. ¶ 86.

[82]    *See Northstar Financial Advisors*, 609 F. Supp.2d at 946 (fund deviated from its investment objective by making sizable investments in securities that were not part of its benchmark); *In the Matter of Piper Capital Management, Inc. et al.*, Initial Decision Release No. 175 File No. 3-9657 November 30, 2000, sec.gov/litigation/aljdec/id175hpy.htm. In concluding that Piper Capital Management, Inc. ("PCM"), the investment adviser to an open-end government bond fund ("PJIGX"), falsely compared the fund to a government bond index, the Administrative Law Judge, finding the use of the benchmark to be a material fact and the comparison false and misleading, said:

> I find and conclude that expressly comparing Fund performance to the Merrill Lynch 3-5 Year Treasury Bond Index [in annual/semi-annual reports to shareholders as a benchmark for the Fund's performance] establishes a substantial likelihood that reasonable investors would consider the comparisons important in making PJIGX investment decisions and would view the comparisons as significantly altering the total nix of available information. It follows that PJIGX/Merrill Lynch 3-5 Year Treasury Bond Index comparisons were material to investors.

> The record casts doubt on PCM's claim that the Merrill Lynch 3-5 Year Treasury Bond Index was an appropriate risk/performance benchmark for PJIGX. The Fund's distinguishing feature was an extremely high proportion of CMO derivative securities. . . . The Merrill Lynch 3-5 Year Treasury Bond Index contained no CMOs/CMO derivative securities whatsoever. . . . Moreover, the record indicates that PJIGX exhibited *multiples* of the interest rate sensitivity exhibited by the Merrill Lynch 3-5 Year Treasury Bond Index.

Ex. 55. The Commission affirmed the ALJ's findings, stating:

> PCM further misled investors by comparing the Fund's performance to the Merrill Lynch three- to five-year Treasury Bond Index. The Merrill Lynch three-to five-year Treasury Bond Index, unlike the Fund, did not include CMOs. Thus,

*See e.g., Evergreen Ultra Short Fund*, 2010 WL 1253114, at * 6 (defendants' statements comparing the Fund's results to certain indices, in conjunction with other alleged misrepresentations, is enough to state a claim under §§ 11 and 12 of the '33 Act.) (Ex. 16).

E.   **The Challenged Disclosures Were Neither "Puffery" Nor Are They Protected by the Bespeaks Caution Doctrine.**

Defendants contend that either the alleged misstatements are "puffery" or forward-looking statements protected by the "bespeaks caution" doctrine. E.g., MAM/MK Br. at 48-49. In so arguing, Defendants ignore directly relevant caselaw.

1.   **Puffery.**

Courts find optimistic statements to be immaterial puffery when they are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, no reasonable investor could find them important to the total mix of information available." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (quotation and citation omitted).[83]   Context matters when determining whether a statement constitutes puffery or is, instead, actionable. *City of Monroe Empl. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672

---

the Fund's increasing proportion of CMOs exposed it to interest-rate sensitivity not exhibited by the Merrill Lynch three- to five-year Treasury Bond Index.

*In the Matter of Piper Capital Management, Inc. et al.*, Securities Act of 1933 Release No. 8276, August 26, 2003, www.sec.gov/litigation/opinions/33-8276.htm. Ex. 56.

[83]   *See, e.g., Operation King's Dream v. Connerly*, 501 F.3d 584, 589 (6th Cir. 2007) (where recipient of false information reasonably relies on the information, puffery becomes fraud); *Little Caesar Enterp., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551-52 (6th Cir. 2000) (concluding statements by defendant's real estate manager were actionable because he possessed specialized knowledge beyond that of the property purchaser and the statements were specific and capable of verification); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1483 n.29 (6th Cir. 1989) (disagreeing with district court that defendant's statements to investors were puffery, particularly at the outset of the relationship); *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987) (noting that the Second Circuit disagreed with district court that statements regarding likelihood of profits from future trades were puffing and concluding that statements regarding expertise, status, and ability to control the market were material) (citing *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir. 1986)); *Ala. OB/GYN Specialists, PC v. Cynosure, Inc.* 2003 WL 297560, at *5 (W.D. Tenn. Feb. 7, 2003) (noting that claims made in a sales setting may be actionable) (Ex. 57); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d at 689 (concluding some statements were beyond puffery and were misrepresentations of present facts); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d at 943 (concluding that statements related to annual growth, loan ratios, and credit losses went beyond vaguely optimistic statements about the future); *Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 955 (W.D. Tenn. 1999) (finding Postal Service ad claiming it was a company went beyond puffery).

(6th Cir. 2005) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)). In *Bridgestone*, the Sixth Circuit concluded that a jury could infer that the tire company's statements concerning "objective data" related to a tire recall went beyond puffery. *Id.* The statements, the court reasoned, could be viewed as a response to public outcry over the safety of the company's tires. *Id.* A jury could also have inferred the statement was a material misrepresentation. *Id.* (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 502 (9th Cir. 1992) (defendants' statements emphasizing superior quality were material because "a reasonable jury could conclude that [the company] publicly re-leased optimistic statements . . . when it knew [its product] could not be built reliably")).[84]

Statements of opinion by top corporate officials may be actionable if made without a reasonable basis. *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp.2d 933. 943 (M.D. Tenn. 1999) (citing *Va. Bankshares, Inc. v. Sandberg*, *supra*). Whether the statements are true is not to be decided on a motion to dismiss. *Id.* (citing *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993)).

Failing to disclose noncompliance with a fund's investment objectives, policies and restrictions is not puffing and is actionable under the federal securities laws. *Rodney*, 143 F.3d at 1144-45 ("The Fund specifically said it could not buy illiquid securities, borrow money, or issue senior securities. These rules have nothing in common with the sort of puff-

---

[84]    *See also In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997) (statement that airline's safety record was "certifiably among the very best in the airline indus-try" was material and actionable); *In re F & M Distribs. Inc. Sec. Litig.*, 937 F. Supp. 647, 653 (E.D. Mich. 1996) (defendant chain store's failure to disclose an adverse industry trend that made the "deal buying" strategy touted in its prospectus less viable than otherwise known could be actionable); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 967 (D. Md. 1995) (drug company's statements that "[t]he results of treatment with [its product] were highly statistically significant along all of the efficacy parameters," and "[t]he data are overwhelmingly good" were material and actionable); *Cohen v. Prudential-Bache Sec., Inc.*, 713 F. Supp. 653, 658 (S.D.N.Y. 1989) (broker's statement to a client that she "would receive a very strong cash flow without risk to her initial investment" could not be dismissed as immaterial puffery).

66

ing statements this court and others have held too general to be material.") (citing *Krouner v. American Heritage Fund, Inc.,* 1996 WL 393584, at *3 (S.D.N.Y. July 15, 1996) (undisclosed violation of a fund's policy limiting purchases of illiquid securities is material under federal securities laws.)) (Ex. 19); *In re TCW/DW North American Gov't Income Trust Sec. Litig.,* 941 F. Supp. 326, 339 (S.D.N.Y. 1996) (failure to disclose inherent illiquidity of CMO market not immaterial as a matter of law); *Evergreen Ultra Short Fund*, 2010 WL 1253114, at * 4 (statements in fund's prospectuses were key guidelines that established the Trust's investment strategy and laid down the basic ground rules it would follow) (Ex. 16).[85]

      **2.**    **Bespeaks caution.**

    The bespeaks caution doctrine protects forward-looking statements. *Prison Realty*, 117 F. Supp. 2d at 690.  It is a narrow, fact-intensive defense. *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404-06 (7th Cir. 1994) ("bespeaks caution" doctrine inapplicable to registration statements sued upon); *Mayer*, 988 F.2d at 638-40. The argument made by Defendants was made by PwC and rejected in another mutual fund case. "[T]he 'bespeaks caution' doctrine upon which PwC relies applies only to 'soft information,' projections or forecasts, not to whether the Funds complied with their stated policies or to SEC regulations." *White*, 237 F. Supp. 2d at 986. The court in *White* rejected PwC's argument that the registration statement adequately disclosed the funds' risks: "PwC refers to boilerplate language which warns generally that 'junk bonds' involve greater risks and limited liquidity. General warnings like this are inadequate to support a motion to dismiss." *Id.*

    "A cautionary statement must discredit the alleged misrepresentation to such an extent that 'the risk of real deception drops to nil.'" *Virginia Bankshares,* 501 U.S. at 1097. A defendant must show that the forward-looking statements were accompanied by cautionary

---

[85]    *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2 (2d Cir. N.Y. 1996) (MAM/MK Br. at 28, 49), is of no assistance to Defendants. That case involved an investment strategy that was consistent with that disclosed, and the risks, including the specific risk plaintiffs complained about, were also disclosed; plaintiffs' claim boiled down to a complaint that the disclosed strategy "was not as skillfully done as it should have been." *Id.* at 8 That is not the case here, where the strategy was misrepresented and the risks and violative investment practices were concealed.

language that is substantive and tailored to the specific future projections or opinions challenged by plaintiffs. *In re Royal Appliance Sec. Litig.*, 1995 WL 490131, at *3 (6th Cir. 1995) (citing *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371-72 (3d Cir. 1993) ("[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored...")) (Ex. 20); *see also Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (holding that cautionary language must relate directly to that by which plaintiffs claim to have been misled); *Kline v. First W. Gov't Secs., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994).

Where a fund describes certain risk characteristics of the mortgage-backed securities in which it invested but not the risks alleged by plaintiffs, the disclosure is inadequate. *Rodney*, 143 F.3d at 1145-46 (disclosure regarding prepayment characteristics "does not alert the reader to the level of portfolio maturity risk the Investors claim existed"). *See also Evergreen Ultra Short Fund*, 2010 WL 1253114, at * 5 ("the vague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky nature of the Fund's investments with sufficient clarity as to 'bespeak caution' nor did it expressly warn of the particular risk that allegedly brought about the plaintiffs' loss.") (Ex. 16). In *Evergreen*, the court specifically noted that "statements in the 2005-2007 prospectuses laying out the ground rules for the Fund (e.g., that it would not invest more than 15% of its assets in illiquid securities) are not 'soft statements' or future projections" and, as such, are not entitled to the bespeaks caution protection. *Id.*

Likewise, the Second Circuit denied a bespeaks caution defense when it found that prospectus language warned investors of a different contingency than what plaintiffs alleged was misrepresented. *Hunt*, 159 F.3d at 729 (bespeaks caution provides no defense when the accompanying cautionary language does not expressly warn of, or directly relate to, the risk that brought about a plaintiff's loss). Cautionary statements must not require financial expertise to decipher their meaning. *Id.* (citing *Va. Bankshares*, 501 U.S. at 1097-98). Pur-

ported warnings about some "hypothetical" risk do not satisfy a defendant's disclosure obligation where the risk exists. *See Milman v. Box Hill Sys.*, 72 F. Supp. 2d 220, 230-31 (S.D.N.Y. 1999) (risk disclosures concerning risks that had already come to pass did not satisfy defendants' disclosure obligations);

The Sixth Circuit in *Mayer* overturned a district court's dismissal of a securities fraud case when it concluded that the defendant's statements regarding loan value were actionable. *Mayer*, 988 F.2d at 639-40. The circuit court held that "material statements of opinion, if not truly believed and not supported by available facts, are actionable under Section 10(b) of the ['34 Act]." In *In Re Prison Realty Securities Litigation*, the court concluded that whether cautionary language in forward-looking statements was sufficiently meaningful presented a question of fact inappropriate for determination on a motion to dismiss. 117 F. Supp. 2d at 690; *see also Rodney*, 143 F.3d at 1146 (sufficiency of warnings is for a jury).

Defendants make no effort to overcome Plaintiffs' allegations that the statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged in the CAC. ¶ 673.

III.    **PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION.**

Defendants contend Plaintiffs do not adequately allege loss causation. MAM/MK Br. at 49-53; PwC Br. at 15-17; RF/RB Br. at 15-17; Directors' Br. at 6-8. They are wrong.

A.    **Loss Causation for Section 10b-5 Claims.**

Plaintiffs have adequately pled the requirements for loss causation for Rule 10b-5 claims under the '34 Act.  In order to state a claim for securities fraud, a plaintiff "must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). Plaintiffs must prove that there is a "causal connection between the material misrepresentation and the loss." *Id.* at 342. All that is required are allegations of "facts to support a theory that is not facially implausible."  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

"To prove loss causation, a plaintiff must show 'that the untruth was in some reasona-

69

bly direct, or proximate, way responsible for the loss.' A plaintiff need not allege the defendants' misrepresentations were the sole cause of the plaintiff's loss, only that they were a substantial contributing cause." *In re Unumprovident Corp. Sec. Lit.*, 396 F.Supp. 2d at 898. Even if the mismanagement that Defendants concede Plaintiffs allege does not prove loss causation on its own, "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery." *In re America Serv. Group, Inc.*, 2009 WL 1348163, at *62 (M.D. Tenn. 2009) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000)) (Ex. 21).[86] At the motion to dismiss stage, a plaintiff is not required to rule out all the other factors that contributed to a security's lower price in order to plead loss causation. *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 55 (D. Mass. 2006) ("[I]solating the myriad causal factors that affect the stock price is a factual question that should be decided at trial, with the help of qualified experts.  It is not an issue appropriate for a motion to dismiss."); *In re Brooks Automation Inc. Sec. Litig.*, 2007 WL 4754051, at *15 n.17 (D. Mass. Nov. 6, 2007) ("Although defendants raise an issue regarding plaintiffs' ability to establish loss causation, this factual issue is hotly contested and is not amenable to disposition at this time.") (Ex. 22).

Causation under Section 10b-5 has two components: transaction causation and loss causation. *Unumprovident*, 396 F.Supp. 2d at 897-98 (describing transaction causation as the idea "that but for the defendant's fraudulent statement or omission, the plaintiff would not have entered into the transaction for the purchase or sale of a security" and loss causation as "that the *subject* of the fraudulent statement relied upon was the cause of the actual loss suffered"). Defendants concede that Plaintiffs have adequately alleged transaction ("but

---

[86]     Defendants' reliance on *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 389 F. Supp. 2d 429 (S.D.N.Y. 2003), is inapposite.  In that case, the plaintiffs alleged that defendants failed to disclose certain "conflicts of interest."  *Id.* at 437.  The court found that plaintiffs failed to allege a causal connection between the defendants' failure to disclose and the decline in the funds' price. *Id.* at 431.  Here, of course, plaintiffs have alleged the causal connection between the defective disclosures and the decline in the Funds' NAVs.

for") causation. MAM/MK Br. at 52-53. Plaintiffs allege loss causation occurred in the form of the Funds' undisclosed mismanagement—i.e., the undisclosed liquidity and valuation risks, among others, arising from the Funds' violations of their investment objectives, policies and restrictions; thus, the *subject* of the deficient disclosures caused Plaintiffs' losses.

The "failure to administer properly" a securities interest is adequate to allege loss causation. *Johnson v. Songwriter Collective, LLC*, 2006 WL 861490, at *12 (M.D. Tenn. Mar. 28, 2006) (Ex. 23). The "failure to administer properly" in this instance consisted of the RMK Defendants' wrongful conduct in connection with their concealed mismanagement.

      **1.    Mismanagement versus misrepresentation/omissions as loss causation.**

Claiming that Plaintiffs allege that only mismanagement, not misrepresentations, caused their losses, Defendants argue that only omissions or misrepresentations can be alleged to cause Plaintiffs' losses, not mismanagement, to support claims under the federal securities laws. MAM/MK Br. at 15-19, 49-50; RF/RB Br. at 15; Funds' Br. at 2-3, 5. Here, the RMK Defendants' mismanagement consisted of their *undisclosed* violations of the Funds' investment objectives, policies and restrictions, the undisclosed dominance in the Funds' portfolios of securities with speculative valuations, and other mismanagement, all of which created huge undisclosed risks, which all Defendants admit Plaintiffs allege as the cause of Plaintiffs' losses. Acknowledging that Plaintiffs adequately allege *mismanagement* caused their losses means Defendants admit the alleged nondisclosures caused Plaintiffs' losses because the *subject* of those defective disclosures was Defendants' *mismanagement*. *See In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 546-47 (N.D. Cal. 2009) (court rejected defendants' argument that a fund's misrepresentation of its investment policies and risk profile could not have caused plaintiffs' losses because the misrepresentations did not cause the decline in the value of the portfolio's asset holdings).

      **a.    RMK Defendants.**

Several Defendants do not dispute that the CAC alleges that mismanagement of the

Funds caused the decline in the Funds' NAV.[87] These Defendants admit, or do not dispute, that Plaintiffs allege that this mismanagement was concealed, that it consisted of the RMK Defendants' management of the Funds without regard to the Funds' investment objectives and restrictions that resulted in undisclosed risks, and that the Funds were injured thereby— that the materialization of the undisclosed risks embedded in the Funds' mismanaged portfolios caused Plaintiffs' losses. ¶¶ 308-21. The Individual Defendants concede the issue in this case is whether "the very risk factors that ultimately materialized and caused Plaintiffs' losses" were disclosed: they say they were; Plaintiffs allege they were not. This clearly creates a fact dispute that is not resolvable by a Rule 12(b)(6) motion. *RMK ERISA Litig.*, 2010 WL 809950, at *5 (improper on a motion to dismiss to resolve evidentiary issues, even one regarding the nature of plaintiffs' ERISA plan) (Ex. 9). Moreover, by contending that the "Funds' offering documents disclosed the very risk factors that ultimately materialized and caused Plaintiffs' losses" (Ind. Defs. Br. at 3), the Individual Defendants join Plaintiffs in correctly framing the issue as whether the risks that materialized to cause Plaintiffs' losses were disclosed, dispelling the argument that this case is not about disclosure.

How a mutual fund is to be managed must be disclosed. SEC Form N-1A Item 4 (Curley Decl. Ex. X at 18). This form requires that a fund disclose its "principal investment

---

[87]    MAM/MK Br. at 16 ("Plaintiffs assert that their losses were caused by mismanagement of the Funds"), 50; Funds' Br. at 5; Ind. Defs' Br. at 4; RF/RB Br. at 15 (CAC alleges Defendants' "poor portfolio management" caused Plaintiffs' losses). Defendants do not address allegations that mismanagement and "poor portfolio management" were causing the Funds to violate their investment objectives, policies and restrictions and that these violative investment practices, which Plaintiffs allege caused their losses, were not disclosed. Defendants' argument that Plaintiffs allege only mismanagement, not defective disclosures, as the bases for their claims is absurd. E.g., MAM/MK selectively quotes a tiny handful of the CAC's allegations in its vain effort to support this argument, but of its 13 examples (including five that MAM/MK admits were under the heading "Defendants' *Undisclosed and Misrepresented* Risks and Violations of the Funds' Investment Objectives, Policies and Restrictions," and four of these five examples bear subheadings that include the words "as they and the Funds *represented*"), eight include disclosure terms and phrases (e.g., "omissions of material facts," "Defendants' representations," "failed to identify," "disclosed procedures," "failure to disclose," "disclosed investment objectives", "how RMK Defendants said they would manage the Funds," "undisclosed concentration," and a ninth included the pronoun "this" whose antecedent clearly was the disclosed restriction on concentration whose violation was not disclosed. *See* MAM/MK Br. at 16-17.

strategies, including the *particular* type or types of securities in which the Fund *principally* invests or will invest." *Id.* A fund must also disclose "the risks to which the Fund's *particular* portfolio as a whole is expected to be subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, or total return." *Id.* A fund must also disclose how "a strategy to invest in a *particular* type of security" affects the fund's potential risks and returns, where that strategy is a "principal investment strategy." *Id.* A fund's "principal investment strategy" is determined by, *inter alia*, that amount of the fund's assets committed to the strategy, the amount of the fund's assets placed at risk by the strategy, and the likelihood of the fund's losing some or all of those assets. *Id.* Thus, investment management and methodology are required disclosures, making undisclosed mismanagement and failure to adhere to disclosed methodologies a proper subject of claims under the '33 and '34 Acts. Here, the Funds' principal investment strategy was investing in ABS/MBS, and Plaintiffs allegations of undisclosed mismanagement states claims under those statutes.

MAM/MK/RF/RB mischaracterize the CAC's allegations regarding what caused Plaintiffs' losses. The "poor portfolio management" and "bad investments" (MAM/MK Br. at 50; RF/RB Br. at 15) consisted of failing to adhere to the Funds' investment objectives, policies and restrictions as represented in the Funds' prospectuses and with which the Funds were required to comply. This and other undisclosed wrongful mismanagement (dominance in Funds' portfolios of speculatively valued securities with extraordinarily high credit risk) existed throughout the Class Period and ultimately caused Plaintiffs' huge losses.[88]

MAM/MK and RB were supposed to be astute managers of other people's money. ¶¶ 43, 50-51, 57, 110, 129-34, 138-42. The RMK organization touted its funds under the heading "THE RELIABILITY OF INVESTING WISELY," saying "When you invest in RMK Select Funds, *you know exactly where you're going and exactly what you own*. Each Fund has a *well defined*, *'no-surprises'* style of structured, *disciplined decision making*." ¶

---

[88]       ¶¶ 3-7, 119-28, 180-87, 191-202, 204, 207, 209-11, 213, 215, 220-22, 226, 249-66, 269-72, 278-83, 286-87, 293-303, 308, 318-21, 348-67, 371-78, 386, 391-95, 568-71.

139. One commentator noted that IBF was supposed to be safe: "At least investing in a hedge fund you knew you were taking risk. *This was supposed to be an investment grade bond fund.* You know, where you don't take a lot of risk? You know, the safe part of your portfolio?" ¶ 142. The undisclosed risks that caused the catastrophic losses of late 2007 and early 2008 were foreseen by, and disclosed to, Defendants in prospectuses relating to many of the securities purchased by the Funds. ¶¶ 121, 125, 197, 235, 258, 329-40, 721.

In pushing its spurious argument that Plaintiffs allege only that mismanagement caused their losses, not misrepresentations or omissions, Defendants are forced to distort the CAC by selectively quoting allegations while ignoring others. MAM/MK Br. at 51; PwC Br. at 17; Funds Br. at 12. The paragraphs quoted or referenced (¶¶ 120, 121, 128) bracket the paragraphs that summarize the CAC's loss causation allegations and that directly contradict Defendants' version of what happened to cause such extraordinary losses for a bond fund, regardless of whether high-yield, intermediate-term, or short-term. ¶¶ 119-28, 318-21; *see also* ¶¶ 116-18, 129-44, 161-328.

### b.   PwC.

PwC admits, "Suffice it to say plaintiffs allege a host of material misrepresentations and omissions relating to risks inherent in the Funds' investments and operations." PwC Br. at 3 (citing 145 paragraphs of the CAC). PwC also acknowledges that Plaintiffs allege "that PwC failed to conduct its audits of the Funds' 2004, 2005, and 2006 financial statements in accordance with its obligations under SEC regulations and various other standards and guidelines applicable to professional auditors." *Id.* (citing 189 paragraphs of the CAC). Then PwC says, "The gist of plaintiffs' complaint is that, had PwC conducted a proper audit of the Funds' financial statements, PwC would have reported to the SEC, the Board of Directors, and/or the Funds' management alleged deficiencies with regard to the securities held by the Funds, and thus allowed some or all of the losses experienced by the Funds in 2007 to have been avoided." *Id.* (citing 12 paragraphs of the CAC). PwC is right again, except that the CAC alleges PwC should also have reported these matters to the Funds' share-

holders. ¶¶ 437, 464, 499, 539-40, 543, 556-59, 561, 606. PwC addressed its reports on the Funds' financial statements to the Funds' shareholders. *See*, e.g., Curley Decl. Ex. S at 68.

PwC also grudgingly admits that the CAC ties these allegations to PwC's audit reports and to allegations that the Funds' financial statements did not comply with GAAP and PwC did not conduct its audit in accordance with GAAS. PwC Br. at 3 (citing five paragraphs of the CAC). There are actually many more than five (190 to be precise – ¶¶ 421-610), but if PwC acknowledged that, it could not say that the allegations in the five paragraphs were "conclusory." Finally, PwC admits that the "nature" of the allegations underlying Plaintiffs' claims against it is "that PwC should have discovered and disclosed the risks alleged to have caused the declines in the Funds' values in 2007." However, its conclusion that this is not a legally sufficient basis for § 11 claims against an auditor was rejected by the courts in *White* and *Rodney*.[89] It is worthy of note that nowhere does PwC say Plaintiffs have not alleged enough; PwC just disputes what Plaintiffs allege and presents its own conclusory counterstatements of a limited number of facts, often with a false spin.

### 2.   Defendants' "market-is-to-blame" argument is meritless.

As argued by all Defendants,[90] MAM/MK and PwC contend that the market caused Plaintiffs' losses, that their losses resulted from "complex macroeconomic factors." *Id.* Defendants ignore the undeniable fact that the same market phenomenon that they say caused Plaintiffs' losses did not cause anything remotely like these losses by any other short-term, intermediate-term, or high-yield fund (except the RMK closed-end funds). They further ignore that the reason no other funds experienced such drastic losses is because those funds did not heavily invest in the ABS/MBS in which the Funds so heavily invested.[91] They also

---

[89]    In *Rodney*, the Eighth Circuit held that plaintiff's allegations that a fund's auditor failed to disclose the fund's violations of the 15% limit on illiquid securities and investment policies stated a claim under the '33 Act § 11. 143 F.3d at 1145. Likewise, in *White*, the court held that plaintiffs' similar allegations to *Rodney* and here against PwC, the fund's auditor, stated a claim under the '33 Act § 11. 237 F. Supp. 2d at 985.

[90]    MAM/MK Br. at 51; PwC Br. at 17; Funds Br. at 12; RF/RB Br. at 14-15; Ind. Defs' Br. at 1.

[91]    E.g., from June 2007 to March 2008, the Schwab YieldPlus Fund lost 18% (Ex. 58 at ¶

ignore allegations that this risk was foreseeable and actually foreseen by Defendants.[92]

MAM/MK's market-caused-the-loss argument was rejected by the court in *Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534. In rejecting defendants' argument that a fund's misrepresentation of its investment policies and risk profile could not have caused plaintiffs' losses because the misrepresentations did not cause the decline in the value of the portfolio's asset holdings, the court recognized that, while the decline resulted from market forces, defendants' conduct nevertheless played a causal role in the fund's losses. *Id.* at 546-47. Noting it is like proximate cause, the court held that loss causation is established by alleging that the materialization of the concealed risk diminished the price of the fund's shares or that mounting losses caused a run on the fund and further decline in share price, i.e., that the undisclosed facts were the cause of the actual loss suffered, that defendants' misstatements and omissions concealed the price-volatility risk or some other risk that materialized and played some part in diminishing the market value of the security. *Id.* (citing and relying on *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173, 177 (2d Cir. 2005)).

Of particular relevance here, the *Schwab* court said, "Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions. Defendants would immunize a scheme that purported to invest in low-risk govern-

---

25). This Fund held 45% in ABS/MBS. 257 F.R.D. at 543. The RMK closed-end funds also heavily invested in these securities and incurred huge losses. Appx. D-F. As MAM/MK notes, when a plaintiff's loss "coincides with a market phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases." (MAM/MK Br. at 51) (citations omitted). Here, no other bond fund suffered anything close to the losses that the RMK Funds did from the claimed market phenomenon cited by Defendants. *See* Exs. 2 ¶¶ 2, 4 ("Beginning in early 2007, serious turmoil in the mortgage-backed securities market, most notably in the sub-prime home equity arena, *particularly* impacted the Bond Funds *due to the investment style and philosophy of the portfolio manager*, JK, and the *portfolio holdings*."), 46; 3 ¶ 86 ("Kelsoe cited sub-prime fears and liquidity as the primary factors for the Funds' collapse rather than explain to the sales force that the Funds were largely composed of the lower tranches of structured debt instruments.").

[92]    ¶¶ 3-7, 119-28, 143, 145-60, 180-87, 191-202, 204, 207, 209-11, 213, 215, 220-22, 226, 235, 249-66, 269-72, 278-83, 286-87, 293-303, 308, 318-21, 329-40, 348-67, 371-78, 386, 391-95, 568-71, 721, Appx. A, C-E.

ment bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions." 257 F.R.D. at 547. *See also In re Solomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579, 589 (S.D. N.Y. 2006) ("To plead loss causation, the complaints must allege facts that support an inference that [Defendants'] misstatements and omissions concealed the *circumstances* that *bear upon* the *loss suffered* such that plaintiffs would have been spared all or *an ascertainable portion* of that loss absent the fraud" (emphasis in original; internal quotes and citation omitted).[93]

In any event, arguments about the extent to which changed economic circumstances may have contributed to Plaintiffs' losses are not appropriately decided on a motion to dismiss; they are a fact question to be determined at trial. *See America Serv. Group, Inc.*, 2009 WL 1348163, at *63 ("'[I]t is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct.'" (quoting *Caremark, Inc. v. Coram Healthcare Carp.*, 113 F.3d 645, 649 (7th Cir. 1997)) (Ex. 21); *White*, 2:00-cv-01388, Dkt. No. 312 at 11 (May 11, 2005) ("Quantifying the amount of causation between PwC's alleged misstatements or omissions and the drop in the value of the Funds is a matter that the court will not remove from the determination of the jury.") (Ex. 24).

The notion that changed economic circumstances are a factual issue to be decided by the fact-finder, not the court on a motion to dismiss, has been applied to cases arising from the recent economic climate, in which defendants argue that the 2008 economic downturn

---

[93]    For this reason, MAM/MK's reliance on *Solomon Smith Barney*, which involved claimed excessive mutual fund fees, not losses attributable to violations of investment objectives, policies and restrictions, is misplaced. In that case, in language clearly distinguishing this case, the court said, "The 'loss suffered' of course refers to diminution of value of the mutual fund share and, here, Plaintiffs make no such allegations and, indeed, they cannot." 441 F. Supp. at 589. The *Solomon Smith Barney* court further noted, "Here, Plaintiffs . . . have not alleged even that they in fact lost money on their purchase of the mutual fund stock (i.e., that the mutual fund share price dropped and that it dropped for the precise reason complained of)." *Id.* at 591. In short, plaintiffs' complaints in that case about excessive fees and commissions and defendants' use thereof are completely different from these Funds' infliction of huge losses on their shareholders because they violated their investment objectives, policies and restrictions, as Plaintiffs allege here.

was responsible for the losses incurred. *See In Re Countrywide Fin. Corp. Sec. Lit.*, 588 F.Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) (rejecting as "wasteful," a "distraction," and "tenuous" defendants' repeated recitations of the theme that market forces had caused Countrywide's collapse, since the issue on a motion to dismiss is whether alleged securities violations were *one* cause of plaintiffs' loss, not *how much* of their loss the alleged violations proximately caused); *see also In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d at 898 ("A plaintiff need not allege the defendant's misrepresentations were the *sole* cause of the plaintiff's loss, only that they were *a* substantial contributing cause.").

### 3.   Plaintiffs need not allege inflated valuations or corrective disclosures to allege loss causation.

MAM/MK and PwC argue that Plaintiffs fail to allege that their purchases of the Funds' shares were at inflated values due to misrepresentations or omissions and "have not pleaded a 'corrective disclosure' that revealed an alleged falsity or omission." MAM/MK Br. at 52 n. 43; PwC Br. at 3, 16-17. They are wrong.

MAM/MK, with its presumed vast expertise in accounting and preparation of financial reports (for which it was hired by the Funds), must know that there is more to audited financial statements than just the numbers and that the accompanying verbal disclosures, which are required by GAAP, "are an integral part of, and should be read in conjunction with, the financial statements," a statement that typically appears on the bottom of financial statements. E.g., Curley Decl. Ex. S at 13, 45-54; ¶¶ 566-71, 626-27. Given the whimsical valuations that made up the Funds' NAVs, these verbal disclosures were far more material than in the usual mutual fund's financial statements. As this Court has already observed in this action, open-end funds' shares do not trade in a market, unlike shares of closed-end funds and other corporations whose shares do trade in a secondary market. Dkt. No. 154 at 4 n. 2, 20. Thus, the Funds' shares not having a market-determined value, they could not possibly have been affected by a market-moving corrective disclosure.[94]

---

[94]      MAM/MK relies on *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994 (6th Cir. 2005), but that case is easily distinguished as it did not involve an open-end fund.

Even so, loss causation is not limited to market-moving corrections. *In re Williams Secs. Litig. - WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009) ("[T]he truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists."); *Evergreen Ultra Short Fund*, 2010 WL 1253114, at * 7 (loss causation is not limited to the common "corrective-disclosure drop" scenario, in which the alleged misrepresentation was followed by a corrective disclosure that led directly to a drop in share price) (Ex. 9); *Countrywide Financial Corporation Securities Litigation*, 588 F. Supp. 2d at 1172-73 (rejecting the argument that only a corrective disclosure followed by a drop in the issuer's shares' market value satisfies loss causation, recognizing that a leak of material information or a series of corrective disclosures countered by continuing misrepresentations alleges loss causation); *Levine v. AtriCure, Inc.,* 508 F. Supp. 2d 268, 273 (S.D.N.Y. 2007).

Likewise, in *Siemers v. Wells Fargo & Co*., 2007 WL 760750, at * 14 (N.D. Cal. Mar. 9, 2007), plaintiffs alleged mutual fund losses were caused by secret kickbacks paid from the fund's assets. (Ex. 25). In rejecting defendants' arguments regarding lack of corrective disclosures, the court noted that loss causation, as defined in *Dura*, was a broad concept encompassing many theories of loss and that a plaintiff need only give some indication of a causal connection so that the defendant is fairly on notice of the plaintiff's causation theory. Causation is usually fact-intensive and, therefore, not appropriate for resolution on a Rule 12(b)(6) motion. *Countrywide*, 588 F. Supp. 2d at 1173.

Similarly, the *Schwab* court held that:

Loss causation, however, is not limited to the common 'corrective disclosure-price drop' scenario.

As courts in other circuits have explained, a plaintiff may establish loss causation by alleging "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security.

\* \* \*

Here, plaintiffs certainly alleged that the subject of the fraudulent statements caused their losses—that defendants misrepresented or failed to disclose port-

folio risks, the materialization of which caused (or exacerbated) the losses. Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses.

257 F.R.D. at 547 (citations omitted). *See also Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 995 (7th Cir. 2007) (outlining three methods for establishing loss causation); *Evergreen Ultra Short Fund.*, 2010 WL 1253114, at * 7 (discussing *Schwab, Ray* and three methods).

MAM/MK argues that "Plaintiffs allege that Defendants did not disclose the allegedly omitted facts until Fall 2007, after the funds had already suffered most of their losses." MAM/MK Br. at 52 n. 43. This is incorrect because the first hint of trouble was the disclosure in the August 13, 2007 prospectus supplement that "fair valuation procedures are currently being used to value a substantial portion of the assets of the Fund." ¶ 231. Most of the Funds' NAV losses in 2007 occurred after August 2007. ¶ 324. The Funds' NAVs continued to plummet after December 31, 2007 and into 2008. ¶¶ 147-59, 324, Appx. A.

### 4.   Plaintiffs allege the funds' valuations were misstated.

PwC says Plaintiffs do not allege that any of the prices of the securities held by the Funds "were incorrect, misstated, overvalued or otherwise erroneous" during the Class Period. PwC Br. at 16-17. PwC is wrong.

Initially, Plaintiffs note that, PwC, as a world renowned "Big Four" auditor, obviously knows that there is more to audited financial statements than just numbers and that the accompanying "footnote" disclosures "are an integral part of" financial statements. In the absence of the missing disclosures, which were required by GAAP, the valuations in the 2004-2006 financial statements were meaningless. ¶¶ 567-71. The Funds' illiquidity and speculative valuations rendered the Funds' NAVs illusory, and Defendants' failure to disclose these and other risks to which the Funds exposed their investors, together with the violations of the Funds' investment objectives, policies and restrictions, concealed the Funds' potential for catastrophic losses. ¶¶ 216-72, 293-322, 372(n), 375(v), 377(n), 566-71.

Although Plaintiffs do not allege the Funds' NAVs were overstated by a specified

80

dollar amount, Plaintiffs do allege that Defendants' fair value procedures did not take into account all relevant factors, such as illiquidity, resulting in misstated estimated values for the ABS/MBS that composed a preponderance of the Funds' portfolios. ¶¶ 226(d), 246, 318(b), 442, 444 (2.36, 2.37), 496(d). PwC has validated these allegations in contending in a related case that, based on allegations "virtually the same" as those in the CAC,[95] the losses suffered in 2007-2008 would have happened in 2006 if the Funds had sought to get in compliance with their investment objectives, policies and restrictions by selling their ABS/MBS then. PwC *Landers* Br. at 17, 18. If the sale of these securities in 2006 would have forced the Funds to drop their NAVs by 31%-78%, then those securities were in fact overvalued from at least August 2006 forward (i.e., the depths to which the Funds' NAVs plunged in 2007-2008 were the true value in 2006).[96] Because the Funds' portfolios were just as illiquid and their NAVs just as uncertain at June 30, 2005 and 2004 (¶¶ 183, 196, 198-203, 209-15), as June 30, 2006, PwC's prior year's audits were just as deficient as its 2006 audit.

Allegations that fair valued securities are misstated because of defective financial statement disclosures, even though not alleging inflated values, states a claim under § 11. *White*, 237 F. Supp. 2d at 985 (court rejected PwC's argument that the plaintiffs had failed to identify "how or to what extent the financial statements themselves may have been inaccurate" where plaintiffs alleged that financial statement nondisclosures regarding, *inter alia*, valuation uncertainty and noncompliance with limits on illiquid securities caused the financial statements to be misstated). Apart from whether the numbers part of the financial statements is correct, compliance with GAAP includes the financial statement disclosures found in the footnotes. In certifying the financial statements, an accountant also certifies that the footnotes accompanying the financial statements comply with GAAP. *Endo v. Arthur Andersen & Co.*, 163 F.3d 463, 466 (7th Cir. 1999) ("The footnotes are … a part of the finan-

---

[95]     MAM/MK says allegations in the First Amended Derivative Complaint in *Landers* are "virtually the same" as those in the CAC. MAM/MK Br. at 2.

[96]     The SEC has charged MAM/MK with overstating the Funds' NAVs from at least January 2007 through July 2007. Ex. 1 ¶¶ 11-14, 28-39.

cial statements.") (citing 17 C.F.R. § 210.1-01(b)); AU § 508.41 (financial statements in-clude related notes, which must include all GAAP-required disclosures).[97] The clear and ex-press language on the face of the financial statements themselves, which states that "[t]he accompanying notes to financial statements are an integral part of these statements," further supports the accountant's responsibility for the footnotes as incorporated into the financial statements he has certified.

In *White*, besides arguing plaintiffs had not alleged the values of the funds' shares were at any time overstated, PwC also contended that the plaintiffs had failed to allege any link between the precipitous decline in the funds' NAV and PwC's audits of the Funds' fi-nancial statements and that the plaintiffs' complaint against PwC rested entirely on unsup-ported inferences that the Funds' financial statements were wrong and that PwC's reports on those statements must be false or misleading. 237 F. Supp. 2d at 984. The *White* plaintiffs alleged that PwC made actionable false statements under § 11 by certifying the Funds' fi-

---

[97]     The Financial Accounting Standards Board ("FASB") has pronounced that "[i]nformation disclosed in notes or parenthetically on the face of financial statements . . . is es-sential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally ac-cepted accounting principles." FASB Statement of Concepts, CON5, Recognition and Meas-urement in Financial Statements of Business Enterprises, ¶ 7. Similarly, the American Institute of Certified Public Accountants ("AICPA") requires auditors to ensure that financial statement and footnotes contain proper disclosures and do not make misleading omissions. In particular, the third standard of reporting under GAAS provides: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the [auditor's] report." AU § 150.02. *See* ¶ 605(h). The AICPA also has issued Statement on Auditing Stan-dards ("SAS") No. 32 entitled, "Adequacy of Disclosure in Financial Statements." In SAS No. 32, the AICPA directs auditors as follows:

> The presentation of financial statements in conformity with generally accepted accounting principles includes adequate disclosure of material matters.  These matters relate to the form, arrangement, and content of the financial statements and their appended notes, . . . . .

AU § 431.02.  An auditor is required to express a qualified or an adverse opinion if the financial statements fail to make the proper disclosures.  AU § 431.03.  Pursuant to the industry profes-sional standards promulgated by the AICPA, PwC was required to perform procedures to ensure that its audit opinions were correct as of the effective date of the Funds' registration statement and amendments thereto.  AICPA Professional Standards, AU § 711 (auditor is prohibited from consenting to the incorporation of his report in the registration statement without performing a subsequent events review to see whether material developments have occurred subsequent to the preparation of the report being incorporated by reference). *See also* ¶¶ 572-610.

nancial statements because the statements failed to disclose the material valuation uncertainty of the Funds' assets and the Funds' failure to adhere to their own stated investment policies and restrictions. *Id.* The plaintiffs alleged that PwC did not conduct its audits in accordance with GAAS and that the statements were not presented in accordance with GAAP because PwC failed to disclose the alleged operational shortcomings of the Funds. *Id.* The plaintiffs also alleged that if PwC had made such disclosures, corrective action could have been taken to avoid some or all of the purchases and sales of the Funds' shares that occurred at erroneous prices or under the auspices of misleading or incomplete information. *Id.*

The court in *White* took specific note of the plaintiffs' allegations that PwC was "obligated to know about the funds' noncompliance with the limitations on illiquid securities" and that PwC was "required to disclose the funds' noncompliance." *Id.* at 985. The court also noted that plaintiffs had identified the statements alleged to constitute "a series of false representations" as those that appeared in PwC's audit report, including the statements that the funds' financial statements were presented in conformity with GAAP and that PwC conducted its audit in accordance with GAAS. *Id.* The court held that these allegations are sufficient to state a § 11 claim against PwC. *Id.*

In *Rodney*, investors alleged that a fund's investments violated three of its investment restrictions and that the fund's auditor failed to meet its duty to disclose those violations and also to reveal a material fact about the fund that caused the fund to be riskier than was disclosed. 143 F.3d at 1141. The Eighth Circuit held that "reasonable investors reading the Fund's prospectuses and KPMG's reports would conclude that whatever risks they were accepting by investing in a mutual fund ... they were not encountering the enhanced risks created by violations of the Fund's own basic investment policies." *Id*. at 1145.

*In re Charles Schwab Corporation Securities Litigation* does not help PwC here. Plaintiffs in *Schwab* focused solely on internal control; Plaintiffs do not. It appears the *Schwab* plaintiffs did not elaborate on their theory of liability against PwC in their complaint or brief, as the *Schwab* court repeatedly noted plaintiffs' failure to expound on their

83

theory of PwC's liability. 257 F.R.D. at 558, 558 n. 13, 559, 559 n. 15, 560, 560-61. As distinguished from the issue of whether internal control problems must be disclosed to investors, which the court noted the *Schwab* plaintiffs did not even plead, the CAC here clearly alleges the several disclosure obligations by which PwC was bound under GAAP, GAAS and SEC regulations that PwC failed to satisfy. ¶¶ 421-42, 566-71, 574-76, 579-80, 602-05.

The CAC alleges PwC's audit reports falsely opined the Funds' financial statements were "fairly presented" in conformity with GAAP when they were not (because a required financial statement was omitted and the financial statement disclosures [footnotes] were deficient). The *Schwab* court said such allegations state a § 11 claim against an accountant. 257 F.R.D. at 559-60 ("The latter is an entirely distinct Section 11 claim: that the unqualified audit opinion was misleading not because it failed to disclose internal-control problems but rather because it approved faulty financial reports, *i.e.,* it erroneously stated that the certified financial reports "fairly present" the company's financial position when in actuality they did not."). A complaint states a claim for accounting fraud "if it adequately pleads a material violation of GAAP in the statements [the auditor] certified." *Id.* at 558. As distinguished from the *Schwab* plaintiffs, who only cited AICPA Audit and Accounting Guide—Investment Companies §§ 2.35-2.39 in a footnote to their complaint and did "not explain what the cited standards say or how they give rise to the alleged GAAP duties," *id.* at 558 n. 13, Plaintiffs have provided the Court with the applicable standards, explicitly rely on §§ 2.35-2.39 and other GAAS, and have, in great detail, identified PwC's failures and explained how they contravened GAAP and GAAS. ¶¶ 439-610; *see* Ex. 1 at ¶ 15 n. 4.

*Schwab* provides important support for one of Plaintiffs' key contentions herein. Regarding plaintiffs' contention that certain of the fund's securities were overpriced and therefore PwC's audit opinion was false and misleading, the *Schwab* court said, "As PwC emphasizes, an audit opinion is not *a guarantee that the financial statements* are entirely without error *nor an exact science*" but found that plaintiffs' "complaint offers no allegations whatsoever regarding what steps PwC did take or should have taken with respect to the of-

fending asset valuations" for *14 securities*. 257 F.R.D. at 560-61. In contrast, Plaintiffs here allege in detail the substantial percentages of the Funds' securities whose uncertain valuations were not identified and the materiality of those speculative valuations to the Funds' total NAVs in addition to the numerous other financial statement nondisclosures. E.g., ¶¶ 183, 220-22, 226, 439-571.

The PwC/*Schwab* recognition of the insufficiency of the numbers in audited financial statements strongly supports Plaintiffs' emphasis on the crucial importance of financial statements disclosures so that investors can know just how inexact, error-prone and unreliable the numbers in the balance sheet really are. Here, PwC does not attempt to refute the applicability of the GAAP/GAAS/SEC regulations Plaintiffs allege or argue their immateriality. Nor does PwC attempt to argue, as it did in *Schwab*, that the CAC does not allege sufficient applicable standards by which PwC's conduct is to be measured.

Instead, PwC argues that Plaintiffs engage in "speculation and conjecture about PwC's conduct" and that "because the Funds allegedly did not make disclosures about investment valuation methods 'the inference arises that PwC failed to obtain such information'" and further that "PwC must not have complied with [GAAS requirements] because if PwC had complied, the losses would somehow not have occurred." PwC Br. at 13-14. This is not a basis for dismissal; PwC simply is disputing Plaintiffs' allegations, not the adequacy thereof. Whatever PwC did learn or do, it did not make the disclosures required by GAAP and SEC rules (e.g., ¶¶ 430-571) or perform the audit procedures required by GAAS (¶¶ 572-610); indeed, PwC issued "clean" unqualified opinions that the Funds' financial statements complied with GAAP even though a required financial statement was missing.

### 5. Possibly leaked information led to losses.

Notwithstanding that the Funds' shares could not react directly to a market-moving disclosure, a phenomenon resembling a "corrective" disclosure that triggered a reaction appears to have occurred. ¶¶ 322-28. A big drop in all three Funds' NAVs occurred at or just before the August 13, 2007 disclosure of the Funds' inability to value their securities and

issue their financial statements. ¶¶ 231, 324. These precipitous NAV drops coincided with a significant increase in redemptions for IBF and HIF; HIF saw $375 million in redemptions between July 1 and August 31, 2007. ¶¶ 325-26. Redemptions increased thereafter. *Id.* Redemptions led to selling pressure on the Funds' assets; to the extent that the Funds were forced to sell their illiquid securities, the prices were reduced, a risk that was not avoided by the RMK Defendants as they had represented they would do. ¶¶ 204, 213-15, 270, 371(b), 374(b), 375(c). The Funds' illiquid securities greatly exacerbated this risk. ¶ 322.

Each of the three Funds experienced a significant drop in their NAVs around the time of the August 13, 2007 supplement. ¶ 324; Ex. 26. From July 13 until July 31, HIF dropped 5%, IBF dropped 1%, and STF was up 0.3%. But from August 1 until August 13, HIF dropped 26%, IBF dropped 15%, and STF dropped 5%. *Id.* From August 13 to the end of the month, the Funds were flat, before resuming their descent. *Id.* One explanation is that the Funds' securities were being rapidly repriced ahead of the August 13 disclosure. Another (alleged) explanation is that increased redemptions were forcing sales of illiquid securities. ¶¶ 322, 325-28. To the extent that redemptions significantly increased ahead of the August 13 disclosure, there may have been selective disclosure to preferred accounts to enable them to divest their Fund holdings before the disclosure, as has been alleged in the States and FINRA Actions.[98] The CAC alleges facts that raise the possibility of selective disclosure of material information that led to a sudden increase in redemptions before the first disclosure of the Funds' difficulty in pricing their securities in August 2007 that exacerbated the Funds' illiquid condition. ¶¶ 231, 204, 213-15, 270, 322-28. A leak of material information or series of corrective disclosures countered by continuing misrepresentations

---

[98]    Ex. 3 ¶¶ 119-23. The preferential redemption of MK-managed accounts invested in IBF and HIF was accomplished by a $30 million capital infusion by a MK-affiliate into IBF and $55.2 million into HIF, enabling these accounts to receive a higher NAV than if IBF and HIF were forced to sell their illiquid securities to obtain the needed cash. *Id.* at ¶¶ 22-23; Ex. 2 ¶¶ 50-51, 76, 92 (throughout 2007 MK told retail customers to hold or buy more of the Funds); *see also* ¶¶ 204, 213-15, 231 (misleadingly disclosing "significant net redemptions" without disclosing the circumstances), 322, 328.

may also constitute adequate allegations to claim loss causation. *Countrywide Fin. Corp. Sec. Lit.*, 588 F. Supp. 2d at 1172-3; *see also Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 274 (S.D.N.Y. 2007) (changes in securities' values following leaks of negative undisclosed information can show loss causation).[99]

### B. Plaintiffs' Allegations Causally Link the Funds' Misstated Valuations and Their Losses.

#### 1. PwC's misstatements.

PwC says the CAC fails to allege any misstatements or omissions by PwC. PwC Br. at 9-15. The CAC extensively alleges PwC's misstatements and the accounting and auditing guidance requiring PwC to make the disclosures alleged in the CAC.[100] ¶¶ 245, 421-610. The verbal disclosures that accompany financial statements (footnotes) "are an integral part of, and should be read in conjunction with, the financial statements." E.g., Curley Decl. Ex. S at 13, 45-54. The valuations in the 2004-2006 financial statements were meaningless without the missing disclosures, which were required by GAAP in order for the financial statements to be properly presented. ¶¶ 567-71.

Plaintiffs allege the Funds' NAVs were misstated because of the failure to disclose their illiquidity and speculative valuations, rendering the Funds' NAVs illusory, with not a hint of the huge valuation and other risks to which the Funds exposed their investors and the violations of the Funds' investment objectives, policies and restrictions, all of which were required GAAP disclosures. ¶¶ 216-72, 293-322, 372(n), 375(v), 377(n), 499-513, 566-71. Plaintiffs also allege that Defendants' fair value procedures did not take into account all relevant factors, such as illiquidity, and were otherwise performed contrary to what was disclosed. ¶¶ 226(d), 246, 318(b), 442, 444 (2.36, 2.37), 496(d). The SEC Action validates

---

[99]     In *SEC v. State Street Bank and Trust Company*, Dkt. No. 1, (D. Mass. February 4, 2010) (Ex. 34), the SEC asserts that *holders* of an open-end fund's shares are adversely affected by selective disclosure of material facts to preferred accounts, allowing them to redeem at the expense of the fund's other shareholders who are not given that information. *Id.* at 37.

[100]     Significantly, because Plaintiffs allege the Funds' financial statements did not comply with GAAP, the Funds should also be addressing these allegations. They do not. Nor, unlike MK, do they assert reliance on PwC.

Plaintiffs' allegations that the Funds' NAVs were illusory. Ex. 1 ¶¶ 15-27.[101]

PwC correctly says § 11 provides for an accountant's liability for "having …certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement." PwC Br. at 9. However, according to PwC, only if the offending disclosure deficiencies all were set out in the auditor's report could they be actionable. Br. at 11, 13. The straitjacket that PwC seeks to impose on an auditor's § 11 liability would totally nullify such liability. PwC can cite no relevant authority for this remarkable proposition, which, as discussed below, is contrary to GAAS and GAAP. Contrary to PwC  (PwC Br. at 15), nothing that Plaintiffs allege "falls outside of the scope of [PwC's] responsibilities as an auditor.".

Contrary to PwC's perplexing conclusory statements (PwC Br. at 13), the CAC specifically alleges which of PwC's statements were false and misleading, the relevant registration statements, and the specific portions thereof (i.e., prospectus) that were "certified" by PwC. ¶¶ 94, 135-36, 543-48, 598, 602-05, 690. These certified portions of the prospectuses related to PwC's reports on the Funds' financial statements and the footnotes thereto, which were incorporated into the registration statement, and the "Financial Highlights," but the highly speculative valuations and other risks related to the "Financial Highlights" and the Funds' valuations that required disclosure were not disclosed. ¶¶ 59, 545-48, 551-54, 568, 570(k), 571, 600(e), 601, 608-609. Indeed, the "Financial Highlights" falsely projected safe Funds with stable NAVs. ¶¶ 386-94; see Ex. 3 ¶ 76 (HIF's NAV was stable because many of its portfolio securities were not actively traded and were not even regularly valued daily).

PwC said in its opinions that the Funds' financial statements were presented in ac-

---

[101]     See, e.g., Ex. 1 ¶ 17 (pricing done by low level MK employees who were not qualified for this task who relied on undocumented price adjustments provided by Kelsoe without applying the disclosed factors to determine fair value; the fair value prices assigned to many of the Funds' securities were not regularly re-evaluated, resulting in stale prices for many months at a time), ¶¶ 23-26 (prices were not determined daily; Kelsoe routinely allowed to override monthly dealer quotes, all of which was known to Weller and MK), ¶ 27 (MK recklessly published the Funds' daily NAVs without knowing whether they were accurate and sold shares based on these NAVs).

cordance with "certain accounting principles"; Plaintiffs allege that they were not and spec-
ify with which of the "certain accounting principles" those financial statements did not com-
ply and why. ¶¶ 531-61, 566-71, 575-76, 598, 600, 604. Plaintiffs likewise allege with
specificity the audit standards to which PwC was required to adhere and its required knowl-
edge, responsibilities and duties with respect to pricing and valuation of the Funds' thinly
traded investments, the use of and need for good faith fair value procedures and valuation
uncertainty, the Funds' noncompliance with their investment restrictions, the Funds' con-
centrated credit risk, and the risks of material misstatements in the Funds' financial state-
ment disclosures. ¶¶ 245, 421-530. Finally, the CAC alleges PwC's failure to include in its
opinion matters required by GAAS and applicable accounting principles, including disclos-
ing the Funds' violative investment practices and uncertain valuations to alert investors as to
the uncertainty of the Funds' NAVs. E.g., ¶¶ 510, 513, 536, 540, 605-07.

PwC makes contradictory statements: "plaintiffs have, at most, identified two state-
ments by PwC that they could, in theory, allege were material misrepresentations" (PwC Br.
at 10). Then PwC picks out one allegation: "But nowhere in *this allegation* have plaintiffs
identified a misstatement or omission in PwC's audit opinions, nor have they identified the
audit opinion and accompanying registration statement in which this alleged misstatement
or omission appears." *Id.* at 13, referencing ¶ 468. Paragraph 468 alleges PwC should have
"issued a qualified audit opinion as to the Funds' financial statements or disclaimed its abil-
ity to render such an opinion." PwC makes the same argument regarding ¶ 518, which al-
leges that PwC should have identified the extraordinary credit concentration in the Funds'
portfolios; this allegation follows the audit standards that require disclosure of such risks in
financial statements. ¶¶ 514-17. Elsewhere, Plaintiffs identify the audit opinions and regis-
tration statements at issue regarding both allegations. ¶¶ 94, 135-36, 543-44, 690.[102]

---

[102]    The excerpt from PwC's audit report in ¶ 543 contains six sentences, the second, third
(PwC's representation that the audit was conducted in accordance with GAAS), fourth and fifth
of which are factual statements and the remaining two contain PwC's opinion that the Funds'
financial statements complied with GAAP and PwC's belief that its audits provided a reason-
able basis for that opinion.  Plaintiffs allege PwC did not conduct its audits in accordance with

Notably, except for formulaic and conclusory denials that any such financial state-
ment disclosure deficiencies existed, PwC offers nothing specific to counter Plaintiffs' par-
ticular allegations that a whole required financial statement (cash flow statement) was omit-
ted from the Funds' Class Period financial statements. The CAC also alleges that the follow-
ing GAAP-required financial statement disclosures were not made or were made deficiently:
(1) the magnitude of the Funds' respective investment portfolios that was invested in illiquid
or restricted securities and that was required to be valued using good faith fair value proce-
dures established by the Funds' board of directors, as was disclosed in the Funds' 2007 and
2008 financial statements; (2) the methods used to perform such valuations; (3) the valua-
tion uncertainty attendant to the Funds' ABS/MBS and the effect of such uncertainty on the
Funds' respective estimated net asset values, including the likelihood of significant volatility
based on the historical performance of such securities; (4) that the Funds' investment prac-
tices were prohibited by (i) their disclosed investment restrictions limiting investments in
illiquid securities and investments in a single industry, (ii) the RMK Defendants' representa-
tions regarding how the Funds would be managed, and (iii) with respect to STF and IBF, the
investment objectives of those Funds to the extent that those investment objectives imposed
upon the Funds and the RMK Defendants the obligation to manage them in a manner that
preserved capital, as they represented they would do; and (5) that the Funds failed to dis-
close the concentration of credit risk inherent in their heavy investments in mortgage related
securities. ¶¶ 220(l), 551-54, 568-69, 570(k), 571, 600-01. Plaintiffs cited specific SEC
regulations and GAAP that required such disclosures, to which PwC has not responded. ¶¶
533-37, 566-67, 570, 600, 602-03.

The Funds' financial statement disclosures in their 2007 financial statements (issued
in October 2007, after significant losses had already been incurred) and PwC's audit report
thereon are substantially more in compliance with applicable GAAP and GAAS require-

GAAS, that there was, therefore, no reasonable basis for its opinion, and that the financial state-
ments were not in compliance with GAAP. ¶¶ 543-610.

ments than the financial statements and PwC's reports for the prior years in the Class Period. ¶¶ 220(l), 571. PwC makes no effort to explain why those disclosures were not made for prior years, notwithstanding Plaintiffs' allegations that the conditions that existed at June 30, 2007 also existed at June 30, 2005 and 2004. E.g., ¶ 183.

### 3.    Plaintiffs allege their losses were caused by PwC's statements.

PwC says, "Even if PwC had ***not*** made any alleged misstatements or omission, the value and the price of the shares plaintiffs purchased would have been the same, and the losses they experienced in the second half of 2007 would still have occurred." PwC Br. at 17 (emphasis in original). This is a speculative, factually unsupported, conclusory argument that contradicts the CAC's particular allegations that if PwC had performed its duties as auditor, it would have informed the Funds' management and directors of the Funds' violative investment practices and the Funds' wholly speculative NAVs, and if the management and directors failed to take corrective action, PwC should have informed the SEC, resulting in the suspension of the Funds' sales of their shares, and disclosed these matters to the Funds' shareholders. ¶¶ 468, 518, 531-42, 555-61, 589. MAM/MK became keenly aware of the Funds' dire predicament at least by early 2007. Ex. 3 ¶¶ 112-13. There was time before then to avoid the disaster.

PwC's statement is also contrary to the CAC's particular allegations that, if PwC had performed its duties as auditor, the Funds' investors would have been warned of the huge risks embodied in the Funds and would have been able to invest elsewhere or could have redeemed their shares, forcing the Funds' to liquidate when the Funds could have sold their assets.[103] This statement also contradicts the CAC's allegations regarding how the Funds' violations of their investment objective, policies and restrictions caused Plaintiffs' losses that could have been avoided by correcting the RMK Defendants' wrongful mismanagement. ¶¶ 119-28, 318-21. This statement disputes Plaintiffs' allegations that, without audited

---

[103]    ¶¶ 38, 213-15, 217-19, 247, 322, 328, 397, 539-42, 556, 558-60, 606, 695, 737, 740, 751.

financial statements, the Funds could not have continued to offer their shares. ¶ 610; Curley Decl. Ex. X at Item 22(b)(1).

Indeed, this statement contradicts PwC's own statements in *Landers*, where PwC contends that, according to Plaintiffs' allegations, if the Funds had tried in 2006 to sell their violative holdings of toxic securities to comply with their investment objectives, policies and restrictions, the losses incurred in 2007 and 2008 would simply have been incurred then. PwC *Landers* Br. at 17, 18. Thus, the Funds were injured by no later than August 2006. Now, totally contradicting its prior assertions, PwC says that even if it had not made any misstatements or omissions in its 2006 audit report, the prices of the Funds' shares would have been the same and the losses experienced in 2007-2008 would still have occurred.

Similarly, if PwC had made the required disclosures, the Funds' directors and management (MAM/MK) would have been compelled to take into account the illiquidity and speculative valuations of the Funds' ABS/MBS in fair valuing these securities.[104] This necessarily would have resulted in purchases of the Funds' shares by investors at much lower NAVs during the Class Period, thus avoiding the losses incurred in 2007-2008, as the proportion of the Funds' respective portfolios in illiquid or thinly traded securities of uncertain valuation existed throughout the Class Period. ¶¶ 180-91, 195-99, 201-10, 222-26, 234-45.

## C.   Loss Causation for §§ 11 and 12 Claims.

Under the '33 Act, loss causation for §§ 11 and 12 claims is not an element of the action; rather, it is presumed.  *See* 15 U.S.C. § 77k(a); *Charles Schwab Corp. Sec. Lit.*, 257 F.R.D. at 546 ("[L]oss causation is not an element of the *prima facie* case under Section 11, but defendants may assert a *lack* of loss causation as an affirmative defense."). Because plaintiffs are not required to plead loss causation to survive a motion to dismiss, it must be "apparent on the face of the complaint that the plaintiffs would be unable to establish loss causation." *Briarwood Investments, Inc. v. Care Inv. Trust Inc.*, 2009 WL 536517, at *3

---

[104]      ¶¶ 220(i) and (l), 222, 226(d), 245-47, 318(b), 372(n), 375(v), 377(n), 400, 442, 444-48, 453-55, 462-63, 465, 491, 493, 657; PwC *Landers* Br. at 17. 18.

(S.D.N.Y. Mar. 4, 2009) (Ex. 27). Defendants have not come close to meeting this burden.

Defendants argue that § 11 loss causation fails because Plaintiffs' allegations establish that Funds lost value "as a result of external market forces." *See*, e.g., PwC Mem. at 17. Defendants are wrong. Significantly, PwC does not say Plaintiffs' allege their losses were caused *only* by market forces, and PwC disingenuously ignores all of the causal factors Plaintiffs do allege. *Id.* Plaintiffs have alleged the causal connection between Defendants' wrongful conduct and their losses and why and how their losses were not caused by the subprime market events but by the Funds' vulnerability thereto, a vulnerability other bond funds largely avoided. ¶¶ 119-28, 318-21; *see also supra* Part III.A.2.

## IV.    PLAINTIFFS ADEQUATELY ALLEGE EACH DEFENDANT'S ROLE AND SCIENTER.

### A.      Each Defendant's Role.

Plaintiffs allege the role of each Defendant that was instrumental to the Funds' mismanagement: the preparation, review and signing of the Funds' registration statement and annual and semi-annual reports; the distribution and redemption of the Funds' shares; the management of the Funds; the accounting for the Funds and the valuation of their securities; compliance with applicable law, regulations, and the Funds' investment objectives, policies and restrictions; MK's squelching of MK's employees sales of the Funds' shares upon learning about MAM's dealings with a small broker to avoid a run on the Funds; RF's foreseeing the subprime debacle and cross-marketing/branding; Kelsoe's knowing purchase of illiquid securities for the Funds and reliance on the credit research of a tiny outside firm and its salesmen. ¶¶ 40-85, 94-104, 331-40, 346-69, 402, 618-60, 676, 687, 711-12.[105]

---

[105]    The conduct involved in *White* led to SEC administrative proceedings against the funds' outside directors. *In the Matter of Jon D. Hammes, Albert Gary Shilling, Allan H. Stefl, and Linda F. Stephenson*, Release No. IC-26290 (Dec. 11, 2003) (Ex. 59). In its order settling the proceeding, the SEC found that these outside directors (1) failed to monitor adequately the liquidity of certain bonds in the funds' portfolios and to assure the continued liquidity of the bonds so that the funds could meet shareholder redemption requests; and (2) failed to adequately fulfill their responsibility to participate meaningfully in the valuation of the funds' assets and ensure that the funds' securities were priced at fair value. *Id.* The SEC also brought an action against the funds' adviser, officers and employees, which was settled as to all except one defendant. *SEC v. Heartland Advisors Inc.*, No. 2:03-cv-01427-CNC (E.D. Wisc. Dec. 11, 2003), Dkt. No. 395; SEC Release No. IC-28136 (January 25, 2008) ("*Heartland Advisors Or-*

Discovery will shed further light on various Defendants' individual roles. This includes, e.g., RF's analysis that led it to dump EquiFirst and with whom that analysis was shared (e.g., with Defendant Morgan, who was a director and vice-chairman of RF and who also was a director and chairman of the Funds and chairman and executive managing director and chief executive officer of MK, or with Defendant Alderman, who was a Fund director during the Class Period and also president of RMK Trust, vice-chairman and chief executive officer of MAM and executive vice president of RF, and whether they shared this information with their fellow Fund directors and MAM/MK officers); the extent to which Director Defendants participated in the fair value pricing of the Funds' securities and reviewed the determination each quarter that the Funds' held no illiquid securities; whether PwC advised the Funds' board and management regarding one or more of the issues alleged in the CAC; whether MAM/MK, the Individual Defendants and Director Defendants read the prospectuses identified in the CAC to learn about the liquidity and credit risks inherent in the ABS/MBS in which the Funds so heavily invested. ¶¶ 95, 97, 99.

As underwriter, statements in prospectuses and documents incorporated therein are attributable to MK. [106] MK's "wealth management services" division "ostensibly performed

---

*der*") (Ex. 60). In the settlement order, the SEC recited the following facts, among others: a majority of the municipal bonds owned by the two funds were below investment-grade and illiquid; market quotations were not readily available for most of the funds' bonds; the funds, as open-end funds, offered their own securities to investors on a redeemable basis; as a result of the delegation by the funds' directors to the funds' adviser, the adviser made many decisions affecting the funds' conduct; the adviser did not take into account all relevant factors in its valuations of the funds' bonds; incremental price reductions were spread out to minimize the impact of the total valuation declines on the funds' NAVs and the funds' performance; the funds represented that their adviser and directors would monitor the issuers of the securities purchased by the funds but did not do so; the funds' prospectus represented that the adviser would manage the funds' risks through "intensive credit research" but the adviser was understaffed in performing such research; the funds' net redemptions exacerbated their illiquid position. *Id.* at 4-6. Monetary sanctions were imposed on each of the settling defendants. *Id.* at 10.

[106]   Without authority, the Funds assert that their lack of officers and employees rendered them incapable of incurring § 11 liability. Funds' Br. at 7-8. The Funds had officers, who also were officers of and employed and paid by MAM/MK. ¶¶ 75-85, 96. Their acts were the acts of the Funds. The Funds carried out their business through MAM/MK. ¶¶ 40-46, 97, 618, 626-27. The Funds' liability under § 11 is "virtually absolute." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) (a plaintiff need only show a material misstatement or omission to establish his prima facie case; liability against the issuer of a security is virtually absolute, even

due diligence on traditional and alternative funds and fund managers for the benefit of
[MK]." Ex. 3 ¶¶ 26, 29, 42-43; ¶ 57. MK falsely touted its "exceptional due diligence," ex-
plaining that MK's mutual funds "are subject to one of the most detailed, thorough and ex-
haustive due diligence processes in the industry." Ex. 3 ¶¶ 87-123. MK utterly failed in its
due diligence responsibilities in connection with the distribution of the Funds' shares. Exs. 2
¶¶ 6, 54-55, 79-92; 3 ¶ 161-63. As the underwriter and distributor of the Funds' shares, MK
was charged with the responsibility of understanding the contents of the Funds' portfolios
and their inherent risks. Ex. 3 ¶ 168.

Moreover, group pleading is permissible. ¶¶ 97-99. A "group pleading" exception to
the pleading-with-particularity requirements of Fed.R.Civ.P. 9(b) is premised on the as-
sumption that "[i]n cases of corporate fraud where the false or misleading information is
conveyed in prospectuses, registration statements, annual reports, press releases, or other
'group-published information,' it is reasonable to presume that these are the collective ac-
tions of the officers." *In re Goodyear Tire & Rubber Co. Deriv. Litig.,* 2007 WL 43557, at
* 11 (N.D. Ohio Jan. 5, 2007) (Ex. 28); *Bridgestone,* 399 F.3d at 689. Courts in this circuit
have upheld the group pleading doctrine after the passage of the PSLRA. *In re FirstEnergy
Corp. Sec. Litig.,* 316 F.Supp.2d 581, 599 (N.D. Ohio 2004); *In re Century Business Ser-
vices Securities Litigation,* 2002 WL 32254513, at *12-13 (N.D. Ohio June 27, 2002)
("group-published information doctrine survived the passage of the PSLRA and has contin-
ued viability in the Sixth Circuit") (Ex. 30)*; In re SmarTalk Teleservices, Inc. Securities
Litigation,* 124 F.Supp.2d 527, 545 (S.D. Ohio 2000); *Benedict v.Cooperstock,* 23
F.Supp.2d 754, 762 (E.D. Mich.1998); *In re Century Business Services Sec. Litig.,* 2002 WL
32254513, at *12 ("the vast majority of cases decided nationwide also have recognized this
doctrine") (Ex. 30). The standards for applying the group-pleading presumption are rela-
tively lenient. *Id.* at *14. *See also In re Cardinal Health Inc. Sec. Litig.,* 426 F. Supp. 2d

for innocent misstatements).

95

688, 744 (S.D. Ohio 2006); *Benedict,* 23 F.Supp.2d at 762-63 (holding that conclusory allegations were sufficient as to inside directors with involvement in the day-to-day affairs of the corporation).[107]

RF/RB's contention that a "'statement-by-statement analysis' on a defendant-by-defendant basis is required in this Circuit" is not supported by the case it cites, *Bridgestone Corp.*, 399 F.3d at 683. RF/RB's quote is taken out of context, does not say what RF/RB says it says, and instead is in the context of what constitutes adequate allegations of scienter.

### B.        Plaintiffs Have Adequately Alleged Scienter.

A plaintiff may establish scienter by demonstrating a defendant acted with recklessness or a knowing and deliberate intent to manipulate, deceive, or defraud. *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008). In securities fraud claims based on statements of present or historical fact, scienter can consist of either knowledge or recklessness. *Helwig v. Vencor, Inc.,* 251 F.3d 540, 552 (6th Cir. 2001) (en banc). Thus, a plaintiff may survive a motion to dismiss by pleading with particularity facts giving rise to a strong inference that the defendant acted with knowledge or recklessness. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004). *In re: Unumprovident Corp. Sec. Litig.*, 396 F. Supp.2d at 892. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665-666 (8th Cir. Minn. 2001) (citations omitted).

The Sixth Circuit employs a totality-of-the-circumstances analysis. *Fidel v. Farley*, 392 F.3d 220, 233 (6th Cir. 2004) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690

---

[107] In a related case, this Court recently denied defendants' motion to dismiss against individual executives, noting that "[f]iduciary status [in the ERISA context] is a fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss" and further stating, "[T]he manner in which each defendant…operated is for now something of a black box. To expect a plaintiff to be able to turn on the light and point to particular individuals who exercised decision making authority is simply too much to require at this stage of the case." *RMK ERISA Litig.*, 2010 WL 809950, at *15 (citations and internal quotation marks omitted).

(6th Cir. 2004)); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d. 1010, 1026 (N.D. Ohio 2000).  In *Ley*, the Sixth Circuit listed nine factors drawn from *Helwig v. Vencor Inc.* that "while not exhaustive, are probative of scienter." [108]  *Ley* itself demonstrated that each of the nine *Helwig* factors is not required when the circuit court referenced just one in its analysis. *Id.* at 811.  *Ley* went beyond the nine factors by examining motive, reporting practices, and nature and magnitude of accounting improprieties. *Id.* at 812-814.[109]

Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  *Konkol*, 590 F.3d at 396 (quotations omitted).  A defendant's motive may be suggestive of scienter. *Ley*, 343 F.3d at 813 (citing *P.R. Diamonds*, 364 F.3d at 690).  In *PR Diamonds*, the Sixth Circuit held that motive and opportunity allegations on their own are insufficient, but "the Court must assess whether such allegations, considered in conjunction with the remainder of Plaintiff's allegations, on the whole raise an inference of recklessness or knowing disregard."  364 F.3d at 689-90. *But cf. Fidel*, 392 F.3d at 231 (declining to consider magnitude of fraud as a factor because it would eviscerate the principle that accounting errors alone cannot justify a finding of scienter) (citing *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 234, 359 (W.D. Tenn. 2001); *In*

---

[108]   The *Helwig* factors are: "(1) insider trading at a suspicious time or in an unusual amount, (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs."  *Ley*, 543 F.3d at 810 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (en banc)).

[109]   Other courts have also conducted a scienter analysis that applies only some of the *Helwig* factors.  *See* e.g., *Konkol*, 590 F.3d at 399-401 (considering only two of nine *Helwig* factors in lengthy scienter analysis); *Fidel*; 392 F.3d at 232-33 (same); *In re Huntington Bancshares Inc. Sec. Litig.*, 2009 WL 4666455, at * 15-22 (S.D. Ohio Dec. 4,  2009) (using only five of the nine factors in scienter analysis) (Ex. 61); *In re Am. Serv. Group, Inc.*, 2009 WL 1348163, at *49-53 (M.D. Tenn. March 31, 2009) (using only six of the nine factors) (Ex. 21); *Beaver County Ret. Bd. v. LCA-Vision Inc.*, 2009 WL 806714, at *17-22 (S.D. Ohio March 25, 2009) (using only two of the nine factors) (Ex. 62).

*re Comshare*, 183 F.3d 542, 553 (6th Cir. 1999)). When applied to auditor defendants, a plaintiff must demonstrate "a mental state so culpable that it "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Ley*, 543 F.3d at 814.

Of the nine factors, four are relevant here, which the CAC satisfies: (i) Closeness in time of an allegedly fraudulent statement or omission and the later disclosure—the percentage of fair valued securities at June 30, 2006 disclosed in October 2007 and the additional disclosures regarding risks of illiquid fair valued securities (¶¶ 182-83, 187, 195-98, 220(h), 220(l), 221, 222, 470-72); (ii) Disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication—the failure to disclose the liquidity and valuation risks and their potential impact on the Funds' NAVs (¶¶ 183, 189, 195-98, 209, 220, 220(l), 469-72);[110] (iii) disregard of the most current factual information before making statements—Defendants had knew of the Funds' violative investment practices but nonetheless published prospectuses, shareholder reports, and sales materials that did not disclose these risks;[111] and (iv) Defendants' self-interested motivation (¶¶ 41, 45, 83-84, 86, 651, 654, 712; Ex. 3 ¶¶ 40, 144 (RF wanted RB to convert its customers to MK customers because "[m]ore money could be made on broker-dealer fees than on the interest spread on interest-bearing deposits.")).

Moreover, Plaintiffs have adequately alleged Defendants possessed actual knowledge of the conditions and risks that materialized to cause Plaintiffs' losses. Indeed, PwC has so stated. PwC *Landers* Br. at 13-15. Contrary to MAM/MK's assertion, Plaintiffs do

---

[110]    Here, significant accounting matters were not disclosed at all, let alone in such a way that their negative implications could be understood only by someone with a high degree of sophistication. ¶¶ 161-215, 430, 439-68, 499-513, 562-71 (disclosure regarding illiquid securities and liquidity risk is required by GAAP); ¶¶ 216-47, 430, 439-98 (disclosure of fair valued securities and attendant risks required by GAAP); ¶¶ 248-66, 273-76, 278-83, 514-18 (industry concentration and concentration of credit risk is a required GAAP disclosure); ¶¶ 161-83, 293-305, 499-542 (GAAP required disclosure of violations of Funds' investment objective, policies and restrictions); ¶¶ 519-30 (material misstatements of financial disclosures must be investigated under GAAP and GAAS); 562-71 (GAAP requirements); ¶¶ 572-610 (PwC failed to comply with GAAS); 531-61 (PwC's financial and accounting disclosure and reporting obligation and false financial statement disclosures).

[111]    *See*,,e.g., ¶¶ 48-49, 59, 60, 96, 101, 139, 339-40, 646-60.

not premise scienter on the Funds' performance, corporate affiliation (except that the Funds
were managed by MAM/MK, without which the Funds would never have been in business),
or breach of fiduciary duty. MAM/MK Br. at 49. Plaintiffs do base scienter on the RMK
Defendants' mismanagement; management is done knowingly, and so is mismanagement.[112]
RF's knowledge of the deteriorating subprime market in 2006 was attributable to MAM/MK
because of the interlocking officers and directors and the integrated RMK organization. ¶¶
48-49, 59, 60, 96, 101, 139, 339-40, 646-60.[113]

    In *RMK ERISA Litig*., 2010 WL 809950, this Court rejected the defendants' argument
that the complaint lacked "any explanation of how [RF] knew or should have known that the
Bond Funds violated their own investment guidelines" on the ground that plaintiffs alleged
"[MK] ran the Bond Funds and is an integral component of [RF]" and that, therefore, "De-
fendants knew or should have known that the Bond Funds violated their own investment
guidelines when they assumed high levels of risk by investing primarily and imprudently in
the subprime market." *Id.* at *14 (internal quotes and cites to complaint omitted) (Ex. 9).
Whereas in *RMK ERISA Litig*. MAM/MK's knowledge was being attributed to RF, here
RF's knowledge is being attributed to MAM/MK, but in both cases the attribution is on the
basis of the RMK integrated enterprise. *See In re MoneyGram Int'l, Inc*., 626 F. Supp. 2d
947, 974 (D. Minn. 2009) (where plaintiffs alleged company's financial condition was mis-
represented because its ABS were overvalued, alleged violation of company's internal con-
trols permits an inference that defendants had access to valuation information contradicting
the public financial statements).

## V.    SECTIONS 11, 13 STATUTE OF LIMITATIONS

    The Funds and PwC argue that only those registration statements, or amendments

---

[112]    MAM/MK's reliance on *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2005), is perplexing as
the case, which involved whether allegations of a post-audit inventory adjustment establishes
the auditor's scienter when doing its audit for the preceding year, says nothing about scienter
based on "corporate affiliation" or mismanagement.

[113]    MAM/MK have been deemed to be "affiliates" of RB. Amended Order Appointing
Trustee *ad Litem*, No. 2:08-cv-02454-SHM-dkv, Dkt. No. 1-5 (Ex. 63).

thereto, that became effective during the three years prior to December 6, 2007, can be the
basis for § 11 liability—i.e., the November 1, 2004 amendment cannot be the basis for li-
ability, and purchases from November 1, 2004 to November 1, 2005 are excluded. Funds
Br. at 5-6; PwC Br. at 5-9. They are wrong.

This is plainly contrary to § 11(a), last paragraph, which provides:

> If such person *acquired* the security *after* the issuer has made generally avail-
> able to its security holders an *earning statement* covering a period of at least
> ***twelve months beginning <u>after the effective date</u>*** of the registration statement,
> then the *right of recovery under this subsection* shall be conditioned on *proof
> that such person acquired the security relying upon such untrue statement in
> the registration statement* or *relying upon the registration statement and not
> knowing of such omission*, but such reliance may be established without proof
> of the reading of the registration statement by such person.

This provision contemplates that § 11 liability continues for purchases after the ef-
fective date of a registration statement or an amendment thereto. The Funds' first "earning"
statement covering an entire 12 months beginning after the effective date of November 1,
2004, was June 30, ***2006*** (operations statement is for the 12 months July 1, 2005 to June 30,
2006). Curley Decl. Ex. S. The December 31, ***2005*** semi-annual report does not satisfy this
requirement because the earnings statement was for only six months, not 12 months. Curley
Decl. Ex. Q. Thus, purchases made from December 6, 2004 through November 1, 2005 are
subject to § 11 liability and reliance on the untrue prospectus need not be proven, as is true
during the rest of the Class Period.

PwC repeatedly says that an amendment to a registration statement remains effective
for a year until the next amendment. PwC Br. at 6-7. PwC further says that November 1,
2004 to October 31, 2005 is the "period during which a potential plaintiff must have ac-
quired securities" and that "No plaintiff can have any potential claim against PwC except to
the extent that the claim is based on an acquisition of Fund securities during the period No-
vember 1, 2004 to October 31, 2007." PwC Br. at 7. Thus, consistent with the last paragraph
of Section 11(a), PwC correctly recognizes that shares that are continuously offered by an
open-end fund are offered pursuant to the most recent post-effective amendment during the

100

period until the next post-effective amendment. This means that shares purchased by the Class from December 6, 2004 until November 1, 2005 were offered pursuant to the November 1, 2004 prospectus contained in Post-Effective Amendment No. 13.[114]

Alternatively, the initial October 27, 1998, registration statement was amended on numerous dates, including September 10, October 28, November 23, and December 13, 2004 ("post-effective amendments"). ¶ 690. The effect of these post-effective amendments is to make the offering language of Post-Effective Amendment No. 12 that relates to IBF and HIF effective February 28, 2005, thus cutting only 11 weeks (December 6, 2004 to February 28, 2005) off the Class Period. Post-Effective Amendment No. 12, filed September 10, 2004, was to become effective 75 days after filing—i.e., November 25, 2004. Ex. 31 cover page. Although Post-Effective Amendment No. 12 includes a new prospectus for STF only, it does contain offering language for IBF and HIF. *Id.* at 24, 26.[115] Post-Effective Amendment No. 12 also included an SAI dated "November __, 2004" that included information about IBF and HIF, and the Amendment was signed on behalf of the Company and is an

---

[114] The cases cited by PwC (Br. at 8) are irrelevant. *Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508, 512 (S.D. N.Y. 2000) and *Brick v. Dominion Mortgage & Realty Trust*, 442 F. Supp. 283, 290 (W.D. N.Y. 1977), are not about an open-end fund or a continuous offering of shares and address § 13 regarding a conventional initial public offering. Neither of these cases offers any support for PwC in this case, and PwC simply cites these cases without explaining their application.

[115] This offering language included the following offering language on page 24:



If you choose to invest in more than one fund initially, please also indicate the total purchase amount and how you wish to have your initial investment split among the fund and other funds in Morgan Keegan Select Fund, Inc.

$_____ to the Regions Morgan Keegan Select LEADER Short-Term Bond Fund.

$_____ to the Regions Morgan Keegan Select Intermediate Bond Fund.

$_____ to the Regions Morgan Keegan Select High Income Fund.  (Not available to new shareholders after December 31, 2002.)

Page 26:

5.    INVESTMENT   METHOD   (MINIMUM   INVESTMENT:   INTERMEDIATE BOND  FUND & HIGH INCOME FUND - $1,000)

[ ]  CHECK

Enclosed is a check payable to Morgan Keegan.  (Neither initial nor subsequent investments should be made by third party check.)

For $  _____

amendment to the Company's registration statement. *Id.* at 31, 93. Post-Effective Amendment No. 15, filed November 23, 2004, designated the effective date for Post-Effective Amendment No. 12 to be February 28, 2005; this Amendment was likewise signed on behalf of the Company and is an amendment to the Company's registration statement. Ex. 32 at [116]

PwC's statute of limitations argument (PwC Br. at 8-9) is wrong for the reasons discussed above. In any event, even if the Court accepts Defendants' arguments, they only limit the scope of the Class Period or of the class as to Plaintiffs' § 11 purchaser claims. They do not provide a basis for dismissal of that or any other claim.

## VI.   PLAINTIFFS PROPERLY ASSERT CLAIMS AS HOLDERS OF THE FUNDS' REDEEMABLE SHARES.

### A.   The '33 and '34 Acts Define the Terms "Purchase" and "Sale" to Include Contractual Obligations to Purchase or Sell Securities and Do Not Limit the Terms to Encompass Only <u>Actual</u> Purchases or Sales.[117]

Defendants contend Plaintiffs cannot assert claims as holders for the Funds' fraudulent offers to redeem.[118] That is not correct. All class members have standing to assert claims for having been fraudulently induced not to redeem their Fund shares after RF determined in 2006 to sell its subprime lending unit. They satisfy the purchase/sale requirement for a Rule 10b-5 claim because they had a contractual right to redeem their Fund shares. Likewise, the Fiduciary Accounts have standing to assert claims arising from the failure of RB/RMK Trust and MAM/MK to cause the accounts to redeem their Fund shares after 2006 because these Defendants failed to obtain said accounts' consent to continue to

---

[116]   The ICA provides that, for purposes of § 11 of the '33 Act, "the effective date of the latest amendment filed shall be deemed the effective date of the registration statement with respect to securities sold after such amendment shall have become effective." ICA § 24(e).

[117]   Plaintiffs recognize that in *Atkinson*, this Court held that holders are not included in the "Delaware carve-out" to SLUSA preclusion. In so holding, this Court did not address Plaintiffs' contractual argument. As discussed *infra*, this argument has been further developed on the basis of additional information regarding the RMK Defendants' wrongful conduct, which, Plaintiffs respectfully submit, warrants further consideration by this Court.

[118]   MAM/MK Br. at 19-20; Ind. Defs. Br. at 4-5; Funds' Br. at 6-7, 11-12; Directors' Br. at 5; RF/RB Br. at 13-14.

hold their Fund shares after RF determined the subprime market was headed for a collapse.

Both the '33 and '34 Acts define the "purchase" or "sale" of a security to include any contract to purchase or sell a security. 15 U.S.C. §§ 77b(a)(3) (the terms "sale" or "sell" in-cludes "every contract of sale or disposition of a security or interest in a security, for value"); 78c(a)(13) ("buy" and "purchase" includes "any contract to buy, purchase, or oth-erwise acquire"); 15 U.S.C. § 78c(a)(14) ("sale" and "sell" includes "any contract to sell or otherwise dispose of"). *See generally Kern County Land Co. v. Occidental Petro. Corp.*, 411 U.S. 582, 593 (1973) (citing same definitions in 1934 Act); *Ormond v. Anthem, Inc.*, 2008 WL 906157, at *11 (S.D. Ind. Mar. 31, 2008) (referring to the '34 Act's definitions of the terms "purchase," "sale," and "sell") (Ex. 33).

The Supreme Court has adopted the interpretation of purchase and sale as set forth in the two Acts.  In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750-51 (1975), the Supreme Court, consistent with the broad definitions found in the '33 and '34 Acts, inter-preted the terms "purchase" or "sale" so as to embrace not just actual purchases but "other contractual rights or duties to purchase or sell securities":

> A contract to purchase or sell securities is expressly defined [by the 1934 Act] as a purchase or sale of securities for purposes of that Act. . . .  [T]he holders of *puts*, calls, options, and other *contractual rights or duties to pur-chase or sell securities* have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to "purchasers" or "sellers," but because the definitional provisions of the 1934 Act themselves grant them such a status.

In 2001, the Supreme Court re-affirmed the interpretation of purchase or sale it had set forth in *Blue Chip Stamps.  Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 593-94 (2001) (citing *Blue Chip Stamps* and concluding that a holder of an option to pur-chase stock and a person having "other contractual rights and duties to purchase securities" were "purchasers" with standing to assert a claim under § 10(b) of the '34 Act).

Here, the ability of a shareholder in an open-end fund to redeem his shares at the fund's net asset value (as distinguished from selling the shares in an open securities market

103

at whatever the then current market price might be) most resembles a "put" option.[119]   In addition, under the ICA, an open-end fund shareholder has both a statutory *and* a contractual right to sell his shares back to the open-end fund. *See* ICA §§ 2(a)(32), 5(a)(1).   On the shareholder's unilateral decision to exercise his right to sell his shares back to the open-end fund for their net asset value, the open-end fund is statutorily obligated under the ICA to purchase the shares. The ICA explicitly protects the redemption rights of an open-end fund's shareholders. The ICA requires that an open-end fund cannot sell or redeem, or offer to redeem, its shares unless the fund is registered under the ICA and its redeemable shares are registered under the '33 Act. ICA §§ 7, 8; ¶¶ 678-79.

Besides their statutory rights to sell their shares back to the Funds at their sole discretion, Plaintiffs, as shareholders in the Funds, had contractual rights to sell (or "put") their shares back to the Funds at their discretion. Upon Plaintiffs deciding to do so, the Funds were required by contract to redeem Plaintiffs' shares at the Funds' then current net asset values. Plaintiffs' contract is found in the Company's articles of incorporation, which expressly incorporate the redeemable-security and other provisions of the ICA, providing that the Funds' shareholders had the contractual right to redeem their shares at net asset value. Section 6.6 of the Morgan Keegan Select Fund's articles of incorporation provided:

> Redemption by Stockholders. Each holder of Shares shall have the *right* at such times as may be permitted by the Corporation to *require* the Corporation to ***redeem*** all or any part of his Shares at a redemption price per Share equal to the net asset value per Share as of such time as the Board of Directors shall have prescribed by resolution, minus any applicable sales charge or redemption or repurchase fee. In the absence of such resolution, *the redemption price*

---

[119]   A "put" resembles the "redeemable" shares issued by an open-end fund. A "'[r]edeemable security' means any security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, is entitled (whether absolutely or only out of surplus) to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof." ICA § 2(a)(32), 15 U.S.C. § 80a-2(a)(32). A "put" issued by the issuer of the security and held by the investor is an option that entitles the holder to sell the security back to the company—i.e., the company/issuer is required to redeem the shares held by the investor. *See Hastings v. Wilson*, 516 F.3d 1055, 1057 (8th Cir. 2008) (explaining that a put issued by the corporation regarding its preferred stock entitled the holder of the put to demand the corporation redeem the preferred stock held by the investor).

> *per Share shall be the net asset value* next determined (in accordance with
> Section 6.7) after acceptance of a request for redemption in proper form less
> such charges as are determined by the Board of Directors and described in the
> Corporation's registration statement under the Securities Act of 1933, . . . .

¶ 746. In addition, the Funds' prospectus includes the following provisions for a shareholder

to redeem his shares in the Morgan Keegan open-end funds:

> You may redeem Class A Shares, Class C Shares and Class I Shares through
> your Morgan Keegan Financial Adviser or by telephoning Morgan Keegan at
> 800-366-7426.  Regions Morgan Keegan Trust customers may redeem shares
> of a fund through their local Trust Administrator.

Curley Decl. Ex. J at 35.

It is well-settled that articles of incorporation constitute a contract that a shareholder

can enforce against a corporation, or, as here, an incorporated open-end fund.[120]  Thus, the

Funds' contractual duty to purchase/redeem covered securities from Plaintiffs expressly falls

within a "contractual right[] or dut[y] to purchase or sell securities."  *See Blue Chip Stamps*,

421 U.S. at 751.

For purposes of the "purchase or sale" language in Rule 10b-5, the Funds' contrac-

---

[120].   *New Orleans Opera Ass'n v. S. Reg'l Opera Endowment Fund*, 993 So. 2d 791, 797
(La.App. 4 Cir. 2008) ("A corporate charter or articles of incorporation are a contract between
the corporation and its shareholders and forms a contractual relationship between the sharehold-
ers themselves, which sets forth rights, obligations and liabilities.") (citing Fletcher, Cyclopedia
of Corporations, Vol. 7A, § 3634, pp. 219-221 (Thomson/West 2006)); *Exec. Bd. of the Mo.
Baptist Convention v. Windermere Baptist Conf. Ctr.*, 280 S.W.2d 678, 687 (Mo. Ct. App.
2009) (articles and bylaws of a corporation constitute a contract between the corporation and its
members); *Eastgate Vill. Water & Sewer Ass'n v. Davis*, 183 P.3d 873, 878 (Mont. 2008) ("It is
a well established precedent that the bylaws of a corporation, together with the articles of incor-
poration, the statute under which it was incorporated, and the member's application, constitute a
contract between the member and the corporation."); *Sutter v. Sutter Ranching Corp.*, 14 P.3d
58, 64 (Okla. 2000) ("the certificate of incorporation constitutes a contract between the corpora-
tion and its shareholders and the rules governing the interpretation of contracts applie[s] to the
interpretation of a certificate of incorporation.") (internal quotes and citation omitted); *Family
Sav. & Loan Asso. Shareholders Protective Committee v. Stewart*, 194 A.2d 118 (Md. 1963)
(contract consisted of, *inter alia*, the articles of incorporation and by-laws); *Hartford Acci. &
Indem. Co. v. W. S. Dickey Clay Mfg. Co.*, 24 A.2d 315, 321-22  (Del. 1942) (referring to the
"contract rights of shareholders" under articles of incorporation); *James F. Powers Foundry Co.
v. Miller*, 166 Md. 590 (Md. 1934) (contract consisted of the amended charter and stock certifi-
cate); *Lawson v. Household Finance Corp.*, 17 Del. Ch. 343, 352 (Del. Ch. 1930) (corporate
charter creates contract); *Bailey v. Philadelphia, W. & B. R. Co.*, 4 Del. 389 (Del. 1846) (a
"corporate charter is a contract within the meaning of the tenth section of the first article of the
Constitution of the United States, and the point is too well settled at this day to be successfully
controverted.").

tual and statutory obligation to purchase their redeemable shares is the same as a "purchase." Thus, the purchase requirement applies to the holders of the Funds' redeemable shares, even though no transactions actually occurred.[121] Finally, the registration requirements of the Securities Act of 1933 apply to an "offer to buy through the use or medium of any prospectus or otherwise any security." '33 Act § 5(c). The ICA incorporates the registration and other requirements of the '33 Act. ICA §§ 2(a)(31), 8, 9, 15, 24. The SEC has recognized the importance of protecting current investors in open-end funds in view of the redemption rights. In *SEC v. State Street Bank and Trust Company*, No. 1:10-cv-10172, Dkt. No. 1, (D. Mass. February 4, 2010), the SEC asserts that holders of an open-end fund's shares have a protectable interest in having equal access to material information about the fund. *Id.* at 37 (Ex. 34).[122]

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006), the Supreme Court held "holder" claims have a sufficient nexus to the purchase or sale of a security where there are contemporaneous purchases or sales. *Id.* at 85. The Supreme Court noted that when it interpreted the "in connection with purchase or sale" requirement of § 10(b) and Rule 10b-5, "it has espoused a broad interpretation":

> Under our precedents, it is enough that the fraud alleged "coincide" with a se-
> curities transaction—whether by the plaintiff or by someone else. See
> *O'Hagan*, 521 U.S., at 651, 117 S. Ct. 2199, 138 L. Ed. 2d 724. The requisite
> showing, in other words, is "deception 'in connection with the purchase or sale
> of any security,' not deception of an identifiable purchaser or seller." *Id.*, at
> 658, 117 S. Ct. 2199, 138 L. Ed. 2d 724. Notably, this broader interpretation
> of the statutory language comports with the longstanding views of the SEC.
> See *Zandford*, 535 U.S., at 819-820, 122 S. Ct. 1899, 153 L. Ed. 2d 1.

---

[121]   It is the absence of transactions that makes the alleged fraudulent offers and accompanying obligations to redeem actionable; those who did redeem were not damaged.

[122]   *See also In the Matter of Evergreen Investment Management Company,* LLC, SEC Release No. IC-28759, June 8, 2009, at ¶¶ 15-23, 27 (disclosure of likelihood of continuing repricings of the fund's illiquid securities to selective accounts would be viewed by a reasonable investor in the fund as important information in deciding whether to redeem the fund's shares; such selective disclosure operated as a fraud and deceit on fund's existing shareholders) (Ex. 45); *Heartland Advisors Order*, Release IC-28136 at 4 (where two bond funds' NAVs were incorrect, "investors purchased and redeemed Fund shares at prices that benefited redeeming investors at the *expense of remaining* and new investors.") (Ex. 60).

106

*Id.* The existence of "coinciding" transactions herein provides a separate basis for finding the requisite purchase/sale element. During the relevant period the Funds' shareholders redeemed net of sales approximately $900 million worth of their shares.[123] ¶¶ 5, 325-28.

The Sixth Circuit's decision in *James v. Gerber Prods. Co.*, 483 F.2d 944 (6th Cir. 1973), in which the court held that the beneficiary of a testamentary trust had § 10(b) standing even though she was not a party to the allegedly fraudulent sale of her trust's securities by the trustee to the issuer, is consistent with *Dabit*'s "broad interpretation" of the "in connection with" requirement. In *James*, plaintiff alleged an interlocking directorate between the buyer of the shares sold by the trust and the bank trustee of the trust of which she was a beneficiary. *Id.* at 945. The Sixth Circuit noted that the '33 and '34 Acts "were enacted in part to restore the public's confidence in the stock market following the public investment frauds of the 1920's." *Id.* at 946. The court observed that "where the alleged deceptive practices have led or would lead the shareholder into a completed transaction giving rise to a § 10(b) suit, the courts have generally inclined to a logical and flexible construction of the term 'purchaser-seller' in order to accommodate the avowed purpose of § 10(b) of protecting the investing public and of ensuring honest dealings in securities transactions." *Id.* at 948. In holding that the plaintiff-beneficiary had § 10(b) standing, the court said, "The trustee's promotion of any interest other than the beneficiary's, such as its own, would be fraudulent." *Id.* at 949. *James* is very similar to the Fiduciary Accounts' claims: there the beneficiary challenged a sale of securities to the issuer thereof by her trust that was made, whereas here the beneficiaries challenge the failure to make such sales. In addition, here the conflicting interests were far more pernicious than in *James*.[124]

---

[123]    Significantly, as discussed elsewhere herein, certain of those coinciding redemptions benefited from preferential disclosure denied to Plaintiffs. In the context of fraudulent offers to redeem, only those who were harmed—i.e., those who were not among the favored and who, therefore, continued to hold their shares and not redeem them—are injured. If holders of redeemable securities have no claim, then those injured by demonstrably fraudulent conduct are denied recovery.

[124]    MAM/MK's reliance on *Simmons v. Wolfson*, 428 F.2d 455, 456 (6th Cir. 1970), is misplaced. In that case, the plaintiffs, who brought claims under the '33 and '34 Acts, were owners

### B.    The Fiduciary Accounts Have Standing to Assert Their '34 Act Claim.

Certain Plaintiffs assert a claim (Count VI) under § 10(b) of the '34 Act and Rule
10b-5 thereunder on behalf of the Fiduciary Subclass against RB and MAM/MK. Because
RMK Trust and MAM/MK had interests that conflicted with their fiduciaries' interests,
RMK Trust and MAM/MK were obliged to seek their fiduciaries' consent to continue to re-
frain from redeeming their Fund shares. Certain Defendants argue that Plaintiffs have no
standing to do so, citing *O'Brien v. Continental Ill. Nat'l Bank & Trust Co*., 593 F.2d 54, 60
(7th Cir. 1979) and *Congregation of the Passion v. Kidder Peabody & Co*., 800 F.2d 177,
181 (7th Cir. 1986), but those cases do not apply here.

#### 1.    The need for the Fiduciary Accounts' consent limited the investment discretion given to RB/RMK Trust and MAM/MK.

RB delegated certain of its trust functions to MAM/MK. ¶¶ 42, 54, 635-45, 664-66.
In 2002, RB and RMK Trust (then known as Morgan Keegan Trust Company FSB) entered
into a Trust Servicing Agreement that, among other things, established a joint marketing ar-
rangement for trust and fiduciary services under the trade name "Regions Morgan Keegan
Trust." ¶ 42. Under the Investment Advisory Service Agreements between RB/RMK Trust
and MAM, MAM undertook to provide certain investment advisory and other related ser-
vices to RB and RMK Trust with respect to the investment of assets held in fiduciary ac-
counts under the management of RB or RMK Trust. ¶¶ 54, 635-40. MK provided these trust
and investment advisory services through MAM. ¶¶ 647-55, 665. Notwithstanding these
delegations, RB remained responsible for how its trust functions were carried out by
MAM/MK. ¶ 666. During the Class Period, RB, RMK Trust, and MAM/MK directed or
caused the RB fiduciary accounts to invest almost $378 million in the Funds. ¶¶ 53-56, 659.

Under the Investment Advisory Service Agreements between RB/RMK Trust and
MAM, MAM was obliged to notify RB and RMK Trust about MAM's conflicting interests

---

of shares of common stock in a corporation whose shares were registered and listed on the New
York Stock Exchange, not an open-end fund; the issuer had no contractual obligation to pur-
chase the plaintiffs' shares. Moreover, this case predates *Blue Chip*.

arising from the overlapping purchases, sales and holdings by the Funds and the RMK
closed-end funds of illiquid securities, and MAM was prohibited from completing such
transactions without RB's or RMK Trust's consents. ¶¶ 207-12, 342, 385(g), 642-43, 740,
755-57; Ex. 3 ¶ 16.c. Notwithstanding these delegations, the Investment Advisory Service
Agreements provided that RB and RMK Trust remained responsible "for compliance with
applicable law governing [RB's] and [RMK Trust's] respective management and admini-
stration of the [Fiduciary Accounts] and with the terms and provisions of the instruments
and agreements creating each [Fiduciary Account]" and for the ongoing monitoring and re-
view of MAM's administration of the Fiduciary Accounts. ¶¶ 641, 666.

The identification of such conflicting interests informed RB and RMK Trust of the
Funds' violations of their respective investment objectives, policies and restrictions and
should have led to corrective action to cure such violations. ¶ 643. RB, RMK Trust and
MAM each had the right to approve sales materials and agreements used by the other where
such materials affected the other, including its liability to the Fiduciary Accounts. ¶ 644. Af-
ter this litigation was begun, RB belatedly recognized the conflicting interests inherent in
these relationships throughout the Class Period. ¶¶ 668-70. Although possessing, or privy to,
knowledge about the deterioration of the subprime securities market, RB and MAM/MK
preferred their interests, and the interests of their affiliates, over the interests of the Fiduci-
ary Subclass in connection with any decision by RB (RMK Trust) or MAM/MK to cause the
Fiduciary Subclass's accounts, or to advise or direct such accounts, to redeem their shares
in the Funds at any time after June 30, 2006. ¶ 669. Not only would such a massive redemp-
tion have forced the Funds to sell a large proportion of their respective portfolios, it would
have removed substantial assets from MAM/MK's management, thus significantly reducing
MAM/MK's asset-based fees, to the substantial economic detriment of RF, RB, MAM/MK
and their officers. *Id.*

In sum, the CAC alleges a failure to disclose violations of the disclosed investment
objectives, policies and restrictions; Plaintiffs' right to redeem their shares; Defendants'

conflicts of interest in connection with Plaintiffs' redemption rights; the statutory and regu-

latory protection of open-end fund shareholders' redemption rights; Defendants' intention to

deceive Plaintiffs into retaining their Fund shares and not redeem them to avoid redemptions

and the resulting huge losses that did ultimately accompany massive redemptions in view of

the Funds' illiquid portfolios; and RB's and MAM/MK's fiduciary responsibilities to the

Fiduciary Accounts in connection with their redemption rights.[125]

In *O'Brien*, plaintiffs alleged a lack of information to enable them to replace their

trustee but did not otherwise challenge the transactions in which the trustee engaged on their

behalf. 593 F.2d at 60-63.[126] *See Arlington Heights Police Pension Fund v. Poder*, 700 F.

Supp. 405, 406-407 (N.D. Ill. 1988) (in *O'Brien*, information that the bank failed to disclose

concerned whether plaintiffs should terminate the trust, not whether plaintiffs should invest

in the securities; thus, because plaintiffs had given the bank full discretion to make invest-

ment decisions for the pension trusts, the court found that plaintiffs did not state a § 10(b)

claim). Thus, *O'Brien* involved only "informational fraud" and not fraudulent activity. *Mar-*

*garet Hall Foundation, Inc. v. Atlantic Financial Management, Inc.*, 572 F. Supp. 1475,

1480 (D. Mass. 1983) ("informational fraud" is to be distinguished from both informational

fraud and fraudulent activity consisting of defendants' purchase of a high-risk stock for

plaintiffs in spite of their stated preference for safe investments).

Plaintiffs allege both informational fraud and fraudulent activity. ¶¶ 370-401 (infor-

mational fraud in the Funds' prospectuses); ¶¶ 161-305 (Defendants' purchases of securities

for the Funds' portfolios violated the Funds' investment objectives, policies and restrictions

---

[125]     ¶¶ 2(b), 12-31, 34, 36, 38, 100, 106, 113, 115, 133, 145, 211-20, 247, 322, 326-28, 370-
72, 374-77, 385(g), 443, 445, 466, 542-43, 551-52, 556, 558, 608, 619-20, 632, 669, 678-83,
698-707, 730-41, 744-48, 751, 755, 757.

[126]     "The important point for our analysis is the decision to which the nondisclosure related.
If that decision is whether to purchase or sell a security, the nondisclosure is in connection with
the purchase or sale. Here, however, that decision was not whether Continental should buy or
sell the securities in question, for the terms of the trust and agency agreements made that deci-
sion solely Continental's and plaintiffs had no voice in it. The decision to which the nondisclo-
sure related was whether plaintiffs should terminate the trust or agency agreements or, perhaps,
take some action against Continental." *Id.* (footnote omitted).

that promised stability and that, if adhered to, would not have been made and would have avoided the Funds' losses); ¶¶ 641-43, 730-40, 744-48 (regarding the Fiduciary Accounts, MAM/MK was obliged to consult with RB in connection with purchases by MAM/MK for the Fiduciary Accounts invested in the Funds that triggered conflicts of interests on the part of MAM/MK); ¶¶ 666-69, 730-40, 744-48, 755-57 (MAM/MK and RB had conflicting interests in connection with determining whether to cause the Fiduciary Accounts to hold or redeem their investments in the Funds, which, if redeemed, would have removed substantial assets from MAM/MK's management to the economic detriment of the RMK organization).

RB's, RMK Trust's and MAM/MK's conflicting interests were not curable without obtaining the Fiduciary Accounts' consents. MAM/MK and RB were required to disclose their conflicts and obtain consents by the Fiduciary Accounts, giving the Fiduciary Accounts standing to assert a Rule 10b-5 claim. ¶¶ 755-57. *See Norris v. Wirtz*, 719 F.2d 256, 261 (7th Cir. 1983) (distinguishing *O'Brien*, the court held that a trustee that was precluded by a trust provision from engaging in self-dealing transactions was required to get the beneficiary's consent thereto, giving the beneficiary the authority to make the investment decision at issue and, thus, standing to assert a Rule 10b-5 claim because the need for the beneficiary's consent satisfied the "in connection with" requirement);[127] *see also Tower Bank & Trust Co. v. Bank One, N.A.*, 2006 WL 2092332, at *3-4  (N.D. Ind. July 26, 2006) (*Norris* and not *O'Brien* applied where trust grantor delegated his authority to make investment decisions to the trustee, as in *O'Brien*, but trustee specifically sought out the consent of persons holding powers of attorney on behalf of grantor in order to effectuate an investment strategy, suggesting that their approval was necessary with respect to the proposed investment) (Ex. 35); *Arlington Heights v. Poder*, 712 F. Supp. 680, 684 (N.D. Ill. 1989) (*O'Brien* is inapposite where the nondisclosure of which the plaintiff fund complains directly relates

---

[127]    *Norris* involved an explicit will provision, and the Investment Advisory Service Agreements between RB/RMK Trust and MAM/MK also required consultation between MAM/MK and RB/RMK Trust in the event of transactions proposed by MAM that triggered conflicting interests, of which there were many. ¶¶ 207-12, 342, 385(g), 642-43, 740, 755-57.

to the fund's decision to invest in securities, and the complaint alleges that the fund never gave broker total discretion to trade on behalf of the fund; "in connection with purchase or sale" requirement of § 10(b) and Rule 10b-5 was satisfied); *DelPorte v. Shearson, Hammill & Co., Inc.*, 548 F.2d 1149 (5th Cir. 1977) (unauthorized trading supports § 10(b) claim).[128]

In *Kayne v. Painewebber, Inc.*, 703 F. Supp. 1334, 1341 (N.D. Ill. 1989), the court distinguished both *O'Brien* and *Congregation of the Passion* and held that, because the securities purchases were unauthorized, the "purchase" did not happen until plaintiff was induced to ratify the trades by the broker's false assurances that the trades would be undone. *Id.* Additionally, without regard to the fraudulently induced ratification, the court said the requisite purchase element was satisfied by the allegations in the amended complaint that the unauthorized purchases were undertaken with the intent to deceive plaintiff into retaining them, and this fraudulent intent provides the "something more" required to turn unauthorized trading into securities fraud. *Id.* at 1341-42. Plaintiffs allege that Defendants fraudulently refrained from causing the Fiduciary Accounts to redeem their shares when it became prudent to do so, or failed to obtain the consent of such Fiduciary Accounts to continue to retain their Fund investments, for their economic advantage.[129]

### 2. RB/RMK Trust's and MAM/MK's conflicting interests and self-dealing required the Fiduciary Accounts' consents to their continued holding of Fund shares purchased on their behalf by MAM/MK.

RB/RMK Trust's affiliates' financial interest conflicted with the Fiduciary Accounts' financial interests, and the Fiduciary Accounts' consents were required for their continued holding of Fund shares purchased on their behalf by MAM/MK. Because of the conflicting interests that infected RB/RMK Trust's and MAM/MK's relationships *inter se*

---

[128]   Here, Plaintiffs allege that Fiduciary Accounts' investments in the Funds at the direction of MAM were unauthorized because such investments required their consent. ¶¶ 643, 668-70, 755-57; *see also* cases cited *infra*. Moreover, the Funds' investments were unauthorized because they were largely in violation of their investment objectives, policies and restrictions.

[129]   ¶¶ 2(b), 12-34, 38, 100, 111(g), 111(s), 113, 115, 133, 211-15, 247, 370-71, 374, 376, 445, 542-43, 552(e), 552(f), 556, 608, 669, 678, 678-83, 702-05, 730-41, 744-48, 755-57; Ex. 3 ¶¶ 110, 119-20

(the resolution of which was provided for in the Investment Advisory Service Agreements)
and because of the self-dealing and conflicting interests inherent in their relationships with
the Fiduciary Accounts, the Fiduciary Accounts' consents were required to invest in the
Funds and, especially after RF's decision to sell its subprime lending subsidiary in 2006, to
continue holding the Funds' shares and not redeem.

"Except in discrete circumstances, the trustee is strictly prohibited from engaging in
transactions that involve self-dealing or that otherwise involve or create a conflict between
the trustee's fiduciary duties and personal interests." Restatement (Third) of Trusts § 78(2) at
93-94 (2007). Beyond abstaining from self-dealing, a trustee "must refrain from placing
himself in a position where his personal interest or that of a third person does or may con-
flict with the interest of the beneficiaries," even if the trustee has not profited by a transac-
tion. George T. Bogert, Trusts § 95 at 341 (6th ed. 1987). *See Smith v. Williams*, 698 F.2d
611, 615 (3d Cir. 1983) (if a trustee engages in self-dealing without the consent of the bene-
ficiary, the transaction is voidable even though the transaction was fair and reasonable, cit-
ing Restatement (Second) of Trusts § 170; Scott on Trusts § 170 at 1298 (3rd ed. 1967));[130]
*Cole v. Laws*, 76 S.W.3d 878, 883 (Ark. 2002) (the guiding principle of the fiduciary rela-
tionship is that self-dealing, absent the consent of the other party to the relationship, is
strictly proscribed); *Hosey v. Burgess*, 890 S.W.2d 262 (Ark. 1995) (it is a universal rule of
equity that a trustee shall not deal with trust property to his own advantage without the
knowledge or consent of the cestui que trust).

A trustee "is under a duty not to profit at the expense of the beneficiary unless au-
thorized to do so by the terms of the trust or by a proper court." *Nowak v. Hedke*, 75 N.W.2d

---

[130]     *See also* Restatement of the Law, Second, Trusts, § 216 (Where the trustee has an ad-
verse interest in the transaction, a beneficiary can hold a trustee liable for an act or omission of
the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission did
not consent to such act or omission. The beneficiary's consent does not preclude him from hold-
ing the trustee liable for a breach of trust where (i) the beneficiary, when he gave his consent,
did not know of his rights and of the material facts that the trustee knew or should have known
and that the trustee did not reasonably believe that the beneficiary knew or (ii) if the transaction
to which the beneficiary consented involved a bargain which was not fair and reasonable.).

13, 35-36 (Neb. 2009) (citing Restatement (Second) of Trusts, comment a. at 364). Because trustees have great control over the beneficiaries' property interests and beneficiaries cannot readily terminate their fiduciaries or dispose of their interests, "[t]he duty of loyalty is, for trustees, particularly strict by comparison to the standards of other fiduciary relationships." *Id.* (citing Restatement (Third) of Trusts, comment a. at 94); *see also Quinton v. Gavin*, 2001 WL 119 (Mass. Super. Ct. Feb. 12, 2001) (trustee must fully disclose to beneficiaries the material facts surrounding a self-interested transaction) (Ex. 36).

In *In re New York Trust Co.*, 294 N.Y. 596, 608 (N.Y. 1945), the beneficiaries' interests required that the trustee negotiate for abatement or mitigation of the restrictions that burdened the mortgaged property, while the interests of the trustee's president and his associates were to be served best by enforcement of these restraints. "The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty. Even though the restrictions against the mortgaged property were matters of public record, the trust beneficiaries should not be charged with constructive discovery thereof through the rule as to notice under the recording acts, because the trust beneficiaries (unlike the trustee) had no duty to search the title of the mortgaged property." *Id.*

This Court in *RMK ERISA Litig.* rejected MAM/MK's motion to dismiss plaintiffs' claims against it on the basis of allegations that (i) it failed to take action when it knew or should have known that investment in IBF and HIF had become imprudent, (ii) knew or should have known that these Funds violated their investment guidelines by investing heavily in the subprime sector, and (iii) as *de facto* fiduciaries, MAM/MK was bound by duties of loyalty, exclusive purpose, and prudence. 2010 WL 809950 at *14 (Ex. 9). This ruling is equally applicable here, as ERISA fiduciary concepts are derived from the common law of trusts. *See Krohn v. Huron Mem. Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 496, (1996)).

The Fiduciary Accounts need not have made an investment decision to satisfy the "in connection with a purchase or sale" requirement of a § 10(b) claim as long as Defen-

114

dants' deception deprived them of the value of their investments. In *SEC v. Zandford*, 535 U.S. 813 (2002), the Supreme Court held that the "in connection with" element was satisfied even though the investors did not make any investment decision, because they "were duped into believing respondent would 'conservatively invest' their assets in the stock market and that any transactions made on their behalf would be for their benefit for the 'safety of principal and income.'" *Id.* at 822.[131]

### 3. RB/RMK Trust and MAM/MK owed a duty to the Fiduciary Accounts to disclose their conflicts and the need to redeem.

"A fiduciary has an obligation to convey complete and accurate information to its beneficiaries." *RMK ERISA Litig.*, 2010 WL 809950, at *6 (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 452 (6th Cir. 2002) (Ex. 9). A trustee's duty to inform "is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Id.*

Thus, independent of the self-dealing and conflicting interests, RB/RMK Trust and MAM/MK, in carrying out the RB trust functions delegated to it, were required to disclose to the Fiduciary Accounts that the Funds' shares were no longer an appropriate investment. Alternatively, they were obliged to disclose to the Fiduciary Accounts RF's analysis of the prospects of the ABS/MBS that so dominated the Funds' portfolios, along with the conflicts that disabled RB/MAM/MK from rendering independent and objective advice regarding continuing to invest in the Funds. The need for this disclosure and for a new investment decision supplies the requisite purchase/sale nexus for purposes of Rule 10b-5.

## VII. STATEMENTS OF ADDITIONAL INFORMATION AND MORNINGSTAR REPORTS ARE NOT PROSPECTUSES.

MAM/MK relies on SAI disclosures in response to the CAC's allegations that mate-

---

[131]    As discussed *supra*, the Fiduciary Accounts need not have been defrauded into purchasing or selling particular securities to satisfy the "in connection with" requirement. *Dabit*, 547 U.S. at 85.

rial facts were not disclosed. MAM/MK Br. at 3-4, 25-26. As discussed above, these and the

small number of prospectus disclosures cited by MAM/MK were false and misleading.

MAM/MK also relies on Morningstar reports. *Id.* at 8-9, 31, 33.

Prospectuses are the vehicle prescribed by the '33 Act for transmitting "essential in-

formation" about a mutual fund to help investors make informed decisions about whether to

invest therein. Neither SAIs nor Morningstar reports are prospectuses. MAM/MK's reliance

on SAIs and Morningstar reports begs the obvious question: Why was this information not

disclosed in the Funds' prospectuses, where it belonged, since by its reliance MAM/MK is

conceding the information was "essential" to an understanding of the Funds' risks?

**A.      The SAIs Are Not to Include Required Prospectus Disclosures.**

MAM/MK completely misrepresents the relationship between the prospectus and the

SAI and the extent to which SAI disclosures can be "incorporated" in the prospectus. *See*

MAM/MK Br. at 6-7, 21-23, 25, 29. Form N-1A, General Instruction D(1)(a), (b) provides:

> (a)  A Fund may ***not incorporate*** by reference into a prospectus *information
> that Part A of this Form requires to be included in a prospectus*, except as
> specifically permitted by Part A of the Form.

> (b)  A Fund may incorporate by reference any or all of the SAI into the pro-
> spectus (*but not to provide any information required by Part A to be in-
> cluded in the prospectus*) without delivering the SAI with the prospectus.

Curley Decl. Ex. X at 8.

Part A of a registered investment company's registration statement on SEC Form N-

1A is the prospectus, which includes the *information required* under section 10(a) of the Se-

curities Act of 1933. ¶ 379; Curley Decl. Ex. X at 6. The prospectus provides "*essential in-

formation* about the Fund in a way that will help investors make *informed decisions* about

whether to purchase the Fund's shares described in the prospectus." *Id.*; MAM/MK Br. at

23. Registrants are instructed by the SEC to avoid cross-references in the prospectus to the

SAI. *Id.* The SAI does not contain essential information; that is to be included in the pro-

spectus. *Id.* The purpose of the SAI is to provide additional information about the fund that

the SEC "has concluded is *not necessary or appropriate in the public interest or for the pro-*

116

*tection of investors to be in the prospectus*, but that *some* investors *may* find useful." *Id.*

The SEC considers the prospectus to be the "most complete source of information about a [mutual] fund" and serves as "a fund's primary disclosure document."[132]  In the context of a typical open-end mutual fund, the SEC requires that the prospectus contain "information that is necessary for an average or typical investor to make an investment decision," and "focus its contents on information that is essential to an investment in the fund." *Id.* at 13,918-19).[133] *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management*, 595 F.3d 86, 94 (2d Cir. 2010).

MAM/MK tries to hide its reliance on the SAIs by referring to them as "offering documents." MAM/MK Br. at 23 ("…the Funds' offering documents disclosed the risk factors which Plaintiffs allege were omitted."). But, of course, the SAI is not an "offering docu-

---

[132]    Registration Form Used by Open-End Management Investment Companies Securities Act, 63 Fed. Reg. 13,916, at 13,917-18 (Mar. 23, 1998).

[133]    In its release adopting a revised Form N-1A, the SEC emphasized the critical importance of the prospectus, versus the SAI, and it also stressed the significance of disclosures that enable investors to compare one fund with another. Rel. No. 33-7512 (Ex. 17). These revisions "were intended to: improve fund disclosure by requiring prospectuses to focus on information central to investment decisions; … and enhance the *comparability* of information about funds." *Id.* at 5. The SEC said that a fund's prospectus should include the *essential information* about the fund that "clearly *discloses the fundamental characteristics* of the *particular* investment company," while "more detailed discussions of matters geared to the needs of more sophisticated investors would be available in the SAI." *Id.* at 6. Importantly, a "fund's prospectus principally should include essential information about the fundamental characteristics of, and risks of investing in, the fund. Whenever possible, a fund should present this information in a manner that: -- assists investors in *comparing and contrasting the fund with other funds*" while focusing on the fund's investments that are "a significant part of the fund's investment operations." *Id.* at 8. Prospectus disclosures should not obscure "essential information about an investment in a fund." *Id.* at 8. A fund is required to disclose "the particular type or types of securities in which the fund will invest principally," focusing "disclosure on a fund's anticipated investment operations" and on how the fund "intends to achieve its investment goals as proposed." *Id.* at 15-16. Although not a required disclosure for all funds, the new Form N-1A permits disclosure indicating "whether a fund is appropriate for specific types of investors or is consistent with certain investment goals," because such disclosure "may be useful for some investors and may provide a *means for the fund to distinguish itself from other investment alternatives*." Therefore, Form N-lA, as amended, permits a fund to include disclosure in the narrative risk summary about the types of investors for whom the fund is intended or the types of investment goals that may be consistent with an investment in the fund. *Id.* at 9-10. The SEC noted that "a fund could meet the risk disclosure requirements of Form N-1A, as amended, by including in its prospectus a discussion of the risks of the asset class or classes that the fund expects to hold principally, together with a discussion of the risks to the fund of holding specific types of securities within the asset class or classes. *Id.* at 21.

117

ment" because it was not given to investors and cannot contain information that must be in the prospectus, including material information. The gist of MAM/MK's focus on the SAI disclosures is that they included essential information for investors. Accordingly, these disclosures should have been in the prospectus, not hidden in a document that shareholders must request be sent to them and without being told that the real disclosures about the Funds were tucked away in this document. By its reliance on the Funds' SAIs to respond to Plaintiffs' allegations of undisclosed material facts in the Funds' prospectuses, MAM/MK concedes that the prospectuses did omit such information. *See* MAM/MK Br. at 21-22 (§ 11 liability lies where material information is omitted).

What Plaintiffs allege was not disclosed was essential information relating to the Funds' risks that caused their collapse. Regarding the cases cited by MAM/MK (Br. at 22-23), Plaintiffs' allegations comply therewith, and MAM/MK does not contend otherwise. What can be more specific and meet the requirements of these cases than that the percentage of securities with liquidity and valuation risks be disclosed?

MAM says it cannot be liable under § 11. MAM/MK Br. at 21 n. 17. Section 11(a)(1) includes "every person who signed the registration statement." The non-independent directors who signed the Funds' registration statement (Morgan and Alderman) did so in their capacities as officers and employees of MAM. ¶¶ 59-60, 75-78, 691. Because the Funds had no management of their own, MAM functioned in this capacity. ¶ 97.

### B.    In Any Event, Even the SAIs Are False and Misleading.

The SAI disclosures identified by MAM/MK (Br. at 25-26) are false and misleading for the reasons discussed *supra*.[134] *See, e.g., Rodney*, 143 F.3d at 1145-46 (disclosure re-

---

[134]    The SEC instructs funds not to rely on such generic uninformative disclosures. "Risk disclosure in fund prospectuses typically consists of detailed, and often technical, descriptions of the risks associated with particular securities in which a fund *may* invest. Just as disclosure about each type of security in which a fund *may* invest does not appear to communicate effectively to investors how the fund's portfolio *will be* managed, disclosure about the risks associated with each type of security in which the fund *may* invest does not effectively communicate to them *the overall risks of investing in the fund*. . . . disclosing the risks of each possible portfolio investment, rather than the overall risks of investing in a fund does not help investors evaluate a particular fund or *compare the risks of the fund with those of other funds*." SEC Release

garding prepayment characteristics "does not alert the reader to the level of portfolio matur-
ity risk the Investors claim existed"). Others of the referenced disclosures are meaningless
generalized disclosures (e.g., "…CLOs are subject to credit risk"). The quoted SAI state-
ments do contain one disclosure that *hints* at a major risk that permeated the Funds: "The
return on the lower tranches of *CBOs* is especially sensitive to the rate of defaults in the col-
lateral pool." MAM/MK Br. at 26. This statement is *also* true of *all* of the mortgage-backed
securities bought by the Funds, not just CBOs. Nevertheless, this disclosure, limited as it is
to CBOs, does not remotely suggest the extent to which the Funds were subject to this risk.
¶¶ 253-58; Ex. 3 ¶ 45. *See Hunt*, 159 F.3d at 729 (prospectus language warned investors of a
different contingency than what plaintiffs alleged was misrepresented).

        The "detailed and specific warnings of the risks associated with each type of secu-
rity" were irrelevant, were in the SAIs instead of the prospectuses, were generalized, or
were false and misleading for failing to disclose, *inter alia*, violations of the Funds' invest-
ment objectives, policies and restrictions or the percentage of the Funds' portfolios subject
to these risks. ¶ 382. The Funds were obliged by GAAP to disclose their concentration of
credit risk. ¶¶ 283, 514-18. The Funds failed to disclose the credit risks associated with the
ABS/MBS purchased by the Funds as set out in their prospectuses. ¶¶ 248-66. The listing of
the individual securities did not begin to reveal the risks alleged in the CAC, especially
since many of these securities were misclassified. ¶¶ 286-92; Ex. 3 ¶¶ 49-51.

        The RMK Defendants' use of "may" in the SAIs when the risk *did* exist was false
and misleading. For example, MSF said in its *prospectus* that the *below investment-grade
securities* in which it invested "*are* less liquid than investment-grade securities" whereas the
Funds' *SAI* said the market for such securities "*may* be thinner and less active than for
higher quality debt securities." Appx. F at p. 386. This is far more than a semantic differ-
ence, since Defendants argue that these securities "became" illiquid when the key fact is that

_____

No. 33-7512 at 21-22, Ex. 17.

they "were" illiquid or *currently possessed* the characteristics of securities that can become unsalable overnight (i.e., there was nothing "may" about it). While this risk was not disclosed anywhere by the Funds (even in their SAIs), it was disclosed in the MSF prospectus.

The courts have held that disclosure cannot be generalized or couched in indefinite terms like "may" when the conditions actually exist.  As the Seventh Circuit has observed, a "prospectus stating that [a risk] *could* happen is a far cry from one stating that this *had* happened.  The former does not put an investor on notice of the latter." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993). *Accord*, *Rodney*, 143 F.3d 1145 (use of words like "expects," "ranging" and "approximately" regarding a fund's average maturity does not alert the investor to the actual maturity risk alleged); *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *Carson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 WL 34076402, at *20 (W.D. Ark. Mar. 30, 1998) ("The prospectus contains various statements warning prospective investors that the warrants involve a high degree of risk and that investors may sustain a loss of the purchase.  Those cautionary statements, however, do not specifically address plaintiffs' claims.") (Ex. 37).

C.    **The Morningstar Reports.**

MAM/MK seems to want to take credit for analyses by Morningstar, an organization that provides, for paid subscribers, analyses of mutual funds. MAM/MK Br. at 31 n. 22, 33 (after citing a Morningstar comment on HIF's "heavy tilt towards asset-backeds, which can be illiquid," MAM/MK then says, "*All this*, in combination with the Funds' quarterly disclosures of portfolio securities, put any reasonable investor on notice that securities in the Funds' portfolio bore significant liquidity risk.").[135] Notwithstanding the slippery "All this"

---

[135]    As detailed elsewhere herein, the quarterly reports misrepresented that all of the listed securities were liquid. ¶ 201. Also, merely listing the Funds' portfolio securities did not inform investors of the risks inherent therein. Noting "that mere inventories of potential portfolio securities do not assist typical investors in selecting among funds," the revisions "require a fund to disclose the risks to which the fund's *particular* portfolio *as a whole* is expected to be subject

120

reference, MAM/MK does not, and cannot, claim that Morningstar reports satisfied the Defendants' disclosure obligations under the federal securities laws. However, MAM/MK's use of Morningstar does beg two questions: (1) Given what MAM/MK says is the significance of this information, why was it not included in the Funds' prospectuses? (2) Did Defendants (all of them but especially the Director Defendants, Individual Defendants, and MAM/MK) read these Morningstar reports?[136]

MAM/MK seeks to take advantage of a July 2006 Morningstar report regarding IBF in which the analyst noted that the fund holds an "*unusual mix* of corporate bonds and *asset-backed* securities *for a fund in this category*." Curley Decl. Ex. LL. Since MAM/MK clearly regards this as a material fact, it should have been disclosed in IBF's prospectus and renders the benchmark comparison highly misleading, as Plaintiffs have alleged. ¶¶ 308, 314, 374(u), 375(w), 395(g). This Morningstar analyst also noted IBF's "very low volatility"— i.e., stable NAV—which Plaintiffs have alleged contributed to the perception that IBF was safe. ¶¶ 386-95. This analyst goes on to say, "Low volatility, however, should not be confused with lack of risk. The fund takes on *substantial credit risk* with the majority of its bonds in the BBB credit quality range. Occasionally, these bonds can be downgraded to junk status, making them more volatile and less liquid." Curley Decl. Ex. LL. But this is not disclosure that complies with the federal securities laws. "If it takes a financial analyst to spot the tension between [the truth and the misleading], whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares*, 501 U.S. at 1089.

MAM/MK also seeks to take advantage of a February 2006 Morningstar report regarding HIF in which the analyst noted that the fund holds an "*unusual mix* of corporate

---

and to discuss the circumstances that are reasonably likely to affect adversely the fund's net asset value, yield, or total return." SEC Release No. 33-7512 at 22 (Ex. 17).

[136]    Morningstar's star ratings are risk-adjusted—i.e., Morningstar viewed the Funds as no less safe than did those who invested in it. ¶¶ 140-41. These Morningstar "prestigious five-star ratings" were awarded to both IBF and HIF in 2004 and were featured in these Funds' December 31, 2004 semi-annual report and on the MK website in 2005; thereafter, the RMK Defendants did not disclose Morningstar's ratings of these Funds. *Id.*

bonds and *asset-backed* securities *for a high-yield fund*." Curley Decl. Ex. KK. Again, since MAM/MK regards this as a material fact, it should have been disclosed in HIF's prospectus and renders the benchmark comparison highly misleading, as Plaintiffs have alleged. ¶¶ 308, 317, 371(m), 372(o), 395(g); Ex. 3 ¶¶ 52-54. This analyst also noted HIF's "very low volatility"—i.e., stable NAV—which Plaintiffs have alleged contributed to the perception that HIF was safe and which the RMK Defendants touted. ¶¶ 129, 386-95.

Of particular interest is Morningstar's observation that HIF "has been kept to a manageable size by closing." Curley Decl. Ex. KK; ¶ 37. "The fund's closing after taking in only $240 million helps control the flow of assets in and out of the fund and allows his strategy to be pursued effectively. We are particularly impressed by this shareholder-friendly decision because management decided to close the fund after it had achieved three consecutive years of top 1% performance in the high-yield category—a point at which most firms would be aggressively marketing the offering to attract greater assets." *Id.* This demonstrates the significance of HIF's closing as a benefit to the Funds' shareholders but ignores the fact that largely the same portfolio was being purchased for IBF and the RMK closed-end funds, thus negating these benefits of closing, as RMK did "aggressively" market Kelsoe's performance to attract greater assets. Morningstar also ignores the liquidity risk created by closing HIF and cloning HIF in IBF and the RMK closed-end funds. ¶¶ 186, 204, 206-13. Significantly, the Morningstar analyst views HIF and IBF in largely the same terms.[137]

## VIII.   PLAINTIFFS ADEQUATELY ALLEGE MAM/MK AND RB WERE STATUTORY SELLERS UNDER § 12(a)(2).

The CAC sufficiently alleges that Defendants MAM/MK and RB were sellers pursuant to Section 12 of the Securities Act. Under § 12(a)(2) of the '33 Act, a seller is defined as

---

[137]   In an earlier March 2003 report on HIF (18 months before the start of the Class Period), Morningstar says, "This fund has a great deal going for it: strong performance and *relatively low turnover and volatility*. But with its *heavy tilt toward asset-backeds*, which *can be illiquid*, and its stake in investment-grade credits, this is *not a typical high-yield fund*." Curley Decl. Ex. JJ. The Funds' prospectuses did not disclose HIF's propensity to become illiquid, nor did they disclose this was "not a typical high-yield fund" when comparing it to the high-yield benchmark and its peers.

one who "offers or sells a security." 15 U.S.C § 77l(a)(2). The Supreme Court has held that liability extends to owners who pass title or other interest in the security to the buyer and/or to the person who successfully solicits the purchase, motivated in part by a desire to serve his own financial interests or those of a securities owner. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).[138]  In *Smith v. American National Bank and Trust Co.*, 982 F.2d 936, 942 (6th Cir. 1992), the Sixth Circuit applied *Pinter's* "seller" test.  Defendants do not dispute the "financial interests" prong of the seller definition, but contend that Plaintiffs have not plead that they engaged in solicitation.  This is incorrect.

Pleading "seller" status under § 12 is subject to Rule 8 standards and does not require a plaintiff to plead specific facts (although Plaintiffs here have done so). *McClaren v. Keystone Memphis, LLC*, 2010 WL 56084 (W.D. Tenn. Jan. 5, 2010), at *2; *Prison Realty*, 117 F. Supp. 2d at 687-88. Thus, general allegations of seller status will suffice. In *In re NationsMart Corp. Securities Litigation*, 130 F.3d 309, 319 (8th Cir. 1997), the Eighth Circuit found it sufficient that the plaintiffs had alleged: "*NationsMart* and the Underwriter Defendants offered, sold, and solicited sales of shares, by means of the Prospectus. . . . *NationsMart* and the Underwriter Defendants were sellers of the shares of *NationsMart* stock within the meaning of Section 12(2) of the Securities Act."  Likewise, the Third Circuit concluded that the plaintiffs had stated a § 12 claim against the underwriter defendants, reasoning that "*Pinter* does not address what allegations are necessary to plead that a defendant is a seller within the meaning of the statute.  Absent a particularity requirement, plaintiffs must provide a short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them." *In re Westinghouse Sec. Litig.,* 90 F. 3d 696, 717 (3d. Cir. 1996).

Courts in this circuit have interpreted the Sixth Circuit's decision in *Smith* similarly,

---

[138]    Although *Pinter* addressed the definition of a "seller" under Section 12(1), now 12(a)(1), this Circuit and others have held that this definition applies equally to Section 12(2), now 12(a)(2).  *See, e.g., Smith*, 982 F.2d at 942.

as requiring only a general statement of seller status.  In *In re F & M Distributors, Inc. Securities Litigation*, 937 F. Supp. 647, 657 (E.D. Mich. 1996) the court held:

> Applying *Smith* to the instant action, it is clear that Acree has sufficiently alleged that the Inside Director Defendants, Agley and Timmis, and the Underwriter Defendants had solicited her to purchase F & M Notes. In ¶ 117 of her Complaint, she alleges that "[e]ach defendant named in this Count *solicited* and/or was a substantial factor in the purchase by Plaintiff and the Class of F & M Notes." (emphasis added). In ¶ 118, she asserts that "[b]ut for the *solicitation* by the Defendants named in this Count as set forth above, the Offering could not and would not have been accomplished." (emphasis added). These statements, as well as the other language in Count IV of the Complaint, sufficiently identify the Defendants' participation in the solicitation of the Notes at issue.

As the court in *In re Electronic Data Systems Corporation "ERISA" Litigation*, 305 F. Supp.2d 658, 681 (E.D. Tex. 2004), concluded:

> Notably, Defendants provide no authority for their assertion that Plaintiffs must plead facts affirmatively establishing the "seller" element of Plaintiffs' claim under the federal notice pleading system. Accordingly, the Court finds no reason for requiring fact pleading on this issue. The Complaint has certainly given fair notice that Plaintiffs intend to prove Defendants' seller status, and the Court will not resolve this claim under 12(b)(6) on the fact-intensive "seller" status issue.

*See also Miller v. New America High Income Fund,* 755 F. Supp. 1099, 1105 (D. Mass. 1991) ("Applying the appropriate standard of scrutiny for a Rule 12(b)(6) motion, a set of facts establishing the underwriter defendants as 'sellers' is clearly plausible, although the plaintiffs must later produce facts to prove the underwriter defendants' actual participation in the activity.") (citation omitted). Where plaintiffs sufficiently allege that a defendant solicited a sale, the factual question of whether the defendant actually solicited plaintiffs' sale is inappropriate for disposition on a motion to dismiss. *See, e.g., Charles Schwab Corp.*, 257 F.R.D. at 550; *In re Paracelsus Corp.*, 6 F. Supp. 2d 626, 632 (S.D. Tex. 1998) (seller determination under § 12(a)(2) is fact intensive question to be considered "in an evidentiary context rather than on a bare pleading.").

As noted above, "seller" for purposes of § 12(a)(2) is one who passes title to the securities to the buyer *or* who "successfully solicits the purchase" of the securities, "motivated

at least in part by a desire to serve his own financial interests or those of the securities owner." The Funds were "proprietary funds." ¶ 647. Thus, the Funds were available only through MK as the "exclusive agent" of the Funds to solicit the purchase of the Funds' shares, and the Funds could be purchased and held only in MK accounts. ¶ 624; Ex. 2 ¶¶ 8, 14, 79. As the Funds' "exclusive" distributor, MK passed title to the Funds' shareholders; they could get their title to their Fund shares from nobody other than MK. Thus, the CAC's allegations satisfy the "title" test making MK a "seller" under § 12(a)(2). MK cites no authority for its contention that an underwriter has no § 12(a)(2) liability. MK Br. at 46-47. Courts routinely hold underwriters liable under § 12. *See, e.g., Charles Schwab Corp.,* 257 F.R.D. at 548 (court noted that underwriter defendant "virtually concede[d]" that it was a proper § 12 defendant); *In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (holding that plaintiffs sufficiently alleged that underwriter defendants solicited and sold securities to class members pursuant to § 12).

The CAC likewise satisfies the "solicitation" test. Plaintiffs allege that, as the excusive distributor/underwriter of the Funds' shares, MK directly and actively solicited purchases in the fund and that Plaintiffs and the class purchased such shares from the Funds through MK for its financial benefit. ¶¶ 45, 47, 53, 106-07, 402, 619-624, 687, 711-12. Plaintiffs specifically allege that, as underwriter and distributor, MK's Underwriting Agreement with the Funds required it to market the Funds by distributing prospectuses and reports to current and prospective shareholders and by preparing and distributing sales/redemption literature and advertising. ¶ 620. MK was obliged by its Underwriting Agreement "to solicit orders for the purchases of" the Funds' shares for which MK received a 3% commission, a significant financial benefit accruing from MK's solicitation. ¶¶ 623-24.[139]

These allegations of solicitation, and distribution and marketing activities, clearly al-

---

[139] *Cf. In re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) ("Plaintiff has not alleged that Plaintiff either directly purchased Orion securities from the Underwriter Defendants or that the Underwriter Defendants successfully solicited such sales.") (Ex. 64).

lege seller status under § 12.  *See Charles Schwab Corp.,* 257 F.R.D. at 549-50 (solicitation adequately pleaded where complaint alleged that defendant actively solicited the sale of the fund's shares and was involved in marketing the fund);  *Washington Mutual,*, 259 F.R.D. at 508 (solicitation sufficiently alleged where plaintiffs alleged that underwriter defendants solicited and sold securities to class members; plaintiffs need not allege which underwriter sold securities to which plaintiff to state a claim under Section 12(a)(2)).

As to MAM, Plaintiffs have alleged that MAM directly "sold" Fund shares to the fiduciary accounts held by Regions Bank by directing the fiduciary accounts to make investments in the Funds, and that MAM executives and employees prepared, reviewed, and/or signed the registration statement and amendments used to sell Funds' shares.  ¶¶ 41, 59-60, 75-78, 83-84, 97-99, 107-09, 635-645, 687, 711-12.  Signing the registration statement and amendments thereto, as MAM's executives did, constitutes direct and active participation in a sale.  *See*, *Prison Realty*, 117 F. Supp.2d at 691; *In re Sirrom Capital Corp.*, 84 F. Supp. 2d at 945 ("A Prospectus itself is considered a solicitation document," so "Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock."); *see also Charles Schwab Corp.*, 257 F.R.D. at 549 n. 3 ("As many courts have found, the registration statement is itself a solicitation document. Although the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity."); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) ("Although signing the registration statement need not constitute active solicitation, (citation omitted), it is, at this stage of the proceedings, a sufficient allegation to permit Plaintiffs to present evidence that, alone or in tandem with other acts, the signatures constituted active solicitation, given that other courts have held involvement in preparation and circulation of the prospectus sufficient to show solicitation." (citing *Capri v. Murphy*, 856 F.2d 473, 478 (2d. Cir. 1988)).[140]

---

[140]    *Cent. Laborers Pension Fund v. Merix Corp.*, 2005 WL 2244 (D. Or. Sept. 15, 2005), on which Director Defendants rely (Directors' Br. at 6 n. 3), was reversed and remanded by *In re Merix Corp. Secs. Litig.*, 275 Fed. Appx. 599 (9th Cir. Apr. 22, 2008).

126

Plaintiffs have also alleged that they purchased Fund shares through RB during the Class Period.  ¶¶ 32, 33, 106, 661.  RB, directly and though its trust department, marketed, offered and sold Fund shares.  ¶ 49.  Plaintiffs also allege that RB was a "seller," having aggressively marketed the Funds, even persuading persons seeking to invest in RB certificates of deposit to instead invest in the Funds.  ¶¶ 2(b), 49, 53-56, 96, 106-09, 635-45, 654, 659, 661, 687, 711-12; Ex. 3 ¶¶ 144-48.[141]  These allegations are more than sufficient to plead seller status as to each of the Section 12 Defendants.  Thus, the CAC states valid claims under § 12 of the '33 Act against MAM/MK and RB.

## IX.   DEFENDANTS ARE LIABLE AS CONTROL PERSONS UNDER § 15 OF THE SECURITIES ACT AND § 20 OF THE SECURITIES EXCHANGE ACT.

### A.   Legal Standard.

Section 15(a) of the '33 Act "imposes joint and several liability upon every person who controls any person liable under sections 11 and 12." 15 U.S.C. § 77o. Likewise, § 20(a) of the '34 Act imposes liability upon any person who, directly or indirectly, controls any person liable under the securities law as jointly and severally liable, with and to the same extent as the controlled person. 15 U.S.C. § 78t(a). Although §§ 15 and 20(a) are not identical, the controlling person analysis is the same.  *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 n. 7 (10th Cir. 1998); *Farley v. Henson*, 11 F.3d 827, 835 (8th Cir. 1993).

To state a claim for control person liability, the complaint must sufficiently allege a primary violation, power to control the activity upon which the primary violation is predicated, and actual exercise of control over the operations of the alleged primary violators.[142]

---

[141]    Cases cited by RF/RB are of no help to it. RF/RB Br. at 8. *Montcalm County Bd. Of Commissioners v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1232 (W.D. Mich. 1993), has unique facts:  where plaintiff was a county that regularly purchased commercial paper, court determined broker did not solicit the purchase of securities; Plaintiffs were not regularly purchasing commercial paper.

[142]    RF, the Individual Defendants, and Director Defendants suggest that Plaintiffs must plead "culpable participation" as an element of control person liability. RF/RB Br. at 17 n. 14; Ind. Defs. Br. at 7 n. 6; Ind. Dir. Br. at 13-14. They are wrong. "Culpable participation" is not an element of control person liability in this Circuit. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1021 n. 56 (S.D. Ohio 2008) ("when it listed the two essential elements of a claim under § 20(a), [ ] the Sixth Circuit did not recognize [culpable participation] as one of those elements.")

*Prison Realty*, 117 F. Supp.2d at 692 (citing *Sanders Confectionary Prod., Inc. v. Heller Fin.*, Inc., 973 F. 2d 474, 486 (6th Cir. 1992)). In the absence of a statutory definition, "control" has been defined by the SEC as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "Control" is "'the practical ability to direct the actions of the people' who committed the violation." *Stavroff v. Meyo,* 1997 WL 720475, at *7 n. 5 (6th Cir. Nov. 12, 1997) (quoting *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949 (7th Cir.1989)) (Ex. 38).

Allegations of control need not be plead with particularity. *In re America Service Group*, 2009 WL 1348163, at *59 (M.D. Tenn. Mar. 31, 2009) (Ex. 21). "Whether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage." *Beach*, 2009 WL 650408, at *6; *see also Sanders Confectionary Prods*., 973 F.2d at 485 )).; *Evergreen Ultra Short Fund*, 2010 WL 1253114, at * 9.vv

Having alleged a primary violation of §§ 11, 12 and 10(b), the question is whether Plaintiffs have sufficiently alleged control. Curiously, the RMK Defendants—RF as the parent company, MAM as the funds' investment advisor, MK as the Funds' underwriter/distributor, the Individual Defendants, as the Funds' management and directors, and the Independent Directors—profess Plaintiffs' allegations insufficient regarding their control over the Funds. Defendants would have the Court believe that the Funds ran themselves.

### B.    Plaintiffs Adequately Allege That RF Was a Control Person pursuant to §§ 15 and 20.

RF incorrectly argues that Plaintiffs' claims for control are "based solely on allegations that RF is the 'wholly owning parent' corporation of Regions Bank and Morgan Keegan." RF/RB Br. at 16.  This completely ignores that the CAC alleges extensive over-

---

(citing *PR Diamonds*, 364 F.3d at 696.); *In re National Century Financial Enterprises, Inc*., 504 F.Supp.2d 287, 301-02 (S.D. Ohio 2007) (same); *see also, Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985) (rejecting the culpable participation test as contrary to "the plain meaning" of the statute and to its remedial purpose).

lapping and interlocking directors, officers and employees, all operating under the RF um-
brella as a single integrated enterprise and held out to the public as such.  It also alleges that
RF and its subsidiaries were completely intertwined, operating as a single, unified entity and
cross-branding/marketing the multiple financial products of the RMK organization, includ-
ing prominently the Funds. ¶¶ 48-50, 53, 58, 106-08, 139, 211, 646-60, 665, 760.  For ex-
ample, Allen Morgan, the Funds' Director and Chairman also served as a director and Vice
Chairman of RF, Director of MAM, and Chairman, Executive Managing Director and CEO
of MK. ¶ 59. The CAC also alleges that RF did not distinguish between itself as parent, and
its subsidiaries, representing its subsidiaries' financials, revenues and businesses as those of
its "divisions" in public financial statements. ¶¶ 646-54. For example, Plaintiffs allege that
RF publicly stated that *it* provides "brokerage and trust services in over 400 offices of Mor-
gan Keegan" and that RF did not even separately identify the operating results for its mutual
fund management business (MAM). ¶¶ 650(e), 654. Furthermore, RF wholly owns MK and
MK Holding (the holding company for MAM), which means that it owns all of the voting
shares of MK and MAM. ¶¶ 40, 44, 45, 48.[143]

Courts routinely hold that where a plaintiff demonstrates that a corporate parent and
its subsidiaries are intertwined, control person status is alleged. *See In re Global Crossing,
Ltd. Sec. Litig.*, 2005 WL 1875445, at \*4 (S.D.N.Y. Aug. 5, 2005) (where plaintiffs alleged
that corporate parent and subsidiary's executives were interchangeable and parent corpora-
tion was involved in day-to-day activities of subsidiary, control sufficiently alleged) (Ex.
39); *In re Enron Corp. Sec.,* 2004 WL 3410449, at \*3-4 (S.D. Tex. April 6, 2004) (where
corporate parent owned 100% of subsidiary stock, appointed officers and directors and re-
ported subsidiaries' financials in parent's financial statements, allegations of control found
sufficient) (Ex. 40); *In re Indep. Energy Holdings, PLC Sec. Litig.,* 154 F.Supp.2d 741, 770
(S.D.N.Y.2001) (allegations that parent company conducted business through wholly owned

---

[143]      *See* Facts, VI.D. for a more complete statement of facts relevant to RF's control.

subsidiaries with common management sufficient to allege control); *Pollack v. Laidlaw Holdings, Inc.,* 1995 WL 261518, at \*18 (S.D.N.Y. May 3, 1995) ("[As] Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors. . . plaintiffs have provided prima facie evidence of Laidlaw Holdings' status as a controlling person.") (Ex. 41).[144]

Plaintiffs allegations of corporate control and a tightly-woven interrelationship among RF, RB, MK Holding, MAM, and MK strongly suggest that RF controlled the other RMK corporate Defendants in general and particularly for the purposes of the transactions at issue. These allegations are sufficient to state a claim of control. *Charles Schwab Corp.*, 257 F.R.D. at 550 ("plaintiffs are at least entitled to seek to prove that the alleged parent company… was in a position to exercise actual power and control of the registration statements and reports at issue.").

### C.    Plaintiffs Have Adequately Alleged That MAM/MK Were Control Persons pursuant to §§ 15 and 20.

Plaintiffs have adequately alleged that the Funds were controlled by MAM/MK.  The Funds had no employees—even their executives were executives of and employed by MAM/MK—and were completely dependent upon MAM/MK for their entire business.[145] ¶¶

---

[144]    While RF cites to *In re WorldCom, Inc., Sec. Litig.,* 2004 WL 1097786 (S.D.N.Y. May 18, 2004), as contrary authority, as the court in *Global Crossing* concluded:

> [U]pon closer inspection, the facts there are distinguishable. In *WorldCom,* Judge Cote dismissed a Section 15 claim against a parent corporation as a control person for its subsidiary, but only after the plaintiffs "had the benefit of extensive discovery," leaving only the plaintiffs' "implied assertion" that the parent was the control person of its subsidiary by virtue of the parent-subsidiary relationship.

*Global Crossing*, 2005 WL 1875445, at \*4 (quoting *WorldCom* at \*3 & n. 10) (Ex. 39). In *WorldCom*, cited by MAM/MK, the court noted that plaintiffs had not alleged any ownership of voting securities or other basis for asserting that the alleged controlling persons had the power to direct or cause the direction of the management or policies of the defendant subsidiaries. *Alameda County Emples. Ret. Ass'n v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 2004 U.S. Dist. LEXIS 8661, \*10-11 (S.D.N.Y. May 18, 2004) (Ex. 65). Here, Plaintiffs have alleged both. All corporations must have at least voting common stock; when one corporation wholly owns another, it owns all of its common stock. MAM, MK Holding, and MK each had a single class of stock. Exs. 29, 44, 48, 66.

[145]    The same is true for MK Holding. Three of MAM/MK's officers (Morgan, Maxwell, and Weller) were also officers of MK Holding. Ex. 48.

58-60, 96-97, 101, 339, 723-24, 760, 762-63. Pursuant to the Advisory Agreement, MAM managed the Funds' investments, and pursuant to the Fund Accounting Service and Underwriting Agreements MK served as administrator and distributor and valued the Funds' investments. ¶ 763; Ex. 3 ¶¶ 37, 39.

During the Class Period, the Funds' shareholders did not elect the Funds' directors. These directors were initially selected by MAM/MK. ¶¶ 719-20.  Thus, MAM/MK effectively controlled the Funds. *See In re Enron Corp. Sec.,* 2004 WL 3410449, at *3-4 (corporate parent appointment of officers and directors supported control). Furthermore, MAM/MK held controlling share positions in the Funds, through RMK Trust. ¶¶ 55-56. The RMK organization was the principal shareholder of the Funds during the Class Period, and owned most of STF during most of the Class Period. *Id.* Accordingly, Plaintiffs have adequately alleged control as to MK and MAM.  *See, Gosselin v. First Trust Advisors L.P.,* 2009 WL 5064295, at *10 (N.D. Ill. Dec. 17, 2009) (Funds' trustee and investment advisor were control persons based on their positions and ability to control those in management positions and investment advisor's role in monitoring Funds' portfolio) (Ex. 42); *In re Direct General Corp.,* 398 F. Supp. 2d 888, 897 (M.D. Tenn. 2006) (control person liability established by pleading defendants participated generally in operations of controlled entity).

> **D.**   **Plaintiffs Have Adequately Alleged That the Individual Defendants Were Control Persons pursuant to §§ 15 and 20.**

The Individual Defendants were the Funds' executives and directors, and/or had control over the Funds, and were all also officers of other RMK entities. ¶¶ 59-101.  They were all also officers of RF, MK, and MAM.  *Id.* Six of the Individual Defendant signed the Funds' registration statements, while the other Individual Defendants held essential executive positions from which they controlled the Funds. ¶¶ 59-60, 75-85. For example, Edwards as CEO of MK had control over the Funds, as the Funds were run by MK and MAM, including supervision over the Funds' investment management and selection of the Funds' portfolio managers.  ¶¶ 79, 346-50. Edwards preempted MAM's president in supervising

Kelsoe, thereby assuming direct control over the Funds' portfolio management.[146]

District courts in this Circuit have repeatedly reasoned that, at the motion to dismiss stage, a company's executive officers, who manage the company on a day-to-day basis and prepare and sign the company's registration statements, are presumed to have control over the company. This is a matter of common sense. As one court in this Circuit reasoned when noting that a defendant CEO seemed to concede control person status, "as the CEO, he would be hard-pressed to argue otherwise." *In re Hayes Lemmerz Intern., Inc.*, 271 F. Supp. 2d 1007, 1022 (E.D. Mich. 2003). As to the other executives, who did argue against control person status, the *Hayes* court continued, "the protestations of [ ] the Chief Financial Officer, Chief Accounting Officer, and Vice-President of Finance, and [ ] the Corporate Controller and Chief Accounting Officer, ring particularly hollow." *Id.* Likewise, in *In re Cardinal Health Inc. Securities Litigations*, 426 F. Supp. 2d 688, 762 (S.D. Ohio 2006), the court found that where the plaintiffs alleged that the individual defendants had direct and supervisory involvement in the day-to-day operations of the corporation and were provided with or had unlimited access to copies of the company's press releases, public filings, and other statements alleged to be misleading, plaintiffs sufficiently pled a control person claim. *See also*, *In re FirstEnergy Corp. Sec. Litig.*, 316 F.Supp.2d 581, 600-01 (N.D. Ohio 2004) (same).

It is well-accepted that the act of signing the registration statement and signing or preparing other communications to shareholders (including the annual and semi-annual reports and letters to shareholders, as the Individual Defendants here did (¶¶ 59, 60, 75-85), is sufficient to allege control. *In re Direct General Corp.*, 398 F.Supp.2d at 898 (allegations sufficient to allege control person liability where alleged that top officers managed corporate

---

[146]    Defendant Anthony "was explicitly instructed by [Defendant] Edwards and former [MK] President [Defendant] Allen Morgan that Kelsoe, a person clearly subject to Anthony's supervisory responsibility under MAM's organizational structure, was 'to be left alone,' effectively exempting Kelsoe from Anthony's supervision or the supervisory authority of anyone else within MAM's organizational structure." Ex. 3 ¶ 157; *see also Id.* at ¶¶ 158-60.

defendant and controlled and/or possessed the authority to control the contents of the con-
trolled defendant's reports, press releases and presentations to the public); *Charles Schwab
Corp.*, 2009 WL 262456, at *11 (in denying defendants motion to dismiss, court finds it a
"plausible inference, for example, that individuals who were officers of the fund . . . and
who signed the registration statements were in a position to exercise control over Schwab
Investments and/or the fund's portfolio managers . . .") (Ex. 43).

As signatories to the registration statements, these Defendants are presumed to have
control over their contents. As the court in *In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d
392, 420 (S.D.N.Y. 2003) rhetorically asked, in denying defendants' motion to dismiss con-
trol person claims: "just what is a signature on an SEC filed document meant to represent if
it does not represent a degree of responsibility for the material contained in that docu-
ment?"). *See also*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y.
2004) ("[I]t comports with common sense to presume that a person who signs his name to a
report has some measure of control over those who write the report."); *N.J. v. Sprint*, 314
F.Supp.2d 1119, (D. Kan. 2004) ("the majority of district courts that have addressed this is-
sue have held that an allegation that a board member signed an SEC filing that contains a
misleading or fraudulent statement can raise a sufficient inference of control because it
comports 'with common sense to presume that a person who signs his name to a report has
some measure of control over those who write the report.'") (collecting cases).

At the pleading stage, allegations that the defendants are the violator's senior execu-
tives and directors suffice. Plaintiffs' allegations of control by the Individual Defendants are
sufficiently pleaded.

### E.   Plaintiffs Have Adequately Alleged that the "Independent" Directors Were Control Persons pursuant to §§ 15 and 20.

The Director Defendants[147] all reviewed and signed the Funds' registration statement

---

[147]   Plaintiffs are not to be deemed to be acceding to the "independent" label for the Director
Defendants.

and amendments thereto and were responsible for the content thereof. ¶¶ 61-67. In addition, Defendants Johnson, McFadden, Pittman and Stone were held out as "financial experts" who served as the Funds' Audit Committee, which appointed PwC, consulted with PwC, and reviewed its audits and financial reports. ¶¶ 68-69. All of the Director Defendants served on the Independent Directors Committee and determined annually whether to continue the Funds' contractual arrangements with MAM/MK (including the Advisory Agreement, Underwriting Agreement, and 12b-1 plan). ¶¶ 59-70, 615-17.

As noted above, control person liability is sufficiently plead as to outside directors where the directors review and sign the company's registration statements, especially where the directors serve on the company's audit committee. In *In re Hayes Lemmerz*, 271 F.Supp.2d at 1023, the court determined that control person liability was plead as to the board of directors where the company held the audit committee members out to the public as persons with significant responsibilities and control over accounting matters. Here, the Audit Committee members were referred to and held out as "financial experts" (¶ 69) and had control over PwC and the auditing process and final product. ¶¶ 68-69. *See In re Nat'l Century Fin. Enter., Inc*., 504 F.Supp.2d 287, 301 (S.D. Ohio 2007) (outside director who also served on the audit committee is in a position of control).

As the court explained in *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 437 (S.D.N.Y.2001):

> An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation, at least insofar as the "management and policies" referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. 17 C.F.R. § 240.12b-2. For, by placing liability on directors and other controlling persons the statute contemplates not only giving plaintiffs an additional source of redress to recover losses caused by corporate misrepresentations. It also seeks indirectly to foster accountability by imposing a penalty on those who are in a position to monitor the truthfulness of corporate public representations and establish standards to that end, but fail to do so, to the detriment of the corporation's investors.

134

Accordingly, Plaintiffs have adequately alleged that the Independent Directors, who re-
viewed and signed the Funds' registration statement amendments, served on the Funds Au-
dit Committee, and/or exercised control through service on the Funds' Independent Direc-
tors Committee, are control persons.[148]

   The Independent Directors cite *Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981), for the
proposition that allegations of an actual exercise of control are necessary to survive a motion
to dismiss. "This is not an accurate characterization of the court's holding. In *Herm,* the
court granted a motion for *summary judgment* against a Section 20(a) claim because plain-
tiff failed to present evidence of the defendant director's 'influence' or 'actual participation
in the corporation's operation.' *Id.* at 684." *In re National Century Financial Enterprises,
Inc.*, 504 F.Supp.2d 287 (S.D. Ohio 2007) (emphasis in original).[149] Acknowledging that the
vast majority of cases recognize that directors are adequately alleged as control persons on
facts similar to those presented here, the Director Defendants weakly argue—without any
explanation of *how*—that "*Iqbal*" demands a different result. Br. at 12 n. 7.  It does not and
cases decided after *Iqbal* have continued to find allegations similar to those presented here
sufficient to allege control person liability. *See Charles Schwab*, 257 F.R.D. at 550.

   Perhaps realizing the weakness of their arguments, the Independent Directors invites
the Court to go far out on a limb—and to a place that no court has ever gone before.  To wit,

---

[148]    In *Landers*, the Director Defendants generally contend they were independent from
MAM/MK and able to consider a demand to sue MAM/MK and RF/RB.

[149]    In *Herm*, the record on summary judgment was silent as to how the alleged controlling
person exercised control; the issue was a single director whose "position as a director, if any-
thing, was only a misrepresentation which could have misled potential investors." 663 F.2d at
684-85. The Independent Directors' additional citations are of no more assistance to them.
*Nat'l Mining Ass'n v. United States Dep't of Interior*, 177 F.3d 1, 6 (D.C. Cir. 1999), did not
arise under either of §§ 15 or 20 but addressed what constituted ownership or control based on
being an officer or director for regulatory purposes. In *Sanders Confectionery Prod., Inc. v.
Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992), the putative control person was not a share-
holder, a wholly owning parent, or a director but a *lender*. "Nowhere does [plaintiff] claim that
[the alleged control person] 'actually participated in the operations' of SCPI, other than by mak-
ing secured loans. *Extending a loan* to a company and *taking measures to secure that loan* do
not amount to actual control." *Id.* at 486. Furthermore, the Independent Directors' citation of the
ICA for a definition of control is misplaced. As discussed above, the SEC has defined control in
this context.

the Director Defendants propose that this Court wipe out established Supreme Court and Sixth Circuit precedent and abolish a settled cause of action. *Central Bank of Denver, N.A.*, 511 U.S. 164, 166 (1994); *PR Diamonds,*, 364 F.3d at 696. Cases in this circuit consistently hold that § 20(a) imposes liability on persons for violations of § 10(b) and Rule 10b-5. *See Konkol v. Diebold*, Inc., 590 F.3d 390, 396 (6th Cir. 2009) (noting that Section 20(a) imposes liability on persons based on an underlying violation of Section 10(b) and Rule 10b-5); *PR Diamonds*, 364 F.3d at 696 (same); *see also, In re Mutual Funds Invest. Litig.*, 566 F.3d 111, 129-30 (4th Cir. 2009) (reversing order granting motion to dismiss and finding that plaintiffs' complaint adequately alleged control person liability under Section 20(a); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) (reversing and remanding dismissal of Section 20(a) claim). This argument should not be countenanced; there is *no* authority that suggests that a private cause of action does not exist under § 20(a).[150]

## X.  THE ICA PROVIDES RELIEF FOR VIOLATIONS THEREOF; PLAINTIFFS BY CONTRACT HAVE A PRIVATE CAUSE OF ACTION FOR ICA VIOLATIONS.

Defendants contend that there are no private or implied rights of action under various sections of the ICA. MAM/MK Br. at 55-58; PwC Br. at 17-20; RF/RB Br. at 17-18; Funds' Br. at 13-14. However, they cite no case that finds no private right of action under ICA §§ 13(a) or 30(e). The court in *Northstar* did find such a private right of action under § 13(a). *Northstar Financial Advisors,* 609 F. Supp.2d at 942-48. In a carefully reasoned opinion that addressed, *inter alia*, *Olmsted v. Pruco Life Insurance Company*, 283 F.3d 429 (2d Cir. 2002), and *Alexander v. Sandoval*, 532 U.S. 275 (2001), the court determined that a private right of action exists for violations of § 13(a). *Id.* Noting the 2007 amendment of § 13 that added § 13(c), the court concluded Congress implicitly recognized the right of "persons" to bring a private civil action for a violation of § 13. *Id.* at 944.[151]

---

[150]     The Independent Directors also argue that the control person claims should be dismissed because they are alleged to be primary violators of the securities laws. This is incorrect. Plaintiffs do not plead primary liability as to the Independent Directors. In any event, Plaintiffs are permitted to plead in the alternative under Federal Rule 8(e)(2).

[151]     In § 13(c), Congress amended § 13 to restrict the rights of "persons" to bring actions

In *Northstar*, plaintiff alleged that the fund deviated from its investment objective by making sizable investments in securities that were not part of, or more risky than, the benchmark index. *Id.* at 946. The court held that these allegations stated a claim that these investments violated the fund's investment objective and, therefore, § 13(a). *Id.*

It is the policy of the ICA, effectuated through that statute and the '33 Act, that investors who purchase and redeem their shares in mutual funds are entitled to "adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their managements." ICA § 1(b)(1); ¶¶ 671-72, 689. Regarding RB/RMK Trust's and MAM/MK's conflicting interests, the ICA recites that investors in mutual funds are adversely affected "when investment companies are . . . operated [or] managed . . . in the interest of" the fund's advisers or other affiliated persons thereof, "rather than in the interest of all classes of such companies' security holders." ICA § 1(b)(2); ¶ 671. Also, the ICA recites that mutual fund investors are adversely affected when investment companies "in computing their earnings and the asset value of their outstanding securities, employ unsound or misleading methods, or are not subject to adequate independent scrutiny." ICA § 1(b)(5) ; ¶¶ 671. None of the cases cited by Defendants addresses an argument that these policies require finding a private right of action under the guidance supplied by the Supreme Court.

Section 47(b) of the ICA provides a direct remedy where a contract subject to the ICA is affected by, or involves, a violation of the ICA, or any rule, regulation, or order thereunder.[152] Courts have recognized that the remedies provided by § 47 may be pursued by a

---

with respect to investments in Sudan.

[152]    Pertinent parts of Sec. 47 of the ICA, 15 USC § 80a-46(b) , are as follows:

> (1) A contract that is made, or whose *performance involves*, a violation of this subchapter, or any rule, regulation, or order thereunder, is unenforceable by either party.

> (2) To the extent that a contract described in paragraph (1) has been performed, *a court may not deny rescission at the instance of any party* unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

137

party to the contract. *Mathers Fund, Inc. v. Colwell Company,* 564 F. 2d 780, 783 (7th Cir. 1977) ("Section 47(b) of the Act contemplates civil suits for relief  by way of rescission and for damages."). Section 47's  remedies apply to " … a violation of this subchapter, or any rule, regulation, or order thereunder."

As the predicate for seeking rescission and damages in a direct action under § 47, Plaintiffs have alleged violations of ICA § 13, relating to an unauthorized deviation from an investment policy; § 22, requiring accurate calculations of the Funds' NAV for purposes of both selling and redeeming their shares; § 30(e), requiring the Funds to send to their share-holders annual and semi-annual reports that are not misleading; and § 34(b), relating to un-true disclosures. Even assuming that none of these sections supports an implied right of ac-tion, Defendants cite no authority that these ICA provisions cannot serve as a predicate for § 47 relief. In seeking rescission and damages pursuant to § 47, Plaintiffs need only establish violations of these provisions for a court to impose the remedies contemplated thereby.

Defendants argue that Plaintiffs have not alleged any contract that could not be per-formed without a violation of the federal securities laws that would entitle Plaintiffs to relief under ICA § 47(b). MAM/MK Br. at 58. Two of the cases cited by MAM/MK[153] relate to the '34 Act § 29(b), while *Lord Abbett*, *supra* arose under the IAA § 215. These cases do not support Defendants' argument. In both cases, after examining both the contracts at issue (the advisory agreements) and their performance, the courts concluded the allegedly viola-tive scheme was too remote from the contracts. *GFL,* 272 F. 3d at 202 (alleged violations were "too attenuated from the parties' valid, lawful contracts," holding that "the notes were neither made nor performed in violation of any federal securities law as is required for re-scission."); *Lord Abbett*, 407 F. Supp. 2d at 634 (investment advisory agreement was not voidable because of alleged violations regarding brokerage practices as part of alleged scheme).

---

[153]     *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001); *Zerman v. Jacobs*, 510 F. Supp. 132 (S.D.N.Y. 1981).

Here, Plaintiffs are seeking to rescind their purchases or holdings of the Funds' shares during the Class Period or otherwise to receive damages allowed pursuant to § 47(b). Because Plaintiffs seek rescission of their purchases, the applicable contract is the Underwriting Agreement, under which the Funds delegated to MK the distribution of their shares to potential purchasers and the redemption of shares from existing shareholders. Thus, Plaintiffs had a contractual relationship with MK and the Funds consisting of the Underwriting Agreement and the confirmation statements MK issued to reflect the purchases of the Funds' redeemable shares. MK was also responsible for pricing the Funds' shares, preparing Fund financial statements showing their portfolios and NAVs and preparing other SEC filings, including the prospectus and statement of additional information. Correctly and fully disclosing the Funds' risks and their valuations were obligations of the Funds and MK as underwriter and administrator. Accordingly, MK had first-hand knowledge of the Funds' non-compliance with the ICA, including violations of ICA §§ 13, 22, 30, and 34(b).[154]

Once these various sections of the ICA had been violated through MAM/MK's actions through its delegated functions as adviser and administrator, the Underwriting Agreement necessarily could not be performed by MK in the absence of the alleged required disclosures without violating the ICA. As a result, the alleged ICA violations are not "too attenuated from the ... valid, lawful contracts" to create liability, as found by the court in *GFL,* 272 F. 3d at 202. Nor are they "collateral or tangential to the parties respective obligations under the [agreements]," as found by the court in *Lord Abbett,* 407 F. Supp. at 634. The performance of this web of interrelated contracts between and among the Funds, MK and the Funds' shareholders pursuant to which the Funds' shares were sold (and not redeemed), and the Funds were managed, in violation of the ICA was integral to, and thereby "involved" (within the meaning of § 47(b)(1)), the alleged overall violative deceptive scheme.

Finally, in addition to § 47(b), the Funds' articles of incorporation and Advisory

---

[154]    Funds violated § 22 because their ABS/MBS were not priced daily. Exs. 1 ¶¶ 15-27, 3 ¶ 76.

Agreement explicitly incorporated the ICA with respect to determining the Funds' NAV per share, and the Advisory Agreement provided that the Funds would be managed in accordance with their respective investment objectives, policies and restrictions. ¶¶ 38, 691-93, 698. Thus, by contract, the Funds' shareholders were given the ICA's protection and, therefore, a private right of action for violations thereof. Defendants availed themselves of the ICA when they incorporated it into the Funds' articles of incorporation to limit their liability. *Landers* Directors' Br. at 4-5, Dkt. No. 65-1. Plaintiffs should be able to do so also. ICA § 1(b)(2); ¶ 671. Allowing Defendant Directors the benefit of the Funds' articles and ICA while depriving the Funds' shareholders of the same benefits would unjustly enrich the former, for which Plaintiffs can recover. ICA § 47(b).

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss should be denied in their entirety. Should the Court determine the CAC's allegations to be deficient with respect to any claim, Plaintiffs request leave to amend to cure any such deficiencies.

DATED:  April 13, 2010                    Respectfully submitted,

**APPERSON CRUMP PLC**

*/s/ Jerome A. Broadhurst*
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954
Tel : 901-260-5133
Fax : 901-435-5133
jbroadhurst@appersoncrump.com

*Liaison Counsel for Plaintiffs*

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Tel: 612-339-1601

Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
Matthew R.Salzwedel
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
gmfishbein@locklaw.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this 13th day of April, 2010, a true and correct copy of the foregoing served by electronic means via e-mail transmission (including the Court's ECF System) to the following:

Shepherd D. Tate, Esq.
Michael A. Brady, Esq.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

Matthew M. Curley, Esq.
Michael L. Dagley, Esq.
Britt K. Latham
W. Brantley Phillips, Jr.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

David B. Tulchin
Margaret E. Bartlett
David E. Swarts
**Sullivan & Cromwell, LLP**
125 Broad Street
New York, NY 10004

141

Peter J. Anderson, Esq.
S. Lawrence Polk, Esq.
**Sutherland Asbill & Brennan LLP**
999 Peachtree Street, NE
Atlanta, GA 30309-3996

Jeffrey Maletta, Esq.
Nicole A. Baker
**K & L Gates**
1601 K Street NW
Washington, DC 20006

Emily Nicklin, Esq.
Timothy A. Duffy
Kristopher Ritter
**Kirkland & Ellis**
200 East Randolph Dr., Ste. 5400
Chicago, IL 60601-6636

Leo Maurice Bearman, Jr.
Eugene J. Podesta, Jr.
**Baker Donelson Bearman Caldwell
& Berkowitz**
165 Madison Avenue, Suite 2000
Memphis, TN 38103

Peter S. Fruin
**Maynard Cooper & Gale PC**
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203

Kevin C. Logue, Esq.
Asa R. Danes, Esq.
**Paul, Hastings, Janofsky & Walker LLP**
75 East 55th Street
New York, NY 10022

s/Jerome A. Broadhurst
Jerome A. Broadhurst
