IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

IN RE REGIONS MORGAN KEEGAN )     Case No. 2:09-md-2009-SHM
SECURITIES, DERIVATIVE & ERISA )
LITIGATION )
)
This Document Relates to: )
)
*In re Regions Morgan Keegan Open-End* )
*Mutual Fund Litigation*, )
)
      No. 2:07-cv-02784-SHM-dvk )
_____)

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FILED BY MORGAN KEEGAN & COMPANY, INC.,
<u>MORGAN ASSET MANAGEMENT, INC., AND MK HOLDING, INC.</u>**

Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-6200

Shepherd D. Tate
Michael A. Brady
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee 38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management,
Inc., Morgan Keegan & Company, Inc., and
MK Holding, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PLAINTIFFS' CAC FAILS TO SATISFY THE PLEADING REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 9(B). ...................................................... 2

II.  PLAINTIFFS ARE NOT ENTITLED TO PURSUE RECOVERY FOR CLAIMS OF MISMANAGEMENT UNDER THE FEDERAL SECURITIES LAWS. ................... 4

III.  PLAINTIFFS LACK STANDING. ................................................................................ 7

IV.  PLAINTIFFS FAIL TO PLEAD THAT THE FUNDS' REGISTRATION STATEMENTS CONTAINED ANY MATERIAL MISSTATEMENTS OR OMISSIONS. .......................................................................................................... 8

A.  Plaintiffs' fraud-by-hindsight arguments regarding the Funds' risk disclosures are improper. ...................................................................... 8

B.  The Funds' Offering Documents adequately disclosed all applicable risks. ........ 12

1.  The Funds' Offering Documents disclosed that the Funds could invest in asset-backed and mortgage-backed securities, and also discussed the risks associated with such securities. .................................. 13

2.  MK Select disclosed liquidity risk concerning the Funds' holdings. ....... 15

3.  MK Select disclosed that securities in the Funds' portfolios could be fair valued and the risks associated with the fair valuing of securities held in the Funds' portfolios. .................................................... 18

4.  MK Select was not required to "quantify" risk associated with an investment in the Funds. ................................................................. 20

5.  Plaintiffs fail to plead that the Funds violated any investment guideline or restriction related to industry concentration. ........................ 21

6.  MK Select's additional risk disclosures in the wake of the 2007 credit crisis do not support an inference of fraud. .................................. 23

C.  Plaintiffs are charged with notice of the entirety of the registration statements, including the prospectuses, SAIs, and any other documents incorporated by reference. .................................................................. 24

D.  MK Select's choice of benchmark indices was not misleading. ............................ 26

E.  No other alleged misrepresentations or omissions identified by Plaintiffs are actionable. ................................................................................. 27

# TABLE OF CONTENTS

**Page**

V.    PLAINTIFFS FAIL TO ALLEGE THAT MAM AND MORGAN KEEGAN
      WERE "STATUTORY SELLERS" FOR PURPOSES OF PLAINTIFFS' §
      12(A)(2) CLAIM. ......................................................................................... 30

VI.   PLAINTIFFS FAIL TO STATE AN ACTIONABLE CLAIM UNDER § 10(B)
      AND RULE 10B-5. ....................................................................................... 32

      A.    Plaintiffs have failed to allege a material misrepresentation. ............................... 32

      B.    Plaintiffs have failed to plead scienter. ................................................................. 34

VII.  PLAINTIFFS HAVE FAILED TO PLEAD LOSS CAUSATION AS A
      MATTER OF LAW. ....................................................................................... 37

VIII. PLAINTIFFS HAVE FAILED TO ALLEGE THAT MAM AND MORGAN
      KEEGAN WERE "CONTROL PERSONS" UNDER § 15 OF THE 1933 ACT
      AND § 20 OF THE 1934 ACT. ....................................................................... 39

IX.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE ICA. ................... 40

X.    THE COURT SHOULD DENY PLAINTIFFS LEAVE TO AMEND THE CAC .......... 41

CONCLUSION ........................................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)......................................................................................................40

*Am. Motorist Ins. Co. v. Custom Rubber Extrusions, Inc.*,
  2006 WL 2460861 (N.D. Ohio Aug. 23, 2006)...................................................22

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007)....................................................................5

*Argiropolous v. Kopp*,
  2007 U.S. Dist. LEXIS 22351 (D. Md. Mar. 26, 2007)........................................5

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...........................................................................20, 30

*Ashland Inc. v. Morgan Stanley & Co., Inc.*,
  -- F. Supp. 2d --, 2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010) ............................7

*Ashland Inc. v. Oppenheimer & Co., Inc.*,
  2010 WL 672106 (E.D. Ky. Feb. 22, 2010) ......................................17, 18, 33, 36

*Atkinson v. Morgan Asset Mgmt., Inc.*,
  664 F. Supp. 2d 898 (W.D. Tenn. 2009).............................................................6, 7

*Azzolini Corp. v. CorTS Trust II for Provident Fin. Trust I*,
  2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005)....................................................38

*Azzolini v. CorTS Trust II for Provident Fin. Trust I*,
  2005 U.S. Dist. LEXIS 31853 (E.D. Tenn. Sept. 16, 2005)...................................39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................20

*Benoay v. Decker*,
  517 F. Supp. 490 (E.D. Mich. 1981).....................................................................35

*Benzon v. Morgan Stanley Distrib., Inc.*,
  420 F.3d 598 (6th Cir. 2005) ..............................................................................15

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)............................................................................................7

# TABLE OF AUTHORITIES

**Page(s)**

*Citiline Hldgs, Inc. v. iStarFinancial, Inc.*,
-- F. Supp. 2d --, 2010 WL 1172647 (S.D.N.Y. Mar. 26, 2010) ............................................31

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ................................................................................................35

*D.E.&J. Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 Fed. Appx. 994 (6th Cir. 2005) .............38

*Fait v. Regions Fin. Corp.*,
-- F. Supp. 2d --, 2010 WL 1883487 (S.D.N.Y. May 10, 2010)..................................................4

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004) ................................................................................................36

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ................................................................................................34

*Gabelli Global Multimedia Trust, Inc. v. Western Inv. LLC*,
2010 U.S. Dist. LEXIS 32161 (D. Md. April 1, 2010)..........................................................40

*Hamilton v. Allen*,
396 F. Supp. 2d 545 (E.D. Pa. 2005) ....................................................................................41

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
159 F.3d 723 (2d Cir. 1998)...........................................................................................25, 27

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd* 579 F.3d 878 (8th Cir. 2009) ................12

*In re Am. Serv. Group, Inc.*,
2009 WL 1348163 (M.D. Tenn. March 31, 2009).................................................................35

*In re Charles Schwab Corp. Sec. Litig.*,
2010 WL 1261705 (N.D. Cal. March 30, 2010).....................................................................22

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009).........................................................................................30

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................................35

*In re Comshare, Inc. Secs. Litig.*,
183 F.3d 542 (6th Cir. 1999) ................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................2

*In re Donald J. Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993)......................................9, 10

*In re Evergreen Ultrashort Opportunities Fund Sec. Litig.*,
2010 WL 1253114 (D. Mass. March 31, 2010)................................................26, 31

*In re Franklin Mut. Funds Fee Litig.*,
388 F. Supp. 2d 451 (D.N.J. 2005) .................................................................6

*In re The Goodyear Tire & Rubber Co. Deriv. Litig.*,
2007 WL 43557 (N.D. Ohio Jan. 5, 2007)..............................................................3

*In re Imperial Credit Indus, Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003),
*aff'd sub nom Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005) ...........................38

*In re Lord Abbett Mut. Funds Fee Litig.*,
407 F. Supp. 2d 616 (D.N.J. 2005) .................................................................6

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................3

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010).............................................................................10

*In re Orion Sec. Litig.*,
2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)........................................................31

*In re Reciprocal of Am. Sales Pract. Litig.*,
2007 WL 2900282 (W.D. Tenn. Sept. 28, 2007)....................................................41

*In re Sec. Capital Assur., Ltd. Sec. Litig.*,
2010 WL 1372688 (S.D.N.Y. March 31, 2010) ........................................... passim

*In re Sotheby's Holdings, Inc.*,
2000 WL 1234601 (S.D.N.Y. Aug.31, 2000)........................................................33

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
2010 WL 378300 (D.N.M. Jan. 27, 2010) ............................................................32

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) ...............................................................................30

*Jackson v. Marion County*,
    66 F.3d 151 (7th Cir. 1995) ...........................................................................................38

*Jocham v. Tuscola County*,
    239 F. Supp. 2d 714 (E.D. Mich. 2003).........................................................................22

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009) ....................................................................................35, 37

*Kowal v. MCI Comm'ns Corp.*,
    1992 WL 121378 (D.D.C. May 20, 1992), *aff'd* 16 F.3d 1271 (D.C. Cir. 1994)...................10

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) .........................................................................................37

*Lin v. Interactive Brokers Group, Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008)...........................................................................10

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976).............................................................................................3

*Majeski v. Balcor Entm't Co., Ltd.*,
    893 F. Supp. 1397 (E.D. Wis. 1994),
    *aff'd sub nom Eckstein v. Balcor Film Investors*, 58 F.3d 1162 (7th Cir. 1995) ...................25

*Morse v. McWhorter*,
    290 F.3d 795 (6th Cir. 2002).........................................................................................41

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2010 WL 1257528 (S.D.N.Y. March 31, 2010) .................................................................11

*Northstar Fin. Advisors, Inc. v. Schwab Inv.*,
    609 F. Supp. 2d 938 (N.D. Cal. 2009) ................................................................22, 26, 40

*Northstar Fin. Advisors Inc.* v. *Schwab Investments*,
    2009 U.S. Dist. LEXIS 39410 (N.D. Cal. Apr. 27, 2009). ....................................................40

*Olmsted v. Pruco Life Ins. Co.*,
    283 F.3d 429 (2d Cir. 2002)...........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

*Pac. Inv. Mgmt. Co., LLC* v. *Mayer Brown LLP*,
-- F.3d ---, 2010 WL 1659230 (2d Cir. April 27, 2010) .......................................33

*Panter v. Marshall Field & Co.*,
646 F.2d 271 (7th Cir. 1981) ................................................................5

*Phillips v. Morgan Stanley Dean Witter High Income Adv. Trust III*,
2002 WL 31119441 (S.D.N.Y. Sept. 25, 2002)......................................22

*Plumbers & Steamfitters Local 773 Pension Fund v. CIBC*,
-- F. Supp. 2d --, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ...................... passim

*Pollio v. MF Global, Ltd.*,
608 F. Supp. 2d 564 (S.D.N.Y. 2009)....................................................28

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ...............................................34, 36, 37

*Recupito v. Prudential Sec., Inc.*,
112 F. Supp. 2d 449 (D. Md. 2000) .......................................................10

*Rodney v. KPMG Peat Marwick*,
143 F.3d 1140 (8th Cir. 1998) ...............................................................20

*San Diego County Emp. Ret. Ass'n v. Maounis*,
2010 U.S. Dist. LEXIS 25501 (S.D.N.Y. March 15, 2010) .........................6

*Santa Fe Indus, Inc. v. Green*,
430 U.S. 462, 479 (1977)................................................................4, 5

*Sheppard v. TCW/DW Term Trust 2000*,
938 F. Supp. 171 (S.D.N.Y. 1996)........................................................10

*Stephenson v. Citco, Inc.*,
2010 U.S. Dist. LEXIS 32321 (S.D.N.Y. March 31, 2010) .........................6

*Strougo v. Bear Stearns & Co., Inc.*,
1997 WL 458667 (S.D.N.Y. Aug. 11, 1997), *aff'd sub nom Press v. Quick & Reilly,*
*Inc.*, 218 F.3d 121 (2d Cir. 2000) .........................................................25

*Tabankin v. Kemper Short-term Global Income Fund*,
1994 WL 319185 (N.D. Ill. June 23, 1994)..............................................9

## TABLE OF AUTHORITIES

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Inc.*,
    551 U.S. 308, 314 (2007) .........................................................................34

*Tripp v. Indymac Fin. Inc.*,
    2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ........................................38

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
    342 F.3d 634 (6th Cir. 2003) .............................................................34, 35

*Virtual Countries, Inc. v. Repub. of South Africa*,
    148 F. Supp. 2d 256 (S.D.N.Y. 2001) ...................................................38

*Wallerstein v. Primerica Corp.*,
    701 F. Supp. 393 (E.D.N.Y. 1988) ..........................................................9

*Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*,
    2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. April 6, 2010) ......................40

*White v. Heartland High-Yield Mun. Bond Fund*,
    237 F. Supp. 2d 982 (E.D. Wis. 2002) ....................................................20

*White v. Melton*,
    757 F. Supp. 267 (S.D.N.Y. 1991) ..........................................................25

*Yu v. State Street Corp.*,
    -- F. Supp. 2d --, 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) ...................... *passim*

### RULES

Fed. R. Civ. P. 8 ........................................................................ *passim*

Fed. R. Civ. P. 9(b) .................................................................... *passim*

Fed. R. Civ. P. 12(f) ...............................................................................3

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### OTHER AUTHORITIES

*Registration Form Used by Open-End Management Investment Companies,*
    Release Nos. 33-7512, 34-39748, IC-23064,
    1998 SEC LEXIS 438 (March 13, 1998)...................................................................20, 21, 24

*Registration Form Used by Open-End Management Investment Companies,*
    Release Nos. 33-7398, 34-38346, IC-22528
    1997 WL 87357 (Feb. 27, 1997).............................................................................................21

Defendants Morgan Keegan & Co., Inc. ("Morgan Keegan"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. ("MK Holding") respectfully submit this reply memorandum in further support of their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") and in response to Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Opposition" or "Pls.' Opp'n") (Docket No. 238).

A fair summary of Plaintiffs' theory is that the decline in the value of assets held by certain Morgan Keegan-related mutual funds (the "Funds")[1] can only be explained by alleged violations of the federal securities laws.  Plaintiffs' 400-page CAC, and their 140-page Opposition, are premised on this flawed logic, and consist almost entirely of conclusory allegations and misstatements.  Length (and endless repetition of conclusory catchwords), however, should not be confused with substance or specificity.  Plaintiffs have failed to plead with the required particularity facts demonstrating that MK Select's Offering Documents omitted or misrepresented material information, or that any Defendant otherwise engaged in wrongdoing.  At most, Plaintiffs allege acts of corporate mismanagement that will not support a claim under the federal securities laws.

Plaintiffs ignore numerous recent district court decisions recognizing the unprecedented nature of the credit crisis that began in 2007 and nearly brought the global financial system to its knees.  Plaintiffs in their Opposition contend that Defendants should have predicted the credit crisis and "disclosed" this "shocking" and "extraordinary" risk in the Funds' prospectuses as

---

[1]     Each of the Funds is a series of Morgan Keegan Select Fund, Inc. ("MK Select"), an open-end investment management company organized under the laws of the state of Maryland and pursuant to the Investment Company Act of 1940.  The name of the Funds and the investment company at issue in this action changed on July 29, 2008, upon shareholder approval of Hyperion Brookfield Management, Inc., as the new investment adviser to the Funds.

early as 2004.  MK Select, however, disclosed the risks associated with investing in the Funds in the prospectuses, statements of additional information ("SAIs"), and various other documents that were incorporated by reference into the Funds' registration statements.  Plaintiffs do not seriously contest that these disclosures were made, but instead ask this Court to provide Plaintiffs with a guarantee against investment losses caused by unanticipated financial events and alleged mismanagement of the Funds.  The federal securities laws simply do not establish this regime of investor insurance.

By failing to plead any actionable misrepresentation or omission, Plaintiffs have failed to state a claim for relief under §§ 11, 12, or 15 of the Securities Act of 1933 (the "1933 Act"), §§ 10(b) and 20 of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder, or the Investment Company Act of 1940 (the "ICA").   These claims also fail as a matter of law because: (a) claims of mismanagement are not actionable under the federal securities laws, (b) Plaintiffs do not have standing to bring "holder" claims, (c) Plaintiffs have failed to plead scienter, (d) Plaintiffs have failed to plead loss causation and (e) no private right of action exists under the ICA sections at issue.

I.     **Plaintiffs' CAC fails to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b).**

Plaintiffs assert that "[c]laims brought pursuant to §§ 11 and 12 of the '33 Act are not subject to PSLRA's heightened pleading standards, but are instead subject to Rule 8 standards." (Pls.' Opp'n at 50 n.58.)  This assertion is entirely incorrect.  Where a plaintiff pursues a claim under the securities laws alleging "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim," the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th

Cir. 2003)); *see also In re The Goodyear Tire & Rubber Co. Deriv. Litig.*, 2007 WL 43557, at *10 (N.D. Ohio Jan. 5, 2007).  (*See also* Mem. of Law in Support of Mot. to Dismiss filed by Morgan Asset Mgmt., Inc., Morgan Keegan & Co., Inc., and MK Holding, Inc. ("Memorandum" or "MK/MAM Mem.") at 14-15.)  Plaintiffs' CAC specifically alleges that "[e]ach of the RMK defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Funds [sic] shares by disseminating materially false and misleading statements and/or concealing material adverse facts."  (CAC ¶ 103.)  Given these allegations, Plaintiffs must plead their claims with the particularity required by Rule 9(b).[2]

Plaintiffs also inappropriately refer to allegations made in recent regulatory proceedings filed earlier this year against certain Defendants in this action.  Indeed, a number of statements made by Plaintiffs in their Opposition are supported solely by reference to these new filings and are found nowhere in the CAC.  References to such new allegations are clearly improper and must be disregarded.  *See Yu v. State Street Corp.*, -- F. Supp. 2d --, 2010 WL 668645, at *10 n.6 (S.D.N.Y. Feb. 25, 2010) (holding that "the sufficiency of plaintiffs' allegations must be judged by the contents of the complaint, not by the contents of an agency order"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) ("[R]eferences to preliminary steps in litigation and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of Civil Procedure."); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976) (stating that regulatory

---

[2]     Plaintiffs' Section 10(b) claim is also subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (*See* MK/MAM Mem. at 14-15.)

consent decrees are not "true adjudications of the underlying issues" and affirming district court's order striking references to the consent decree from a complaint).

## II.     Plaintiffs are not entitled to pursue recovery for claims of mismanagement under the federal securities laws.

Plaintiffs do not and cannot dispute that their claims and alleged losses are based on allegations of mismanagement.  (*See* MK/MAM Mem. at 15-19.)  Indeed, a header in Plaintiffs' Opposition unequivocally asserts: "**THE CAC IS ALL ABOUT NOT DISCLOSING THE FUNDS' MISMANAGEMENT**."   (Pls.' Opp'n at 52.)  As discussed below, whether couched as "mismanagement" or a "failure to disclose mismanagement," Plaintiffs may not premise a claim under the federal securities laws on such allegations.

Plaintiffs contend that "Defendants cite no authority for the proposition that the presence of mismanagement renders federal securities claims inapplicable." (Pls.' Opp'n at 53.)  This is a mischaracterization of Defendants' argument.  The point, of course, is that mismanagement in of and of itself is not fraud.  And, where, as here, securities fraud claims and allegations of loss are premised on alleged mismanagement, dismissal is required.  (MK/MAM Mem. at 15-19.)

Indeed, in *Santa Fe Indus, Inc. v. Green*, the Supreme Court made clear that the federal securities laws were not intended "to regulate transactions which constitute no more than internal corporate mismanagement."   430 U.S. 462, 479 (1977) (quotations omitted).  In the 30-plus years since the Supreme Court's decision in *Santa Fe*, courts have consistently applied this principle to reject shareholder claims premised on mismanagement.  *See*, *e.g.*, *Fait v. Regions Fin. Corp.*, -- F. Supp. 2d --, 2010 WL 1883487, at *4 (S.D.N.Y. May 10, 2010) (dismissing claims under Sections 11, 12(a)(2) and 15 because the determination of goodwill and loan reserves, which involved a determination of the fair value of certain assets, including a loan portfolio, was a "matter of judgment and opinion"); *In re Sec. Capital Assur., Ltd. Sec. Litig.*,

2010 WL 1372688, at *28 (S.D.N.Y. March 31, 2010) (rejecting claims premised on a failure to maintain adequate loss reserves and to monitor collateral underlying CDOs and understated mark-to-market losses as "criticisms of . . . business judgment and management . . . , not fraudulent misrepresentations" ).

Nor may Plaintiffs avoid this rule by casting their claim as a failure to *disclose* mismanagement.   "[A] plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach."  *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-683 (D. Colo. 2007) (ruling that a fraudulent omission claim premised on a failure to disclose internal mismanagement was "not actionable").  "[I]f the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law.  To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship."  *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287-89 (7th Cir. 1981) (quoting *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349 (N.D. Tex. 1979)).

Plaintiffs' claims of mismanagement – that Defendants failed to properly value assets held by the Funds, violated concentration and liquidity limitations, and otherwise failed to manage the Funds in a manner consistent with the Funds' respective objectives, policies and investment restrictions (*see*, *e.g.*, CAC ¶ 120.) – allege injury only to the Funds.   As the cases cited by Defendants in their Memorandum demonstrate, such claims belong to the Funds themselves and a shareholder does not have standing to assert those claims directly on his or her own behalf.  (*See* MK/MAM Mem. at 18-19 & n.15.)  *See also Argiropoulos v. Kopp*, 2007 U.S. Dist. LEXIS 22351, at *18 (D. Md. March 26, 2007) (Maryland law provides that allegations of

mismanagement are derivative "notwithstanding allegations of fraudulent representations.");[3] *Stephenson v. Citco, Inc.*, 2010 U.S. Dist. LEXIS 32321, at *28 (S.D.N.Y. March 31, 2010) ("A claim for deficient mismanagement or administration of a fund is 'a paradigmatic derivative claim.'") (quoting *Albert v. Brown Mgmt. Servs., Inc.*, 2005 Del. Ch. LEXIS 133, at *13 (Del. Ch. Aug. 26, 2005)); *San Diego County Emp. Ret. Ass'n v. Maounis*, 2010 U.S. Dist. LEXIS 25501, at *55, 59 (S.D.N.Y. March 15, 2010) (rejecting claims of defendants failing "to properly manage the Fund, failing to exercise proper risk management and control over [the portfolio manager], concentrating the Fund's exposure in the natural gas sector and by deliberately misleading [plaintiff] as to the Fund's investment strategies and risk controls" as a "classic claim of fund mismanagement that belongs to the Fund, and is therefore derivative").

Tellingly, Plaintiffs and their lawyers offer no explanation whatsoever regarding their simultaneous pursuit of derivative claims premised on the very same allegations of mismanagement in the related action before this Court, *Landers v. Morgan Asset Mgmt., Inc.*, No. 2:08-cv-02260-SHM-dvk (W.D. Tenn.). As their allegations in *Landers* make clear, the claims asserted in this action belong to the Funds, not their shareholders. Each claim in the CAC is premised on allegations of mismanagement. For this reason, dismissal of the CAC is required as a matter of law.[4]

---

[3] Whether a claim is direct or derivative is a question of state law and governed by the law of the investment company's state of incorporation, here Maryland. *See In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 625 (D.N.J. 2005). Under Maryland law, a shareholder may only pursue a direct claim where "a shareholder . . . allege[s] an injury distinct from an injury to the corporation. . . ." *Id.* at 626 (quoting *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002)). Where, as here, a plaintiff alleges that mismanagement resulted in a reduction in an investment fund's net asset per share value, the plaintiff has not sustained an injury distinct from that suffered by the fund. *See In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 464 (D.N.J. 2005). (*See, e.g.*, CAC ¶ 122 (alleging that the Funds' net asset value declined as a result of the alleged mismanagement).)

[4] Contrary to Plaintiffs' assertion, Defendants' argument is in no way inconsistent with the Court's decision in *Atkinson v. Morgan Asset Mgmt., Inc.*, 664 F. Supp. 2d 898, 904-907 (W.D. Tenn. 2009).

III.    **Plaintiffs lack standing.**

Plaintiffs' § 11 and § 10(b) claims purportedly brought on behalf of a class of "holders" of shares of the Funds (*see*, *e.g.*, CAC ¶¶ 2(a)(2), 106, 107) fail as a matter of law because only purchasers or sellers of securities during the relevant period have standing to assert such claims, not mere holders of securities.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55 (1975).

Plaintiffs cannot avoid dismissal by suggesting that the Funds have made offers to redeem shares.  Plaintiffs merely hold redeemable securities; they are not purchasers of put options and do not have any other contractual rights or duties to purchase or sell securities.  (*See* Pls.' Opp'n at 103-04.)  This Court has already rejected the argument that the mere holding of a redeemable security constitutes the purchase or sale of securities.  *See Atkinson*, 664 F. Supp. 2d at 904 (rejecting Plaintiffs' holder claims in the related *Atkinson* action because "Plaintiffs do not complain that, during the stated class period, they purchased or sold shares of the Funds because of misleading information Defendants provided.  Plaintiffs' complaint is that they *would have* sold their shares if the Defendants had not made material omissions in their disclosures." (emphasis in original)).  Like the plaintiffs in *Blue Chip Stamps*, Plaintiffs allegedly "decided not to sell their shares because of . . . a failure to disclose unfavorable material."  *Blue Chip Stamps*, 421 U.S. at 737-38; *see also Ashland Inc. v. Morgan Stanley & Co., Inc.*, -- F. Supp. 2d --, 2010 WL 1253932, at *10 (S.D.N.Y. March 30, 2010) ("All allegations relating to misrepresentations that induced [plaintiff] to 'continue to place 'hold' and 'hold-at-rate' orders, rather than 'sell'

---

(*See* Pls.' Opp'n at 52-53.)  As this Court is aware, SLUSA precluded the state law claims asserted in *Atkinson*, as those claims concerned allegations of misrepresentations or omissions made in connection with the sale of securities.   In this action, Plaintiffs have chosen to premise their securities claims on allegations of mismanagement, which is impermissible.  These inquiries are distinct.

orders,' cannot constitute fraud since they do not concern a purchase or sale and, under long-standing Supreme Court precedent, such statements are thus not actionable under federal securities laws.") (citations omitted).  A decision to hold is not a "purchase" or "sale" under the federal securities laws and, therefore, is not actionable.

IV.     **Plaintiffs fail to plead that the Funds' Registration Statements contained any material misstatements or omissions.**

The Funds' Offering Documents,[5] read as a whole, provided full disclosure of all risks associated with an investment in the Funds.  (MK/MAM Mem. at 20-46.)  This is fatal to Plaintiffs' claims.  Rather than address head-on the detailed disclosures that identified the very same risks that Plaintiffs allege caused their losses, Plaintiffs: (i) assert that the Funds' risk disclosures must have been inadequate because the Funds eventually suffered losses greater than did some other funds with similar disclosures; (ii) misconstrue both applicable law and the Funds' investment guidelines and restrictions; and (iii) argue that certain risks addressed at length in the Funds' SAIs were instead required to be set forth in the Funds' prospectuses.  (Pls.' Opp'n at 4-32.)  These arguments are facially inconsistent and have no basis in law.[6]

A.      **Plaintiffs' fraud-by-hindsight arguments regarding the Funds' risk disclosures are improper.**

Plaintiffs extensively rely on the Funds' alleged underperformance relative to certain other RMK funds and other unspecified "peer funds," arguing that if particular investment funds

---

[5]     Plaintiffs take issue with Defendants' use of the term "Offering Documents."  For purposes of clarity, "Offering Documents" is used interchangeably with "Registration Statement," referring to the prospectus, statement of additional information, and all documents incorporated therein by reference as permitted under SEC rules.  *See* Form N-1A, Gen. Instruction D(1)(b) (Curley Decl. Exh. X).

[6]     For example, Plaintiffs argue that the Offering Documents were misleading because the Funds failed to disclose breaches of certain investment guidelines and restrictions contained in the Funds' SAIs, yet at the same time allege that detailed risk disclosures contained in the SAIs are entitled to no consideration.  (Pls.' Opp'n at 13-14, 116.)

identified similar risk factors, such funds should have suffered commensurate losses.  Plaintiffs, in a tortured effort to equate disclosure with performance, then posit that because the Funds at issue in this action "lost a lot more" than other funds, their disclosures must have been inadequate.  (Pls.' Opp'n at 26; *see also id.* at 11 (discussing the "extraordinary risk that the Funds held the potential for losses of a vastly greater magnitude than their respective peers"); *id.* at 25-26 ("That [the Funds'] disclosures contained not a hint of the risk of catastrophic losses is demonstrated by the fact that while HIF lost 73% and IBF lost 78%, STF lost much less, 31%.").)  This sort of fraud-by-hindsight analysis fails to state a claim under the federal securities laws.  (*See* MK/MAM Mem. at 28-30.)

The fact that other investment funds may have been subject to the same or similar risk factors but suffered less severe losses is irrelevant to whether the Funds' disclosures were inadequate.  For example, each of the Funds' Offering Documents included similar risk disclosures because, as the registration statements make clear, they invested in the same types of securities, albeit to differing degrees and with different maturities.  The law does not require investment companies to "quantify" the risk inherent in each Fund, or make speculative financial predictions of ultimate success or failure.  *See*, *e.g.*, *Wallerstein v. Primerica Corp.*, 701 F. Supp. 393, 398 (E.D.N.Y. 1988) ("'Full factual disclosure need not be embellished with speculative financial predictions.'") (quoting *Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir. 1979)); *Tabankin v. Kemper Short-term Global Income Fund*, 1994 WL 319185, *2 (N.D. Ill. June 23, 1994) (holding that "investors [cannot] state a claim for omission of material information where the offeror fails to quantify the risks identified").[7]

---

[7]      Offerors have no "duty to draw inferences for investors."  *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993).  "Business judgment,

Plaintiffs also claim that the Funds' exposure to mortgage-backed and asset-backed securities, both investment grade and below-investment grade, mandated disclosure of the "extraordinary" risks inherent in these securities.[8]  But Plaintiffs fail to plead the existence of any known "extraordinary" or "catastrophic" risk at the time of the effective date of the Funds' Offering Documents (*i.e.*, November 2004, 2005 or 2006) that was not disclosed.  (*See* MK/MAM Mem. at 27.)[9]  The fact that the value of the Funds' assets ultimately declined does not mean that MK Select's disclosures were insufficient.

Courts recently have rejected claims based on this very same argument, in light of recent global economic events:

> [F]rom our vantage point on the other side of the financial crisis, it is conventional wisdom that highly rated, investment grade securities were exposed to risks that the ratings agencies did not perceive.  And not surprisingly, the Fund sustained most of its calamitous losses on securities with the highest investment ratings.  In hindsight, then, it could be alleged that investments that were viewed by defendants—and the marketplace—to be "high quality . . . investment-grade

including inferences drawn from fully-disclosed information, rightly remains the province of individual investors."  *Id.*

[8]      MK Select was not required to use Plaintiffs' preferred wording to describe the risks inherent in the Funds.  "It has repeatedly been held that the securities laws do not impose an obligation upon the seller of a security to engage in characterization, such as the use of subjective modifiers . . . ."  *Kowal v. MCI Comm'ns Corp.*, 1992 WL 121378, *4-5 (D.D.C. May 20, 1992), *aff'd* 16 F.3d 1271 (D.C. Cir. 1994) ("The law simply does not impose a duty to disclose 'pejorative characterizations' of a company's operations or business prospects."); *see also Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 457 (D. Md. 2000) ("A prospectus need not characterize a security or a risk in pejorative manner." (quotations omitted)); *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (holding that defendants had no duty to characterize a fund's investment in mortgage-backed securities as "exotic mortgage derivatives").

[9]      While §§ 11 and 12(a)(2) generally do not require plaintiffs to allege that defendants intentionally or knowingly omitted an applicable risk, whether such risks were known or knowable certainly is "relevant . . . to assessing the nature of the risks that plaintiffs have identified in their claims."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010); *see also Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) ("Plaintiffs pleading §§ 11 and 12 claims must state facts showing the 'allegedly omitted facts both existed and were known or knowable, at the time of the offering.'") (quoting *Castlerock Mgmt. Ltd v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 322-323 (D.N.J. 2000)).

> instruments" in fact stood on shaky foundations. *But the accuracy of offering documents must be assessed in light of information available at the time they were published.* A backward-looking assessment of the infirmities of mortgage-related securities, therefore, cannot help plaintiffs' case.

*State Street Corp.*, 2010 WL 668645, at *6 (citations omitted) (emphasis supplied); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. March 31, 2010) ("Plaintiffs' allegations are otherwise pleading by hindsight. There is no allegation that these offerings did not receive the stated credit rating or credit enhancements detailed in the Offering Documents, and Plaintiffs only allege that the ratings agencies revised their models at a later date, and that the credit enhancements were shown to be inadequate after the offering."); *In re Sec. Capital Assur.*, 2010 WL 1372688 at *24 ("Plaintiffs may not proceed with allegations of 'fraud by hindsight,' and allegations that defendants 'should have anticipated future events and made certain disclosures earlier than they actually did' . . . .") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

Only with the benefit of hindsight do Plaintiffs allege that certain risks were "actually foreseen by Defendants" because the "extraordinary liquidity, valuation, concentration, and credit risks embedded in the Funds' portfolios were certainly knowable." (Pls.' Opp'n at 41-42.) Claims based on such bald allegations should be dismissed. In analyzing claims relating to the subprime mortgage credit crisis, a district court recently explained that plaintiff's allegations stemmed from "an unprecedented paralysis of the credit market and a global recession." *CBIC*, 2010 WL 961596, at *11. Defendants, "like so many other institutions, could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight." *Id.* at *11. "[C]ompanies (and their management) are not expected to be clairvoyant, and bad decisions do not constitute securities fraud. They may constitute negligence; they may constitute breach of fiduciary duty; they may constitute a claim for mismanagement—but they do not constitute

11

fraud." *In re 2007 Novastar Fin., Inc., Sec. Litig.*, 2008 WL 2354367, at *4 (W.D. Mo. June 4, 2008), *aff'd* 579 F.3d 878 (8th Cir. 2009) (citations omitted).

The supposed facts cited by Plaintiffs in support of their allegations of an undisclosed "extraordinary" risk with respect to an investment in the Funds amount to nothing more than conclusory allegations of mismanagement and hindsight characterizations of the Funds' holdings.  (*See*, *e.g.*, Pls.' Opp'n at 12-13 (referencing "holdings of risky securities," percentage of "illiquid securities" calculated according to pure hindsight and conjecture, and speculative characterizations of the Funds' entire holdings based on a small fraction of unidentified securities held by the Funds).)[10]  The Funds' Offering Documents, however, make clear that MK Select disclosed in detail the relevant risks associated with an investment in the Funds and with the Funds' holdings.  Moreover, as discussed below, MK Select disclosed the extent of each Fund's respective exposure to mortgage-backed and asset-backed securities, and such information was readily available to investors at all relevant times.

**B.**     **The Funds' Offering Documents adequately disclosed all applicable risks.**

Contrary to Plaintiffs' contention, the adequacy of MK Select's disclosures regarding the Funds does not turn on whether other investment companies used different language to describe

---

[10]     Plaintiffs make the conclusory assertions that mortgage-backed and asset-backed securities were "uniquely vulnerable to the credit crisis" (Pls.' Opp'n at 7); "that such thinly traded securities periodically collapsed" (*id.* at 9); and that they "had a history, or strongly resembled securities that had a history, of suddenly becoming unsalable at their estimated values" (CAC ¶ 120).  In other words, Plaintiffs assert that Defendants should have predicted the 2007-08 market crisis because the market for such securities had a history of collapses.  To the extent such market history existed, knowledge of it is imputed to Plaintiffs.  *See State Street Corp.*, 2010 WL 668645 at *6 (holding that "the law imputes knowledge of such market trends to a reasonable investor," and dismissing a similar claim where the registration statement "clearly communicated that mortgage-related securities were significant to the Fund's portfolio and allowed investors to evaluate that investment strategy against existing economic trends"); *see also In re Sec. Capital Assur.*, 2010 WL 1372688, at *26 ("Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.  As Plaintiffs themselves have alleged, the housing crisis was popular news by the end of 2006 and early 2007.").

similar risk factors, or whether other investment companies disclosed additional information regarding such risks. (*See* Pls.' Opp'n at 15-16.) Rather, the relevant inquiry must focus on MK Select's actual disclosures regarding the Funds, and "'whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *State Street Corp.*, 2010 WL 668645, at *4 (quoting *Halperin v. eBankerUSA.com*, 295 F.3d 352, 357 (2d Cir. 2002)). (*See also* MK/MAM Mem. at 30-36.) Plaintiffs' Opposition studiously ignores the extensive disclosures contained in the Funds' SAIs and relies almost exclusively on the argument that MK Select's SAI disclosures should have been included in the prospectuses instead. As shown in Part IV.C., *infra*, pp. 24-26, MK Select's SAIs were incorporated by reference into the Funds' prospectuses.

        1.    **The Funds' Offering Documents disclosed that the Funds could invest in asset-backed and mortgage-backed securities, and also discussed the risks associated with such securities.**

Throughout the class period, MK Select's Offering Documents clearly communicated that each Fund could – and did – invest in asset-backed and mortgage-backed securities. For example, the November 2004 Prospectus stated that the Intermediate Bond Fund would invest "at least 80% of its assets in debt securities," and "may invest in . . . mortgage-backed and asset-backed securities." Nov. 2004 Prosp. at 1-2 (Curley Decl. Ex. A); *see also* Nov. 2006 Prosp. at 2-4, 10-12, 18-22 (Curley Decl. Ex. I); Nov. 2005 Prosp. at 2-4, 9-11, 16-18 (Curley Decl. Ex. F); Nov. 2004 Prosp. at 1-2, 6-8 (Curley Decl. Ex. A). The credit risk inherent in such investments was disclosed at all relevant times. *See*, *e.g.*, Nov. 2004 Prosp. at 2 (Curley Decl. Ex. A) ("Credit risk is the risk that the issuer of the bond will not pay or is perceived as less likely to pay the interest and principal payments when due. Bond prices typically decline if the issuer's credit quality deteriorates."). Moreover, with regard to *investment-grade* securities, the

Funds' prospectuses explicitly stated that "[t]he credit quality of these bonds can decline which would normally cause the prices of these bonds to decline."  *Id.*[11]

Furthermore, the Funds' annual reports, which were incorporated by reference into the registration statement, disclosed the exact percentage of the Funds' portfolios that were invested in mortgage-backed and asset-backed securities.  *See State Street Corp.*, 2010 WL 668645, at *2 (dismissing identical claims under the 1933 Act where, as here, "[t]he annual reports contained schedules listing all of the Fund's investments under three major category headings: asset-backed securities, mortgage-backed securities, and international debt.  The reports also included a table showing each category as a percentage of the Fund's total assets." (citations omitted)).

The Funds also attributed their "outperformance" of their benchmarks to an "*overweight allocation to credit sensitive* sectors including corporate bonds, *asset-backed securities and mortgage-backed securities*," and that "[a] significant performance boost came from our allocation to *asset-backed bonds* secured by home equity loans."  June 30, 2005 Ann. Rep. at 13-14 (Curley Decl. Ex. P) (emphasis supplied); *see also id.* at 4 (noting the STF's "corresponding *underweight* allocation" to U.S. government securities) (emphasis supplied), 27; Dec. 31, 2004 Semi-Ann. Rep. at 6, 18 (Curley Decl. Ex. O); Dec. 31, 2005 Semi-Ann. Rep. at 4, 14, 28-29 (Curley Decl. Ex. Q); June 30, 2006 Ann. Rep. at 4, 14-15, 28-29 (Curley Decl. Ex. S); Dec. 31, 2006 Semi-Ann. Rep. at 4, 14-15, 28-29 (Curley Decl. Ex. U).

Thus, Plaintiffs' assertion that the "prospectuses, annual and semi-annual reports, and sales materials[] contained *none* of the risk disclosures that MAM/MK now acknowledges were

---

[11]     At risk of sounding the obvious, this is precisely what occurred beginning in 2007, when ratings agencies systematically downgraded large numbers of mortgage-backed and asset-backed securities, including those formerly rated "investment grade."  With these downgrades, the market for – and hence, the value of – these bonds declined.

so important" is simply incorrect.  (*See* Pls.' Opp'n at 5.)  Likewise, Plaintiffs' statement that the Funds failed "to identify the disclosures that portrayed the risks of IBF and STF in light of their disproportionately (as compared with their peers and their referenced but unrepresentative benchmarks) heavy investments in ABS/MBS" is inaccurate.  (*Id.*)  In sum, MK Select disclosed the extent of the Funds' investment in asset-backed and mortgage-backed securities, the risks involved, and the fact that these "credit sensitive" securities were driving the Funds' performance.  Thus, no reasonable investor could find such disclosures lacking or  misleading.[12]

### 2.  MK Select disclosed liquidity risk concerning the Funds' holdings.

Throughout the class period, the Funds' SAIs contained a section titled, in bold, "**Illiquid and Restricted Securities**," which disclosed liquidity risk associated with assets held by the Funds.  Nov. 2006 SAI at 29-30 (Curley Decl. Ex. J); Nov. 2005 SAI at 27-28 (Curley Decl. Ex. G); Nov. 2004 SAI at 22-23 (Curley Decl. Ex. B).  The Funds further discussed liquidity risk in conjunction with their investments in subordinated securities, Nov. 2006 SAI at 10-11 (Curley Decl. Ex. J); Nov. 2005 SAI at 12 (Curley Decl. Ex. G); Nov. 2004 SAI at 9 (Curley Decl. Ex. B)), and below investment-grade securities, Nov. 2006 SAI at 13-14 (Curley Decl. Ex. J); Nov. 2005 SAI at 14-15 (Curley Decl. Ex. G); Nov. 2004 SAI at 11-12 (Curley Decl. Ex. B)).[13]

---

[12]      Plaintiffs disingenuously assert that "Defendants now admit that the Funds carried 'above-market risks,' but this was not disclosed."  (Pls.' Opp'n at 10.)  This statement does not constitute a factual allegation and is demonstrably false.  In support of this allegation, the CAC offers nothing more than Plaintiffs' summary of a newspaper article that itself purports to summarize comments made by unnamed "Morgan Keegan officials, speaking on background."  This hardly amounts to a factual allegation or an admission by any Defendant, as alleged by Plaintiffs.

[13]      Plaintiffs cannot contest that liquidity risk was disclosed.  Instead, Plaintiffs resort to arguing (absurdly) that the Funds' liquidity disclosures were misleading because they stated that certain securities "may" become illiquid, as opposed to stating that said securities "were" illiquid.  (Pls.' Opp. at 14.)  The Sixth Circuit has soundly rejected identical arguments as "semantic quibbl[ing]."  *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005).

Plaintiffs hope to avoid the import of these disclosures by arguing that MK Select's disclosures somehow were "negated by the Funds' disclosures minimizing the impact of illiquid securities on the Funds' portfolios," and an alleged (though unspecified) "outright denial that the Funds had any illiquid securities." (*See* Pls.' Opp'n at 17.) In advancing this argument, however, Plaintiffs' CAC and their Opposition repeatedly mischaracterize and misquote the Funds' applicable liquidity restrictions. As Defendants have stated, the *actual* restriction prohibits the Funds from "*purchas[ing]* any security, if, as a result, more than 15% of its net assets would be invested in securities that are illiquid. . . ." *See*, *e.g.*, Nov. 2006 SAI at 4 (Curley Dec. Ex. J) (emphasis supplied). Importantly, Plaintiffs ignore the Funds' specific disclosure that "any subsequent change in values, net assets or other circumstances will not be considered when determining whether the investment complies with a fund's investment policies and limitations." *See*, *e.g.*, *id.* Plaintiffs have not alleged facts to show that the Funds failed to comply with applicable investment guidelines or restrictions.

Plaintiffs' claims also fail because: (i) Plaintiffs have misrepresented what the applicable liquidity restriction contemplates, and (ii) Plaintiffs have failed to plead, with the particularity required by Rule 9(b) (or even Rule 8(a)(2)), that the Funds violated the actual investment restriction or that MK Select fraudulently failed to disclose any alleged noncompliance. (*See* MK/MAM Mem. at 32-36.) Contrary to Plaintiffs' baseless and conclusory assertions, Defendants *never* have conceded that "restricted" securities are automatically illiquid, or that there was no market for these securities in the years leading up to the onset of the credit crisis. (Pls.' Opp. at 18-20.) Rather, "[s]ince the promulgation of SEC Rule 144A in 1990, qualifying 'restricted' securities have been freely tradable among institutional investors," and "[t]he SEC

16

expressly contemplated that Rule 144A securities could be determined to be liquid by investment companies for purposes of calculating liquidity percentages." (MK/MAM Mem. at 32-33.)

Plaintiffs' purported calculations of the percentages of "illiquid" securities held by the respective Funds likewise are based on two flawed premises and, therefore, are entitled to no weight. First, Plaintiffs assert that all restricted and fair-valued securities must be deemed illiquid for purposes of determining compliance with the Funds' investment guidelines. Plaintiffs' assertion that "restricted" Rule 144A securities are always illiquid is simply incorrect. The allegations referenced by Plaintiffs in their Opposition are non-specific lists of factors to be considered in determining liquidity, followed by speculative assertions that unspecified securities in the Funds' portfolios must have satisfied these factors. (*See* Pls.' Opp'n at 59; CAC ¶¶ 173-211.) This is entirely insufficient to state a claim with the particularity required by Rule 9(b), and is insufficient to render their claim plausible under Rule 8(a). *See*, *e.g.*, *Ashland Inc. v. Oppenheimer & Co., Inc.*, -- F. Supp. 2d --, 2010 WL 672106, at \*7 (E.D. Ky. Feb. 22, 2010) ("With respect to the safety and liquidity of SLARS, [plaintiff] has not pleaded facts suggesting that these statements were false or misleading when made. [Plaintiff] does not identify the point at which its holdings became illiquid. Based on the facts alleged, it appears that [Plaintiffs'] SLARS holdings became illiquid when the market for these securities collapsed on February 12, 2008. In other words, [Plaintiff] does not allege that, had it attempted to liquidate its holdings earlier, it would not have been able to do [so]. That these securities became illiquid does not automatically render [defendant's] statements actionable.").[14]

---

[14] Plaintiffs concede that the liquidity of each security held by the Funds is a subjective determination made by the Board. (*See* Pls.' Opp. at 21 n.21.) Therefore, any determination of liquidity for purposes of compliance with the investment guidelines is a statement of judgment. In order to be actionable, Plaintiffs also must plead facts demonstrating that any statements regarding compliance with

Second, Plaintiffs fail to plead a *single instance* in which any of the Funds purchased a security in contravention of the actual liquidity restriction. (*See* MK/MAM Mem. at 33-36.) Under applicable pleading standards, Plaintiffs must plead at least *some* concrete facts indicating that at least 15% of the securities held in the Funds' respective portfolios were actually illiquid at the time another allegedly illiquid security was purchased by the Funds in order to implicate the liquidity guideline. Otherwise, they have not alleged that Defendants breached the actual investment guideline. Plaintiffs concede as much and hope to rescue their otherwise deficient allegations with an appeal to the Court for discovery. (*See* Pls.' Opp'n at 21-22 n.22.) Discovery, however, is available only to those who can set forth a viable claim in the first instance.

3.    **MK Select disclosed that securities in the Funds' portfolios could be fair valued and the risks associated with the fair valuing of securities held in the Funds' portfolios.**

Plaintiffs assert that a reasonable investor would not recognize that the value of fair-valued securities "may be vulnerable to changing market sentiments." (*See* Pls.' Opp'n at 18.) This assertion is not credible given the disclosures in the Funds' Offering Documents. The Funds' registration statements – in both the prospectuses and SAIs – contain extensive disclosures concerning the Funds' valuation procedures and the risk of uncertainty and volatility inherent therein. (*See* MK/MAM Mem. at 36-39.)

In an effort to manufacture an omission, Plaintiffs argue that the Funds should have predicted the financial crisis by "disclosing" that securities could become "suddenly unsalable at their estimated values upon shifting market sentiments that would likely result in the substantial

_____

the Funds' liquidity guidelines were *false when made*. *See Ashland, Inc.*, 2010 WL 672106 at *7. Plaintiffs have not done so.

reductions in the values of such securities and the Funds' NAVs."[15]  (Pls.' Opp'n at 22 (quoting the CAC).)  Plaintiffs further assert that Defendants should have disclosed that "the Funds' aggregate NAVs were uncertain and purely subjective," and were "nothing more than speculative estimates of values subject to inherent uncertainty that may differ significantly from the values that would have been used had a ready market for the investments existed. . . ."  (Pls. Opp'n at 22, 24.)  The law simply does not require the Funds to make such pejorative characterizations or speculative inferences.  (*See supra* note 8.)

Plaintiffs' demands for additional disclosures also must be considered against their remarkable concession that they "*do not allege the dollar value for any security was incorrect at any time during the Class Period*."  (Pls.' Opp'n at 22-24 (emphasis supplied).)  Again, as with their claims regarding liquidity, Plaintiffs do not allege that any specific security held by the Funds was ever misvalued.[16]  Therefore, any suggestion by Plaintiffs that valuations of the Funds' portfolio securities were speculative necessarily fails.

Plaintiffs likewise do not plead any facts suggesting any flaws in the Funds' respective valuation processes.  Again, Plaintiffs offer nothing more than fraud-by-hindsight, reasoning that because the Funds' NAV ultimately decreased as the value of assets were written down, there

---

[15]     Plaintiffs seemingly assert that the Funds should have disclosed that fair-valued securities could suddenly become illiquid, in the sense that the Funds could not sell them at the prices at which they were valued.  The Funds do make such a disclosure.  *See, e.g.*, Nov. 2005 Prosp. at 32 (Curley Decl. Exh. F) ("There can be no assurance that the Fund could purchase or sell a portfolio security at the [fair value price] used to calculate the Fund's NAV.").  (*See also* MK/MAM Mem. at 37-39.)

[16]     This concession is significant, because all information necessary to evaluate the Funds' valuation of any given security was contained in the annual and semi-annual reports.  Plaintiffs' failure to do so, and to allege that any specific security was either incorrectly labeled as "liquid" or misvalued prior to the onset of the credit crisis in mid-2007 is essentially an acknowledgment that the scope and impact of the credit crisis was not foreseeable.  As discussed further herein, the unexpected onset of the credit crisis caused Plaintiffs' losses – not any purported misrepresentations or omissions in the Funds' Offering Documents.

must have been a failure to properly value the Funds' portfolio securities.  This is not enough.  "[T]he simple fact of a write-down does not stand for the proposition that values stated before the write-downs were inaccurate, and the write-downs certainly do not substitute for facts about the supposedly false valuations themselves."  *State Street Corp.*, 2010 WL 668645 at *9.[17]

### 4.     MK Select was not required to "quantify" risk associated with an investment in the Funds.

Plaintiffs contend that the Funds were required to disclose "the percentages of illiquid, thinly traded or fair valued securities held by the Funds. . . ."  (*See* Pls.' Opp'n at 6; *see also id.* at 25-26 (claiming that the Funds should have made "quantitative disclosure[s]," "disclos[ing] the percentages of illiquid and fair valued securities held by the Funds and . . . relat[ing] the disclosures regarding uncertainty and subjectivity to those percentages")).)  Plaintiffs also claim, without support, that Form N-1A required the Funds to disclose "how a hypothetical percentage change in the estimated values of the Funds' fair-valued securities affected the Funds' NAVs" – in other words, to speculate.  (*See id.* at 22.)   Nothing in Form N-1A requires any such disclosures, and Plaintiffs point to no regulation or law requiring such disclosures.  *See* Form N-1A, Item 6 (Curley Dec. Ex. X) ("A fund . . . must provide a brief explanation of the circumstances under which it will use fair value pricing and the effects of using fair value pricing."); *see also Registration Form Used by Open-End Management Investment Companies*, Release Nos. 33-7512, 34-39748, IC-23064, 1998 SEC LEXIS 438, *117-124 (March 13, 1998).

---

[17]     Plaintiffs rely heavily on *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002) and *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1998).  Neither of these cases is dispositive, as both address auditor liability.  Moreover, *Rodney* is a summary judgment case, and *White* was decided under a Rule 8 notice pleading standard prior to the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  (*See also* PwC Reply Mem. at 9-10.)

As set forth herein and in Defendants' Memorandum, MK Select more than adequately disclosed all information required by Form N-1A.

Moreover, Plaintiffs' claims are directly at odds with relevant SEC guidelines addressing the disclosure of "quantitative" risk. "The Commission did not propose to require a fund to disclose information designed to quantify its expected risk levels . . . ." 1998 SEC LEXIS 438, at *89-90. "[T]he prospectus risk/return summary and amendments to the general risk disclosure requirements of Form N-1A are designed to improve fund risk disclosure without raising the concerns associated with Commission-mandated quantitative information." *Id.* at *91; *see also Registration Form Used by Open-End Management Investment Companies*, Release Nos. 33-7398, 34-38346, IC-22528, 1997 WL 87357, *19-20 (Feb. 27, 1997).

In sum, Plaintiffs point to nothing more than the fact that, in 2007, MK Select chose to disclose additional information concerning the Fund's portfolio securities (*i.e.*, the percentage of fair-valued securities in the Funds' portfolios) in the midst of a credit crisis, when asset-backed and mortgage-backed securities became difficult to value. As discussed below, that does not mean that such disclosures should have been made sooner.

### 5. Plaintiffs fail to plead that the Funds violated any investment guideline or restriction related to industry concentration.

Plaintiffs recognize that they have failed to plead a breach of the Funds' "industry concentration" guidelines when asserting in the CAC that Defendants improperly caused the Funds to concentrate investments in the "mortgage loan industry." In their Memorandum, Defendants demonstrated that no such industry existed (*see* MK/MAM Mem. at 39-42), and Plaintiffs concede that there is no authority supporting their position (*see* Pls.' Opp'n at 60-61).

Plaintiffs have shifted their position in their Opposition, now asserting that the Funds impermissibly concentrated in "real estate debt," as opposed to the "mortgage-loan industry."

(*See* Pls.' Opp'n at 27.)  But the CAC does not allege an impermissible industry concentration in "real estate debt," and this new allegation should be disregarded because it is well-settled that Plaintiffs cannot amend the CAC with their Opposition to a motion to dismiss.[18]  *See Am. Motorist Ins. Co. v. Custom Rubber Extrusions, Inc.*, 2006 WL 2460861, at *11 (N.D. Ohio Aug. 23, 2006) ("[Plaintiff] cannot use an opposition brief as a vehicle to amend its Complaint."); *Jocham v. Tuscola County*, 239 F. Supp. 2d 714, 732 (E.D. Mich. 2003) ("The pleading contains no such allegation, and the plaintiffs may not amend their complaint through a response brief.").[19]

Plaintiffs cite two cases in support of their assertion that the Funds violated applicable concentration limitations, both involving Charles Schwab Funds that adopted express concentration policies that "treat[ed] mortgage-backed securities issued by private lenders and not federally guaranteed as a stand-alone industry" for purposes of the 25% limitation.  *In re Charles Schwab Corp. Sec. Litig.*, 2010 WL 1261705, at *1, 6 (N.D. Cal. March 30, 2010) (holding that "once the promoter has drawn a clear line and thereafter gathers in the savings of investors, the promoter must adhere to the stated limitation unless and until changed by a stockholder vote"); *see also Northstar Fin. Advisors, Inc. v. Schwab Inv.*, 609 F. Supp. 2d 938,

---

[18]    Similarly, Plaintiffs cannot attempt to allege that the Funds adopted a policy of concentrating in any "group of industries," such as an alleged "group of industries related to mortgages."  (Pls. Opp'n at 62 n.77.)  To the extent Plaintiffs assert that Defendants adopted such a restriction by inference, courts have rejected such allegations as stating a claim.  *See Phillips v. Morgan Stanley Dean Witter High Income Adv. Trust III*, 2002 WL 31119441, *4 (S.D.N.Y. Sept. 25, 2002) ("If the Trust had intended to adopt a . . . policy *not* to concentrate in any group of industries, it would have stated so . . . .  The argument that the Trust's failure to explicitly state that it had adopted a no-concentration policy with respect to any group of industries is equivalent to adopting such a policy is rejected.").  Tellingly, the Plaintiffs in *Phillips* made this argument after abandoning the theory that Plaintiffs continue to pursue in this action – that several vaguely related industries constituted a single industry in violation of the Trust's 25% industry concentration limitation.  *Id.* at *1-2.

[19]    In any event, just as there is no "mortgage loan industry," there also is no "real estate debt industry," and Plaintiffs provide no argument to the contrary.

947-48 (N.D. Cal. 2009).   That is not the case here.   The Funds have not represented that "mortgage-backed securities" constitute a separate industry, nor have they ever treated such securities or securities concerning "real estate debt" as an industry.   The cases on which Plaintiffs rely are entirely inapposite.

Finally, Plaintiffs can point to no allegation in the CAC demonstrating that any "disproportionate concentration did not occur because of a change in valuation of one or the other category, or that there were subsequent purchases of the concentrated securities after the concentrated category exceeded 25% of assets solely due to a valuation change."  (Pls.' Opp'n at 63.)  They now improperly attempt to include new allegations never made in the CAC (and even those do not allege with particularity how any single purchase of securities caused the Funds to violate their industry concentration limitations).  (*See* Pls.' Opp. at 63 n.79.)  This belated effort to supplement the CAC is entirely improper.

> **6.      MK Select's additional risk disclosures in the wake of the 2007 credit crisis do not support an inference of fraud.**

Plaintiffs rely on additional disclosures made by MK Select in its November 2007 Offering Documents in the wake of the credit crisis to argue that prior disclosures were inadequate.  Plaintiffs are wrong.

In November 2007, MK Select disclosed that it had retained a valuation consultant and made additional disclosures regarding growing valuation uncertainty and liquidity risk as the subprime credit crisis was unfolding.   MK Select's disclosure of this new and developing information reflected growing market uncertainty and risks in light of unforeseen events impacting the credit markets.   Plaintiffs' conclusory allegations that these disclosures should have come sooner do not support an inference of fraud.  *See CIBC*, 2010 WL 961596 at *12-13 ("Because the securities laws do not allow fraud by hindsight claims, after-the-fact 'allegations

that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)).

> **C.      Plaintiffs are charged with notice of the entirety of the registration statements, including the prospectuses, SAIs, and any other documents incorporated by reference.**

A mutual fund's registration statement includes both a prospectus and statement of additional information, or SAI.  SEC Form N-1A governs the information that must be included in each portion of the registration statement.  (*See* MK/MAM Mem. at 20-23.)  Plaintiffs correctly note that "'[a] Fund may incorporate by reference any or all of the SAI into the prospectus (but not to provide any information required by Part A to be included in the prospectus) without delivering the SAI with the prospectus.'"  (Pls.' Opp'n at 116 (quoting Form N-1A, Curley Decl. Ex. X at 8).)  Plaintiffs, however, misinterpret this language as requiring *all* risk disclosures to appear in the prospectus.

Plaintiffs argue that Defendants' reference to "disclosures that appeared only in the SAIs proves (i) the materiality of such disclosures and, thus, (ii) the need for such information to have been included in the prospectuses."  (Pls.' Opp'n at 7, 11; *see also id.* at 118 ("The gist of MAM/MK's focus on the SAI disclosures is that they included essential information for investors.").)  These assertions misconstrue or ignore applicable regulations, because Form N-1A specifically does not require that all risk disclosures appear in the prospectus.  *See* Form N-1A, Item 4 (Curley Decl. Exh. X); *see also* 1998 SEC LEXIS 438 at *70, 165 (SEC guidance providing that a prospectus should discuss "the principal risks of investing in the fund, rather than the characteristics and risks of each type of instrument in which the fund may invest," and that "Funds can discuss items of information required to appear in the prospectus in greater detail in the SAI, which may be incorporated by reference into the prospectus").

Here, the Funds' prospectuses indicated that the Funds would invest in mortgage-related and asset-backed securities, and further disclosed that the Funds were subject to, among other things, credit risk (in both investment and below investment grade securities), and the risk that the credit quality – and thereby the value – of the Funds' assets could decline.  (*See* Part IV.B.1, *supra*, pp. 13-15.)  Form N-1A requires nothing more in the prospectus.  Funds are free to include additional disclosures in the SAI, and Plaintiffs are charged with notice of the SAI and other documents incorporated by reference into the prospectus.  *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730-731 (2d Cir. 1998) (noting that where "the prospectuses refer potential investors to the Statements of Additional Information, which contains extensive descriptions of the mortgage-related instruments purchased," the Funds' disclosures, "'taken together and in context, would [not] have misle[d] a reasonable investor'") (quoting *McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576, 579 (2d Cir. 1990)); *Strougo v. Bear Stearns & Co., Inc.*, 1997 WL 458667, at *5 n.3 (S.D.N.Y. Aug. 11, 1997), *aff'd sub nom Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000) ("The SAI is appropriately considered in this motion to dismiss because it is incorporated by reference in the . . . prospectus."); *Majeski v. Balcor Entm't Co., Ltd.*, 893 F. Supp. 1397, 1407-1408 (E.D. Wis. 1994), *aff'd sub nom Eckstein v. Balcor Film Investors*, 58 F.3d 1162 (7th Cir. 1995) (holding that "all investors are put on notice of all information contained in documents which are a part of a registration statement, and incorporated by reference in the prospectus," and finding, "as a matter of law, that a reasonable investor in the position of [plaintiffs] must be imputed with knowledge of the relevant portions of the registration statement"); *White v. Melton*, 757 F. Supp. 267 (S.D.N.Y. 1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed. . . . [T]he

25

Court concludes as a matter of law that plaintiff cannot state a claim for fraud under the securities laws based on defendants' placement of the freeze rule in the SAI, as incorporated by reference into the Prospectus, rather than in the Prospectus itself." (citations omitted)).[20]

### D. MK Select's choice of benchmark indices was not misleading.

Plaintiffs' characterization of the SEC's requirement that the Funds select a broad-based index for purposes of comparison is misleading and incomplete. (*See* Pls.' Opp'n at 63-65.) And, the cases cited by Plaintiffs in their Opposition are inapposite. The funds in those cases involved either "index" funds, in which the fund's *investment objective* is to attempt to track a specified index, or situations in which the fund "expressly invited investors to use the charts *to assess the Fund's risks*, stating that the comparisons to the Lehman indices were 'intended to provide [investors] with some indication of the risks of investing in the Fund.'" *In re Evergreen Ultrashort Opportunities Fund Sec. Litig.*, 2010 WL 1253114, *6 (D. Mass. March 31, 2010) (emphasis supplied, alteration in original); *see also Northstar Fin. Advisors, Inc.*, 609 F. Supp. 2d at 945-46 (the fund's prospectus stated that the fund "'seeks high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index'"); *In the Matter of Piper Cap. Mgmt., Inc.*, Initial Decision Rel. No. 175 (Broadhurst Decl. Exh. 55) (discussing the Fund's use of an index as a "risk/performance benchmark").

The selection of a benchmark index is subject to the Funds' discretion and is a statement of opinion. (*See* MK/MAM Mem. at 42-43.) Here, MK Select offered a broad-based market index for the purpose of comparing the Funds' performance with the broader market in compliance with SEC guidelines. The inclusion of this benchmark is entirely distinguishable

---

[20] Plaintiffs have indicated no case in which a plaintiff has stated a claim under the federal securities laws based on an alleged omission from a prospectus of information that was disclosed in another part of the registration statement and expressly incorporated by reference into the prospectus.

from cases in which investment companies invite investors to gauge risk by comparison to the benchmarks.  *See Hunt*, 159 F.3d at 730 (dismissing claim that a fund's use of a benchmark index was misleading where "[t]he chart purported only to compare the Fund's *returns* to those of the Lehman Brothers indexes.  No reasonable investor could have viewed this chart as an exhaustive description of the Fund's *risks*." (emphasis in original)).

Furthermore, the Funds' Annual and Semi-Annual reports expressly attributed the Funds' over-performance relative to cited indices to the Funds' heavier investments in mortgage-backed and asset-backed securities.  (*See*, s*upra*, Part IV.B.1.)

### E. No other alleged misrepresentations or omissions identified by Plaintiffs are actionable.

Plaintiffs' Opposition also relies, in significant part, on conclusory allegations of certain alleged "misrepresentations" or "omissions" that clearly are not actionable.

- Plaintiffs do not address Defendants' arguments and authorities establishing that certain statements alleged by Plaintiffs to be misleading are non-actionable puffery.  (*See* Pls.' Opp'n at 65-67; *see also* MK/MAM Mem. at 48-49.)  Rather, Plaintiffs merely cite a slew of cases for generalized propositions that are not at all responsive to Defendants' arguments or the allegations in the CAC and should therefore be disregarded.

- Plaintiffs argue that the "bespeaks caution" doctrine does not apply "[w]here a fund describes certain risk characteristics of the mortgage-backed securities in which it invested but not the risks alleged by plaintiffs. . . ."  (Pls.' Opp'n at 68.)  As set forth herein and in Defendants' Memorandum, the bespeaks caution doctrine does apply, as MK Select's registration statements disclosed the precise risks that Plaintiffs allege caused their losses.

27

- Plaintiffs continue to assert that "[t]here was nothing in the Funds' pre-collapse performances to suggest the potential for catastrophic losses."  (Pls.' Opp'n at 28-29.)  Courts, however, have repeatedly held that an accurate representation of Funds' past performance cannot be misleading.  *See*, *e.g.*, *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009).  (*See also* MK/MAM Mem. at 27-38.)

- The Funds' reference to the Intermediate and High Income Funds' five-star Morningstar ratings was not misleading.  (*See* CAC ¶¶ 140-141.)  In fact, Morningstar analysts, based on their reading of the same public disclosures that Plaintiffs allege were misleading and/or incomplete, acknowledged the risks that Plaintiffs allege were undisclosed.  (Pls.' Opp'n at 27-28.)  Morningstar also noted the weighting of the Funds toward asset-backed and mortgage-backed securities.  Morningstar awarded its ratings of the Funds despite these disclosures.

- There was no violation of the prohibition against borrowing.  (Pls.' Opp'n at 29.)  Plaintiffs do not refute Defendants' arguments that there was no prohibition on "implicit leverage risk" and, to the extent this refers to "credit risk," such risk was in fact disclosed.  (*See* MK/MAM Mem. at 43.)

- The importance of research and analysis in selecting the Funds' investments was disclosed in the Funds' SAIs.  (*See* MK/MAM Mem. at 30.)

- Plaintiffs claim that "[t]he critical risk in the subordinated interests purchased by the Funds – that the Funds would not get paid until after senior tranches are paid . . . was not disclosed until 2008."  (Pls.' Opp'n at 29.)  This assertion is manifestly false.  Throughout the class period, MK Select disclosed the risks inherent in subordinated securities, specifically that such securities are "subordinated in some manner as to the

payment of principal and/or interest to the holders of more senior mortgage-backed or asset-backed securities arising out of the same pool of assets."  Nov. 2006 SAI at 10-11 (Curley Decl. Ex. J); Nov. 2005 SAI at 12 (Curley Decl. Ex. G); Nov. 2004 SAI at 9 (Curley Decl. Ex. B).

- Plaintiffs quote numerous "prospectus disclosures" from unspecified securities allegedly held by the Funds and assert that these disclosures should have been copied into the Funds' prospectuses.  (Pls.' Opp'n at 29-30.)  In light of the fact that Form N-1A requires the Funds to disclose only risks borne by the Funds *as a whole*, and not risks specific to individual securities, these allegations fail to demonstrate that the Funds' disclosures were misleading.  (*See* MK/MAM at 44-45.)

- Plaintiffs do not allege non-compliance with GAAP with the requisite particularity.  Merely providing a laundry list of GAAP provisions that allegedly were violated does not meet the requirements of Rule 9(b), and Plaintiffs do not dispute Defendants' assertion that they have pleaded no facts alleging that reliance on PwC's audit opinion was unreasonable.  (*See* MK/MAM Mem. at 45.)  *Cf. CIBC*, 2010 WL 961596 at *13 ("Because the 'GAAP is not [a] lucid or encyclopedic set of pre-existing rules . . . [and is] [f]ar from a single-source accounting rulebook,' reasonable disagreements and deference to business judgment is permissible.") (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995)) (alterations in original).[21]

---

[21]     Plaintiffs' deficient allegations are discussed at length by Defendant PwC in its Memorandum in Support of its Motion to Dismiss and Reply.  Defendants incorporate PwC's arguments as applicable.

V.      **Plaintiffs fail to allege that MAM and Morgan Keegan were "statutory sellers" for purposes of Plaintiffs' § 12(a)(2) claim.**

Plaintiffs claim that Rule 8(a) applies to their claim that MAM and Morgan Keegan were "statutory sellers" under §12(a)(2) of the 1933 Act and, therefore, they must only make "general" allegations with no "specific facts." (Pls.' Opp'n at 123.) As discussed above, Rule 9(b) applies because Plaintiffs' claims sound in fraud. Nonetheless, even if only Rule 8(a) were to apply to this claim, Plaintiffs still have not pleaded sufficient facts to state a claim. *See Iqbal*, 129 S. Ct. at 1949.

Plaintiffs' allegations that Morgan Keegan acted as the "exclusive agent" or "distributor" of the Funds and, as underwriter/distributor, "passed title to the Funds' shareholders" disregards the nature of an open-end investment company, in which an investor must purchase or sell its securities to/from the fund itself. Moreover, the two cases cited by Plaintiffs for this proposition are inapposite. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 548-550 (N.D. Cal. 2009) (not addressing directly the issue of whether a non-issuer can pass title to shares of an open-end investment company, but rather the "solicitation" requirement as applied to individual defendants); *In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (addressing a traditional situation where an underwriter presumably purchased securities from the issuer (a bank, not a fund) and sold them to investors directly).

Nor do Plaintiffs adequately plead that either Morgan Keegan or MAM "solicited" the purchase of the Funds' shares. With regard to Morgan Keegan, Plaintiffs refer to the Underwriting Agreement, which merely *authorized* Morgan Keegan to solicit the purchase of shares in the Funds. (*See* CAC ¶¶ 619-624.) Plaintiffs make other conclusory allegations that parrot the applicable legal standard and purport to assert such allegations with respect to all of the "Section 12 Defendants." (*See id.* ¶¶ 711-716.) Such allegations are entirely deficient, even

under Rule 8(a)(2).  Plaintiffs must allege more, namely that the "Underwriter Defendants *successfully* solicited such sales" to Plaintiffs, not merely that they had the capacity to do so.  *In re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009).  (*See also* MK/MAM Mem. at 46-47.)

Plaintiffs' claim against MAM rests entirely on the assertions that: (i) MAM somehow "directed" fiduciary accounts held by Regions Bank to make investments in the Funds, and (ii) that "MAM executives and employees prepared, reviewed, and/or signed the registration statement and amendments used to sell the Funds' shares."  (Pls.' Opp'n at 126.)  Plaintiffs plead no facts to support these assertions.  In addition, the mere inference that MAM somehow participated in selecting an investment on behalf of unspecified accounts is insufficient to state a claim.  *See In re Evergreen Ultrashort Opportunities Fund Sec. Litig.*, 2010 WL 1253114 at *8 (dismissing § 12(a)(2) claim and holding that a defendant's "'remote' involvement in a sales transaction or his mere 'participat[ion] in soliciting the purchase' will not subject him to Section 12 liability") (quoting *Pinter v. Dahl*, 486 U.S. 622, 651 n.27 (1988)).

Further, the fact that unspecified executives and employees may have prepared and signed offering documents does not mean that they did so in their capacity as employees of MAM.  Several individuals employed by MAM also held positions as directors and officers of the Funds at various times.  Plaintiffs do not specify the "executives and employees" to whom they refer, nor do they allege any facts demonstrating that these individuals signed or prepared offering documents in their capacity as employees of MAM, as opposed to acting as directors or officers of the Funds.  (*See* Pls.' Opp'n at 126.)  In any event, mere signing or participating in the preparation of offering documents, without more, does not constitute "solicitation."  *See Citiline Holdings, Inc. v. iStarFinancial, Inc.*, -- F. Supp. 2d --, 2010 WL 1172647, at *3 (S.D.N.Y.

March 26, 2010) (dismissing § 12(a)(2) claim because "[e]very Court of Appeals to have considered the issue . . . has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)"); *In re Thornburg Mortgage, Inc. Sec. Litig.*, 2010 WL 378300, at *47 (D.N.M. Jan. 27, 2010) ("The fact that the individual Defendants created the offering documents . . . does not constitute 'direct and active' solicitation of the 'immediate sale' that Section 12(a)(2) liability requires.") (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998)).

**VI.    Plaintiffs fail to state an actionable claim under § 10(b) and Rule 10b-5.**

As discussed in Part III, *supra*, Plaintiffs' claims under § 10(b) of the 1934 Act fail in the first instance because they are brought in Plaintiffs' capacity as holders of shares, not as purchasers or sellers. Plaintiffs further fail to meet their pleading burden under Rule 9(b) and the PSLRA by (1) failing to identify misleading statements attributable to Morgan Keegan or MAM, and (2) failing to plead a strong inference of scienter.

**A.    Plaintiffs have failed to allege a material misrepresentation.**

As discussed in Part IV, *supra*, Plaintiffs have failed to allege any material misrepresentations. Furthermore, Plaintiffs attempt to hold Morgan Keegan and MAM responsible for statements by the Funds based solely on conclusory allegations of control person liability. (Pls.' Opp'n at 37-38.)   For example, Plaintiffs argue that "[b]y virtue of their complete control of, and responsibility for, the Funds' management, all of the Funds' alleged misleading statements are attributable to MAM/MK . . . ." (Pls.' Opp'n at 37.) As discussed in Part VIII, *infra*, this argument is unavailing.

Instead of identifying false statements of material fact made by Morgan Keegan or MAM, Plaintiffs have cited paragraphs of the CAC referencing Defendants' positions and responsibilities with the Funds. (*See* Pls.' Opp'n at 38.)   Such generalized allegations that

Morgan Keegan or MAM provided the Funds with employees, prepared, reviewed and signed registration statements, and that Morgan Keegan was responsible for accounting and valuations, insufficiently allege actionable misrepresentations. *See CBIC*, 2010 WL 961596, at *10 (holding that the plaintiff's allegations were insufficient because they merely alleged "that Defendants received information contradicting their public statements because they held management roles and monitored [the corporation's] financial reports"); *see also Pac. Inv. Mgmt. Co., LLC* v. *Mayer Brown LLP*, -- F.3d ---, 2010 WL 1659230, at *8 (2d Cir. April 27, 2010) (holding that the "mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient" to allege a 10b-5 claim, and "a plaintiff must [] rely on a secondary actor's *own* deceptive statements – and not on statements conveyed to the public through another source and not attributed to the defendant – to state a claim under Rule 10b-5(b).") (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 151-152 (2d Cir. 2007)) (emphasis in original).

Here, Plaintiffs' generalized allegations against Morgan Keegan and MAM are "founded on nothing more than a defendant's corporate position [and] are entitled to no weight." *CBIC*, 2010 WL 961596, at *10 (citing *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.")). Such generalized allegations also "fail to identify the specific date or location of the alleged misrepresentations." *Ashland*, 2010 WL 672106, at *6. "At a minimum, a plaintiff must allege the 'time, place, and content of the alleged misrepresentation on which he or she relied,' in addition to other requirements." *Id.*

(quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (noting that a plaintiff's complaint must "state where and when the [fraudulent] statements were made")).

> **B.    Plaintiffs have failed to plead scienter.**

Plaintiffs fail to allege any facts in their CAC that give rise to a "strong inference" that either Morgan Keegan or MAM acted with scienter.  The Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, places the burden on Plaintiffs to allege a compelling inference of fraudulent intent:  "[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. 308, 314 (2007).  Plaintiffs have failed to meet this standard.

Plaintiffs' generic and conclusory allegations of Defendants' roles with respect to the Funds, and Morgan Keegan and/or MAM employees' service as employees of MK Select (*see* Pls.' Opp'n at 93-96, 99) do not give rise to a strong inference of scienter.  *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) ("[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.");  *In re Sec. Capital Assur.*, 2010 WL 1372688, at *25 (holding that the "[p]laintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter") (citing *CBIC*, 2010 WL 961596, at *10).  Further, as scienter allegations must be pleaded with particularity, "the PSLRA and Rule 9(b) preclude attribution of knowledge or intent from one defendant to another."  *Id.*; *see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (holding that a "complaint 'may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged'") (quoting *Benoay v. Decker*, 517 F. Supp. 490, 493 (E.D.

Mich. 1981)); *In re Am. Serv. Group, Inc.*, 2009 WL 1348163, at *30 (M.D. Tenn. March 31, 2009) (holding that "a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations") (citing *Bledsoe* and *Benoay*).[22]  As recently held by the Sixth Circuit, "'[i]n the absence of greater particularity, we have no way of distinguishing the plaintiffs' allegations from the countless fishing expeditions which the PSLRA was designed to deter.'"  *Konkol v. Diebold, Inc.*, 590 F.3d 390, 397 (6th Cir. 2009) (quoting *Fischer v. Vantive Corp.*, 283 F.3d 1097, 1087 (9th Cir. 2002)).

Plaintiffs' Opposition also points to four factors that allegedly show a strong inference of scienter:  (1) proximity in time of alleged fraudulent statements and a later disclosure, (2) alleged accounting violations, (3) disregard of certain information, and (4) self-interested motivation. (Pls.' Opp'n at 98.)  Plaintiffs fail to plead facts that demonstrate the existence of any of these factors.

With respect to motive, Plaintiffs merely allege that Morgan Keegan and MAM "solicited the sale of the Funds' shares to serve their own financial interests" because MAM "received management fees" and Morgan Keegan "received commissions and administrative fees."  (*See*,

---

[22]    Plaintiffs also misstate the law in the Sixth Circuit regarding the group pleading doctrine.  (*See* Pls.' Opp'n at 95-96.)  The Sixth Circuit has not specifically decided the issue regarding the application of this doctrine.  *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 690 (6th Cir. 2005) ("We need not decide here the current viability of the group-published doctrine because resolution of that question is not required to decide this case."); *see also In re Am. Serv. Group, Inc.*, 2009 WL 1348163 at *30 (noting the split of authority and holding that current Sixth Circuit precedent holds that "a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations"); *In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (rejecting finding of scienter based on the defendants' high ranking positions at the company, holding that "[a]lthough the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made").  The group pleading doctrine is inconsistent with the PSLRA's heightened pleading requirements.  Regardless, Plaintiffs have failed to "allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made."  *Id.*

*e.g.*, CAC ¶ 712).)  The Sixth Circuit has made clear that "[i]n order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *PR Diamonds, Inc.*, 364 F.3d at 690 (citation omitted).  In so holding, the court further explained that "courts distinguish motives common to corporations and executives generally from motives to commit fraud." *Id.*  Accordingly, that the Defendants profited by fees received from dealing with the company "suggest[s] no more than a general motive for [the company's] success, not fraud." *Id.*

Plaintiffs also suggest that the proximity in time of the Funds' losses to the Funds' 2007 disclosure of the percentage of fair valued securities held by the Funds and increased liquidity risk suggests scienter.  (*See* Pls.' Opp'n at 98.)  Proximity alone, however, does not support a strong inference of scienter.  *See Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004) (holding that the plaintiffs did not adequately plead scienter despite the temporal proximity of statements "because there is no indication from the class members' allegations that [the defendant] knew or recklessly disregarded information it had before it at the time it issued its" allegedly false statements); *see also Ashland, Inc.*, 2010 WL 672106 at *7 (holding that the plaintiff did not plead "facts suggesting that the[] statements were false or misleading when made" and just because "these securities became illiquid does not automatically render [the defendant's] statements actionable"); *CIBC*, 2010 WL 961596, at *10 (holding that "knowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud").

For the same reasons, Plaintiffs' allegations that Defendants' "disregard of the most current factual information" such as liquidity and valuations risks (*see* Pls.' Opp'n at 98) fail as a matter of law.  Plaintiffs must allege that the valuation calculations were "both objectively and subjectively false" and "that Defendants knew of the error and used it to mislead others."  *CIBC*,

2010 WL 961596, at *11 ("One cannot reasonably conclude that, because the [value] calculations were mistaken, Defendants had the subjective intent to defraud."). Plaintiffs have entirely failed to do this, especially where they do not allege that any specific valuation was incorrect.

Plaintiffs also attempt to plead scienter with allegations of accounting violations. (*See* Pls.' Opp'n at 98 n.110.) But the "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc. Secs. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999). Moreover, "a strong inference of scienter cannot be drawn from speculative and conclusory allegations of GAAP violations." *PR Diamonds, Inc.*, 364 F.3d at 684. Rather, to draw an inference of recklessness from alleged accounting violations, the allegations must show accounting errors that "are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." *Id.; see also Konkol*, 590 F.3d at 400 (holding that "[o]ne cannot determine from the complaint whether the magnitude of [the defendant's] alleged accounting violations are the type of extreme 'in your face facts' that 'cry out' scienter") (quoting *PR Diamonds, Inc.*, 364 F.3d at 686); *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (same). The CAC does no such thing.

## VII. Plaintiffs have failed to plead loss causation as a matter of law.

As set forth in Defendants' Memorandum at pp. 51-52, the CAC affirmatively states that factors other than the purported misrepresentations and omissions contained in the Funds' Offering Documents caused Plaintiffs' losses – the onset of the credit crisis and Defendants' alleged mismanagement of the Funds in failing to predict it. (*See, e.g.*, CAC ¶¶ 5, 306-320, 340 (alleging that Defendants "failed to take measures necessary to avoid or minimize the losses the Funds' shareholders incurred later in 2007 and 2008").)

The global credit crisis provides the most compelling reason for Plaintiffs' alleged losses as opposed to any conduct allegedly attributable to Morgan Keegan or MAM.  (*See* MK/MAM Mem. at 8-12, 51-52.)  *See also CBIC*, 2010 WL 961596 at *11 (finding the "unprecedented paralysis of the credit market and a global recession" a more compelling explanation for the plaintiffs' losses than fraud); *Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) (holding that "an even stronger inference is that Defendants were simply unable to shield themselves as effectively as they anticipated from the drastic change in the housing and mortgage markets").[23]

Plaintiffs' allegations expressly attribute Plaintiffs' losses to factors other than alleged misrepresentations or omissions.  Accordingly, Plaintiffs have failed to plead, as required, "facts which, if proven, would show that [their] loss was caused by the Defendants' alleged misstatements as opposed to . . . intervening events," in this case the financial crisis.  *See In re Sec. Capital Assur.*, 2010 WL 1372688 at *30; *Azzolini v. CorTS Trust II for Provident Fin. Trust I*, 2005 WL 3448053, at *5-6 (E.D. Tenn. Dec. 14, 2005).  (*See also* MK/MAM Mem. at 49-53.)  Indeed, Plaintiffs have affirmatively pleaded themselves out of court.  *See Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995) ("A plaintiff can plead himself out of court by

---

[23]    Plaintiffs argue that the Court cannot take judicial notice of the fact that the Fund suffered losses during the onset of the global credit crisis.  Plaintiffs are wrong.  *See D.E.&J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003), *aff'd*, 133 Fed. Appx. 994 (6th Cir. 2005) (holding that judicial notice may be taken of market trends and media reports); *In re Imperial Credit Indus, Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015-16 (C.D. Cal. 2003), *aff'd sub nom Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005) (taking judicial notice of "dramatic changes in interest rates . . . affecting participants in the credit industry," due to external events such as the "Asian crisis" and the "Long Term Capital [Management] default"); *Virtual Countries, Inc. v. Repub. of South Africa*, 148 F. Supp. 2d 256, 267 n.12 (S.D.N.Y. 2001) ("The Court takes judicial notice of the financial hardship experienced by Internet-based businesses . . . in mid-2000.").  In any event, the relationship between the losses alleged and the credit crises is apparent on the face of the CAC.

alleging facts which show that he has no claim, even though he was not required to allege those facts."). (*See also* PwC Reply Mem. at 11-12 (further discussing loss causation).)

## VIII. Plaintiffs have failed to allege that MAM and Morgan Keegan were "control persons" under § 15 of the 1933 Act and § 20 of the 1934 Act.

In response to Defendants' arguments that Plaintiffs have failed to plead facts sufficient to state a claim for control person liability, Plaintiffs assert that "Defendants would have the Court believe that the Funds ran themselves." (Pls.' Opp'n at 128.) This is a red herring. As discussed in Defendants' Memorandum at pp. 53-55, courts consistently have held that control person liability is not something that can be inferred from conclusory assertions of control or the mere fact of corporate affiliation.

With regard to MAM and MK, Plaintiffs rely solely on their allegations regarding these entities' contractual and corporate relationships with the Funds.[24] At most, these allegations speak to "'power to control the specific transaction or activity upon which the primary violation is predicated.'" *Azzolini v. CorTS Trust II for Provident Fin. Trust I*, 2005 U.S. Dist. LEXIS 31853, at *42 (E.D. Tenn. Sept. 16, 2005) (quoting *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000)). But Plaintiffs' obligation does not end there. They must also plead facts demonstrating "actual participation (*i.e.*, exercise [of] control) in the operations of the primary violator in general," *id.*, and several courts in the Sixth Circuit have required that Plaintiffs plead "culpable participation" in the primary violation in question.[25]  (*See* MK/MAM

---

[24]     Plaintiffs apparently have abandoned their claim against MK Holding, and make no attempt to support it other than the assertion that MK Holding shared officers with "MAM/MK." (Pl.' Opp'n at 130 n. 145.)

[25]     Without addressing the element of "culpable participation" on its merits (other than the conclusory assertion that they pled it), Plaintiffs assert that there is no "culpable participation" test in the Sixth Circuit. (Pls.' Opp'n at 127-128 n.142.) While it is true that the Sixth Circuit has yet to address

39

Mem. at 55 n.44 (collecting cases); Ind. Dirs.' Reply at 5-12 (further discussing control person liability).)  This they have failed to do.

## IX.    Plaintiffs have failed to state a claim under the ICA.

As set forth in Defendants' Memorandum at pp. 55-58, (1) none of the ICA provisions pursuant to which Plaintiffs purport to assert claims provides for a private right of action; (2) the ICA contains no rights-creating language; (3) the ICA provides for alternative enforcement by the SEC of all sections of the Act; and (4) other sections of the ICA that specifically provide for a private right of action are not at issue here.  Under these circumstances, well-accepted case law makes clear that no private right of action exists with respect to the sections of the ICA at issue here.  (*See* MK/MAM Mem. at 56-57 (and cases cited therein).)  *See also Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, 2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. April 6, 2010) (declining to find a private right of action under § 13 of the ICA); *Gabelli Global Multimedia Trust, Inc. v. Western Inv. LLC*, 2010 U.S. Dist. LEXIS 32161 (D. Md. April 1, 2010) (declining to find a private right of action under §§ 12(d)(1)(A) and 48(a) of the ICA).[26]

---

this issue, numerous district courts within the Sixth Circuit have applied this test.  (*See* MK/MAM Mem. at 55 n.44.)

[26]    Faced with the overwhelming authority demonstrating that no private right of action exists with respect to the various provisions pursuant to which Plaintiffs purport to assert claims under the ICA, Plaintiffs cite to *one* district court case from the Northern District of California that implied a private right of action under § 13(a) of the ICA.  (Pls.' Opp'n at 136-37 (citing *Northstar Fin. Advisors, Inc. v. Schwab Inv.*, 609 F. Supp. 2d 938 (N.D. Cal. 2009).)  This Court should decline Plaintiffs' invitation to follow *Northstar*, as that case is an extreme outlier and contrary to the standards used to determine the existence of a private right of action as set forth in *Alexander* v. *Sandoval*, 532 U.S. 275 (2001), and *Olmsted* v. *Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002).

Moreover, the district court in *Northstar* granted defendants' motion for interlocutory appeal to the Ninth Circuit and stayed the case during the pendency of the interlocutory appellate proceedings. *Northstar Fin. Advisors Inc.* v. *Schwab Investments*, 2009 U.S. Dist. LEXIS 39410 (N.D. Cal. Apr. 27, 2009).  On June 29, 2009, the Ninth Circuit granted defendants' request for interlocutory appeal and oral argument was held on April 12, 2010.  As of this date, no decision has been announced by the Ninth Circuit.

Plaintiffs' argument concerning their purported claim under § 47(b) of the ICA likewise fails.  As set forth in Defendants' Memorandum, § 47(b) allows for a party to a contract to rescind the contract in the event of a violation of the ICA.  Plaintiffs claim that the "applicable contracts" are the Underwriting Agreement between Morgan Keegan and the Funds, the Funds' Articles of Incorporation, and the Investment Advisory Agreement between MAM and the Funds.  Notwithstanding their claims to the contrary, Plaintiffs are not parties to any such "contracts" and they may not premise claims for recovery on alleged breaches of these contracts under

§ 47(b).  "The plain language of Section 47(b) states that once a violation of the [ICA] is established, rescission is an available remedy for *a party* to the contract."  *Hamilton v. Allen*, 396 F. Supp. 2d 545, 558 (E.D. Pa. 2005) (emphasis in original).  "In order to assert the remedy set forth in Section 47(b), an individual shareholder who is not a party to an advisory contract must have brought a derivative claim on behalf of the fund."  *Id.*  Because Plaintiffs are not party to the contracts at issue and they did not bring the claim as a derivative action, "they do not have standing to pursue this claim."  *Id.*  Accordingly, Plaintiffs' claim under § 47(b) fails as a matter of law.

**X.     The Court should deny Plaintiffs leave to amend the CAC.**

Plaintiffs' Opposition requests leave to amend.  (*See* Pls.' Opp. at 140.)  The Court, however, should deny this request to file a *fourth* complaint.  Plaintiffs consistently have repeated the same conclusory allegations that fail to pursue a legally cognizable theory of recovery, much less state a claim under the federal securities laws with the requisite particularity.  *See Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) ("Denial [of leave to amend] may be appropriate . . . where there is . . . 'repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

41

amendment, futility of the amendment, etc.'" (quoting *Foman v. Davis*, 371 U.S. 178 (1962)); *In re Reciprocal of Am. Sales Pract. Litig.*, 2007 WL 2900282, *7 (W.D. Tenn. Sept. 28, 2007) (denying leave to amend where, "despite 332 allegations," "Plaintiff is still unable to adequately plead her . . . claims" and where there is no evidence that "another bite at the apple would yield a different result").

## CONCLUSION

For the reasons set forth herein and in Defendants' opening Memorandum of Law in support of their motion to dismiss, Defendants respectfully request that this Court dismiss the CAC with prejudice.

Respectfully submitted,


/s/ Matthew M. Curley
Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN  37201
(615)742-6200

Shepherd D. Tate
Michael A. Brady
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, TN  38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management, Inc., Morgan Keegan & Company, Inc., and MK Holding, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on May 28, 2010, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following and/or served the following via U.S. Mail:

**APPERSON CRUMP PLC**
CHARLES D. REAVES
JEROME A. BROADHURST
6070 Poplar Avenue, Sixth Floor
Memphis, TN  38119-3954

**KIRKLAND & ELLIS, LLP**
TIMOTHY DUFFY, ESQ.
EMILY NICKLIN, ESQ.
KRISTOPHER RITTER, ESQ.
300 North LaSalle
Chicago, IL  60654

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
VERNON J. VANDER WEIDE
THOMAS V. SEIFERT
333 South Seventh St., Suite 1140
Minneapolis, MN  55402-2422

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
LEO BEARMAN, ESQ.
EUGENE PODESTA, ESQ.
165 Madison Avenue
First Tennessee Building
Memphis, TN  38103

**LOCKRIDGE GRINDAL NAUEN PLLP**
RICHARD A. LOCKRIDGE
GREGG M. FISHBEIN
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401

**K&L GATES LLP**
JEFFREY B. MALETTA, ESQ.
NICOLE A. BAKER, ESQ.
1601 K Street, NW
Washington, D.C.  20006-1600

**ZIMMERMAN REED, P.L.L.P.**
CAROLYN G. ANDERSON
TIMOTHY J. BECKER
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402

**SUTHERLAND ASBILL & BRENNAN, LLP**
S. LAWRENCE POLK
999 Peachtree Street NE
Atlanta, GA  30309

**MAYNARD COOPER & GALE PC**
PETER S. FRUIN
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203

**SULLIVAN & CROMWELL LLP**
DAVID B. TULCHIN
DAVID E. SWARTS
125 Broad Street
New York, New York  10004

**PAUL HASTINGS JANOFSKY & WALKER LLP**
Kevin C. Logue
Asa R. Danes
75 E. 55th Street
New York, NY  10022

/s/ Matthew M. Curley