IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE:  REGIONS MORGAN | ) | |
| KEEGAN SECURITIES, | ) | Case No. 07-2784 |
| DERIVATIVE, AND ERISA | ) | MDL 2009 |
| LITIGATION | ) | |
| | ) | |
| IN RE:  REGIONS MORGAN | ) | |
| KEEGAN OPEN-END MUTUAL FUND | ) | |
| LITIGATION | ) | |
| | ) | |
| | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

Before the Court are Defendants' February 11 and 12, 2010 Motions to Dismiss the Consolidated Amended Class Action Complaint ("CAC"). (See ECF. Nos. 222, 226-29, 233.) The Lead Plaintiffs filed a Consolidated Response in Opposition on April 13, 2010. (See ECF No. 238.) Defendants filed their Replies on May 28, 2010, and June 4, 2010. (See ECF. Nos. 246-47, 249-51, 253.) Plaintiffs filed a Consolidated Sur-Reply on July 6, 2010. (See ECF No. 265.) For the following reasons, Defendants' Motions are GRANTED IN PART AND DENIED IN PART.

## I.    BACKGROUND

Plaintiffs' CAC exceeds four hundred pages, comprising 766 paragraphs and six appendices.  The following is a necessarily

brief summary of the named parties in this action and the Plaintiffs' claims.

Plaintiffs Kathryn S. Cashdollar Estate, Dajalis Ltd., Jeanette H. Landers, H. Austin Landers, and Frank D. Tutor are the Lead Plaintiffs for the Open-End Fund Litigation. (CAC ¶ 35.) The Lead Plaintiffs allege that they represent a purported class of individuals who purchased one or more classes of shares in the Regions Morgan Keegan Select Short Term Bond Fund ("Short Term Fund"), the Regions Morgan Keegan Select Intermediate Bond Fund ("Intermediate Fund"), and/or the Regions Morgan Keegan Select High Income Fund ("High Income Fund" and collectively the "Funds") from December 6, 2004 through December 6, 2007 (the "class period"). (Id. ¶ 2(a)(1).) Plaintiffs also assert that they represent those "[w]ho refrained from redeeming the Funds' shares during the period from March 1, 2007 through April 30, 2008." (Id. ¶ 2(a)(2).) Plaintiff John R. S. Robilio seeks to represent a Fiduciary Subclass that includes persons who are members of the primary class and 1) are beneficiaries of trusts or other custodial accounts for which certain Defendants acted as fiduciaries and made investments on the beneficiaries' behalf or 2) who acquired a beneficial ownership of shares in the Funds because of certain Defendants' decisions made as trustee or custodian of these Plaintiffs' accounts. (Id. ¶¶ 33, 107.) During the class period, the named Plaintiffs invested more than

$4.5 million in the Funds and "refrained from redeeming" more than $7 million in investments in the Funds. (Id. ¶ 34.)

Defendant Morgan Keegan Select Fund, Inc. ("MK Select") is a Maryland Corporation organized as a open-end management investment company under the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 et seq. (CAC ¶ 36.) MK Select consisted of three portfolios; namely, the three Funds. (Id.) The Intermediate and High Income Funds opened for investment on March 22, 1999, and the Short Term Fund opened on November 4, 2001. (Id. ¶ 37.) The High Income Fund closed to new investors in December 2002; however, existing shareholders of the High Income Fund could increase their investments by purchasing additional shares. (Id.) Because of the "catastrophic decline" in the Funds' assets during 2007-2008, MK Select and the Funds were liquidated on June 15, 2009. (Id. ¶ 39.) MK Select filed an application with the Securities and Exchange Commission to deregister as an investment company on July 28, 2009. (Id.)

Defendant Morgan Asset Management ("MAM") is a registered investment advisor with its principal place of business in Memphis, Tennessee. MAM is a wholly-owned subsidiary of Defendant MK Holding, Inc. ("MK Holding"). (Id. ¶ 40.) MAM managed the Funds' portfolio of securities, including making purchases or sales of securities consistent with the Funds' investment objectives. (Id.) The Advisory Agreement between

3

MAM and the Funds required MAM to provide the Funds with office space and the executive personnel necessary to operate the Funds; however, Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan") actually provided those services. (Id.) The Agreement also required MAM to provide the Funds' officers and Board of Directors with various reports and statistical information. (Id.) MAM and/or Morgan Keegan compensated those officers and directors who also were employees of MAM or Morgan Keegan. (Id. ¶ 41.) MAM received an annual management fee for its services based on the average daily net assets of the Funds. The more money invested in the Funds, the higher the fee MAM received. (Id.)

Defendant Morgan Keegan is a full service broker/dealer with its principal place of business in Memphis, Tennessee. (Id. ¶ 45.) Morgan Keegan provided an employee to serve as the Funds' chief compliance officer and provided portfolio accounting services to the Funds. It also received an annual fee based on the Funds' average daily net assets for those services. (Id.) Morgan Keegan is a wholly-owned subsidiary of Defendant Regions Financial Corporation ("Regions"), a Delaware corporation with its principal place of business in Birmingham, Alabama. (Id. ¶ 48.) Regions is also the ultimate parent company of MK Holding and MAM. (Id.) Regions marketed shares of the Funds through two subsidiaries, Morgan Keegan and

4

Defendant Regions Bank. (Id. ¶¶ 49, 53.) Regions Bank maintains Defendant Regions Morgan Keegan Trust FSB ("Regions Morgan Keegan Trust"), a federally chartered savings bank formerly known as Morgan Keegan Trust Company, as its trust department. (Id. ¶ 54.) Regions Morgan Keegan Trust served as a fiduciary on behalf of its customers. Under an April 1, 2003 agreement, MAM provided investment advisory services to Regions Bank and Regions Morgan Keegan Trust (collectively "RMK Trust"). (Id.)

Defendants Allen B. Morgan, Jr.; J. Kenneth Alderman; Jack R. Blair; Albert C. Johnson; James Stillman R. McFadden; W. Randall Pittman; Mary S. Stone; and Archie W. Willis, III, were directors of the Funds. (Id. ¶¶ 59-67.) Morgan also served as a director and vice-chairman of Regions, a director of MAM, and chairman and CEO of Morgan Keegan. (Id. ¶ 59.) Alderman served as CEO of MAM and has served as an executive vice president of Regions, president of RMK Trust, and vice chairman and CEO of MAM. (Id. ¶ 60.) Johnson, McFadden, Pittman, and Stone served as members of MK Select's audit committee. (Id. ¶ 69.)

Defendants Carter E. Anthony, Brian B. Sullivan, Joseph C. Weller, J. Thompson Weller,[1] G. Douglas Edwards, Charles D. Maxwell, David M. George, and Michele F. Wood served as officers of the Funds. (Id. ¶¶ 75-82.) Anthony served as the Funds'

---

[1] J. Thompson Weller is the son of Joseph C. Weller. (CAC ¶ 78.)

president from 2003 until August 2006. (Id. ¶ 75.) He also was president and chief investment officer of MAM from 2002-2006. (Id.) Sullivan succeeded Anthony as the Funds' president. (Id. ¶ 76.) Joseph C. and J. Thompson Weller served as treasurer. (Id. ¶¶ 77-78.) Both also held executive roles at Morgan Keegan. (Id.) Edwards, a twenty-five year veteran of Morgan Keegan, served as the investment bank's CEO from 2003 until his resignation in April 2008. Before becoming CEO, Edwards had served as Morgan Keegan's president from 2001-2003. (Id. ¶ 79.) Maxwell was the Funds' secretary and, from 2006, served as the executive managing director, chief financial officer, treasurer, and secretary of Morgan Keegan. (Id. ¶ 80.) David M. George was the Funds' chief compliance officer until 2006 and was Morgan Keegan's senior vice president. (Id. ¶ 81.) Wood succeeded George as chief compliance officer. (Id. ¶ 82.) She also served as MAM's chief compliance officer, and her salary was paid solely by Morgan Keegan. (Id.)

Defendant James C. Kelsoe, Jr., a chartered financial analyst, served as MAM's and the Funds' senior portfolio manager. Kelsoe also was employed by Morgan Keegan and was registered with the Financial Industry Regulatory Authority as a representative of Morgan Keegan. (Id. ¶ 83.) Defendant David H. Tannehill, also a chartered financial analyst, assisted Kelsoe as a portfolio manager for the Funds and MAM. (Id. ¶

84.)  Kelsoe and Tannehill were eligible to receive annual cash bonuses that could equal fifty percent of their base salaries. (Id. ¶ 86.)   The performance of the Funds relative to their benchmark index determined part of Kelsoe's and Tannehill's bonuses.  (Id.)   The remainder of their bonuses was discretionary and depended on factors like their ability to bring in new clients, their service to existing clients, and their support of Morgan Keegan's policies and procedures. (Id.)

Defendant Thomas R. Gamble was a vice president of the Funds from 2003 and an executive of Regions from 1981.  (Id. ¶ 85.)  Plaintiffs have also sued twenty "John Doe" Defendants who were "supervised, or . . . otherwise employed by Morgan Keegan and [MAM]."  (Id. ¶ 87.)   Those John Doe Defendants allegedly aided Morgan Keegan in performing due diligence in its sale of the Funds' shares.  (Id.)   The CAC employs the term "RMK Defendants" to refer to MAM, Morgan Keegan, MK Holding, Regions, Regions Bank, and John Does 1-20.  (Id. ¶ 88.)  "Morgan Keegan" and "MAM" include "as relevant, their respective officers and employees named as Defendants, including John Doe One through Twenty."  (Id.)  The term "Defendants" includes the Funds, the RMK Defendants, and Defendant PricewaterhouseCoopers ("PwC"). (Id.)

PwC, a limited liability partnership, is a national public accounting and auditing firm that audited the Funds' annual

financial statements.  (Id. ¶ 94.)  It also issued reports on the Funds' internal controls and certified certain information in the Funds' prospectuses and statements of additional information.  (Id. ¶ 94.)

According to Plaintiffs' CAC, Kelsoe became enamored with investing in collateralized debt obligations ("CDOs").  (Id. ¶¶ 361, 367.)  He allegedly caused the Funds to invest heavily in CDOs; although, most other mutual funds invested minimally in CDOs.  (Id. ¶ 369)  The Funds' prospectuses stated that they would never invest more than 15% of their total assets in illiquid investments – investments where the market is small because of the small number of potential purchasers.  (Id. ¶ 162.)  Nonetheless, Kelsoe allegedly violated that restriction in managing all three Funds.  (Id. ¶ 164.)  For example, the Short Term Fund, meant to have the most conservative investment strategy of the three Funds, invested 31.5% of its total assets in illiquid CDOs – more than twice the maximum amount allowed.  (Id.)  The Funds also had a "fundamental investment restriction" that prevented them from having more than 25% of their total assets in "the securities of companies whose principal business activities are in the same industry."  (Id. ¶ 273.)  Because that restriction was fundamental, only an affirmative vote of the Funds' shareholders could waive it.  (Id. ¶ 274.)  The RMK Defendants allegedly ignored the restriction and caused the High

Income Fund to invest 52.32% of its assets in mortgage-backed securities. (Id. ¶ 276(a).) The Intermediate Fund held 54.71% of its assets in mortgage-backed securities, and the supposedly conservative Short Term Fund held 54.11% of its assets in similar investments. (Id. ¶ 276(b)-(c).)

Although the markets as a whole experienced a significant decline because of the credit crisis, Plaintiffs assert that the Funds' losses were not a result of normal market factors. Instead, they allege that the Funds declined because of their investment in numerous low-priority tranches[2] of asset-backed securities. (Id. ¶ 295.) These low-quality, high risk investments had the effect of exposing "the Funds and their investors to the credit risk equivalent of an investment in the underlying portfolio of assets leveraged between 10 to 50-to-1. (Id. ¶ 296(b).) This violated the Funds' fundamental restriction that "they would not use leverage for investment purposes" but only for emergency purposes to maintain liquidity. (Id. ¶ 293.)

---

[2] "Tranche" is the French world for "slice." In the field of investments, tranche refers to a security that its sellers split into smaller pieces to be sold to investors. Where the security is an asset-backed security, like those at issue here, each tranche has different rules for paying its investors. The "top" tranche contains the safest securities, and its investors receive principal and income payments first. The lowest tranche contains the riskiest securities. Its investors receive payment only if all investors in the higher tranches are paid first. Thus, if borrowers default on the assets backing the securities, those who have invested in the lowest tranches bear any losses first. Consulting Servs. Group, LLC v. Morgan Keegan & Co., Nos. 10-02045, MDL 2009, 2010 U.S. Dist. LEXIS 66917, at *4 n.2 (W.D. Tenn. July 2, 2010).

When the market began to question the underlying value of mortgage-backed CDOs in 2007, the Funds found themselves holding assets quickly declining in value that they could not readily sell because of the limited market for such investments. (Id. ¶ 5.) From December 31, 2006, to December 31, 2007, the per-share value of the assets held by the High Income Fund, Intermediate Fund, and Short Term Fund dropped respectively by 72%, 70%, and 23%. (Id.) The collective value of the assets held by all three Funds fell from $2.2 billion to $372.5 million. (Id.)

Plaintiffs filed suit on December 6, 2007. (See Compl., ECF No. 1.) This Court consolidated five then-separately pending suits and appointed Lead Plaintiffs and Lead Counsel by Order dated September 23, 2008. (Atkinson v. Morgan Asset Mgmt., No. 07-2784, ECF No. 154, Order Granting in Part and Denying in Part Motions for Partial Consolidation, Appointment of Lead Plaintiff, and Approval of Counsel, at 38-40 (W.D. Tenn.)). The Lead Plaintiffs filed the CAC on November 30, 2009. The CAC alleges seven causes of action, all based on federal law. Plaintiffs allege Defendants violated §11, §12(a)(2), and § 15 of the Securities Act of 1933; §§ 11, 22, 30, 34(b), and 47(b) of the Investment Company Act of 1940; and § 10(b), § 20, and Rule 10b-5 of the Securities Exchange Act of 1934. (CAC ¶¶ 684-766.) Plaintiffs seek compensatory or rescissory damages for their losses, prejudgment interest,

costs, and reasonable attorneys' fees. (Id. at 366.)
Defendants filed the present Motions to test the adequacy of
Plaintiffs' Complaint.

## II.   JURISDICTION AND STANDARD OF REVIEW

Plaintiffs bring all their claims under the federal
securities laws. This Court thus has federal question
jurisdiction over Plaintiffs' suit. 28 U.S.C. § 1331.

In addressing a motion to dismiss for failure to state a
claim under Federal Rule of Civil Procedure 12(b)(6), the Court
must construe the complaint in the light most favorable to the
plaintiff and accept all well-pled factual allegations as true.
League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523,
527 (6th Cir. 2007). A plaintiff can support a claim "by
showing any set of facts consistent with the allegations in the
complaint." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563
(2007). This standard requires more than bare assertions of
legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d
356, 361 (6th Cir. 2001). "[A] formulaic recitation of the
elements of a cause of action will not do." Twombly, 550 U.S.
at 555. Any claim for relief must contain "a short and plain
statement of the claim showing that the pleader is entitled to
relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per
curiam). "Specific facts are not necessary; the statement need
only 'give the defendant fair notice of what the . . . claim is

and the grounds upon which it rests.'" Id. (citing Twombly, 550 U.S. at 555.)

Nonetheless, a complaint must contain sufficient facts "to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "This plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949 (citation omitted). A plaintiff with no facts and "armed with nothing more than conclusions" cannot "unlock the doors of discovery." Id. at 1950.

Plaintiffs' CAC accuses "[e]ach of the RMK Defendants" of being "a participant in a fraudulent scheme and course of conduct." (CAC ¶ 103.) Where a plaintiff makes allegations of fraud, including securities fraud, he or she must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Frank v. Dana Corp., 547 F.3d 564, 569-70 (6th Cir. 2008). Rule 9(b) requires that a party "alleging fraud or mistake . . . state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard mandates that plaintiffs alleging

fraud 1) specify which statements were fraudulent, 2) indentify the defendant(s) who spoke the fraudulent statements, 3) describe "when and where the statements were made" and 4) "explain why the statements were fraudulent." Frank, 547 F.3d at 570 (citation and internal quotation marks omitted). "At a minimum, [p]laintiffs must allege the time, place and contents of the misrepresentations upon which they relied" to satisfy Rule 9. Id. (citing Bender v. Southland Corp, 749 F.2d 1205, 1216 (6th Cir. 1984)).

### III. ANALYSIS

#### A. `34 Act Claims

Plaintiffs' CAC alleges three claims under the Securities and Exchange Act of 1934 (the "`34 Act"). Count V alleges that the Funds, MAM, Morgan Keegan, Regions Bank, and PwC violated § 10 of the `34 Act and Rule 10b-5 promulgated thereunder. (CAC ¶ 742, 750); see also 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Count VI of the CAC alleges violations of the same provisions against Regions Bank, Morgan Keegan, and MAM on behalf of the Fiduciary Subclass. (Id. ¶ 752.) Count VII alleges that the officer and director Defendants, Regions, and MK Holding were "control persons" under § 20 of the `34 Act. See § 15 U.S.C. § 78t(a). Plaintiffs' control person claim may only stand if Plaintiffs successfully plead a primary violation of § 10(b). See 15 U.S.C. § 78t(a); PR Diamonds, Inc. v. Chandler, 364 F.3d

671, 696 (6th Cir. 2004).   Section 10(b) prohibits, "in connection with the purchase or sale of any security," the use of "any manipulative device or contrivance."   15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the Securities and Exchange Commission, implements that prohibition.   <u>See</u> 17 C.F.R. § 240.10b-5; <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 318 (2007).

### 1. The PSLRA's heightened pleading standard

When a plaintiff alleges a violation of § 10(b) and Rule 10b-5, the Private Securities Litigation Reform Act ("PSLRA") mandates a heightened pleading standard greater than that required by Rule 9(b).   <u>Compare</u> 15 U.S.C. § 78u-4(b)(2), <u>with</u> Fed. R. Civ. P. 9(b); <u>Konkol v. Diebold, Inc.</u>, 590 F.3d 390, 396 (6th Cir. 2009) (noting "the more exacting pleading requirements" of the PSLRA (citation and internal quotation marks omitted)).   The PSLRA requires a plaintiff 1) "to state with particularity" the facts constituting the alleged violation, including "specifying each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1), and 2) "state with particularity the facts giving rise to a strong inference that the defendant acted with the particular state of mind."   <u>Id.</u> § 78 u-4(b)(2).   That "particular state of mind" is known as scienter and requires a plaintiff to show that a defendant's intention was "to deceive, manipulate or defraud."   <u>Tellabs</u>, 551

U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976)).  An inference of scienter is "strong" within the meaning of the PSLRA if it is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 314. Allegations of negligence do not support a finding of scienter. Konkol, 590 F.3d at 396.  In the Sixth Circuit, a plaintiff at least must state allegations sufficient to find that a defendant acted with recklessness.  Mansbach v. Prescott, Ball, & Turben, 598 F.2d 1017, 1023 (6th Cir. 1979); see also Konkol, 590 F.3d at 396.  The Sixth Circuit defines recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  Mansbach, 598 F.2d at 1025.  The danger "must be so obvious that any reasonable man would have known of it."  Id.

### 2. Plaintiffs have failed to plead scienter

Plaintiffs argue that they have adequately pled scienter as to the named Defendants in Counts V-VI of the CAC.  (Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss, ECF No. 238, at 93-99.) ("Pls' Resp.")  An examination of the CAC and the relevant case law, however, demonstrates that they have not met the PSLRA's enhanced burden.

15

### a. It is unclear who is a Defendant

Plaintiffs' CAC names as Defendants in their § 10(b) claims the Funds, MAM, Morgan Keegan, Regions Bank, and PwC. (CAC ¶¶ 74, 750, 752.) Paragraph 88 of the CAC advises that the terms MAM and Morgan Keegan "shall each be deemed to include, as relevant, their respective officers and employees as named Defendants, including John Doe One through Twenty." Thus, at first glance, one would conclude that Plaintiffs are stating claims against the officers and directors of Morgan Keegan and MAM by the use of those terms in Counts V and VI. However, examining the other counts of the CAC, one finds that Plaintiffs appear to state explicitly when they are suing, or not suing, "Defendant Officers and Directors" in the relevant count. (Cf. CAC ¶ 684 (explicitly excluding the directors and officers for claims under the `33 Act); ¶ 758 (suing the officers and directors for control person liability under § 20 of the `34 Act).) The Motion to Dismiss of the Individual Defendants[3] points to this ambiguity and states that the Individual Defendants are unsure whether Plaintiffs have sued them under § 10(b). (Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss, ECF No. 226-1, at 1 n.1.) Plaintiffs' own Response fails to answer the Individual

---

[3] Allen B. Morgan, Jr.; J. Kenneth Alderman; Carter E Anthony; Brian B. Sullivan; Joseph C. Weller; John T. Weller; G. Douglas Edwards; Charles D. Maxwell; David M. George; Michelle F. Wood; James C. Kelsoe, Jr.; David H. Tannehill; and Thomas R. Gamble.

16

Defendants' query.   Plaintiffs state instead that they have
"allege[d] the role of each Defendant that was instrumental to
the Funds' mismanagement" without clarifying whether that
includes officers and directors such as the Individual
Defendants. (Pls' Resp. at 93.)

When it is possible to ask legitimately, after reading a
four-hundred-page Complaint, who is being sued for what on a
particular count, Plaintiffs have not met the PSLRA's pleading
standards. See 15 U.S.C. § 78u-4(b)(1)-(2) (requiring that a
plaintiff "state with particularity" all facts surrounding the
alleged misrepresentations or omissions and why a finding of
scienter is appropriate).   It is not for the Court or for
Defendants to ask who is "relevant" (CAC ¶ 88) to a particular
count.   It is Plaintiffs' duty to state clearly against whom
they seek damages. See Frank, 547 F.3d at 570.   Counts V and VI
arguably do not meet even Rule 8's more forgiving standard
requiring plausibility. See Fed. R. Civ. P. 8(a)(2) (requiring
a "short and plain statement of the claim showing that the
pleader is entitled to relief" (emphasis added)).   Therefore,
they cannot meet the "more exacting" standards of Rule 9(b) and
the PSLRA. Konkol, 590 F.3d at 396 (internal quotation marks
and citation omitted).   On this basis alone, DISMISSAL of the
`34 Act counts is appropriate.

### b. Plaintiffs fail under group pleading

Alternatively, assuming that Plaintiffs have pled with the requisite particularity against whom they bring their claims, Plaintiffs have failed to demonstrate that "an inference of scienter . . . [is] at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. Plaintiffs invoke the "group pleading" doctrine, also called the "group published doctrine," which provides that, "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers."[4]  City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 689 (6th Cir. 2005).  Following the passage of the PSLRA, the Fifth Circuit and many district courts have found that the group pleading doctrine no longer applies.  See Southland Sec. Corp. v. INSpire Solutions, Inc., 365 F.3d 353, 364 (5th Cir. 2004) (collecting cases).  Those circuits that have continued to apply the doctrine have generally done so without analysis of the potential effects of the PSLRA's passage.  See Bridgestone, 399 F.3d at 690 n.33 (collecting cases).  The Sixth Circuit has not taken a position

---

[4] Here, Plaintiffs arguably seek to expand the group pleading doctrine to include not only the officers but also the directors, related corporate entities, and the Funds' auditor.  (Pls' Resp. at 95-96.)  Cf. Bridgestone, 399 F.3d at 689.

on the continuing viability of the group pleading doctrine. See id. at 690 (noting that the court "need not decide here the current viability of the group published doctrine"). For the purposes of this analysis, the Court will assume the doctrine applies.

The Sixth Circuit has identified nine factors that are "usually relevant to scienter." Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001) (en banc), abrogated in part by Tellabs, 551 U.S. at 324 (expressly abrogating the Sixth Circuit's prior, higher standard requiring that the inference that a defendant acted with scienter be the "most plausible of competing inferences"); see also PR Diamonds, 364 F.3d at 682-83 (noting that the Helwig factors remain "probative of scienter"). Those nine factors are:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Helwig, 251 F.3d at 552 (citation omitted).  The Helwig factors are not an exhaustive list.  PR Diamonds, 364 F.3d at 682.  The Court must view the Plaintiffs' CAC as a whole, take into account documents incorporated into the CAC by reference, and engage in a comparative inquiry about how likely it is that scienter, as opposed to non-fraudulent activity, arises from the underlying facts.  Tellabs, 551 U.S. at 323.

Plaintiffs point to four factors suggesting scienter in this case.  (Pls' Resp. at 98.)  First, they note those portions of their CAC that allege the proximity between the allegedly fraudulent statements about the liquidity of the Funds' investments and the later disclosure of those investments' illiquidity.  (CAC ¶¶ 182-83, 187, 195-98, 220(h), 220(l), 221-22, 470-72.)  Temporal proximity alone, however, cannot support a finding of scienter.  See Fidel v. Farley, 392 F.3d 220, 232 (6th Cir. 2004).  The facts alleged in this case illustrate why. The credit crisis that caused the collapse of the market for asset backed securities, like those in which the Funds invested, occurred over a relatively short time.  (Cf. CAC ¶ 154 (graph depicting the sharp and sudden drop of the share price of the Intermediate Fund in mid-to-late 2007).)  It is at least equally possible that the temporal proximity occurred because of the closeness of the sudden market crash to the July 30, 2007 end

date of the Funds' fiscal years.   Nonetheless, proximity must
weigh in the scienter analysis.

The second factor Plaintiffs cite is the disclosure of
accounting information in such a way that only a person of a
high degree of sophistication could understand it.  (CAC ¶¶ 183,
189, 195-98, 209, 220, 220(l), 469-72.)   Plaintiffs undercut
their theory by admitting that they "do not allege that the
dollar value for _any_ security was incorrect at _any_ time during
the Class Period."  (Pls' Resp. at 22 (emphasis added).)   Thus,
Plaintiffs admit that a perfect disclosure of the facts
surrounding the Funds' investments would _not_ have revealed that
any dollar value assigned to a Fund security was incorrect.
Although the cited paragraphs of the CAC reference specific
omitted or misleading disclosures about the Funds' liquidity,
when one views Plaintiffs' inability to allege that any
security's dollar value was overstated in conjunction with the
proximity of the Funds' revelation of illiquidity to the
collapse of the credit markets, it becomes increasingly likely
that market forces, rather than recklessness, caused the
collapse.

Plaintiffs' third factor is that the `34 Act Defendants'
disregarded the most current factual information before making
the misleading statements.  (Pls' Resp. at 98.)   Particularly
relevant here are Plaintiffs' allegations that Regions, Morgan

Keegan, and PwC had actual knowledge that the Funds' liquidity disclosures were deficient because they issued, underwrote, or audited some of the same securities in which the Funds invested and had reason to know they were illiquid. (Id. ¶ 205.) Such an allegation is damaging and likely would lead to a finding of scienter, because it would mean these Defendants concluded that the investments were illiquid when they analyzed them for independent investors, but stated they were liquid when they purchased or audited them for the Funds. Once again, however, the Plaintiffs severely undermine their own allegation. The CAC states that the Funds invested in two securities that Morgan Keegan underwrote; PwC audited twenty securities the Funds purchased as investments; and the CAC is silent about how many securities Regions issued. (Id.) For Funds that held $2.2 billion in assets, two or twenty securities are likely to represent a de minimus amount. (See ¶ 5.) It is impossible to determine how large a share of the Funds' investments these securities represented because Plaintiffs fail to indentify the securities by name and do not allege how large a share of the Funds' assets they represented. Basing knowledge on two or twenty securities among differing investments made over a three-year period does not support a finding of scienter. A court cannot infer fraudulent intent from the mere fact that a

22

particular defendant had access to information.   PR Diamonds,
364 F.3d at 688.

   This barrier is especially applicable to PwC.   "To allege
that an independent auditor acted with scienter, the complaint
must allege specific facts showing that the deficiencies in the
audit were so severe that they strongly suggest that the auditor
must have been aware of the corporation's fraud."   Id. at 694
(citations omitted).   Plaintiffs cannot allege that PwC must
have been aware of the fraud when Plaintiffs admit that no
security's dollar value was incorrect.   (Pls' Resp. at 22.)
Although Plaintiffs plead violations of several provisions of
the Generally Accepted Accounting Principles ("GAAP"), (see CAC
¶¶ 531-71), failure to follow GAAP does not by itself state a
securities fraud claim.   Konkol, 590 F.3d at 400.   The Sixth
Circuit has described the type of accounting violations that
lead to a finding of scienter as "obvious."   PR Diamonds, 364
F.3d at 685.   That a perfect audit would not have led PwC to
find a misvalued security in the Funds' portfolios leads the
Court to conclude that any errors were not clear violations of
"simple accounting rules."   See id.

   The final factor Plaintiffs assert is that the Defendants
had a self-interested motivation.   (Pls' Resp. at 98.)
Plaintiffs point to the fees received by MAM, Morgan Keegan,
Regions, and Regions Bank for managing and administering the

Funds and marketing the Funds' shares (CAC ¶¶ 41, 45); the substantial bonuses Kelsoe and Tannehill could earn (id. ¶¶ 83-84, 86); and Regions' and Morgan Keegan's strategy of cross-branding each other's services. (Id. ¶¶ 651, 654.) When analyzing the self-interest factor, a court must differentiate between "motives common to corporation and executives generally" and "motives to commit fraud." PR Diamonds, 364 F.3d at 690. Every corporation and business executive wants to appear successful. Id. That Morgan Keegan, MAM, and Regions stood to profit from the success of the Funds does not make a "cogent" case for fraud. See Tellabs, 551 U.S. at 314. Plaintiffs do not allege that Tannehill or Kelsoe ever received a bonus or how much they received, requiring the Court to discount these allegations, as well. (See CAC ¶¶ 83-84, 86.)

Plaintiffs have not chosen to argue one allegation. They allege that certain employees of Morgan Keegan read a "published article" revealing that the Funds had purchased many securities from a small Florida dealer who focused on illiquid securities. (CAC ¶ 352.) These unidentified employees became concerned about their investments in the Funds and sold their personal shares. (Id. ¶ 354.) Defendant Edwards, Morgan Keegan's CEO, discovered those sales and prohibited other employees from selling their personal holdings in the Funds. (Id. ¶ 354.) It is certainly possible to read this allegation to indicate that a

corporate leader was concerned that news of his employees' selling their shares could alert other shareholders to potential losses. (See id.) However, the CAC notes that this revelation about one of the sources of the Funds' investments came in a published, publically available article. Any interested investor could have gained access to the same information. Edwards may have believed that the Funds were sound investments and that individual employees – the precise number of whom and the size of whose sales the CAC does not reveal – should not undermine this corporate message. (See id. ¶¶ 352-54.)

Employing the reading of this allegation most favorable to Plaintiffs, Plaintiffs have not established scienter. Insider trading only raises suspicions "when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed insider information."[5] Konkol, 590 F.3d at 399 (citations and internal quotation marks omitted). Plaintiffs do not allege how many employees sold their shares in the Funds, when these sales took place, how many total employees held the Funds' shares, or whether the individual share sales made a marked difference in the number of shares held by Morgan Keegan employees. Without

---

[5] The information here, of course, was disclosed publically in a published article. (CAC ¶ 352.)

more, it is impossible to know whether this was an aberration or indicative of deep, growing concerns about the Funds' liquidity.

Assuming the group pleading doctrine has retained its viability after passage of the PSLRA and viewing the pleadings as a whole, Plaintiffs have failed to demonstrate that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. Plaintiffs' pleadings undermine their strongest assertions of scienter and some assertions, like those about violation of the GAAP or the alleged self-interested motives of the Defendants, are entitled to little or no weight. Counts V and VI of the CAC are DISMISSED. Because Plaintiffs have failed to plead a primary violation, they may not bring a claim for controlled person liability under § 20(a) of the `34 Act. See 15 U.S.C. § 78t(a); PR Diamonds, 364 F.3d at 696. The Court, therefore, DISMISSES Count VII of the CAC.

### B. `33 Act Claims

Plaintiffs' CAC also allege causes of action based on the Securities Act of 1933 (the "33 Act"). (CAC ¶¶ 683-724.) Count I alleges violations of § 11 of the `33 Act, 15 U.S.C. § 77k, against the Funds, Morgan Keegan, Morgan Management, Regions Bank, and PwC.[6] (Id. ¶ 684.) The Count's heading makes clear

---

[6] Auditors such as PwC are only liable for those statements in the registration statement that they certified. 15 U.S.C. § 77k(a)(4).

that the claim does not lie against the officer and director Defendants. (See id.) Count II, which is against all Defendants except Regions, PwC, and MK Holding, asserts claims under § 12(a)(2) of the `33 Act, 15 U.S.C. § 77l. Count III alleges control person liability under § 15, 15 U.S.C. § 77o, against the officers and directors of the Funds; MAM; MK Holding; Regions; Morgan Keegan; and the officers and directors of MAM, Morgan Keegan, MK Holding, Regions Bank, and Regions. (CAC ¶ 717.) As with control person liability under the `34 Act, Plaintiffs must successfully state a primary violation of the `33 Act, i.e., Counts I or II, to maintain their control person claims. See 15 U.S.C. § 77o(a); J&R Mktg. v. Gen. Motors Corp., 549 F.3d 384, 398 (6th Cir. 2008).

The heightened pleading standards of the PSLRA do not apply to claims under the `33 Act; however, where the claims sound in fraud, the standards of Rule 9(b) do apply. Indiana State Dist. Council of Laborers v. Omnicare, Inc., 583 F.3d 935, 948 (6th Cir. 2009); Rubke v. Capitol Bancorp, Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009). Thus, "[a]t a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." Frank, 547 F.3d at 570 (citation omitted).

## 1. Section 11 claims

Section 11 prohibits making "untrue statement[s] of material fact" or omitting statements of material fact in a

27

security's registration statement.   15 U.S.C. § 77k(a).   It
protects investors who "acquired" the security in reliance on
the representations contained in the registration statement.
Id.   The CAC identifies with particularity when the supposedly
misleading statements were made.   (CAC ¶ 690.)   It also makes
clear which statements were misleading:   the Funds claimed to
abide by restrictions that prohibited them from holding more
than 15% of their assets in illiquid securities and more than
25% of their assets in securities related to the same industry.
(See, e.g., id. ¶¶ 162, 276.)   Plaintiffs allege that these
statements were misleading because the Funds did not, in fact,
abide by these restrictions.   (See, e.g., id. ¶¶ 171, 276(a)-
(c).)   Other courts faced with similar § 11 claims have allowed
such claims to proceed.   See, e.g., Rodney v. KPMG Peat Marwick,
143 F.3d 1140, 1145 (8th Cir. 1998) (allowing claims alleging
that the funds violated restrictions on borrowing money,
purchasing illiquid securities, and investing in derivatives to
proceed); White v. Heartland High-Yield Mun. Bond Fund, 237 F.
Supp. 2d 982, 984-86 (E.D. Wis. 2002) (permitting claims against
PwC based on failure to follow limitations on illiquid
securities).   Indeed, in one of the cases Defendants cite to
support their argument that Plaintiffs' claims should be
dismissed, the district court reversed itself as to the § 11
claims on reconsideration.   See Yu v. State St. Corp., 686 F.

Supp. 2d 369, 378-81 (S.D.N.Y. 2010) (dismissing plaintiffs'
claims based on funds' over-exposure to mortgage backed
securities), vacated by 2010 U.S. Dist. LEXIS 70931, at *9-15
(allowing claims to proceed following the filing of amended
complaint).

Defendants argue that Plaintiffs have failed to plead loss
causation. (See, e.g., Memorandum in Support of Defendant
Morgan Keegan's Motion to Dismiss, ECF No. 222-1, at 49-55.)
("Morgan Keegan Mem.") Loss causation is not an element of a §
11 claim; it is an affirmative defense unsuitable for
adjudication in a motion to dismiss. 15 U.S.C. § 77l(b); see
Indiana State Dist. Council, 583 F.3d at 947. Plaintiffs have
therefore stated a claim under Section 11 of the `33 Act, and
Defendants' Motions to Dismiss this claim are DENIED.

## 2. Sections 12(a)(2) and 15 claims

Section 12(a)(2) creates a cause of action based on
"misleading statements, misstatements, or omissions in a . . .
prospectus." J&R Mktg., 549 F.3d at 389; see also 15 U.S.C. §
77l(a)(2). Plaintiffs base their allegations in this count on
the same misstatements alleged under the § 11 count. (See,
e.g., CAC ¶ 222.) For the reasons stated in the § 11 analysis,
Plaintiffs have stated a claim under § 12(a)(2) of the `33 Act.

Certain Defendants argue that they are not "statutory
sellers" under § 12(a)(2). (See, e.g., Morgan Keegan Mem. at

46-47.)   A seller is one who 1) passes title, or other interest in the security, to the purchaser for value or 2) successfully solicits the purchase based at least in part on a desire to further his own financial interests or those of the securities' owner.  <u>Pinter v. Dahl</u>, 486 U.S. 622, 647 (1988); <u>Smith v. Am. Nat'l Bank & Trust Co.</u>, 982 F.2d 936, 941 (6th Cir. 1992).  As the test suggests, whether someone "solicits" a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion. Defendants' Motions to Dismiss Plaintiffs' claims under § 12(a)(2) of the `33 Act are DENIED.

Because Plaintiffs have stated primary claims under the `33 Act, they may also state a claim under § 15 for control person liability.  15 U.S.C. § 77o(a); <u>J&R Mktg.</u>, 549 F.3d at 398. Section 15 places liability "jointly and severally" on any person who "controls any person liable under section 11 or 12." 15 U.S.C. § 77o(a).  Whether a party exercised the requisite control involves a factual analysis best saved for later determination.  The Court, therefore, DENIES Defendants' Motions to Dismiss Plaintiffs' control person liability claims under the `33 Act.[7]

---

[7] Likewise, any arguments about the application of the statue of repose to any individual claims should await factual development of the claims.  <u>See</u> 15 U.S.C. § 77m (extinguishing all claims "three years after the security was bona fide offered to the public").

### 3. Holder Claims

Plaintiffs seek to represent a class of individuals who "refrained from redeeming the Funds' shares during the period from March 1, 2007 through April 30, 2008." (CAC ¶ 2(a)(2).) The `33 Act limits claims to <u>purchasers</u>. 15 U.S.C. § 77k(a) (noting that the party must have "acquired" the security); 15 U.S.C. § 77l(a)(2) (imposing liability if a the party "offers or sells" a security to an investor based on misstatements in a prospectus or oral communication). Because the proposed class definition includes investors who did not purchase the Funds' shares during the class period of December 6, 2004 - December 6, 2007, these holder claims must be DISMISSED. <u>See</u> <u>Simmons v. Wolfson</u>, 428 F.2d 455, 456 (6th Cir. 1970) (<u>per curiam</u>); <u>Miller v. Lazard, Ltd.</u>, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007) (noting that the `33 Act allows "purchasers of registered securities" to hold parties liable for misstatements).

### C. ICA Claims

Count IV of the CAC alleges that all Defendants violated §§ 13, 22, 30, 34(b), and 47(b) of the Investment Company Act of 1940 ("ICA"). (CAC ¶ 725.) As Plaintiffs admit, other than § 47(b), the cited ICA provisions do not contemplate private rights of action. (Pls' Resp. at 136-37.) Plaintiffs assert that one district court has found an implied private right of action under § 13(a). <u>See</u> <u>Northstar Fin. Advisors, Inc. v.</u>

31

Schwab Invs., 609 F. Supp. 2d 938, 944 (N.D. Cal. 2009).   The
Ninth Circuit recently reversed that conclusion on interlocutory
appeal.   Northstar Fin. Advisors, Inc. v. Schwab Invs., No. 09-
16347, ___ F.3d ___, 2010 U.S. App. LEXIS 16706, at *2 (9th Cir.
Aug. 12, 2010).

The Second Circuit has persuasively explained why it is
inappropriate to imply private rights of action under the ICA.
See Olmsted v. Pruco Life Ins. Co., 283 F.3d 429, 432-436 (2d
Cir. 2002).   The ICA expressly provides that the Securities and
Exchange Commission, rather than private plaintiffs, has the
right to enforce all provisions of the ICA.   See 15 U.S.C. §
80a-41.   Congress provided an express private right of action to
enforce § 36(b) of the ICA, demonstrating that Congress knew how
to provide a private right of action when it wanted one.   See 15
U.S.C. § 80a-35(b) ("An action may be brought under this
subsection by the Commission, or by a security holder of such
registered investment company." (emphasis added)).   These two
factors create a strong presumption that Congress did not intend
to create a private right of action under any section of the ICA
that does not specify one.   Olmsted, 283 F.3d at 433.
Plaintiffs have failed to overcome that presumption, and the
Court DECLINES to imply any new private rights of action under
the ICA.   Plaintiffs' claims under §§ 13, 22, 30, and 34(b) of
the ICA are DISMISSED.

Courts have determined that § 47(b) of the ICA contemplates a private right of action. Lessler v. Little, 857 F.2d 866, 874 (1st Cir. 1988); Mathers Fund, Inc. v. Colwell Co., 564 F.2d 780, 783 (7th Cir. 1977); Hamilton v. Allen, 396 F. Supp. 2d 545, 558-60 (E.D. Pa. 2005); In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 873, 880-81 (D. Md. 2005). Section 47(b) provides that any contract whose terms or performance would involve violating any provision of the ICA is unenforceable. 15 U.S.C. § 80a-46(b)(1). It gives "any party" to the contract the right to seek rescission. Id. (b)(2). Plaintiffs argue that the underlying contract is the underwriting agreement between the Funds and Morgan Keegan. (Pls' Resp. at 139.) Plaintiffs are not parties to the underwriting agreement and, therefore, may not assert a direct remedy under § 47(b). Lessler, 857 F.2d at 874; Hamilton, 396 F. Supp. 2d at 558. A plaintiff may bring a § 47(b) claim derivatively on behalf of the Funds, but this suit is a direct suit against the defendants, not a derivative action. Lessler, 857 F.2d at 874; Hamilton, 396 F. Supp. 2d at 558. Plaintiffs' claim under § 47(b) of the ICA is prohibited and is DISMISSED.

### IV.   CONCLUSION

Defendants' Motions to Dismiss the `34 Act claims are GRANTED because Plaintiffs have failed to plead scienter properly, as required by the PSLRA. Defendants' Motions to

Dismiss the `33 Act claims are DENIED, with the exception of any claims on behalf of those who did not purchase shares of the Funds during the class period.  All such holder claims are DISMISSED for lack of standing.  Plaintiffs' claims under the ICA are also DISMISSED.

In the last sentence of their response, Plaintiffs seek permission to amend the CAC "to cure any deficiencies" the Court may find.  (Pls' Resp. at 140.)  This request is unsupported by any argument or citation to authority.  The request is DENIED. See PR Diamonds, 364 F.3d at 699 (noting that "a bare request in an opposition to a motion to dismiss" without any argument does not constitute a motion to amend (citations and internal quotation marks omitted)); cf. Mitan v. Duval (In re Mitan), 573 F.3d 237, 248 n.5 (6th Cir. 2009) (declining to consider a "last-sentence request" because applicants provided no citation of authority or other support).

So ordered this 30th day of September, 2010.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE