IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION | No. 2:09-md-02009-SHM |
| | Judge Samuel H. Mays, Jr. |
| This Document Relates to: | Magistrate Judge Diane K. Vescovo |
| *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, No. 2:07-cv-02784-SHM-dkv | |
| and | |
| *Landers v. Morgan Asset Management, Inc.*, No. 2:08-cv-02260-SHM-dkv | |

**SETTLING FUND DEFENDANTS' MEMORANDUM IN REPLY TO DEFENDANTS'
OPPOSITION TO JOINT MOTION FOR PRELIMINARY APPROVAL
OF PARTIAL SETTLEMENT AND JOINT MOTION FOR APPROVAL OF RULE 23.1
NOTICE TO SHAREHOLDERS AND FOR FINAL APPROVAL OF THE
<u>MEMORANDUM OF UNDERSTANDING</u>**

**PAUL, HASTINGS, JANOFSKY &
WALKER LLP**
Kevin C. Logue
75 East 55th Street
New York, NY 10022
Tel: (212) 318-6000
Fax: (212) 319-4090
E-mail: kevinlogue@paulhastings.com
*Counsel for Defendants
Helios Select Fund, Inc. (formerly Morgan
Keegan Select Fund, Inc.), Helios Select Short
Term Bond Fund (formerly Regions Morgan
Keegan Select Short Term Bond Fund), Helios
Select Intermediate Bond Fund (formerly
Regions Morgan Keegan Select Intermediate
Bond Fund) and Helios Select High Income
Fund (formerly Regions Morgan Keegan Select
High Income Fund)*

## TABLE OF CONTENTS

**Page**

I.   FACTUAL/PROCEDURAL HISTORY ........................................................................ 1

II.   ARGUMENT ...................................................................................................... 5

    A.   The Settlement Was the Product of the Independent New Board's Exercise of  Business Judgment and Is Fair and Reasonable to the Settlement Class(es) ......................................................................................................... 5

    B.   Defendants' Objections Are Incorrectly Premised Upon Allegations of a Conflict of Interest ....................................................................................... 10

    C.   The Remaining Arguments in Defendants' Objections to the Settlement Are Equally Unfounded .............................................................................. 17

        1.   Standing to Pursue Derivative Claims ................................................. 17

        2.   Consideration for Releasing Claims Against the Funds ......................... 21

        3.   Compensation Provisions in the MOU .................................................. 22

        4.   Board Decision Regarding Dismissal of Independent Directors ............. 24

III.   CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp.*,
    690 F. Supp. 607 (S.D. Ohio 1988) ......................................................................13

*Bertozzi v. King Louie Int'l, Inc.*,
    420 F. Supp. 1166 (D.R.I. 1976).........................................................................16

*Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*,
    573 F.2d 988 (8th Cir. 1978) ..............................................................................11

*Heilbrunn v. Hanover Equities Corp.*,
    259 F. Supp. 936 (S.D.N.Y. 1966).......................................................................16

*Host Marriott Corp. v. Fast Food Operators, Inc.*,
    891 F. Supp. 1002 (D.N.J. 1995) .........................................................................11

*Howard v. Wilkes & McHugh, P.A.*,
    2007 WL 4370584 (W.D. Tenn. Dec. 3, 2007) ....................................................13

*In re Regions Morgan Keegan Open-End Mutual Fund Litig.*,
    No. 2:07-cv-02784-SHM-dkv (W.D. Tenn.) ..........................................................1

*In re Regions Morgan Keegan Secs., Derivative, & ERISA Litig.*,
    742 F. Supp. 2d 917 (W.D. Tenn. 2010).............................................................22

*In re Reserve Fund Securities and Derivative Litigation*,
    673 F. Supp. 2d 182, 196 (S.D.N.Y. 2009).................................................. passim

*Jolly Roger Fund LP v. Sizeler Property Investors, Inc.*,
    2005 WL 2989343 (D. Md. Nov. 3, 2005) ...........................................................19

*Jones v. Harris Associates L.P.*,
    130 S. Ct. 1418 (2010)..........................................................................................7

*Kane Assoc. v. Clifford*,
    80 F.R.D. 402 (E.D.N.Y. 1978) ...........................................................................16

*Landers v. Morgan Asset Management, Inc.*,
    No. 2:08-cv-02260-SHM-dkv (W.D. Tenn.) ..........................................................1

*SEC v. Alpine Mutual Fund Trust*,
    824 F. Supp. 987, 993 (D. Colo. 1993)...............................................................15

*SEC v. Byers*,
    637 F. Supp. 2d 166 (S.D.N.Y. 2009).................................................................16

*SEC v. Credit Bancorp, Ltd*.,
    290 F.3d 80 (2d Cir. 2002)............................................................................8

*SEC v. Wealth Management LLC*,
    628 F.3d 323 (7th Cir. 2010) .........................................................................8

*Shaffer v. Farm Fresh, Inc*.,
    966 F.2d 142 (4th Cir. 1992) ........................................................................13

*Smith v. Pfizer, Inc*.,
    688 F. Supp.2d 735 (M.D. Tenn. 2010)...........................................................21

*U.S. v. Garcia*,
    496 F.3d 495 (6th Cir. 2007) ........................................................................20

*Warpar v. Ashland Oil, Inc*.,
    606 F. Supp. 852 (N.D. Ohio 1984)...............................................................11

*Weeks v. Samsung Heavy Indus*.,
    909 F. Supp. 582 (N.D. Ill. 1996) ..................................................................11

*Werbowski v. Collomb*,
    766 A.2d 123 (Md. 2001) ............................................................................6

*Wike v. Vertrue, Inc*.,
    2010 WL 3447756 (M.D. Tenn. Aug. 30, 2010) ..............................................21

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ..........................................................................6

### OTHER AUTHORITIES

James J. Hanks, Jr., *Maryland Corporate Law*, § 6.6 (2010) .........................................6

James J. Hanks, Jr., *Maryland Corporate Law*, § 7.21 (2010) ....................................19

Order, *In the Matter of Morgan Asset Management, Inc., et al*., Administrative
    Proceeding File No. 3-13847, dated June 22, 2011 ...........................................10

September 24, 2010 Order, *Open-End Derivative Action* Docket No. 92.....................20

Fund Defendants Helios Select Fund, Inc. (formerly Morgan Keegan Select Fund, Inc.), Helios Select Short Term Bond Fund (formerly Regions Morgan Keegan Select Short Term Bond Fund), Helios Select Intermediate Bond Fund (formerly Regions Morgan Keegan Select Intermediate Bond Fund) and Helios Select High Income Fund (formerly Regions Morgan Keegan Select High Income Fund) (collectively, the "Funds")[1], respectfully submit this Memorandum of Law in response to Defendants'[2] Opposition to Plaintiffs'[3] and the Funds' Joint Motion for Preliminary Approval of Partial Settlement and the Joint Motion for Approval of Rule 23.1 Notice to Shareholders and Final Approval of the Memorandum of Understanding.

## I.   FACTUAL/PROCEDURAL HISTORY

As this Court is aware, and as Defendants acknowledge, the Funds are in the midst of a phased liquidation process, pursuant to a shareholder vote which took place on May 29, 2009.[4] The liquidation plan provided for the complete liquidation and ultimate distribution to

---

[1] The Funds are named as Nominal Defendants in *Landers v. Morgan Asset Management, Inc.*, No. 2:08-cv-02260-SHM-dkv (W.D. Tenn.) (the "*Open-End Derivative Action*"), and are named Defendants in *In re Regions Morgan Keegan Open-End Mutual Fund Litig.*, No. 2:07-cv-02784-SHM-dkv (W.D. Tenn.) (the "*Open-End Class Action*").

[2] "Defendants" include Jack R. Blair, Albert C. Johnson, William Jefferies Mann, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis III ("Director Defendants"); Allen B. Morgan, Jr., J. Kenneth Alderman, Carter E. Anthony, Brian B. Sullivan, Joseph C. Weller, J. Thompson Weller, G. Douglas Edwards, Charles D. Max-well, David M. George, Michele F. Wood, James C. Kelsoe, Jr., David H. Tannehill, and Thomas R. Gamble ("Individual Defendants"); Regions Financial Corporation ("RF") and Regions Bank ("RB"); Morgan Keegan & Co., Inc. ("MK"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. (together "MAM/MK"); and PricewaterhouseCoopers ("PwC"). These Defendants collectively sometimes hereinafter referred to as the "Non-Settling Defendants."

[3] As used herein, "Plaintiffs" refers to both Lead Plaintiffs (comprised of the "RMK Open-End Funds Group," which consists of Kathryn S. Cashdollar Estate, Dajalis Ltd., Jeanette H. Landers, H. Austin Landers, and Frank D. Tutor) and Derivative Plaintiffs (comprised of H. Austin Landers, Jeanette H. Landers, Estate of Charles M. Crump, Diana W. Crump, James H. Frazier, James P. Whitaker and Peggy C. Whitaker).

[4] *See* Schedule 14A Proxy Statement filed on behalf of Helios Select Fund, Inc., attached as Exhibit J to the Declaration of Matthew Curley, filed with Defendants' opposition papers.

shareholders of all of the Funds' assets.[5]  In order to preserve claims advanced on behalf of the Funds in the derivative actions, the liquidation plan provided that "the Funds' shares will remain outstanding after payment of the liquidation proceeds."  (Curley Decl. Ex. J (Schedule 14A) at 2).  With respect to the derivative lawsuit, the Schedule 14A related to the proposed liquidation disclosed to shareholders that "the Board noted that the complaint alleges claims that belong to the Company and the Funds, and considered that the Plan was structured in order to preserve any such claims for appropriate action by the Board."  (*Id*. at 2).  The Schedule 14A acknowledged that any recovery received by the Company or the Funds would be retained as an asset of the Funds "*pending the resolution of other claims and liabilities*," that the liquidation plan provided for "the payment and discharge of, *or other provision for*, all liabilities and obligations of the Funds," and that each of the Funds would engage in, among other things,  "winding up its business and affairs" and "discharging or making reasonable provision for the payment of all of its liabilities."  (*Id*. at 4; emphasis added).

Pursuant to the liquidation plan, the current Board of Directors (the "New Board") set aside a Reserve Fund for payment of liabilities and obligations of the Funds, including, without limitation, contingent or unascertained liabilities, and for coverage of certain costs and expenses related to the legal proceedings in which the Funds are involved and the investigation of certain potential claims. The Schedule 14A discussed above specifically noted that the "Board also considered it appropriate to retain a portion of the assets of the Funds in the Reserves to permit the Board to take appropriate action with respect to claims on behalf of the Funds."  (*Id*. at 4). At the time the plan of liquidation was approved in May 2009, the Reserve Fund had a balance

---

[5] As part of the liquidation process, the Funds also filed an application with the SEC for an order declaring that they cease to be investment companies.  *See* SEC Release No. 29140, attached as Exhibit M to the Curley Declaration.

of approximately $1.5 million among all the Funds.  As of November 30, 2010, when the Memorandum of Understanding ("MOU") was filed with this Court (*Open-End Derivative Action* Docket No. 98-1), the Reserve Fund had a balance of approximately $750,000, with litigation and related expenses continuing to mount.  (MOU § III.3(a)).

At the same time, the Funds also faced potential and substantial liability in the securities class actions, specifically as named Defendants in the *Open-End Class Action*.  Prior to entering into the MOU, the Funds had moved in this Court on February 12, 2010 to dismiss all of Plaintiffs' claims (*Open-End Class Action* Docket No. 233).  On September 30, 2010, this Court partially granted the Funds' motion and dismissed Plaintiffs' claims under Section 10 of the Securities Exchange Act of 1934 and under the Investment Company Act of 1940 (*Open-End Class Action* Docket No. 272).  Although the Funds also had argued, among other things, that they were not proper defendants on the Section 11 claim (and that those claims were subject to dismissal on other grounds), the Court declined to dismiss Plaintiffs' Section 11 claims under the Securities Act of 1933.  Accordingly, the Funds faced potential liability far exceeding the remaining balance of the Reserve Fund, as well as litigation costs and expenses incurred in defending against these remaining claims.  Moreover, the Section 11 claims against the Funds were based on a theory of purported issuer liability, meaning that certain affirmative defenses potentially available to other Defendants might not be available to the Funds, and that the Funds' defenses were limited.

On September 24, 2010, in an order addressing Defendants' motion to dismiss the *Open-End Derivative Action*, the Court ordered that the action be stayed pending the Court's receipt of a report from the Funds' New Board of Directors as to the status of its investigation of the claims (*Open-End Derivative Action* Docket No. 92).  The New Board subsequently advised

the Court that, as part of its investigation of the allegations in the First Amended Derivative Complaint (as well as those of various derivative complaints and demands related to the closed-end funds), counsel for the New Board reviewed several thousands of pages of documents, numerous public disclosure documents from the various Funds, materials from various regulatory or administrative proceedings, as well as numerous pleadings, exhibits and materials filed as part of the motion practice in the derivative actions and numerous related cases before this Court.  Counsel for the New Board also interviewed various witnesses as part of the investigation, and met on numerous occasions with the New Board to review and discuss the allegations and evidence.  The Funds also advised the Court in an October 22, 2010 Status Report, that as part of the New Board's investigation, the Funds engaged in communications with plaintiffs' counsel with respect to, among other things, possible resolution of certain issues related to the pending litigation  (*Open-End Derivative Action* Docket No. 93).

On November 30, 2010, in a report on the status of the New Board's investigation into the merits of Plaintiffs' claims, the Funds advised this Court that, in the exercise of its business judgment, it had authorized entry into a Memorandum of Understanding ("MOU") with Plaintiffs' counsel.  (*Open-End Derivative Action* Docket No. 98).  Pursuant to the agreement reflected in the MOU, the Funds would be substituted as Plaintiffs in the *Open-End Derivative Action*, and would retain current Derivative Plaintiffs' counsel to pursue the derivative claims on behalf of the Funds.  Conjointly, the Funds would settle the *Open-End Class Action* by consenting to the Court's jurisdiction and, without admitting or denying liability, agreeing to the entry of judgment against the Funds on the Section 11 claim against them.  Under the terms of settlement, satisfaction of that judgment would come solely out of any recovery by the Funds on their derivative claims in the *Open-End Derivative Action*, with the putative settlement class

placed in the position of judgment creditor of the Funds.[6]  As this Court stated in its December 16, 2010 Scheduling Order, this proposed settlement would resolve the case against the Funds in the *Open-End Class Action* (*Open-End Class Action* Docket No. 289 at 2).  The MOU also anticipated the dismissal without prejudice of the former independent director defendants from the *Open-End Derivative Action*.

On December 6, 2010, this Court preliminarily approved the terms of the agreement outlined in the MOU, and directed the parties to file the appropriate motions and supporting memoranda for final approval (*Open-End Derivative Action* Docket No. 100).  On March 14, 2011, Plaintiffs and the Funds filed joint motions in support of final approval of the MOU.  The Non-Settling Defendants filed briefs in opposition to final approval on April 18, 2011.

## II.     ARGUMENT

### A.     The Settlement Was the Product of the Independent New Board's Exercise of Business Judgment and Is Fair and Reasonable to the Settlement Class(es)

In their opposition papers, Defendants do not, and cannot, seriously attack the business judgment of the New Board's decision to pursue its claims in the *Open-End Derivative Action* as Plaintiffs.  Nor can Defendants question the Board's business judgment in deciding to extinguish the substantial remaining Section 11 claim against the Funds in the *Open-End Class Action*, by entering into judgment (without admission of liability) and providing that satisfaction of such judgment will be made only from recovery, if any, on the derivative claims.

---

[6] Under the MOU, should the Section 10 claims, which have been dismissed, be revived, the same agreement that applies with respect to the disposition of the Section 11 claims against the Funds would be applied to dispose of the Section 10(b) claims.  Furthermore, to prevent a windfall, any recovery by the plaintiff class on the Section 10(b) claims will be taken into account in the allocation of recovery from the derivative claims.  *See* MOU §§ I.12, 13.  Thus, no further litigation on the Funds' part will be necessary with respect to the Section 10(b) claims.

Indeed, Defendants have repeatedly acknowledged the independence of the New Board, as they must.  As Defendants have stated, "a majority of the board members are independent, outside directors.  In this situation, there is a heightened presumption that directors act in good faith under Maryland's formulation of the business judgment rule."[7]   Defendants have also acknowledged Maryland statutory authority stating that "a director of a corporation who with respect to the corporation is not an interested person… shall be deemed to be independent and disinterested when making any determination or taking any action as a director."[8]  Maryland case law endorses this same principle.  *See e.g. Werbowski v. Collomb*, 766 A.2d 123, 144 (Md. 2001) (directors are presumed to act properly and in the best interest of the corporation); *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) ("The presumption of good faith the business judgment rule affords is heightened when the majority of the board consists of independent outside directors."); *see also* James J. Hanks, Jr., *Maryland Corporate Law*, §6.6 (2010) ("Maryland appellate courts have consistently deferred to the business judgment of corporate boards of directors.").  Indeed, in its order denying Derivative Defendants' motion to dismiss, this Court has acknowledged, in the context of discussing Plaintiffs' demand on the New Board, that the Board is qualified to exercise its business judgment about whether the suit should go forward.[9]  Thus, the sound decision of the indisputably independent New Board should be given more

---

[7] Reply Memorandum in Support of Motion to Dismiss filed by Morgan Keegan & Company, Inc., et al. (*Open-End Derivative Action* Docket No. 40 at 3 n. 3) .

[8] *Id*., at 4 (*citing* MD. Code Ann., Corps. & Ass'ns §2-405.3(b)).

[9] "By affirmatively choosing to make demand on the New Board, Plaintiffs have admitted that the New Board is qualified to exercise its business judgment about whether their suit should go forward…  All that remains is for the New Board to complete its investigation and declare its intention about this suit."  (*Open-End Derivative Action* Docket No. 92 at 15-16).

weight than the arguments of obviously self-interested Defendants whose conduct is being challenged in the litigation.[10]

In their opposition to the settlement, Defendants and their expert repeatedly suggest that there is no basis for anyone other than the Liquidating Shareholders[11] to share in any recovery from the *Open-End Derivative Action*. This argument is at best premature. As an initial matter, Defendants ignore the reality that, absent approval of the settlement, the Funds face the very real prospect of liability on the Section 11 claims in the class action. Even if they could successfully defend such Section 11 claims, the Funds would at a minimum incur substantial litigation costs that could quickly exhaust the balance remaining in the Reserve Fund. In contrast, the MOU allows the Reserve Fund to be put to use to pursue a recovery on behalf of the Funds that may inure to the potential benefit of the various constituencies addressed in the MOU. As noted above, the Court has rejected both the Funds' argument that they were not proper defendants in the securities class action, and their other challenges to the Section 11 claims (*Open-End Class Action* Docket No. 233 at 7; Docket No. 272). But for the MOU, the Funds would risk exhausting their already limited resources in defending against these claims, with nothing then left for distribution to the Liquidating Shareholders or to anyone else.

Defendants' argument also ignores the reality that any claims by Liquidating Shareholders are, by definition, subject to the satisfaction of claims and liabilities of the Funds.

---

[10] *See Jones v. Harris Associates L.P.*, 130 S. Ct. 1418, 1429 (2010) (in discussing the decision by the board of directors of a mutual fund to approve a compensation agreement with an investment advisor, the U.S. Supreme Court stated "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process… Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently.").

[11] "Liquidating Shareholders" refers to shareholders of the Funds who held their shares at the time of the Funds' liquidation on June 15, 2009; as opposed to "Former Shareholders" who sold their shares prior to the liquidation.

As Defendants admit, the Funds' creditors must be paid before the "equity" interests (*i.e.*, Liquidating Shareholders) can share in the recovery (*Open-End Class Action* Docket No. 317 at 19).

Additionally, Defendants' suggestion that the Liquidating Shareholders are exclusively entitled to recovery, without regard to competing claims, is contrary to law.   Courts have consistently recognized that, in liquidating open-end funds like the ones here, remaining shareholders and former shareholders-claimants are to be treated equitably and fairly, which often means that both groups of shareholders share *pro rata* in the fund's remaining assets.  In *In re Reserve Fund Securities and Derivative Litigation*, the district court approved the *pro rata* distribution of a money market fund's remaining assets, holding:

> "…the logic underlying the decision endorsing *pro rata* distribution is relevant here, because such a distribution is appropriate where any distinctions that might be drawn among the parties receiving funds would be arbitrary or based on mere chance.  In such cases, *pro rata* treatment of the parties is most equitable."

673 F. Supp. 2d 182, 196 (S.D.N.Y. 2009);  *see also SEC v. Wealth Management LLC*, 628 F.3d 323, 333-35 (7th Cir. 2010) (affirming district court's decision to reject objection to a *pro rata* distribution by fund shareholders and stating that pro rata distribution plans "promote fairness by preventing a redeeming investor from jumping to the head of the line and recouping 100% of his investment by claiming creditor status while similarly situated non-redeeming investors receive substantially less."); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-90 (2d Cir. 2002) (*pro rata* distribution subsequent to funds' liquidation approved); *see also Reserve*, 673 F. Supp. 2d at 198:

> "…any alternative to a *pro rata* distribution would reward certain investors over others based on arbitrary factors and would be difficult, time-consuming, and expensive. . . . when sitting in equity, it is important to remember that each

- 8 -

investor's recovery comes at the expense of the others. . . . the circumstances surrounding the collapse of the Primary Fund make a pro rata distribution the fairest and most equitable approach."[12]

The terms of the distribution among shareholder classes provided for in the MOU are entirely consistent with the legal principles of *pro rata* distribution. The MOU affords the New Board discretion and flexibility to take into account any factors that may arise that will have an impact on an equitable allocation among shareholders classes. Under the MOU, the allocation and distribution of a recovery from Fund assets are to be determined by the New Board, with approval by this Court. For the purposes of the allocation, the amounts of the Section 11 damages and damages from the *Open-End Derivative Action* are to be calculated by the Funds' counsel, subject to the approval of both the New Board and this Court. Furthermore, the MOU prohibits a windfall recovery by any shareholder group. For example, § I.7 of the MOU states:

> "To avoid 'double recovery', the amounts recoverable by the §11 class from any Derivative Recovery shall be reduced dollar for dollar by any recovery by the §11 class from the defendants other than the Funds pursuant to §11 in *Open-End Fund Litig*."

In addition to § I.7, the original MOU also contains numerous other provisions that, among other things, retain the New Board's discretion to avoid windfall recoveries. *See, e.g.*, MOU, §§ I.8, I.11. For example, § I.11 addresses the contingency of potential recovery by Fund investors from the pending regulatory actions (including but not limited to the SEC proceeding of which the Court has been apprised[13]), provided that in the event of any such recovery to be

---

[12] The equitable principles employed by courts approving *pro rata* distribution among classes of shareholders also dictate that no group of shareholders is entitled to a windfall. *See e.g., Reserve*, 673 F. Supp. 2d at 193 (no investor should receive as part of a *pro rata* distribution more than that investor paid for its fund shares).

[13] Indeed, it was just announced on June 22, 2011, that a settlement order was entered by the SEC (Order Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to § 15(b) of the Securities Exchange Act of 1934, §§ 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and §§ 9(b) and 9(f) of

allocated among investors, "a determination shall be made whether, and to what extent, any such fund shall be considered or included in any allocation and distribution pursuant to" the terms of the MOU. MOU § I.11. The same section also provides that "[n]othing herein shall preclude the New Board from considering other sources of recovery, if any, in connection with any allocation or distribution ...." *Id*.

This discussion highlights the inescapable fact that Defendants' arguments regarding the allocation of recovery among shareholder classes are, at best, premature. No one now knows what recovery, if any, the Funds may have to allocate among shareholder classes, or what shareholder groups, if any, will have obtained recovery from other sources (*i.e.*, the Non-Settling Defendants). That is precisely why the MOU is structured in a way that contemplates not only preserving the New Board's discretion to distribute recovery among the shareholders in a fair and equitable manner, but also requiring that such distribution be subject to approval by this Court.

**B.      Defendants' Objections Are Incorrectly Premised Upon Allegations of a Conflict of Interest**

Defendants' objection to this Court's approval of the settlement contemplated in the MOU (and their proffered expert declaration) asserts, incorrectly, that an allegedly un-waivable conflict of interest would arise by virtue of the fact that the Funds would retain Derivative Plaintiffs' counsel in moving forward as Plaintiffs in the *Open-End Derivative Action*, while simultaneously defending a claim against the same Plaintiffs' counsel in the *Open-End Class*

---

the Investment Company Act of 1940, and Imposing Suspension Pursuant to § 4C of the Securities and Exchange Act of 1934 and Rule 102(e)(1)(iii) of the Commission's Rules of Practice) which, among other things, provided for the creation of one or more funds of approximately $200 million to be distributed to "investors in the Funds who suffered losses." *See* Order, *In the Matter of Morgan Asset Management, Inc., et al.*, Administrative Proceeding File No. 3-13847, dated June 22, 2011, at 19.

*Action.*  Defendants' objections, however, are premised upon a misreading of the MOU, and their arguments regarding the alleged conflict of interest are, in any event, baseless.[14]  Nothing in the MOU supports Defendants' faulty inference that the Funds would continue to oppose the Section 11 claims in the *Open-End Class Action*, and that was obviously not the intent.  As explained earlier, and as this Court acknowledged in its December 16, 2010 Scheduling Order, by settling the Section 11 claims, the Funds would end their participation in that action.  Hence Plaintiffs' counsel in the *Open-End Class Action* would not be prosecuting a suit against the Funds, as Defendants argue, but rather will be pursuing claims against the Non-Settling Defendants, and on behalf of the Funds.  The contorted scenario that Defendants describe, where Plaintiffs' counsel will be suing the Funds in one action while representing them in another, simply will not exist.

A central premise of the MOU is that, upon approval, final judgment will promptly be entered against the Funds on the Section 11 claims.  As the terms of the MOU provide, this judgment is not contingent in any way.  Thus, Defendants' inaccurate suggestion that Derivative Plaintiffs' counsel will simultaneously be suing the Funds while representing them is erroneous.  Once judgment is entered against the Funds on Section 11, there will be no live claims pending

---

[14] It was disingenuous for Defendants during the *Open-End Class Action* Scheduling Conference on December 16, 2010 to raise objections to the dual representation by plaintiffs' counsel in the *Open-End Class Action* and the *Open-End Derivative Action*.  Any objections Defendants may have had to such representation should have been raised earlier in the litigation, when the Amended Derivative Complaint was filed in October 2009, or at the latest in Fall 2010 during the New Board's investigation period.  *See Warpar v. Ashland Oil, Inc.*, 606 F. Supp. 852, 859-59 (N.D. Ohio 1984) (rejecting attorney disqualification motion due to delay where plaintiff was aware of dual representation at the outset, but waited 21 months to move to disqualify); *Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978) (courts cannot allow parties to "delay in filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed."); *Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F. Supp. 1002 (D.N.J. 1995) (motion to disqualify attorney as necessary witness must be promptly filed "lest the right to move for disqualification may be waived if not timely made"); *Weeks v. Samsung Heavy Indus.*, 909 F. Supp. 582, 584-85 (N.D. Ill. 1996) (finding party waived right to challenge representation by attorney who may also serve as a witness by waiting 24 months).

against the Funds in the *Open-End Class Action*.  The Funds' participation in that action will be over.  Furthermore, even if the Section 10(b) claims that this Court previously dismissed were later resurrected, the final resolution of those claims as to the Funds is addressed as part of the agreement reflected in the MOU.[15]  The settlement therefore disposes of any and all remaining claims against the Funds in the *Open-End Class Action*, and obviates further litigation by or on behalf of the Funds in defense of the Class Action.

Much of Defendants' argument centers on how the MOU originally dealt with satisfaction of the Section 11 judgment.  The original MOU provided that, upon entry of judgment against the Funds on the Section 11 claims in the Open-End Class Action, the putative Section 11 class would be placed in a position of judgment creditor of the Funds.  The satisfaction of such judgment from any *Landers* recovery was made subject to certain provisos.  One such proviso (reflected in § 5(b) of the original MOU), provided, among other things, that the Section 11 class judgment could not be satisfied out of the Derivative Recovery "if a judgment is entered, and becomes final following the expiration of the time for appeal, dismissing the §11 class claim as to all remaining Defendants on the basis of the affirmative causation defense under §11 or on the basis of a failure to prove material misrepresentations or omissions"  (with certain exceptions).  Defendants argue that this provision creates a conflict because the interests of certain claimants to any ultimate Fund recovery from the *Landers Open-End Derivative Action* (presumably those not in the Section 11 class) may favor a scenario where that proviso is triggered, while the interests of other claimants to any ultimate recovery to the

---

[15] Pursuant to §§ I.12 and I.13 of the MOU, should the Section 10(b) claims be reinstated, the same agreement that applies with respect to disposition of the Section 11 claims will be applied to dispose of any reinstated Section 10(b) claims against the Funds.  Any recovery by the plaintiff class on a Section 10(b) claim will be taken into account in the allocation arrangement of any derivative recovery to prevent any double recovery or windfall.

*Landers Open-End Derivative Action* (*i.e.*, the Section 11 class) will not.  Aside from being premature, this argument is misguided and reflects a misreading of the MOU.

Again, the judgment against the Funds was not conditional.   Nothing in the MOU reflects any intent or ability of the Funds to continue to litigate issues that might trigger the proviso.  Moreover, this particular purported conflict asserted by Defendants - if it might ever exist under some to be determined scenario down the road[16] - is not with the Funds (*i.e.*, the new clients of the Derivative Plaintiffs' Counsel), because there would be no continuing claim against the Funds.  Defendants' argument is nothing more than a recognition of a circumstance that, prior to the MOU, may have existed throughout this litigation, namely, that the interests of the Section 11 Plaintiffs represented by the Derivative Plaintiffs' Counsel may diverge from the interests of other potential claimants to any derivative recovery.  Defendants failed to object to such purported conflict throughout this lengthy litigation (or throughout the pendency of the New Board's investigation to which they asked the Court to defer), and their belated objection at this juncture should not be countenanced.[17]  *See* Plaintiffs' Brief at 28-30.[18]

---

[16] As another court has recognized, disqualification of counsel "may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur."  *See Shaffer v. Farm Fresh, Inc*., 966 F.2d 142, 145-46 (4th Cir. 1992).

[17] Moreover, courts in the Sixth Circuit have recognized that "a party's right to select its own counsel is an important public right and a vital freedom that should be imposed only when absolutely necessary."  *Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp*., 690 F. Supp. 607, 613 (S.D. Ohio 1988) (citing *Melamed v. ITT Continental Baking Co*., 592 F.2d 290, 293 (6th Cir. 1979)); *see also Howard v. Wilkes & McHugh, P.A*., 2007 WL 4370584, at *6 (W.D. Tenn. Dec. 3, 2007) (noting how motions to disqualify counsel can be used for improper tactical purposes, recommending that courts view such a motion "with extreme caution because it can easily be misused as a harassment technique.").

[18] Citations to "Plaintiffs' Brief" refer to Plaintiffs' Consolidated Memorandum in Reply to Defendants' Opposition to Joint Motion for Preliminary Approval of Partial Settlement and Joint Motion for Approval of Rule 23.1 Notice to Shareholders and for Final Approval of the Amended Memorandum of Understanding, filed simultaneously herewith.

Moreover, as noted elsewhere in this brief, the MOU contemplates both New Board and Court approval of any ultimate allocation or distribution of any recovery from the *Landers Open-End Derivative Action*. Any remaining concerns about the appropriateness of any amounts allocated or distributed to the Section 11 class can better be considered and addressed at that time, when they are no longer speculative. In any event, and without conceding the validity of Defendants' objections or the inappropriateness of the original MOU framework in this regard, but in an attempt to avoid needless speculation about a potential, but not actual, purported conflict, the parties to the MOU have elected to enter into an Amended Memorandum of Understanding in Landers Derivative Action ("Amended MOU")[19], that among other things, eliminates the former § I.5 proviso. Accordingly, Defendants' objection, albeit invalid, is now moot and there is no basis presented to reject the Amended MOU on conflict of interest grounds.

Furthermore, contrary to Defendants' suggestion, the MOU does not contemplate that Derivative Plaintiffs' Counsel will decide how to allocate any recovery that the Funds may obtain from the pursuit of claims against the Co-Defendants. Once again, pursuant to the MOU, any allocation decision is to be made by the New Board, and is also ultimately subject to review by this Court. *See* MOU §§ I.5(c), I.6(a),(b). Among other decision-making options, the New Board has discretion specifically preserved in § I.5(c) of the MOU to retain an expert to assist the Board in making decisions as to any allocation. *See* MOU § I.5(c) ("with or without an expert).

---

[19] The Amended MOU is being submitted to the Court pursuant to a Joint Report of the Nominal Defendants, Derivative Plaintiffs and Lead Plaintiffs, dated June 24, 2011, which is filed concurrently with Plaintiffs' Brief.

In addition, it bears emphasis that when referring to "calculations by counsel", the MOU does not use the phrase "Derivative Plaintiffs' counsel" as it does in other sections.[20]   In accordance with the overarching spirit of the MOU, the New Board retains discretion as to what counsel to consult for this purpose, and what advice to consider.[21]   Thus, any suggestion that Derivative Plaintiffs' counsel may have an interest in allocating proceeds in a particular manner ignores the fact that Derivative Plaintiffs' counsel will not control the allocation process.  Under the MOU, discretion and ultimate authority to act rests and remains with the New Board, not with Derivative Plaintiffs' counsel.

Additionally, contrary to Defendants' suggestion that the "governing principles" outlined in the MOU - namely, "to seek the largest possible recovery for the greatest number of persons who suffered losses in connection with their investments in the Funds and to treat all such persons in the fairest and most equitable manner possible"[22] - amount to "vague guidelines," these principles are entirely consistent with prevailing case law dealing with liquidated funds.  In *SEC v. Alpine Mutual Fund Trust*, the Court approved the *pro rata* distribution recommendations of a receiver appointed to administer and manage the affairs of a liquidated fund, holding that the receiver:

> "…can consider the interests of the investors in its equitable decisions.  We believe the receiver can point out to the Court the ways the equities fall upon the investors for whom the receiver is acting, and the Court can consider such arguments in its decision."

---

[20] Compare MOU §§ II.2 and II.3 ("Derivative Plaintiffs' counsel") with §§ I.5(c) and I.6(b) ("calculation made by counsel").

[21] In fact, the MOU specifically contemplates the ongoing participation of the New Board's current counsel, Paul Hastings, as an independent adviser to the Board in a coordinating, advisory, and stand-by conflicts role.  (*See* MOU § III.2).

[22] MOU § I.14.

824 F. Supp. 987, 993 (D. Colo. 1993); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 168 (S.D.N.Y. 2009) (court appointed a receiver to propose a plan of distribution for remaining assets in investment funds; receiver determined that liquidation of the estate and a *pro rata* distribution of the proceeds was the most "prudent and equitable course of action"); *Reserve*, 673 F. Supp. 2d at 199 n. 46 ("equitable principles control the distribution of all remaining Primary Fund assets"); *see also* cases cited *supra* at 8-9.

To the extent that there are competing claims on the Funds, such claims are to be considered and resolved by the New Board in its independent exercise of business judgment at the time of allocation, subject to review by this Court.  Any speculative and purported "conflict of interest" presented by the possible prospective assertion of competing claims on any Fund recovery is not a conflict created by the retention of Derivative Plaintiffs' counsel, nor for that matter by approval of the MOU.  In any event, it is not a conflict with the interest of the Funds, but rather the potential for possible competing claims on Fund recovery to be resolved by the New Board at the appropriate time.[23]

Indeed, as noted at page 10 above, it is not yet clear what if any proceeds there will be to allocate down the road.  But if and when we arrive at the time to allocate, the New Board should

---

[23] Defendants and their proffered expert incorrectly argue that there is a conflict of interest; in fact the relevant interests are aligned because recovery on behalf of the Funds increases the potential for recovery to the Section 11 class, and for that matter, all claim constituents.  *See* MOU § I.6; *see also Bertozzi v. King Louie Int'l, Inc*., 420 F. Supp. 1166, 1180 (D.R.I. 1976) ("The asserted antagonism between the primary and derivative actions pressed herein is no more than a surface duality.  Since plaintiffs' success as to either action is equally contingent upon the proof of the same nucleus of facts, they and their counsel can be expected to attack all fronts with equal vigor."); *Heilbrunn v. Hanover Equities Corp*., 259 F. Supp. 936, 939 (S.D.N.Y. 1966) (rejecting the "surface duality" of making direct and derivative claims as creating a conflict if both actions have a "basic goal which entails no inconsistencies."); *Kane Assoc. v. Clifford*, 80 F.R.D. 402, 408 (E.D.N.Y. 1978) (allowing derivative and class actions to proceed, holding that "one must not let the 'surface duality' blind one to the possibility that 'the action has a basic goal which entails no real inconsistencies…'").

then be permitted to make its allocation determination.  The MOU expressly provides that this Court will have the opportunity to review such decisions after they are made (and any party that feels it is aggrieved may assert any objection to the allocation at the time that Court approval is sought).

Similarly, Defendants advance a speculative "straw man" argument that it may be "difficult or impossible" to determine which litigation expenses can be properly allocated to the *Open-End Derivative Action*.  But under the MOU, the New Board retains ample discretion to approve any litigation expenses incurred by Derivative Plaintiffs' counsel to be applied against the Reserve Fund (with remaining expenses to be borne by Derivative Plaintiffs' counsel).[24] Any purported challenge to the exercise of such discretion should reasonably await an actual decision taken by the Board.[25]

## C.  The Remaining Arguments in Defendants' Objections to the Settlement Are Equally Unfounded

### 1.  Standing to Pursue Derivative Claims

Defendant PricewaterhouseCoopers ("PwC") makes the unfounded and belated argument that the Derivative Plaintiffs lack standing because all derivative claims were allegedly extinguished when the Funds liquidated in May 2009, leaving no claims for the New Board to assume and prosecute.  Citing *Price v. Upper Chesapeake Health Ventures*, 995 A.2d 1054 (Md.

---

[24] It should also be noted that pursuant to the terms of the MOU, the $500,000 from the Reserve Fund to be allocated toward expenses incurred in prosecution of the *Landers Open-End Derivative Action*, subject to approval of the New Board, specifically shall not include counsel's travel and other firm-specific expenses (such as copying charges) but shall include experts, court reporters for depositions, deposition transcripts, and mediators.  *See* MOU § III.3(b).

[25] For all of the reasons discussed herein, and for the separate reasons addressed in the Declaration of Mark L. Hayes submitted in support of Plaintiffs' Brief filed simultaneously herewith, the Court should reject or disregard the views and opinions expressed in the Declaration of Professor Nancy J. Moore, filed in support of Defendants' opposition papers.

App. 2010), PwC argues that when a company is dissolved, shareholders lose their standing to bring derivative claims.  That argument is inapposite, and the case law cited is clearly distinguishable from the facts here.  *Chesapeake* involved a particularly narrow ruling involving the statutory forfeiture of rights of a limited liability company.  There, the LLC forfeited its right to continue doing business in Maryland because it failed to file a tangible personal property tax report for a given year.  *Id*. at 1056.  The court went on to discuss cases where corporate charters had been annulled or forfeited by statute for failure to file an annual tax return, and such entities ceased to exist as legal entities and lost any power to sue or be sued.  *Id*. at 1059.  Clearly, this is not the situation presented here because the Funds' shares remain outstanding pursuant to the plan of liquidation.  *See infra* at 20.  Defendants cannot, and do not, argue that the Funds lack the capacity to sue or be sued.

Furthermore, the *Chesapeake* court stressed that the evident purpose of the forfeiture statutes, which served to deprive plaintiffs there of standing to sue, is to penalize entities that fail to comply with its revenue and regulatory obligations, thereby coercing compliance.  *Id*. at 1064.  Such a scenario is not analogous to the issue presented here – shareholder derivative standing subsequent to a phased liquidation plan (or for that matter, status of the New Board to pursue claims on behalf of the liquidating funds).  In fact, the *Chesapeake* court noted that "with respect to matters relating to the liquidation and winding up of the corporation, Maryland law authorizes a director-trustee of a corporation whose charter has been forfeited to sue or be sued in his own name or in the name of the corporation."  *Id*. at 1066.[26]

---

[26] The *Chesapeake* court further noted:

> "When the charter of a Maryland corporation has been forfeited, until the court appoints a receiver, the directors of the corporation become trustees of its assets for purposes of liquidation.

Contrary to Defendant PwC's arguments, even a liquidation of the Funds would not extinguish Derivative Plaintiffs' standing under Maryland law.  A leading Maryland commentator has noted that the liquidation or dissolution of a Maryland corporation will not serve to deprive a stockholder of standing to pursue a derivative suit.  *See* James J. Hanks, Jr., *Maryland Corporate Law*, §7.21 (2010):

> "Although the Maryland courts have not specifically addressed whether a stockholder may bring a derivative suit on behalf of a dissolved corporation, ***the dissolution of a corporation should not, without more, deprive stockholders of their derivative remedy***.  While the plaintiff in a derivative suit on behalf of a dissolved corporation may no longer be a stockholder of the corporation, ***he continues to possess an interest in the distribution of corporate assets***, thereby satisfying the rule requiring ownership at the commencement of a derivative suit." (Emphasis added).

Courts addressing the issue of shareholder standing subsequent to liquidation under Maryland law have similarly held that derivative standing is not extinguished.  *See Jolly Roger Fund LP v. Sizeler Property Investors, Inc.*, 2005 WL 2989343, at *7 n. 13 (D. Md. Nov. 3, 2005) ("A corporation's dissolution or liquidation, without more, will not defeat a shareholder's right to prosecute an action on the corporation's behalf…").

Moreover, here the plan of liquidation specifically provided that the shares in the Funds would remain outstanding through this process.  In reply papers previously filed with the Court in support of their motion to stay or dismiss the derivative action, the Funds explained how their plan of liquidation had been structured in a way that anticipated this issue, and therefore

---

Among other powers, the director-trustees may…sue or be sued in their own names as trustees or in the name of the corporation; and do all other acts consistent with law and the charter of the corporation necessary and proper to liquidate the corporation and wind up its affairs."  *Id*. at 1066 (internal citations omitted)

preserved any such derivative claims for appropriate action to be taken by the New Board.[27]

Similarly, the proxy statement filed with the SEC to solicit shareholder approval of the Funds'

liquidation states:

> "[the liquidation] plan provides that the shareholders' shares in the Funds will remain outstanding after payment of the Liquidation Distribution … **Following resolution of claims and liabilities and the distribution of any recovery, all outstanding shares in the Funds will be cancelled** and the Board will seek to dissolve the Company under Maryland law."[28]

(Emphasis added.)  This phased timing of the liquidation was approved explicitly in order to

preserve derivative claims to be made on behalf of the Funds.[29]

These facts provided the basis for this Court's acknowledgment that the "liquidation did

not cancel the outstanding shares of the Funds, leaving Plaintiffs' standing to pursue this

derivative action unaffected." (September 24, 2010 Order, *Open-End Derivative Action* Docket

No. 92 at 8).  This earlier finding by this Court constitutes the law of the case, and Defendants

have advanced no basis for why this earlier finding should be disregarded or reconsidered.  *See*

*e.g. U.S. v. Garcia*, 496 F.3d 495, 514 (6th Cir. 2007) ("The law-of-the-case doctrine expresses

the routine practice of courts to refuse to reopen what has been decided… as a rule courts should

be loathe to [revisit prior decisions] in the absence of extraordinary circumstances."); *Wike v.*

*Vertrue, Inc*., 2010 WL 3447756, at *5 (M.D. Tenn. Aug. 30, 2010) ("… findings made at one

point in the litigation become the law of the case for subsequent stages of that same litigation.");

---

[27] Reply Memorandum in Support of Nominal Defendants' Motion to Dismiss (*Open-End Derivative Action* Docket No. 41 at 3-4).

[28] Proxy Statement, Curley Aff. Ex. J at 4.

[29] See *id*. at 2: "In order to preserve certain legal claims made on behalf of the Funds… the Funds' shares will remain outstanding after payment of the liquidation proceeds… With respect to the derivative lawsuit, the Board noted that the complaint alleges claims that belong to the Company and the Funds, and considered that the Plan was structured in order to preserve any such claims for appropriate action by the Board."

*Smith v. Pfizer, Inc.*, 688 F. Supp.2d 735, 752 (M.D. Tenn. 2010) ("The law of the case doctrine provides that a prior order of the Court in an action controls unless a showing of manifest injustice arises.").

### 2.      Consideration for Releasing Claims Against the Funds

Defendant PwC also suggests that any purported derivative claims against it have no value, and thus cannot equitably serve as a sufficient basis for releasing the Funds from the *Open-End Class Action*.  Putting aside the significant issue as to whether PwC even has standing to assert this position, as an initial matter, PwC distorts the terms and meaning of the MOU.  The Funds are not simply being "released from the class action", as PwC suggests in its brief. Rather, judgment against the Funds is being entered.  *See* MOU § I.3.  The MOU then goes on to provide that the judgment debt is to "be satisfied solely out of any recovery by the Funds on their claims in the Landers Derivative Action", subject to the further provisions of the MOU.  *See* MOU § I.4.  It is erroneous of PwC to suggest that the Funds are being released in exchange for the New Board's decision to pursue claims against PwC.

Additionally, PwC's argument that the derivative claims against it have no value is too narrowly drawn.  In reality, the potential sources of recovery available to the Section 11 Plaintiff Class are not simply the derivative claims against PwC, but the claims against all the Non-Settling Defendants.  Moreover, PwC offers no explanation as to what other potential sources of recovery there are for such liability.  In any event, PwC's motion to dismiss the Funds' claims against it on the merits has previously been denied by this Court.  *In re Regions Morgan Keegan Secs., Derivative, & ERISA Litig.*, 742 F. Supp. 2d 917 (W.D. Tenn. 2010).

### 3.      Compensation Provisions in the MOU

Defendants also argue that Derivative Plaintiffs' counsel aims to advance its own self-interest in putting forth a fee arrangement that is disproportionate to any relief Plaintiffs can hope to obtain.  Without conceding any impropriety or inappropriateness of the initial fee agreement, but again in a constructive effort to address and resolve objections to the proposed MOU, the Funds, Derivative Plaintiffs, and Derivative Plaintiffs' counsel have agreed to modify the fees potentially available to Derivative Plaintiffs' counsel. Accordingly, the modified fee section of the Amended MOU provides that:

> "Derivative Plaintiffs' counsel's fees shall be a sliding scale contingent fee:
>
> - 20% of the first $250 million of any *Landers* Recovery;
> - 17.5% of the excess of any *Landers* Recovery over $250 million up to $500 million;
> - 15% of the excess of any *Landers* Recovery over $500 million."  Amended MOU § III.1.

Moreover, the Amended MOU provides specifically that "[s]aid fee and the payment thereof shall be subject to the approval of the Court."  Amended MOU § III.2.

As it pertains specifically to Paul Hastings, which serves as counsel for the Funds and the New Board, Defendants also argue that the arrangement in the MOU providing that Paul Hastings will potentially share in any recovery in the *Open-End Derivative Action* and will negotiate a premium with Plaintiffs' counsel creates another ground for a conflict of interest, or impacts the independence of Paul Hastings.[30]  Once again, Defendants are contorting the terms of the MOU, and fabricating conflicts where none exists.  The MOU never intended that Paul

---

[30] It should be noted that at no time during the pendency of these litigations prior to the entry of the MOU have Defendants ever questioned the independence of Paul Hastings as counsel for either the Fund Defendants or the New Board.  Nor do they raise any other challenge to the independence of Paul Hastings in or following the MOU, other than this fee "premium" provision, which now has been addressed by the above-referenced modification.

Hastings would share in a percentage of the derivative recovery.  On the contrary, Paul Hastings has been and will continue to record and bill for time on an hourly basis.  The section of the MOU at issue here, § III.2(b), simply evidences the New Board's intent to retain discretion to compensate Paul Hastings at some premium to its billed rates,[31] given the potential delay in receiving payment, as well as the risk that the Reserve Fund will be insufficient to pay Paul Hastings in full.  This provision, as part of the original MOU, was, of course, subject to approval by the Court.  It should also be noted that even under the terms of the original MOU, to the extent any compensation to Paul Hastings were to derive from the proceeds of the derivative action, any such payment would be subject to consideration by this Court pursuant to the Court's approval of allocations by the New Board.  *See* MOU §§ I.6(a), I.15.

In any event, and again, without conceding the merits of Defendants' objections or any impropriety of the original arrangement with respect to the New Board's discretion to award Paul Hastings a premium to be paid from any recovery on the Landers Action, the Amended MOU provides, among other things, that any such "premium" may be awarded by the New Board in its sole discretion, subject only to approval of the Court.  *See* Amended MOU § III.3(b)(iii).  The Amended MOU further clarifies that any such "'premium,' when added to the outstanding fees billed by Paul Hastings and to be paid from any recovery in the *Landers Action*, shall not exceed in the aggregate 120% of Paul Hastings' standard hourly billed rates."  *Id.*

Under the circumstances, any remaining challenges to the fee provisions of the MOU are meritless.

---

[31] § III.2(b) of the MOU provides that "[t]o the extent that [the amount, if any, available from the Reserve Fund to pay Paul Hastings' fees] is inadequate for such purpose" and that Paul Hastings must be compensated from any derivative recovery; in that event, the New Board retains discretion to award Paul Hastings a premium over its billed hourly rates.

####     4.      Board Decision Regarding Dismissal of Independent Directors

Defendants also raise arguments against § II of the MOU concerning dismissal of claims against the former independent directors.  Defendants suggest that the New Board has delegated to Plaintiffs' counsel authority regarding the decision to dismiss the claims against the directors.  This reading of the MOU is incorrect and Defendants' arguments are flatly wrong.  The MOU clearly states that the decision ultimately rests with the New Board, who in the exercise of sound business judgment may rely on advice of Derivative Plaintiffs' counsel, as well as other counsel.  *See* MOU § II.4.  Any suggestion on Defendants' part that such a decision is vested in the discretion of Plaintiffs' counsel discretion is unwarranted and baseless.  As the MOU and Amended MOU plainly state, the final decision as to whether to dismiss the former independent directors, and if so, on what terms, has not been made by the New Board.

###     III.      CONCLUSION

In light of the sound business judgment of the New Board's decision to enter into the Memorandum of Understanding and to agree to an amendment thereof, and for the reasons outlined above and those separate reasons outlined in Plaintiffs' Consolidated Memorandum in Reply to Defendants' Opposition to Joint Motion for Preliminary Approval of Partial Settlement and Joint Motion for Approval of Rule 23.1 Notice to Shareholders and for Final Approval of the Amended Memorandum of Understanding, filed simultaneously herewith, the undersigned respectfully requests that the Court enter the Proposed Order approving Partial Settlement of the Open-End Class Action and the Rule 23.1 Notice to Shareholders, and enter the Proposed Order for final approval of the Amended Memorandum of Understanding.

Dated this 24th day of June, 2011.                    PAUL, HASTINGS, JANOFSKY &
                                                                                        WALKER LLP

By:_____/s/Kevin C. Logue_____
               Kevin C. Logue
75 East 55th Street
New York, NY 10022
Tel: (212) 318-6000
Fax: (212) 319-4090
E-mail: kevinlogue@paulhastings.com
*Counsel for Defendants*
*Helios Select Fund, Inc. (formerly*
*Morgan Keegan Select Fund, Inc.),*
*Helios Select Short Term Bond Fund*
*(formerly Regions Morgan Keegan*
*Select Short Term Bond Fund), Helios*
*Select Intermediate Bond Fund*
*(formerly Regions Morgan Keegan*
*Select Intermediate Bond Fund) and*
*Helios Select High Income Fund*
*(formerly Regions Morgan Keegan*
*Select High Income Fund)*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2011, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following and/or served the following via U.S. Mail:

**APPERSON CRUMP, PLC**
CHARLES D. REAVES, ESQ.
JEROME A. BROADHURST, ESQ.
6070 Poplar Avenue, 6th Floor
Memphis, TN 38119-3954

**KIRKLAND & ELLIS, LLP**
TIMOTHY DUFFY, ESQ.
EMILY NICKLIN, ESQ.
KRISTOPHER RITTER, ESQ.
300 North LaSalle
Chicago, IL 60654

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
VERNON J. VANDER WEIDE, ESQ.
THOMAS V. SEIFERT, ESQ.
333 South Seventh St., Suite 1140
Minneapolis, MN 55402-2422

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
LEO BEARMAN, ESQ.
EUGENE PODESTA, ESQ.
165 Madison Avenue
First Tennessee Building
Memphis, TN 38103

**LOCKRIDGE GRINDAL NAUEN PLLP**
RICHARD A. LOCKRIDGE, ESQ.
GREGG M. FISHBEIN, ESQ.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

**K&L GATES LLP**
JEFFREY B. MALETTA, ESQ.
NICOLE A. BAKER, ESQ.
1601 K Street, NW
Washington, D.C. 20006-1600

**ZIMMERMAN REED, P.L.L.P.**
CAROLYN G. ANDERSON, ESQ.
TIMOTHY J. BECKER, ESQ.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

**SUTHERLAND ASBILL & BRENNAN, LLP**
S. LAWRENCE POLK, ESQ.
999 Peachtree Street NE
Atlanta, GA 30309

**MAYNARD COOPER & GALE PC**
PETER S. FRUIN, ESQ.
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203

**SULLIVAN & CROMWELL LLP**
DAVID B. TULCHIN, ESQ.
DAVID E. SWARTS, ESQ.
125 Broad Street
New York, New York 1004

**BASS BERRY & SIMS PLC**
MICHAEL L. DAGLEY, ESQ.
MATTHEW M. CURLEY, ESQ.
BRITT K. LATHAM, ESQ.
W. BRANTLEY PHILLIPS, JR., ESQ.
150 Third Avenue South, Suite 2800
Nashville, TN 37201

**BASS BERRY & SIMS PLC**
SHEPHERD D. TATE, ESQ.
MICHAEL A. BRADY, ESQ.
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

/s/Kevin C. Logue

Kevin C. Logue