# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION )<br><br>This Document Relates to:<br><br>*In re Regions Morgan Keegan Open-End Mutual Fund Litigation*,<br>No. 2:07-cv-02784-SHM-dkv<br><br>and<br><br>*Landers* v. *Morgan Asset Management, Inc.*,<br>No. 2:08-cv-02260-SHM-dkv | No. 2:09-md-02009-SHM<br><br>Judge Samuel H. Mays, Jr.<br><br>Magistrate Judge Diane K. Vescovo<br><br>ORAL ARGUMENT REQUESTED |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM IN REPLY TO DEFENDANTS' OPPOSITION TO (1) JOINT MOTION FOR PRELIMINARY APPROVAL OF PARTIAL SETTLEMENT AND (2) JOINT MOTION FOR APPROVAL OF RULE 23.1 NOTICE TO SHAREHOLDERS AND FOR FINAL APPROVAL OF THE MEMORANDUM OF UNDERSTANDING

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Telephone: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**ZIMMERMAN REED, P.L.L.P.**
Carolyn G. Anderson
Patricia A. Bloodgood
Kirsten D. Hedberg
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-341-0400
Fax: 612-341-0844
cga@zimmreed.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P**.
Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
gmfishbein@locklaw.com

**APPERSON CRUMP, PLC**
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3972
(901) 260-5133 direct
(901) 435-5133 fax
jbroadhurst@appersoncrump.com

ATTORNEYS FOR LEAD AND DERIVATIVE PLAINTIFFS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.     PRELIMINARY STATEMENT ................................................................. 2

II.    REPLY TO MAM/MK AND THE INDIVIDUAL DEFENDANTS .......... 4

    A.   THERE IS NO CONFLICT BETWEEN THE FUNDS' NON-REDEEMING AND REDEEMING SHAREHOLDERS ................................................ 4

       1.   The Funds Were Forced to Liquidate from July 1, 2007 through May 2009 as a Result of Insufficient Liquidity to Meet Massive Redemptions. ........................................................................ 5

          a.   The Funds were almost completely liquidated from July 2007 through May 2009......................................................... 5

          b.   RF reneged on its promises of liquidity support and was unwilling or unable to provide the liquidity support needed by the Funds. .. 7

       2.   The Funds' Liquidation Was Disorderly and Fraudulent....................... 9

          a.   The preferential redemptions of favored PF2 accounts................ 9

          b.   The non-PF2 account holders were actively encouraged not to redeem.................................................................... 12

          c.   A fraudulent liquidation.................................................. 12

          d.   The Funds' NAVs during their liquidation were unreliable because they were based on uncertain, "[un]fair" and "[un]realistic" valuations of the Funds' assets and omitted assets. ................................................................ 13

          e.   The Funds' board and management should have suspended redemptions and sought a receivership to preserve the Funds' assets and allow an orderly liquidation; instead, they abandoned the Funds................................................................. 17

             i.   The Funds' board should have suspended redemptions and sought a receiver. ............................................. 18

             ii.   The Funds' board and management acted imprudently. ... 20

       3.   The Funds' Redeeming and Non-Redeeming Shareholders Are Entitled to Share *Pro Rata* in a Recovery by the Funds....................................... 21

          a.   Plaintiffs and the Funds negotiated an agreement providing that former and current shareholders are to share in a Funds recovery. ................................................................ 21

          b.   The Funds' non-redeeming and redeeming shareholders must be treated equally............................................................ 22

ii

    i.  Equity requires that a recovery by the Funds be distributed *pro rata* among redeeming and non-redeeming shareholders. ........................................................... 22

    ii.  The "Liquidating Shareholders" are not entitled to a windfall. ........................................................... 23

    iii.  A *pro rata* distribution of a Funds recovery among all redeeming and non-redeeming shareholders is fair and equitable. ........................................................... 24

   c.  The AMOU provides for a *pro rata* distribution. ........................ 26

  4.  The Redemption Settlement Class and § 10(b). .................................... 27

B. DEFENDANTS' CONFLICT OF INTEREST CHARGE IS WITHOUT MERIT. ............. 28

 1.  Because Opposing Defendants' Effort to Disqualify Plaintiffs' Counsel Is Untimely, Defendants Have Waived any Right to Assert a Conflict. 28

 2.  Defendants' Conflict Accusations Are Improperly Made in Their Opposition to the Partial Settlement and MOU. .................................... 31

 3.  There Is No Disqualifying Conflict in Connection with Counsel Representing Both the Funds and the Class; any Potential Conflict Does Not Require Disqualification of Counsel. ............................................. 32

   a.  There is no conflict inherent in counsel's representation of a class plaintiff against a corporation who is also a derivative plaintiff on behalf of that corporation. ......................................................... 33

   b.  The theoretical conflict in the simultaneous prosecution of a derivative claim and a class action direct claim presents merely a "surface duality.". ........................................................... 34

   **c.**  In the absence of an identifiable impropriety having actually occurred, any potential conflict that may exist in the proposed joint representation does not require disqualification. ................ 40

   **d.**  The Funds' and Lead Plaintiffs' Interests Are Not in Conflict. .. 42

 4.  If the Partial Settlement and AMOU Are Approved, the § 11 Judgment Will Become Final, and There Will Be No Adversity between Plaintiffs and the Funds. ........................................................... 44

C. THERE ARE NO INTRA-CLASS CONFLICTS THAT WOULD PRECLUDE CERTIFICATION OF THE PROPOSED SETTLEMENT CLASSES; STF IS ADEQUATELY REPRESENTED. ........................................................... 45

 1.  There Is No Conflict between Redeeming and "Liquidating" Shareholders or between the Purchaser and Redemption Settlement Classes. ........................................................... 45

          2.    STF's Investors Are Adequately Represented by Lead Plaintiffs. ........ 49

    D.    MAM/MK's OTHER CONTENTIONS LIKEWISE LACK MERIT. .......................... 51

          1.    The AMOU Offers Shareholders a Substantial Benefit. ...................... 51

          2.    The AMOU Adequately Provides for the Distribution of a *Landers* Recovery. ................................................................................... 53

          3.    Counsel's "Representation" of the Funds; Purported Discovery Conflict. ........................................................................................ 54

          4.    Statute of Limitations. ......................................................... 55

    E.    MODIFICATION OF COUNSEL'S FEE IN *LANDERS*. ............................................ 55

III.    REPLY TO PwC .................................................................................................. 57

    A.    THIS COURT HAS ALREADY RULED THAT PLAINTIFFS HAVE SATISFIED THE DEMAND REQUIREMENT. .................................................................. 58

    B.    PwC'S STATUTE OF LIMITATIONS DEFENSE HAS BEEN DENIED BY THE COURT. ................................................................................................. 58

    C.    THE FUNDS' CLAIMS HAVE NOT BEEN EXTINGUISHED. ................................ 59

IV.    REPLY TO RF/RB ............................................................................................ 60

V.    REPLY TO FORMER INDEPENDENT DIRECTORS ............................................. 60

    A.    THE MOU PROPOSES TO DISMISS THE INDEPENDENT DIRECTOR DEFENDANTS. ...................................................................................... 60

    B.    MOU § II.6-8 REFLECTS THE NEW BOARD'S BUSINESS JUDGMENT. .............. 62

CONCLUSION ........................................................................................................... 63

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ 37

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ........................................................................ 58

*Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp.*, 690 F. Supp. 607 (S.D. Ohio 1988) ................................................................................................................ 40

*Bayside Fed. Savings & Loan Ass'n v. United States*, 57 Fed. Cl. 18 (Fed. Cl. 2003) ......... 31

*Bertozzi v. King Louie Int'l, Inc.*, 420 F. Supp. 1166 (D.R.I. 1976) ............................... 36, 38

*Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) ............................................................ 57

*Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101 (S.D.N.Y. 1990) ......................................... 37

*Brieger v. Tellabs, Inc.*, 245 F.R.D. 345 (N.D. Ill. 2007) ..................................................... 47

*Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978) ...... 30

*Chapman v. King*, 572 S.W.2d 925 (Tenn. 1978) .................................................................. 59

*Clay v. Doherty*, 608 F. Supp. 295 (N.D. Ill. 1985) ........................................................ 41, 42

*Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998) ..................................................... 62

*Dollens v. Zionts*, 2001 WL 1543524 (N.D. Ill. Dec. 4, 2001) ...................................... 34, 45

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985) .............................................................. 47

*El Camino Res. Ltd. v. Huntington Nat'l Bank*, 623 F. Supp. 2d 863 (W.D. Mich. 2007) ... 32

*Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289 (S.D.N.Y. 1990) ............... 32

*Eon Streams, Inc. v. Clear Channel Communs., Inc.*, 2007 WL 954181 (E.D. Tenn. Mar. 27, 2007) ..................................................................................................................................... 32

*Field Turf Builders, LLC v. FieldTurf USA, Inc.*, 2010 WL 817628 (D. Or. Mar. 4, 2010) . 36

*First American Bank & Trust by Levitt v. Frogel*, 726 F. Supp. 1292 (S.D. Fla. 1989) ....... 38

*First Nat'l Bank v. Hawkins County*, 463 S.W.2d 946 (Tenn. Ct. App. 1970) ..................... 59

*Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975) .................................................................... 6

*Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 2011 WL 907121 (S.D.N.Y. Mar. 16, 2011) ..................................................................................................................................... 56

*Forsythe v. Sun Life Fin. Inc.*, 2005 WL 81576 (D. Mass. Jan. 13, 2005) ............................ 29

*Frank v. Dana Corp.*, __ F.3d __, 2011 WL 2020717 (6th Cir. 2011) ................................. 28

*Frazer v. Worldwide Energy Corp.*, 1991 WL 74041 (Del. Ch. May 6, 1991) .................... 57

*Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377 (D. Or. 1996) ............................... 48

*Gen. Cable Corp. v. Highlander*, 2005 WL 2875380 (S.D. Ohio Nov. 2, 2005) ................. 40

*Gonzalez v. Chilura*, 892 So.2d 1075 (Fla. Dist. Ct. App. 2004) ......................................... 34

*Gordon v. Norman*, 788 F.2d 1194 (6th Cir. 1986) ............................................................... 41

*Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121 (N.D. Ohio 1990)..... 32, 40

*Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319 (Tenn. Ct. App. 1982) ............................ 59

*Guenther v. Pac. Telecom, Inc.*, 123 F.R.D. 341 (D. Or. 1988).............................................. 39

*Guillen v. City of Chicago,* 956 F. Supp. 1416 (N.D. Ill. 1997)............................................. 41

*Hall v. Tennessee Dressed Beef Co.*, 957 S.W.2d 536 (Tenn. 1997) ..................................... 35

*Harker v. Comm'r of Internal Revenue,* 82 F.3d 806 (8th Cir. 1996)................................... 32

*Heilbrunn v. Hanover Equities Corp.*, 259 F. Supp. 936 (S.D.N.Y. 1966).......................... 37

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983).................................................... 52

*Hicks v. Morgan Stanley & Co.*, 2003 WL 21672085 (S.D.N.Y. July 16, 2003) ................ 51

*Host Marriott Corp. v. Fast Food Operators, Inc.,* 891 F. Supp. 1002 (D.N.J. 1995) ......... 30

*Howard v. Wilkes & McHugh, P.A.*, 2007 WL 4370584 (W.D. Tenn. Dec. 3, 2007) ... 32, 35, 41

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2010 WL 5248815 (S.D.N.Y. Dec. 14, 2010) .................................................................................................................................... 39

*In re Bayou Group, LLC*, 372 B.R. 661 (Bankr. S.D.N.Y. 2007) ................................... 23, 26

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ...................................................... 48

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d. Cir. 2005)............................................... 49

*In re Daimler Chrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003)................................ 47

*In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 624 (S.D. Ohio 1984) ........... 33, 34, 35

*In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2000 WL 1357509 (S.D.N.Y. Sept. 19, 2000 ................................................................................................................... 50, 51

*In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011)............... 51

*In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) .......................... 51

*In re Honeywell Int'l Inc., Sec. Litig.*, 211 F.R.D. 255 (D.N.J. 2002).................................. 48

*In re Ikon Office Solutions Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000)...................... 48

*In re Intelligent Elec., Inc. Sec. Litig.,* 1996 WL 67622 (E.D. Pa. Feb. 13, 1996) .............. 48

*In re Intelligent Electronics, Inc., Sec. Litig.*, 1996 WL 67622 (E.D. Pa. Feb. 13, 1996) .... 48

*In re McLaren,* 115 B.R. 922 (N.D. Ohio 1990) .................................................................. 32

*In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680 (N.D. Ga. 1999).................................. 48

*In re Mut. Sav. Bank Secs. Litig.*, 166 F.R.D. 377 (E.D. Mich. 1996) ................................. 48

*In re Nortel Networks Corp. ERISA Litig.*, 2009 WL 3294827 (W.D. Tenn. Sept. 2, 2009) 47

*In re Oracle Corp. Sec. Litig.*, 2005 WL 1030215 (N.D. Cal. Apr. 22, 2005)...................... 34

*In re Packaged Ice Antitrust Litig. Indirect Purchaser Action*, 2011 WL 611894 (E.D. Mich. Feb. 11, 2011) ................................................................................................................ 45

*In re Regions Morgan Keegan Open-End Fund Litig.*, 743 F. Supp. 2d 744 (W.D. Tenn., 2010) ................................................................................................. 28

*In re Regions Morgan Keegan Secs, Derivative, & ERISA Litig.*, 2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010) ................................................................................. 28

*In re Regions Morgan Keegan Secs., Derivative, & Erisa Litig.*, 742 F. Supp. 2d 917 (W.D. Tenn. 2010) .......................................................................................... 58, 60

*In re Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182 (S.D.N.Y. 2009) ... passim

*In re Robinson*, 90 S.W.3d 921 (Tex. Ct. App. 2002) .......................................... 42

*In re Sheehan*, 198 B.R. 516 (N.D. Ohio 1996) ................................................ 32

*In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005) ........................................... 58

*In re TransOcean Tender Offer Secs. Litig.*, 455 F. Supp. 999 (N.D. Ill. 1978).................. 37

*In re Unumprovident Corp. Deriv. Litig.*, 2010 WL 289179 (E.D. Tenn. Jan. 20, 2010)..... 56

*In re Valley-Vulcan Mold Co.*, 237 B.R. 322 (B.A.P. 6th Cir. 1999).......................... 30, 40

*In re Yes! Entertainment Corp.*, 316 B.R. 141 (D.Del. 2004) ................................ 59

*Insurance Brokerage Antitrust Litig.*, 2009 WL 411877 (D.N.J. Feb. 17, 2009) ............... 49

*International Union v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) ..................... 49

*International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America  v. Ford Motor Co.*, 2006 WL 1984363 (E.D Mich. July 13, 2006).............. 49

*Jackson v. JC Penney Co.*, 521 F. Supp. 1032 (N.D. Ga. 1981) ............................ 30

*Janus Capital Group, Inc. v. First Derivative Traders*, 2011 WL 2297762 (U.S. June 13, 2011) .................................................................................. 28

*Julian v. American Nat'l Bank*, 106 S.W.2d 871 (Tenn. Ct. App. 1937)........................... 59

*Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338 (7th Cir. 1990) ......................... 49

*Kamerman v. Steinberg*, 113 F.R.D. 511 (S.D.N.Y. 1986) .................................... 39

*Kane Assoc. v. Clifford*, 80 F.R.D. 402 (E.D.N.Y. 1978) .................................... 38

*Keyser v. Commonwealth Nat. Fin. Corp.*, 120 F.R.D. 489 (M.D. Pa. 1988)...................... 36

*Keyser v. Commonwealth Nat'l Financial Corp.*, 120 F.R.D. 489 (M.D. Pa. 1988) ...... 33, 37

*King County, Wash. v. IKB Deutsche Industriebank AG*, 2010 WL 2010943 (S.D.N.Y. May 18, 2010) .............................................................................. 52

*Koenig v. Benson*, 117 F.R.D. 330 (E.D.N.Y. 1987).......................................... 38

*Krim v. PCOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002) ............................. 35

*Langbecker v. Elec. Data Sys.*, 476 F.3d 299 (5th Cir. 2007) .............................. 47

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ...................................................... 23

*Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222 (6th Cir. 1988) ............ 32, 40

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ............................ 28

vii

*Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51 (S.D.N.Y. 1993) .................. 51

*McKinney v. McMeans*, 147 F. Supp. 2d 898 (W.D. Tenn. 2001). ................................ 35, 40

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010)...... 51

*Melamed v. ITT Continental Baking Co.,* 592 F.2d 290 (6th Cir. 1979).............................. 41

*Miller v. Fisco*, 63 F.R.D. 132 (E.D. Pa. 1974) ...................................................... 37

*N.J. Carpenters Health Fund v. DJ Mortgage Capital, Inc.,* 2010 WL 1473288 (S.D.N.Y.
    Mar. 29, 2010) ........................................................................................... 52

*Natomas Gardens Investment Group LLC v. Sinadinos*, 2009 WL 1363382 (E.D. Cal. May
    12, 2009) .................................................................................................. 35

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73 (2d Cir.
    2006) ....................................................................................................... 23

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) .................................... 49

*Picard Chem., Inc. Profit Sharing v. Perrigo Co.*, 1996 WL 739170 (W.D. Mich. Sept. 27,
    1996) ....................................................................................................... 48

*Priestly v. Comrie*, 2007 WL 4208592 (S.D.N.Y. Nov. 27, 2007) ................................ 39

*Ray v. Tennessee Farmers Mut. Ins. Co.*, 2001 WL 91948 (Tenn. Ct. App. Feb. 1, 2001) .. 59

*Regions Morgan Keegan Open-End Mutual Fund Litig.*, 743 F. Supp. 2d 744 (W.D. Tenn.
    2010) ....................................................................................................... 55

*Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424 (1985) ..................................... 32

*Robin v. Katten Muchin*, 1986 WL 7079 (N.D. Ill. June 13, 1986) ..................... 42

*Ruggiero v. Am. Bioculture, Inc.*, 56 F.R.D. 93 (S.D.N.Y. 1972)........................ 39

*SEC v. Alpine Mut. Fund Trust*, 824 F. Supp. 987 (D. Colo. 1993)............ 17, 19, 26, 28

*SEC v. Byers,* 637 F.Supp.2d 166 (S.D.N.Y. 2009) ............................................. 21

*SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80 (2d Cir. 2002).............................. 23, 25

*SEC v. Forex Asset Management, LLC ,* 242 F.3d 325 (5th Cir. 2001) ................ 23, 25

*SEC v. Infinity Group Co.,* 226 Fed. Appx. 217 (3d Cir. 2007)............................ 23

*SEC v. Wealth Mgmt. LLC*, 628 F.3d 323 (7th Cir. Wis. 2010) ..................... passim

*Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142 (4th Cir. 1992) .................................. 41

*Shoregood Water Co. v. U.S. Bottling Co.*, 2009 WL 2461689 (D. Md. Aug. 10, 2010)..... 39

*Smillie v. Park Chem. Co.*, 710 F.2d 271 (6th Cir. 1983) ................................... 56

*St. Clair Shores Gen. Emples. Ret. Sys. v. Eibeler*, 2006 WL 2849783 72316 (S.D.N.Y. Oct.
    4, 2006) .................................................................................................... 36

*Strigliabotti v. Franklin Resources, Inc.*, 2006 WL 2792417 (N.D. Cal. Sept. 27, 2006) .... 39

*Telxon Corp. v. Bogomolny*, 792 A.2d 964 (Del. Ch. 2001) ................................ 62

*UAW v. General Motors Corp.*, 2006 WL 891151  (E.D. Mich. Mar. 31, 2006). ............... 49

*Wall St. Sys. v. Lemence*, 2005 WL 292744 (S.D.N.Y. Feb. 7, 2005) ................................... 39

*Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F. Supp. 852 (N.D. Ohio 1984) ......... 30, 31, 40

*Weeks v. Samsung Heavy Indus.,* 909 F. Supp. 582 (N.D. Ill. 1996) ................................... 31

*Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J. 1998) ................................... 47

*Wolf v. Barkes*, 348 F.2d 994 (2d Cir. 1965) ........................................................................ 63

*Yamamoto v. Omiya*, 564 F.2d 1319 (9th Cir. 1977) ......................................................... 35

## Statutes

ICA § 2(a)(33)(E) ................................................................................................................ 23

ICA § 22(e) .......................................................................................................................... 19

ICA § 36(b) .......................................................................................................................... 40

Md. Code Ann. Corps. & Ass'ns § 3-408(b) ........................................................................ 37

Securities Act of 1933 § 11 .................................................................................................. 52

Securities Exchange Act of 1934 § 10(b) .................................................................. 12, 13, 28

Securities Exchange Act of 1934 § 20 .................................................................................. 28

## Other Authorities

*Alabama Securities Commission, Administrative Consent Order as to Respondents MKC, MAM and Kelsoe* (June 22, 2011) ................................................................................... 12

*In re Morgan Asset Management, Inc., SEC Cease-and-Desist Order*, ICA Release No. 29704 (June 22, 2011) ............................................................................................. 14, 16

*In re Piper Capital Management, Inc.,* Exch. Act. Rel.48409 (August 26, 2003) ............... 16

*In the Matter of Evergreen Investment Management Company,* LLC, SEC Release No. IC-28759, June 8, 2009 ....................................................................................................... 13

*In the Matter of Heartland Advisers, Inc.*, SEC Release No. IC-28136, ......................... 10, 16

*SEC v. Heartland Group, Inc.*, No. 01 C 1984 (N.D. Ill.), SEC Litigation Release No. 16938 (March 22, 2001) ............................................................................................................. 19

*SEC v. State Street Bank and Trust Company*, No. 1:10-cv-10172, Dkt. No. 1, (D. Mass. February 4, 2010) ............................................................................................................ 12

## Rules

Fed. R. Civ. P. 17.01 ............................................................................................................ 59

Federal Rules of Civil Procedure Rule 23 ............................................................................ 47

Federal Rules of Civil Procedure Rule 23.1 ......................................................................... 62

Securities Exchange Act of 1934 Rule 10b-5 ....................................................................... 12

Tenn. Sup. Ct. R. 8, TRPC 1.7 ............................................................................................. 32

Tenn. Sup. Ct. R. 8, TRPC Scope, Par. (6) .......................................................................... 31

## INTRODUCTION

Lead Plaintiffs[1] and Derivative Plaintiffs[2] (collectively "Plaintiffs") submit this consolidated memorandum in reply to certain Defendants'[3] opposition[4] to Lead Plaintiffs' and the Funds'[5] Joint Motion for Preliminary Approval of Partial Settlement and Approval of Notice to Settlement Class Members ("Partial Settlement") in *In re Regions Morgan Keegan Open-End Mutual Fund Litig.*, No. 2:07-cv-02784-SHM-dkv (W.D. Tenn.) (the "*Open-End Class Action*") (ECF No. 309) and Derivative Plaintiffs' and the Funds' Joint Motion for Approval of  Rule 23.1 Notice to Shareholders and for Final Approval of the Memorandum of Understanding ("MOU") in *Landers* v. *Morgan Asset Management, Inc.*, No. 2:08-cv-02260-SHM-dkv (W.D. Tenn.) ("*Landers*") (ECF No. 103). Significantly, the former independent directors[6] do not oppose the Partial Settlement or the MOU except that portion of the MOU that addresses the potential dismissal of the Independent Director Defendants.

Plaintiffs and the Company/Funds are filing herewith a Joint Report and Amended

---

[1]     Lead Plaintiffs, the "RMK Open-End Funds Group," are Kathryn S. Cashdollar Estate, Dajalis Ltd., Jeanette H. Landers, H. Austin Landers, and Frank D. Tutor.

[2]     Derivative Plaintiffs are H. Austin Landers, Jeanette H. Landers, Estate of Charles M. Crump, Diana W. Crump, James H. Frazier, James P. Whitaker and Peggy C. Whitaker.

[3]     Allen B. Morgan, Jr., J. Kenneth Alderman, Carter E. Anthony, Brian B. Sullivan, Joseph C. Weller, J. Thompson Weller, G. Douglas Edwards, Charles D. Maxwell, David M. George, Michele F. Wood, James C. Kelsoe, Jr., David H. Tannehill, and Thomas R. Gamble ("Individual Defendants"); Regions Financial Corporation ("RF") and Regions Bank ("RB"); Morgan Keegan & Co., Inc. ("MK"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. (together "MAM/MK"); and PricewaterhouseCoopers ("PwC"). These Defendants collectively are sometimes hereinafter referred to as the "Non-Settling Defendants" or "Opposing Defendants."

[4]     Defendants' briefs are at, in the *Open-End Class Action*, ECF Nos. 314 (PwC), 315 (RF/RB), 316 (Anthony), and 326 and 329 (MAM/MK, Individual Defendants) and in *Landers*, ECF Nos. 107 (PwC), 108 (RF/RB), 113 (Independent Director Defendants), 118 and 119 (MAM/MK, Individual Defendants; 119 is 118 refiled).

[5]     Helios Select Fund, Inc., formerly known as Morgan Keegan Select Fund, Inc. ("Company"), which had three portfolios before they were liquidated on May 29, 2009: Regions Morgan Keegan ("RMK") Select Short Term Bond Fund ("STF"), RMK Select Intermediate Bond Fund ("IBF"), and RMK Select High Income Fund ("HIF") ("the Funds"). The "Regions Morgan Keegan" was replaced with "Helios" for the three portfolios following transfer of the Funds' investment advisory agreements to Hyperion Brookfield Asset Management ("HBAM") on July 29, 2008.

[6]     Jack R. Blair, Albert C. Johnson, William Jefferies Mann, James Stillman R. McFadden, W. Randall Pittman, Mary S. Stone, and Archie W. Willis III ("Independent Director Defendants" or "IDD"). The Independent Director Defendants are sometimes also included in the ref-

1

Motion, together with an Amended Memorandum of Understanding ("AMOU"). As pertinent to Plaintiffs, the AMOU differs from the MOU in, *inter alia*, the following respects:

- AMOU § I.4.: makes explicit that the § 11 judgment shall share on a *pro rata* basis in any *Landers* recovery if the Funds' New Board so determines;

- AMOU § I.5.b.: deletes the contingency relating to subsequent developments in the litigation;

- AMOU § I.6: provides that a *Landers* recovery is to be distributed *pro rata* if the Funds' New Board so determines;

- AMOU § II.7: recognizes that, upon realignment of the Funds as plaintiffs, Rule 23.1 is no longer applicable to a dismissal of the Independent Director Defendants but provides for Court approval thereof should the New Board determine to seek it;

- AMOU § III.1, 2: revises the fee structure, which remains subject to Court approval;

- AMOU § III.3: provides that the Paul Hastings law firm shall serve as stand-by conflicts counsel for the Funds;

- Changes to reflect that the AMOU speaks as of the present instead of last November.

## I.      PRELIMINARY STATEMENT

In October 2007, *The Wall Street Journal* reported the evolving fiasco at a group of RMK bond funds. Ex. 35.[7] Dr. and Mrs. Atkinson thereafter engaged counsel and, on December 6, 2007, filed the first of the actions arising from the collapse of these funds. ECF No. 1. Additional plaintiffs joined the Atkinsons to bring an amended complaint in February 2008 (ECF No. 53) and a derivative action in March 2008 (*Landers* ECF No. 1-4).

While Plaintiffs were preparing their complaint, RMK and the Funds' directors were busily planning their escape from the disaster they had created. FADC ¶¶ 595-600. Especially galling is that RF, MAM/MK's parent, concluded in the latter part of 2006 to exit the subprime mortgage business in which the Funds were so heavily invested and which accounted for most of the Funds' losses. ¶¶ 234, 249-56, 308-16, 331-33, 738; Ex. 36.

_____

erence to "Non-Settling Defendants."

[7]      Unless otherwise noted, all paragraph ("¶") references are to the CAC, all exhibit ("Ex.") references are to the Declaration of Jerome A. Broadhurst filed herewith, all ECF references are to the *Open-End Class Action*, and all emphases are supplied.

MAM/MK's opposition to the MOU and Partial Settlement is grounded in part on an undisclosed self-interest. MAM/MK repeatedly expresses its concern for the "Liquidating Shareholders."[8] Based on the Funds' data, MK Properties LLC ("MKP"), an affiliate of MAM/MK and wholly owned by RF, holds 52.3% of IBF's liquidating shares and 25.7% of HIF's shares. Ex. 1. Thus, MKP is a significant "Liquidating Shareholder."

Contrary to MAM/MK's unsupported assumption, the "Liquidating Shareholders" do not have an exclusive right to a recovery by the Funds on their claims. As open-end funds, all of the Funds' assets were subject to being redeemed every day in their entirety by the then existing shareholders. Thus, it would be fundamentally unfair for the "Liquidating Shareholders" to lay sole claim to assets (the Funds' claims) that belonged to all redeeming shareholders while the Funds were liquidating. Because the Funds began liquidating in July 2007, all shareholders who redeemed thereafter were "liquidating shareholders."

The AMOU provides how foreseeable events are to be resolved. These provisions were negotiated at arms-length between Plaintiffs and the Funds' New Board. MAM/MK offers no authority that parties to an agreement are not able to negotiate the resolution of issues they expect to arise in the course of their relationship. MAM/MK may not like how these issues were negotiated, but MAM/MK was not asked to be a party to the agreement.

Ironies abound in Defendants' attack on the MOU. After having mismanaged the Funds to catastrophic losses, after abandoning the Funds, after doing nothing to pursue the Funds' claims against themselves, and after persistently obstructing the prosecution of those claims, Opposing Defendants now are suddenly concerned about how those claims will be prosecuted and how a recovery by the Funds will be distributed. MAM/MK's purported concern over the alleged conflicts comes 17 months after the Lead Plaintiffs sued the Funds. They have simply waited too long to raise these issues, which were just as apparent before Plaintiffs and the Funds agreed to the MOU and Partial Settlement as after.

The Funds' board and management failed to do what they should have done after they determined the Funds had been mismanaged and held huge quantities of illiquid assets whose values were highly uncertain. They did nothing while the Funds' shareholders, with

---

[8]    MAM/MK mentions "Liquidating Shareholders" 36 times in its 43-page brief.

3

inadequate and misleading information, were panicked into redeeming at plummeting, unreliable NAVs that did not reflect the fair value of all of the Funds' assets. This run on the Funds was exacerbated by MK's preferential redemptions of favored accounts and RF's refusal to supply sufficient liquidity to the Funds to prevent the burgeoning redemptions from forcing the sale of illiquid assets, notwithstanding promising to do so in response to the urgent repeated requests of the Funds' directors. Then, instead of the Funds' board doing its job to investigate the Funds' claims for mismanagement, the board acquiesced in the RMK decision to unload the Funds, refusing even, notwithstanding Plaintiffs' request, to inform the Funds' shareholders about the derivative claims and what steps the board and management had taken to ensure those claims would be promptly pursued against themselves.

MAM/MK has repeatedly vouched for the independence and objectivity of the Funds' New Board. Now, after failing to take any action in the discharge of their fiduciary and contractual responsibilities to the Funds and their shareholders, the Opposing Defendants attempt to block the agreement between Plaintiffs and the Funds to join forces in the pursuit of their common interests against the Opposing Defendants to recover the massive losses these Defendants caused to the Funds and their shareholders.

## II.     REPLY TO MAM/MK AND THE INDIVIDUAL DEFENDANTS

MAM/MK's principal argument in support of its opposition to the proposed Partial Settlement and MOU is that Plaintiffs' counsel in the class action cannot also represent the Funds in their action because of purported conflicts of interest. These conflicts are alleged to consist of (i) a conflict between the "Liquidating Shareholders" and former/redeeming shareholders (shareholders who had redeemed their shares before the Funds were formally liquidated), (ii) a conflict in the representation by counsel of the class in the continuing action against the Non-Settling Defendants and of the Funds in their claims against the Non-Settling Defendants arising from the contingency on the judgment to be entered on the Securities Act of 1933 § 11 claim ("§ 11 claim"), and (iii) intra-class conflicts that preclude certification of the Settlement Classes. MAM/MK is wrong on all counts.

## A.     THERE IS NO CONFLICT BETWEEN THE FUNDS' NON-REDEEMING AND REDEEMING SHAREHOLDERS

MAM/MK's contention that a conflict exists between "Liquidating" and former

4

shareholders suffers from a fatal flaw: It is predicated upon the false premise that the "Liquidating Shareholders" have exclusive rights to a *Landers* recovery and that current and former shareholders have competing interests in any such recovery. MAM/MK Br. at 4, 12 n. 11, 19-23, 35-38. MAM/MK cites no authority for its position.

Because the Funds began liquidating in July 2007, the Funds' former shareholders who sold their shares thereafter redeemed during the course of the Funds' liquidation and, therefore, are also "liquidating shareholders" entitled to be treated equally with the "Liquidating Shareholders." The Funds were forced to sell their illiquid securities at depressed prices, depriving redeeming shareholders of the NAV they would have received if the Funds had suspended redemptions and been liquidated in an orderly manner. Facing increasing redemptions, and uncertain valuations, PwC's inability to timely complete the Funds' audit, the acute need for cash to satisfy redemptions without selling illiquid assets to avoid driving down NAVs, MK preferentially redeemed certain favored MK accounts, while it actively discouraged the Funds' shareholders from redeeming their shares and concealed the Funds' increasingly desperate circumstances.

### 1. The Funds Were Forced to Liquidate from July 1, 2007 through May 2009 as a Result of Insufficient Liquidity to Meet Massive Redemptions.

Between July 1, 2007 and April 30, 2008, the Funds redeemed most of their outstanding shares, and the Funds' assets were largely depleted by those redemptions. Notwithstanding promises of liquidity support, RF was unable or unwilling to provide the needed liquidity in sufficient amounts to avoid the Funds' forced liquidation.

### a. The Funds were almost completely liquidated from July 2007 through May 2009.

For the period July 1, 2007 through April 30, 2008, each of STF's, IBF's, and HIF's three classes of shares suffered substantial net redemptions (redemptions exceed sales):

| Short Term Fund | | Intermediate Bond Fund | | High Income Fund | |
|---|---|---|---|---|---|
| Shares | Dollars | Shares | Dollars | Shares | Dollars |
| 9,429,560 | $76,228,009 | 138,820,730 | $972,525,905 | 134,167,077 | $921,046,052 |

Ex. 4 pp. 72-74; *see also* ¶¶ 231, 306-07, 325-27. STF's net redemptions totaled 9.4 million shares worth $76 million, IBF's net redemptions totaled almost 139 million shares worth $972.5 million, and HIF's net redemptions totaled over 134 million shares for $921 million.

Because these were net redemptions, the Funds were forced to sell assets to fund the re-demptions.[9]

   These net redemptions constituted a substantial portion of the Funds' shares during this period, which, together with the net redemptions between April 30, 2008 and the Funds' formal liquidation on May 29, 2009[10] (represented by the shares currently outstanding), greatly exceeded the shares outstanding at the formal liquidation. The following table shows shares outstanding for each of STF, IBF, and HIF at June 30, 2007, April 30, 2008, and cur-rently following their formal liquidation (Exs. 1,  4 p. 44, 15 p. 54):

| RMK Short Term Fund Shares Outstanding | | | | | | |
|---|---|---|---|---|---|---|
| 6/30/07 | 4/30/08 | Difference | % | Current | Difference 6/30/07 | % |
| 3,286,843 | 1,028,698 | | | 151,827 | | |
| 76,747 | 23,740 | | | 7,907 | | |
| 5,595,467 | 788,211 | | | 433,130 | | |
| 8,959,057 | 1,840,649 | 7,118,408 | 79.5% | 592,864 | 8,366,193 | 93.3% |
| RMK Intermediate Bond Fund Shares Outstanding | | | | | | |
| 6/30/07 | 4/30/08 | Difference | % | Current | Difference 6/30/07 | % |
| 37,879,101 | 6,573,634 | | | 3,279,772 | | |
| 36,868,281 | 7,633,888 | | | 4,676,351 | | |
| 32,400,586 | 14,659,576 | | | 13,237,824 | | |
| 107,147,968 | 28,867,098 | 78,280,870 | 73.1% | 21,193,948 | 85,954,020 | 80.2% |
| RMK High Income Fund Shares Outstanding | | | | | | |
| 6/30/07 | 4/30/08 | Difference | % | Current | Difference 6/30/07 | % |
| 49,957,252 | 10,464,134 | | | 3,439,027 | | |
| 29,140,271 | 8,949,772 | | | 3,701,514 | | |
| 35,655,819 | 20,855,976 | | | 9,616,458 | | |
| 114,753,342 | 40,269,882 | 74,483,460 | 64.9% | 16,756,999 | 97,996,343 | 85.4% |

   As the above table shows, during the ten months from July 1, 2007 through April 30, 2008, the Funds liquidated from 65% to almost 89% of their assets in the course of redeem-ing a similar proportion of their shares, and during the period from July 1, 2007 to when the Funds formally liquidated in May 2009, they sold from 80% to 93% of their assets in the course of redeeming a similar proportion of their shares. The accelerating redemptions forced the Funds into a downward spiral, causing the sale of assets to meet those

---

[9]    *See Fogel v. Chestnutt*, 533 F.2d 731, 757 (2d Cir. 1975) (open-end funds must sell shares equivalent to anticipated redemptions in order to avoid having to liquidate portfolio secu-rities at disadvantageous times).

[10]    Ex. 37 p. 3 (Funds' shareholders approved the Funds' liquidation on May 29, 2009).

redemptions, leading to increasing sales of illiquid securities at ever decreasing prices, precipitating further declines in each Fund's NAV—i.e., a run on the Funds. ¶¶ 213-15, 231-33, 328; *see Fogel*, 533 F.2d at 757.

Because the Funds began liquidating on July 1, 2007, all shareholders who redeemed thereafter were "liquidating shareholders." Neither these "liquidating shareholders" nor the "Liquidating Shareholders" on whom MAM/MK is solely focused received in their liquidating distribution the *pro rata* share of the Funds' assets (the Funds' claims and prices of the Funds' securities that would have been obtained in an orderly liquidation) to which they were entitled. Both groups are to be treated equally. *See* discussion below.

> **b.  RF reneged on its promises of liquidity support and was unwilling or unable to provide the liquidity support needed by the Funds.**

The accelerating redemptions exhausted the Funds' liquidity and ability to satisfy the redemptions. ¶¶ 231-33. The Funds' liquidity crisis was exacerbated by the uncertain valuations of the Funds' securities. PwC, the Funds' auditor, was unable to satisfy itself as to the valuations of a large number of the Funds' securities, preventing the timely filing of the Funds' June 30, 2007, annual report. ¶¶ 227-29; Ex. 3. This led MAM/MK to engage HBAM on August 13, 2007 to assist in the valuations of these securities. ¶¶ 230-31; Ex. 3.

The Funds' liquidity needs led the Funds' directors to seek liquidity support from RF. From August 2, 2007 through at least September 12, 2007, the Funds' directors begged RF for liquidity support. Exs. 2, 3, 5, 10, 33, 38-44. Following the SEC's expressed concern for the Funds' liquidity in light of increasing redemptions, Morgan informed the Funds' board that he "was confident that liquidity support would be available [from RF] for the Funds as needed," including for HIF "in amounts up to $350 million." Exs. 38 p. 2, 40 p. 2. The Funds' independent directors viewed the "continuing significant net redemptions" as a threat to HIF's "viability as a going concern unless liquidity support was available." Ex. 39 pp. 2-3. The board requested it be advised of "available options in the event [liquidity] support was not forthcoming," including suspending redemptions. Ex. 2 p. 2.

RF responded by letter dated August 12, 2007, in which RF said it would provide liquidity support for HIF:

In order to provide the Board with comfort regarding the Fund's ability to

> effect redemptions during the current period of increased redemption activ-
> ity, Regions Financial Corporation, through Morgan Keegan or one or more
> of its affiliates, is prepared, in circumstances in which liquid resources may
> not otherwise be available to effect timely redemptions of its shares at net
> asset value, to purchase Class I shares at net asset value for the purpose of
> funding current redemptions.

Ex. 5 p. 2. RF made the same promise regarding IBF by letter dated September 7, 2007. Ex.
5 p. 1. RF repeated this promise regarding both Funds by letters dated October 5, 2007,
January 4 and March 11, 2008. Exs. 5, 6 p. 18. That RF and MK were in "ongoing discussions
with the Federal Reserve, the SEC, and the New York Stock Exchange about the Fund's situa-
tion" in mid-August 2007 is strong evidence of the Funds' desperate circumstances. Exs. 3, 5.

RF's promise was, however, subject to significant limitations. Aggregate shares of
HIF/IBF purchased by RF or its affiliates were limited to less than 50% of each Fund's out-
standing shares, substantially limiting RF's support. Ex. 5.[11] Notwithstanding the promised
support to maintain the Funds' NAVs, the Funds suffered from massive redemptions after
August 12 at rapidly declining NAVs. According to FINRA, an RF affiliate's capital injec-
tions of $30 million into IBF and $55 million into HIF to provide liquidity for redemptions
were "a paltry amount compared to the $330 million and $374 million, respectively, re-
deemed by investors during July–August."[12] Ex. 7 ¶ 50.

Apparently pursuant to RF's promise to the board, MK Properties, an MAM/MK af-
filiated entity owned by RF, purchased shares of HIF/IBF. MKP purchased $55.2 million of
HIF shares from August 7 through August 13 and $75 million of IBF shares from August 16
through November 15. Exs. 8, 9. Amid heavy redemptions, on September 28, 2007, MKP
redeemed HIF shares worth $20 million, for a realized loss of only $4.3 million, avoiding a
much larger loss if these shares had not been redeemed. *Id.*

The Funds' independent directors viewed the RF promises as a "commitment." Ex.
10. Whether RF would not, or could not, provide the needed liquidity support, it is clear it
did not, and the Funds' board appears not to have pursued the issue. In *In re Reserve Fund*

---

[11]     The restriction on RF's liquidity support was never disclosed to the Funds' shareholders.

[12]     The Funds' net assets decreased almost $1.2 billion for the three months ended Septem-
ber 30, 2007. Ex. 44 p. 2; *see also* ¶ 5.

*Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 187-90 (S.D.N.Y. 2009), the fund's directors sought liquidity support from the fund's adviser and were "shocked" when the adviser told the directors that it was unable to provide such support, resulting in adopting the only alter-native—delaying and eventually suspending redemptions. Here, RF was also unable, or un-willing, to provide the necessary liquidity support sought by the Funds' directors to fund the deluge of redemptions, but, unlike the adviser in *Reserve*, RF never said so.[13]

### 2.    The Funds' Liquidation Was Disorderly and Fraudulent.

The Funds' lengthy liquidation was tainted by the fraud arising from the selective redemption of IBF shares held by certain favored accounts, while MAM/MK simultaneously withheld material information from its customers about, *inter alia*, IBF and RF's inadequate liquidity support, and actively discouraged the Funds' shareholders from redeeming.

### a.    The preferential redemptions of favored PF2 accounts.[14]

At 3:43 p.m. on August 14, 2007, an MK official directed that "all [IBF] positions [be liquidated] from all PF2 models during trading tomorrow," and eight minutes later Gary Stringer, Senior Vice President, responded, "You got it." Ex. 11. Upon being asked whether he was giving a "heads up to anyone," Stringer replied, "Not yet." *Id.* The next morning, in response to his 10:21 a.m. e-mail inquiring into the status of the IBF trade, Stringer was told at 11:15 a.m., "Done. Sold 1,304,202 shares of [IBF] in all PF2 accounts." Ex. 12. The next day, MKP purchased $30 million of IBF shares. Ex. 9. MKP thereby provided the cash for these redemptions without IBF having to sell illiquid securities, thus maintaining its NAV.

---

[13]    RF's $132 million in purchases of HIF/IBF's shares came nowhere close to 50% of the aggregate $1.9 billion in shares redeemed or even the $350 million for HIF alone promised on August 7 and affirmed on August 10 (Exs. 2, 40) and, obviously, came nowhere close to staving off the run on HIF/IBF. At the August 10, 2007 meeting of the Funds' board, Stone asked about the 50% limitation and whether additional support for HIF would be available, if necessary, to which MK CEO Edwards (not Funds/MAM president Sullivan) responded that he believed the "commitment was adequate for the time being" and that RF "was continuing to explore other available options for supporting liquidity." Ex. 40 p. 2. Edwards further commented that HIF "may be approaching the end of the redemption cycle." *Id.* The board again, on August 12, 2007, "asked MAM to develop a supplemental plan for covering redemptions, particularly in light of the anticipated 50% limitation on Regions' purchase of [HIF] shares." Ex. 33. The Fund documents reviewed thus far do not reveal how RF responded or whether the Funds' directors followed up on their requests.

[14]    Plaintiffs have not seen any documents that describe the "PF2 accounts" or governing documents relating to such accounts. In discussing these redemptions, FINRA refers to MK's

By August 15, 2007, IBF's NAV had fallen to approximately $8.00 per share. ¶ 324. By April 30, 2008, IBF's NAV had fallen to $1.91 per share and by May 29, 2009 to $0.22. Exs. 1, 4 p. 44. The PF2 accounts avoided a vastly larger loss as a result of their preferential treatment. Of the 78 million IBF shares redeemed during the period July 1, 2007 through April 30, 2008 at ever decreasing NAVs, the favored PF2 accounts' 1.3 million shares were redeemed early on to their substantial benefit.

The HIF/IBF prospectus supplements disclosing the Funds' valuation difficulties and retention of an independent consultant to value the Funds' ABS/MBS holdings were filed with the SEC on August 13, 2007, at about 5:30 p.m. Exs. 13-14. Less than 13 business hours after the IBF and HIF prospectus supplements were filed, the PF2 accounts were bailed out of IBF. Exs. 11-14.[15]

The PF2 accounts' IBF shares were sold when MAM/MK and the Funds' board knew, *inter alia*, that (i) PwC was unable to value IBF's shares at June 30, 2007; (ii) PwC likely would not be able to complete its audit of the Funds' financial statements by the August 31 deadline, (iii) the Funds' NAVs were likely to continue to decline; and (iv) because of the illiquidity of the Funds' investments, HIF/IBF required capital infusions by the RMK organization to enable them to meet redemptions, but RMK was unwilling or unable to provide the needed support. Exs. 3 p. 6, 8,  11, 12, 34, 41 p. 4; ¶¶ 107, 227-30, 322-28, 661-70.

None of this was disclosed before the PF2 accounts' IBF shares were sold. The Funds' annual report and financial statements for June 30, 2007 were not issued until October 3, 2007. Ex. 15. These financial statements disclosed for the first time  the magnitude of fair valued securities in HIF/IBF's portfolios and included such disclosure as of June 30, 2006 as well. *Id.* at pp. 70/66, 80/76-90/86; ¶¶ 183, 187-89.

MAM/MK favored the PF2 accounts over even the RMK Trust accounts invested in

---

"Preferred Funds Discretionary Program model accounts". Ex. 7 ¶ 50.

[15]      In *SEC v. Heartland Advisors, Inc*., No. 2:03-cv-01427-CNC (E.D. Wisc.) ¶¶ 76-78, the SEC charged certain defendants with having sold shares of two mutual funds before they publicly disclosed liquidity and valuation issues concerning the funds' investments. Ex. JJ. The matter was settled and sanctions imposed for such conduct. *In the Matter of Heartland Advisers, Inc.*, SEC Release No. IC-28136 ("*Heartland Consent Order*"), pp. 7 ¶¶ 22-23 and  10 ¶¶ 8-9. Ex. KK.

the Funds notwithstanding their fiduciary duties to the latter. The following table shows the
extent to which RMK Trust accounts remained in the Funds as of April 30, 2008:

| RMK Short Term Fund | | RMK Intermediate Bond Fund | | RMK High Income Fund | |
|---|---|---|---|---|---|
| Class | % | Class | % | Class | % |
| A | 34.44% | A | 4.72% | A | 0.52% |
| C | 6.97% | C | 0.69% | C | 0.30% |
| I | 94.66% | I | 8.03% | I | 24.43% |

Ex. 4 at 70. Thus, while the PF2 accounts were redeemed in their entirety, RMK Trust left a
significant number of their trust accounts invested in the Funds.[16]

During this period, MK's brokers complained about the dearth of information re-
garding the critical issues of HIF/IBF's valuations and liquidity support. After a conference
call between Kelsoe and MK brokers on August 13, MAM/MK was deluged with e-mails
from brokers begging for information. One broker said, "We need more to work with than
what was on the call today. 20% decline in a Int. Bond may set a record. We need help!!!!!"
Ex. 16. On August 10, 2007, Kelsoe appears to have issued a comment, which at least one
broker, on August 13, said was insufficient as "news we already know and would like more
specific information concerning the [Funds'] holdings and what is going on concerning the
equity infusion into the funds." Ex. 17. This broker further complained that "[k]eeping us in
the dark is not helping at all." *Id.* In another e-mail the same day, this broker said, "I know
you have been swamped with calls and e-mails but what the #$%@& is going on with the
NAVs of these funds???! Please let us know so we can call our customers and make an IN-
FORMED decision. Kelsoe has got to get on the box and tell us what's going on with not
only the high yield funds but also to [sic] intermediate fund too." *Id. See also Alabama Se-
curities Commission, Administrative Consent Order as to Respondents MKC, MAM and*

---

[16]     The Funds' need for liquidity support underscores RF/RB/MAM/MK's conflict of inter-
est in connection with a fiduciary obligation to redeem the Fiduciary Accounts and RMK's fi-
nancial interest in preventing additional selling pressure on the illiquid holdings of the Funds
and the RMK closed-end funds. Because of the overlapping holdings of the same illiquid
ABS/MBS by the Funds and the four RMK closed-end funds, RMK had a strong incentive to
discourage redemptions to avoid having to sell illiquid securities. Substantial sales by one of
these funds would have depressed the prices of the same securities held by the other funds. ¶¶
204, 207, 209-15, 322-28, 341-42, 382(c), 383, 385(f)-(g), 415-16, 643, 740, 755.

*Kelsoe* (June 22, 2011) ("*Alabama Consent Order*") ¶¶ 21-23, 44-46 (Ex. PP.);[17] Ex. OO.

### b. The non-PF2 account holders were actively encouraged not to redeem.

Before and after the preferential redemptions, MK encouraged the Funds' shareholders in non-PF2 accounts to not redeem. Exs. 18 (MK customer assured on August 7, 2007 that HIF "is going to come back" and "The fund will come back and then they won't let you back in."), 19 (MK customer told by MK broker's assistant in August 2007 that "she was instructed to advise clients not to sell while the fund was low and that it would come back."), 20 (MK customer living on Social Security and income from his RMK funds told in August 2007 that "it was not the time to sell because the funds were too low then").[18]

### c. A fraudulent liquidation.

While discouraging the Funds' shareholders from redeeming their shares, MAM/MK fraudulently withheld material information from its clients about the Funds and their gloomy near term prospects and engaged in other fraudulent conduct.

The preferential redemptions of the PF2 accounts violated Securities Exchange Act of 1934 § 10(b). In *SEC v. State Street Bank and Trust Company*, No. 1:10-cv-10172, Dkt. No. 1, (D. Mass. February 4, 2010) (Ex. HH), the SEC asserted that holders of an open-end fund's shares have a protectable interest in having equal access to material information about the fund. *Id.* at 37. *See also In the Matter of Evergreen Investment Management Company, LLC*, SEC Release No. IC-28759, June 8, 2009, at ¶¶ 15-23, 27 (disclosure to selective accounts of the likelihood of continuing repricings of the fund's illiquid securities

---

[17]     MAM/MK admits the findings in ¶¶ 44-46. *Alabama Consent Order* pp. 2, 41.

[18]     *See also* Exs. 21 (On August 21, 2007, "Angie Askew informed me that she had recently heard in a meeting or via a conference call from fund Manager James Kelsoe repeated assurances that the fund was safe, will continue to pay the same dividends and will turn around. On that day, as well as before and after that date, she indicated for such reasons that I should not sell the funds."), 22 (MK representative said, in September 2007, "that she had just met with or talked with MK Executives and Morgan Keegan's advice was to hold the funds, not sell."), 23, 24 (MK customer told on August 13, 2007, to hold rather than sell the funds and was given the same advice thereafter through October 2007, being further told that "Kelsoe assures that the funds are safe"). In a November 15, 2007 conference call with MK's sales force, Edwards, in encouraging MK's brokers "to hang in there," said MK "supported the funds through this period when liquidity has been tough" without revealing that this "support" was to facilitate the preferential redemptions of favored customers, was insufficient to stem the rising tide of redemptions, and that some of that "support" had since been withdrawn. Ex. 25.

would be viewed by a reasonable investor in the fund as important information in deciding whether to redeem the fund's shares; such selective disclosure operated as a fraud and deceit on the fund's existing shareholders in violation of § 10(b)) (Ex. II); *SEC v. Heartland Advisors Inc.*, No. 2:03-cv-01427-CNC (E.D. Wisc. Dec. 11, 2003), Dkt. No. 395 (Ex. JJ).

The wrongful conduct in connection with the preferential redemptions on August 15 is compounded by MK's acknowledgment 11 months earlier—in September 2006—that IBF was not a traditional bond fund. Exs. 28, 29 (IBF is a "non-traditional" bond fund carrying risks that "Mr. & Mrs. Jones don't expect . . . from their bond funds."). MK eliminated the IBF holdings in its Preferred Funds Discretionary Program model accounts because IBF was "expos[ed] to less liquid structured and sub-prime related fixed income investments," and MK "believ[ed] there will be more trouble to come in this area." Ex. 7 ¶ 50. Some MK officials questioned the rationale for keeping IBF in customers' accounts notwithstanding the decision to remove IBF from the model portfolios. Exs. 29, 30.

The Funds' shareholders were deprived of material facts while redeeming their shares amid plummeting NAVs—e.g., (1) the Funds' management's belief that their NAVs were likely to continue to decline; (2) the Funds' need for greater liquidity support than RF was willing or able to provide; (3) the restriction on RF's liquidity support; (4) the available option of suspending redemptions to avoid the likelihood of the Funds being forced to continue selling illiquid assets at depressed prices, driving down NAVs from what they would have been in an orderly liquidation; (5) whether the Funds' board intended to pursue the Funds' claims against themselves and management; (6) the increasingly speculative valuations; and (7) the estimated value of the Funds' claims. In commenting on the SEC's settlement of its regulatory action against MAM/MK, Robert Khuzami, director of the SEC's enforcement division said, "The falsification of fund values misrepresented critical information exactly when investors needed it most—when the subprime mortgage meltdown was impacting the funds. Such misconduct does grievous harm to investors." Exs. 50, OO. *See also* Ex. PP ¶¶ 11-30, 39.

### d. The Funds' NAVs during their liquidation were unreliable because they were based on uncertain, "[un]fair" and "[un]realistic" valuations of the Funds' assets and omitted assets.

By August 13, 2007, HIF and IBF were experiencing "significant net redemptions of [their] shares." Exs. 13-14. HIF/IBF said: "many of the Fund's portfolio securities may be

difficult to sell at a *fair price* when necessary to pay for redemptions from the Fund," the "illiquidity of [HIF/IBF's securities] may result in the Fund incurring greater losses on the sale of some portfolio securities than under more stable market conditions," and "[s]uch losses can adversely impact the Fund's net asset value per share." *Id*. HIF/IBF also admitted that it had become "more difficult to obtain *realistic values* for the Fund's portfolio securities" and that these valuation difficulties for a "substantial portion of the assets of the Fund" and the related "complexity of fair value judgments" had led the Funds' board to engage "an independent valuation consultant" to fair value the Fund's portfolio securities. *Id*.

By November 7, 2007, matters had only gotten worse. In a letter to the Funds' shareholders, Kelsoe disclosed that, because of the continuing weakness in the market for the Funds' securities, the "potential loss of cash flow to the lower-rated tranches will obviously be a catalyst for weaker prices of the bonds from these tranches." ¶ 233. He further said that, because of "an already illiquid market, such as the current one, the *downward pressure on market pricing is considerably magnified*" and that "our portfolios have been pressured across the board." *Id.* "Even the asset classes that are performing well have been *severely devalued* due to the CDO packaging," said Kelsoe. *Id.*

Throughout the period beginning July 1, 2007 during which the Funds were liquidating, the Funds' portfolios substantially consisted of securities whose values could only be determined by fair valuation procedures because there were no readily available market quotations for these securities.[19] Although these securities were only thinly traded in the best of times, after July 2007 the market for the Funds' ABS/MBS virtually disappeared. *Id.* The "fair value" of these securities was extremely difficult to determine, as judgment plays a large role in this valuation process. Ex. 31 p. 57/53; ¶ 220(m). In its February 11, 2008 letter reporting on its examination of the Funds, the SEC informed the Funds' directors that the Funds' November 2006 prospectus "failed to disclose the following material information: a significant majority of RMK Funds' portfolios were [sic] internally valued; the possible effects of fair valuation on the prices used to calculate NAV; the liquidity risk associated with certain

---

[19]      Exs. 4 pp. 60-62, 80; 13; 14; 15 pp. 66, 76-78, 86; 31 p. 53; 32 pp. 49-50, 68; ¶¶ 220(l), 220(m), 231-33; *see also In re Morgan Asset Management, Inc., SEC Cease-and-Desist Order*,

securities held in RMK Funds' portfolios." Ex. 48 p. 6.[20] These findings echoed certain of the allegations in the December 6, 2007 complaint. ECF No. 1 ¶¶ 56-103, 113-29, 147(2.34-2.39), 158, 185, 188(d), 234; *see also SEC Consent Order* ¶¶ 14 n. 3, 15.

Because assumptions were so important in determining the values of most of the Funds' assets during the Funds' liquidation, and because the imprecision involved in estimating fair value affected the amount of unrealized appreciation or depreciation recorded for a particular portfolio security, "differences in the assumptions used could result in a different determination of fair value, and those differences could be material."[21] As further evidence of their unreliable NAVs, the Funds' dividends were grossly inflated and unsustainable; in September, October and November 2008, the Funds' new manager reduced HIF's dividend by 92%, IBF's dividend by 94%, and STF's by 63% to bring dividends in line with investment income. ¶¶ 553-54.[22]

---

ICA Release No. 29704 (June 22, 2011) ("*SEC Consent Order*") (Ex. OO).

[20]    As the Funds and their independent directors, through their counsel K & L Gates, in responding to the SEC in March 2008, said: "It is not surprising that changes occurred during the period in which Hyperion assumed pricing functions. Hyperion's valuations for certain securities were likely different from those produced through [MK's] internal pricing methodologies. Different methodologies may produce different outcomes, but the fact that one methodology produces different fair values than another does not prove that either is right or wrong, or that NAVs were incorrect or not calculated on a daily basis." Ex. 6 pp. 14-15 (citing an SEC official's letter [Ex. 27] and an ICI "White Paper": "Even similar methodologies will produce different outcomes depending on assumptions and judgments.").

[21]    Ex. 4 pp. 61-62; *see also* Ex. 2  p. 2 (fair valuation of securities involved matters of judgment; MAM's prices may differ significantly from HBAM's prices as a result of differences in methodology, assumptions and judgments), Ex. 33 (demonstrating the effect of the differing methodologies, assumptions and judgments, as a result of HBAM's pricing, HIF's and IBF's NAVs fell 7% and 10.1%, respectively, from the previous day); Ex. 27 p. 4 (letter from SEC official to Investment Company Institute "("ICI") official: "We also recognize that different fund boards, or funds in the same complex with different boards, when fair value pricing identical securities, could reasonably arrive at prices that were not the same .... ").

[22]    In *Reserve*, 673 F. Supp. 2d at 198, the fund's trustees, in setting the fund's NAVs for two days, relied on, *inter alia*, incomplete or inaccurate information about one of the fund's investments, which led the court to reject the suggestion that it should attempt to retroactively reconstruct the true NAVs for each hour of those two days because it "is simply not possible or practical, would not address the other issues discussed above, and if attempted, would undoubtedly inordinately delay the distribution of funds investors have been awaiting for more than a year." Consistent with the *Reserve* court's recognition of the practical realities regarding securities that are difficult to value, Plaintiffs have focused on the uncertainty of the Funds' NAVs, rather than their numerical inaccuracy, which, as seen from the SEC official's and K&L Gates's comments, would be, as a practical matter, irrelevant. *See* fn. 21, 22; *see also*, e.g., ¶¶ 3-4, 120, 123, 125-26, 216-47, 469-98; ECF No. 275-1 p. 13 n 12.

As PwC said in its audit reports on the Funds' June 30, 2007 and April 30, 2008 financial statements, the "estimated values [in the absence of readily ascertainable market values] may differ significantly from the values that would have been used had a ready market for the securities existed, and the differences could be material." Exs. 4 p. 80, 15 p. 86. The Funds' new auditor said the same thing in its audit report on the Funds' financial statements dated December 30, 2008. Ex. 32 p. 68. The Funds' NAVs during the entire liquidating period were speculative and largely based on assumptions that, if changed, likely would change the NAV materially.

The Funds, and their redeeming shareholders, suffered from the accelerating redemptions, which in turn forced sales of the Funds' illiquid securities at prices that did not reflect "realistic values" as a result of "the downward pressure on market pricing [that was] considerably magnified." The rapidly declining NAVs fed the accelerating redemptions.[23] In the resulting run on the Funds, redeeming shareholders sold their shares at NAVs that, as MAM/MK admits, did not reflect "fair prices" or "realistic values" of the Funds' "valuable" assets.[24] Accordingly, the Funds' shareholders were unable to make informed decisions or operate on an equal playing field with those who were favored by MAM/MK.[25] Because of

As a result of MK's completely incompetent and reckless valuations of the Funds' ABS/MBS, the SEC has barred MK from being "involved in, or responsible for, recommending to, or determining on behalf of, a registered investment company's board of directors or trustees or such company's valuation committee, the value of [fair valued securities]" for three years and imposed severe restrictions on any such activity for three years thereafter. *SEC Conent Order* ¶¶ 23-24, 30, 32. The SEC determined such conduct to be "fraud." *Id.* at ¶ 27 (". . . the failure to disclose to the Funds' boards that Morgan Asset and Morgan Keegan were not complying with stated valuation procedures constitutes fraud. In addition, the knowing or reckless failure to value securities, for which market quotations are not readily available, consistent with fair value requirements under the Investment Company Act and that materially affects a fund's NAV constitutes fraud.") (citing *In re Piper Capital Management, Inc.,* Exch. Act. Rel.48409 (August 26, 2003)). In *Piper,* such conduct was held to violate § 10(b). Ex. NN pp. 21, 25.

[23]    *See Heartland Consent Order* ¶¶ 14-18 (net redemptions caused liquidity problems as funds could not sell portfolio securities at their valuations).

[24]    Exs. 13, 14. At the August 10, 2007 meeting of the Funds' board, Kelsoe "emphasized his belief that the Funds' holdings were valuable, and there had been a good income yield." Ex. 40 p. 2.

[25]    *See Reserve,* 673 F. Supp. 2d at 196 ("Primary Fund investors deciding whether or not to redeem following the collapse of Lehman were unable to make informed decisions or operate on an equal playing field in light of the chaotic circumstances and the actions of Fund managers and salespeople.").

these uncertain, "unfair," and "unrealistic" valuations, the Funds inequitably redeemed most of their shares and liquidated most of their assets before the Funds were formally liquidated. Distributing a fund's limited assets on the basis of unreliable NAV calculations is not equitable. *Reserve*, 673 F. Supp. 2d at 198 (citing *SEC v. Alpine Mut. Fund Trust*, 824 F. Supp. 987, 989 (D. Colo. 1993).

Additionally, the Funds, at the direction of its directors and management (including MAM/MK), failed to disclose to the Funds' shareholders during their liquidation that the Funds had claims arising from the mismanagement of the Funds and that the Funds' officers and directors did not intend to pursue those claims against themselves. They also misrepresented the estimated value of such claims. FADC ¶¶ 626(a), 626(b)(3), 626(b)(4), 636-41, 872; Ex. B (*Landers* ECF No. 46); Vander Weide Decl. ¶¶ 3-4, Ex. A (*Landers* ECF No. 103-2). The Funds' claims are based on facts alleged in the first class action complaint arising from the Funds' collapse, which was filed on December 6, 2007; therefore, the Funds' board and management, including MAM/MK, were on notice of the Funds' claims no later than December 6, 2007. *See Landers*, ECF No. 94 p. 3 (This Court observed that "Plaintiffs' allegations [in *Landers*] are similar to those found in lawsuits dating back to 2007") (citing *Open-End Fund Litig.*). The Funds' board and management were actually aware of such claims as early as August 12, 2007. Exs. 10 p. 4, 33 p. 3.

The failure to inform the Funds' investors of the Funds' claims and their estimated value deprived redeeming shareholders of material information about the value of their Fund shares. Thus, the Funds' redeeming shareholders are creditors of the Funds for the difference between the *deflated* NAV at which they redeemed and the NAV which they should have been paid represented by a recovery by the Funds in *Landers*. *Cf. SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 329 (7th Cir. 2010) (objecting redeeming shareholders were denied their effort to be redeemed at what was later determined to be an *inflated* NAV); *see* discussion below.

> **e. The Funds' board and management should have suspended redemptions and sought a receivership to preserve the Funds' assets and allow an orderly liquidation; instead, they abandoned the Funds.**

Rather than choosing a course of action that would have spared the Funds and their shareholders losses arising from the Funds' forced selling of illiquid securities and declining

NAVs that did not reflect "fair" or "realistic" valuations of the Funds' portfolio securities, the Funds' directors and management (including MAM/MK), after taking care of MK's favored accounts, instead discouraged the Funds' non-favored shareholders from redeeming, neglected their responsibilities, and sought to jettison the fiasco that they had created.

### i. The Funds' board should have suspended redemptions and sought a receiver.

At least by the time of the preferential redemptions, if not before, it was obvious that no significant number of shareholders could get out of the Funds at the then current NAV. *See* ¶ 322. The factors that led to the preferential redemptions on August 15, 2007 and the need for RF's liquidity support should have led MAM/MK and the Funds' board to suspend redemptions, allowing the Funds to liquidate in an orderly manner.[26] *See Reserve*, 673 F. Supp. 2d at 189 (anticipating accelerating redemptions, the fund imposed a seven day redemption delay until further notice); *Wealth Mgmt.*, 628 F.3d at 328 (funds invested in illiquid assets informed investors that there was not enough cash to pay redemptions in full and that redemptions would be limited to two percent per quarter of the value of each individual's investment; subsequently, the adviser decided to completely suspend redemptions and liquidate the funds).[27]

---

[26]   Section 6.6 of the Funds' Articles of Incorporation allowed the suspension of redemptions:

> Section 6.6. Redemption by Stockholders. . . . Payment of the redemption price may be wholly or partly in securities or other assets at the value of such securities or assets used in such determination of net asset value, or may be in cash. Notwithstanding the foregoing, the Board of Directors may *postpone payment* of the redemption price and *may suspend the right of the holders of Shares to require the Corporation to redeem* Shares during any period or at any time when and to the extent permissible under the 1940 Act.

[27]   The Funds' board briefly considered suspending redemptions. At its August 9, 2007 meeting, the board was advised that no definitive response had been received to the independent directors' request for liquidity support for HIF. Ex. 3 pp. 1-2. "A discussion followed regarding the request for a written letter of liquidity support for the High Income Fund and the available options in the event such support was not forthcoming." *Id.* One of these options was asking the SEC to allow redemptions to be suspended: "Mr. Pittman emphasized that the Independent Directors needed to consider the best interests of shareholders, which may include seeking SEC permission to suspend share redemptions in the absence of an acceptable response to their request [for liquidity support]." *Id.* p. 3. The Funds' board was advised by MAM on August 12, 2007 that "it may be necessary to delay immediate payment of redemption proceeds in [HIF] for several days due to lack of available cash." Ex. 33 p. 2. A search of the Funds' documents did not produce documents reflecting any response by the RMK organization to, or any further con-

Suspending redemptions would have stopped the pressure on the Funds to sell illiquid securities at "[un]fair" and "[un]realistic" prices and would have enabled the Funds to liquidate in an orderly manner.[28] Doing so would have given all of the Funds' shareholders an equal opportunity to minimize their losses, rather than just a select few. The Funds could then have sought permission from the SEC to suspend redemptions pursuant to ICA § 22(e). *See Reserve*, 673 F. Supp. 2d at 189, 190 n 37 (six days after the fund delayed redemptions, the SEC granted fund's request for an exemption from ICA § 22(e) and suspended redemptions, based on the adviser's representation on behalf of the fund that it would "create a plan for the orderly liquidation of each Fund's assets to meet redemption requests and for the appropriate payments to each Fund's shareholders.").

In another case involving similar circumstances, the SEC brought an action alleging the management of six related funds misled investors regarding the safety and liquidity of the funds—which the SEC said was a breach of their fiduciary duty to investors who had sought low-risk investments—and that the adviser's communications to investors were based on inflated values. The funds held illiquid assets and were no longer able to redeem their shares. The court granted the SEC's request to freeze the funds' assets and appoint a receiver for both the adviser and the funds; the receiver was tasked with, *inter alia*, identifying any assets that could be recovered. *Wealth Mgmt.*, 628 F.3d at 329; *see also Alpine*, 824 F. Supp. at 989 (mutual funds invested in illiquid municipal leases had suspended redemptions due to insufficient liquidity with which to redeem their shares and applied to SEC to approve continued suspension of redemptions; with consent of funds' president, court enjoined disposition of funds' assets and appointed receiver to manage the funds, liquidate their assets, and take actions for the protection of the funds' assets and their shareholders).

In *Reserve*, the drop in the fund's NAV and suspension of redemptions led to numerous class and individual actions, including actions against the fund. *Reserve*, 673 F.

---

sideration by the board of, suspending or postponing redemptions.

[28]     *See, e.g.*, *SEC v. Heartland Group, Inc.*, No. 01 C 1984 (N.D. Ill.), SEC Litigation Release No. 16938 (March 22, 2001) (funds consented to an injunction freezing their assets and appointing a receiver who subsequently liquidated the funds) (Ex. KK p. 2 n 2). As the auditor of the Heartland Funds, PwC had experience with mutual funds in these circumstances.

Supp. 2d at 189. In response to the litigation, the fund's board created a $3.5 billion reserve to satisfy, *inter alia*, claims against the fund. *Id. Reserve*, 673 F. Supp. 2d at 189, 194. Here, the Funds' board took none of these actions to protect investors in the Funds.

### ii.    The Funds' board and management acted imprudently.

Instead of acting prudently, the Funds' directors, at MAM/MK's direction, and management, under RF/MK's control, preferentially redeemed selected accounts and chose to allow a disorderly and fraudulent liquidation while trying to discourage the Funds' shareholders from redeeming. As a result, the mismanagement of the Funds by MAM/MK, which led the Funds to heavily invest in securities—in violation of the Funds' investment objectives, policies and restrictions—that caused their collapse, was compounded by the reckless failure to suspend redemptions and preserve assets. This was in turn compounded by the Funds' directors' and management's decision to abandon the Funds rather than preserve assets and pursue the Funds' claims against themselves and PwC.

Not only did the Funds' officers and directors and MAM/MK fail to take action to pursue the Funds' claims against themselves, but the board renewed the Funds' advisory agreement with MAM in October 2007. FADC ¶¶ 593-94. In December 2007, the Funds' directors, at MAM/MK's behest, began considering the transfer of the management of the Funds to another adviser, replacing both the Funds' directors and management and relieving them of further responsibility for the Funds. *Id.* at 595-97. Even when the RMK organization realized that the Funds were no longer viable and began the process of unloading them for nothing,[29] the Funds' board and management (including MAM/MK) did nothing to protect the Funds' investors, allowing the run on the Funds to continue unabated.

Instead of an orderly liquidation of the Funds that would have guaranteed the fair and equitable treatment of all of the Funds' shareholders, offering all of them an equal opportunity to get out, to minimize their losses, and to share in a Funds recovery on their claims, a multitude of litigation has erupted, including class and individual actions and hundreds of arbitrations reaching inconsistent and contradictory results. This is exactly what the

---

[29]    Because of the Funds' extraordinarily bad performance and the Funds being no longer viable, as evidenced by the Funds' shrinking assets in the ongoing liquidation, HBAM paid nothing for the contracts to manage the Funds. ¶¶ 39, 93; FADC ¶¶ 597, 641, 874.

court in *Reserve* said should be avoided, finding that the fund's plan of liquidation treated investors neither fairly nor equitably, as the reserve constituted a finite pool of assets that, given the number of claims brought against the fund, "is certain to be allocated not according to equitable precepts but rather based on a race among investors to obtain favorable judgments—judgments that might be decided based on conflicting principles." *Reserve*, 673 F. Supp. 2d at 194-95.[30]

### 3. The Funds' Redeeming and Non-Redeeming Shareholders Are Entitled to Share *Pro Rata* in a Recovery by the Funds.

MAM/MK assumes, without citing any authority, that the "Liquidating Shareholders" are solely entitled to share in a recovery by the Funds in *Landers* to the exclusion of the Funds' former shareholders. MAM/MK is wrong. First, Plaintiffs and the Funds' New Board negotiated an agreement whereby the former shareholders' interests in such a recovery are recognized. Second, courts have consistently recognized that, in the case of open-end funds like the Funds, the remaining shareholders and the redeeming shareholders are to be treated equally.

### a. Plaintiffs and the Funds negotiated an agreement providing that former and current shareholders are to share in a Funds recovery.

MAM/MK repeatedly recognizes that the Plaintiffs negotiated a deal with the Funds that entitles the Funds' former shareholders to be treated in the same manner as the current shareholders. The MOU/AMOU were reached as a result of arms-length negotiations between Plaintiffs and the Funds, both of whom were represented by counsel. MAM/MK does not contend otherwise.

The New Board investigated the FADC's allegations. *Landers* ECF Nos. 93, 98; Funds' Br. at 4-5. The New Board concluded that the FADC's allegations and claims have merit. *Id.* The New Board, in the reasonable exercise of its business judgment, determined to pursue the claims asserted in the FADC against the Opposing Defendants. MAM/MK does not and cannot suggest that the New Board's decision to pursue the Funds' claims is any-

---

[30]     *See also SEC v. Byers,* 637 F. Supp. 2d 166, 168 (S.D.N.Y. 2009) (court appointed a receiver to propose a plan of distribution for investment funds' remaining assets; receiver determined that liquidation of the funds and a *pro rata* distribution of the proceeds was the most "prudent and equitable course of action").

thing other than a proper exercise of its business judgment.

Nor has MAM/MK sought to show that the New Board did not have the authority to negotiate the MOU's provisions regarding the non-redeeming and redeeming shareholders. MAM/MK's focus on the "Liquidating Shareholders" as exclusive recipients of a Funds recovery runs counter to the requirement that an open-end fund's liquidation must treat both former and current shareholders fairly and equitably. Nor does MAM/MK contend that the New Board has breached its fiduciary duty by agreeing to the MOU's provisions recognizing the interests of the Funds' current and former shareholders.

Finally, the purported conflict between redeeming and non-redeeming shareholders, of which MAM/MK makes so much, exists regardless of which lawyers represent the Funds in the prosecution of their claims. The same purported conflict confronts the New Board, which it agreed to resolve in the manner provided in the AMOU. The New Board chose to settle the § 11 claim against the Funds. The New Board must also address competing claims by the Funds' former shareholders to the extent that those shareholders' losses are not covered by the § 11 judgment. The New Board addressed that conflict by agreeing to treat a revival of the § 10(b) claim in the same manner as the § 11 claim. It further agreed to consider a *pro rata* distribution to all redeeming and non-redeeming shareholders, which is the method decreed by courts of equity in distributing an open-end mutual fund's assets under these, or similar, circumstances. *See* discussion below.

### b. The Funds' non-redeeming and redeeming shareholders must be treated equally.

As liquidating open-end funds, the Funds' assets/recovery must be distributed *pro rata* among their redeeming and current shareholders. The "Liquidating Shareholders" are not entitled to a windfall. A *pro rata* distribution of a recovery among all injured former and current shareholders is fair and equitable, as the AMOU provides and the courts require.

### i. Equity requires that a recovery by the Funds be distributed *pro rata* among redeeming and non-redeeming shareholders.

Redeeming shareholders of liquidating open-end mutual funds with claims against the fund and the fund's remaining shareholders are to be treated equitably, which in most cases means that both share *pro rata* in the fund's remaining assets. *Wealth Mgmt.*, 628 F.3d

at 335; *Reserve*, 673 F. Supp. 2d at 196; *In re Bayou Group, LLC*, 372 B.R. 661, 664-666 (Bankr. S.D.N.Y. 2007). The ICA requires that a registered investment company's voluntary dissolution or liquidation be "fair and equitable." ICA §§ 2(a)(33)(E), 25(c); *Reserve*, 673 F. Supp. 2d at 194.

The AMOU provides that the distribution must be fair and equitable and further provides for Court approval of the agreement. AMOU §§ I.14, IV.1. In so providing, the parties seek to invoke the equitable powers of the Court under ICA § 25(c). "[I]n shaping equity decrees, [a] trial court is vested with broad discretionary power." *Lemon v. Kurtzman,* 411 U.S. 192, 200, (1973). As is clear from Defendants' opposition, an equitable plan for distributing a Funds recovery will not satisfy everyone. *See Byers,* 637 F. Supp. 2d at 168 ("An equitable plan is not necessarily a plan that everyone will like."). "When funds are limited, hard choices must be made." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 82 (2d Cir. 2006).

A *pro rata* distribution of assets is "favored" where investors' funds are "commingled" and the investors are "similarly situated." *SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88 (2d Cir. 2002). *See also, SEC v. Infinity Group Co.,* 226 Fed. Appx. 217, 218-19 (3d Cir. 2007); *SEC v. Forex Asset Management, LLC ,* 242 F.3d 325, 331 (5th Cir. 2001). The *Reserve* court concluded "the logic underlying the decision endorsing *pro rata* distribution is relevant here, because such a distribution is appropriate where any distinctions that might be drawn among parties receiving funds would be arbitrary or based on mere chance. In such cases, *pro rata* treatment of the parties is most equitable." *Reserve*, 673 F. Supp. 2d at 196.[31]

### ii.   The "Liquidating Shareholders" are not entitled to a windfall.

Tellingly, MAM/MK did not disclose in its brief that its affiliate, MKP, is the largest of the "Liquidating Shareholders," holding 52% of IBF's shares and 26% of HIF's. Ex. 1. While the AMOU provides that MKP is not to share in a recovery by HIF or IBF, MKP will undoubtedly dispute being excluded.

Plaintiffs have estimated the potential losses by the Funds at $937.5 million. FADC

---

[31]     In *Reserve*, the fund paid to all shareholders, including those who had redeemed, a *pro rata* distribution. *Reserve*, 673 F. Supp. 2d at 188, 190.

¶¶ 871-74. In order to avoid a windfall to the Funds' remaining shareholders, Derivative Plaintiffs seek a constructive trust to be imposed on a recovery by the Funds for the benefit of shareholders who redeemed at an NAV that did not take into account the value of the Funds' claims that the Funds have now determined to pursue. FADC ¶ 876.

On the basis of data provided by the Funds as to the current shareholders and MKP's purchase prices (Exs. 1, 34), and making some assumptions as to the likely NAVs at which they purchased their shares, the aggregate losses of the "Liquidating Shareholders" are estimated to be $369.2 million, $102.2 million of which is attributable to MKP. Given the Funds' estimated damages of $937.5 million, MAM/MK seeks a windfall for "Liquidating Shareholders" of almost three times their estimated losses. Excluding MKP, the "Liquidating Shareholders'" losses are estimated at $266 million, an even larger windfall if they are exclusively entitled to share in a Funds recovery. Even at the $500 million hypothetical recovery posited by MAM/MK (MAM/MK Br. at 31), the "Liquidating Shareholders" without MKP would have a windfall of almost two times their estimated losses.

Shareholders in a liquidating open-end fund are not entitled to a windfall. *Reserve*, 673 F. Supp. 2d at 200; *Alpine,* 824 F. Supp. at 989, 991, 994 (distributing the assets of funds forced to liquidate because of illiquid investments on the basis of erroneously computed pre-receivership NAVs would give pre-receivership redeeming shareholders an undeserved windfall). Equity requires that the difference between the "Liquidating Shareholders'" losses and the Funds' recovery be distributed to the former shareholders. *See Reserve*, 673 F. Supp. 2d at 199 n 46 (equitable principles control the distribution of a fund's assets); *see also WorldCom,* 467 F.3d at 82.

### iii.   A *pro rata* distribution of a Funds recovery among all redeeming and non-redeeming shareholders is fair and equitable.

The Funds have liquidated their assets and paid a liquidating distribution to the "Liquidating Shareholders." This distribution, like the liquidating distributions paid to the Funds' redeeming shareholders during their liquidation beginning in July 2007, did not include the value of the Funds' claims.

In *Reserve*, which involved a money market fund that was forced to suspend redemptions pending the adoption of a plan for an orderly liquidation after its NAV fell below

$1.00, shareholders who had redeemed at less than the amount of the final liquidating distribution shared *pro rata* with all other fund shareholders, including those who remained in the fund. *Reserve*, 673 F. Supp. 2d at 184, 188, 190-91. In adopting the plan for a *pro rata* distribution to all of the fund's remaining and former shareholders who redeemed at less than the liquidating distribution, the court rejected the objections of investors who tried to redeem while shares were still being redeemed at $1.00 and who argued they had a contractual right to have their shares redeemed at $1.00. *Id.* at 188-89, 191. The court held that equity demanded such contractual rights not interfere with "an equitable remedy that takes account of the competing claims of all unpaid investors to a finite res." *Id.* at 196, 198 n 45. These objectors resemble MAM/MK's "Liquidating Shareholders" in that they, according to MAM/MK, now have first call on the assets remaining to be distributed. *See also Wealth Mgmt.*, 628 F.3d at 329-30, 333-35 (district court properly rejected objection to a *pro rata* distribution by fund shareholders who unsuccessfully sought to redeem their shares, contending they should be given priority over non-redeeming shareholders).[32]

The *Reserve* court diligently adhered to the *pro rata* basis for distributing the fund's assets in liquidation. For example, one group of the fund's investors consisted of "straddler" investors who redeemed some but not all of their shares at $1.00. *Reserve*, 673 F. Supp. 2d at 193. Noting the unreliable NAV calculation and the misleading information that caused some investors not to redeem, the court agreed it was not equitable to permit investors who received $1.00 NAV payments for some of their shares to participate in the *pro rata* distribution with no offset. Accordingly, distributions made to the "straddlers" were offset to ensure that they did not obtain an overall recovery of more money per share than other investors participating in the *pro rata* distribution. *Id.* at 200.

Because the Funds are in liquidation, the "Liquidating Shareholders" are deemed

---

[32]     The Seventh Circuit in *Wealth Mgmt*. approvingly cited *Reserve. Id.* at 333. Other courts have likewise endorsed *pro rata* distribution plans as an equitable way to distribute assets in similar circumstances. *Forex Asset Mgmt*. LLC, 242 F.3d at 331-32 (affirming a *pro rata* distribution among defrauded investors, court declined to treat objectors whose funds were segregated in a separate account more favorably than other fraud victim creditors); *Credit Bancorp, Ltd*., 290 F.3d at 88-90 (*pro rata* distribution is particularly appropriate where funds are commingled and investors are similarly situated); *Byers*, 637 F. Supp. 2d at 176-77.

creditors, not shareholders entitled to what remains after satisfying all liabilities. *See Reserve*, 673 F. Supp. 2d at 199 n 46 (the remaining shareholders of a money market fund in liquidation are not "equity holders" but creditors seeking the return of their investments). Shareholders in an ordinary stock corporation that is liquidated generally do not have a contractual right to redeem their shares; as equity holders, they are entitled to the assets remaining after satisfaction of all liabilities. *Bayou Group,* 372 B.R. at 665. However, investors in a fund who have a contractual right of redemption are creditors of the debtor because "a party with a contract claim against a debtor is a creditor of the debtor." *Id.* Because the "Liquidating Shareholders" are creditors, they are entitled to be paid only on a *pro rata* basis. *See Wealth Mgmt.*, 628 F.3d at 335; *Reserve*, 673 F. Supp. 2d at 196; *Bayou Group*, 372 B.R. at 664-666.[33]

Because the Funds began liquidating in July 2007 and should have been put into receivership, all "liquidating shareholders" are creditors of the Funds as a result of redeeming at unreliable NAVs for the difference between what they received and what they should have received at an NAV produced in an orderly liquidation that included the value of the Funds' claims. The "Liquidating Shareholders" are not entitled to share exclusively in a Funds recovery of damages that belong to all redeeming/liquidating shareholders.

### c.    The AMOU provides for a *pro rata* distribution.

The AMOU provides that the allocation of a Funds recovery is to be determined by the Funds' board and approved by this Court. AMOU §§ I.6.a., 10. The AMOU further pro-

---

[33]    *Alpine* also supports the principle that redeeming shareholders and non-redeeming shareholders are to be treated equally. In *Alpine*, the court approved the receiver's decision to treat redeeming shareholders equitably with remaining shareholders by paying each group of shareholders fair market value for their equity interest in the funds, regardless of the prior (higher) NAVs at which redeeming shareholders sought to redeem. 824 F. Supp. at 989-992, 994. Likewise, in *Wealth Mgmt.*, the Seventh Circuit upheld the district court's approval of a receiver's plan that treated redeeming shareholders and non-redeeming shareholders equally. 628 F.3d at 329. *Alpine* and *Wealth Mgmt* stand for two propositions: (1) regardless of their contract, the remaining/non-redeeming shareholders of an open-end fund are neither stuck with the entire risk nor are they entitled to solely benefit from a fund's remaining assets to the exclusion of redeeming shareholders; (2) regardless of their contract, redeeming shareholders are not entitled to benefit at the expense of the non-redeeming shareholders, notwithstanding a timely made but unaccepted redemption demand. Thus, in a liquidating open-end fund, no redeeming or non-redeeming shareholder, regardless of their circumstances, is allowed to be treated in accordance with their presumed contract at the expense of the other shareholders.

vides that, for purposes of such allocation, the amounts of the § 11 damages and of "derivative action damages" are to be calculated by counsel for the Funds and will be subject to approval by both the Funds' board and this Court. *Id.* at §§ I.5.c., I.6.b. The AMOU prohibits a windfall recovery by any group of the Funds' shareholders. *Id.* at §§ I.6., I.7.

The AMOU provides that the distribution among the identified groups that the New Board determines shall share in a Funds recovery is, if the New Board so determines, to be on a *pro rata* basis. AMOU § I.6. If the New Board so determines, the § 11 judgment is also to be satisfied out of any such recovery on a *pro rata* basis with the other shareholder groups identified in the AMOU. AMOU § I.4. The AMOU is thus wholly consistent with the preferred method for distributing the assets of an investment fund to its investors who incurred losses on their investments in such fund. *See Wealth Mgmt.*, 628 F.3d at 327, 333-334) ("By subordinating the objectors' claims and effectuating a *pro rata* distribution of assets, the district court avoided the inequity of giving some investors preference even though all investors' claims were substantively the same.").

The Funds' New Board is fully capable of making such a decision. *See Alpine*, 824 F. Supp. at 993 (A fund's receiver, and thus a court, "can consider the interests of the investors in its equitable decisions. We believe the Receiver can point out to the Court the way the equities fall upon the investors for whom the Receiver is acting, and the Court can consider such arguments in its decision.").[34]

### 4.   The Redemption Settlement Class and § 10(b).

The only claims asserted on behalf of the Redemption Settlement Class are those under Securities Exchange Act of 1934 §§ 10(b) and 20 and Rule 10b-5 thereunder. ¶¶ 106, 742-51, 758-66. The Funds are Defendants on the § 10(b) claim. ¶¶ 742-51. As Opposing Defendants concede, the § 10(b) claim remains as an ongoing claim that the MOU addresses in the event it should be revived.

---

[34]     The *Alpine* court concluded that the receiver "can, if necessary, assert the remaining investors' interests in his equitable arguments." *Id.* at 994. *See also Wealth Mgmt.*, 628 F.3d at 327) ("Where a receivership trust lacks sufficient assets to fully repay investors and the investors' funds are commingled, a distribution plan may properly be guided by the notion that 'equality is equity,' and pro rata distribution is appropriate.") (citation omitted).

Citing, *inter alia*, what the Court viewed was the CAC's insufficient allegations of scienter, this Court dismissed the § 10(b) claim. *In re Regions Morgan Keegan Open-End Fund Litig*., 743 F. Supp. 2d 744, 762 (W.D. Tenn., 2010).[35] The dismissal is not final. In denying Lead Plaintiffs' motion for reconsideration with respect to scienter, this Court declined to address the preferential redemptions because they were not alleged in the CAC but were presented in "extraneous materials." *In re Regions Morgan Keegan Secs, Derivative, & ERISA Litig*., 2010 WL 5464792, at *9 (W.D. Tenn. Dec. 30, 2010)(Ex. Z). The jointly proposed Case Management Order that was to be the subject of the hearing before the Court on December 16, 2010, provides for a second amended or supplemental complaint. ECF No. 282 p. 3. Lead Plaintiffs anticipate including in such a complaint, in support of the § 10(b) claim, allegations relating to, *inter alia*, the redemption fraud on the vast majority of the Funds' shareholders who did not get the preferential treatment given a select few that enabled them to avoid most of the Funds' catastrophic losses and MAM/MK's effort to discourage redemptions while failing to disclose material facts.

## B. DEFENDANTS' CONFLICT OF INTEREST CHARGE IS WITHOUT MERIT.

Opposing Defendants' contention that a conflict exists between the class and the Funds is untimely, improperly asserted in opposition to the proposed Partial Settlement and MOU, and is otherwise without merit because there is no conflict that precludes the proposed representation of the Funds by Plaintiffs' counsel.

### 1. Because Opposing Defendants' Effort to Disqualify Plaintiffs' Counsel Is Untimely, Defendants Have Waived any Right to Assert a Conflict.

The Funds were named defendants in the CAC filed on November 30, 2009. ECF

---

[35]    In dismissing these claims, the Court did not have the benefit of two recent decisions that clarify the standard for determining whether a plaintiff has sufficiently alleged scienter: *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011); *Frank v. Dana Corp*., __ F.3d __, 2011 WL 2020717 (6th Cir. May 25, 2011) (Ex. EE). In *Frank*, the Sixth Circuit ruled that, after *Matrixx*, the past practice in this circuit of "conduct[ing] our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach" is no longer appropriate. *Id.*, at *5. The CAC asserts claims against MAM/MK both as a maker of misleading statements in the Funds' prospectuses (Count V) and as controlling persons of the Funds (¶ 749, Count VII). ECF No. 218 pp. 360-65. The Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 2011 WL 2297762 (U.S. June 13, 2011) (Ex. MM), addressed the former while explicitly distinguishing the latter. *Id.*, at *5, 6 n. 10, 7, 8.

No. 218 ¶¶ 36, 684-707, 742-51. The FADC was filed on October 13, 2009. *Landers*, ECF No. 46. Seventeen months after the Lead Plaintiffs named the Funds as defendants in the CAC and three years after Derivative Plaintiffs brought their action on behalf of the Funds, and after whatever conflicts may have existed between the Funds and Lead Plaintiffs have been resolved, MAM/MK now tries to prevent counsel from representing the class and the Funds in their joint prosecution of their claims arising out of the same facts against the same Non-Settling Defendants.[36]

Defendants' motions to dismiss the FADC were filed in December 2009. *Landers*, ECF Nos. 57-65. On April 5, 2010, Defendants filed replies to Derivative Plaintiffs' opposition. *Landers*, ECF Nos. 79-83. At no time during the almost four months of briefing did any Defendant raise the issue of the dual representation of the Funds by Derivative Plaintiffs' counsel in *Landers* and Lead Plaintiffs' counsel of the class in the *Open-End Class Action*. Despite numerous opportunities and despite a 17-month period during which counsel

---

[36]    Lead Plaintiffs did not sue the Funds in the *Open-End Class Action* while the Funds remained operating registered investment companies. After the Funds adopted a formal plan of liquidation and deregistered, Lead Plaintiffs determined that naming the Funds as defendants in the class action presented no conflict. In the initial distribution following their formal liquidation, except for a reserve, the Funds distributed all of the cash proceeds from the sale of the Funds' securities. Accordingly, naming the Funds as defendants in the class action did not pose the conflict now asserted by MAM/MK and argued by Lead Plaintiffs in the initial round of motions for Lead Plaintiff. The Funds' cash from the sale of their securities having been distributed, current shareholders are not at risk of their Funds' assets being used to pay off former and current shareholders as a result of the class action. The AMOU makes clear that any recovery from the Funds in the class action is to come only from a *Landers* recovery, and the current shareholders are not exclusively entitled to such recovery—any such recovery will include monies that should have been paid to former shareholders when they redeemed.

MAM/MK's citation on p. 24 of their brief to *Forsythe v. Sun Life Fin. Inc.*, 2005 WL 81576 (D. Mass. Jan. 13, 2005) (Ex. Q), is telling, because the *Forsythe* court addresses these very same factors in concluding plaintiffs' and counsel's representation in a class action against *operating* funds conflicted with their representation of those funds in a derivative action. The court noted that "any possible recovery would effectively come from the fund's assets" and, with respect to other funds, "no evidence has been offered in support of [the] assertion" that those funds' assets would not be vulnerable to a class recovery. *Id.* at *2. Here, the evidence and the AMOU make clear that (1) the Funds have liquidated and are not operating and (2) any recovery will come solely from a Funds' recovery, which, because the Funds have no other assets, is a practical reality. The *Forsythe* court further concluded that, even if it accepted counsel's assertion that the class actions against the funds were not really against the funds' assets, counsel had a conflict in connection with their representation of class members who no longer owned the funds' shares and would benefit from the pursuit of claims against those funds' assets but counsel had represented they would not do so. *Id.* These issues do not exist here.

29

represented the Lead Plaintiffs regarding the class's claims against the Funds and Derivative Plaintiffs regarding the Funds' claims, counsel's dual representation did not cause any concerns among any of the Defendants. Meanwhile, Plaintiffs' counsel continued to investigate both the derivative and class claims, as is apparent from the extensive briefing throughout 2010 in response to Defendants' motions to dismiss the CAC and FADC.  Not until after Plaintiffs and the Funds filed with this Court their agreement to jointly pursue the class's and Funds' claims have Opposing Defendants raised this issue.

A party entitled to contest an attorney's representation who knowingly refrains from promptly doing so "is deemed to have waived that right." *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337-38 (B.A.P. 6th Cir. 1999); *Jackson v. JC Penney Co.,* 521 F. Supp. 1032, 1034-35 (N.D. Ga. 1981). A late-filed motion to disqualify not only infringes on a party's "important public right" to select and employ its own counsel, but it also prejudices a party by denying its choice of counsel after substantial case preparation and expenditure of resources. *Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F. Supp. 852, 858 (N.D. Ohio 1984). Courts cannot allow parties to "delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed." *Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 992 (8th Cir. 1978). "The right to move for disqualification may be waived if not timely made." *Host Marriott Corp. v. Fast Food Operators, Inc.,* 891 F. Supp. 1002, 1010 (D.N.J. 1995).

In *Warpar,* the court rejected an attorney disqualification motion due to the plaintiff's delay. 606 F. Supp. at 858-59.  Although the plaintiff was aware of counsel's dual representation at the outset of a second lawsuit, the plaintiff waited 21 months to bring the motion to disqualify counsel. *Id.* at 854. In denying the motion, the court noted that, during the 21-month period, the defendant's attorneys expended a substantial amount of time working on the case.  *Id.* at 858; *see also Weeks v. Samsung Heavy Indus.,* 909 F. Supp. 582, 584-85 (N.D. Ill. 1996) (finding party waived right to challenge representation by attorney who may also serve as a witness by waiting 24 months); *Bayside Fed. Savings & Loan Ass'n v. United States,* 57 Fed. Cl. 18, 21-22 (Fed. Cl. 2003) (same: 15 months).

30

Plaintiffs' Counsel here have invested significant time and resources in pursuing the derivative claims.  Defendants have been aware that Plaintiffs were serving in a representative capacity on behalf of the Funds while pursuing §§ 11 and 10(b) claims against the Funds.  Counsel's dual representation did not trouble Defendants for 17 months, and only now that the Funds and class Lead Plaintiffs have agreed to jointly pursue their common interests against the Opposing Defendants do they protest.

### 2. Defendants' Conflict Accusations Are Improperly Made in Their Opposition to the Partial Settlement and MOU.

Defendants' untimely assertion of purported conflicts is nothing less than an opportunistic effort to exploit the ethics rules to gain an advantage in this litigation. Opposing Defendants argue that Plaintiffs are subject to a "disqualifying conflict" as a result of conflicting representation, in violation of Tennessee Rule of Professional Conduct 1.7(b). However, the Tennessee Rules of Professional Conduct ("TRPC" or "Rules") explicitly prohibit use of the Rules to gain an advantage in litigation.[37] That the first time the Opposing Defendants attacked counsel's representation of both the class and the Funds comes after Derivative Plaintiffs, class Lead Plaintiffs, and the Funds announced their agreement to jointly pursue the class's and Funds' claims herein is clear evidence of Opposing Defendants' improper use of the accusation as purely a litigation strategy.

Courts must be vigilant in viewing motions to disqualify counsel, as the "ability to deny one's opponent the services of capable counsel is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir. 1988); *Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424, 441 (1985) ("the tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation"). Due to the potential for abuse by the opposing party, motions to disqualify counsel are subject to "particularly strict judicial scrutiny." *Harker v. Comm'r of Internal Revenue,* 82 F.3d 806, 808 (8th Cir. 1996). In addition to the delay caused to the proceedings, disqualification also causes the client "a loss of time and money in being compelled to retain new counsel who in turn have to become familiar with the prior comprehensive investigation which is the core of

---

[37]     Tenn. Sup. Ct. R. 8, TRPC Scope, Par. (6) (charges of conflict of interest are not to be used by opposing parties as procedural weapons).

modern complex litigation." *Emons Indus., Inc. v. Liberty Mut. Ins. Co.,* 749 F. Supp. 1289, 1292 (S.D.N.Y. 1990).

Courts in this Circuit recognize that a disqualification motion presents the danger that a party will use it as a tactic for unfair advantage. *In re Sheehan,* 198 B.R. 516, 518 (N.D. Ohio 1996) (disqualification motions are "often interposed for tactical reasons"). A court should view a motion to disqualify "with extreme caution because it can easily be misused as a harassment technique." *Howard v. Wilkes & McHugh, P.A.,* 2007 WL 4370584, at *6 (W.D. Tenn. Dec. 3, 2007) (Ex. A); *Eon Streams, Inc. v. Clear Channel Communs., Inc.,* 2007 WL 954181, at *3 (E.D. Tenn. Mar. 27, 2007) (Ex. B); *see also* Tenn. Sup. Ct. R. 8, TRPC 1.7, Comment 19 (same). Disqualification for strategic reasons encourages "vexatious" behavior, increasing public cynicism about the administration of justice. *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 738 F. Supp. 1121, 1126 (N.D. Ohio 1990). Disqualification motions "launched as litigation tactics," as Opposing Defendants have here, must be denied. *See In re McLaren,* 115 B.R. 922, 930 (N.D. Ohio 1990); *El Camino Res. Ltd. v. Huntington Nat'l Bank,* 623 F. Supp. 2d 863, 876 (W.D. Mich. 2007).

Plaintiffs' Counsel have been litigating the complex issues regarding the implosion of the Funds since late 2007.  Now Opposing Defendants would have the Funds take the expensive and inefficient route of searching for new counsel, rather than availing the Funds of the expertise gained by chosen counsel during the past three-plus years, a decision the New Board was fully capable of making in the exercise of its business judgment. Opposing Defendants' move is clearly designed to thwart the Funds' ability to engage counsel with extensive experience in this litigation to prosecute their claims against Opposing Defendants.

### 3.   There Is No Disqualifying Conflict in Connection with Counsel Representing Both the Funds and the Class; any Potential Conflict Does Not Require Disqualification of Counsel.

Assuming approval of the Partial Settlement and AMOU, counsel's representation of the Funds and the class does not present an actual conflict. Such dual representation presents only a theoretical conflict, merely a "surface duality." Any potential conflict does not require that counsel be disqualified. There is no actual adversity between the interests of the Funds and those who will have claims on a recovery by the Funds and the proposed Settle-

ment Classes.

### a.  There is no conflict inherent in counsel's representation of a class plaintiff against a corporation who is also a derivative plaintiff on behalf of that corporation.

Courts have readily accepted that counsel may represent a shareholder in both a securities class action and a derivative action, recognizing that "the case law is virtually unanimous in holding that one counsel can represent a stockholder in bringing *both* an individual *and* a derivative action."  *See In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 624, 630 (S.D. Ohio 1984) (emphasis in original).[38]  While *Dayco* did not specifically address whether counsel could represent a plaintiff in a securities class action and a derivative action simultaneously, *Dayco* has been accepted for that proposition.  *See, e.g.*, *Keyser v. Commonwealth Nat'l Financial Corp.*, 120 F.R.D. 489, 492 & n.7 (M.D. Pa. 1988) (addressing the issue of whether plaintiffs may simultaneously bring a securities suit and a derivative suit and quoting *Dayco* for the proposition that "the case law is virtually unanimous that one counsel can represent a stockholder bringing *both* an individual *and* a derivative action").

In *Gonzalez v. Chilura*, the defendant argued that counsel should be disqualified under the Rules Regulating the Florida Bar because counsel was concurrently representing the plaintiff in a derivative action on behalf of the corporation while simultaneously pursuing litigation individually against the corporation. 892 So.2d 1075, 1077 (Fla. Dist. Ct. App. 2004).  The court adopted *Dayco's* reasoning to conclude that there was no conflict of interest and counsel should not be disqualified for representing a plaintiff in a derivative action and an individual action against the company where breach of fiduciary duties was the claim in both actions.  *Id.* at 1077-79.  In determining that it was appropriate for counsel to represent the plaintiff in both actions, the court noted that the proper focus should be on whether the counsel was "representing two clients whose interests conflict."  *Id.* at 1078-79.

Similar results have been reached in cases where counsel has previously represented plaintiffs in a securities case or a derivative case against the same company.  In *In re Oracle*

---

[38]  In *Dayco*, defendants moved to disqualify counsel for a conflict of interest because the counsel in the derivative action had also represented one of the defendant's former employees in a wrongful termination suit after the derivative claim was filed.  102 F.R.D. at 626.  The court rejected this argument, noting that defendants had failed to establish how counsel was rep-

*Corp. Sec. Litig.*, 2005 WL 1030215, at *1 (N.D. Cal. Apr. 22, 2005) (Ex. C), counsel, while working at a different law firm, had previously represented Oracle shareholders in a derivative lawsuit, and counsel's current law firm now sought to represent plaintiffs in a securities fraud case based on the same factual predicate as the derivative action.  2005 WL 1030215, at *1.  The court rejected the defendant's argument that counsel should be disqualified, recognizing that Oracle was the real plaintiff in the derivative suit, and finding that "the interests of the clients at issue are not adverse and that the presumption of conflict under [the California Rules of Professional Conduct] does not arise."  *Id.* (citing *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. at 630).

In *Dollens v. Zionts*, 2001 WL 1543524, at *3 (N.D. Ill. Dec. 4, 2001) (Ex. D), the court determined that no conflict of interest existed that would prohibit counsel from representing derivative shareholders when counsel had previously represented shareholders in a securities fraud claim against the same company. The court concluded there was no conflict under the local rules because the interests of the plaintiffs in the securities case and the interests of the plaintiffs in the derivative action were not "materially adverse" and the "plaintiffs in both [the securities case and the derivative case] need to prove the malfeasance of the *same individual defendants* based on the *same set of facts*."  *Id.*, at *3.  The court further noted that "[a]lthough recovery in the derivative suit could require individual directors to return money *to the corporation itself*, while recovery in the class action would require the individual defendants and the *corporation to compensate the plaintiffs directly*, the *source of the recovery is the same*, and the *shareholders benefit from either result*."  *Id.*[39]

       **b.**  **The theoretical conflict in the simultaneous prosecution of a derivative claim and a class action direct claim presents merely a "surface duality".**

Defendants argue that counsel's proposed representation of the Funds and the class

---

resenting clients with interests adverse to each other.  *Id.* at 630.

[39]     MAM/MK acknowledges that the sources of recovery in both the class and *Landers* actions are the same: the Non-Settling Defendants. MAM/MK Br. at 36. MAM/MK's reliance on *Krim v. PCOrder.com, Inc.*, 210 F.R.D. 581, 590-91 (W.D. Tex. 2002), is misplaced. In that case, the court was concerned with counsel's involvement in apparently competing class actions in other jurisdictions over which the court had no supervisory authority. It was further concerned with counsel's failures to disclose to their clients their involvement in other lawsuits and settlement offers and negotiations and to prepare their clients for their depositions.

Lead Plaintiffs violates Rule 1.7 of the Tennessee Rules of Professional Conduct. MAM/MK Br. at 22-25.[40] MAM/MK is wrong.

There is no *per se* rule precluding shareholders from simultaneously bringing both a derivative and a direct action. *Natomas Gardens Investment Group LLC v. Sinadinos*, 2009 WL 1363382, at *15 (E.D. Cal. May 12, 2009) (Ex. E). The role of plaintiffs as both "friend" and "enemy" to the corporation is a common "surface duality." *Dayco*, 102 F.R.D. at 630. "Shareholders may bring derivative and individual actions simultaneously." *Hall v. Tennessee Dressed Beef Co*., 957 S.W.2d 536, 540 (Tenn. 1997); Declaration of Mark L. Hayes ("Hayes Decl.") ¶ 28 ("Tennessee Supreme Court specifically rejected a *per se* rule that a shareholder cannot maintain both an individual claim against and a derivative claim on behalf of an entity," citing *Hall*).[41] *See also Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977) (it is permissible for plaintiff to assert both a derivative claim on behalf of and a class action against the same corporation).

Cases to the contrary relied upon by MAM/MK (MAM/MK Br. at 18-21) come almost entirely from the Second Circuit (none from the Sixth Circuit or Tennessee), which follows a *per se* rule. *See St. Clair Shores Gen. Emples. Ret. Sys. v. Eibeler*, 2006 WL 2849783, at *7  (S.D.N.Y. Oct. 4, 2006) ("Courts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest.")(Ex. AA); Moore Decl. ¶ 10 (ECF No. 320).

In cases where the derivative actions and the direct actions are "equally contingent upon the proof of the same nucleus of facts," courts outside the Second Circuit permit the

---

[40]    A motion to disqualify counsel is the proper method for a party to bring to the court's attention an alleged conflict of interest or breach of ethical duty by opposing counsel. *Howard,*, 2007 WL 4370584, at *5. "A federal district court's authority to disqualify attorneys derives from two sources. First, attorneys are governed by the local rules of the court in which they appear. The Western District of Tennessee, by Local Rule 83.6(e), has adopted the ABA's Code of Professional Responsibility as promulgated and amended by the Supreme Court of Tennessee.  Second, because motions to disqualify affect a party's substantive rights under *Erie,* such motions are decided by applying standards developed under federal law." *McKinney v. McMeans*, 147 F. Supp. 2d 898, 900 (W.D. Tenn. 2001).

[41]    Because Tennessee does not follow the *per se* rule, a principal tenet underlying Prof. Moore's opinions has no application in Tennessee. Hayes Decl. ¶ 28.a.

plaintiffs to bring both a direct action and a derivative action.[42] *Bertozzi v. King Louie Int'l, Inc.*, 420 F. Supp. 1166, 1180 (D.R.I. 1976). "Courts should look behind 'the surface duality of the two types of actions and allow them to proceed together unless an actual conflict emerges.'" *Field Turf Builders, LLC v. FieldTurf USA, Inc.*, 2010 WL 817628, at *3 (D. Or. Mar. 4, 2010) (Ex. F); *see also Keyser*, 120 F.R.D. at 492 (concluding that the defendants had not established that the plaintiffs were inadequate class representatives merely because they were also pursuing a derivative action).

Defendants argue that a "conflict of interest exists where *potentially* antagonistic claims compete for the same recovery." MAM/MK Br. at 18.[43] While, on its face, the "antagonism" between a direct and derivative action may appear to constitute a conflict, when reviewed more closely, it is no more than a "surface duality." *Bertozzi*, 420 F. Supp. at 1180 ("[T]he asserted 'antagonism' between the primary and derivative actions pressed herein is no more than a 'surface duality.' Since plaintiffs' success as to either action is equally contingent upon the proof of the same nucleus of facts, they and their counsel can be expected to attack all fronts with equal vigor."); *see also Miller v. Fisco*, 63 F.R.D. 132, 133-34 (E.D. Pa. 1974) (a conflict of interest did not exist on the mere basis of simultaneously bringing a derivative suit on behalf of the corporation and a shareholder suit against the corporation; court permitted the plaintiff to bring both suits); *see also In re TransOcean Tender Offer Secs. Litig.*, 455 F. Supp. 999, 1014 (N.D. Ill. 1978). In these cases, the courts have looked behind the "'surface duality' of these two types of actions and allow them to proceed to-

---

[42]     This Court has recognized the similarity of facts underlying *Landers* and the *Open-End Class Action*. *Landers* ECF No. 94 p. 3. On numerous occasions, Defendants have noted the extensive factual allegations common to both actions. *See, e.g.*, MAM/MK Br. at 33 (FADC's allegations "are essentially verbatim recitations of the [CAC]").

[43]     MAM/MK suggests the class and Funds are competing for the same recovery. MAM/MK Br. at 18, 36 n 22. MAM/MK is wrong. Given that RF's book value at December 31, 2010 was over $13 billion (Ex. 45), RMK has sufficient net worth for any likely judgment here. *See* FADC ¶ 872. More to the point, the FADC and AMOU provide that a class recovery is to be offset against the Funds' recovery to the extent necessary to avoid any double or windfall recovery by the former or current shareholders. FADC ¶ 876; AMOU § I.7. MAM/MK's suggested conflict does not exist. Lead Plaintiffs and their counsel have absolutely no concern "that the Funds could recover first against the non-settling Defendants, leaving them unable to pay a class action judgment." Because the proposed settlement allows the class to share in a *Landers* recovery pursuant to the § 11 judgment (and, if revived, a § 10(b) judgment), the issue is wholly precluded.

gether unless an actual conflict emerges." *Keyser*, 120 F.R.D. at 492.[44]

Defendants rely heavily on *Amchem Products, Inc. v. Windsor*, an inapposite Supreme Court decision that examined Rule 23 in the context of certifying a settlement class. 521 U.S. 591 (1997); *see* MAM/MK Br. at 16-18, 21. In *Amchem,* plaintiffs with widely diverse medical conditions allegedly caused by exposure to defendant's asbestos products sought to act on behalf of a single massive amorphous class that included persons seeking damages for possible future injuries. *Amchem*, 521 U.S. at 626. Class certification was denied because the case involved millions of individuals exposed to various asbestos products over many years with dozens of differing state laws where individualized issues included whether each individual suffered from one of numerous asbestos-related diseases. *Id.* at 627. Indeed, *Amchem* explicitly said securities cases are well suited for class certification. *Id.* at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

In *Kane Assoc. v. Clifford*, the court considered certifying a class in an action alleging violations of the 1934 Act. 80 F.R.D. 402 (E.D.N.Y. 1978). Defendants argued that the named plaintiffs would not fairly and adequately protect the interests of the class because their claims were not typical of other members of the proposed class since they sought to bring a derivative lawsuit on behalf of the defendant. *Id.* at 407. The court held that there was no conflict and indicated there was a common interest arising out of a "common nucleus of facts." *Id.* at 408. The court also held that "one must not let the 'surface duality' blind one to the possibility that 'the action has a basic goal which entails no real inconsis-

---

[44]     *See also Heilbrunn v. Hanover Equities Corp.*, 259 F. Supp. 936, 939 (S.D.N.Y. 1966) (rejecting the "surface duality" of making direct and derivative claims as creating a conflict if both actions have a "basic goal which entails no inconsistencies."). Even where courts have found a conflict in a class/derivative representation, the class representative in the suit may explain "why potential conflicts are not likely to materialize in their particular case." *Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 109 (S.D.N.Y. 1990) (concluding that class certification was inappropriate where the plaintiff was unable to explain why there would be no conflicts between the derivative claim and the class claim). Here, the Funds, having liquidated, now exist for the sole purpose of pursuing their claims for the benefit of its potential judgment creditors in the class action. FADC ¶ 567(c); Md. Code Ann. Corps. & Ass'ns § 3-408(b) (upon dissolution, the "corporation continues to exist for the purpose of paying, satisfying, and discharging any existing debts or obligations, collecting and distributing its assets, and doing all other acts required to liquidate and wind up its business and affairs").

tencies'" and allowed both the derivative and direct class actions to proceed. *Id.*.[45]

Similarly, in *First American Bank & Trust by Levitt v. Frogel*, the court concluded that the plaintiff could bring both securities class and derivative claims. 726 F. Supp. 1292, 1298 (S.D. Fla. 1989). The court noted that the "'theoretical distinction between individual and derivative stockholder suits . . . is just that, a theoretical one, not rooted in the realities of most individual and derivative suits, which usually are equally contingent upon the proof of the same nucleus of facts.'" *Id.* at 1297-98.

In concluding that a securities action and a derivative action may proceed simultaneously, courts have recognized that a potential for actual conflict between the two claims does exist, for instance when it comes time to seek recovery. But, instead of using this potential conflict a bar preventing plaintiffs from bringing both actions, these courts have noted that it is within the court's power to address the issue at a later stage of the litigation.[46] *See, e.g.*, *Bertozzi*, 420 F. Supp. at 1180.[47]

---

[45]     *Kane* involved a corporation that had liquidated, and the derivative action against its former directors and accountants "was considered a prerequisite for the success of a complementary class action," which was how it was distinguished by *Koenig v. Benson*, 117 F.R.D. 330, 334-35 (E.D.N.Y. 1987), a case that involved a "functioning enterprise" upon which MAM/MK relies. MAM/MK Br. at 24. For the same reasons, *Koenig* is distinguishable here.

[46]     No such conflict is apparent here. *See* fn. 43 above.

[47]     All of MAM/MK's cases (MAM/MK Br. at 18-21) are distinguishable on their facts. None involved a liquidating open-end mutual fund whose board has made a business judgment to pursue claims brought in a derivative action on the fund's behalf where the fund's sole purpose is to recover on those claims for the benefit of former/liquidating shareholders who have a judgment against the corporation and who must be treated equally with all other former and current shareholders in the distribution of the fund's remaining assets, eliminating any conflict between the two groups of shareholders. *Kamerman v. Steinberg*, 113 F.R.D. 511, 515-16 (S.D.N.Y. 1986) (conflict seen between class of former shareholders and current shareholders who would benefit from derivative action on behalf of an operating corporation); *Ruggiero v. Am. Bioculture, Inc.*, 56 F.R.D. 93, 95 (S.D.N.Y. 1972) (same). In five cases—*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2010 WL 5248815 (S.D.N.Y. Dec. 14, 2010)(Ex. R); *Priestly v. Comrie*, 2007 WL 4208592 (S.D.N.Y. Nov. 27, 2007)(Ex. S); *Shoregood Water Co. v. U.S. Bottling Co.*, 2009 WL 2461689 (D. Md. Aug. 10, 2010)(Ex. T); *Wall St. Sys. v. Lemence*, 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005)(Ex. FF); *Guenther v. Pac. Telecom, Inc.*, 123 F.R.D. 341, 345-46 (D. Or. 1988)—courts found derivative plaintiffs unfit because their personal non-class (except *Guenther*) claims against their closely held corporations (again, except *Guenther*) were deemed to supersede their interest in pursuing the derivative claims. In *Shoregood*, the court noted the absence of a "*per se* rule" barring a shareholder from bringing both derivative and direct claims and that, instead, courts "engage in a fact intensive analysis to determine whether a conflict of interest exists under the circumstances of a particular case." 2009 WL 2461689, at *4. Five of MAM/MK's cases are from the Second Circuit, which follows a *per se* rule. Here, a *Landers* recovery funds the Purchaser Settlement Class's judgment

38

The class's Lead Plaintiffs and the Funds agreed to settle the class's claims against the Funds with a judgment, thereby eliminating any theoretical conflict. The Funds in *Landers* will then pursue their claims directly herein arising out of what MAM/MK acknowledges is a "common nucleus of facts" in both *Landers* and the *Open-End Class Action*. The judgment in the *Open-End Class Action* will be satisfied solely out of a recovery by the Funds in *Landers*. Having secured a judgment in the *Open-End Class Action*, Plaintiffs' pursuit of the Funds' claims to fund that judgment "appear designed to do no more than to fill the coffers [] so that any class action recovery may be meaningful." *Heilbrunn*, 259 F. Supp. at 939.[48] The surface duality of the two types of actions allows them to proceed in these circumstances without any type of conflict because, in the event the judgment is entered as to the direct class claims against the Funds, the Funds will be re-aligned as plaintiffs in *Landers*. Ultimately, any monetary recovery in *Landers* will be distributed to the proposed Settlement Classes. Because the Funds will be pursuing their own direct claims, replacing Derivative Plaintiffs, whether Derivative Plaintiffs satisfy Rule 23.1's adequacy requirements as representatives of the Funds is wholly irrelevant.[49]

---

against the Funds, there is no competition between the class and the Funds (*see* fn. 43), and there is no economic antagonism between Derivative Plaintiffs and the Funds' other former and current shareholders because all of them must be treated fairly and equitably.

[48]   *See* Hayes Decl. ¶ 21.d.: The lack of opposing interests between Plaintiffs and the Funds can be demonstrated by the following: ". . . a judgment against the Funds in the Class Action Lawsuit would have been worthless without some source other than the Funds from which to seek satisfaction of the judgment. . . . The sole meaningful and real opportunity for recovery by the plaintiffs and the Funds arose from claims against defendants other than the Funds in both the Derivative Lawsuit and the Class Action Lawsuit (and the Derivative Lawsuit came into existence, at least in part, to obtain a recovery by the Funds for the benefit of the plaintiffs in the Class Action Lawsuit."

[49]   MAM/MK's reliance on *Strigliabotti v. Franklin Resources, Inc.*, 2006 WL 2792417 (N.D. Cal. Sept. 27, 2006)(Ex. GG), is likewise misplaced. The "derivative" action therein involved an ICA § 36(b) excessive fee claim (a statutory cause of action and not a typical derivative claim) against an operating fund, which was necessarily for the sole benefit of the fund's shareholders and did not result in any assets that could be distributed to either current or former shareholders. Here, the class includes all former and current shareholders who are entitled to share in a *Landers* recovery, while the class in *Strigliabotti* was composed of only those of the fund's shareholders residing in California who brought claims under California law. Also, the class action involved some but not all of the funds in the § 36(b) case and some but not all of the defendants in the § 36(b) case. Under these unique circumstances (which MK's expert euphemistically calls a "structural" difference between *Strigliabotti* and this case), the court refused to certify the proposed California class. *Strigliabotti* offers no guidance on whether the proposed Settlement Classes should be certified; it certainly does not stand for the general

### c.   In the absence of an identifiable impropriety having actually occurred, any potential conflict that may exist in the proposed joint representation does not require disqualification.

Motions to disqualify counsel are disfavored, as disqualification is a drastic measure that "courts should hesitate to impose except when absolutely necessary." *Valley-Vulcan Mold Co.,* 237 B.R. at 337; *McKinney*, 147 F. Supp. 2d at 900. A party seeking to disqualify opposing counsel has the burden of proving that counsel should be disqualified. *McKinney*, 147 F. Supp. 2d at 900. The Sixth Circuit has held that the burden is a heavy one that must meet a high standard of proof, and that a party's choice of counsel is entitled to substantial deference. *Valley-Vulcan Mold Co.,* 237 B.R. at 337. In order to find that a conflict of interest exists, Defendants have the burden of eliciting evidence that counsel's representation of the Funds is materially limited by its representation of the class. Defendants are required to satisfy a strict standard of proof, and close questions (if any) should be resolved in favor of the Funds' right to choose their own counsel. *See Manning,* 849 F.2d at 224; *Valley-Vulcan Mold Co.,* 237 B.R. at 337-38; *Gen. Cable Corp. v. Highlander,* 2005 WL 2875380, at *2 (S.D. Ohio Nov. 2, 2005) (Ex. G); *Gould, Inc.,* 738 F. Supp. at 1126; *Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp.,* 690 F. Supp. 607, 613 (S.D. Ohio 1988); *Warpar,* 606 F. Supp. at 858.

The Funds have selected Plaintiffs' counsel to represent them in *Landers*. That Opposing Defendants are displeased with this arrangement is of no moment. As courts in the Sixth Circuit have recognized, "a party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." *Banque Arabe,* 690 F. Supp. at 613 (citing *Melamed v. ITT Continental Baking Co.,* 592 F.2d 290, 293 (6th Cir. 1979)).

Because disqualification is an "extreme sanction," an attorney should be disqualified only if there is a "'reasonable possibility that some specifically identifiable impropriety' *actually occurred*, and where the public interest in requiring professional conduct by an attor-

---

proposition that Prof. Moore (Defendants' expert) seems to suggest that class and derivative actions involving  mutual funds are always in conflict and can never have a common plaintiff.

ney outweighs the competing interest of allowing a party to retain counsel of his choice."

*Howard,* 2007 WL 4370584, at *6  (quotation omitted). As one court has recognized,

> [T]he right of a party to select counsel of his choice [is] a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety *has occurred.* A disqualification order discredits the bar generally and the individual attorneys particularly. Thus, while there can be no hesitation to disqualify where impropriety *has occurred* . . . judges must exercise caution not to paint with a broad brush stroke under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect. The opposite effects are just as likely— encouragement of vexatious tactics and increased cynicism by the public.

*Guillen v. City of Chicago,* 956 F. Supp. 1416, 1421 (N.D. Ill. 1997) (emphasis in original).

Defendants do not come close to meeting this exacting burden. They fail to show that any improper conduct "actually occurred," much less conduct so extreme that the fairness of the proceedings would be undermined by the proposed joint representation. *See Howard,* 2007 WL 4370584, at *6. Thus, the mere possibility of a conflict does not preclude representation. Multiple representation is only impermissible in cases where there is an actual divergence of interest. Indeed, "[t]here is always the *potential* for conflict in multiple representation cases. Without more, however, that potential is insufficient to compel withdrawal or disqualification." *Clay v. Doherty*, 608 F. Supp. 295, 303 (N.D. Ill. 1985) (recognized by the Sixth Circuit in *Gordon v. Norman*, 788 F.2d 1194, 1198 (6th Cir. 1986)).

Defendants have utterly failed to show that Plaintiffs' counsel are materially limited in their representation of the Funds. Disqualification of counsel on the basis of a lawyer's duty owed to another client "may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur." *See Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 145-46 (4th Cir. 1992). Mere proclamations of counsel are simply insufficient to support a motion to disqualify, as these statements "do not amount to evidence of an actual conflict of interest." *In re Robinson,* 90 S.W.3d 921, 926 (Tex. Ct. App. 2002) (denying motion to disqualify because no proof of an actual conflict existed).

Here, both the MOU and AMOU create a congruity of interest between Plaintiffs and the Funds such that no adversity exists between Plaintiffs and the Funds and counsel's pro-

posed dual representation of both is not materially limited as to either. Hayes Decl. ¶¶ 15, 17, 18, 28.b. Moreover, any such conflict as may exist is waivable and has been waived. *Id.* at ¶¶ 15.d., 16.l., 24.g., 25.[50]

### d.   The Funds' and Lead Plaintiffs' Interests Are Not in Conflict.

In connection with their contemplated representation of the Funds, counsel conducted a thorough analysis of the facts and issues in both the derivative and class actions. In the exercise of counsel's professional judgment and discretion based on the foregoing and the arguments set forth herein, and as is apparent from the CAC and FADC, counsel concluded that the interests of the class and the Funds, upon the proposed resolution of the class's § 11 claim against the Funds (and the § 10(b) claim should it be revived), are fully aligned and that no actual conflict of interest exists as a result of the concurrent representation of the Funds and the class. Counsel also believe, for the reasons stated herein, that their representation of the class and the Funds will not adversely affect the relationship counsel has, or will have, with either the class or the Funds.

Such reasoned determinations are entitled to deference. *Clay*, 608 F. Supp. at 304 (Counsel's "statement that his joint representation of defendants entails no conflicts warranting withdrawal merits some deference. This Court will not *presume* reputable counsel have winked at or wholly ignored their responsibilities under the Code, at least when their representations are to the contrary. To give any lesser credence to counsel's representations, and to the bar's capacity for self-regulation, seems both cynical and unwise."); *see also Robin v. Katten Muchin*, 1986 WL 7079, at *10 (N.D. Ill. June 13, 1986) (same) (Ex. H); Hayes Decl. ¶ 26.

That the interests of the Funds and the class are entirely common and in no way adverse is obvious when one considers that the Funds have liquidated. This means that the Funds' recovery will go directly to their non-redeeming ("Liquidating Shareholders") and redeeming (former) shareholders, each of which groups is represented in both proposed Set-

---

[50]    Prof. Moore's contention that the Settlement Class cannot consent to a conflict is without basis. Moore's argument assumes that consent cannot be obtained from named plaintiffs that would be binding on unnamed class members to a conflict that may exist, but the TRPC does not support Moore's assumption. Hayes Decl. ¶ 27.

tlement Classes. The conflict charged by MAM/MK with respect to the settled §§ 11 and 10(b) claims is no more than a chimera. There is no conflict between redeeming and non-redeeming shareholders, either for purposes of distributing a recovery in *Landers* (*see* discussion above) or intra-class in the *Open-End Class Action* (*see* discussion below).

All "Liquidating Shareholders" are in one or the other or both of the proposed Settlement Classes: Those in the Purchaser Settlement Class will benefit from the § 11 judgment; those in the Redemption Settlement Class will benefit from a § 10(b) judgment should that claim be revived. Neither current nor former shareholders can get a windfall; they can only share in a *Landers* recovery to the extent of their losses and then only on an equal or *pro rata* basis. Current and former shareholders who have losses that are not recoverable via the § 11 judgment are in the Redemption Settlement Class and would benefit from a § 10(b) judgment.[51] Thus, all of the "Liquidating Shareholders" stand to benefit from one or both of the claims asserted by Lead Plaintiffs in the *Open-End Class Action* against the Funds, along with all of the other liquidating shareholders.

MAM/MK's argument (and its expert's opinions) assume, without authority or addressing the relevant facts, that the Funds have interests that are separate from their redeeming and non-redeeming shareholders taken together. Whatever the validity of such a conflict regarding an operating corporation, the Funds have liquidated and exist for the sole purpose of pursuing their claims against the Non-Settling Defendants arising from the same nucleus of facts as support the former and current shareholders' class claims against the same Defendants. The interests of the Funds and their former and current shareholders are identical when considered in accordance with the equitable principles applicable to the distribution of a Funds recovery. Hayes Decl. ¶¶ 15, 19, 21.d. Neither MAM/MK nor its expert has identified any differences between the Funds' interests and the interests of their former and current shareholders.[52]

---

[51]     MAM/MK incorrectly says Lead Plaintiffs and their counsel do not represent former shareholders who have losses attributable to purchases before the 1933 Act class period. MAM/MK Br. at 19 n 13. Lead Plaintiffs Austin and Jeanette Landers have such losses, and the Redemption Settlement Class includes such shareholders, all of whom are represented by Plaintiffs' counsel. ¶ 14

[52]     MAM/MK seems to see the Funds' interests as the same as those of the "Liquidating

43

**4. If the Partial Settlement and AMOU Are Approved, the § 11 Judgment Will Become Final, and There Will Be No Adversity between Plaintiffs and the Funds.**

In support of its conflict charge, MAM/MK focuses extensively on the contingency on the § 11 judgment pursuant to which the judgment would have become void in the event that at least two Non-Settling Defendants are successful in defeating the § 11 claim on certain grounds. That contingency has been removed. AMOU § I.5. Accordingly, in the event of final approval by the Purchaser Settlement Class and the Court, the judgment will become final.[53] If the § 10(b) claim should be revived, a judgment thereon will also become final. AMOU § I.13. The § 11 judgment (and § 10(b) judgment if the claim is revived) eliminate any conflict that might otherwise have existed. Hayes Decl. ¶¶ 15, 23, 24.c.

Lead Plaintiffs and the Funds have agreed to resolve by settlement any foreseeable possible conflicts that may arise during the course of counsel's representation of the Funds and the class in this litigation. Hayes Decl. ¶ 19. The AMOU eliminates any adversity that might otherwise have existed between Plaintiffs and the Funds. *Id.* ¶¶ 15.a., 18. The AMOU creates a congruity of interest between the Funds and Plaintiffs in securing as large a recovery as possible from the non-Funds defendants in the *Open-End Class Action* and *Landers*. *Id.* ¶¶ 15.a., 18-19, 28.b. Accordingly, upon approval of the AMOU, will there be no material limitation upon the representation of both Plaintiffs and the Funds by Plaintiffs' counsel.

---

Shareholders" and the thus-perceived common interests of the Funds and "Liquidating Shareholders" as conflicting with the class's interest. MAM/MK ignores the "Liquidating Shareholders" presence in the class and the prohibition against them getting a windfall. If a § 10(b) claim is revived, the Redemption Settlement Class, which includes the Purchaser Settlement Class and the "Liquidating [non-redeeming] Shareholders" (all "Liquidating Shareholders" are members of the Redemption Settlement Class, as are all Purchaser Settlement Class members), will account for all of the Funds' recovery.

[53] Pending cases against the Funds identified by MAM/MK do not pose a conflict with respect to the class's pursuit of § 11 claims against the Non-Settling Defendants. MAM/MK Br. at 27-28. *Daniels v. Morgan Asset Mgmt., Inc.*, No. 2:10-cv-02514-SHM-dkv (W.D. Tenn.), does not allege a § 11 claim and, in any event, has been consolidated with another action that does not assert claims against the Funds. 2:08-cv-02193 ECF No. 24. The other two cases—*Duncan v. Morgan Keegan & Co.*, No. 2:10-cv-02640-SHM-dkv (W.D. Tenn.), and *Francis v. Morgan Keegan & Co.*, No. 2:10-cv-026410-SHM-dkv—assert claims against the Funds under §§ 11 and 12(a)(2). Presumably plaintiffs in those actions will no longer see it a useful enterprise pursuing the § 11 claims because they will benefit from the § 11 judgment like all other Purchaser Settlement Class members; opting out of the settlement to pursue their claims against the Funds will gain them nothing because any judgment they obtain is just as dependent upon a recovery in *Landers* as is the § 11 judgment in the *Open-End Class Action*.

44

*Id.* ¶¶ 15.b., 24. Both Plaintiffs and the Funds stand to gain from Plaintiffs' counsel's dual representation, and neither Plaintiffs nor the Funds risk losing anything thereby. *Id.* ¶ 15.c. Given the equitable principles applicable to distributing the assets of a liquidated open-end fund, either the conflicts identified by MAM/MK do not exist or those theoretical conflicts have been eliminated by settlement. *Id.* ¶ 19.

Should any presently unforeseen circumstances arise whereby the Funds' and class's interests diverge, the Paul Hastings law firm will serve in a stand-by capacity to advise the New Board. AMOU § III.3. *See Dollens*, 2001 WL 1543524, at *3 (court noted that, to the extent that the interests of the shareholders in the securities and derivative actions diverged, separate counsel had been engaged to advise); *see also In re Packaged Ice Antitrust Litig. Indirect Purchaser Action*, 2011 WL 611894 (E.D. Mich. Feb. 11, 2011) (availability of independent counsel in the event of a conflict arising from representation of multiple defendants by same counsel sufficient to preclude counsel's disqualification)(Ex. BB).[54]

**C.    THERE ARE NO INTRA-CLASS CONFLICTS THAT WOULD PRECLUDE CERTIFICATION OF THE PROPOSED SETTLEMENT CLASSES; STF IS ADEQUATELY REPRESENTED.**

MAM/MK argues that Plaintiffs have not satisfied Federal Rule of Civil Procedure 23(a)(4) because conflicts exist between the "Liquidating" and redeeming shareholders, claiming their interests are directly at odds with respect to the recovery sought herein because the class certification sought by Plaintiffs will result in "groups of distinct shareholders competing for the same recovery."  MAM/MK Br. at 17-18. MAM/MK is wrong.

**1.    There Is No Conflict between Redeeming and "Liquidating" Shareholders or between the Purchaser and Redemption Settlement Classes.**

MAM/MK argues that an intra-class conflict exists between the two proposed settlement classes: (1) the "Purchaser Settlement Class," consisting of persons or entities who purchased shares of the Funds from December 6, 2004 through December 6, 2007; and (2) the "Redemption Settlement Class," consisting of persons who refrained from redeeming the Funds' shares during the period from March 1, 2007 through May 29, 2009.[55]  Both Settle-

---

[54]    Mutual funds' independent directors customarily have independent counsel—e.g., K & L Gates served as independent counsel for the Funds' former independent directors.

[55]    The § 10(b) class period has no ending date. ¶¶ 106, 107. The Amended Notice sets the ending date at May 29, 2009, the date shareholders approved the Funds' formal liquidation.

ment Classes include shareholders who purchased the Funds' shares during the relevant class period and held the Funds until their formal liquidation ("Liquidating Shareholders") and those shareholders who purchased the Funds' shares and sold prior to the formal liquidation ("Redeeming Shareholders"). Contrary to MAM/MK (Br. at 17), the Purchaser Settlement and Redemption Settlement Classes will not be "competing for the same recovery." If the § 10(b) claim is not revived, the Redemption Settlement Class is moot; if the § 10(b) claim is allowed, the Redemption Settlement Class will include all Purchaser Settlement Class members who sold their Fund shares at a loss after July 1, 2007.[56]

MAM/MK further contends that the Redeeming and "Liquidating Shareholders" are directly competing for the same recovery, thus creating an intra-class conflict.  MAM/MK Br. at 19. MAM/MK's argument betrays a fundamental misunderstanding of the two groups. Putting aside the critical fact that all Redeeming Shareholders after July 1, 2007 were also liquidating shareholders, the two groups substantially overlap: Both "Liquidating" and Redeeming Shareholders include those whose losses are all or partially recoverable via the Purchaser Settlement Class; virtually all of the losses of both "Liquidating" and Redeeming Shareholders are recoverable via the Redemption Settlement Class. Thus, both Purchaser and Redemption Settlement Classes include both "Liquidating" and Redeeming Shareholders. Because Redeeming and "Liquidating" Shareholders are to be treated equally in distributing a *Landers* recovery, and because the "Liquidating Shareholders" are not entitled to a windfall or to exclusively share in the recovery, there is no intra-class conflict between them. Lead Plaintiffs include both "Liquidating" and Redeeming Shareholders.[57]

---

[56]    If allowed, a § 10(b) holders claim's damages are likely to equal the Funds' damages and subsume the § 11 damages. AMOU  § I.12. A holders claim (¶¶ 106, 742-51) treats redeeming and non-redeeming shareholders equally

[57]    Even if there are competing interests, they are properly addressed in the distribution plan. In addressing a liquidating fund's investors' competing interests, the *Reserve* court said, ". . . certain investors objected to [the *pro rata* distribution] plan because it failed to take into account a variety of factors that allegedly distinguished their claims from others made against the estate, including level of risk, timing of investment, tracing analysis, or some other factors. . . . however, . . . any alternative to a *pro rata* distribution would reward certain investors over others based on arbitrary factors and would be difficult, time-consuming, and expensive. . . . when sitting in equity, it is important to remember that each investor's recovery comes at the expense of the others. . . . the circumstances surrounding the collapse of the [fund] make a *pro rata* distribution the fairest and most equitable approach." *Reserve*, 673 F. Supp. 2d at 198.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately pro-tect the interests of the class." A plaintiff is an adequate class representative as long as her claim is not in conflict with or antagonistic to those of other class members. *Brieger v. Tellabs, Inc*., 245 F.R.D. 345, 355 (N.D. Ill. 2007). Class certification should not be denied based on speculative or hypothetical intra-class conflicts. *Id.* Any doubt concerning the ade-quacy of a class representative should be resolved in favor of certification. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985). In *Weikel v. Tower Semiconductor Ltd*., the court held that the potential for intra-class conflict regarding whether a plaintiff held or sold shares during the proposed class period did not render the plaintiff inadequate when certify-ing a proposed class. 183 F.R.D. 377, 396 (D.N.J. 1998); *see also Langbecker v. Elec. Data Sys*., 476 F.3d 299, 315-16 (5th Cir. 2007) (intra-class apportionment issues may be ad-dressed with subclasses, if necessary, under Rule 23(a)(4)).

MAM/MK essentially asserts the seller-purchaser conflict theory. Under this theory, no stockholder would be able to represent other stockholders in a class action because indi-vidual shareholders will have bought and sold at different times, rendering it nearly impos-sible to determine the stock's true market price. *In re Nortel Networks Corp. ERISA Litig*., 2009 WL 3294827, at * 11 (W.D. Tenn. Sept. 2, 2009) (Ex. I). "[C]ourts have overwhelm-ingly rejected the seller-purchaser conflicts theory as precluding class certification." *Id.*

The vast majority of courts hold that a class should be certified despite potential in-tra-class conflicts over damages between investors selling at different times during a class period. *In re Daimler Chrysler AG Sec. Litig*., 216 F.R.D. 291, 297 (D. Del. 2003)(finding no intra-class conflict "between equity plaintiffs and selling plaintiffs and retention plain-tiffs and in/out plaintiffs" that would preclude class certification); *Freedman v. Louisiana-Pacific Corp*., 922 F. Supp. 377, 400-02 (D. Or. 1996) (indicating that the weight of prece-dent favors class certification); *Picard Chem., Inc. Profit Sharing v. Perrigo Co*., 1996 WL 739170, at *6 (W.D. Mich. Sept. 27, 1996) (finding that "the potential for intra-class con-flict is a peripheral concern to a class") (Ex. J); *In re Mut. Sav. Bank Secs. Litig*., 166 F.R.D. 377, 385 (E.D. Mich. 1996) (noting that to "deny sellers participation in the class…would be an overinclusive solution" to the potential intra-class conflict); *In re Intelligent Electron-*

47

*ics, Inc., Sec. Litig.*, 1996 WL 67622, at *5 (E.D. Pa. Feb. 13, 1996) (noting a reluctance to deny class certification on the basis of a theoretical intra-class conflict between sellers and holders of shares) (Ex. K).

The type of purported intra-class conflict Opposing Defendants assert between the Liquidating and Redeeming Shareholders is not the type of conflict that exists throughout the course of the litigation, but only in the determination of damages. *See In re Honeywell Int'l Inc., Sec. Litig.*, 211 F.R.D. 255, 262 (D.N.J. 2002); *In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680, 687 (N.D. Ga. 1999) (holding that the alleged intra-class conflicts "present no impediment to certification" when the alleged conflicts are primarily with respect to damage issues). Any possible conflicts in determining class members' damages can readily be addressed through the use of subclasses. *In re Cendant Corp. Litig.*, 264 F.3d 201, 243-44 (3d Cir. 2001) (recognizing that conflicts between retention and in/out plaintiffs can be addressed by the creation of subclasses if necessary). Moreover, even if the class may have different measures of damages, the variations are more appropriately addressed in the plan of allocation. *In re Ikon Office Solutions Inc. Sec. Litig.*, 194 F.R.D. 166, 176 (E.D. Pa. 2000) (noting plan of allocation addressed discrepancies in plaintiff's damages).

Defendants in *In re Intelligent Elec., Inc. Sec. Litig.,* unsuccessfully argued that an intra-class conflict existed between the proposed class members who sold all or some of their shares during the class period and those who continued to hold their shares during the litigation. 1996 WL 67622, at *5 (E.D. Pa. Feb. 13, 1996). In that case, plaintiffs sought a class defined as "all persons who purchased common stock and/or call options, or who sold put options." *Id.*, at *1. The court rejected the defendants' claims that a theoretical intra-class conflict prohibited certifying the class of shareholders. *Id.*, at *6.

Recognizing every possible intra-class conflict is unnecessary because to do so "would require the class to be fragmented based on minute individual differences divorced from any notion of antagonism, which would endanger the class action device and discourage settlements." *UAW v. General Motors Corp.*, 2006 WL 891151, at *11  (E.D. Mich. Mar. 31, 2006) (Ex. L).  "The interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objective and legal

or factual positions." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999). "Yet if every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair." *International Union v. General Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d. Cir. 2005) ("If subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.  Such a fragmented class might be unmanageable, certainly would reduce the economic incentives [of class litigation] and could be extremely difficult to settle.").

The named representative's interests are not in conflict with or antagonistic to the interests of class members simply because the settlement may impact individuals differently based on preexisting circumstances.  *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America  v. Ford Motor Co.*, 2006 WL 1984363, at *20 (E.D Mich. July 13, 2006) (Ex. M). *See also Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1350 (7th Cir. 1990) (differences among class members should be distinguished from "a concrete conflict of interest between 'representative' and other members of the class").  In *Insurance Brokerage Antitrust Litig.*, 2009 WL 411877, at *14 (D.N.J. Feb. 17, 2009) (Ex. N.),  the court held that the fact that the relief sought may vary among named representatives and members of the class does not show conflicting or antagonistic interests.

### 2.   STF's Investors Are Adequately Represented by Lead Plaintiffs.

Opposing Defendants also argue that STF is not represented among Lead Plaintiffs, and, therefore, Lead Plaintiffs lack standing to pursue § 11 claims on behalf of STF shareholders. MAM/MK Br. at 42. The argument is without merit.

Plaintiffs named in the CAC include the late Charles M. Crump and Diana W. Crump, who invested approximately $100,000 in STF during the Class Period. ¶ 13. Given the relatively modest amount of the investment and the limit on the number of investors in a lead plaintiffs group, the Crumps were not included. If deemed necessary, the estate of Charles Crump could be named a class representative.

STF was very similar to IBF. During the Class Period, 34% to 56% of STF's portfolio

consisted of fair valued and/or restricted securities. ¶¶ 183, 185. As of March 31 and June 30, 2007, securities comprising over half (54.5% and 52.6% respectively) of the investments held by STF were the same as securities held by the IBF, so that STF in significant part took on the risk profile of IBF. ¶ 186; *see Alabama Consent Order* ¶ 15. Accordingly, as an "IBF-lite" fund, STF was not so dissimilar from IBF that its shareholders cannot be represented by the  Lead Plaintiffs. The omissions and misrepresentations alleged by Lead Plaintiffs are largely the same for all three Funds. *See, e.g.,* ¶¶ 371-401. Also, many investors in STF also were investors in HIF or IBF. For example, the RMK Trust accounts were invested in all three Funds during the Class Period, holding from 10% to 76% of the three Funds. ¶ 56.[58]

Not every related fund needs separate representation. Named plaintiffs can represent the investors in a related fund in which the plaintiff did not invest where (1) the funds in which named plaintiffs have not invested were "substantially identical" to the funds in which the named plaintiffs had invested and (2) the named plaintiffs "alleged a single course of wrongful conduct with regard to each security." *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 19, 2000) (certifying two classes of shareholders where plaintiffs had invested in only one of the funds because plaintiffs' and class members' claims were derived from the same course of events, alleged similar misrepresentations and omissions, and were based on the same legal theories) (Ex. O); *accord Hicks v. Morgan Stanley & Co.*, 2003 WL 21672085, at *5  (S.D.N.Y. July 16, 2003) (concluding that plaintiff "can be appointed to represent a class that includes a claim for which he has not suffered an actual injury (but others in the class have) but where he undeniably suffered an injury and thus has standing with respect to a closely related claim")(Ex. CC).

Recently, in *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *3 (S.D.N.Y. Mar. 7, 2011) (Ex. P), the court rejected the argument that the plaintiffs could not represent purchasers of certain collateralized bonds because, although plaintiffs had purchased the Se-

---

[58]   RMK Trust accounts were the predominant investors in STF. During the Class Period, RMK Trust accounts constituted 76% of all purchases of STF shares. ¶ 56. As of November 1, 2006 and November 1, 2007, RMK Trust accounted for 91% and 96% of STF, respectively. ¶ 55. RB, which had a fiduciary responsibility for these accounts, obtained the appointment of a Trustee *ad Litem*, and the Trustee filed an action that has been consolidated in the *Open-End Class Action*. ECF No. 332.

ries 12 and 13 Bonds, no plaintiff had purchased the Series 12-1 Bond.  The court declined to deny class certification on these grounds, noting that courts have "repeatedly certified classes where the class representatives had not invested in all of the subject securities." *Id.* (quoting *Dreyfus Aggressive Growth Fund Litig.*, 2000 WL 1357509, at *3); *see also, In re Mutual Funds Inv. Litig.*, 519 F. Supp. 2d 580, 583, 586 (D. Md. 2007) (rejecting argument that class representative only had standing to assert claims against the specific mutual fund in which it had purchased shares, finding that "the focus should be upon whether a defendant's allegedly illegal conduct caused the same type of harm to the plaintiff and all the others on whose behalf he is asserting claims."); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 461-62 (D.N.J. 2005) (class action permissible against defendant funds in which no plaintiff owned shares); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (class certified despite plaintiff investing in only three of five limited partnerships).[59]

The allegations in the CAC clearly support the application of these cases. On the other hand, none of the cases cited by MAM/MK are relevant to a pair of open-end funds that shared to a significant extent the same management, the same shareholders, and the same investments, such as STF and IBF.

## D.     MAM/MK's OTHER CONTENTIONS LIKEWISE LACK MERIT.

### 1.     The AMOU Offers Shareholders a Substantial Benefit.

MAM/MK makes the astonishing statement that the MOU offers shareholders "no

---

[59]     MAM/MK's reliance on *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010) (MAM/MK Br. at 43), is misplaced but perhaps revealing. The court addressed plaintiffs' effort to represent investors in all of the mortgage-backed securities issued by Countrywide, including many in which plaintiffs did not invest. As the court took pains to note, "Each MBS is backed by a pool of unique loans, and the representations made in the prospectus supplements accompanying the issuance of those securities are themselves unique, focused on the specific loans underlying each offering and the specific underwriting standards and origination practices in effect at the time those specific loans were originated." *Id.* at 1163; *see also* ¶¶ 253-54 (notwithstanding the largely uniform risk disclosures alleged at ¶ 258). Presumably, MAM/MK would know this if they had these prospectuses. In contrast to the unique characteristics of MBS pools of mortgages, IBF and STF were very similar. *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010)(Ex. U), which involved four different MBS offerings in not all of which plaintiffs invested, is distinguishable for the same reason. *King County, Wash. v. IKB Deutsche Industriebank AG*, 2010 WL 2010943 (S.D.N.Y. May 18, 2010) (Ex. V), involved securities issued to investors in different countries.

discernible benefit." MAM/MK Br. at 34-36. Again, Plaintiffs are struck by the irony of MAM/MK expressing concern regarding whether the deal Plaintiffs made with the Funds benefits the shareholders MAM/MK deceived and whose savings it mismanaged. Contrary to MAM/MK's distorted interpretation, the Settlement Classes obtain a substantial benefit from the Partial Settlement and MOU/AMOU.

Under § 11, "[l]iability against an issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). MAM/MK's argument that Plaintiffs' statement about the benefit gained from a § 11 judgment against the Funds "makes no sense because if successful on the merits, the proposed Settlement Classes would recover their full damages on the § 11 claim from other Defendants" is perplexing. MAM/MK Br. at 35. The Purchaser Settlement Class most certainly fully intends to continue to pursue its claims against the Non-Settling Defendants. While perhaps Plaintiffs should be grateful to Opposing Defendants for suggesting that the elements of their § 11 claim against Defendants are identical to those against the Funds, Plaintiffs suspect these Defendants know otherwise. Unlike the claim against the Funds, the § 11 claim against the Non-Settling Defendants has been met with the due diligence defense allowed non-issuer defendants by § 11. *See e.g.*, ECF No. 298 p. 58. Plaintiffs believe that the Funds' claims against the Non-Settling Defendants offer certain advantages over their § 11 claim against the same Defendants and that the § 11 judgment allows them to obtain the benefit of the Funds' claims and access a recovery from the Non-Settling Defendants via those claims.[60]

Regarding MAM/MK's statement that a Funds recovery in *Landers* is "transferred to the Settlement Classes if it [sic] recovers in the *Open-End Class Action*" (MAM/MK Br. at

---

[60]    Also perplexing, in light of the Funds' "virtually absolute" liability under § 11 and MAM/MK's concession that the Funds must satisfy their liabilities before making any distribution to the "Liquidating Shareholders," is MAM/MK's statement that the "MOU affords Former Shareholders the possibility of recovery against the Funds, which they likely otherwise would not have." MAM/MK Br. at 35.This statement contradicts MAM/MK's argument that "the MOU provides Shareholders with no discernible benefit." Not only does MAM/MK seek to interfere with its adversaries' choice of counsel, it also wants to dictate their litigation strategy against the Non-Settling Defendants. Nothing in the MOU/AMOU suggests that Plaintiffs will not aggressively pursue their 1933 Act claims against the Non-Settling Defendants notwithstanding the § 11 judgment against the Funds.

35-36), under the AMOU, the § 11 judgment (and a § 10(b) judgment if relevant) enables the Settlement Classes to participate in a *Landers* recovery regardless of whether those classes obtain a recovery against the Non-Settling Defendants in the *Open-End Class Action*. While MAM/MK is correct that the ultimate source of recovery in both actions is the Non-Settling Defendants,[61] the two actions offer alternative ways to obtain that recovery.

### 2. The AMOU Adequately Provides for the Distribution of a *Landers* Recovery.

Contrary to MAM/MK (Br. at 36-38), the MOU fully explained how a *Landers* recovery was to be distributed, and the AMOU clarifies that it is to be done on a *pro rata* basis if the New Board so determines. AMOU §§ I.6-I.14. The AMOU recognizes the former and current shareholders who have claimed an interest in a *Landers* recovery, including the § 11 class and, if revived, the § 10(b) class, "Liquidating Shareholders," and former and current shareholders whose losses are not recoverable under the 1933 Act claims. *Id.* § I.6. Distribution of a recovery among these groups is subject to certain provisos. *Id.* at § I.6.a.

The allocation of a recovery among these groups will be based on the respective groups' damages to be calculated by counsel, with or without an expert, determined by the board and approved by this Court.[62] *Id.* §§ I.5.c., I.6.a., b., I.12. No group shall be allowed a windfall or double recovery. *Id.* §§ I.6-7. The AMOU addresses how §§ 10(b), 11 and 12(a)(2) recoveries from Non-Settling Defendants are to be treated for purposes of the allocation and to avoid double recovery. *Id.* §§ I.8, 12, 13. The AMOU provides that MKP is to be excluded. *Id.* § I.9. The AMOU addresses how, in the event thereof, separate settlements

---

[61]     This alone negates the conflict posited by MAM/MK. *See Dollens*, 2001 WL 1543524, at * 3 (no conflict between derivative and class actions because "the source of the recovery is the same, and the shareholders benefit from either result").

[62]     The Funds' estimated damages are based on the Funds' own reports (FADC ¶ 872), and § 11 damages are prescribed by statute. If the New Board is satisfied with these calculations, there may be no need for an expert. MAM/MK's statement that "the MOU lacks specific details regarding how damages will be calculated" and provides "that the parsing of any such recovery will be, in large measure, subject to Plaintiffs' Counsel's discretion" (MAM/MK Br. at 37) totally misrepresents the MOU. MAM/MK's attack on the MOU is predicated almost entirely upon its fallacious arguments of a conflict between Liquidating and Redeeming Shareholders. Here, the MOU/AMOU has a three-level safeguard system that renders non-existent the possibility of a material limitation on Plaintiffs' counsel's judgment in connection with the calculation of § 11 damages and the allocation of any *Landers* recovery. Hayes Decl. ¶¶ 15.b., 24.c., 24.j.

in *Landers* and the *Open-End Class Action* are to be treated. *Id.* § I.10. It also addresses how a settlement in the regulatory actions is to be treated in both actions. *Id.* § I.11.

The AMOU incorporates, as a guiding principle, the goal of "the largest possible recovery for the greatest number of persons who suffered losses" on their investments in the Funds. *Id.* § I.14. The "Liquidating Shareholders" and the former shareholders are to be treated fairly and equitably; unlike MAM/MK's past practices and its current sole focus on "Liquidating Shareholders," no group will be preferred over another. *Id.* Thus, the AMOU is totally consistent with the principles applicable to the liquidation of open-end funds.

### 3.   Counsel's "Representation" of the Funds; Purported Discovery Conflict.

MAM/MK argues that the MOU ignores "conflicts of interest raised by discovery" (MAM/MK Br. at 26), but Lead Plaintiffs will not pursue discovery from the Funds. The Funds and Lead Plaintiffs are on the same side and will cooperate in the joint pursuit of their common interests against the Non-Settling Defendants. The Funds' information will be used to pursue the Funds' claims based on the same wrongful conduct alleged in both the *Open-End Class Action* and *Landers* complaints. Hence, Lead Plaintiffs agree that their counsel can make available to the Funds all of counsel's work product, and the Funds will make available to Lead Plaintiffs their investigation and documents. Thus, Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 6 is inapplicable.[63] The rule is also inapplicable because the Funds, assuming approval, will be counsel's "client," and the witnesses counsel expects to "cross-examine" are the Funds' *former* directors and management, who are not counsel's "clients."

MAM/MK complains that Derivative Plaintiffs' counsel have been "representing" the Funds. MAM/MK Br. at 39-40. First, the relationship between the Funds and Derivative Plaintiffs' counsel is of no proper concern to the Opposing Defendants. Second, the so-called "representation" has involved reviewing documents in connection with whether to dismiss the claims in *Landers* against the Independent Director Defendants and pursuing

---

[63]     Tenn. Sup. Ct. R. 8, RPC 1.7 cmt. 6, cited by MAM/MK, recognizes that a "directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit." MAM/MK's argument is a "straw man." Hayes Decl. ¶ 22.

approval of the Partial Settlement and MOU.

MAM/MK complains that Plaintiffs' counsel have been given access to the Funds' documents but offers no authority that such cooperation is somehow improper. MAM/MK fails to explain why a defendant that decides to cooperate with a plaintiff cannot do so. Plaintiffs' counsel informed Defendants' counsel on December 10, 2010 that they had received documents from the Funds and informed the Court in the presence of all Defendants on December 16, 2010, of their intention to continue reviewing documents regarding the former independent directors' conduct. Ex. 49 pp. 1-2. No Defendant objected when the Court made clear that such inquiry was not subject to the continued PSLRA stay of discovery in the *Open-End Class Action*. *Id.* Not reviewing these documents would not only be contrary to the Court's direction but also a failure to diligently represent Plaintiffs' interests.

### 4. Statute of Limitations.

In response to Opposing Defendants' statute of repose argument (MAM/MK Br. at 41-42), this Court said resolution of this issue "should await factual development of the claims." *Regions Morgan Keegan Open-End Mutual Fund Litig.*, 743 F. Supp. 2d 744, 761 (W.D. Tenn. 2010). This is a settlement class, and the terms agreed upon are not binding on the Court in considering a subsequent motion to certify a class regarding the § 11 claim. Importantly, the argument relates solely to the Purchaser Settlement Class, not the Redemption Settlement Class or a § 10(b) claim.[64]

### E.   MODIFICATION OF COUNSEL'S FEE IN *LANDERS*.

Counsel and the Funds have agreed to modify the MOU regarding counsel's fees. The AMOU provides for the following fee structure: 20% of the first $250 million, 17.5% of the next $250 million, and 15% of any amount over $500 million.[65] Although the MOU

---

[64]     *Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 2011 WL 907121, at *3 (S.D.N.Y. Mar. 16, 2011)(Ex. W), relied upon by MAM/MK (MAM/MK Br. at 41), is inapposite. This case involved two mortgage-backed securities offerings, not open-end funds whose shares are continuously offered by the issuer—i.e., shares cannot be purchased in the secondary market but only from the issuer.

[65]     The discussion regarding counsel's fee in *Landers* at this point is irrelevant (as it presupposes a substantial recovery that is by no means assured and the MOU/AMOU itself provides for court approval). After all, Defendants say all of Plaintiffs' and the Funds' claims are worthless, and any percentage of zero is zero. The proposed fee may be compared to Defen-

already provided for court approval, the AMOU's fee provision now separately also provides for court approval.

MAM/MK attacks the proposed fee as "without any benefit having been conferred on the Funds or shareholders." MAM/MK Br. at 32. The attack is senseless. It is a *contingent* fee—no recovery, no fee.[66]

MAM/MK and RF/RB erroneously suggest that Plaintiffs' counsel are attempting to evade the PSLRA's reasonable fee requirement and will be incentivized by a "pre-approved contingency fee in *Landers*" to favor a "litigation strategy that would shift recovery to *Landers*, which would come at the expense of certain members of the proposed Settlement Classes." RF/RB Br. at 4-5; MAM/MK Br. at 32. First, the fee agreement between the Funds and their counsel is not subject to the PSLRA. Second, while the PSLRA requires that attorneys' fees must be reasonable, the AMOU explicitly requires this Court's approval of every aspect of implementation of the AMOU, including attorneys' fees. AMOU § IV.1.

Third, Plaintiffs' counsel are recording time and expenses separately as to *Landers* and the *Open-End Class Action*: time spent on work unique to each case is so recorded; time spent on work common to both cases is divided between the two cases. Thus, attorneys' fees are being appropriately allocated between the two cases, and there is no opportunity or incentive to shift work from one to the other case. Finally, while Plaintiffs find MAM/MK's concern for their welfare touching, how the two actions will be resolved is hardly within

---

dants' legal fees; MK alone paid $251 million in legal and other professional fees in 2008 and 2009, which must largely be attributable to this and related litigation. Ex. 46 p. 57. RF did not disclose this number in its 2010 Form 10-K report. Ex. 47 p. 63.

[66]    MAM/MK'S reliance on *In re Unumprovident Corp. Deriv. Litig.*, 2010 WL 289179 (E.D. Tenn. Jan. 20, 2010)(Ex. X), is misplaced. MAM/MK Br. at 32. In this derivative action, the benefited corporation, which *did not* engage derivative plaintiffs' counsel to pursue its claims, objected to the attorneys' fees provided in the settlement between derivative plaintiffs and defendants. Here, just like Defendants, the Funds have engaged counsel to represent them in this litigation, which will no longer be a derivative action upon the realignment of the Funds as plaintiffs. The *Unumprovident* court reduced the requested fee because the recovery was not due entirely to the work of plaintiffs' counsel and the lack of any contested motions regarding the merits of the case. *Id.* In *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983), cited by MAM/MK for the unremarkable proposition that a "district court may adjust an award up or down from the objective value of legal services rendered in order to reflect the economic benefit conferred upon the corporation or other shareholders," the district court had reduced an attorneys' fees award of $24,000 based on relevant factors to $10,000, because that was the monetary value of the benefit to the corporation.

Plaintiffs' or their counsel's control.

Regarding MAM/MK's baseless attack on the use of the reserve: First, contrary to MAM/MK's assertion (MAM/MK Br. at 33), the reserve is not to be used to pay fees to Derivative Plaintiffs' counsel.[67] Second, the Funds are no less free to use the reserve to prosecute their claims than are Defendants to use their assets to defend the claims.[68] MAM/MK has given the Court no reason to believe that the New Board, whose approval is required for expenses to be paid out of the reserve, is not capable of being prudent stewards of the reserve without the Court's or MAM/MK's interference any more than the Court or the Funds or Plaintiffs can interfere with how Defendants spend their assets herein. *See Braddock v. Zimmerman*, 906 A.2d 776, 785-86 (Del. 2006) (a company's board has plenary authority to respond to plaintiffs derivative lawsuit in the manner it deems appropriate, including by realigning the corporation as a party plaintiff); *see also In re Tower Air, Inc*., 416 F.3d 229, 238 (3d Cir. 2005) (applying the business judgment rule that presumes "directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company," citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) .

## III.    REPLY TO PwC

PwC has reargued its motion to dismiss the FADC, which was denied. Those arguments are irrelevant to the motions at hand. The only argument that PwC makes that was not previously raised in its motion to dismiss—Plaintiffs' derivative claims were extinguished when the Funds' shares were sold—is directly contrary to the record. PwC's opposition should be rejected.

---

[67]    MOU § III.3; AMOU § III.4. Strangely, while Opposing Defendants have attacked the Funds' use of their assets to pursue their claims against these Defendants, no Defendant has voiced a similar concern over the Funds' payment of the premium for directors' and officers' insurance for their officers and directors, notwithstanding that this insurance by now likely has been exhausted in *opposing* the Funds' claims. *See* Ex. 10 p. 3.

[68]    *Frazer v. Worldwide Energy Corp.*, 1991 WL 74041, at *4 (Del. Ch. May 6, 1991)(Ex. Y), relied upon by MAM/MK (Br. at 33), is inapposite. There, *class* counsel was precluded from using a settlement to fund continuing litigation against non-settling defendants, except they were allowed to use the settlement to pay out-of-pocket expenses (including the costs of the notice) incurred to date. Here, the Funds are using their own assets to fund their prosecution of their own claims.

**A.    THIS COURT HAS ALREADY RULED THAT PLAINTIFFS HAVE SATISFIED THE DEMAND REQUIREMENT.**

PwC's argument that the derivative claims must be dismissed because of a failure to make a demand was rejected by this Court's ruling that Plaintiffs' demand on the Funds' New Board satisfied Maryland's demand requirement. *In re Regions Morgan Keegan Secs., Derivative, & Erisa Litig.*, 742 F. Supp. 2d 917, 924-25 (W.D. Tenn. 2010).

**B.    PWC'S STATUTE OF LIMITATIONS DEFENSE HAS BEEN DENIED BY THE COURT.**

PwC claims that its previously argued statute of limitations defense is relevant to whether this Court should approve the pending motions. PwC Br. at 3-5; *see Landers* ECF Nos. 61-1, 82. PwC ignores this Court's prior rejection of its argument. *Regions Morgan Keegan Secs., Derivative, & Erisa Litig.*, 742 F. Supp. 2d 917.[69]

PwC offers no authority for its contention that once this action is realigned as a direct action by the Funds, neither the discovery rule nor the adverse domination doctrine is applicable. PwC Br. at 5.  PwC asserts the adverse domination doctrine has no application to suits authorized by the board, without addressing whether the rule is different when the board is different than the one that presided over the company's mismanagement. *Id.*

Presumably, the reason that PwC has not offered any legal authority for this contention is because there isn't any.  The discovery rule and the adverse domination doctrine protects both the shareholders and the corporation. In a claim against its former officers or directors, a corporation is not charged with the knowledge of its officers and directors where the officer's or director's interests are adverse to the corporation so that it is to his own advantage not to impart his knowledge to the corporation.  *Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982) (in an action by a corporation against its outside accountants, its embezzling director/officer's knowledge was not imputed to it); *Ray v. Tennessee Farmers Mut. Ins. Co.*, 2001 WL 91948, *3  (Tenn. Ct. App. Feb. 1, 2001) (same,

---

[69]    A full elucidation of why Derivative Plaintiffs' (and, therefore, the Funds') claims are *not* barred by the statue of limitations, including an explication of PwC's fraudulent concealment, the discovery rule applicable to Plaintiffs'/Funds' claims against PwC, and the applicability of the adverse domination doctrine to toll the statue of limitations during the period that the Defendant directors controlled the Funds, can be found in Plaintiffs' briefs in opposition to PwC's motion to dismiss. *Landers* ECF No. 78 at 6-10, ECF No. 87 at 5-14.

citing *Griffith*) (Ex. DD).[70]

Whether or not the adverse domination doctrine or the discovery rule tolls the statute of limitations *after* Plaintiffs filed their derivative lawsuit against PwC is irrelevant. At that point, as even PwC must admit, the statute of limitations was tolled by the filing of the initial derivative complaint in March 2008. Tenn. R. Civ. P. 3. The realignment of this action as a direct action by the Funds directed by an entirely new board does not change that fact; the plaintiffs remain the same. *See Chapman v. King*, 572 S.W.2d 925, 927-28 (Tenn. 1978) (the substitution of a party plaintiff can be made even though the statute of limitations would have barred a new suit by the substituted party); *In re Yes! Entertainment Corp*., 316 B.R. 141 (D.Del. 2004) (derivative plaintiff's action tolled statute of limitations; bankruptcy court should have allowed substitution of the Chapter 11 trustee and liquidating trust despite the fact that statute of limitations ran soon after derivative plaintiff filed his lawsuit); *see also* Fed. R. Civ. P. 17.01 (substitution of a real party in interest shall have the same effect as if the action had been commenced in the name of the real party in interest). PwC's claim that the statute of limitations on the Funds' claims against it began to run again as of the date that the New Board took over control of the Funds is without merit.

## C.   THE FUNDS' CLAIMS HAVE NOT BEEN EXTINGUISHED.

PwC next argues that Plaintiffs have alleged that the derivative claims were extinguished when the Funds shares were redeemed by the final liquidating distribution, leaving no derivative claims for the New Board to pursue. PwC Br. at 6-8. PwC concedes that Plaintiffs have alleged that, when the Funds were liquidated, the outstanding shares were not

---

[70]     *See also First Nat'l Bank v. Hawkins County*, 463 S.W.2d 946, 949-50 (Tenn. Ct. App. 1970) (corporation is not charged with notice of facts known to a director in a transaction between him and the corporation in which he is acting for himself and not for the corporation); *Julian v. American Nat'l Bank*, 106 S.W.2d 871, 887 (Tenn. Ct. App. 1937) (knowledge of bank officers is not imputable to the bank since it would have been against their interest to have disclosed it to the bank); 7 Tennessee Jurisprudence § 70 (There is an exception to the rule charging a corporation with constructive knowledge of all material facts of which its officer receives notice or acquires knowledge while acting in the course of his employment within the scope of authority where the agent's interests are adverse to the principal's, so that imparting his knowledge to the principal is not to his advantage.); *see also Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir. 1995) (once the wrongdoing management is replaced, the corporation is free to maximize the value of the corporation for the benefit of its investors; "the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated.").

cancelled in order to preserve Plaintiffs' standing to maintain this derivative action. FADC ¶ 11. The Court took note of this plan when it said the "liquidation did not cancel the outstanding shares of the Funds, leaving Plaintiffs' standing to pursue this derivative action unaffected." *Regions Morgan Keegan Secs., Derivative, & Erisa Litig.*, 742 F. Supp. 2d at 921.

PwC claims that the declaration of Vernon Vander Weide ("Vander Weide Declaration"), submitted in support of the Joint Motion, calls Derivative Plaintiffs' standing into question, citing paragraphs 16-17 and 24 of the Vander Weide Declaration. ECF No. 314 at 8. The only thing that those paragraphs set forth are the efforts Plaintiffs' counsel went to in order to ensure that their shares were not canceled.  At most what happened was a mischaracterization of the liquidating dividend by MAM/MK; because MAM/MK was no longer in control of the Funds at the time of that dividend, its mistake is not binding on the Funds.

In any case, the Plaintiffs' outstanding shares were not canceled and their claims were not extinguished.  Funds' Br. at 17-20. Also, upon realignment, the Funds' claims are no longer derivative, and Derivative Plaintiffs' standing is irrelevant, Thus, PwC's argument is utterly without merit.

## IV.     REPLY TO RF/RB

Since RF/RB joins in MAM/MK's brief, no additional response is necessary.

## V.      REPLY TO FORMER INDEPENDENT DIRECTORS

The Independent Director Defendants oppose only the MOU § II ¶¶ 2-4, 6-8. The Independent Director Defendants assert that these provisions impose impermissible conditions on the implementation of a decision that has already been made by the New Board. IDD Br. at 2. The Independent Director Defendants assert, incorrectly, that the New Board has already exercised its business judgment to dismiss them as defendants in *Landers*. As is plain from MOU § II, no such final decision has been made. *See* Funds' Br. at 24.

### A.     THE MOU *PROPOSES* TO DISMISS THE INDEPENDENT DIRECTOR DEFENDANTS.

MOU § II opens with this statement:  "The following is a *proposal* for the disposition of the breach of fiduciary duty claim in the *Landers Derivative Action* against the former independent directors." Contrary to the Independent Director Defendants, the New Board has made no final decision concerning their proposed dismissal. Again, contrary to the In-

dependent Director Defendants (IDD Br. at 2), the MOU (§ II.2, 4) does not state that Derivative Plaintiffs' counsel will review *only* "evidence relied upon by current board members." MOU § II.1 states that the New Board's counsel has reviewed with Derivative Plaintiffs' counsel certain "evidence that supports the New Board's decision to dismiss claims against the Funds' former independent directors," but § II.2 provides that "Derivative Plaintiffs' counsel shall be provided and shall review *additional materials* in the custody or possession of the Fund, [the Fund Advisor] or the Funds' counsel. . . ." The New Board has agreed to defer its final decision on the dismissal of the Independent Director Defendants until Derivative Plaintiffs' counsel completes their review. MOU § II.3; Funds' Br. at 24.

MOU § II.3 deals with the New Board's decision that any dismissal of the Independent Director Defendants would be without prejudice and would be conditioned upon the ability of the New Board to withdraw the dismissal in the event of the subsequent discovery of new evidence of reckless or other non-exculpated conduct. The "negotiation" language of MOU § II.3 to which the Independent Director Defendants refer (IDD Br. at 2) actually recognizes the fact that the New Board considers that any position that it has taken concerning their dismissal is preliminary in nature; that the terms of any dismissal would have to be negotiated with the Independent Director Defendants' counsel before being implemented; and that any such negotiation is to be "deferred until after Derivative Plaintiffs' counsel have been engaged to represent the Funds in the *Landers Derivative Action* and have had access to information as set out in II.2."

The Independent Director Defendants misstate the meaning of MOU § II.4. It does not address the question of whether to dismiss the Independent Director Defendants. Instead, § II.4 addresses "any decision to reinstate" the claim against them if the New Board should decide to dismiss the claim against them at this time.

The Funds' former auditor continues to assert that the FADC's allegations demonstrate the Funds' former directors had knowledge of the Funds' mismanagement. PwC Br. at 4. Given PwC's assertion and the presumed truth of these allegations, the New Board's decision to defer taking any action to dismiss the Independent Director Defendants before the completion of Derivative Plaintiffs counsel's investigation is clearly a sound exercise of the

New Board's business judgment for the benefit of the Funds.

**B.      MOU § II.6-8 REFLECTS THE NEW BOARD'S BUSINESS JUDGMENT.**

      The Independent Director Defendants fail to acknowledge or recognize that the "conditions" imposed by MOU § II.6-8 on any dismissal are being imposed by the New Board in the good faith exercise of its business judgment.  These conditions are not being imposed on the New Board, as suggested by the Independent Director Defendants. IDD Br. at 2.  MOU § II.6-7 embody the New Board's determination to protect the Fund's breach of fiduciary duty claims against the other Defendants in *Landers* by requiring that any dismissal of the Independent Director Defendants "is not to sever the joint and several liability of the individual and corporate defendants."  MOU § II.6.[71]

      Recognizing that Fed. R. Civ. P. 23.1 may not be applicable after the Funds are re-aligned as plaintiffs,[72] the AMOU amends MOU § II.8 to provide that any dismissal be pursuant to Rule 23.1(c) if applicable; if not applicable, the New Board at its option may determine to seek Court approval.[73] AMOU § II.7. Until this Court approves the AMOU, the Funds file an amended complaint, and the parties are realigned, *Landers* continues as a de-

---

[71]    The New Board, as the MOU/AMOU make clear, retains complete authority to decide whether to proceed with the dismissal of the Independent Director Defendants and on what terms. Contrary to their assertion, the MOU/AMOU does not limit the New Board's exercise of its fiduciary duty, and Derivative Plaintiffs' counsel have no more "veto power" over any decision to be made by the New Board in this regard than any litigation counsel have over their clients' decisions. Accordingly, the cases cited by the Independent Director Defendants for the propositions that a board cannot contract away its fiduciary obligations or that parties can settle without their counsel's consent are irrelevant. Indeed, the Independent Director Defendants are trying to prevent their successors (the New Board) from exercising their power to manage and direct the business of the Funds by fully evaluating a decision as to whether to dismiss the Independent Director Defendants. *See Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291-92 (Del. 1998) (court invalidated a provision in a shareholder plan adopted by a corporation's board designed to prevent a newly elected board from completely discharging its management duties to the corporation for six months).

[72]    *See Telxon Corp. v. Bogomolny*, 792 A.2d 964, 793-94 (Del. Ch. 2001) (Rule 23.1's "stringent requirements of factual particularity" in pleadings no longer applied once the re-alignment of the corporation as plaintiff occurred and the derivative action was converted to a direct action by the corporation).

[73]    *See Wolf v. Barkes*, 348 F.2d 994, 998 (2d Cir. 1965) (Judge Friendly noted that a "corporation and a defendant have much to gain by having their settlement approved by the court under [Rule 23.1's predecessor]" to protect against a later attack, while recognizing a settlement of a non-derivative claim by a former employee against the corporation can take "the out-of-court route, with all its hazards, if the corporation elects to pursue this.").

rivative action, and any dismissal is subject to Rule 23.1.

## CONCLUSION

For the reasons stated herein, Lead Plaintiffs' and the Funds' Joint Motion for Preliminary Approval of Partial Settlement and Approval of Notice to Settlement Class Members in the *Open-End Class Action* and Derivative Plaintiffs' and the Funds' Amended Joint Motion for Approval of Rule 23.1 Notice to Shareholders and for Final Approval of the Amended Memorandum of Understanding in *Landers* should be granted.

DATED:  June 24, 2011                     Respectfully submitted,


**APPERSON CRUMP PLC**
*/s/ Jerome A. Broadhurst*
Jerome A. Broadhurst, TN BPR 12529
Charles D. Reaves, TN BPR 22550
6070 Poplar Avenue, Sixth Floor
Memphis, TN 38119-3954
Tel : 901-260-5133
Fax : 901-435-5133
jbroadhurst@appersoncrump.com

**HEAD, SEIFERT & VANDER WEIDE, P.A.**
Vernon J. Vander Weide
Thomas V. Seifert
333 South Seventh Street, Suite 1140
Minneapolis, MN 55402-2422
Tel: 612-339-1601
Fax: 612-339-3372
vvanderweide@hsvwlaw.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
gmfishbein@locklaw.com

**ZIMMERMAN REED PLLP**
Carolyn G. Anderson
Patricia A. Bloodgood
Kirsten D. Hedberg

63

1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-341-0400
Fax: 612-341-0844
carolyn.anderson@zimmreed.com

**ATTORNEYS FOR LEAD AND DERIVA-
TIVE PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that this 24th day of June, 2011, a true and correct copy of the foregoing was served by electronic means via e-mail transmission (including the Court's ECF System) on the following:

Shepherd D. Tate, Esq.
Michael A. Brady, Esq.
**Bass, Berry, & Sims, PLC**
100 Peabody Place, Suite 900
Memphis, TN 38103-3672

Matthew M. Curley, Esq.
Michael L. Dagley, Esq.
Britt K. Latham
W. Brantley Phillips, Jr.
**Bass, Berry, & Sims, PLC**
150 Third Avenue South, Ste. 2800
Nashville, TN 37201

David B. Tulchin
David E. Swarts
**Sullivan & Cromwell, LLP**
125 Broad Street
New York, NY 10004

S. Lawrence Polk, Esq.
**Sutherland Asbill & Brennan LLP**
999 Peachtree Street, NE
Atlanta, GA 30309-3996


Jeffrey Maletta, Esq.
Nicole A. Baker
**K & L Gates**
1601 K Street NW
Washington, DC 20006


Emily Nicklin, Esq.
Timothy A. Duffy
Kristopher Ritter
**Kirkland & Ellis**
200 East Randolph Dr., Ste. 5400
Chicago, IL 60601-6636


Leo Maurice Bearman, Jr.
Eugene J. Podesta, Jr.
**Baker Donelson Bearman Caldwell**
**& Berkowitz**
165 Madison Avenue, Suite 2000
Memphis, TN 38103


Peter S. Fruin
Scott S. Brown, Esq.
**Maynard Cooper & Gale PC**
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203


Kevin C. Logue, Esq.
Michael M. Bruso, Esq.
**Paul, Hastings, Janofsky & Walker LLP**
75 East 55th Street
New York, NY 10022


R. Hal Meeks, Jr.
**Pursley Lowery Meeks LLP**
260 Peachtree Street, NW
Suite 2000
Atlanta, GA 30303

John McQuiston, II
**Evans Petree, PC**
1000 Ridgeway Loop Rd., Ste. 200
Memphis, TN 38120

<u>s/Jerome A. Broadhurst</u>
Jerome A. Broadhurst

66